Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
(208) 742-6789
ritchie@wrest.coop
casey@wrest.coop

Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 6th Avenue
New York, NY 10019
Tel: (212) 373-3000
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com
jorosz@paulweiss.com

Eric Alan Stone*
Ariella C. Barel*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
(332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com

***Attorneys for Plaintiffs***                    *Pro hac vice* application pending

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE; JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**, <br><br> Plaintiffs, <br><br> v. <br><br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

Plaintiffs Pam Poe, Penny Poe, Peter Poe, Jane Doe, Joan Doe, and John Doe, by and through their attorneys, bring this civil action for declaratory and injunctive relief and allege as follows:

## PRELIMINARY STATEMENT

The Idaho State Legislature has taken the extraordinary step of criminalizing the provision of well accepted medical care. Under House Bill 71, an Idaho doctor faces 10 years in prison for providing to a transgender minor healthcare that is supported by every major medical organization in the United States, including the American Academy of Pediatrics and the American Medical Association.

Specifically, HB 71 prohibits physicians from providing medications or surgical treatments to a minor "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." H.B. 71a (engrossed) § 1, 67th Leg., 1st Sess. (Idaho 2023) (the "Healthcare Ban," "Ban," or "H.B. 71") [appended at the end of the complaint]. In so doing, it prohibits gender-affirming medical care that is known to alleviate the debilitating distress of gender dysphoria and significantly improve patients' mental health, wellbeing and functioning.

The law is also an unprecedented intrusion into families' fundamental autonomy. HB 71 overrides medical decisions made by parents in consultation with their children's doctors, about the care of their children. Where the adolescent patient, their parents, and their doctor all agree that gender-affirming medical care is medically necessary, the law strips families of the ability to access such care. Simply put, the law preempts Idaho parents' (and doctors') judgment about what is best for their own children.

The Idaho legislature passed the Healthcare Ban, and on April 4, 2023, Governor Brad Little signed the bill into law in the name of "protecting minors."  But lawmakers and the Governor ignored the extensive legislative testimony that the Healthcare Ban *harms* children. Idaho doctors testified about the damage that the Healthcare Ban would cause by limiting physicians' ability to treat patients' gender dysphoria, as well as the unavoidable, grave harm to the health and wellbeing of transgender youth if they are prohibited from receiving necessary medical care, including debilitating anxiety, severe depression, self-harm, and suicide. Transgender people testified about their painful experiences of depression and social isolation before receiving treatment for their gender dysphoria, and the marked improvement that care brought to their lives.  Parents of transgender children begged legislators not to eliminate their ability to protect their children's health and wellbeing in Idaho.  The Lawmakers disregarded *all* of this testimony and passed a law that interferes with loving parents' decisions about what is best for their children, and criminalizes doctors who provide medically necessary care for their patients.

The Healthcare Ban is not only harmful to the wellbeing of the minors it purports to protect; it is also unconstitutional.  It violates the right to equal protection of transgender adolescents by singling out for prohibition only medical treatments that affirm a patient's gender if inconsistent with that patient's "biological sex"—thus prohibiting those treatments only for transgender minors.  The law is subject to heightened scrutiny because it classifies based on sex and because classifications based on transgender status are at least quasi-suspect.  The Healthcare Ban also infringes on a fundamental right—parents' right  to make decisions about their children's medical care.  Burdens on this right are subject to strict scrutiny.  But the Healthcare Ban does not satisfy any level of constitutional scrutiny because it serves no

governmental interest whatsoever, let alone a compelling one.  To the contrary, as major medical groups recognize, laws like the Healthcare Ban are a grave threat to the safety and wellbeing of minors.  The Healthcare Ban is not narrowly tailored to further any government interest and is sweeping in its application, without exception.  The Healthcare Ban is unconstitutional for the additional reason that it was based on negative attitudes toward and disapproval of transgender people.  This was reflected in statements made by legislators who supported the law, and the fact that the Healthcare Ban is just part of a broader campaign by the Idaho Legislature targeting transgender people of all ages.

Idaho's Healthcare Ban is unconstitutional.  Plaintiffs bring this action for declaratory and injunctive relief prohibiting its enforcement.  The law by its own terms will not take effect until January 2024.  Plaintiffs will work with Defendants' counsel and the Court to set a schedule for a preliminary injunction motion that will allow the Court to resolve that motion before the law would otherwise take effect.

## JURISDICTION AND VENUE

1.       This action arises in part under the United States Constitution and 42 U.S.C. § 1983.

2.       This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

3.       Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.

4.       Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because one or more Defendants resides in this district and because a substantial part of the events giving rise to the claims occurred in this district, where one or more Plaintiffs reside.

5.     Consistent with Dist. Idaho Loc. Civ. R. 3.1, venue is proper in the Southern Division because Plaintiffs and some Defendants legally reside in Ada County, Idaho, and because that is where the claim for relief arose.

**PARTIES**

**I.     The Minor Plaintiffs and Their Families**

     **A.     The Poe Family**

6.     Plaintiffs Pam Poe, Penny Poe, and Peter Poe live in Idaho.  Penny and Peter are the parents of Pam.  Pam is 15 years old and has lived in Idaho her whole life.  She is transgender and is currently receiving medically necessary care that would be prohibited by the Healthcare Ban.  The experience of Pam and her family is discussed in paragraphs 71-81 below.

     **B.     The Doe Family**

7.     Plaintiffs Jane Doe, Joan Doe, and John Doe live in Idaho.  Joan and John met while in college and are the parents of Jane.  Jane is 16 years old and has lived in Boise her whole life.  She is transgender and currently receiving medically necessary care that would be prohibited by the Healthcare Ban.  The experience of Jane and her family is discussed in paragraphs 82-94 below.

**II.     Defendants**

8.     Defendant Raúl Labrador is the Attorney General of the State of Idaho.  The Attorney General's offices are located at 700 W. Jefferson St. #210, Boise, Idaho.  The Healthcare Ban grants Defendant Labrador authority to bring legal action to enforce the Ban, and Defendant Labrador has publicly announced that he intends to enforce the Healthcare Ban.  Defendant Labrador is sued in his official capacity.

9.     Defendant Jan M. Bennetts is the Prosecuting Attorney for Ada County, Idaho, where Plaintiffs reside.  County Prosecutor Bennetts is named in her official capacity.  County

Prosecuting Attorneys bear "primary" responsibility for enforcing the Healthcare Ban in their respective Idaho counties. *See* Idaho Code § 31-2227.

