Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

**PAM POE**, et al.,

    *Plaintiffs*,

        v.

**RAÚL LABRADOR**, et al.,

    *Defendants*.

Case No. 1:23-cv-00269-CWD

**MEMORANDUM OF
LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Jordan E. Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................... ii

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ....................................................................................2

I.     Medical Protocols for the Treatment of Transgender Adolescents with Gender Dysphoria........................................................................................................2

II.    The Healthcare Ban.........................................................................................5

III.   The Healthcare Ban Inflicts Severe and Irreparable Harms .............................7

ARGUMENT .......................................................................................................11

I.     PRELIMINARY INJUNCTION STANDARD ................................................11

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM .....................................................................11

     A.    The Healthcare Ban Is Subject to Heightened Equal Protection Scrutiny Because It Discriminates Based on Transgender Status and Sex. ........................12

          1.    The Ban Discriminates Based on Transgender Status. .............................13

          2.    The Ban Discriminates Based on Sex.......................................................13

     B.    The Healthcare Ban Fails Heightened Equal Protection Scrutiny. ........................16

     C.    The Healthcare Ban Fails Any Level of Review....................................................20

III.   THE PARENT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE HEALTHCARE BAN VIOLATES PARENTS' FUNDAMENTAL RIGHT TO PARENTAL AUTONOMY........................................22

     A.    Strict Scrutiny Applies to the Parent Plaintiffs' Due Process Claims. .................22

     B.    The Healthcare Ban Cannot Survive Strict Scrutiny.............................................24

IV.   THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT GRANTING A PRELIMINARY INJUNCTION ..............................................25

     A.    Plaintiffs Will Suffer Immediate and Irreparable Harm If the Healthcare Ban Is Not Blocked. ....................................................................................................25

     B.    The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction Is in the Public Interest. ..................................................27

V.     A FACIAL STATEWIDE INJUNCTION IS NECESSARY ...........................28

VI.   BOND SHOULD BE WAIVED ........................................................................29

VII.  CONCLUSION................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Ariz. Dream Act Coalition* v. *Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ...................................................................27

*Baca* v. *Moreno Valley Unified Sch. Dist.*,
    936 F. Supp. 719 (C.D. Cal. 1996) ...........................................................29

*Bd. of Trs. of Univ. of Ala.* v. *Garrett*,
    531 U.S. 356 (2001)...............................................................................21, 22

*Bernal* v. *Fainter*,
    467 U.S. 216 (1984)....................................................................................24

*Bostock* v. *Clayton Cnty.*,
    140 S. Ct. 1731 (2020)...........................................................................14, 15

*Boyden* v. *Conlin*,
    341 F. Supp. 3d 979 (W.D. Wis. 2018) .....................................................15

*Brach* v. *Newsom*,
    6 F.4th 904 (9th Cir. 2021) ........................................................................23

*Brandt* v. *Rutledge*,
    --- F. Supp. 3d ---, 2023 WL 4073727 (E.D. Ark. June 20, 2023) ................ *passim*

*Brandt* v. *Rutledge*,
    47 F.4th 661 (8th Cir. 2022), *reh'g en banc denied*, 2022 WL 16957734 (8th
    Cir. Nov. 16, 2022) ...........................................................................1, 15, 25

*Bresgal* v. *Brock*,
    843 F.2d 1163 (9th Cir. 1987) ...................................................................28

*City of Cleburne* v. *Cleburne Living Ctr.*,
    473 U.S. 432 (1985)....................................................................................20

*Diaz* v. *Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ...................................................................29

*DiFrancesco* v. *Fox*,
    No. CV 17-66-BU-SEH, 2019 WL 145627 (D. Mont. Jan. 9, 2019) .....................29

*Dodds* v. *U.S. Dep't of Educ.*,
    845 F.3d 217 (6th Cir. 2016) (*per curiam*) ...........................................14

*Doe* v. *Ladapo*,
    No. 4:23cv114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023).....................2, 17, 22

*E. & J. Gallo Winery* v. *Andina Licores S.A.*,
    446 F.3d 984 (9th Cir. 2006) .......................................................................11

*Easyriders Freedom F.I.G.H.T.* v. *Hannigan*,
    92 F.3d 1486 (9th Cir. 1996) ......................................................................28

*Eisenstadt* v. *Baird*,
    405 U.S. 438, 451-452 (1972) ....................................................................21

*Eknes-Tucker* v. *Marshall*,
    603 F. Supp. 3d 1131 (M.D. Ala. 2022), *appeal filed*, No. 22-11707 (11th Cir.
    May 18, 2022)....................................................................................2, 22, 24

*F.V.* v. *Barron*,
    286 F. Supp. 3d 1131 (D. Idaho Mar. 5, 2018).........................................12, 16, 29

*Fain* v. *Crouch*,
    618 F. Supp. 3d 313, 327 (S.D. W. Va. 2022), *appeal filed*, No. 22-1927, 2022
    WL 16708468 (4th Cir. Nov. 2022)...........................................................13

*Flack* v. *Wis. Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) .....................................................13

*Glenn* v. *Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ..................................................................14

*Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*,
    546 U.S. 418 (2006)...................................................................................11

*Grabowski* v. *Arizona Board of Regents*,
    69 F.4th 1110 (9th Cir. 2023) ..............................................................14, 16

*Grimm* v. *Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) .....................................................................12

*Halet* v. *Wend Inv. Co.*,
    672 F.2d 1305 (9th Cir. 1982) ...................................................................23

*Hecox* v. *Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020), *aff'd*, 2023 WL 1097255 (9th Cir.
    Jan. 30, 2023)...............................................................................11, 12, 16

*Hernandez* v. *Sessions*,
    872 F.3d 976 (9th Cir. 2017) .....................................................................25

*James* v. *Ball*,
    613 F.2d 180 (9th Cir. 1979), *rev'd on other grounds*, 451 U.S. 355 (1981)..........................28

*K. C.* v. *Individual Members of the Med. Licensing Bd. of Ind.*,
No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086 (S.D. Ind. June 16, 2023) ............2, 16, 20

*Kadel* v. *Folwell*,
446 F. Supp. 3d 1 (M.D.N.C. 2020) ......................................................................15

*Kanuszewski* v. *Mich. Dep't of Health & Hum. Servs.*,
927 F.3d 396 (6th Cir. 2019) ...............................................................................23

*Karnoski* v. *Trump*,
926 F.3d 1180 (9th Cir. 2019) ......................................................................12, 13

*L.W.* v. *Skrmetti*,
No. 23-5600, 2023 WL 4410576 (6th Cir. July 8, 2023)......................................2

*Latta* v. *Otter*,
19 F.Supp.3d 1054 (D. Idaho May 13, 2014), *aff'd*, 771 F.3d 456
(9th Cir. 2014)......................................................................................................12

*Latta* v. *Otter*,
771 F.3d 456 (9th Cir. 2014) (Berzon, J. concurring) .........................................15

*Melendres* v. *Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...............................................................................27

*Monterey Mech. Co.* v. *Wilson*,
125 F.3d 702 (9th Cir. 1997) ...............................................................................25

*Olson* v. *California*,
62 F.4th 1206 (9th Cir. 2023) .........................................................................21, 22

*Parham* v. *J.R.*,
442 U.S. 584 (1979)..............................................................................................23

*Porretti* v. *Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) ..............................................................................27

*Ray* v. *McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) ................................................................12

*Reno* v. *Flores*,
507 U.S. 292, 302 (1993)), *vacated as moot*, 38 F.4th 6 (9th Cir. 2022)
(en banc)...............................................................................................................23

*Roman* v. *Wolf*,
977 F.3d 935 (9th Cir. 2020) ...............................................................................11

*Romer* v. *Evans*,
  517 U.S. 620 (1996)..................................................................................20, 21

*Santosky* v. *Kramer*,
  455 U.S. 745 (1982)..............................................................................................24

*Sessions* v. *Morales-Santana*,
  582 U.S. 47 (2017)................................................................................................16

*Toomey* v. *Arizona*,
  No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144 (D. Ariz.
  Dec. 23, 2019).......................................................................................................13

*Troxel* v. *Granville*,
  530 U.S. 57 (2000)................................................................................................23

*United States* v. *Virginia*,
  518 U.S. 515 (1996).................................................................................11, 12, 16

*Wallis* v. *Spencer*,
  202 F.3d 1126 (9th Cir. 2000) .............................................................................23

*Washington* v. *Glucksberg*,
  521 U.S. 702 (1997)..............................................................................................22

*Whitaker by Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by*
  *Ill. Republican Party* v. *Pritzker*, 973 F.3d 760 (7th Cir. 2020)..............................14

**Statutes**

H.B. 71 (engrossed) § 1, 67th Leg., 1st Sess. (Idaho 2023). ................................. *passim*

Idaho Code § 18-1506C(4)(a) ....................................................................................7

Idaho Code § 18-4007 ................................................................................................7

**Other Authorities**

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender*
  *Diverse People, Version 8*, 23(1) Int'l J Transgender Health (Supplement 1)
  S1 (2022)..................................................................................................................3

Fed. R. Civ. P. 65(a) ................................................................................................11

Fed. R. Civ. P. 65(c) ................................................................................................29

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-In-
congruent Persons: An Endocrine Society Clinical Practice Guideline*,
102(11) The J. of Clinical Endocrinology & Metabolism 3869 (2017) ....................................3

**INTRODUCTION**

Idaho has enacted a law that, if it goes into effect on January 1, 2024, would make it a felony, punishable by up to 10 years in prison, to provide medical care to transgender minors with gender dysphoria that those minors, their parents, and their doctors all agree is medically necessary for them, and is care that is supported by every major medical association in the United States. Plaintiffs are two Idaho transgender teenagers who are receiving care that the law would ban, and their parents. The care has alleviated the distress of gender dysphoria and significantly improved their mental health. The parents have seen their children go from dark places to becoming happy, thriving teens, and they fear for their children's well-being if they are forced to discontinue care. This is these youths' and their parents' motion for a preliminary injunction.

