Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on the following page*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **PAM POE**, *by and through her parents and next friends, Penny and Peter Poe*; **PENNY POE**; **PETER POE**, *et al.*,<br><br>v.<br>*Plaintiffs*,<br><br>**RAÚL LABRADOR**, *in his official capacity as Attorney General of Idaho*, *et al.*,<br><br>*Defendants*. | Case No. 1:23-cv-00269-CWD<br><br>**DECLARATION OF JOAN DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR A <u>PRELIMINARY INJUNCTION</u>** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## DECLARATION OF JOAN DOE IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Joan Doe, hereby declare as follow:

I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth herein and could and would testify competently to these facts if called as a witness.

1. I am a Plaintiff in this action, and refer to myself here as "Joan Doe." I am the mother and next friend of Plaintiff Jane Doe, my minor child. Plaintiff John Doe is my husband, and Jane Doe's father. I make this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to these facts if called to do so.

2. My husband and I, with our three children, have resided in Boise for seventeen years. I work part-time at an elementary school. My husband is an engineering director at a technology company.

3. Our daughter Jane Doe is sixteen years old, is a girl, and is transgender.

4. My husband and I love Jane unconditionally, exactly as we do our other two children. As parents, we have always done what we know and believe to be best for her, to ensure that she is happy and healthy. That is all we have ever wanted for all of our children.

5. Jane was assigned the sex male at birth, and we gave her a traditionally male name. Around September 2020, when she was 14 years old, Jane told my husband and me that she is transgender. She told us that she had known she was a girl for much longer, but that she had been afraid to tell us and unsure how to do so. But she told us that she could not put off telling us any

1

longer because she was in so much pain because of changes that were happening to her body. Like any mother whose child tells them that they are in pain, this broke my heart more than I could ever express. No mother ever wants their child to be in any kind of pain, let alone to struggle in silence.

6. My husband and I have friends who are transgender, and we felt we understood at some level what it means to be transgender and how difficult it can be in this world. And like any parents confronting something new with their child, we had concerns because we just did not know how to get Jane the right help. Our main concern was and continues to be Jane's health and happiness.

7. As a child, Jane had naturally gravitated towards things considered to be for little girls. For example, when Jane played video games, which she enjoys, she would always choose to be a female character. Jane would also often choose clothes in the girls' section of the store.

8. Before Jane told us she is transgender, I saw her struggle immensely with her mental health, especially as puberty started. At the time, I was not sure what was causing it, but I saw her withdrawing and closing off from her normal self. In retrospect, I realize this was stemming from her gender dysphoria.

9. After Jane told us what was going on and that she is transgender, we immediately wanted to educate ourselves and to get her help. We first took her to her long-time pediatrician. We explained to the pediatrician what Jane had told us, and Jane herself explained how she felt and what she was experiencing. While our pediatrician had no personal experience treating gender dysphoria, and therefore referred us to someone with expertise in the area, I will never forget what she said to Jane that day: "from the moment you were born my job has been to make sure you're healthy and happy, and this doesn't change anything." It meant so much to us that she knew instinctually to support us and to do so overtly.

2

10. With our pediatrician's help, we found a therapist with experience working with transgender patients and made appointments for Jane, and we found a doctor who had experience caring for youth with gender dysphoria. We reached out and set up an appointment.

11. While we waited for the appointment, Jane began to socially transition and we educated ourselves about that. She chose her new name, and she started styling her hair more femininely and wearing makeup.

12. We noticed some improvements in Jane's mental health and confidence, just from calling her by her chosen name and pronouns, supporting her in dressing and grooming herself how she wanted, and in finally being free to live as herself. But she remained distressed about the changes that puberty was bringing to her body.

13. When the time finally came for Jane's first appointment with the doctor in November 2020, she was very excited. During that appointment, several things happened. We provided Jane's past medical history, which was quite limited because she had never had any medical issues. The doctor evaluated her, asking her a lot of questions about her experiences, understanding of herself, and mental health history. Separately, he and I talked about what I had seen with regard to Jane's gender identity, experiences, and mental health. He also requested contact information for Jane's primary care doctor and therapist. Next, he went over the treatment options for gender dysphoria, such as puberty blockers, and later, potentially gender-affirming estrogen therapy. He explained what to expect regarding timelines, and risks associated with each type of treatment, and he also did bloodwork.

