Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice*

*Additional counsel for Plaintiffs identified on
the following page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RAÚL LABRADOR**, et al.,<br><br>*Defendants*. | Case No. 1:23-cv-00269-CWD<br>**DECLARATION OF<br>ARIELLA BAREL IN SUPPORT OF<br>PLAINTIFFS' MOTION FOR A<br>PRELIMINARY INJUNCTION** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice*

I, Ariella Barel, declare under penalty of perjury of the laws of the United States of America that the following is true and correct, and state:

1.      I am an attorney with the law firm Groombridge, Wu, Baughman and Stone LLP, counsel of record for Plaintiffs Pam Poe, Penny Poe, Peter Poe, Jane Doe, Joan Doe, and John Doe.  I have been admitted *pro hac vice* in this Court for this action.  I make the following statements of my own personal knowledge, and, if called as a witness, I would and could testify competently thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of Idaho House Bill 509 of the 65th Legislature, introduced during the Second Regular Session of 2020, as published on the Idaho Legislature's official website.

3.      Attached hereto as Exhibit B is a true and correct copy of the engrossed version of Idaho House Bill 500 of the 65th Legislature, introduced during the Second Regular Session of 2020, as published on the Idaho Legislature's official website.

4.      Attached hereto as Exhibit C is a true and correct copy of the engrossed version of Idaho Senate Bill 1100 of the 67th Legislature, introduced during the First Regular Session of 2023, as published on the Idaho Legislature's official website.

5.      Attached hereto as Exhibit D is a true and correct copy of a Tweet from Tammy Nichols' official Twitter account, dated April 30, 2023.

6.      Attached hereto as Exhibit E is a true and correct copy of a Tweet from Tammy Nichols' official Twitter account, dated April 28, 2023.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on:  July 21, 2023

Ariella Barel, Esq.

# EXHIBIT A

LEGISLATURE OF THE STATE OF IDAHO
Sixty-fifth Legislature                    Second Regular Session - 2020

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 509

BY STATE AFFAIRS COMMITTEE

1              AN ACT
2  RELATING TO VITAL STATISTICS; AMENDING SECTION 39-240, IDAHO CODE, TO
3      PROVIDE LEGISLATIVE FINDINGS AND TO MAKE A TECHNICAL CORRECTION; AMEND-
4      ING CHAPTER 2, TITLE 39, IDAHO CODE, BY THE ADDITION OF A NEW SECTION
5      39-245A, IDAHO CODE, TO ESTABLISH PROVISIONS REGARDING CERTAIN FACTS
6      INCLUDED IN AND AMENDMENTS TO BIRTH CERTIFICATES; AND AMENDING CHAPTER
7      2, TITLE 39, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 39-279, IDAHO
8      CODE, TO PROVIDE SEVERABILITY.

9  Be It Enacted by the Legislature of the State of Idaho:

10      SECTION 1.  That Section 39-240, Idaho Code, be, and the same is hereby
11  amended to read as follows:

12      39-240.  SHORT TITLE -- LEGISLATIVE FINDINGS. (1) This act shall be
13  known and may be cited as the "Idaho Vital Statistics Act."
14      (2)  The legislature finds:
15      (a)  As early as 1632, government officials began tracking vital statis-
16  tics, specifically births, deaths, and marriages;
17      (b)  Today, state and local vital records offices record over eleven
18  million (11,000,000) vital events annually in the United States;
19      (c)  Material facts included in vital records include the date of birth,
20  the individual's sex, the location of birth, the parents' identities,
21  and the date of death;
22      (d)  The purpose of documenting factual information on vital records is
23  to help the government fulfill one of its most basic duties:  protecting
24  the health and safety of its citizens;
25      (e)  Numerous courts have recognized that the purpose of vital records
26  is to maintain an accurate database of factual information regarding
27  births, deaths, and other vital events in a given jurisdiction. See Sea
28  v. U.S. Citizenship & Immigration Servs., 2015 WL 5092509, at *4 (D.
29  Minn. Aug. 28, 2015) ("The public does have an interest in having accu-
30  rate records on vital statistics…"); Ampadu v. U.S. Citizenship & Immi-
31  gration Servs., Dist. Dir., 944 F. Supp. 2d 648, 655 (C.D. Ill. 2013)
32  (acknowledging "the public's interest in having accurate records on vi-
33  tal statistics"); Boiko v. Holder, 2013 WL 709047, at *2 (D. Colo. Feb.
34  26, 2013) ("[T]he government, and the public at large, would appear to
35  benefit from having the most accurate vital statistics records possi-
36  ble."); J.R. v. Utah, 261 F. Supp. 2d 1268, 1294 (D. Utah 2002) ("The
37  State also has a significant interest in the accuracy of the records it
38  keeps, particularly vital records like birth certificates.");
39      (f)  According to the national research council committee on national
40  statistics, factual information contained in vital records is used to
41  help diagnose and solve problems that impact national health, including
42  tracking and diagnosing disparities in mortality rates based on age and

