KRISTEN CLARKE, ASSISTANT ATTORNEY GENERAL
CHRISTINE STONEMAN, CHIEF
COTY MONTAG, DEPUTY CHIEF
**ALYSSA C. LAREAU, DC BAR NO. 494881**
**JENNA GRAMBORT, CO BAR NO. 49418**
**TRIAL ATTORNEYS**
CIVIL RIGHTS DIVISION
FEDERAL COORDINATION AND COMPLIANCE SECTION
950 PENNSYLVANIA AVENUE NW – 4CON
WASHINGTON, DC 20530
TELEPHONE: (202) 598-5032
Email: Alyssa.Lareau@usdoj.gov
Email: Jenna.Grambort@usdoj.gov

JOSHUA D. HURWIT, ID STATE BAR NO. 9527
UNITED STATES ATTORNEY
**NICHOLAS J. WOYCHICK, ID STATE BAR NO. 3912**
**CIVIL CHIEF**
CHRISTINE G. ENGLAND, ID STATE BAR NO. 11390
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 WEST MYRTLE STREET, SUITE 500
BOISE, ID 83702
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-9375
Email: NWoychick@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>RAÚL LABRADOR, et al.,<br><br>    Defendants. | Case No. 1:23-cv-00269-BLW<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA** |

The Idaho State Legislature recently enacted a statute that criminalizes the provision of medically necessary care to young people because of their sex and because they are transgender. Idaho House Bill 71, 2023 Idaho Sess. Laws Ch. 292 (codified at Idaho Code § 18-1506C) (H.B. 71), conditions the medical care a minor may receive on that person's sex assigned at birth. As a result, health care providers in Idaho are prohibited from administering medically necessary care for transgender minors diagnosed with gender dysphoria, while leaving non-transgender minors free to receive the same procedures and treatments. The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517[1] to advise the Court of its view that, by denying transgender minors—and only transgender minors—access to medically necessary and appropriate care, H.B. 71 violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, Plaintiffs are likely to succeed on the merits of their equal protection claim. *See* Pls.' Mot. for Prelim. Inj., Dkt. 32.[2]

## INTEREST OF THE UNITED STATES

The United States has a strong interest in protecting both individual and civil rights, including the rights of transgender persons. Executive Order 13,988 recognizes the right of all people to be "treated with respect and dignity," "to access healthcare . . . without being subjected to sex discrimination," and to "receive equal treatment under the law, no matter their gender identity or sexual orientation." 86 Fed. Reg. 7,023 (Jan. 25, 2021).

The United States has, for example, intervened in litigation challenging state laws restricting gender-affirming medical care for minors. *See* U.S. Compl. in Intervention, Dkt. 38-1,

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[2] The United States expresses no view on any issues in this case other than those set forth herein.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    1

*L.W. v. Skrmetti*, No. 3:23-cv-00376 (M.D. Tenn. Apr. 26, 2023); U.S. Am. Compl. in

Intervention, Dkt. 92, *Eknes-Tucker v. Ivey*, No. 2:22-cv-184-LCB-SRW (M.D. Ala. May 4,

2022). The United States has also filed numerous Statements of Interest related to state laws

banning gender-affirming medical care. *See* U.S. Statement of Interest, Dkt. 61, *Poe v.

Drummond*, No. 4:23-cv-00177-JFH-SH (N.D. Ok. June 9, 2023); U.S. Statement of Interest,

Dkt. 37, *Doe v. Thornbury*, No. 3:23-cv-00230-DJH (W.D. Ky. May 31, 2023); U.S. Statement

of Interest, Dkt. 19, *Brandt v. Rutledge*, No. 4:21-cv-00450-JM (E.D. Ark. June 17, 2021); Br.

for the U.S. as Amicus Curiae in Supp. Pls.-Appellees, *Brandt v. Rutledge*, No. 21-2875 (8th Cir.

Jan. 25, 2022).

## BACKGROUND

### A.     Transgender Youth and Their Need for Medically Appropriate Gender-Affirming Care

Transgender people are individuals whose gender identity does not conform with the sex

they were assigned at birth.[3] A transgender boy is a child or youth who was assigned a female

sex at birth but whose gender identity is male; a transgender girl is a child or youth who was

assigned a male sex at birth but whose gender identity is female. By contrast, a non-transgender,

or cisgender, child has a gender identity that corresponds with the sex the child was assigned at

birth. A person's gender identity is an essential part of one's identity and cannot be voluntarily

changed.[4]

According to the American Psychiatric Association's Diagnostic & Statistical Manual of

---

[3] Expert Decl. of Christine Brady, PhD, Dkt. 32-6 [hereinafter Brady Decl.], ¶ 12; *see also Karnoski v. Trump*, 926 F.3d 1180, 1187 n.1 (9th Cir. 2019).
[4] Brady Decl. ¶¶ 13-14.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          2

Mental Disorders,[5] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of "clinically significant distress" resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.[6] To be diagnosed with gender dysphoria, the incongruence between one's sex assigned at birth and one's gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning.[7] The inability of transgender youth to live consistent with their gender identity due to the irreversible physical changes that accompany puberty can have significant negative impacts on their overall health and wellbeing.[8] Thus, the delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality.[9]

The prevailing standard of care for treating gender dysphoria is set out in evidence-based guidelines[10] published by well-established medical organizations, including the World

---

[5] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision 2022) [hereinafter DSM-5-TR].