10.     The individual members of the Idaho Code Commission (Defendants Jeremy Vaughn, Andrew Doman, and Jill Holinka) are sued in their official capacities and all reside in Idaho, and are designated in the caption by their titles pursuant to Federal Rule of Civil Procedure 17(d). The Code Commission's members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. The Idaho Code Commission is an office of the Secretary of State established by statute. *See* Idaho Code §§ 73-201–73-221. The Commission's purpose is to keep the Idaho Code up to date by indicating changes to laws, including constitutional changes, and providing annotations, and the Commission has all power and authority necessary to accomplish that purpose. It has the specific power to keep the Idaho Code up to date, to provide annotations to the Code, and to provide references in the Code to decisions of the federal courts. *Id.* § 73-205. These Defendants are referred to in this Complaint collectively as the "Idaho Code Commission Defendants."

### III.     FACTUAL BACKGROUND

#### A.     Gender Dysphoria and Its Treatment

##### 1.     Gender Identity

11.     "Gender identity" is a person's internal sense of belonging to a particular gender. Everyone has a gender identity, and it is a fundamental aspect of human development for all people. No medical intervention can alter a person's gender identity.

12.     People are "transgender" when their gender identity does not align with the sex assigned to them at birth. A transgender boy is a boy who was assigned a female sex at birth but

persistently, consistently, and insistently identifies as male.  A transgender girl is a girl who was assigned a male sex at birth but persistently, consistently, and insistently identifies as female.

13.     Some transgender people recognize this misalignment in early childhood.  For others, it can become apparent with the onset of puberty and the resulting physical changes, or later into adulthood.

14.     People are "cisgender" when their gender identity aligns with the sex assigned to them at birth.  A cisgender boy is a boy who was assigned male at birth and persistently, consistently, and insistently identifies as male.  A cisgender girl is a girl who was assigned female at birth  and persistently, consistently, and insistently identifies as female.

15.     Some people's gender identity does not strictly fall within the binary categories of male and female.  The term non-binary is commonly used to express such a gender identity.

16.     The terms "sex designated at birth" or "sex assigned at birth" are more accurate and precise than the term "biological sex" used in the Healthcare Ban, because "biological sex" falsely implies clear divisions between and uniformity within "sexes."  For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation (XY) but external genitalia typically designated female (a vulva rather than a penis).  For these reasons, the Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

### 2.     Gender Dysphoria

17.     The lack of alignment between one's gender identity and their sex assigned at birth can cause significant distress, particularly during the onset of puberty, when the development of secondary sex characteristics—e.g., breasts for those assigned female at birth or

facial hair for those assigned male at birth—can widen the gap between someone's gender identity and their physical appearance.

18.     "Gender dysphoria" is the clinical diagnosis for the significant distress that can result from the incongruity between one's gender identity and the sex they were designated at birth.  It is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) (DSM-5 released in 2013, and DSM-5-TR released in 2022).  To be clear, being transgender is not a medical or psychiatric condition to be cured—gender identity is innate, and no medical or psychological treatment can change it.  The American Psychiatric Association has thus explained that "[t]he presence of gender variance is not the pathology."  Instead, gender dysphoria results "from the distress caused by the body and mind not aligning and/or societal marginalization of gender-variant people."  Laws targeting transgender people, like the one at issue here, are an example of such marginalization.

19.     To be diagnosed with gender dysphoria, a patient's incongruence between their gender identity and the sex they were designated at birth must have persisted for at least six months and the dysphoria must be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.  Gender dysphoria is a serious medical condition.  If left untreated, gender dysphoria can result in debilitating anxiety, severe depression, self-harm, and suicide.  These symptoms will only worsen without treatment.

### 3.      Treatment of Gender Dysphoria

20.     The World Professional Association for Transgender Health ("WPATH") has published guidelines for the treatment of gender dysphoria since 1979, which are widely accepted in the medical community.  These guidelines are now known as the Standards of Care

for the Health of Transgender and Gender Diverse People ("WPATH Standards of Care").  The

current version is Standards of Care 8, published in 2022.  The recommendations in WPATH's

Standards of Care 8 are based on a systematic review of the evidence.

21.     The WPATH Standards of Care provide guidelines for multidisciplinary care of

transgender people and describe criteria for medical interventions to treat gender dysphoria,

including puberty-delaying medication, hormone treatment, and surgery when medically

indicated.  Every major medical organization in the United States recognizes that these

treatments are medically necessary for some patients in order to treat gender dysphoria, and that

they are safe and effective treatments.

22.     A clinical practice guideline from the Endocrine Society (the "Endocrine Society

Guideline") provides protocols for the treatment of gender dysphoria similar to those outlined in

the WPATH Standards of Care.

23.     Doctors in Idaho and throughout the country follow both the WPATH Standards

of Care and the Endocrine Society Guideline to treat people with gender dysphoria.

24.     Recommendations for treatment for gender dysphoria depend on whether

treatment is for a pre-pubertal child, an adolescent, or an adult.  In all cases, the precise treatment

recommended for gender dysphoria will depend upon each patient's individualized needs.

25.     Before puberty, gender-affirming care does not include any pharmaceutical or

surgical interventions.  Care for a pre-pubertal child often includes supporting the child's "social

transition," which refers to living consistently within one's persistently expressed gender identity

(e.g., adopting a new name and pronouns and dressing in a manner that aligns with one's gender

identity).

26.     Under the WPATH Standards of Care and the Endocrine Society Guideline, medical interventions may become medically necessary and appropriate after transgender youth reach puberty.  Both guidelines recommend that adolescent patients receive comprehensive psychological assessments prior to receiving any gender-affirming medical interventions.

27.     Both Pam Poe and Jane Doe are receiving treatment in accordance with the WPATH Standards of Care and the Endocrine Society Guideline.

### (a)     Puberty-Delaying Treatment

28.     For many transgender adolescents, going through puberty in accordance with the sex designated to them at birth can cause extreme distress.  For these adolescents, puberty-delaying medications—known as gonadotropin-releasing hormone ("GnRH") antagonists—can minimize and potentially prevent gender dysphoria, as well as the permanent, unwanted physical changes that undergoing endogenous puberty would cause.  Puberty-delaying treatment is safe and effective in treating gender dysphoria in adolescents.

29.     Under the Endocrine Society Guideline, transgender adolescents may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:

    - the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria;

    - gender dysphoria worsened with the onset of puberty;

    - if there are any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence), those have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and

    - the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment.

- The adolescent:

    - has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility; and

    - has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable law) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

    - agrees with the indication for GnRH agonist treatment;

    - has confirmed that puberty has started in the adolescent; and

    - has confirmed that there are no medical contraindications to GnRH agonist treatment.