The Idaho law is House Bill 71, referred to in this brief as H.B. 71, the "Healthcare Ban," or simply the "Ban." *See* H.B. 71 (engrossed) § 1, 67th Leg., 1st Sess. (Idaho 2023). A copy is attached to the brief as Exhibit 1. It is part of a raft of laws passed in the last year across the country that prohibit gender-affirming medical care for transgender minors. H.B. 71 specifically prohibits medical providers from providing treatment "for the purpose of "alter[ing] the appearance of or affirm[ing] the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." The law bans medications and treatments only when provided to affirm the gender identity of transgender youth; the same medications and treatments are allowed if provided to non-transgender youth for other purposes.

Numerous courts have enjoined similar laws, either preliminarily or permanently, finding that they are, or likely are, unconstitutional. *See Brandt* v. *Rutledge*, --- F. Supp. 3d ---, 2023 WL 4073727 (E.D. Ark. June 20, 2023) (Arkansas: permanent injunction); *Brandt* v. *Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022) (Arkansas: affirming district court's grant of preliminary injunction),

*reh'g en banc denied*, 2022 WL 16957734 (8th Cir. Nov. 16, 2022); *Eknes-Tucker* v. *Marshall*, 603 F. Supp. 3d 1131, 1151 (M.D. Ala. 2022) (Alabama: preliminary injunction), *appeal filed*, No. 22-11707 (11th Cir. May 18, 2022); *Doe* v. *Ladapo*, No. 4:23cv114-RH-MAF, 2023 WL 3833848, (N.D. Fla. June 6, 2023) (Florida: preliminary injunction); *K. C.* v. *Individual Members of the Med. Licensing Bd. of Ind.*, No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086 (S.D. Ind. June 16, 2023) (Indiana: preliminary injunction). Only a motions panel of the Sixth Circuit has held otherwise, in a tentative ruling expressing "initial views" that the court acknowledged might be wrong, and which relied on precedent in conflict with controlling Ninth Circuit law. *See L.W.* v. *Skrmetti*, No. 23-5600, 2023 WL 4410576 (6th Cir. July 8, 2023) (Tennessee: staying the district court's preliminary injunction pending expedited appeal).

Plaintiffs respectfully request that this Court preliminarily enjoin the Idaho Healthcare Ban because it, too, is unconstitutional. There is no constitutionally sufficient justification for singling out for prohibition only gender-affirming medical care provided to transgender youth. If the law takes effect it will cause irreparable harm to plaintiffs and many other families across Idaho.  This Court should grant a preliminary injunction against H.B. 71.

## STATEMENT OF FACTS

## I.    MEDICAL PROTOCOLS FOR THE TREATMENT OF TRANSGENDER ADOLESCENTS WITH GENDER DYSPHORIA

"Gender identity" refers to a person's core sense of belonging to a particular gender. Declaration of Dr. Christine Brady ("Brady Decl.") ¶ 13. Everyone has a gender identity, and it is a fundamental aspect of human development for all people. *Id.* A person's gender identity cannot be changed voluntarily, by external forces, or through medical or mental health intervention. *Id.* ¶¶ 14–15. People whose gender identity matches the sex they were designated at birth are cisgender. *Id.* ¶ 12. People whose gender identity differs from their sex designated at birth are transgender.

2

*Id.* Some transgender people recognize this misalignment in early childhood. For others, it can become apparent with the onset of puberty and the resulting physical changes, or later into adulthood. *Id.* ¶ 32. Being transgender is not itself a condition to be cured, *id.* ¶ 23, but it is common for clinically significant distress—called "gender dysphoria"—to arise from the incongruence transgender people experience between their gender identity and their assigned sex. *Id.* ¶¶ 23–25. To meet the criteria for gender dysphoria in the Diagnostic and Statistical Manual of Mental Disorders (5th Ed.), the incongruence must be present for at least six months, and be causing clinically significant distress or impairment in social, occupational, or other important areas of functioning. *Id.* ¶¶ 18–19.

Gender dysphoria is a serious medical condition that, if left untreated, can result in severe anxiety and depression, self-harm, and suicidality. *Id.* ¶ 24. Treatment for gender dysphoria is provided in accordance with evidence-based clinical guidelines. The Endocrine Society and the World Professional Association for Transgender Health ("WPATH") have published widely accepted clinical guidelines for treating gender dysphoria.[1] Declaration of Dr. Kara Connelly ("Connelly Decl.") ¶¶ 15–16; Brady Decl. ¶¶ 26–27. These guidelines are recognized as authoritative by all of the major medical organizations in the United States. Connelly Decl. ¶ 19; Brady Decl. ¶ 29.

Treatment options for gender dysphoria depend on a patient's stage of pubertal development. Under the WPATH and Endocrine Society guidelines, no medical treatments are indicated or provided before the onset of puberty. Connelly Decl. ¶ 17; Brady Decl. ¶ 31. For

---

[1] *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23(1) Int'l J Transgender Health (Supplement 1) S1 (2022); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) The J. of Clinical Endocrinology & Metabolism 3869 (2017).

adolescents with gender dysphoria who have started puberty, if medically indicated, puberty-delaying medications (called GnRH agonists) may be prescribed to prevent the distress of developing permanent, physical characteristics that do not align with their gender identity. Brady Decl. ¶ 32. Pubertal suppression is reversible, and if the treatment is discontinued, endogenous puberty will resume. Connelly Decl. ¶¶ 21, 46. Thus, puberty-delaying medications can provide patients time to better understand their gender identity before considering less reversible treatments. Brady Decl. ¶ 32.

In some cases, it may be medically necessary for an adolescent patient to be treated with gender-affirming hormone therapy. Brady Decl. ¶ 32. These treatments—testosterone for adolescent transgender boys and testosterone suppression and estrogen for adolescent transgender girls—alleviate the distress of gender dysphoria by allowing the patient to go through puberty consistent with their gender identity. *Id.*

Under the guidelines, before providing any gender-affirming medical care to minors, they should undergo a comprehensive psychosocial assessment. Brady Decl. ¶¶ 30, 33–34. The assessment explores the patient's gender dysphoria and any co-occurring mental health conditions, as well as their ability to understand the potential risks, benefits, and long-term consequences of treatment. *Id.* ¶¶ 35–37.

Gender-affirming medical care is recommended for minors with gender dysphoria only when a patient has: (i) gender incongruence that is marked and sustained over time; (ii) sufficient emotional and cognitive maturity to understand and provide informed assent; (iii) any other mental health conditions that do not interfere with diagnostic clarity or ability to consent; and (iv) the patient and their family is fully informed of potential risks—including the potential impact of some

treatments on fertility—and fertility preservation options. *Id.* ¶ 33. For minors, parental consent—in addition to the minor's assent—is required to prescribe these medical treatments. *Id.*  ¶ 37.

Gender-affirming medical treatments can significantly alleviate gender dysphoria by bringing a patient's body into alignment with their gender identity. Brady Decl. ¶¶ 38–41. In addition to addressing the distress the adolescent is experiencing, providing treatment during adolescence can significantly minimize dysphoria later in life by preventing permanent physical changes and may eliminate the need for future surgery. *Id.* A delay in treatment, on the other hand, can result in significant distress, including anxiety and escalating suicidality, as well as permanent physical changes from puberty that can require surgical treatment to reverse later in life. Connelly Decl. ¶¶ 33, 60–63; Brady Decl. ¶¶ 42–44.