14. After the first appointment with her doctor, Jane continued seeing her therapist, which went really well. She also continued to see her doctor during this time so he could see how she was progressing in therapy, and to continue to discuss the potential risks and benefits of

treatment and to discuss fertility preservation options should she proceed with gender affirming medical care.

15. During this time, we also continued to discuss everything we were learning with Jane, privately as a family. Jane still struggled with the changes that were happening to her body as male puberty continued, and she was hopeful knowing that she had options and a competent doctor who could provide the care she needed. But she wanted the process to move faster.

16. In January, 2021, with the support of her therapist and doctor, as a family we decided that Jane would start puberty blockers. I know that this was a huge relief for Jane. Even though the effects were not immediate, just knowing that she was finally getting the care to stop the changes to her body that were causing her so much pain really impacted her mental health in a positive way. I was just so happy to see her happy and getting what she needed to be herself.

17. In April 2021, Jane was nearly 15 and there were no doubts about the stability of Jane's female gender identity, so in consultation with Jane's doctor and after again discussing what to expect from estrogen therapy, the potential risks and benefits, and fertility preservation options, we all agreed that it was appropriate for Jane to start estrogen therapy for the continued treatment of her gender dysphoria.

18. Jane remains on estrogen therapy for the treatment of her gender dysphoria, under the care and supervision of her doctor.

19. Gender-affirming medical care has changed Jane's life, and the life of our family, for the better. She has never been happier. She has never been more herself. As a parent, to see where she started, in so much pain, in comparison to where she is today, a vibrant, happy, outgoing, beautiful young woman, has been lifechanging for me and my family as well. Her mental health

4

has significantly improved. Her grades in school have improved. And this is all because she was able to access the healthcare that she needed.

20.   As a family, when we first heard about H.B. 71, we were naturally concerned and confused. We have seen how beneficial gender affirming medical care had been for Jane.

21.   Leading up to H.B. 71 being passed, my husband and I witnessed Jane's mental health begin to decline, out of anxiety about what was happening in the state legislature and out of fear of having to stop gender-affirming medical care. Her mental health deteriorated to a state that we had not seen since before she came out to us and began treatment. It terrified all of us. Jane's anxiety around potentially losing care intensified to such debilitating levels that her grades began to slip again. She started missing school because her anxiety was so bad that she could not get out of bed or leave her room. She was scared to go outside. I was heartbroken to see my child, this beautiful flower that had blossomed so much and was finally thriving, start to wither away.

22.   On the day H.B. 71 passed into law, Jane was so emotionally devastated that my husband and I had to pick her up from school and bring her home for the day.

23.   This is the medical care that we want for our child. This is the medical care for which we sought out experienced, competent providers for. My husband, Jane's siblings, and I, are all so scared about what will happen to Jane if she is forced to stop treatment. We do not know what to do. We have thought about trying to find care in another state, but do not know if we can make it work with out-of-state providers, insurance, time off for travel, and the additional financial burden. My husband and I are also seriously considering uprooting our lives and our

children's lives by leaving Idaho, so that Jane can continue to receive the gender-affirming medical care she needs.

24. We do not want to leave Idaho. Jane does not want to leave Idaho. Her siblings do not want to leave Idaho. They have lived here their entire lives. This is where we have built our lives, it is our community, it is where they go to school, and it is where our friends and family are. I love my job and care deeply about the students that I work with. The reality that I might have to quit my job because of H.B. 71 makes me incredibly sad.

25. Our oldest child committed to attending Boise State University before any of this happened, because he wanted to remain close to us and we wanted to be close to him.

26. As each day passes, our fear grows and we are still grappling with what we must do if H.B. 71 goes into effect in a few months. Jane's health is our priority, and we know that we have done what is best for her. The fear and uncertainty is affecting all of us, and threatens to upend all of our lives. All that we want is for Jane to be able to continue receiving the care that we agree she needs, her providers agree that she needs, and that we have seen, firsthand, as necessary for our daughter to thrive.

27. But as parents who have seen what it means when their child is not receiving care, we understand how serious Jane's gender dysphoria is, and how harmful it would be if her treatment is cut off and all her progress is lost.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023.

*Joan Doe*