1  sex, identifying factors that account for the significant differences
2  in life expectancy between males and females, measuring and seeking so-
3  lutions to socioeconomic inequalities in health based on sex and age,
4  and studying infant death rates based on sex, location, birth weight,
5  and other information collected from vital records;
6  (g)  Factual information from vital records is also necessary for na-
7  tional security.  It is used to identify potential disease epidemics,
8  such as the zika virus, that may disproportionately impact one sex over
9  the other;  expose covert bioterrorist attacks, such as determining
10  whether a sudden increase in certain symptoms in a population is due to
11  random chance or should be further investigated; and identify criminals
12  and terrorists, where vital records can be used to uncover fraudulently
13  obtained driver's licenses or passports; and
14  (h)  Allowing individuals to alter their vital records, including birth
15  certificates, based upon subjective feelings or experiences undermines
16  the government's interest in having accurate vital records.

17  SECTION 2.  That Chapter 2, Title 39, Idaho Code, be, and the same is
18  hereby amended by the addition thereto of a NEW SECTION, to be known and des-
19  ignated as Section 39-245A, Idaho Code, and to read as follows:

20  39-245A.  CERTIFICATES OF BIRTH -- MATERIAL FACTS INCLUDED -- AMEND-
21  MENTS.
22  (1)(a)  The legislature finds that:
23  (i)  There is a compelling interest in maintaining accurate, quan-
24  titative, biology-based material facts on Idaho certificates of
25  birth that provide material facts fundamental to the performance
26  of government functions that secure the public health and safety,
27  including but not limited to identifying public health trends,
28  assessing risks, conducting criminal investigations, and helping
29  individuals determine their biological lineage, citizenship, or
30  susceptibility to genetic disorders;
31  (ii)  The equal protection clause of the fourteenth amendment to
32  the United States constitution prohibits purposeful discrimina-
33  tion, not facially neutral laws of general applicability, such as
34  a biology-based definition of sex that has been consistently ap-
35  plied since our nation's founding;
36  (iii) Decades of court opinion have upheld the argument that bio-
37  logical distinctions between male and female are a matter of sci-
38  entific fact, and biological sex is an objectively defined cate-
39  gory that has obvious, immutable, and distinguishable character-
40  istics;
41  (iv)  Identification of biological sex on a birth certificate im-
42  pacts the health and safety of all individuals.  For example, the
43  society for evidence based gender medicine has declared that the
44  conflation of sex and gender in health care is alarming, subjects
45  hundreds of thousands of individuals to the risk of unintended
46  medical harm, and will greatly impede medical research;
47  (v)  Vital statistics are defined in section 39-241(21), Idaho
48  Code, as data, being the plural of datum, which is a known fact;