[6] DSM-5-TR at 511-15; Brady Decl. ¶¶ 16-17; *see also* Br. of Amici Curiae Am. Acad. of Pediatrics and Add'l Nat'l and State Med. and Mental Health Orgs. in Supp. Pls.' Mot. for Prelim. Inj., Dkt. 33-1 [hereinafter Br. Amici], at 4-5.

[7] DSM-5-TR at 511-15; Brady Decl. ¶¶ 17-19; Br. Amici at 2.

[8] Brady Decl. ¶¶ 32, 43; *see also* Expert Decl. of Kara Connelly, MD, Dkt. 32-7 [hereinafter Connelly Decl.] ¶ 62.

[9] DSM-5-TR at 511-15 ("Adolescents and adults with gender dysphoria before gender-affirming treatment . . . are at increased risk for mental health problems including suicidal ideation, suicide attempts, and suicides."); Brady Decl. ¶¶ 25, 42-44; Connelly Decl. ¶ 65; *see also* Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGTBQI+ Youth*, SAMHSA Publication No. PEP22-03-12-001 (2023), at 14, https://perma.cc/2SJU-8K66 [hereinafter *SAMHSA Report*] ("Withholding timely gender-affirming medical care when indicated . . . can be harmful because these actions may exacerbate and prolong gender dysphoria." (footnotes omitted)).

[10] The Guidelines are based on both clinical and research evidence in both youth and adult populations that evaluates the risks and benefits of providing this care, in addition to the risks of

---

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**            3

Professional Association for Transgender Health (WPATH) and the Endocrine Society

(collectively, Guidelines).[11] These Guidelines provide a framework for treating gender dysphoria

based on the best available science and clinical experience that is widely accepted for use with

children and adolescents, as endorsed by the American Academy of Pediatrics (AAP).[12]

Treatment for gender dysphoria differs for pre-pubertal children versus adolescents.[13] The

Guidelines recommend that pre-pubertal children with gender dysphoria receive treatments that

may include supportive therapy, encouraging support from loved ones, and assisting the young

person through elements of a social transition.[14] "Social transition" can include a name change,

pronoun change, bathroom and locker use, personal expression, and communication of affirmed

gender to others, and, for each person, may evolve over time.[15]

For some adolescents with gender dysphoria, the Guidelines recommend that treatments

---

[11] not providing care. Connelly Decl. ¶¶ 15, 57-58. The evidence is comparable in quantity and quality to evidence relied on to support many other medical interventions, and research supports the efficacy and safety of this care in addition to substantial evidence about the use of these medications in other areas of medicine. *Id.*

[11] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022) [hereinafter *WPATH Standards*]; Wylie Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017), https://perma.cc/8R3P-6NQY [hereinafter *ES Standards*]. *See also* Br. Amici at 6-7.

[12] Brady Decl. ¶¶ 26-29; Connelly Decl. ¶ 19; Br. Amici at 11-15; Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) Pediatrics 1 (2018), https://perma.cc/D4R6-GP6C [hereinafter *AAP Statement*]. S*ee also* Press Release, Am. Acad. Pediatrics, *AAP Reaffirms Gender-Affirming Care Policy, Authorizes Systematic Review of Evidence to Guide Update* (Aug. 4, 2023), https://perma.cc/C5TG-MEMG (expressing "confiden[ce]" in AAP's original policy authorizing a "systematic review of the evidence" supporting gender-affirming care in response to the organization's "concerns about restrictions to access to health care").

[13] Brady Decl. ¶¶ 31-32; Connelly Decl. ¶¶ 17-18.

[14] *See WPATH Standards* at S74-77; *AAP Statement* at 4-6; *see also* Brady Decl. ¶¶ 30-31; Br. Amici at 8.