30.     WPATH Standards of Care similarly provide that transgender adolescents may be eligible for puberty-delaying treatment if:

- A health care professional has confirmed that:

    - The experience of gender diversity/incongruence is marked and sustained over time;

    - That puberty has started;

    - The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed;

    - The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

- The adolescent:

    - Has been informed of possible reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

11

31.     Puberty-delaying treatment works by pausing a person's endogenous puberty. For transgender girls, this treatment pauses the physiological changes typical of male puberty and prevents the development of associated secondary sex characteristics like facial hair, a pronounced Adam's apple, deepening of the voice, and genital growth.  For transgender boys, puberty-delaying treatment pauses the development of breasts and menstruation.  The use of these interventions after the onset of puberty can eliminate or reduce the need for gender-affirming surgeries later in life, and prevent bodily changes that cannot be later corrected with surgical interventions.

32.     Puberty-delaying treatment is reversible.  If puberty-delaying treatment is stopped and no gender-affirming hormone therapy is provided, endogenous puberty resumes and patients undergo puberty in a timeline typical of their peers.

33.     Puberty-delaying treatment does not, by itself, impair future fertility.

34.     When puberty-delaying treatment is followed by gender-affirming hormone therapy, fertility may be affected.  For this reason, patients and their families are counseled about fertility preservation before even beginning puberty-delaying treatment.   Where preserving fertility is important to the family, treatment can be timed to minimize the risk.

35.     If gender-affirming hormone therapy is provided after puberty-delaying treatment, patients then undergo puberty consistent with their gender identity on a timeline typical of their peers.

### (b)     Gender-Affirming Hormone Therapy

36.     For some adolescents, it may be medically necessary and appropriate to treat their gender dysphoria with gender-affirming hormone therapy (testosterone for transgender boys, and testosterone suppression and estrogen for transgender girls).

37.     Under the Endocrine Society Guidelines, transgender adolescents may be eligible

for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

  - the persistence of gender dysphoria; and

  - if there are any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence), those have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment.

- The adolescent:

  - has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);

  - the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to the treatment; and

  - has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable laws) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

  - agrees with the indication for sex hormone treatment; and

  - has confirmed that there are no medical contraindications to sex hormone treatment.

38.     WPATH Standards of Care similarly provide that transgender adolescents may be

eligible for gender-affirming hormone therapy if:

- A health care professional has confirmed that:

  - The experience of gender diversity/incongruence is marked and sustained over time;

  - That puberty has started;

- The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed;

- The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

- The adolescent:

  - Has been informed of the possible reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

39.     Through decades of clinical experience and research, gender-affirming hormone therapy has been shown to be safe and effective at treating gender dysphoria in both adolescents and adults.

40.     Adverse side effects from clinically supervised gender-affirming hormone therapy are rare.

41.     While gender-affirming hormone therapy can in some circumstances affect fertility, many people receiving hormone therapy can conceive children while undergoing treatment or after discontinuing or pausing hormone therapy treatment (e.g., men who are transgender can give birth and women who are transgender can produce viable sperm).  Patients and their parents are counseled about fertility preservation, and treatment can be tailored to minimize the risk.

42.     Apart from the potential impact on fertility, gender-affirming hormone therapy poses the same (rare) potential risks as the use of these medications for non-transgender patients for other purposes.

### (c)     Gender-Affirming Surgical Interventions

43.     Under the WPATH Standards of Care, surgical interventions may become medically necessary and appropriate in certain cases for transgender adolescents.  Gender-

14

affirming surgeries are only considered for minors if they have longstanding gender dysphoria and are assessed to possess the emotional and cognitive maturity to understand the risks and benefits of the treatment.

44.     Plaintiffs are not aware of any doctors in Idaho who perform any gender-affirming surgeries on minors.  Elsewhere, gender-affirming surgeries for transgender minors are not common, and the vast majority are chest masculinization surgery for transgender boys.

## IV.     The  Enactment of the Healthcare Ban

45.     On March 29, 2023, the Idaho State Legislature passed the Healthcare Ban, prohibiting medical providers from providing medications or surgical treatments to minors "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."  The law defines "sex" based on "chromosomes and internal and external reproductive anatomy."  H.B. 71 § 1.  The specified treatments include surgeries which alter "the appearance of genitalia that differs from the child's biological sex" or "mastectom[ies]," in addition to "administering or supplying . . . [p]uberty blocking medication," "testosterone to a female," or "estrogen to a male."  *Id*.  A child is defined as anyone under eighteen years of age.  *Id*.

46.     Notably, the Healthcare Ban makes it a felony for Idaho doctors to provide these medical treatments to minors *only* when it is "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."  *Id.*  The same medical treatments are not banned under the law if they are provided for any other purposes, including to affirm a minor's gender if it is *consistent* with the child's "biological sex."

47.     The Healthcare Ban treats the provision of gender-affirming medical care to minors as a "crime[ ] of violence," *id.* § 2, and imposes on healthcare providers a penalty of

imprisonment up to 10 years.  *Id.* § 1.  This is equivalent to the prison penalty for involuntary or vehicular manslaughter.  H.B. 71 § 2; Idaho Code § 18-4007.  And the Ban authorizes up to $5,000 in fines in addition to imprisonment.

48.     There is no exception for treatment that is necessary for the adolescent's health—regardless of their prior course of treatment, individual circumstances, or degree of distress—if the treatment's purpose is to affirm a minor's gender "inconsistent with [their] biological sex." HB 71E1 § 1, 18-1506C(4)(a).

49.     The Ban expressly allows physicians to perform permanent and irreversible treatment on children with intersex conditions, including genital surgeries on newborns, despite their incapacity to assent, and despite the fact that major medical organizations like the American Academy of Family Physicians have expressly said that such surgeries on intersex infants and youth are harmful.  H.B. 71 § 1.

50.     In passing the law, the State Legislature ignored compelling testimony from the very people the Healthcare Ban affects.  Indeed, the House Judiciary, Rules & Administration committee took the extraordinary, unprecedented step of trying to prevent people under the age of 18 from testifying, and after public outcry, ultimately passed a modified rule which made it harder for people under the age of 18 to testify.  Further, the State Legislature ignored testimony from transgender adults who shared their painful experiences of depression and social isolation prior to receiving treatment for their gender dysphoria, and how their lives were improved by receiving care prohibited by the Healthcare Ban.