The efficacy of gender-affirming medical care in improving mental health outcomes for adolescents suffering from gender dysphoria is supported by decades of clinical experience and scientific research. Connelly Decl. ¶¶ 32–35, 43, 55–57; Brady Decl. ¶ 39. Clinical experience and research regarding the use of these medications to treat gender dysphoria and other conditions has shown that they are safe when provided under the supervision of a medical provider. Connelly Decl. ¶ 49. Like all medications, they have potential risks, which exist whether used to treat transgender adolescents with gender dysphoria or cisgender adolescents for a range of other conditions. *Id.* ¶¶ 36–57. As is the case with other medical treatments patients and their families may undertake, some—but not all—treatments for gender dysphoria can potentially impact fertility. And, as with other medical treatments that can affect fertility, patients and their families are provided information to be able to make a fully informed decision about care. *Id.* ¶¶ 51–54.

## II.    THE HEALTHCARE BAN

H.B. 71 prohibits medical providers from providing medications or certain surgical treatments to a minor "for the purpose of attempting to alter the appearance of or affirm the child's

perception of the child's sex if that perception is inconsistent with the child's biological sex." H.B. 71 § 1. The law defines "sex" based on "chromosomes and internal and external reproductive anatomy." H.B. 71 § 1. The law specifies that it is prohibited to "administer[] or supply[] . . . [p]uberty blocking medication," "testosterone to a female," or "estrogen to a male,"  provide surgeries which create "the appearance of genitalia that differs from the child's biological sex" or "mastectom[ies]." *Id.* A child is defined as anyone under 18 years of age. *Id.*

Notably, the Healthcare Ban makes it a felony for Idaho medical providers to provide these medical treatments to minors *only* where it is "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." *Id.* The same medical treatments are not banned if they are provided for any other purposes, including to affirm a minor's gender if it is *consistent* with the child's "biological sex." For example, cisgender adolescent boys with gynecomastia—enlargement of the breast tissue— may undergo a mastectomy because of the distress related to being a boy with breasts. Connelly Decl. ¶¶ 40–41. Similarly, cisgender girls with polycystic ovarian syndrome—a condition that can cause increased testosterone and, as a result, symptoms including facial hair—may receive testosterone suppressants to address the distress of having facial hair. *Id.* Additionally, the Ban expressly allows physicians to perform permanent and irreversible cosmetic genital surgeries on children with intersex conditions, including newborns, despite their incapacity to assent, and despite the fact that major medical organizations like the American Academy of Family Physicians have said that such surgeries on intersex infants and youth are harmful. H.B. 71 § 1.

There is no exception for treatment that is necessary for the adolescent's health—regardless of their prior course of treatment, individual circumstances, or degree of distress—if the treatment's purpose is to affirm a minor's gender "inconsistent with [their] biological sex."  H.B.

6

71 § 1 (to become Idaho Code § 18-1506C(4)(a)). The Healthcare Ban treats the provision of gender-affirming medical care to minors as a "crime[ ] of violence," *id.* § 2, and imposes on medical providers a penalty of imprisonment up to 10 years. *Id.* § 1. This is equivalent to the prison penalty for involuntary or vehicular manslaughter. H.B. 71 § 2; Idaho Code § 18-4007.

## III.  THE HEALTHCARE BAN INFLICTS SEVERE AND IRREPARABLE HARMS

By cutting off access to treatment on which transgender adolescents with gender dysphoria in Idaho rely for their health and well-being and prohibiting future access to that treatment, the Ban would cause immediate, severe, and irreparable harm to all Plaintiffs.

**The Poe Family:** Pam Poe is a 15-year-old rising 10th grader and a lifelong Idaho resident. Pam is transgender: she is a girl with a female gender identity, but when she was born, she was designated as male. Penny Poe Decl. ¶¶ 5–6; Pam Poe Decl. ¶ 3. Pam began to realize she was transgender when she was in seventh grade and changes to her body made her feel less and less like herself. She began to suffer from severe depression and anxiety and engaged in self-injurious acts. Pam Poe Decl. at ¶¶ 4, 9. She began wearing more feminine clothing and makeup, and growing out her hair, which helped her feel more like herself, but she continued to suffer. *Id.* at ¶¶ 16–18.

Despite weekly counseling, Pam's mental health reached a crisis point in early 2022 when she told her mom that she did not want to be alive anymore. With her parents' support, she entered inpatient residential treatment. There, Pam was diagnosed with gender dysphoria. *Id.* at ¶¶ 10–11; Penny Poe Decl. ¶¶ 11–12.

After Pam came home, her parents began taking her to a doctor experienced in treating gender dysphoria. After thorough evaluation of Pam, and discussions with Pam and her parents about the benefits and potential risks of pubertal suppression, the doctor prescribed puberty blockers for Pam in June 2022. By pausing the physical changes that were exacerbating her gender

7

dysphoria, the puberty blockers improved Pam's mental health. Pam Poe Decl. ¶¶ 12–14; Penny Poe Decl. ¶¶ 13–14, 16–17. When Pam started high school in August 2022, she did so living as a girl and being treated as a girl. Pam Poe Decl. ¶ 17. Her mental health continued to improve, though she still had distress about her body. *Id.* at ¶¶ 14, 18.

In April 2023, when Pam was 15 years old and had been on puberty blockers for roughly a year, her family and her doctor discussed the possibility of Pam beginning estrogen treatment. After the doctor performed bloodwork, discussed the risks and benefits as well as options for fertility preservation, and confirmed Pam's ongoing therapy and mental health support, Pam and her parents, in consultation with her doctor, decided that this was the appropriate treatment plan for Pam. She began estrogen therapy, which she continues to this day. *Id.* at ¶ 19; Penny Poe Decl. ¶ 18.

Gender-affirming medical care has caused a dramatic improvement in Pam's mental health; she is happy, confident, and can see a future for herself. Pam Poe Decl. ¶¶ 20–21; Penny Poe Decl. ¶ 19. She and her family are afraid of the impact the Healthcare Ban will have on them if it goes into effect. Pam is scared of losing access to her medication and her body undergoing unwanted, permanent changes that are inconsistent with her gender identity.  Pam and her parents worry about the severe stress, anxiety, and depression associated with Pam's gender dysphoria returning if that happens. The Poe family has considered what they would do if the Healthcare Ban goes into effect, including traveling regularly out of state for care, or uprooting their settled lives and moving out of Idaho. Both options would cause significant hardships to the family, but they do not see any other choices. Pam Poe Decl. ¶¶ 22–23; Penny Poe Decl. ¶¶ 20–23.

**The Doe Family:** Jane Doe is a 16-year-old rising senior in high school and has lived in Idaho her entire life. Jane Doe Decl. ¶ 2. Jane is transgender. She is a girl with a female gender

identity. Her birth certificate, passport, and school records now all list her as female, but when she was born, she was designated as male. *Id.* at ¶¶ 3, 19–20; Joan Doe Decl. ¶¶ 3, 5.

Growing up, Jane never really felt like a boy. When playing video games or "make believe," she was almost always a girl character. Jane Doe Decl. ¶¶ 5–6; Joan Doe Decl. ¶ 7. In 2018, as she started puberty, Jane was devastated by the way her body was changing, and her mental health deteriorated. She avoided having her picture taken, and there are few photos of her from this time. Jane knew "something felt off" and experienced a great deal of pain moving through the world as a boy. She frequently secluded herself because she did not think she could be herself in social settings, her schoolwork suffered, and she sometimes wished she did not even exist. Jane Doe Decl. ¶¶ 5, 9; Joan Doe Decl. ¶ 8.

Jane came out to some of her friends as transgender in June 2020 and told her parents three months later. Her parents were supportive and loving. Jane Doe Decl. ¶ 10; Joan Doe Decl. ¶¶ 5–6. Around October 2020, Jane began socially transitioning. She dressed in more traditionally feminine clothing, asked her mom to teach her how to wear makeup, and began using a new name consistent with her female gender identity. Jane Doe Decl. ¶ 11; Joan Doe Decl. ¶ 11.

In mid-October 2020, Jane's pediatrician referred her to a doctor who specializes in treating gender dysphoria, and she began seeing a therapist. Jane Doe Decl. ¶ 12; Joan Doe Decl. ¶¶ 9–10. The next month, Jane met with her new doctor who, after evaluating her, diagnosed her with gender dysphoria. Jane Doe Decl. ¶¶ 4, 13. Jane and her parents had conversations with the doctor in which the doctor provided them with information about gender dysphoria and counseled them on the risks and benefits of gender-affirming medical care and fertility preservation. *Id.* at ¶ 13; Joan Doe Decl. ¶¶ 13–14. After several months of therapy, an additional visit with Jane's doctor, and lab work, the doctor prescribed her a puberty blocker in January 2021. Jane Doe Decl. ¶ 14; Joan

9

Doe Decl. ¶ 16. Knowing that the pubertal changes to her body were not going to get worse was a huge relief to Jane. Jane Doe Decl. ¶ 15; Joan Doe Decl. ¶ 16.