1      (vi)  Idaho certificates of birth are of an evidentiary character
2      and prima facie evidence of the facts recited therein, according
3      to section 39-274, Idaho Code;
4      (vii) Age and sex, unlike the names of natural parents whose rights
5      have been terminated, are legally applicable facts fundamental to
6      the performance of public and private policies and contracts;
7      (viii) The failure to maintain accurate, quantitative vital sta-
8      tistics and legal definitions upon which the government and others
9      may with confidence rely constitutes a breach of the public trust;
10      and
11      (ix)  The government has a compelling interest in maintaining the
12      public trust and confidence and a duty to fulfill, to the best of
13      its ability, those functions that rely on accurate vital statis-
14      tics.
15   (b)  Based on the findings in paragraph (a) of this subsection, the leg-
16 islature directs that an Idaho certificate of birth shall document spe-
17 cific quantitative, material facts at the time of birth, as provided in
18 subsection (2) of this section.
19   (2)  Any certificate of birth issued under the provisions of this chap-
20 ter shall include the following quantitative statistics and material facts
21 specific to that birth:  time of birth, date of birth, sex, birth weight,
22 birth length, and place of birth.
23   (3)  For purposes of this chapter, "sex" means the immutable biological
24 and physiological characteristics, specifically the chromosomes and inter-
25 nal and external reproductive anatomy, genetically determined at conception
26 and generally recognizable at birth, that define an individual as male or fe-
27 male.
28   (4)  The quantitative statistics and material facts identified in sub-
29 section (2) of this section may be amended within one (1) year of the filing
30 of the certificate by submitting to the registrar a notarized affidavit of
31 correction that:
32   (a)  Is on a form prescribed by the registrar;
33   (b)  Is signed by:
34      (i)  The parents identified on the certificate of birth; or
35      (ii)  The child's legal guardian;
36   (c)  Is signed by the physician or other person in attendance who pro-
37 vided the medical information and certified to the facts of birth; and
38   (d)  Declares that the information contained on the certificate of birth
39 incorrectly represents a material fact at the time of birth.
40   After one (1) year, the quantitative statistics and material facts
41 identified in subsection (2) of this section may be challenged in court only
42 on the basis of fraud, duress, or material mistake of fact, with the burden of
43 proof upon the party challenging the acknowledgment.
44   (5)  In those instances in which an individual suffers from a physiolog-
45 ical disorder of sexual development and the individual's biological sex can-
46 not be recognized at birth as male or female based upon externally observable
47 reproductive anatomy, the physician shall make a presumptive determination
48 of the individual's sex, which may thereafter be amended based on the appro-
49 priate combination of genetic analysis and evaluation of the individual's

1   naturally occurring internal and external reproductive anatomy as provided
2   in section (4) of this section.
3       (6)  Notwithstanding any provision of this section to the contrary, a
4   hospital may correct a birth certificate for a clerical or data entry error
5   at any time by submitting a notarized affidavit on a form specified by the
6   registrar with any appropriate supporting documentation.

7       SECTION 3.  That Chapter 2, Title 39, Idaho Code, be, and the same is
8   hereby amended by the addition thereto of a NEW SECTION, to be known and des-
9   ignated as Section 39-279, Idaho Code, and to read as follows:

10      39-279.  SEVERABILITY. The provisions of this chapter are hereby de-
11  clared to be severable, and if any provision of this chapter or the applica-
12  tion of such provision to any person or circumstance is declared invalid for
13  any reason, such declaration shall not affect the validity of the remaining
14  portions of this chapter.

# EXHIBIT B

LEGISLATURE OF THE STATE OF IDAHO
Sixty-fifth Legislature                    Second Regular Session - 2020

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 500, As Amended in the Senate

BY EDUCATION COMMITTEE

1    AN ACT
2  RELATING TO THE FAIRNESS IN WOMEN'S SPORTS ACT; AMENDING TITLE 33, IDAHO
3      CODE, BY THE ADDITION OF A NEW CHAPTER 62, TITLE 33, IDAHO CODE, TO
4      PROVIDE A SHORT TITLE, TO PROVIDE LEGISLATIVE FINDINGS AND PURPOSE, TO
5      PROVIDE FOR THE DESIGNATION OF ATHLETIC TEAMS, TO PROVIDE PROTECTION
6      FOR EDUCATIONAL INSTITUTIONS, TO PROVIDE FOR A CAUSE OF ACTION, AND TO
7      PROVIDE SEVERABILITY.

8  Be It Enacted by the Legislature of the State of Idaho:

9      SECTION 1.  That Title 33, Idaho Code, be, and the same is hereby amended
10  by the addition thereto of a NEW CHAPTER, to be known and designated as Chap-
11  ter 62, Title 33, Idaho Code, and to read as follows:

12                              CHAPTER 62
13                    FAIRNESS IN WOMEN'S SPORTS ACT

14      33-6201.  SHORT TITLE. This chapter shall be known and may be cited as
15  the "Fairness in Women's Sports Act."