[15] *See WPATH Standards* at S75-76; *AAP Statement* at 6; *see also* Brady Decl. ¶ 30.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          4

involving medications may be appropriate.[16] For instance, after the onset of puberty, treatment may include gonadotropin-releasing hormone agonists to prevent progression of pubertal development (also called "puberty blockers") and, for some older adolescents, hormonal interventions such as testosterone and estrogen.[17] The Guidelines make clear that gender-affirming medical care for transgender adolescents diagnosed with gender dysphoria should only be recommended when certain criteria are met.[18] These criteria include: when the adolescent meets the diagnostic criteria of gender dysphoria as confirmed by a qualified mental health professional; when the experience of gender dysphoria is marked and sustained over time; when gender dysphoria worsens with the onset of puberty; when the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; when the adolescent's other mental health concerns (if any) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and when the adolescent has been informed of any risks.[19] The Guidelines emphasize that an individualized approach to clinical care for transgender adolescents is both ethical and necessary and recommend a multidisciplinary approach.[20] The Guidelines cite to data demonstrating that pubertal suppression for transgender youth generally leads to improved psychological

---

[16] Brady Decl. ¶ 32; Connelly Decl. ¶ 18; Br. Amici at 8-11.
[17] Brady Decl. ¶ 32; Connelly Decl. ¶¶ 21-25; *WPATH Standards* at S116; Br. Amici at 9-11.
[18] *See WPATH Standards* at S59-S66; *ES Standards* at 3878; *AAP Statement* at 4-5; Connelly Decl. ¶¶ 22-25. The use of medical interventions to treat gender dysphoria in some cases is consistent with the types of gender-affirming medical care provided in several European countries, where care is subject to different guidelines but not categorically banned and is "provided when deemed appropriate for adolescents." Connelly Decl. ¶ 20.
[19] *See WPATH Standards* at S59-S66; *ES Standards* at 3878; *AAP Statement* at 4-6; Connelly Decl. ¶¶ 22-24.
[20] *See WPATH Standards* at S45 and S56; Br. Amici at 11.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    5

functioning in adolescence and young adulthood.[21]

Like all medical interventions, puberty blockers and hormone therapies carry risks of side effects, but the evidence in these cases shows that the risks are low, usually can be mitigated, and are outweighed by the treatments' benefits, when clinically indicated.[22] And—like all medical interventions—physicians are required to fully inform transgender youth and their parents or guardians of potential side effects so that they may determine for themselves whether the potential risks outweigh the benefits.[23]

### B.    Idaho House Bill 71

The Governor of Idaho signed H.B. 71, the "Vulnerable Child Protection Act," into law on April 4, 2023. H.B. 71 bans the prescription and administration of certain gender-affirming medical care to transgender youth suffering from gender dysphoria.

The law, set to go into effect on January 1, 2024, if not enjoined, prohibits medical providers from providing puberty blockers, hormone therapies, genital surgeries, or mastectomies to any minor "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." H.B. 71 § 1(3). H.B. 71 defines "child" as a person under age eighteen, and "sex" as "the immutable biological and physiological characteristics, specifically the chromosomes and

---

[21] *See WPATH Standards* at S47; *ES Standards* at 3882; *AAP Statement* at 5; *see also SAMHSA Report* at 37 ("Access to gender affirmation can reduce gender dysphoria and improve mental and physical health outcomes among transgender and gender-diverse people . . . ."); Brady Decl. ¶¶ 38-39; Connelly Decl. ¶ 31.

[22] *See generally* Brady Decl. ¶ 38; Connelly Decl. ¶¶ 30-37, 44-51.

[23] *See* Brady Decl. ¶ 37; Connelly Decl. ¶¶ 29, 51-54 (outlining informed consent process and observing that "[t]here is nothing unique about gender-affirming medical care that warrants departing from the normal principles of medical decision-making for youth that parents make the decision after being informed of the risks, benefits, and alternatives by physicians.").

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                  6

internal and external reproductive anatomy, genetically determined at conception and *generally recognizable at birth*, that define an individual as male or female." *Id.* §§ 1(2)(a), (b) (emphasis added). The statute prohibits healthcare providers from providing certain healthcare to minors if that care "alter[s] the appearance of" their sex assigned at birth, or if it "affirm[s] the child's perception of the[ir] . . . sex if that perception is inconsistent with" their sex assigned at birth. *Id.* § 1(3). In other words, H.B. 71 prohibits certain medical treatments *only* when offered as gender-affirming care for transgender youth.[24] In addition, H.B. 71 asserts that puberty blockers and hormone therapy are treatments that can "induce profound morphologic changes in the genitals of a child or induce transient or permanent infertility." *Id.* § 1(3)(c).

However, nothing in H.B. 71 prevents health care providers from administering these same medical treatments to non-transgender youth for other purposes. For example, a non-transgender minor who was assigned male at birth may receive testosterone as a treatment for hypogonadism or delayed puberty to allow the minor to progress through male puberty because the treatment is consistent with the sex the minor was assigned at birth.[25] The statute expressly states that its prohibitions do not apply to the treatment of minors born with certain conditions, such as "a child born with a medically verifiable genetic disorder of sex development," or who are later diagnosed with such a condition if "the physician has determined through genetic testing that the child does not have the normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female." *Id.* §§ 1(4)(c), (c)(ii). In addition, health care providers treating such "disorder[s] of sex development," commonly referred to as intersex traits, are specifically exempted from criminal liability under the statute.