51.     The State Legislature ignored testimony from parents of transgender children who testified to the harm that the legislation would do to their children's wellbeing, and who begged legislators not to strip them of their ability to get their children lifesaving care in their home

state.  The mother of one 15-year-old transgender Idahoan testified that since her daughter began receiving hormone therapy, she witnessed her "go from being lost and unhappy to being comfortable and thriving."  She added, "We know that there are risks to hormone treatments, but we also know there are risks to delaying those treatments, such as depression, suicide, and more difficulty integrating into society as adults.  Parenting is hard, and there are so many risks that we have to weigh from whether or not we circumcise an infant to which vaccinations to give to when to let our teenagers date or letting them drive a car for the first time, all of which can have negative consequences.  As a parent, I'm appealing to you to not take away my right to work with professionals to parent my child and help her fulfill her potential to be a healthy, productive adult."  But in passing the Healthcare Ban, the legislature did just that.  The State Legislature also ignored testimony from Idaho doctors about the damage that the Healthcare Ban would cause by limiting physicians' options for treating gender dysphoria, as well as the unavoidable grave harm to the health and wellbeing of transgender youth if they are prohibited from receiving necessary medical care.

52.     The legislature's decision to supplant the medical judgment of Idaho physicians (and every major medical association in the nation) with its own, to subject Idaho physicians to draconian penalties for providing patients with well-accepted medical care, and to intrude on family medical decisions, is extraordinary.

53.     Statements from members of the State Legislature demonstrate disapproval of transgender people.  For example, the bill's first-listed sponsor, Representative Bruce Skaug, and co-sponsor Senator Ben Adams equated the provision of well-accepted treatment for gender dysphoria in adolescents with "genital mutilation" and the "wicked past [of] sterilizations."  On her official Twitter account, Senator Tammy Nichols, another cosponsor, referred to identifying

as LGBTQ as an "epidemic" of which "States need to help stop the spread," and called gender-affirming medical care "Frankenstein Practices."  On his official Twitter account, Senator Scott Herndon dismissed gender dysphoria as "a social mania that needs to stop."

54.     This law is just the latest of a wave of recently proposed bills and laws in Idaho targeting transgender people for marginalization.

55.     During the 2020 legislative session, the State Legislature passed, and the Governor signed into law, bills prohibiting transgender people from changing the gender recorded on their birth certificate, H.B. 509, 65th Leg., 2nd Sess.  (Idaho 2020), and prohibiting transgender women and girls from participating in women's sports, regardless of the circumstances, H.B. 500, 65th Leg., 2nd Sess. (Idaho 2020).

56.     On March 14, 2023, the State Legislature introduced H.B. 314, which would ban schools or public libraries from making material deemed inappropriate available, and which was widely understood to target books specifically discussing sexual orientation or gender identity. H.B. 314, 67th Leg., 1st Sess. (Idaho 2023).  The bill passed both houses before being vetoed by Governor Little.

57.     And just two weeks prior to signing the Healthcare Ban, Governor Little signed SB 1100 into law, which will ban transgender public-school students from using the bathroom that aligns with their gender identity.  S.B. 1100, 67th Leg., 1st Sess. (Idaho 2023).

58.     Viewed in the proper context, it is clear that the State Legislature's passage of the Healthcare Ban had nothing to do with protecting children and everything to do with expressing disapproval of, and stigmatizing, transgender people.

**V.     The Criminalized Treatment Is Permitted for Treating Other Conditions**

59.     While the Healthcare Ban prohibits the use of well-established treatments for gender dysphoria in transgender adolescents—including puberty-delaying drugs, testosterone

therapy, estrogen therapy, testosterone suppressants, and mastectomy—it permits the use of those very medications and surgeries for minors for other purposes, including to affirm the gender of cisgender minors.

60.     For example, cisgender boys may be prescribed testosterone if they have not begun puberty by 14 years of age.  For most of these patients, puberty would eventually initiate naturally even without testosterone.  But testosterone is prescribed to avoid some of the social stigma that can come from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as one's peers. Similarly, cisgender boys who are forecasted to have a post-pubertal height of 5'4" or shorter— which is roughly the average height of an American woman—may be treated with testosterone for "short stature."  Idaho doctors are thus free to prescribe testosterone to cisgender boys, including to affirm cisgender boys' gender identity.  But under the Healthcare Ban, they would face imprisonment for prescribing exactly the same medication to affirm a transgender boy's gender identity.

61.     Likewise, cisgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants.  The same treatments that are permitted for cisgender minors—often to affirm their gender—are banned if provided to transgender minors to affirm *their* gender.

62.     Puberty delaying medication is widely used to treat "central precocious puberty"—the premature initiation of puberty (before eight years of age in people assigned female at birth and before nine years of age in people assigned male).  Central precocious puberty can lead to anxiety, depression, and lower academic achievement, as well as impairment of final adult height.  Under the Healthcare Ban, doctors in Idaho can prescribe puberty-delaying

medications to treat children with precocious puberty, but cannot prescribe those very same medication to treat transgender adolescents with gender dysphoria..

63.     Cisgender girls may be treated with estrogen for a variety of conditions, including primary ovarian insufficiency, hypogonadotropic hypogonadism (lack of hormone production due to a problem with the pituitary gland or hypothalamus), and Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop).  Under the Healthcare Ban, doctors in Idaho can prescribe estrogen to treat cisgender girls with any of these conditions but cannot prescribe the same medication to treat transgender adolescents with gender dysphoria.

64.     The Healthcare Ban also criminalizes providing mastectomy to transgender young men to treat gender dysphoria because it is "inconsistent" with their "biological sex," but cisgender boys are permitted to undergo mastectomy to ensure their bodies track their own perception of their gender.  Cisgender adolescent boys can have surgery to treat gynecomastia—the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue, in individuals assigned male at birth.  These surgeries are commonly performed to reduce psychosocial distress, often related to the incongruence with one's gender.  Therefore, a transgender boy cannot receive chest-masculinizing surgery to affirm his gender identity, but a cisgender boy can.

## VI.    The Healthcare Ban Will Cause Severe Harm to Transgender Adolescents

65.     Withholding gender-affirming medical care from adolescents with gender dysphoria when it is medically indicated puts them at risk of extreme harm to their health and wellbeing.

66.     Adolescents with untreated gender dysphoria often suffer significant distress. Many are on medications for depression and anxiety.  Self-harm and suicidal ideation are exceedingly common.  Indeed, suicidality among transgender young people is a crisis.  One

survey found that more than half of transgender youth had seriously contemplated suicide. Studies have found that as many as 40% of transgender people have attempted suicide at some point in their lives.