The family began to discuss amongst themselves the possibility of Jane starting estrogen therapy and later discussed this with her doctor. The doctor advised them again on the risks and benefits, further counseled them on fertility preservation, and conducted additional lab work, ultimately finding hormone therapy to address her gender dysphoria to be appropriate. In April 2021, at age 14, Jane started hormone therapy at a very low dose. Jane Doe Decl. ¶ 16; Joan Doe Decl. ¶ 17. Her doctor has been monitoring Jane and her bloodwork since then, adjusting her medications as needed. Jane Doe Decl. ¶ 17; Joan Doe Decl. ¶ 18.

Gender-affirming medical care has transformed Jane's life, and she feels like a brand-new person. Since receiving gender-affirming medical care, Jane's mental health has significantly improved. She no longer feels isolated and is able to go out into the world. She experiences happiness when she looks in the mirror. Her grades in school have improved as well. Jane Doe Decl. ¶¶ 21–22; Joan Doe Decl. ¶ 19.

The debate over H.B. 71 brought back depressive and harmful thoughts for Jane that she had not had since socially and medically transitioning. When the bill passed, Jane was so emotionally devastated that her parents had to come and take her home from school. Joan Doe Decl. at ¶ 22. Jane and her family are scared about what would happen to Jane if she had to stop care. They do not know what they will do if H.B. 71 takes effect; they are grappling with the options of regular travel out of state or selling their home and leaving Idaho, either of which would cause significant hardship to the family. Jane Doe Decl. ¶¶ 23–25; Joan Doe Decl. ¶¶ 23–27.

**ARGUMENT**

## I.      PRELIMINARY INJUNCTION STANDARD

"The purpose of a preliminary injunction is to preserve rights pending resolution of the merits of the case by the trial." *E. & J. Gallo Winery* v. *Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006) (quoting *Big Country Foods, Inc.* v. *Bd. of Educ.*, 868 F.2d 1085, 1087 (9th Cir.1989) (internal quotation marks omitted)). The Court considers whether (1) the plaintiffs show "(1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest." *Hecox* v. *Little*, 479 F. Supp. 3d 930, 971 (D. Idaho 2020), *aff'd*, 2023 WL 1097255 (9th Cir. Jan. 30, 2023) (quoting *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (internal quotation marks omitted)); *see* Fed. R. Civ. P. 65(a). "Where, as here, 'the government is a party, these last two factors merge.'" *Hecox*, 479 F. Supp. 3d at 971 (quoting *Drakes Bay Oyster Co.* v. *Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). And where, as here, the ultimate burden to justify H.B. 71 under the Equal Protection Clause "rests entirely on the State," *United States* v. *Virginia*, 518 U.S. 515, 533 (1996) [hereinafter "*VMI*"], the burden to justify H.B. 71 shifts to Defendants at the preliminary injunction stage as well. *See, e.g.*, *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006) ("The point remains that the burdens at the preliminary injunction stage track the burdens at trial."). Furthermore, where, as here (*see* section IV(B), *infra*), the balance of hardships tips sharply towards the plaintiff, a preliminary injunction is appropriate so long as there are serious questions going to the merits. *Roman* v. *Wolf*, 977 F.3d 935, 941 (9th Cir. 2020).

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM

H.B. 71 prohibits, and makes it a crime for medical providers to provide, gender-affirming

11

medical care to transgender adolescents. The Ban classifies based on transgender status and sex, thereby triggering heightened equal protection scrutiny. The Ban cannot survive this "exacting" test. *VMI*, 518 U.S. at 555. Indeed, it would fail under even the most deferential constitutional scrutiny.

**A.    The Healthcare Ban Is Subject to Heightened Equal Protection Scrutiny Because It Discriminates Based on Transgender Status and Sex.**

Under the Equal Protection Clause, heightened scrutiny applies to classifications based on transgender status and sex. *Karnoski* v. *Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (applying heightened scrutiny to discrimination based on transgender status); *VMI*, 518 U.S. at 555 (all sex-based classifications are subject to heightened scrutiny); *see also Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611–13 (4th Cir. 2020) (applying heightened scrutiny to discrimination based on sex and transgender status); *Ray* v. *McCloud*, 507 F. Supp. 3d 925, 937–38 (S.D. Ohio 2020) (collecting cases); *Hecox*, 479 F. Supp. 3d at 973–74 (finding that discrimination against transgender people is discrimination on the basis of sex); *F.V.* v. *Barron*, 286 F. Supp. 3d 1131, 1144–45 (D. Idaho Mar. 5, 2018) (finding "transgender people bear all of the characteristics of a quasi-suspect class" and applying heightened scrutiny).[2] To survive heightened scrutiny, such classifications must be "substantially related to an important government interest." *Latta* v. *Otter*, 19 F. Supp. 3d 1054, 1073 (D. Idaho May 13, 2014), *aff'd*, 771 F.3d 456 (9th Cir. 2014) (quoting

---

[2] As this Court detailed in *F.V.*, "(1) transgender people have been the subject of a long history of discrimination that continues to this day; (2) transgender status as a defining characteristic bears no relation to ability to perform or contribute to society; (3) transgender status and gender identity have been found to be obvious, immutable, or distinguishing characteristics; and (4) transgender people are unarguably a politically vulnerable minority." 286 F. Supp. 3d at 1145 (cleaned up). These realities are "especially true in Idaho," this Court has noted, "where transgender people have no state constitutional protections from discrimination based on their transgender status in relation to employment decisions, housing, and other services." *Id.*  Thus, people who are transgender are a quasi-suspect class and H.B. 71 must withstand heightened scrutiny review to be constitutionally sound. *Id.*

12

*Miss. Univ. for Women* v. *Hogan*, 458 U.S. 718, 724 (1982)). Because the Ban facially discriminates based on transgender status and sex, it is subject to heightened scrutiny.

### 1.    The Ban Discriminates Based on Transgender Status.

The Ban expressly classifies based on transgender status. A transgender person is, by definition, someone whose sex designated at birth is different from their gender identity. Brady Decl. ¶ 12, *see also Karnoski*, 926 F.3d at 1187 n.1 (transgender people have a "gender identity [that] does not match their birth-assigned sex"). H.B. 71 explicitly bans healthcare for minors *only* when provided "for the purpose of attempting to alter the appearance of or affirm the [minor's] perception of the [minor's] sex" where the minor's "perception of the [minor's] sex is inconsistent with the [minor's] biological sex." H.B. 71 § 1(3). Sex is defined in the statute as "chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth." H.B. 71, § 1(2)(b). In banning medical care that affirms a minor's gender *only where* it is different from their sex assigned at birth—the defining trait of being transgender—the law necessarily classifies based on transgender status. *See Brandt*, 2023 WL 4073727, at *31 (prohibiting medical care that only transgender people choose to undergo constitutes discrimination against transgender people). Moreover, under the Ban, the medications and treatments that are prohibited for transgender adolescents to affirm their gender identity remain available to cisgender adolescents. *See Fain* v. *Crouch*, 618 F. Supp. 3d 313, 327 (S.D. W. Va. 2022), *appeal filed*, No. 22-1927, 2022 WL 16708468 (4th Cir. 2022); *Toomey* v. *Arizona*, No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019); *Flack* v. *Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 950 (W.D. Wis. 2018).

### 2.    The Ban Discriminates Based on Sex.

In addition to classifying based on transgender status, the Ban draws a classification based on sex in three distinct ways.

13

*First*, the Ban speaks in explicit gendered terms, proffers its own definition of the term "sex," and facially discriminates based on that definition. If the legislature cannot "writ[e] out instructions" for determining whether treatment is permitted "without using the words man, woman, or sex (or some synonym)," the law classifies based on sex. *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1746 (2020); *see Grabowski* v. *Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (applying *Bostock* outside of context of Title VII). Here, the Ban prohibits medical care when the care is provided in a manner the state deems "inconsistent with the child's biological sex." H.B. 71 § 1(3). Because it is not possible to determine if a practice is permitted or forbidden under H.B. 71 without referring to sex, it draws a classification on the basis of sex.

*Second*, the Ban discriminates based on stereotypes relating to a person's sex assigned at birth. "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker by Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party* v. *Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *accord Glenn* v. *Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). "Sex stereotyping based on a person's gender non-conforming behavior"—including a person's "fail[ure] to act and/or identify with his or her" sex designated at birth—"is impermissible discrimination." *Dodds* v. *U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (*per curiam*) (quoting *Smith* v. *City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (internal quotation marks omitted)). When the government "penalizes a person identified as male at birth for traits or actions that it tolerates in" people "identified as female at birth,"—here, for example, receiving medical treatment to live in accordance with a female gender identity—the person's "sex plays an unmistakable and impermissible role." *Bostock*, 140 S. Ct. at 1741–42.