16      33-6202.  LEGISLATIVE FINDINGS AND PURPOSE. (1) The legislature finds
17  that there are "inherent differences between men and women," and that these
18  differences "remain cause for celebration, but not for denigration of the
19  members of either sex or for artificial constraints on an individual's op-
20  portunity," United States v. Virginia, 518 U.S. 515, 533 (1996);
21      (2)  These "inherent differences" range from chromosomal and hormonal
22  differences to physiological differences;
23      (3)  Men generally have "denser, stronger bones, tendons, and liga-
24  ments" and "larger hearts, greater lung volume per body mass, a higher red
25  blood cell count, and higher haemoglobin," Neel Burton, The Battle of the
26  Sexes, Psychology Today (July 2, 2012);
27      (4)  Men also have higher natural levels of testosterone, which affects
28  traits such as hemoglobin levels, body fat content, the storage and use of
29  carbohydrates, and the development of type 2 muscle fibers, all of which re-
30  sult in men being able to generate higher speed and power during physical
31  activity, Doriane Lambelet Coleman, Sex in Sport, 80 Law and Contemporary
32  Problems 63, 74 (2017) (quoting Gina Kolata, Men, Women and Speed. 2 Words:
33  Got Testosterone?, N.Y. Times (Aug. 21, 2008));
34      (5)  The biological differences between females and males, especially
35  as it relates to natural levels of testosterone, "explain the male and female
36  secondary sex characteristics which develop during puberty and have life-
37  long effects, including those most important for success in sport:  cate-
38  gorically different strength, speed, and endurance," Doriane Lambelet Cole-
39  man and Wickliffe Shreve, "Comparing Athletic Performances:  The Best Elite
40  Women to Boys and Men," Duke Law Center for Sports Law and Policy;

(6)  While classifications based on sex are generally disfavored, the Supreme Court has recognized that "sex classifications may be used to compensate women for particular economic disabilities [they have] suffered, to promote equal employment opportunity, [and] to advance full development of the talent and capacities of our Nation's people," United States v.  Virginia, 518 U.S. 515, 533 (1996);

(7)  One place where sex classifications allow for the "full development of the talent and capacities of our Nation's people" is in the context of sports and athletics;

(8)  Courts have recognized that the inherent, physiological differences between males and females result in different athletic capabilities. See e.g.  Kleczek v.  Rhode Island Interscholastic League, Inc., 612 A.2d 734, 738 (R.I. 1992) ("Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition."); Petrie v.  Ill.  High Sch.  Ass'n, 394 N.E.2d 855, 861 (Ill.  App.  Ct.  1979) (noting that "high school boys [generally possess physiological advantages over] their girl counterparts" and that those advantages give them an unfair lead over girls in some sports like "high school track");

(9)  A recent study of female and male Olympic performances since 1983 found that, although athletes from both sexes improved over the time span, the "gender gap" between female and male performances remained stable. "These suggest that women's performances at the high level will never match those of men." Valerie Thibault et al., Women and men in sport performance: The gender gap has not evolved since 1983, 9 Journal of Sports Science and Medicine 214, 219 (2010);

(10) As Duke Law professor and All-American track athlete Doriane Coleman, tennis champion Martina Navratilova, and Olympic track gold medalist Sanya Richards-Ross recently wrote:  "The evidence is unequivocal that starting in puberty, in every sport except sailing, shooting, and riding, there will always be significant numbers of boys and men who would beat the best girls and women in head-to-head competition. Claims to the contrary are simply a denial of science," Doriane Coleman, Martina Navratilova, et al., Pass the Equality Act, But Don't Abandon Title IX, Washington Post (Apr.  29, 2019);

(11) The benefits that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones.  A recent study on the impact of such treatments found that even "after 12 months of hormonal therapy," a man who identifies as a woman and is taking cross-sex hormones "had an absolute advantage" over female athletes and "will still likely have performance benefits" over women, Tommy Lundberg et al., "Muscle strength, size and composition following 12 months of gender-affirming treatment in transgender individuals: retained advantage for the transwomen," Karolinksa Institutet (Sept. 26, 2019); and

(12) Having separate sex-specific teams furthers efforts to promote sex equality.  Sex-specific teams accomplish this by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors.