---

[24] *See* Brady Decl. ¶ 12.
[25] *See* Connelly Decl. ¶¶ 38-42.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    7

*Id.* § 1(4)(c). Indeed, licensed medical providers may provide the prohibited care if they determine it medically necessary for *any other purpose* apart from treating gender dysphoria. *Id.* § 1(4)(a) (exempting procedures deemed "[n]ecessary to the health of the person on whom it is performed . . . except that a surgical operation or medical intervention is never necessary to the health of the child on whom it is performed if it is for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex"). In other words, only in the case of treating a transgender adolescent with gender dysphoria does the Idaho legislature deem it necessary to usurp a licensed health care provider's judgment that medical treatment is "necessary to the health" of a minor and criminalize treatment in accordance with that judgment. *Id.*

The penalties for a violation of H.B. 71 are severe. A health care provider may be charged with a felony, carrying a state prison sentence of up to ten years. *Id.* § 1(5). The statute also deems the provision of gender-affirming medical care to transgender minors a "crime[] of violence" by adding it to Idaho Code § 19-5307, which provides for a fine of up to $5,000. *Id.* §§ 2(1), (2).

## DISCUSSION

H.B. 71 violates the Fourteenth Amendment's Equal Protection Clause because it discriminates against transgender minors on the basis of their sex and their membership in a quasi-suspect class. Accordingly, the statute is subject to heightened scrutiny, which it fails because it is not substantially related to an important government interest. Plaintiffs are likely to succeed on the merits of their claim that the statute is unconstitutional, and thus their Motion for Preliminary Injunction (Dkt. 32) should be granted.

**A.    H.B. 71's Ban on Gender-Affirming Medical Care Warrants Heightened Scrutiny Under the Equal Protection Clause.**

H.B. 71 prohibits transgender youth from obtaining medically necessary gender-affirming care but leaves other minors eligible for the same treatments. Accordingly, the statute is subject to intermediate scrutiny for two reasons: (1) it discriminates on the basis of sex; and (2) it discriminates against transgender individuals, a quasi-suspect class.

**1.    H.B. 71's Ban on Gender-Affirming Medical Care Discriminates on the Basis of Sex.**

H.B. 71 discriminates on the basis of sex because whether a minor may receive the banned medical treatments under the statute depends on the sex the minor was assigned at birth. Under H.B. 71, the medical treatments available to a minor expressly depend on "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female"—*i.e.*, the minor's sex assigned at birth. H.B. 71 § 1(2)(b). Under the statute, a minor assigned female at birth cannot receive testosterone to treat gender dysphoria, but a non-transgender minor who was assigned male at birth can receive testosterone to treat low hormone production because the treatment is consistent with the sex the minor was assigned at birth. *See id.* §§ 1(3)(c), (4)(a). As the U.S. Supreme Court held in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1746 (2020), sex discrimination "unavoidably" occurs when an individual is treated differently based on transgender status, because the individual had "one sex identified at birth" but identifies with a different sex "today." *See also M.H. v. Jeppesen*, No. 1:22-cv-00409-REP, 2023 WL 4080542, at *11 (D. Idaho June 20, 2023) (holding that insurance policy's "seemingly gender-neutral exclusion is not so" because "exclusively transgender persons—and not cisgender persons—suffer from gender dysphoria").

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA          9**

Here, the medical care that H.B. 71 prohibits explicitly depends on a sex-based classification, as the scope of its ban on certain types of medical care is limited to people with gender dysphoria. H.B. 71 §§ 1(2)(b)-(3). The law simply cannot be enforced "without referencing sex." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020). *See also Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021) ("[H]eightened scrutiny applies to Plaintiffs' Equal Protection claims because [a law banning gender-affirming care for minors] rests on sex-based classifications . . . ."), *aff'd sub nom. Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022).

Indeed, recent Ninth Circuit authority confirms the approach that lower courts from this Circuit have long recognized: classifications involving transgender people similar to those in H.B. 71 constitute sex-based discrimination that is entitled to heightened scrutiny. *See Hecox v. Little*, Nos. 20-35813, 20-35815, 2023 WL 5283127, at *12 (9th Cir. Aug. 17, 2023) (holding that "discrimination on the basis of transgender status is a form of sex-based discrimination" in challenge to Idaho law categorically barring transgender women from participating in women's sports teams); *see also F.V. v. Barron*, 286 F. Supp. 3d 1131, 1143-44 (D. Idaho 2018) (observing that "significant changes in the medical understanding of gender identity call for a reexamination of its place in the equal protection context in relation to sex-based discrimination" and for a court to conclude that discrimination based on transgender status is not sex discrimination "is to depart from advanced medical understanding in favor of archaic reasoning."); *M.H.*, 2023 WL 4080542, at *8 ("[C]ourts in this district have held that discrimination against transgender individuals is a form of sex discrimination subject to

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**      10

heightened scrutiny."). While some circuits have taken a different approach,[26] this Circuit's jurisprudence requires the application of heightened scrutiny to these types of classifications.