67.     When adolescents are able to access puberty-delaying treatment and hormone therapy—which prevent them from going through endogenous puberty and allow them to go through puberty consistent with their gender identity—their distress recedes and their mental health improves.  Both clinical experience and medical studies confirm that for many young people, this treatment is transformative, helping them go from suffering to thriving.

68.     If a healthcare provider is forced to deny or discontinue puberty-delaying treatment or hormone therapy due to the Healthcare Ban, it will cause patients to undergo their endogenous puberty.  For a girl who is transgender, this could mean that she would experience genital growth, body hair growth, deepening of her voice, and development of a more pronounced Adam's apple.  For a boy who is transgender, this could mean the initiation or resumption of a menstrual cycle and breast growth.  This can result in extreme distress for adolescents with gender dysphoria.  Additionally, the effects of undergoing one's endogenous puberty may not be reversible even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in patients who have this treatment withheld or cut off.

69.     And for patients who have been relying on puberty-delaying treatment and/or hormone therapy to alleviate their gender dysphoria, being forced to stop treatment and experience the changes of endogenous puberty can be extremely distressing and have significant impact on mental health.  Moreover, abruptly withdrawing hormone therapy can pose additional risks to patients.  The body takes about six weeks to ramp up endogenous hormones, so a patient

will be without sufficient circulating hormones at all if their treatment is abruptly halted.  This can result in depressed mood as well as debilitating hot flashes and headaches.  For patients on spironolactone—a testosterone suppressant—abruptly terminating treatment can cause a patient's blood pressure to spike, increasing the risk of heart attack or stroke even for young patients.

70.    Gender-affirming medical care is lifesaving treatment for many adolescents experiencing gender dysphoria.  The major medical and mental health associations in the United States all support the provision of such care as safe and effective treatment.  These associations include the American Academy of Pediatrics, American Medical Association, the Endocrine Society, the Pediatric Endocrine Society, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American Nurses Association, the National Association of Social Workers, and WPATH.

## VII.    The Impact of the Healthcare Ban on Plaintiffs

### (a)    The Poe Family

71.    Pam Poe is a fifteen-year-old ninth grader and a lifelong Idaho resident.  She has a part-time job and loves engineering, programming, and math.  Pam lives with her parents and her seventeen-year old sister.  Her oldest sister is nineteen years old and has moved out of the family home.

72.    Pam is transgender.  She is a girl with a female gender identity, but when she was born, she was designated as male.

73.    Pam began to realize she was transgender around March 2021, while she was in seventh grade.

74.     In August of 2021, Pam worked up the courage to tell her mom that she was transgender.  Her mother reacted with acceptance and support, hugging her, thanking Pam for introducing herself, and declaring, "I love you."

75.     Pam began experimenting with traditionally feminine clothing and makeup throughout eighth grade.  She began living socially as a girl when she started high school in August 2022.

76.     In late-2021, Pam was struggling with depression, anxiety, and self-harm, and she began seeing a counselor weekly.  When counseling did not alleviate her negative feelings, Pam asked her mom to admit her to a residential treatment facility in late February 2022.  She spent one week there, and she was diagnosed with gender dysphoria while in treatment.

77.     Two months after leaving the treatment center, Pam began seeing a doctor who specializes in treating gender dysphoria.  Pam's mom observed that when she left her first appointment having learned that puberty blockers were a possibility for her, Pam had a huge smile and seemed like the happiest she had been in almost a year.

78.     After careful evaluation, thorough discussion of risks and benefits, and bloodwork, in May 2022, when Pam Poe was 14, her  doctor prescribed her puberty blockers. The medication had a near-immediate positive effect on Pam.  By pausing the physical changes that were causing her depression and anxiety, her mental health greatly improved.

79.     In April 2023, when Pam was 15 years old, Pam's family and her doctor had a conversation about the possibility of Pam beginning hormone treatment.  The doctor performed bloodwork, discussed the risks and benefits as well as options for fertility preservation, and confirmed Pam's ongoing therapy and mental health support.  Pam and her parents, in close consultation with her doctor, decided that this was the appropriate treatment plan for Pam.  The

family signed a consent form, and the doctor wrote Pam a prescription for hormone therapy. Pam continues to be on hormone therapy.

80.    Pam and her family are afraid of the impact the Healthcare Ban will have on them if it goes into effect.  Pam is scared that losing access to her medication will mean that her body will undergo unwanted, permanent changes that are inconsistent with her gender identity.  Pam and her parents worry about the severe stress and anxiety associated with Pam's gender dysphoria returning if she is forced to stop gender-affirming medical care.

81.    Pam has lived in her Idaho neighborhood for her entire life, and Pam's school, friends, and family are all there, as well as her parents' jobs.  However, Pam's parents are not willing to sacrifice her health and wellbeing to stay if that means she can no longer receive the medical care she needs in Idaho.  If the Healthcare Ban goes into effect, the Poe family is considering upending their settled lives to move out of Idaho.

**(b)    The Doe Family**

82.    Jane Doe is a 16-year-old rising senior in high school and has lived in Idaho her entire life.  When she is not at school, she likes to play video games, listen to music, and go on walks.  She is interested in computer science and coding, and she plans to go to college after she graduates high school.

83.    Jane is transgender.  She is a girl with a female gender identity, but when she was born, she was designated as male.

84.    Growing up, Jane always felt more like a girl than a boy.  Socially, she was a lot more comfortable playing with and associating with the girls.  When teams were divided into girls and boys at recess, she felt like she belonged with the girls' team, and the girls would

usually allow her to join.  When playing "make believe," she was always a girl character. Beginning at a young age, Jane expressed a desire to be a mom.

85.     Before she came out as transgender, Jane's gender dysphoria negatively impacted her mental health.  In 2018, as she started puberty, Jane hated the way her body was changing, and her mental health worsened.  She particularly despised having her picture taken, and there are few photos of her from this time.  Jane did not like *who she was* when she had to move through the world as a boy.  She sometimes wished she did not even exist.  She frequently secluded herself because she did not think she could be herself in social settings.  Her schoolwork suffered as well.

86.     Jane came out to her friends in Summer 2020, and the response was overwhelmingly positive.  Her friends' support of her true self made Jane feel the happiest she had in years.

87.     Jane made the brave decision to tell her parents that she was transgender in Fall 2020.  Her parents were not surprised and were supportive and loving.  They knew that their daughter was the same beautiful soul she had always been.

88.     Around October, 2020, Jane began socially transitioning, dressing, wearing makeup, and using her new name consistent with her female gender identity.