Here, the Ban explicitly enforces sex stereotypes and gender conformity by targeting

14

medical care for exclusion only if the purpose of the care is to "attempt[] to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." H.B. 71 § 1(3). Conversely, the Ban does not prohibit a cisgender boy with gynecomastia from having a mastectomy so that his chest will conform to his male gender; nor does it prohibit cisgender girls who have unwanted facial hair due to polycystic ovarian syndrome from being treated with testosterone suppressants to address this unwanted masculinization of their appearance. The same medications that are banned when used to affirm a gender that is inconsistent with one's birth-assigned sex are permitted to affirm a gender that matches their birth-assigned sex. By allowing and disallowing care based on sex designated at birth, the Ban is an impermissible "form of sex stereotyping where an individual is required effectively to maintain [their] natal sex characteristics." *Boyden* v. *Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018); *see also Latta* v. *Otter*, 771 F.3d 456, 484 (9th Cir. 2014) ("Laws that strip *individuals* of their rights or restrict personal choices or opportunities solely on the basis of the individuals' gender are sex discriminatory.") (Berzon, J. concurring). The Ban "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel* v. *Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020).

*Third*, the Ban discriminates based on sex because, as articulated above, it discriminates based on transgender status, which necessarily discriminates based on sex. As the Supreme Court explained in *Bostock*, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741. By "discriminating against transgender persons," the Ban "unavoidably discriminates against persons with one sex identified at birth and another today." *Id.* at 1746; *see also Brandt*, 47 F.4th at 669 (by relying on "the minor's sex at birth," Arkansas' ban on gender-affirming care for minors

"discriminates on the basis of sex"). The Ninth Circuit and District of Idaho have likewise recognized that discrimination "because of sex" includes discrimination based on transgender status. *See, e.g.*, *Grabowski*, 69 F.4th at 1116 (observing that in *Bostock*, the Supreme Court held "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex.") (internal quotation marks and citations omitted); *F.V.*, 286 F. Supp. 3d at 1142. And as explained above, the Ban discriminates based on transgender status.

### B.      The Healthcare Ban Fails Heightened Equal Protection Scrutiny.

To survive heightened scrutiny, Idaho must provide an "exceedingly persuasive justification" for the Ban's classifications and a "close means-end fit." *Sessions* v. *Morales-Santana*, 582 U.S. 47, 58, 68 (2017); *see also VMI*, 518 U.S. at 531. Neither exists here. At the preliminary injunction stage and beyond, this Court "(1) looks to the Defendants to justify the Act [here, the Ban]; (2) must consider the Act's actual purposes; (3) need not accept hypothetical, *post hoc* justifications for the Act; and (4) must decide whether Defendants' proffered justifications overcome the injury and indignity inflicted on Plaintiffs and others like them." *Hecox*, 479 F. Supp. 3d at 976. The "burden of justification is demanding"—not "deferential"—and "rests entirely on the State." *VMI*, 518 U.S. at 533, 555. Defendants cannot meet this demanding burden.

Gender dysphoria is a serious medical condition, and all the major medical groups recognize that gender-affirming medical care—the care banned by H.B. 71—is necessary to alleviate the significant distress and other effects of gender dysphoria for many adolescents. There is no justification for singling out gender-affirming medical care for minors and taking this medical decision away from parents. Further, even if Defendants could show an "exceedingly persuasive justification" to restrict care for some minors, the categorical denial of care under the Ban would still be an unconstitutionally restrictive means of achieving the interest. *See K. C.*, 2023 WL

4054086, at *11–12 (finding that Indiana's ban on gender-affirming medical care does not have the necessary "close means-end fit").

Although H.B. 71 is titled the "Vulnerable Child Protection Act," the Ban does nothing to protect children. On the contrary, it will cause them significant harm. If left untreated, gender dysphoria can result in severe anxiety and depression, self-harm, and suicidality. Brady Decl. ¶¶ 24, 36. Gender-affirming medical care is well-accepted in the medical field as appropriate treatment for gender dysphoria in adolescents. Connelly Decl. ¶¶ 19–20; Brady Decl. ¶ 29; *see also Brandt*, 2023 WL 4073727, at *33 ("[B]ased on the decades of clinical experience and scientific research, it is widely recognized in both the medical and mental health fields—including by major medical and mental health professional associations—that gender-affirming medical care can relieve the clinically significant distress associated with gender dysphoria in adolescents."); *Ladapo*, 2023 WL 3833848, at *4 ("The overwhelming weight of medical authority supports treatment of transgender patients with [puberty-delaying medication] and cross-sex hormones in appropriate circumstances.").

Gender-affirming medical care can greatly improve the health and well-being of adolescent patients with gender dysphoria. Connelly Decl. ¶ 31; Brady Decl. ¶ 39. Practitioners' clinical experience observing the benefits of treatment is bolstered by nearly two decades of research demonstrating that gender-affirming care improves health outcomes for adolescent patients and reduces symptoms of anxiety, depression, and suicidality. Connelly Decl. ¶ 32; Brady Decl. ¶ 39.

The personal experiences of the minor Plaintiffs illustrate how this treatment can positively transform the lives of the adolescents who need it. Gender-affirming care has not harmed them; it has enabled them to thrive. It is the denial of this care that will harm the minor Plaintiffs, and transgender minors across Idaho.

17

There is nothing about gender-affirming medical care for adolescents that justifies singling out for prohibition *only* gender-affirming medical care—and *all* gender-affirming medical care—and taking these medical decisions away from transgender adolescents and their parents.

Gender-affirming medical care is supported by substantial clinical and research evidence demonstrating its effectiveness. The quality of evidence supporting this care is comparable to the quality of evidence supporting other medical treatments that may be provided to minors.  Connelly Decl. ¶¶ 55–57.

Gender-affirming care is not uniquely risky, and instead raises the same types of risks as other types of healthcare that families are free to pursue for their minor children. Connelly Decl. ¶¶ 44–48; *Brandt*, 2023 WL 4073727, at *17–18 ("[T]he risks associated with the treatments prohibited by [the Arkansas Ban] are comparable to the risks associated with many other medical treatments that parents are free to choose for their adolescent children after weighing the risks and benefits.").

Moreover, the same medications and treatments that are used in gender-affirming medical care—puberty blockers, testosterone, testosterone suppression, estrogen, and mastectomy—are widely used to treat cisgender adolescents for other purposes, and pose the same potential risks. Connelly Decl. ¶¶ 36–40. For example, GnRHa medications are widely used to treat precocious puberty; testosterone is used to treat cisgender boys with delayed puberty; estrogen is used to treat cisgender girls for ovarian failure, regulation of menstruation, and contraception; and mastectomy is used to treat cisgender boys with gynecomastia. *Id.* ¶¶ 37–40. The potential health risks associated with these medications or surgery are the same whether used for these purposes, or to treat transgender adolescents with gender dysphoria. *Id.* ¶¶ 45, 47, 48. The only difference is that some types of gender-affirming medical care may impair fertility. But as with other medical

treatments that can impact fertility, this is discussed in the informed consent process. *Id.* ¶¶ 50–51. And there are ways to adjust the treatment to protect fertility if that is important to the patient and their family. *Id.* ¶ 50.

Gender-affirming medical care is well-supported by evidence and, thus, widely accepted in the medical field. The fact that the medications used in gender-affirming medical care are used "off-label"—that is, without FDA approval for this specific indication—does not make the care experimental or mean that the FDA does not support this care. Indeed, the medications used off-label to treat gender dysphoria are also commonly used off-label for many other purposes. For example, GnRHa medications are regularly prescribed for minors for a variety of non-FDA-approved indications, including ovarian cancer, premenstrual syndrome, fertility preservation in women, and as an adjunct to growth hormone therapy in youth with idiopathic short stature. Connelly Decl. ¶ 59. Once the FDA approves a drug for one indication, doctors are free to prescribe it for other purposes, and off-label use is extremely common in medicine. Connelly Decl. ¶ 59. Once a pharmaceutical company gets FDA approval for one indication, they often do not consider it worth the cost to pursue approval for additional indications since there is no need. *Id.*; *see also Brandt*, 2023 WL 4073727, at *5 ("Transgender care is not experimental care.").

In sum, the scientific and medical evidence robustly supports the safety and efficacy of gender-affirming care for transgender adolescents. The evidence supporting that care and the potential risks associated with it are comparable to many other medical treatments adolescents and their families are free to seek. Indeed, the Ban does not target the medical treatments; puberty-delaying medication, hormone therapy, and mastectomies are permitted, as long as they are given for some reason other than gender-affirming medical care for transgender adolescents. There is no justification—much less the "exceedingly persuasive justification" that the Constitution would

19

require—for treating gender-affirming medical care differently than all other medical treatment for minors.