33-6203.   DESIGNATION OF ATHLETIC TEAMS. (1) Interscholastic, inter-
collegiate, intramural, or club athletic teams or sports that are sponsored
by a public primary or secondary school, a public institution of higher edu-
cation, or any school or institution whose students or teams compete against
a public school or institution of higher education shall be expressly desig-
nated as one (1) of the following based on biological sex:
(a)  Males, men, or boys;
(b)  Females, women, or girls; or
(c)  Coed or mixed.
(2)  Athletic teams or sports designated for females, women, or girls
shall not be open to students of the male sex.
(3)  A dispute regarding a student's sex shall be resolved by the school
or institution by requesting that the student provide a health examination
and consent form or other statement signed by the student's personal health
care provider that shall verify the student's biological sex.  The health
care provider may verify the student's biological sex as part of a routine
sports physical examination relying only on one (1) or more of the following:
the student's reproductive anatomy, genetic makeup, or normal endogenously
produced testosterone levels.  The state board of education shall promul-
gate rules for schools and institutions to follow regarding the receipt and
timely resolution of such disputes consistent with this subsection.

33-6204.   PROTECTION FOR EDUCATIONAL INSTITUTIONS. A government
entity, any licensing or accrediting organization, or any athletic associa-
tion or organization shall not entertain a complaint, open an investigation,
or take any other adverse action against a school or an institution of higher
education for maintaining separate interscholastic, intercollegiate, in-
tramural, or club athletic teams or sports for students of the female sex.

33-6205.   CAUSE OF ACTION. (1) Any student who is deprived of an ath-
letic opportunity or suffers any direct or indirect harm as a result of a vi-
olation of this chapter shall have a private cause of action for injunctive
relief, damages, and any other relief available under law against the school
or institution of higher education.
(2)  Any student who is subject to retaliation or other adverse action by
a school, institution of higher education, or athletic association or organ-
ization as a result of reporting a violation of this chapter to an employee
or representative of the school, institution, or athletic association or or-
ganization, or to any state or federal agency with oversight of schools or
institutions of higher education in the state, shall have a private cause of
action for injunctive relief, damages, and any other relief available under
law against the school, institution, or athletic association or organiza-
tion.
(3)  Any school or institution of higher education that suffers any di-
rect or indirect harm as a result of a violation of this chapter shall have a
private cause of action for injunctive relief, damages, and any other relief
available under law against the government entity, licensing or accrediting
organization, or athletic association or organization.
(4)  All civil actions must be initiated within two (2) years after the
harm occurred.  Persons or organizations who prevail on a claim brought pur-

4

1   suant to this section shall be entitled to monetary damages, including for
2   any psychological, emotional, and physical harm suffered, reasonable attor-
3   ney's fees and costs, and any other appropriate relief.

4       33-6206.   SEVERABILITY. The provisions of this chapter are hereby de-
5   clared to be severable and if any provision of this chapter or the applica-
6   tion of such provision to any person or circumstance is declared invalid for
7   any reason, such declaration shall not affect the validity of the remaining
8   portions of this chapter.

# EXHIBIT C

LEGISLATURE OF THE STATE OF IDAHO
Sixty-seventh Legislature                    First Regular Session - 2023

IN THE SENATE

SENATE BILL NO. 1100, As Amended

BY EDUCATION COMMITTEE

1          AN ACT
2   RELATING TO PROTECTING THE PRIVACY AND SAFETY OF STUDENTS IN PUBLIC SCHOOLS;
3       AMENDING TITLE 33, IDAHO CODE, BY THE ADDITION OF A NEW CHAPTER 66, TITLE
4       33, IDAHO CODE, TO PROVIDE LEGISLATIVE FINDINGS, TO DEFINE TERMS, TO ES-
5       TABLISH PROVISIONS REGARDING SCHOOL RESTROOMS, TO PROVIDE EXEMPTIONS,
6       TO PROVIDE FOR REASONABLE ACCOMMODATION IN CERTAIN INSTANCES, TO PRO-
7       VIDE FOR A CIVIL CAUSE OF ACTION, AND TO PROVIDE FOR PREEMPTION; PROVID-
8       ING SEVERABILITY; AND DECLARING AN EMERGENCY AND PROVIDING AN EFFECTIVE
9       DATE.