H.B. 71 also discriminates on the basis of sex because it conditions the availability of particular medical procedures on a sex stereotype: that an individual's gender identity should match their sex assigned at birth. Many federal courts, including the Ninth Circuit, have repeatedly recognized that discrimination against transgender individuals based on their gender nonconformity is sex discrimination. *See, e.g.*, *Hecox*, 2023 WL 5283127, at *12 ("Indeed, '[m]any courts . . . have held that various forms of discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes.'" (quoting *Grimm*, 972 F.3d at 608)); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017), abrogated on other grounds as recognized by *Ill. Republican Party* v. *Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 572, 577 (6th Cir. 2004).[27] Accordingly, because H.B. 71 discriminates on the basis of sex, heightened scrutiny applies.

---

[26] *See Eknes-Tucker v. Governor of Alabama*, No. 22-11707, 2023 WL 5344981, at *1 (11th Cir. Aug. 21, 2023) (vacating preliminary injunction and holding that rational basis review applies); *L.W. v. Skrmetti*, 73 F.4th 408, 422 (6th Cir. 2023) (staying the Tennessee district court's preliminary injunction pending expedited appeal); *Doe v. Thornbury*, No. 3:23-cv-230-DJH, 2023 WL 4230481 (W.D. Ky. June 28, 2023) (granting preliminary injunction, later stayed in light of appeal consolidated with *L.W. v. Skrmetti*, Nos. 23-5600/5609 (6th Cir. July 8, 2023)).

[27] H.B. 71's carveout for intersex minors, § 1(4)(c), reinforces the conclusion that H.B. 71 discriminates on the basis of sex. The carveout exempts minors from H.B. 71's prohibitions if they are born with or later diagnosed with a "disorder of sex development," or intersex condition. *Id.* Consequently, under H.B. 71, it is legal for a medical provider to offer the same gender-affirming medical care to a minor with intersex traits as long as such care conforms the minor's appearance to the expectations of the sex they were assigned at birth; such care would be

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          11

That the statute's facial classifications are purportedly based on "biological" or "physiological" differences between sexes does not change the analysis.[28] *See, e.g.*, *Hecox*, 2023 WL 5283127, at *8. In *Hecox*, the Ninth Circuit noted that it had previously rejected a similar argument in a case involving state laws that regulated "procreative capacity" instead of sexual orientation, where the defendants argued that "heightened scrutiny is not appropriate because differential treatment by sexual orientation is an incidental effect of, but not the reason for, those laws." *Id.* at *10 (quoting *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014)). In rejecting the argument, the Ninth Circuit emphasized that whether sex discrimination exists does not depend on *why* a policy discriminates, but rather on the explicit terms of the policy. *Id.*

Nor does the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), alter this conclusion. In *Dobbs*, the Court reasoned that the challenged law did not trigger heightened scrutiny on the ground that "a State's regulation of abortion is not a sex-based classification" under the Fourteenth Amendment's Equal Protection Clause, and "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny" unless the regulation is pretext for discrimination. *Id.* at 2245-46. But, as the Ninth Circuit recently explained in *Hecox*, a law relying on a definition of "biological sex" that precisely excludes transgender people is itself a pretextual classification. 2023 WL 5283127, at *11 (distinguishing *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).

---

unlawful if offered for the purpose of affirming a transgender minor's gender identity because it differs from their sex assigned at birth.

[28] As noted above, H.B. 71 defines "sex" as "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." H.B. 71 §§ 1(1)-(2). After defining sex, H.B. 71 then then seeks to prohibit certain medical treatments only when the treatments are "inconsistent with" or "differ[]" from" a child's "biological sex." *Id.* at § 3.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    12

Furthermore, transgender patients are barred from receiving treatments that are available to non-transgender patients, and unlike laws regulating abortion, H.B. 71 regulates medical procedures that *all* individuals can undergo. Any reliance on *Dobbs* for the principle that heightened scrutiny is inapplicable to sex-based classifications in the healthcare context given "biological" differences between sexes "conflates the classifications drawn by the law with the state's justification for it." *Brandt*, 47 F.4th at 670.