89.      In mid-October 2020, Jane saw her pediatrician, who referred her to a doctor who specializes in treating gender dysphoria.  The next month, she met with that doctor and was diagnosed with gender dysphoria.  Jane and her parents had multiple conversations with the doctor over time, in which the doctor provided them with information about gender dysphoria, counseled them on the risks and benefits of gender-affirming medical care, counseled them on fertility preservation, and recommended that Jane see a therapist.

90.     After several months of therapy, additional visits with her doctor, and lab work, Jane Doe's doctor prescribed Jane a puberty blocker in January 2021.  Knowing that the pubertal changes to her body were not going to get worse was a huge relief to Jane.

91.     The family began to discuss amongst themselves the possibility of Jane starting on hormone therapy and later discussed this with the doctor.  The doctor advised them again on the risks and benefits, further counseled them on fertility preservation, and conducted additional lab work.   Jane had been consistent in her gender identity, and ultimately the doctor recommended hormone therapy to address her gender dysphoria.  In April 2021, at age fourteen, Jane started hormone therapy at a very low dose.  Her doctor has been monitoring Jane and her bloodwork since then, adjusting her medications as needed.

92.     Since receiving gender-affirming medical care, Jane's mental health has significantly improved.  She no longer has days where her gender dysphoria is so severe that she feels she cannot get out of bed.  She experiences happiness when she looks in the mirror.  She feels able to go out into the world.  Her grades in school have improved as well.  When Jane was preparing to go to the prom and looked at herself in the mirror, Jane's mom could see the glow of Jane's authentic gender expression.

93.     The ongoing debate over HB 71 and other anti-transgender bills has been a heavy cloud over Jane and has negatively impacted her life.  She feels like her home state does not recognize her humanity and is telling her she has to leave.  The 2023 legislative session brought back depressive and harmful thoughts for Jane that she had not had since transitioning.  The looming law has affected her school life and her grades.  She recently had to take several days off of school because she was too depressed to go.  When the bill passed, Jane wept in the hallway at school, and her parents had to come and take her home.

94.     Jane's family is seriously considering leaving Idaho for Jane's senior year of high school to ensure that she can continue to access the medical care that has helped her so significantly.  The Doe family loves living in Idaho; their community is in Idaho, and their friends are in Idaho.  They do not want to leave, but they might have to in order to care for their child.

## CAUSES OF ACTION

### COUNT ONE

**THE HEALTH CARE BAN VIOLATES THE
FOURTEENTH AMENDMENT'S GUARANTEE OF
EQUAL PROTECTION UNDER THE LAW
(MINOR PLAINTIFFS)**

95.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

96.     Jane Doe and Pam Poe (the "Minor Plaintiffs") bring this Count against Defendant Labrador and Defendant Jan M. Bennetts, in their official capacities.

97.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, protects individuals and groups from discrimination by the government.

98.     The Healthcare Ban prohibits the provision of various medical treatments to minors only when the care is provided "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."  HB 71E1 § 1, 18-1506C(3).  Whether or not a person can receive certain medical treatments turns on their sex and on whether the care is consistent with stereotypes associated with a person's sex assigned at birth.

99.     The Healthcare Ban therefore discriminates against transgender youth, including the Minor Plaintiffs, based on their transgender status and sex, including their failure to conform to stereotypes associated with their sex assigned at birth.

100.    In addition to facially discriminating based on sex and transgender status, the Ban was also passed because of its deleterious effects on transgender people, not in spite of them.

101.    Discrimination based on transgender status and sex is subject to heightened scrutiny under the Equal Protection Clause and is therefore presumptively unconstitutional, placing a demanding burden of justification upon the State to provide at least an exceedingly persuasive justification for the differential treatment.

102.    Transgender people have obvious, immutable, and distinguishing characteristics that define that class as a discrete group.  These characteristics bear no relation to transgender people's abilities to perform in, or contribute to, society.

103.    Transgender people have historically been subject to discrimination, and remain a very small minority of the American population that lacks political power.

104.    Gender identity is a core, defining trait, that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

105.    Under the Healthcare Ban, the same medical treatments that are prohibited when provided to transgender adolescents to help align their bodies with their gender identity may be provided to cisgender adolescents to help align their bodies with their gender identity, or for any other purpose.

106.     Under the Healthcare Ban, the Doctor Plaintiffs are prohibited from providing certain medically necessary care to their adolescent transgender patients that they are permitted to provide to their cisgender adolescent patients.

107.     The Healthcare Ban does nothing to protect the health or wellbeing of minors.  To the contrary, it gravely threatens the health and wellbeing of adolescents suffering from gender dysphoria by denying them access to necessary medical care that is recognized as safe and effective by every major medical association in the United States.

108.     The Healthcare Ban is not substantially related to any important government interest, nor is it even rationally related to any legitimate government interest.

109.     There is no rationale for the Healthcare Ban that could explain why only gender-affirming medical care—and *all* types of gender-affirming medical care—is singled out for prohibition.

110.     The Healthcare Ban's targeted ban on medically necessary care for transgender youth is based on generalized fears, negative attitudes, and disapproval of transgender people that are not legitimate bases for unequal treatment under any level of scrutiny.

111.     Defendants are liable for their violation of the right to equal protection under 42 U.S.C. § 1983, and the Minor Plaintiffs are entitled to a declaratory judgment that the Healthcare Ban violates the Equal Protection Clause of the Fourteenth Amendment.

## COUNT TWO

### THE HEALTH CARE BAN VIOLATES THE RIGHT TO PARENTAL AUTONOMY GUARANTEED BY THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE (PARENT PLAINTIFFS)

112.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

113.     Joan Doe, John Doe, Penny Poe, and Peter Poe (the "Parent Plaintiffs") bring this Count against Defendant Labrador and Defendant Jan M. Bennett, in their official capacities.

114.     The Due Process Clause of the Fourteenth Amendment of the United States Constitution,  enforceable pursuant to 42 U.S.C. § 1983, protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

115.     That fundamental right of parental autonomy includes the right of parents to seek and follow medical advice to protect the health and wellbeing of their minor children.

116.     Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

117.     The Healthcare Ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria stands directly at odds with parents' fundamental right to make decisions concerning the care of their children.  The Healthcare Ban barges into Idaho families' living rooms and strips Idaho parents of the right to provide medical care for their children.

118.     The Healthcare Ban does nothing to protect the health or wellbeing of minors.  To the contrary, it gravely threatens the health and wellbeing of adolescents with gender dysphoria by denying their parents the ability to obtain for them necessary medical care that is recognized as safe and effective by every major medical association in the United States.