Moreover, the Ban would be unconstitutional even if there were such an exceedingly persuasive justification for restricting care in some circumstances because the legislation *categorically bans* gender-affirming medical care when given to a transgender minor, regardless of the circumstances. A categorical denial of care is an unconstitutionally restrictive means of achieving the interest. *See K. C.*, 2023 WL 4054086, at *11–12 (noting less-restrictive means of regulating gender-affirming care that are available and finding that Indiana's ban does not have the necessary "close means-end fit").

### C.    The Healthcare Ban Fails Any Level of Review.

Heightened scrutiny is appropriate here for the reasons described above. But the Ban would fail *any* level of scrutiny, including rational basis review, because it "is so far removed from" the purported goal of protecting children, "it [is] impossible to credit" it. *Romer* v. *Evans*, 517 U.S. 620, 635 (1996). The Ban does nothing to protect youth; it simply harms transgender youth. Moreover, there is no rational basis to conclude that allowing minors with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten [Idaho's] legitimate interests in a way that" allowing other types of medical care "would not." *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). There is nothing unique about gender-affirming medical care that explains the State's decision to override parents' medical decisions for their children for only gender-affirming medical care. Indeed, the Ban's permission of the *same treatments* for non-transgender minors for different medical conditions only underscores the lack of any rational basis for the State to draw the distinctions here. *See Bd. of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 366 n.4 (2001) ("The

Court's reasoning [in *Cleburne*] was that the city's purported justifications . . . *made no sense* in light of how the city treated other groups similarly situated in relevant respects.") (emphasis added).

That the State has banned these medical treatments only for gender dysphoria, while permitting the same treatments when given to affirm an adolescent's gender assigned at birth, confirms that the Ban fails rational-basis review. In *Eisenstadt* v. *Baird*, the Supreme Court held that a state could not rationally ban birth control for unmarried people based on the supposed health risks of the pills, while allowing married people to use the same pills. 405 U.S. 438, 451–52 (1972).

The Supreme Court has also made clear that animus is not a rational basis, *see Romer*, 517 U.S. at 632, and that "a legislative 'desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.'" *Olson* v. *California*, 62 F.4th 1206, 1220 (9th Cir. 2023) (quoting *U.S. Dep't of Ag.* v. *Moreno*, 413 U.S. 528, 534 (1973)). While the Ban purports to protect "vulnerable" children, the facts surrounding its enactment show that its real purpose was to express disapproval of transgender people. The Ban was just part of a larger legislative strategy to discriminate against transgender people, including by prohibiting transgender people of all ages from changing the gender recorded on their birth certificate. *See* Declaration of Ariella Barel (Barel Decl.), Ex. A, B & C. Indeed, a co-sponsor of the bill referred to identifying as LGBTQ as an "epidemic" of which "States need to help stop the spread," and called gender-affirming medical care "Frankenstein Practices." *See* Barel Decl. Ex. D, E. "[D]isfavor with which the architect of the legislation view[s]" the targets of a law—here, transgender people—can belie the articulated purposes of the legislation framed in the language of "protection" of the same individuals. *Olson*, 62 F.4th at 1219. Even where a State's targeting of a particular group does not rise to the level of malice, an improper motive for legislation can also arise due to "insensitivity caused by simple want of careful, rational reflection or some instinctive mechanism to guard against people who

appear to be different in some respects from ourselves." *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring). There is no rational basis to ban accepted gender-affirming care for transgender adolescents. In the absence of a rational relationship to a legitimate state interest, the Ban must fail. *Id.* at 377; *Olson*, 62 F.4th at 1219; *accord, e.g.*, *Ladapo*, 2023 WL 3833848, at \*10 (concluding a similar Florida ban on gender-affirming care fails rational basis review).

## III.   THE PARENT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE HEALTHCARE BAN VIOLATES PARENTS' FUNDAMENTAL RIGHT TO PARENTAL AUTONOMY.

Idaho's Healthcare Ban triggers strict scrutiny because it burdens the parent Plaintiffs' fundamental right to seek appropriate medical care for their children under the Fourteenth Amendment's substantive due process clause. As explained above, the Healthcare Ban cannot survive any level of constitutional scrutiny, let alone strict scrutiny. *See Brandt*, 2023 WL 4073727, \*36 (holding ban on gender-affirming healthcare for minors violates parents' substantive Due Process rights "to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."); *Ladapo*, 2023 WL 3833848, \*11 (holding parent plaintiffs challenging a similar healthcare ban likely to prevail on their substantive due process parental-rights claim); *Eknes-Tucker*, 603 F. Supp. 3d at 1146 (holding that parent plaintiffs challenging a similar healthcare ban in Alabama "have a fundamental right to direct the medical care of their children" and were "substantially likely to succeed on their Substantive Due Process claim.")

### A.   Strict Scrutiny Applies to the Parent Plaintiffs' Due Process Claims.

The Due Process Clause protects "against government interference with certain fundamental rights and liberty interests." *Washington* v. *Glucksberg*, 521 U.S. 702, 719–20 (1997). The government cannot "infringe certain 'fundamental' liberty interests at *all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state

22

interest." *Brach* v. *Newsom*, 6 F.4th 904, 922 (9th Cir. 2021) (emphasis in original) (quoting *Reno* v. *Flores*, 507 U.S. 292, 302 (1993)), *vacated as moot*, 38 F.4th 6 (9th Cir. 2022) (en banc).

Fundamental liberty interests include parents' rights to make decisions "concerning the care, custody, and control of their children," based on a "presumption" that "fit parents act in the best interests of their children." *Troxel* v. *Granville*, 530 U.S. 57, 66, 68 (2000). This right is "perhaps the oldest of the fundamental liberty interests recognized by [the] Court." *Id.* at 65; *see also Parham* v. *J.R.*, 442 U.S. 584, 602 (1979) (collecting cases). Any substantial infringement of a fundamental right is subject to strict scrutiny. *Halet* v. *Wend Inv. Co.*, 672 F.2d 1305, 1310 (9th Cir. 1982).

The Ninth Circuit has held that the Fourteenth Amendment right to direct the upbringing of one's children includes "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis* v. *Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (citing *Parham*, 442 U.S. at 602); *see also Kanuszewski* v. *Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (strict scrutiny applies to "parents' substantive due process right . . . to direct their children's medical care."); *Troxel*, 530 U.S. at 68–69 ("[T]here is normally no reason for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children."). Accordingly, parents "retain plenary authority to seek such [medical] care for their children, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604.

When the parents' and child's liberty interests in pursuing a course of medical care align, the strength of those interests against state interference is at its apex. *Cf. Santosky* v. *Kramer*, 455 U.S. 745, 760–61 (1982) (heightened evidentiary standards required where the "vital interest" of

the parent and child in preserving their relationship "coincide"). Idaho's Healthcare Ban deprives the parents of the right to seek care for their children that every major U.S. medical association has recognized as safe, effective, and medically necessary care. "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether [gender-affirming] medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

> **B.     The Healthcare Ban Cannot Survive Strict Scrutiny.**

Idaho's Healthcare Ban cannot survive any level of constitutional scrutiny, and thus necessarily fails to satisfy the strict scrutiny applied to governmental intrusions into fundamental rights. In addition to the reasons discussed above, Idaho's Healthcare Ban fails strict scrutiny because the means chosen by Idaho to address any purported concerns about gender-affirming healthcare are nowhere near the "least restrictive." *See Bernal* v. *Fainter*, 467 U.S. 216, 219 (1984).

Nothing about Idaho's Healthcare Ban is narrowly tailored to *any* interest. Rather than address any particularized concerns, the Ban simply rules out *all* medical treatments if the purpose is to affirm the gender identity of transgender youth. There is no rationale that explains why this fundamental right of medical decision-making must be stripped from parents for *every* type of gender-affirming medical care and in all circumstances. *See Brandt*, 2023 WL 4073727 at *36 (finding the ban on "all gender transition procedures" not to be narrowly tailored, but rather, violative of the parents' substantive due process rights). The parent Plaintiffs are acting in the best interests of their children, and the State's interference in their decision-making does not survive strict scrutiny, let alone any basis of review.

## IV.   THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT GRANTING A PRELIMINARY INJUNCTION

### A.   Plaintiffs Will Suffer Immediate and Irreparable Harm If the Healthcare Ban Is Not Blocked.

If the Ban is not blocked, Plaintiffs will suffer serious and irreparable harm for which there is no adequate remedy at law. *See Brandt*, 47 F.4th at 672. As discussed above, the Ban violates the constitutional rights of both adolescents and their parents, which is, in and of itself, irreparable harm. *See, e.g.*, *Hernandez* v. *Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017); *Monterey Mech. Co.* v. *Wilson*, 125 F.3d 702, 715 (9th Cir. 1997).