10  Be It Enacted by the Legislature of the State of Idaho:

11      SECTION 1. That Title 33, Idaho Code, be, and the same is hereby amended
12  by the addition thereto of a NEW CHAPTER, to be known and designated as Chap-
13  ter 66, Title 33, Idaho Code, and to read as follows:

14                          CHAPTER 66
15      PROTECTING THE PRIVACY AND SAFETY OF STUDENTS IN PUBLIC SCHOOLS

16      33-6601.  LEGISLATIVE FINDINGS. The legislature finds that:
17      (1)  There are real and inherent physical differences between men and
18  women;
19      (2)  Every person has a natural right to privacy and safety in restrooms
20  and changing facilities where such person might be in a partial or full state
21  of undress in the presence of others;
22      (3)  This natural right especially applies to students using public
23  school restrooms and changing facilities where student privacy and safety is
24  essential to providing a safe learning environment for all students;
25      (4)  Requiring students to share restrooms and changing facilities with
26  members of the opposite biological sex generates potential embarrassment,
27  shame, and psychological injury to students, as well as increasing the like-
28  lihood of sexual assault, molestation, rape, voyeurism, and exhibitionism;
29      (5)  Providing separate public school restrooms and changing facilities
30  for the different biological sexes is a long-standing and widespread prac-
31  tice protected by federal law, state law, and case law;
32      (6)  Federal legislative action, federal executive action, and fed-
33  eral court judgments that prevent public schools from maintaining separate
34  restrooms and changing facilities for different biological sexes are in-
35  consistent with the United States constitution and violate the privacy and
36  safety rights of students; and
37      (7)  A statewide policy ensuring separate school restrooms and chang-
38  ing facilities on the basis of biological sex is substantially related to the
39  important governmental interest in protecting the privacy and safety of all
40  students.

2

1    33-6602.   DEFINITIONS. For the purposes of this chapter:
2        (1)  "Changing facility" means a facility in which a person may be in a
3    state of undress in the presence of others, including a locker room, changing
4    room, or shower room.
5        (2)  "Public school" means any public school teaching K-12 students
6    within an Idaho school district or charter school.
7        (3)  "Sex" means the immutable biological and physiological character-
8    istics, specifically the chromosomes and internal and external reproductive
9    anatomy, genetically determined at conception and generally recognizable at
10   birth, that define an individual as male or female.

11   33-6603.   SCHOOL RESTROOMS. (1) Every public school restroom or chang-
12   ing facility accessible by multiple persons at the same time must be:
13       (a)  Designated for use by male persons only or female persons only; and
14       (b)  Used only by members of that sex.
15       (2)  No person shall enter a multi-occupancy restroom or changing facil-
16   ity that is designated for one sex unless such person is a member of that sex.
17   The public school with authority over the building shall ensure that all re-
18   strooms and changing facilities provide its users with privacy from members
19   of the opposite sex.
20       (3)  In any other public school setting where a person may be in a state
21   of undress in the presence of others, school personnel must provide separate
22   and private areas designated for use by persons based on their sex, and no
23   person may enter these private areas unless such person is a member of the
24   designated sex.
25       (4)  During any school authorized activity or event where persons share
26   overnight lodging, school personnel must provide separate sleeping quar-
27   ters for members of each sex.  No person shall share sleeping quarters, a
28   restroom, or a changing facility with a person of the opposite sex, unless
29   the persons are members of the same family.