> **2.     H.B. 71's Ban on Gender-Affirming Medical Care Discriminates Against Transgender Individuals, a Quasi-Suspect Class.**

In addition to discriminating based on sex, H.B. 71 warrants heightened scrutiny because it discriminates on the basis of transgender status, which this Court has held is a quasi-suspect classification. *See Hecox*, 2023 WL 5283127, at *11 ("We have previously held that heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a 'quasi-suspect class.'"); *Karnoski*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (stating that the district court "reasonably applied the factors" articulated in *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), to find transgender persons to be a quasi-suspect class); *F.V.*, 286 F. Supp. 3d at 1145 ("[T]ransgender people bear all of the characteristics of a quasi-suspect class and any rule developed and implemented by [defendant] should withstand heightened scrutiny review to be constitutionally sound."); *M.H.*, 2023 WL 4080542, at *8 (noting the Ninth Circuit and this district "have recognized that transgender status is a quasi-suspect classification in and of itself, and therefore, independently subject to heightened scrutiny").

This precedent, along with an analysis of the *Lyng* factors, compels the same conclusion here.[29] First, transgender individuals, as a class, have historically been subject to discrimination

---

[29] The factors include whether the group: (1) has historically been subjected to discrimination,

and continue to "face discrimination, harassment, and violence because of their gender identity."[30] Second, no "data or argument suggest[s] that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society."[31] Third, transgender individuals share "obvious, immutable, or distinguishing characteristics that define them as a discrete group."[32] Fourth, transgender individuals, as a community, lack political power.[33] It makes no difference that H.B. 71 does not explicitly use the word "transgender" or "gender identity" under the law's definition of "sex." Under the statute, only minors whose gender identity does not conform with their sex assigned at birth—in other words, only transgender minors—are prohibited from receiving the targeted medical treatments. In *Hecox*, the Ninth Circuit rejected Idaho's contention that, because its categorical sports ban for transgender girls "uses 'biological sex' in place of the word 'transgender,' it is not targeted at excluding transgender girls and women." 2023 WL 5283127, at *10. The court concluded: "The Act's specific classification of 'biological sex' has similarly been carefully drawn to target

---

*see Lyng*, 477 U.S. at 638; (2) has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) is a minority lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).

[30] *See F.V.*, 286 F. Supp. 3d at 1145 ("[T]ransgender people have been the subject of a long history of discrimination that continues to this day . . . [.]"); *see also Whitaker*, 858 F.3d at 1051 (same); *Grimm*, 972 F.3d at 611-612 (same); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020) (same).

[31] *Adkins v. N.Y.C.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *see also F.V.*, 286 F. Supp. 3d at 1145; *Grimm*, 972 F.3d at 612; *Ray*, 507 F. Supp. 3d at 937; *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016).

[32] *Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638); *see also Grimm*, 972 F.3d at 612-13; *F.V.*, 286 F. Supp. 3d at 1145 ("[T]ransgender status and gender identity have been found to be 'obvious, immutable, or distinguishing characteristic[s.]'"); *Ray*, 507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874 (quoting *Lyng*, 477 U.S. at 638).

[33] *See Grimm*, 972 F.3d at 613; *F.V.*, 286 F. Supp. 3d at 1145. That the United States has taken action in this matter does not demonstrate that transgender people have political power but instead underscores how dire their situation has become.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**      14

transgender women and girls, even if it does not use the word 'transgender' in the definition." *Id*. Similarly, despite the lack of the use of the term "transgender" the only purpose of H.B. 71 is to ban transgender youth from receiving medically necessary care.

> **B.    H.B. 71's Ban on Gender-Affirming Medical Care Cannot Survive Heightened Scrutiny Because it is not Substantially Related to Achieving Idaho's Important Governmental Interests.**

To withstand heightened scrutiny, a defendant must show that the challenged action "serves important governmental objectives" and that the "discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996) [hereinafter *VMI*] (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982)) (requiring an "exceedingly persuasive justification" for a sex-based classification)); *see also Craig v. Boren*, 429 U.S. 190, 197 (1976). "The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. The heightened scrutiny inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that a legal classification results from impermissible prejudice or stereotypes. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, the "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation," and it "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533; *see also Hecox*, 2023 WL 5283127, at *15 (finding that the sweeping prohibition on transgender female athletes was too overbroad to satisfy heightened scrutiny); *Glenn*, 663 F.3d at 1321; *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014). A classification does not withstand heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Miss. Univ. for Women*, 458 U.S. at 730.

H.B. 71's asserted purpose to protect "vulnerable" youth from harm cannot withstand heightened scrutiny, even assuming this asserted interest is genuine, because H.B. 71 is not, either on its face or as explained by the legislative record, substantially related to that goal. A criminal ban on providing transgender youth certain forms of medically necessary gender-affirming care is not "substantially related" to protecting vulnerable youth. *See VMI*, 518 U.S. at 533. Rather, it is a pretextual justification lacking accurate scientific or medical basis that ultimately harms—not helps—the minors it purports to protect. *See Hecox*, 2023 WL 5283127, at *13 (holding that "the Act's means . . . are not substantially related to, and in fact undermine," the purported legislative objectives). Banning these forms of gender-affirming care will have devastating effects on many transgender youths while providing no countervailing benefit to them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979) (requiring courts "weigh[] the state interest sought to be furthered against the character of the discrimination caused by the statutory classification").