119.     The Healthcare Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest; nor is it rationally related to any legitimate government interest.

120.    There is no  rationale for the Healthcare Ban that could explain why only gender-affirming medical care—and *all* types of gender affirming medical care—is singled out for prohibition and the medical decision-making regarding this care is taken away from parents.

121.    Defendants are liable for their violation of the right to due process under 42 U.S.C. §1983, and the Parent Plaintiffs are entitled to a declaratory judgment that the Healthcare Ban violates the Due Process Clause of the Fourteenth Amendment.

### COUNT THREE

### PUBLISHING THE HEALTH CARE BAN IN THE IDAHO CODE VIOLATES DUE PROCESS  GUARANTEED BY THE FOURTEENTH AMENDMENT DUE TO LACK OF FAIR NOTICE

### (ALL PLAINTIFFS AGAINST IDAHO CODE COMMISSION DEFENDANTS)

122.    All plaintiffs bring this count against the Idaho Code Commission defendants, in their official capacities.

123.    Because the Healthcare Ban is unconstitutional, if it is published in the Idaho Code, it will mislead and deceive Idahoans, including medical professionals, law enforcement, other government actors, and the general public, about the requirements of the law.  The publication of HB 71's provisions in the official Idaho Code, especially without clear notice that the law is unconstitutional and unenforceable, would coerce compliance with the law despite its unconstitutionality and illegality, chill health care providers from providing necessary medical care, chill minors and their parents from seeking necessary medical care, and promote unconstitutional and illegal enforcement of the law by government actors.

124.    The lack of fair notice of the unconstitutionality and unenforceability of the Healthcare Ban in the Idaho Code would violate the due process clause of the Fourteenth Amendment.

125.    The Idaho Code Commission defendants are liable for their imminent violation of the right to due process under 42 U.S.C. §1983, and the Plaintiffs are entitled to declaratory judgment declaring that official publication of the provisions of HB 71, without clear notice of those provisions' unconstitutionality and unenforceability is unconstitutional, as well as injunctive relief prohibiting publication of those provisions without such clear notice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(a)    Enter a judgment declaring that the Healthcare Ban violates the equal protection clause and the due process clause of the Fourteenth Amendment and is therefore unenforceable;

(b)    Issue preliminary and permanent injunctions enjoining Defendants and their employees, agents, and successors in office from enforcing the Healthcare Ban;

(c)    Enter a judgment declaring that official publication of the Healthcare Ban in the Idaho Code without clear notice of the law's unconstitutionality and unenforceability is unconstitutional;

(d)    Issue preliminary and permanent injunctions enjoining the members of the Idaho Code Commission and their employees, agents, and successors in office from publishing the Healthcare Ban in the Idaho Code without clear notice of those provisions' unconstitutionality and unenforceability is unconstitutional;

(e)    Waive the requirement for the posting of a bond as security for entry of preliminary injunctive relief;

(f)    Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(g)    Grant such other relief as the Court deems just and proper.

Dated: May 31, 2023

Respectfully submitted,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

/s/ Li Nowlin-Sohl
Li Nowlin-Sohl

/s/ Alexia D. Korberg
Alexia D. Korberg

/s/ Leslie Cooper
Leslie Cooper

/s/ Jackson Yates
Jackson Yates

/s/ Taylor Brown
Taylor Brown

/s/ Dana L. Kennedy
Dana L. Kennedy

/s/ Jordan Orosz
Jordan Orosz

WREST COLLECTIVE

GROOMBRIDGE, WU,
BAUGHMAN AND STONE
LLP

/s/ Richard Eppink
Richard Eppink

/s/ Eric Alan Stone
Eric Alan Stone

/s/ Casey Parsons
Casey Parsons

/s/ Ariella C. Barel
Ariella C. Barel

LEGISLATURE OF THE STATE OF IDAHO
Sixty-seventh Legislature                    First Regular Session - 2023

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 71, As Amended in the Senate

BY JUDICIARY, RULES AND ADMINISTRATION COMMITTEE

1     AN ACT
2  RELATING TO THE VULNERABLE CHILD PROTECTION ACT; AMENDING CHAPTER 15, TITLE
3      18, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 18-1506C, IDAHO CODE,
4      TO PROVIDE A SHORT TITLE, TO DEFINE TERMS, TO PROHIBIT CERTAIN PRACTICES
5      UPON A CHILD, TO PROVIDE CERTAIN EXEMPTIONS, TO PROVIDE A PENALTY, AND
6      TO PROVIDE SEVERABILITY; AMENDING SECTION 19-5307, IDAHO CODE, TO PRO-
7      VIDE A CODE REFERENCE; AND PROVIDING AN EFFECTIVE DATE.

8  Be It Enacted by the Legislature of the State of Idaho:

9      SECTION 1.  That Chapter 15, Title 18, Idaho Code, be, and the same is
10 hereby amended by the addition thereto of a NEW SECTION, to be known and des-
11 ignated as Section 18-1506C, Idaho Code, and to read as follows:

12     18-1506C.  VULNERABLE CHILD PROTECTION. (1)  This section shall be
13 known and may be cited as the "Vulnerable Child Protection Act."
14     (2)  As used in this section:
15     (a)  "Child" means any person under eighteen (18) years of age; and
16     (b)  "Sex" means the immutable biological and physiological charac-
17     teristics, specifically the chromosomes and internal and external
18     reproductive anatomy, genetically determined at conception and gener-
19     ally recognizable at birth, that define an individual as male or female.
20     (3)  A medical provider shall not engage in any of the following prac-
21 tices upon a child for the purpose of attempting to alter the appearance of or
22 affirm the child's perception of the child's sex if that perception is incon-
23 sistent with the child's biological sex:
24     (a)  Performing surgeries that sterilize or mutilate, or artificially
25     construct tissue with the appearance of genitalia that differs from the
26     child's biological sex, including castration, vasectomy, hysterec-
27     tomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phal-
28     loplasty, clitoroplasty, vaginoplasty, vulvoplasty, ovariectomy, or
29     reconstruction of the fixed part of the urethra with or without metoid-
30     ioplasty, phalloplasty, scrotoplasty, or the implantation of erection
31     or testicular prostheses;
32     (b)  Performing a mastectomy;
33     (c)  Administering or supplying the following medications that induce
34     profound morphologic changes in the genitals of a child or induce tran-
35     sient or permanent infertility:
36         (i)  Puberty-blocking medication to stop or delay normal puberty;
37         (ii) Supraphysiological doses of testosterone to a female; or
38         (iii) Supraphysiological doses of estrogen to a male; or
39     (d)  Removing any otherwise healthy or nondiseased body part or tissue.
40     (4)  A surgical operation or medical intervention shall not be a viola-
41 tion of this section if the operation or intervention is:

1  (a)  Necessary to the health of the person on whom it is performed and is
2  performed by a person licensed in the place of its performance as a med-
3  ical practitioner, except that a surgical operation or medical inter-
4  vention is never necessary to the health of the child on whom it is per-
5  formed if it is for the purpose of attempting to alter the appearance of
6  or affirm the child's perception of the child's sex if that perception
7  is inconsistent with the child's biological sex;
8  (b)  For the treatment of any infection, injury, disease, or disorder
9  that has been caused or exacerbated by the performance of gender transi-
10  tion procedures, whether or not the procedures were performed in accor-
11  dance with state and federal law; or
12  (c)  Performed in accordance with the good faith medical decision of a
13  parent or guardian of a child born with a medically verifiable genetic
14  disorder of sex development, including:
15    (i)  A child with external biological sex characteristics that
16    are ambiguous and irresolvable, such as a child born having 46, XX
17    chromosomes with virilization, 46, XY chromosomes with undervir-
18    ilization, or with both ovarian and testicular tissue; or
19    (ii)  When a physician has otherwise diagnosed a disorder of sex-
20    ual development in which the physician has determined through ge-
21    netic testing that the child does not have the normal sex chro-
22    mosome structure, sex steroid hormone production, or sex steroid
23    hormone action for a male or female.
24  (5)  Any medical professional convicted of a violation of this section
25  shall be guilty of a felony and shall be imprisoned in the state prison for a
26  term of not more than ten (10) years.
27  (6)  The provisions of this act are hereby declared to be severable,
28  and if any provision of this act or the application of such provision to any
29  person or circumstance is declared invalid for any reason, such declaration
30  shall not affect the validity of the remaining portions of this section.

31  SECTION 2.  That Section 19-5307, Idaho Code, be, and the same is hereby
32  amended to read as follows:

33  19-5307.  FINES IN CASES OF CRIMES OF VIOLENCE. (1) Irrespective of any
34  penalties set forth under state law, and in addition thereto, the court, at
35  the time of sentencing or such later date as deemed necessary by the court,
36  may impose a fine not to exceed five thousand dollars ($5,000) against any
37  defendant found guilty of any felony listed in subsections (2) and (3) of
38  this section.
39  The fine shall operate as a civil judgment against the defendant and
40  shall be entered on behalf of the victim named in the indictment or infor-
41  mation, or the family of the victim in cases of homicide or crimes against
42  children, and shall not be subject to any distribution otherwise required
43  in section 19-4705, Idaho Code.  The clerk of the district court may collect
44  the fine in the same manner as other fines imposed in criminal cases are
45  collected and shall remit any money collected in payment of the fine to the
46  victim named in the indictment or information or to the family of the victim
47  in a case of homicide or crimes against minor children, provided that none
48  of the provisions of this section shall be construed as modifying the provi-
49  sions of chapter 6, title 11, Idaho Code, chapter 10, title 55, Idaho Code, or

1  section 72-802, Idaho Code. A fine created under this section shall be a sep-
2  arate written order in addition to any other sentence the court may impose.
3      The fine contemplated in this section shall be ordered solely as a puni-
4  tive measure against the defendant and shall not be based upon any require-
5  ment of showing of need by the victim. The fine shall not be used as a substi-
6  tute for an order of restitution as contemplated in section 19-5304, Idaho
7  Code, nor shall such an order of restitution or order of compensation en-
8  tered in accordance with section 72-1018, Idaho Code, be offset by the entry
9  of such fine.
10     A defendant may appeal a fine created under this section in the same man-
11  ner as any other aspect of a sentence imposed by the court. The imposition of
12  a fine created under this section shall not preclude the victim from seeking
13  any other legal remedy; provided that in any civil action brought by or on be-
14  half of the victim, the defendant shall be entitled to offset the amount of
15  any fine imposed pursuant to this section against any award of punitive dam-
16  ages.
17     (2)  The felonies for which a fine created under this section may be im-
18  posed are those described in:
19     Section 18-805, Idaho Code (Aggravated arson);
20     Section 18-905, Idaho Code (Aggravated assault);
21     Section 18-907, Idaho Code (Aggravated battery);
22     Section 18-909, Idaho Code (Assault with intent to commit a serious
23          felony);
24     Section 18-911, Idaho Code (Battery with intent to commit a serious
25          felony);
26     Section 18-913, Idaho Code (Felonious administration of drugs);
27     Section 18-918, Idaho Code (Felony domestic violence);
28     Section 18-923, Idaho Code (Attempted strangulation);
29     Section 18-1501, Idaho Code (Felony injury to children);
30     Section 18-1506, Idaho Code (Sexual abuse of a child under the age of
31          sixteen);
32     Section 18-1506A, Idaho Code (Ritualized abuse of a child);
33     Section 18-1506B, Idaho Code (Female genital mutilation of a child);
34     Section 18-1506C, Idaho Code (Vulnerable child protection);
35     Section 18-1507, Idaho Code (Sexual exploitation of a child);
36     Section 18-1508, Idaho Code (Lewd conduct with a child under the age of
37          sixteen);
38     Section 18-1508A, Idaho Code (Sexual battery of a minor child sixteen or
39          seventeen years of age);
40     Section 18-4001, Idaho Code (Murder);
41     Section 18-4006, Idaho Code (Felony manslaughter);
42     Section 18-4014, Idaho Code (Administering poison with intent to kill);
43     Section 18-4015, Idaho Code (Assault with intent to murder);
44     Section 18-4502, Idaho Code (First degree kidnapping);
45     Section 18-5001, Idaho Code (Mayhem);
46     Section 18-5501, Idaho Code (Poisoning food, medicine or wells);
47     Section 18-6101, Idaho Code (Rape);
48     Section 18-6501, Idaho Code (Robbery).

4

1   (3)  Notwithstanding the provisions of section 18-306(4) and (5), Idaho
2 Code, the fine created under this section may also be imposed up to five thou-
3 sand dollars ($5,000) for attempts of the felonies described in:
4   Section 18-4001, Idaho Code (Murder);
5   Section 18-6101, Idaho Code (Rape).

6   SECTION 3.  This act shall be in full force and effect on and after Jan-
7 uary 1, 2024.