The irreparable harm here is far greater than just the deprivation of Plaintiffs' constitutional rights. The Ban would strip the minor Plaintiffs and other Idaho youth of medically necessary care, forcing them to suffer the pain of gender dysphoria and jeopardizing their mental health and well-being. And the Ban would force parents to watch their children suffer—or, if they have the resources, incur the significant expense of regular travel or uproot their lives to relocate out of state to access care.

__Minor Plaintiffs:__ As a result of the Ban, Pam Poe and Jane Doe are at risk of losing the medical treatment that has allowed them to thrive. They are already experiencing severe anxiety and distress at the prospect of losing care, and the harm from this loss of care will be immediate.

For Pam Poe, if the Ban takes effect, she would be forced to stop hormone therapy that is enabling her to go through puberty consistent with her gender identity, and force her into endogenous puberty, causing her to develop physiological traits inconsistent with her gender identity, at great risk to her mental health. *See* Pam Poe Decl. ¶¶ 14, 19; Penny Poe Decl. ¶¶ 16–19. Pam has already experienced significant distress related to her endogenous puberty, and she has engaged in self-harm and didn't want to live prior to receiving gender-affirming medical care. *See* Pam Poe Decl. ¶¶ 9–11; Penny Poe Decl. ¶¶ 11–13. Pam is terrified of losing access to the

medication that has saved her life and made her feel like a future is possible. Pam Poe Decl. ¶¶ 20–22; Penny Poe Decl. ¶¶ 20–23. She has already lived through the extreme despair of not receiving treatment and cannot go back to that. Pam Poe Decl. ¶ 22.

For Jane Doe, the Ban would mean disrupting her hormone therapy that she has been receiving for over two years. *See* Jane Doe Decl. ¶ 24; Joan Doe Decl. ¶ 17, 21. This care has alleviated her gender dysphoria and turned her life around. *See* Jane Doe Decl. at ¶¶ 18, 21; Joan Doe Decl. ¶¶ 19–20. The prospect of H.B. 71 has already brought back pain and mental health struggles that Jane has not had since starting gender-affirming medical care, affecting her daily life and her grades. Jane Doe Decl. ¶¶ 23–24; Joan Doe Decl. ¶¶ 21–22.

**Parent Plaintiffs:** If the Ban is not blocked, the parent Plaintiffs will have their parental decision-making displaced by the State, forcing them either to watch their minor children suffer immense pain and worry about a resumption of isolation, self-harm, or worse, or—if they are able to manage it financially—regularly travel out of state for care or disrupt their lives, families, and careers to move out of state.

Both the Poes and the Does are grappling with how to get their children care if the Ban takes effect because discontinuing care is not an option. Penny Poe remembers the fear of possibly losing her daughter before she and her husband could get Pam the gender-affirming care she needed, and they are terrified of the potential consequences on Pam's health if care is stopped—they "do not even have to guess what will happen to her mental health" because they have been through it. Penny Poe Decl. ¶¶ 20–22. For both families, they are facing an impossible decision because both regular travel out of state for care and moving would cause significant financial and personal hardships to their families. Joan Doe Decl. ¶¶ 23–27.

A preliminary injunction is necessary to prevent these severe and irreparable harms.

**B.     The Balance of Equities Weigh in Plaintiffs' Favor and Issuance of the Preliminary Injunction Is in the Public Interest.**

Because state government officials are Defendants here, this Court considers the "balance of the equities" and "public interest" components of the preliminary injunction test together, as one inquiry. *Porretti* v. *Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021). The threat of harm to Plaintiffs far outweighs Defendants' interests in immediately enforcing the Ban, and preserving Plaintiffs' constitutional rights is in the public interest. *See Melendres* v. *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (citation omitted)).

The balance of equities decidedly warrants a preliminary injunction here and the court should preserve the status quo until the case can be decided on the merits.

The harm to Plaintiffs from allowing the Ban to go into effect would be tangible, immediate, and irreparable. Whatever interest the State may have in enforcing the Ban during the pendency of this case pales in comparison to Plaintiffs' certain and severe harm. In stark contrast to the deeply personal and irreparable harms Pam, Jane, and their families face, a preliminary injunction would not harm Defendants at all, but merely maintain the status quo while Plaintiffs pursue their claims. Gender-affirming medical care has been provided safely in Idaho for many years. No problems have been reported from the treatment that either family has undertaken, nor does H.B. 71's legislative history identify any harm to the State of Idaho from the medical care H.B. 71 would criminalize.

And so, "by establishing a likelihood that [the government's] policy violates the U.S. Constitution," as Plaintiffs have here, they "have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coalition* v. *Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

## V.        A FACIAL STATEWIDE INJUNCTION IS NECESSARY

Plaintiffs have met all of the factors for a preliminary injunction, and a facial statewide injunction is "necessary to give [Plaintiffs] the relief to which they are entitled." *See Bresgal* v. *Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) (finding a nationwide mandatory injunction not "overbroad" because limiting enforcement of the law to a particular group would not give the prevailing parties relief); *see also Easyriders Freedom F.I.G.H.T.* v. *Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (affirming a statewide injunction prohibiting enforcement of California's motorcycle helmet law, even though there were just 14 named plaintiffs and was no class certification, because plaintiffs could not otherwise "receive the complete relief to which they are entitled").

An injunction applicable to only the Plaintiffs would not allow them to obtain the relief they urgently need and to which they are entitled. It is not clear how any medical provider or pharmacist in Idaho from whom plaintiffs might seek care or medication would be able to verify that they are the plaintiffs in this case (even if they were not proceeding under pseudonyms) and, thus, feel secure that they will not face severe criminal penalties if they provide them with care or medications. *See Easyriders*, 92 F.3d at 1502 (granting statewide preliminary injunction enjoining a highway patrol policy regarding enforcement of a motorcycle helmet mandate because patrol officers could not know which motorcyclists were plaintiffs). Moreover, even if a doctor or pharmacist is willing to provide care or medications to Plaintiffs, the institutions where they work may implement policies prohibiting the care if H.B. 71 goes into effect.

Additionally, the Ninth Circuit has held that courts may deny class certification in prospective constitutional challenges to state statutes, such as the present challenge, because "the relief sought will, as a practical matter, produce the same result as formal class-wide relief." *James* v. *Ball*, 613 F.2d 180, 186 (9th Cir. 1979), *rev'd on other grounds*, 451 U.S. 355 (1981); *see also*

*DiFrancesco* v. *Fox*, No. CV 17-66-BU-SEH, 2019 WL 145627, at *2 (D. Mont. Jan. 9, 2019) (denying class certification because "[a]ny judgment implicating the constitutionality of [the state statute] would be binding on all Defendants and to the benefit of all potential class members"). In other words, the Ninth Circuit recognizes that statewide relief is an appropriate remedy where there is a challenge to the constitutionality of a state statute. And Courts in this district have granted statewide relief in cases similar to this one. *See, e.g.*, *F.V.*, 286 F. Supp. at 1146.

## VI.  BOND SHOULD BE WAIVED

Plaintiffs seek an injunction of unconstitutional conduct by a governmental entity, and because there is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined, the FRCP 65(c) bond is neither appropriate nor necessary in this case and should be waived. *See Diaz* v. *Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011); *Baca* v. *Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

## VII.  CONCLUSION

Plaintiffs respectfully request the Court grant this Motion and enjoin the enforcement of H.B. 71 pending a decision on the merits of Plaintiffs' claims and grant such other relief that the Court deems just and proper. Given the Ban's grave harms, Plaintiffs request a hearing as soon as practicable. Defendants are being served with the motion papers immediately.

Date:       July 21, 2023                          Respectfully submitted,

                                                                  /s/ *Alexia D. Korberg*
                                                                  Alexia D. Korberg


Li Nowlin-Sohl                                     Brad S. Karp
Leslie Cooper                                      Alexia D. Korberg
Taylor Brown                                       Jackson Yates
AMERICAN CIVIL LIBERTIES UNION                     Dana L. Kennedy
FOUNDATION                                         Jordan Orosz
                                                   PAUL, WEISS, RIFKIND, WHARTON
Dina Flores-Brewer                                 & GARRISON LLP
ACLU OF IDAHO FOUNDATION
                                                   Richard Eppink
Eric Alan Stone                                    Casey Parsons
Ariella C. Barel                                   David A. DeRoin
Kyle Bersani                                       WREST COLLECTIVE
Philip S. May
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP                                          *Attorneys for Plaintiffs*

# Exhibit 1

LEGISLATURE OF THE STATE OF IDAHO
Sixty-seventh Legislature                    First Regular Session - 2023

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 71, As Amended in the Senate

BY JUDICIARY, RULES AND ADMINISTRATION COMMITTEE

1      AN ACT
2    RELATING TO THE VULNERABLE CHILD PROTECTION ACT; AMENDING CHAPTER 15, TITLE
3        18, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 18-1506C, IDAHO CODE,
4        TO PROVIDE A SHORT TITLE, TO DEFINE TERMS, TO PROHIBIT CERTAIN PRACTICES
5        UPON A CHILD, TO PROVIDE CERTAIN EXEMPTIONS, TO PROVIDE A PENALTY, AND
6        TO PROVIDE SEVERABILITY; AMENDING SECTION 19-5307, IDAHO CODE, TO PRO-
7        VIDE A CODE REFERENCE; AND PROVIDING AN EFFECTIVE DATE.