30   33-6604.   EXEMPTIONS. This chapter shall not apply:
31       (1)  To single-occupancy restrooms and changing facilities or restrooms
32   and changing facilities that are conspicuously designated for unisex or fam-
33   ily use;
34       (2)  To restrooms and changing facilities that have been temporarily
35   designated for use by that person's biological sex;
36       (3)  To a person of one sex who uses a single-sex facility designated for
37   the opposite sex, if such single-sex facility is the only facility reason-
38   ably available at the time of the person's use of the facility;
39       (4)  To a person employed to clean, maintain, or inspect a restroom or
40   single-sex facility;
41       (5)  To a person who enters a restroom or facility to render medical as-
42   sistance;
43       (6)  To a person who is in need of assistance and, for the purposes
44   of receiving that assistance, is accompanied by a family member, a legal
45   guardian, or the person's designee who is a member of the designated sex for
46   the single-sex restroom or changing facility;
47       (7)  To coaching staff and personnel during athletic events; or

1    (8)  During an ongoing natural disaster or emergency, or when necessary
2  to prevent a serious threat to good order or student safety.

3    33-6605.   REASONABLE ACCOMMODATION. (1) A public school shall provide
4  a reasonable accommodation to a student who:
5    (a)  For any reason, is unwilling or unable to use a multi-occupancy re-
6    stroom or changing facility designated for the person's sex and located
7    within a public school building, or multi-occupancy sleeping quarters
8    while attending a public school-sponsored activity; and
9    (b)  Provides a written request for reasonable accommodation to the pub-
10   lic school.
11   (2)  A reasonable accommodation does not include access to a restroom,
12 changing facility, or sleeping quarter that is designated for use by members
13 of the opposite sex while persons of the opposite sex are present or could be
14 present.

15   33-6606.   CIVIL CAUSE OF ACTION. (1) Any student who, while accessing a
16 public school restroom, changing facility, or sleeping quarters designated
17 for use by the student's sex, encounters a person of the opposite sex has a
18 private cause of action against the school if:
19   (a)  The school gave that person permission to use facilities of the op-
20   posite sex; or
21   (b)  The school failed to take reasonable steps to prohibit that person
22   from using facilities of the opposite sex.
23   (2)   Any civil action arising under this chapter must be commenced
24 within four (4) years after the cause of action has occurred.
25   (3)  Any student who prevails in an action brought under this chapter may
26 recover from the defendant public school five thousand dollars ($5,000) for
27 each instance that the student encountered a person of the opposite sex while
28 accessing a public school restroom, changing facility, or sleeping quarters
29 designated for use by aggrieved student's sex.  The student may also recover
30 monetary damages from the defendant public school for all psychological,
31 emotional, and physical harm suffered.
32   (4)  Any student who prevails in action brought under this chapter is en-
33 titled to recover reasonable attorney's fees and costs from the defendant
34 public school.
35   (5)   Nothing in this chapter limits other remedies at law or equity
36 available to the aggrieved student against the school.

37   33-6607.   PREEMPTION. This chapter preempts any law, regulation, pol-
38 icy, or decree enacted or adopted by any city, county, municipality, or other
39 political subdivision within the state that purports to permit or require
40 public schools to allow persons to use facilities designated for the other
41 sex.

42   SECTION 2. SEVERABILITY. The provisions of this act are hereby declared
43 to be severable and if any provision of this act or the application of such
44 provision to any person or circumstance is declared invalid for any reason,
45 such declaration shall not affect the validity of the remaining portions of
46 this act.

4

1     SECTION 3.  An emergency existing therefor, which emergency is hereby
2  declared to exist, this act shall be in full force and effect on and after
3  July 1, 2023.

# EXHIBIT D



← Tweet

**Nichols For Idaho**
@nicholsforidaho

Frankenstein procedures on children are barbaric and people who do this should go to jail.

The following media includes potentially sensitive content. Change settings    View

7:42 PM · Apr 30, 2023 · **1,119** Views

**9** Retweets    **28** Likes

EXHIBIT E

← **Tweet**

 **Nichols For Idaho**
@nicholsforidaho

···

This is clearly an epidemic running in America because of a variety of reasons including indoctrination, social media, wokeism, mental health and more. States need to help stop the spread.
#stopthespread



NEWSMAX

**CDC: 1 IN 4 HIGH SCHOOL STUDENTS IDENTIFY AS LGBTQ**

♡  💬  ⊲                                                🔖

**13,408 likes**
**newsmax** In a new CDC youth survey, 1 in 4 high school students identify as something other than straight, more than double than previous years.

3:32 PM · Apr 28, 2023 · **1,998** Views