First, it is well-established that the provision of gender-affirming medical care to treat gender dysphoria is helpful, not harmful, to transgender youth. Contrary to Idaho legislators' assertions that gender-affirming care for transgender youth is dangerous, every major medical association has recognized that gender-affirming care is safe, effective, and medically necessary treatment for the health and wellbeing of some youth diagnosed with gender dysphoria.[34] In fact, the medical evidence shows that trying to "cure" a person with gender dysphoria by forcing them to live in alignment with their sex assigned at birth is severely harmful and ineffective.[35] Transgender minors who do not receive gender-affirming care face increased rates of

---

[34] Br. Amici at 12-17; Connelly Decl. ¶¶ 36, 55-59.
[35] Brady Decl. ¶ 23; DSM-5-TR at 511-15.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**        16

victimization, substance abuse, depression, anxiety, and suicidality.[36] The medical community overwhelmingly agrees that this care is medically necessary for some transgender youth.[37]

Second, the medical research supporting the safety and efficacy of the forms of gender-affirming care banned by H.B. 71 is substantial. Contrary to the legislators' assertions in support of the law, gender-affirming medical treatment for patients diagnosed with gender dysphoria is far from "experimental"[38] in nature, and, instead, has long been recognized as part of the standards of care by major medical associations.[39] The American Medical Association recognizes that "standards of care and accepted medically necessary services that affirm gender or treat gender dysphoria may include mental health counseling, non-medical social transition, gender-affirming hormone therapy, and/or gender-affirming surgeries," and that "[e]very major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people."[40] Clinicians have used these standards of care, which are peer-reviewed and based on reviews of scientific literature, for

---

[36] *See* Jack L. Turban, et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, 17(1) PLoS ONE 1, 1-15 (2022); Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics 1, 1-8 (2020); Nat'l Academies Scis., Eng'g, and Med., *Understanding the Well-Being of LGBTQI+ Populations* 363-64 (2020); *see also* Brady Decl. ¶¶ 38-39; Connelly Decl. ¶¶ 31-34; Br. Amici at 5-6. *See generally AAP Statement.*

[37] *See, e.g.*, Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care,* 5(2) Pediatrics 1 (2022); Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones,* 7(3) Clinical Practice in Pediatric Psychology 302 (2019); *see also* Br. Amici at 12-15.

[38] H.B. 71, 67th Leg., 1st Reg. Sess. (Idaho 2023), https://perma.cc/NS9Y-UPWA (describing gender-affirming medical care as "experimental, irreversible, and medically unnecessary").

[39] Connelly Decl. ¶ 19; Br. Amici at 2, 6-14.

[40] *See, e.g.*, James L. Madara, *AMA to States: Stop Interfering in Health Care of Transgender Children*, AMA (April 26, 2021), https://perma.cc/7JYQ-FW2P.

---

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    17

decades.[41] Puberty blockers have been prescribed for many years to treat gender dysphoria, and

for 40 years to treat medical conditions such as precocious puberty.[42]

The conclusory assertions in H.B. 71 regarding the risks from receiving puberty blockers

and hormone therapy are not supported by scientific evidence. For example, it is simply untrue

that puberty blockers "induce profound morphologic changes in the genitals of a child" or induce

"permanent infertility." H.B. 71 § 1(3)(c).[43] This underscores the mismatch between the "alleged

objective" and "actual purpose" of H.B. 71. *See Miss. Univ. for Women*, 458 U.S. at 730. That

H.B. 71 allows health care providers to prescribe and administer these treatments for other

purposes serves as an implicit acknowledgment of their longstanding safety.[44] *See* H.B. 71

§ 1(4).

Furthermore, the legislation's text and history belie the purported purpose of protecting

youth, strongly suggesting that Idaho's asserted interest is pretextual. In discussing their

justifications for introducing H.B. 71, Idaho legislators demonstrated anti-transgender animus,

---

[41] *See* Meredith McNamara, M.D., M.S., et al., "A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria," at 5 (July 8, 2022), https://perma.cc/2LLH-EDYU; *see also* Br. Amici at 15-16.

[42] Connelly Decl. ¶ 37; Br. Amici at 9-10.

[43] Connelly Decl. ¶ 46 ("Pubertal suppression does not result in any permanent changes to the body and has no permanent impact on fertility as a stand-alone medication.").