8    Be It Enacted by the Legislature of the State of Idaho:

9        SECTION 1.  That Chapter 15, Title 18, Idaho Code, be, and the same is
10   hereby amended by the addition thereto of a NEW SECTION, to be known and des-
11   ignated as Section 18-1506C, Idaho Code, and to read as follows:

12       18-1506C.  VULNERABLE CHILD PROTECTION. (1)  This section shall be
13   known and may be cited as the "Vulnerable Child Protection Act."
14       (2)  As used in this section:
15       (a)  "Child" means any person under eighteen (18) years of age; and
16       (b)  "Sex" means the immutable biological and physiological charac-
17       teristics, specifically the chromosomes and internal and external
18       reproductive anatomy, genetically determined at conception and gener-
19       ally recognizable at birth, that define an individual as male or female.
20       (3)  A medical provider shall not engage in any of the following prac-
21   tices upon a child for the purpose of attempting to alter the appearance of or
22   affirm the child's perception of the child's sex if that perception is incon-
23   sistent with the child's biological sex:
24       (a)  Performing surgeries that sterilize or mutilate, or artificially
25       construct tissue with the appearance of genitalia that differs from the
26       child's biological sex, including castration, vasectomy, hysterec-
27       tomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phal-
28       loplasty, clitoroplasty, vaginoplasty, vulvoplasty, ovariectomy, or
29       reconstruction of the fixed part of the urethra with or without metoid-
30       ioplasty, phalloplasty, scrotoplasty, or the implantation of erection
31       or testicular prostheses;
32       (b)  Performing a mastectomy;
33       (c)  Administering or supplying the following medications that induce
34       profound morphologic changes in the genitals of a child or induce tran-
35       sient or permanent infertility:
36           (i)  Puberty-blocking medication to stop or delay normal puberty;
37           (ii) Supraphysiological doses of testosterone to a female; or
38           (iii) Supraphysiological doses of estrogen to a male; or
39       (d)  Removing any otherwise healthy or nondiseased body part or tissue.
40       (4)  A surgical operation or medical intervention shall not be a viola-
41   tion of this section if the operation or intervention is:

1     (a)  Necessary to the health of the person on whom it is performed and is
2   performed by a person licensed in the place of its performance as a med-
3   ical practitioner, except that a surgical operation or medical inter-
4   vention is never necessary to the health of the child on whom it is per-
5   formed if it is for the purpose of attempting to alter the appearance of
6   or affirm the child's perception of the child's sex if that perception
7   is inconsistent with the child's biological sex;
8     (b)  For the treatment of any infection, injury, disease, or disorder
9   that has been caused or exacerbated by the performance of gender transi-
10   tion procedures, whether or not the procedures were performed in accor-
11   dance with state and federal law; or
12     (c)  Performed in accordance with the good faith medical decision of a
13   parent or guardian of a child born with a medically verifiable genetic
14   disorder of sex development, including:
15         (i)   A child with external biological sex characteristics that
16         are ambiguous and irresolvable, such as a child born having 46, XX
17         chromosomes with virilization, 46, XY chromosomes with undervir-
18         ilization, or with both ovarian and testicular tissue; or
19         (ii)  When a physician has otherwise diagnosed a disorder of sex-
20         ual development in which the physician has determined through ge-
21         netic testing that the child does not have the normal sex chro-
22         mosome structure, sex steroid hormone production, or sex steroid
23         hormone action for a male or female.
24     (5)  Any medical professional convicted of a violation of this section
25  shall be guilty of a felony and shall be imprisoned in the state prison for a
26  term of not more than ten (10) years.
27     (6)  The provisions of this act are hereby declared to be severable,
28  and if any provision of this act or the application of such provision to any
29  person or circumstance is declared invalid for any reason, such declaration
30  shall not affect the validity of the remaining portions of this section.

31     SECTION 2.  That Section 19-5307, Idaho Code, be, and the same is hereby
32  amended to read as follows:

33     19-5307.   FINES IN CASES OF CRIMES OF VIOLENCE. (1) Irrespective of any
34  penalties set forth under state law, and in addition thereto, the court, at
35  the time of sentencing or such later date as deemed necessary by the court,
36  may impose a fine not to exceed five thousand dollars ($5,000) against any
37  defendant found guilty of any felony listed in subsections (2) and (3) of
38  this section.
39     The fine shall operate as a civil judgment against the defendant and
40  shall be entered on behalf of the victim named in the indictment or infor-
41  mation, or the family of the victim in cases of homicide or crimes against
42  children, and shall not be subject to any distribution otherwise required
43  in section 19-4705, Idaho Code.  The clerk of the district court may collect
44  the fine in the same manner as other fines imposed in criminal cases are
45  collected and shall remit any money collected in payment of the fine to the
46  victim named in the indictment or information or to the family of the victim
47  in a case of homicide or crimes against minor children, provided that none
48  of the provisions of this section shall be construed as modifying the provi-
49  sions of chapter 6, title 11, Idaho Code, chapter 10, title 55, Idaho Code, or

1    section 72-802, Idaho Code. A fine created under this section shall be a sep-
2    arate written order in addition to any other sentence the court may impose.
3        The fine contemplated in this section shall be ordered solely as a puni-
4    tive measure against the defendant and shall not be based upon any require-
5    ment of showing of need by the victim. The fine shall not be used as a substi-
6    tute for an order of restitution as contemplated in section 19-5304, Idaho
7    Code, nor shall such an order of restitution or order of compensation en-
8    tered in accordance with section 72-1018, Idaho Code, be offset by the entry
9    of such fine.
10       A defendant may appeal a fine created under this section in the same man-
11    ner as any other aspect of a sentence imposed by the court. The imposition of
12    a fine created under this section shall not preclude the victim from seeking
13    any other legal remedy; provided that in any civil action brought by or on be-
14    half of the victim, the defendant shall be entitled to offset the amount of
15    any fine imposed pursuant to this section against any award of punitive dam-
16    ages.
17       (2) The felonies for which a fine created under this section may be im-
18    posed are those described in:
19    Section 18-805, Idaho Code (Aggravated arson);
20    Section 18-905, Idaho Code (Aggravated assault);
21    Section 18-907, Idaho Code (Aggravated battery);
22    Section 18-909, Idaho Code (Assault with intent to commit a serious
23       felony);
24    Section 18-911, Idaho Code (Battery with intent to commit a serious
25       felony);
26    Section 18-913, Idaho Code (Felonious administration of drugs);
27    Section 18-918, Idaho Code (Felony domestic violence);
28    Section 18-923, Idaho Code (Attempted strangulation);
29    Section 18-1501, Idaho Code (Felony injury to children);
30    Section 18-1506, Idaho Code (Sexual abuse of a child under the age of
31       sixteen);
32    Section 18-1506A, Idaho Code (Ritualized abuse of a child);
33    Section 18-1506B, Idaho Code (Female genital mutilation of a child);
34    <u>Section 18-1506C, Idaho Code (Vulnerable child protection);</u>
35    Section 18-1507, Idaho Code (Sexual exploitation of a child);
36    Section 18-1508, Idaho Code (Lewd conduct with a child under the age of
37       sixteen);
38    Section 18-1508A, Idaho Code (Sexual battery of a minor child sixteen or
39       seventeen years of age);
40    Section 18-4001, Idaho Code (Murder);
41    Section 18-4006, Idaho Code (Felony manslaughter);
42    Section 18-4014, Idaho Code (Administering poison with intent to kill);
43    Section 18-4015, Idaho Code (Assault with intent to murder);
44    Section 18-4502, Idaho Code (First degree kidnapping);
45    Section 18-5001, Idaho Code (Mayhem);
46    Section 18-5501, Idaho Code (Poisoning food, medicine or wells);
47    Section 18-6101, Idaho Code (Rape);
48    Section 18-6501, Idaho Code (Robbery).

4

1      (3)  Notwithstanding the provisions of section 18-306(4) and (5), Idaho
2 Code, the fine created under this section may also be imposed up to five thou-
3 sand dollars ($5,000) for attempts of the felonies described in:
4      Section 18-4001, Idaho Code (Murder);
5      Section 18-6101, Idaho Code (Rape).

6      SECTION 3.  This act shall be in full force and effect on and after Jan-
7 uary 1, 2024.