[44] Medical experts recognize that "off-label use" of medications is a legal, ethical, and widely accepted practice. Connelly Decl. ¶ 59. In the field of pediatrics, off-label use is common: 45% of pediatric outpatient prescriptions are off-label, and nearly 80% of hospitalized children receive at least one drug off-label. *Id.* Off-label uses are common, in part, because FDA does not *sua sponte* engage in a review of all drugs for all potential uses. Instead, a sponsor must submit a new drug application expressly asking the FDA to approve a particular use. *See* 21 U.S.C. 355(a) and (d); 21 C.F.R. Pt. 314. A particular use may lack FDA approval for reasons entirely unrelated to a medication's safety and efficacy. For example, even where there is ample evidence supporting a drug's effectiveness for a new use and no apparent safety concerns, a sponsor may elect not to file an application with the FDA to market the drug for that use if not economically viable. Christopher M. Wittich et al., *Ten Common Questions (and Their Answers) About Off-Label Drug Use*, 87 Mayo Clinic Proc. 982, 985 (2012), https://perma.cc/2YHU-LLLJ.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          18

including a belief that all transgender youth are confused or that affirming transgender youths'

gender identity is equivalent to affirming that a patient's hallucinations are real.[45] H.B. 71 was

one of several bills introduced during the 2020 and 2023 Idaho legislative sessions that target

transgender Idahoans.[46] In April 2023, Representative Tammy Nichols, a co-sponsor of H.B. 71,

posted on Twitter (now called X) stating that a reported increase in the number of high school

students who identify as LGBTQ is an "epidemic. . . . States need to help stop the spread," and

calling gender-affirming medical care "Frankenstein procedures."[47]

       "[I]f the constitutional conception of 'equal protection of the laws' means anything, it

must at the very least mean" that the desire to express moral disapproval of "a politically

unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v.*

*Moreno*, 413 U.S. 528, 534 (1973). That is exactly what Idaho has done here, by attempting to

conceal its moral disapproval in the guise of "protecting" youth. *See Hecox*, 2023 WL 5283127,

---

[45] *See, e.g.*, Senate Chamber Session Day 78 (Mar. 27, 2023), 2:31:27,
https://lso.legislature.idaho.gov/MediaArchive/MainMenu.do (H.B. 71 co-sponsor Sen. Ben
Adams stating that "[w]e're drifting into a very dangerous place where we are recognizing
something is a mental health disorder and then we are affirming that that mental health disorder
is real," comparing gender-affirming care to treating a veteran with post-traumatic stress disorder
by encouraging his feeling "that everyone around him is trying to kill him"); House Chamber
Session Day 37 (Feb. 14, 2023), 21:30,
https://lso.legislature.idaho.gov/MediaArchive/MainMenu.do (H.B. 71 sponsor Rep. Bruce D.
Skaug stating that providing medical treatment based on "the child's thoughts and feelings . . .
[is] the wrong way to approach it scientifically"). The legislators did not refer to or cite any
medical or scientific support for any of these statements.

[46] *See, e.g.*, S.B. 1100, 2023 Idaho Laws Ch. 120, codified at Idaho Code § 33-6601-07
(prohibiting transgender students from using restrooms, changing facilities, and temporary
sleeping quarters that align with their gender identity); H.B. 509, 2020 Idaho Laws Ch. 334,
codified at Idaho Code § 39-240, 245A (prohibiting changes to sex designations on birth
certificates and vital records except in the cases of an intersex individual with ambiguous
genitalia or a clerical or data entry error); H.B. 500, 2020 Idaho Laws. Ch. 333, codified at Idaho
Code § 33-62 (prohibiting transgender girls from participating in athletic teams designated for
females, women, or girls).

[47] Decl. of Ariella Barel Ex. D, E (Dkt. 32-8).

---

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**     19

at *17 ("The record indicates that Idaho may have wished 'to convey a message of disfavor' toward transgender women and girls, who are a minority in this country. And '[t]his is a message that Idaho . . . simply may not send' through unjustifiable discrimination." (quoting *Latta*, 771 F.3d at 476) (internal citations omitted)). H.B. 71 prevents transgender minors diagnosed with gender dysphoria from receiving care that they, their physicians, and their parents agree is appropriate and medically necessary. Therefore, it does not substantially achieve the legislature's asserted interest in protecting youth and fails heightened scrutiny.[48]

## CONCLUSION

The Court should find that Plaintiffs are likely to succeed on the merits of their equal protection claim.

---

[48] A law like H.B. 71, motivated by prejudice towards a particular group and bearing no rational relationship to the law's stated purpose, cannot survive even the lowest level of review. *See Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534 ("[A] bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

Respectfully submitted this 23rd day of August, 2023,

JOSHUA D. HURWIT
United States Attorney
District of Idaho

 /s/ *Nicholas J. Woychick*
NICHOLAS J. WOYCHICK
Civil Chief

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief, Federal Coordination and Compliance Section

COTY MONTAG
Deputy Chief, Federal Coordination and Compliance Section

 /s/ *Alyssa C. Lareau*
ALYSSA C. LAREAU
JENNA GRAMBORT
Trial Attorneys
Federal Coordination and Compliance Section

*Attorneys for the United States of America*

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          21