RAÚL R. LABRADOR
ATTORNEY GENERAL

LINCOLN DAVIS WILSON, ISB #11860
Chief, Civil Litigation and
Constitutional Defense
RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID  83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8073
lincoln.wilson@ag.idaho.gov
rafael.droz@ag.idaho.gov

DAVID H. THOMPSON (PHV)
Special Deputy Attorney General
BRIAN W. BARNES (PHV)
Special Deputy Attorney General
JOHN D. RAMER (PHV)
Special Deputy Attorney General
Cooper & Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Attorneys for Defendants Raúl Labrador
and Individual Members of the Idaho
Code Commission*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00269-BLW<br><br>**COMBINED MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................. iv

INTRODUCTION .............................................................................................. 1

BACKGROUND ............................................................................................... 3

I.      Gender dysphoria is a psychiatric diagnosis ..................................... 3

II.     "Transitioning" minors inflicts irreversible harms and unknown risk .......... 5

        A. Taking cross-sex hormones before puberty causes sterility ...................... 5

        B. The neurological effects of suppressing puberty are unknown ................. 6

        C. Puberty blockers and cross-sex hormones cause other harms.................... 7

III.    No reliable science evidence justifies medical transition for minors.............. 7

        A. Medical ethics require benefits outweigh the risks..................................... 7

        B. European Authorities find benefits do not outweigh the risks.................. 8

        C. Detransitioners cast significant doubt on Plaintiffs' claims...................... 9

IV.     Idaho enacts the Vulnerable Child Protection Act ......................................... 10

STANDARD OF DECISION .......................................................................... 10

ARGUMENT .................................................................................................. 11

I.      The Court lacks subject matter jurisdiction ................................................. 11

II.     Plaintiffs fail to demonstrate a likelihood of success on the merits ............. 12

        A. The Act does not discriminate by sex or transgender status .................... 13

                1. The Act does not discriminate based on sex........................................ 13

                2. The Act does not discriminate based on transgender status................ 15

        B. Parents have no right to experimental and harmful treatments ............. 17

C.  The Act satisfies any level of scrutiny ..................................................... 19

D.  Plaintiffs' experts' opinions are unreliable ................................................ 24

III.   Plaintiffs have not met the remaining preliminary-injunction factors........... 27

IV.   The scope of Plaintiffs' requested relief is inappropriate ............................... 29

CONCLUSION.................................................................................................... 31

TABLE OF AUTHORITIES

CASES

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
495 F.3d 695 (D.C. Cir. 2007) ................................................................. 19

*California v. Azar,*
911 F.3d 558 (9th Cir 2018) ............................................................. 12, 27

*Coalition for the Econ. Equity v. Wilson,*
122 F.3d 718 (9th Cir. 1997) .................................................................. 27

*Daniels-Feasel v. Forest Pharms.,*
2021 WL 4037820 (S.D.N.Y. September 3, 2021), *aff'd,* 2023 WL 4837521 (2d Cir.
July 28, 2023) ........................................................................................ 24

*Dobbs v. Jackson Women's Health Organization,*
142 S. Ct. 2228 (2022) .................................................................. *passim*

*Doe v. Snyder,*
28 F.4th 103 (9th Cir. 2022) ................................................................. 16

*Doe 1 v. Thornbury,*
75 F.4th 655 (6th Cir. 2023) ................................................................. 28

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) ............................................................. 28

*East Bay Sanctuary Covenant v. Barr,*
934 F.3d 1026 (9th Cir 2019) ............................................................. 29

*EEOC v. Freeman,*
778 F.3d 463 (4th Cir. 2015) ............................................................. 24

*Eknes-Tucker v. Gov of Alabama,*
No., 22-11707, ___F.4th___ 2023 WL 5344981 (11th Cir. August 21, 2023) .. *passim*

*Ex parte McCardle,*
74 U.S. 506 ........................................................................................ 11

*Ex parte Young,*
209 U.S. 123 (1908) ............................................................................ 11

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ................................................................. 13

*Godecke v. Kinetic Concepts, Inc.,*
    937 F.3d 1201 (9th Cir. 2019) ................................................. 10

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ................................................................ 19

*Hecox v. Little,*
    Nos. 20-35813, 20-35815, ___F.4th___ 2023 WL 5283127 (9th Cir. August 17, 2023)
        *passim*

*In re Lipitor,*
    892 F.3d 624 (4th Cir. 2018) .................................................. 24

*In re Lipitor,*
    185 F. Supp. 3d (D.S.C. 2016) ........................................... 26, 27

*In re Zoloft,*
    26 F. Supp. 3d 449 (E.D. Penn. 2014) ................................... 24

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) ............................................ 3, 16

*Latta v. Otter,*
    771 F.3d 496 (9th Cir. 2014) ................................................. 27

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ................................................. 11

*L.W. v. Skrmetti,*
    73 F.4th 408 (6th Cir. 2023) ......................................... *passim*

*Newman v. Lance,*
    129 Idaho 98, 922 P.2d 395 (Idaho 1996) ............................. 12

*Planned Parenthood Greater Northwest v. Labrador,*
    No. 1:23-cv-00142-BLW, ___F.Supp.3d___, 2023 WL 4864962 (D. Idaho July 31, 2023) .................................................................................. 11

*Parham v. J. R.,*
    442 U.S. 584 (1979) ................................................................ 18

*Raidoo v. Moylan,*
    75 F.4th 1115 (9th Cir. 2023) ............................................................... 19

*Reed v. Reed,*
    404 U.S. 71 (1971).................................................................................. 12

*Rink v. Cheminova, Inc.,*
    400 F.3d 1286 (11th Cir 2005).............................................................. 24

*Roman v. Wolf,*
    977 F.3d 935 (9th Cir. 2020)................................................................. 27

*Rosen v. Ciba-Geigy Corp.,*
    78 F.3d 316 (7th Cir. 1996)................................................................... 26

*State v. Summer,*
    139 Idaho 219, 76 P.3d 963 (Idaho 2003)............................................ 12

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir 2022) ................................................................ 22

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)............................................................................ 21

*Tuan Anh Nguyen v. Immigration Naturalization Services,*
    533 U.S. 53 (2001).................................................................................. 14

*Twitter, Inc. v. Paxton,*
    56 F.4th 1170 (9th Cir. 2022) ............................................................... 11

*United States v. Hansen,*
    143 S. Ct. 1932 (2023)............................................................................ 30

*United States v. Virginia,*
    518 U.S. 515 (1996)................................................................................ 14

*United States v. Wilson,*
    484 F.3d 267 (4th Cir. 2007)................................................................. 26

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)........................................................................ 17, 18

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).................................................................................... 10

STATUTES

Idaho Code § 18-1506...................................................................... 10

Idaho Code § 31-2227...................................................................... 12

Idaho Code § 31-2604...................................................................... 12

OTHER AUTHORITIES

Academie Nationale de Medecine of France, Medicine and gender transidentity in
    children and adolescents, February 25, 2022 ........................................... 9

Attorney General Opinion No. 23-1 ......................................................... 11

Diagnostic and Statistical Manual of Mental Disorders 5-TR ("DSM-5").............. 3,

Guidelines from the World Professional Association for Transgender Health
    (WPATH) and the Endocrine Society ................................................. 5, 30

*Health services for children and young people with gender dysphoria,*
    Ugeskr Læger 2023; 185; V11220740 (July 3, 2023)................................. 9

Senate Chamber Session Day 78 (March 27, 2023)
    https://tinyurl.com/3ebfbknt........................................................... 22

Swedish Socialstyrelsen Support 2022 ................................................... 21

Testimony of Dr. Roger Hiatt, February 7, 2023,
    House Judiciary, Rules & Administration Hearing
    https://tinyurl.com/59jt7376 ......................................................... 23

The Cass Review, Independent Review of Gender Identity Services for Children and
    Young People: Interim Report at 33 (February 2022)
    http://tinyurl.com/5s55653n ......................................................... 4

## INTRODUCTION

Idaho's Vulnerable Child Protection Act regulates specific medical treatments for a specific psychiatric diagnosis in a specific age group. In particular, it prohibits the use of medical interventions (like puberty blockers and cross-sex hormones) and surgical interventions (like mastectomies and penectomies) as a treatment for gender dysphoria in minors. The Act permits the use of mental health therapy to treat gender dysphoria in minors. And the Act permits adults to obtain any intervention.

The reason for prohibiting these interventions for minors is clear: The interventions provide no proven benefit, impose lifelong and irreversible harm, and carry significant unknown risks. The harms include not only near-certain sterilization and lack of sexual function, but also increased chances of heart disease, stroke, blood clots, breast and uterine cancer, liver dysfunction, hypertension, and osteoporosis. The unknowns include a complete lack of evidence regarding long-term outcomes for the current patient population and *total* uncertainty regarding the neurological and cognitive effects resulting from the suppression of healthy puberty in adolescents. No benefit from these interventions has been reported in any reliable study. And not a single systematic review—the highest form of medical evidence—has ever demonstrated reduced death by suicide from these interventions.

Governments around the globe have taken note. Specifically, public health authorities in Europe have acknowledged that the risks associated with these interventions outweigh any demonstrated benefits. Several states in the U.S. have likewise acknowledged the danger of these interventions and corresponding lack of proven benefit and prohibited the practice of this experimental medicine on minors.

Two federal courts of appeals have concluded that such commonsense regulations are likely constitutional. The Eleventh Circuit Court of Appeals recently vacated a preliminary injunction against Alabama's law protecting minors from these interventions. And the Sixth Circuit Court of Appeals stayed preliminary injunctions against similar laws in both Tennessee and Kentucky.

The reasoning of those decisions shows why Idaho's Vulnerable Child Protection Act is likewise constitutional. Specifically, the Act is not subject to heightened scrutiny merely because it acknowledges biological differences that must be considered in the medical context. The Act is not subject to heightened scrutiny absent some showing of invidious discrimination—which cannot be made here. Lastly, the Parent Plaintiffs' claims fail because parents do not have a substantive Due Process right to obtain for their children puberty blockers, cross-sex hormones, and surgeries that are prohibited by state law. One cannot conclude that these interventions are "deeply rooted in our Nation's history."

Moreover, even if the Act were subject to heightened scrutiny, it easily passes. The Act serves the compelling government interest of protecting minors from harmful and unproven medical interventions. And a prohibition on those interventions is necessary to adequately serve that compelling interest because almost nothing is known about the long-term consequences associated with them. In addition, the existence of detransitioners—those who have transitioned but later come to identify with their sex—offers living proof that, as Plaintiffs' experts conceded, providers cannot know who has a "true" need for these interventions ahead of time.

Finally, even if Plaintiffs are entitled to injunctive relief, they have offered no justification for either statewide relief or an injunction against the Act in all its applications. Therefore, if the Court enters an injunction, it should limit the scope of that injunction to Plaintiffs and their providers.

BACKGROUND

## I.    Gender dysphoria is a psychiatric diagnosis.

There are two human sexes—male and female. Malone Decl. ("Malone") ¶ 59. An individual's sex is an objective and biological fact that cannot be changed. *Id.*; Weiss Decl. ("Weiss")¶ 34. Distinct from "sex," an individual's "gender identity" is his or her personal sense of being male or female. *See* Malone ¶ 62. Individuals "identify as transgender" when their sex is different from their gender identity. *Karnoski v. Trump*, 926 F.3d 1180, 1187 n.1 (9th Cir. 2019). "Gender dysphoria," in contrast, is a specific psychiatric diagnosis defined by diagnostic criteria set out in the *Diagnostic and Statistical Manual of Mental Disorders* 5-TR ("DSM-5"). Cantor Decl. ("Cantor") ¶ 109.  Although its definitions vary slightly for children, adolescents, and adults, all cases are characterized by a strong and lasting desire to be the opposite sex and "clinically significant" distress that impairs the individual's ability to function in daily life. *Id.*

In the last decade, the number of minors diagnosed with gender dysphoria has exploded. Cantor ¶ 64; Malone ¶ 15. This explosion has disproportionately affected adolescent natal females. Malone ¶ 16. The following chart displays the number of minors, distinguished by sex, referred to the UK's Gender Identity Services clinic between 2009 and 2016:



Figure 1: Sex ratio in children and adolescents referred to GIDS in the UK (2009-16)

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| Adolescents F | 15 | 48* | 78* | 141* | 221* | 314* | 689* | 1071* |
| Adolescents M | 24 | 44* | 41 | 77* | 120* | 185* | 293* | 426* |
| Children F | 2 | 7 | 12 | 17 | 22 | 36 | 77* | 138* |
| Children M | 10 | 19 | 29 | 30 | 31 | 55* | 103* | 131 |

AFAB = assigned female at birth; AMAB = assigned male at birth

*Indicates p<.05 which shows a significant increase of referrals compared to the previous year

Source: de Graaf NM, Giovanardi G, Zitz C, Carmichael P (2018).[32]

The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Interim Report at 33 (Feb. 2022), *available at* http://tinyurl.com/5s56653n.

Health authorities in the UK, Sweden, and Finland have noted this phenomenon is "unexplained," with this group of "later-presenting birth-registered female teenagers" now the "current predominant cohort" of minors with gender dysphoria. Cantor ¶¶ 64-65. Some researchers posit that "social contagion," meaning the "well-established psychological concept defined as the spread of behaviors, attitude and affect through crowds and other types of social aggregates from one member to another," may be a "factor in both the rise of new cases and the demographic shift

towards females." Malone ¶¶ 16-17. Others have noted the correlation between this increase and social media. Cantor ¶¶ 287-89.

## II.    "Transitioning" minors inflicts irreversible harms and unknown risk.

Psychotherapy is an accepted approach to treating gender dysphoria. Cantor ¶¶ 16, 290.  Advocates of so-called "gender-affirming care," however, also endorse medically and surgically "transitioning" as a treatment for minors with gender dysphoria. These interventions cause known harms and carry unknown risks.

### A.    Taking cross-sex hormones before puberty causes sterility.

The protocol for *medical* interventions to treat gender dysphoria calls for the suppression of an adolescent's natural puberty. As Plaintiffs explain, under the guidelines from the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, providers prescribe GnRH agonists (puberty blockers) to suppress an adolescent's natural puberty. Dkt. 32-1 at 4. This suppression allegedly prevents the distress associated with going through natural puberty when the adolescents' gender identity is not consistent with their sex. *See  id.*

Next, as Plaintiffs also explain, providers prescribe cross-sex hormones. *See id.* This means that natal females take testosterone, and natal males take estrogen. *Id.* Adolescents who are prescribed cross-sex hormones for this purpose "will require continuing treatment with cross-sex hormones for life." Cantor ¶ 224.

It is a near certainty that treatment in accordance with either the WPATH or Endocrine Society Guidelines will result in sterility. It is essentially indisputable that taking cross-sex hormones without first going through puberty will sterilize a person. Cantor ¶ 205; Malone ¶ 118; Weiss ¶ 116. Relatedly, these individuals may never be

able to achieve an orgasm. Cantor ¶ 208; Weiss ¶ 115.  Even for those who begin such treatment at a later stage of puberty, "no studies at all have been done" regarding "when, … or with what probability either males or females can achieve healthy fertility if they later regret their transition" and cease treatment.  Cantor ¶ 206. "Infertility is frequent in those females treated with testosterone even if not given puberty blockers." Weiss ¶ 134. And the "hormonal and surgical treatment pathway" will sterilize a person. Malone ¶ 19.

There are no established fertility options for minors who undergo medical transition.  For minors who take cross-sex hormones without going through puberty, "no viable fertility preservation options exist." Cantor ¶ 205. The "fertility options" for natal females who have been exposed to cross-sex hormones are so uncertain "that mouse studies are being done to try to understand how to mitigate the harm." Weiss ¶ 135. In addition, when natal females undergo a so-called "gender-affirming mastectomy," Connelly Decl. ¶ 26, "it is functionally irreversible" and "breast-feeding a child will never be possible."  Cantor ¶ 207.

## B.    The neurological effects of suppressing puberty are unknown.

Pubertal hormones "drive important stages of neural development."  Cantor ¶ 209. As UK health authorities have put it, a "further concern" regarding pubertal suppression "is that adolescent sex hormone surges may trigger the opening of a critical period for experience-dependent rewiring of neural circuits underlying executive function," meaning "maturation of the part of the brain concerned with planning, decision making and judgment." *Id.* (quotations omitted).

"To date, there has been very limited research on the short-, medium- or longer-term impact of puberty blockers on neurocognitive development." *Id.* (quotations omitted). Given this lack of knowledge, many "have expressed concern that blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development." Cantor ¶ 212.

### C.    Puberty blockers and cross-sex hormones cause other harms.

In addition to near-certain infertility, medicalized transition causes additional harms. These harms include "increased risks of heart disease, stroke, blood clots, breast and uterine cancer, liver dysfunction, hypertension, and osteoporosis." Malone ¶ 24; *see also* Cantor ¶¶ 214-225; Weiss ¶¶ 133, 136-49.

## III.    No reliable science evidence justifies medical transition for minors.

Because the "fundamental objective of medicine is to enhance an individual's health and well-being," a medical intervention is justified only when its probable benefits outweigh its probable risks. Malone ¶ 40. Systematic reviews of the evidence—including those by European health authorities—have concluded that the evidence does not show the benefits of medically or surgically "transitioning" minors outweigh the risks. European health authorities concluded that the experience of "detransitioners" casts doubt on the safety and efficacy of these treatments.

### A.    Medical ethics require benefits outweigh the risks.

Any particular medical treatment cannot simply be labeled "safe." Cantor ¶ 70. Instead, a medical treatment is appropriate only when the probable benefits outweigh the probable risks associated with the treatment. Cantor ¶ 71. Under this risk-benefit analysis, serious risks associated with a particular treatment cannot be

justified "without evidence of correspondingly greater benefit." Cantor ¶ 52. There-fore, no medical intervention that carries risks should be used unless there is "a higher degree of certainty regarding its benefits." Malone ¶ 40. Given the significant irreversible risks—including sterility—of medically and surgically transitioning mi-nors, these interventions cannot be justified unless there is a high degree of certainty regarding their benefits. *Id.* ¶¶ 40-42.

### B.   European Authorities find benefits do not outweigh the risks.

Several European countries have concluded that the demonstrated benefits do not clearly outweigh the risks. *Id.* ¶¶ 124-30.  In particular, health authorities in Sweden and the U.K. have engaged in systematic reviews of the evidence surrounding these treatments.  Cantor ¶¶ 78-85.  This means the health authorities engaged in "a comprehensive analysis of the entire body of evidence" surrounding the "transition" of minors, rather than focused on "individual research studies alone." Malone ¶ 27. The point of the systematic review is to "minimiz[e] opportunities for bias in gather-ing and evaluating research evidence." Cantor ¶ 40.  A systematic review is the high-est form of medical evidence.  *Id.*

Every systematic review of medically and surgically transitioning minors shows a "low" or "very-low" degree of certainty in mental-health improvement. Malone ¶ 28. No systematic review has ever demonstrated reduced death by suicide resulting from these treatments. *Id*. After Swedish health authorities conducted their systematic review, they concluded that the "risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Cantor ¶ 28 (quotations omitted). UK health authorities have

said "it is an unanswered question whether the evidence for the use and safety of [puberty blockers] is strong enough as judged by reasonable clinical standards." *Id.* ¶ 19 (quotations omitted). Health authorities and researchers in Finland, Norway, France, and Denmark have expressed similar caution. *Id.* ¶¶ 21-24, 29-33; Malone ¶ 129. Meanwhile, in the United States, the FDA has not approved the use of puberty blockers or cross-sex hormones as a treatment for gender dysphoria. *L.W. v. Skrmetti*, 73 F.4th 408, 418 (6th Cir. 2023) (noting "the FDA is not prepared to put its credibility and careful testing protocols behind the use" of these drugs for this purpose).

## C. Detransitioners cast significant doubt on Plaintiffs' claims.

With the rise of minors being diagnosed with gender dysphoria has come the rise of "detransitioners"—those who have previously undergone some form of "gender-affirming" treatment but later come to identify with their natal sex. Malone ¶ 12. At least two recent studies suggest the medical detransition rate among youth who underwent gender transitions in recent years may be as high as 30%—and that is only within a few years of beginning transition. *Id.* ¶ 34. A study based on a highly reliable dataset from the U.S. military healthcare system similarly showed that nearly 30% of youth who commenced medical transition discontinued it within the first four years. *Id.* ¶ 35. The existence of detransitioners has been part of the basis for caution throughout the world. Cantor ¶ 29 (citing Press Release, Academie Nationale de Medecine of France, Medicine and gender transidentity in children and adolescents, February 25, 2022); Malone ¶ 129 (citing Status Article, *Health services for children and young people with gender dysphoria,* Ugeskr Læger 2023; 185: V11220740 (July 3, 2023)). The unexplained fact of those who transitioned as minors and later came

to identify with their natal sex casts doubt on the entire practice of "youth transgender medicine."

## IV.   Idaho enacts the Vulnerable Child Protection Act.

This past spring, Idaho passed a law to protect children and adolescents from the dangers of these unproven medical and surgical interventions. The Vulnerable Child Protection Act (the Act) makes it a crime to perform particular surgical or medical interventions on minors "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." *See* Idaho Code § 18-1506(c)(3).  The Act will go into effect on January 1, 2024.

Plaintiffs filed this lawsuit in May. *See* Dkt. 1.  The Plaintiffs are two minors and their respective parents. *Id.* ¶¶ 6-7.  They allege they are currently receiving care that will be prohibited by the Act in January.  *Id.*  Plaintiffs filed this motion for a preliminary injunction in July. *See* Dkt. 32.

### STANDARD OF DECISION

A motion to dismiss under Rule 12(b)(6) may seek dismissal based on "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008). And a court cannot grant a preliminary injunction if it lacks subject matter jurisdiction. *See Ex parte McCardle*, 74 U.S. 506, 514.

ARGUMENT

## I.    The Court lacks subject matter jurisdiction.

At the outset, Plaintiffs' claims against the Attorney General and the members of the Idaho Code Commission fail for lack of subject matter jurisdiction. These Defendants have Eleventh Amendment immunity, and the *Ex parte Young* exception applies only if they are "clothed with some duty in regard to the enforcement of the laws of the state, and ... threaten and are about to commence proceedings ... to enforce against parties affected [by] an unconstitutional act." *Ex parte Young*, 209 U.S. 123, 155–56 (1908). And proving a justiciable controversy in the pre-enforcement context also requires a threat: for standing, "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022), and for ripeness, a "specific and credible threat of adverse action." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010).

Plaintiffs do not meet these standards as to the Attorney General and the Code Commission Defendants. As the Attorney General has recently explained, he lacks authority to enforce Idaho criminal law absent a referral by county prosecutors, and Plaintiffs do not allege that any such referral has occurred, much less that the Attorney General has made any threat of enforcement.[1] *See* Formal Att'y Gen. Op. 23-1;

---

[1] The Attorney General recognizes that the Court has recently rejected this argument but he asserts it here to preserve his immunity defense. *Planned Parenthood v. Labrador*, ___ F.Supp.3d ____, 2023 WL 4864962, at *7 (D. Idaho July 31, 2023).

Idaho Code § 31-2227; Idaho Code § 31-2604;*Newman v. Lance*, 922 P.2d 395, 399 (Idaho 1996); *State v. Summer*, 76 P.3d 963, 968 (Idaho 2003). And there is even less of a connection to the members of the Idaho Code Commission, which has *no* enforcement authority of any kind, nor do Plaintiffs allege otherwise. The mere act of publication of the code is not enforcement, and it has no nexus to Plaintiffs' purported harm. Dkt. 1 ¶ 123. In fact, the only claim they assert against the members of the Code Commission—that the law is void for vagueness—is not even one on which they seek a preliminary injunction. *See* Dkt. 1, Count III.

## II.     Plaintiffs fail to demonstrate a likelihood of success on the merits.

Plaintiffs fail to demonstrate a likelihood of success on the merits—the "most important" preliminary-injunction factor—for several reasons. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quotations omitted). First, the Act is not subject to heightened scrutiny because it does not discriminate on the basis of either sex or transgender status. Second, even if the Act were subject to heightened scrutiny, it is constitutional given the compelling interest served by the Act and the fact that the treatments at issue offer no proven benefit, impose numerous long-term irreversible harms, and carry risks that are completely unknown.

### A.     The Act does not discriminate by sex or transgender status.

#### 1.  The Act does not discriminate based on sex.

Under the Equal Protection Clause, sex discrimination is a "preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971). The Act clearly does not violate this constitutional principle because it applies to both males and females the same. Instead, as the Eleventh Circuit held with

respect to a similar law, the Act "is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause." *Eknes-Tucker v. Gov. of Ala.*, No. 22-11707, --- F.4th---, 2023 WL 5344981, at *15 (11th Cir. Aug. 21, 2023).

Moreover, a statute regulating *medical procedures* does not trigger heightened scrutiny when it acknowledges sex-based distinctions. As the Supreme Court recently explained, "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny" absent a showing of "'invidious discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). "In *Geduldig*, the Supreme Court stated that a classification based on pregnancy is not per se a classification based on sex, even though 'it is true that only women can become pregnant.'" *Hecox v. Little*, Nos. 20-35813, 20-35815, ___ F.4th ____, 2023 WL 5283127, at *11 (9th Cir. Aug. 17, 2023) (quoting *Geduldig*, 417 U.S. at 496 n.20). Here, the Act regulates two *separate* "medical procedure[s] that only one sex can undergo," *id.*, because a natal female "cannot transition through use of estrogen" and a natal male "cannot transition through use of testosterone," *L.W.*, 73 F.4th at 419. The Act does not trigger heightened scrutiny simply because it acknowledges these biological distinctions.

It is true the Act "mentions the word 'sex.'" *Id*. But as the Sixth Circuit recently asked with respect to a similar law, "how could it not?" *Id.* "That is the point of the existing hormone treatments—to help a minor transition from one gender to another." *Id.* Thus, the Act "refers to sex only because the medical procedures that it

regulates—puberty blockers and cross-sex hormones as a treatment for gender dys-phoria—are themselves sex-based." *Eknes-Tucker*, 2023 WL 5344981 at *16.

Plaintiffs' sex-stereotyping argument fails for a similar reason. Dkt. 32-1 at 14–15. First, "[p]hysical differences between men and women are . . . enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). They are "not a stereotype." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). And this enduring biological reality ex-plains *why* the "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245–46.

Second, the diagnosis of gender dysphoria turns *expressly* on sex stereotypes. For example, the criteria for pre-pubertal children asks whether the child has shown a preference "for the toys, games, or activities *stereotypically* used or engaged in by the other gender." Dkt. 32-6 ¶ 18 (emphasis added). For boys, it asks if the child re-jected "*typically masculine* toys, games, and activities" and demonstrated an "avoid-ance of rough-and-tumble play." *Id.* (emphasis added). For girls, it asks whether the child rejected "*typically feminine* toys, games, and activities." *Id.* (emphasis added). Thus, the Act "targets certain medical interventions for minors meant to treat the condition of gender dysphoria," which is expressly diagnosed based on gender stereo-types. *Eknes-Tucker*, 2023 WL 5344981 at *17. But the Act *itself* "does not further any particular gender stereotype." *Id.* Instead, it simply regulates particular inter-ventions for a *diagnosis* that turns on gender stereotypes. *Id.*

Third, Plaintiffs' examples of medical procedures that, they say, demonstrate sex-based discrimination only undermine their argument. Specifically, Plaintiffs highlight treatments for gynecomastia in natal males and polycystic ovarian

syndrome (PCOS) in natal females. *See* Dkt. 32-1 at 15. But neither gynecomastia nor PCOS are *psychological* disorders. As Plaintiff's own expert admitted, gynecomastia is "diagnosed clinically by physical exam" and "does not turn on the presence or lack thereof of psychological distress." Connelly Dep. ("Ex. A") 247:6-8, 14-17. Similarly, Plaintiffs' expert admitted that the diagnosis for PCOS "is not dependent o[n] psychological distress." Ex. A 248:1-6. Thus, treatments for gynecomastia and PCOS do not "affirm" the gender of a patient to treat psychological distress; rather, they treat *physical* conditions. In contrast, and also as Plaintiffs' expert admitted, the purpose of prescribing puberty blockers and cross-sex hormones is to treat the *psychological* condition of gender dysphoria. Ex. A 70:12-25. Plaintiffs provide no example of a treatment permitted in Idaho that "affirms" the gender of a natal male as male or a natal female as female to treat *psychological distress*. Therefore, permitting treatments for gynecomastia and PCOS does not reflect any sort of sex-based discrimination in the Act's regulation of medical interventions as a treatment for gender dysphoria in minors.

### 2.  The Act does not discriminate based on transgender status.

The Ninth Circuit has "held that heightened scrutiny applies to laws that discriminate on the basis of transgender status" because transgender persons are a "'quasi-suspect class.'" *Hecox*, 2023 WL 5283127 at *11. While Defendants dispute that holding and reserve their right to challenge it *en banc* or before the Supreme Court, even if it were correct, it would not apply here based on the testimony of Plaintiffs' own experts. That is because the Act regulates medical and surgical treatments for a particular psychiatric diagnosis—gender dysphoria—that Plaintiffs' experts say

is not the same as transgender status.  Brady Dep. (Ex. B") 71:12-14 (individual can be "transgender without having gender dysphoria"). Regulating treatment for a psychiatric diagnosis does not classify based on identity.

First, Ninth Circuit precedent does *not* establish that regulation of treatments for gender dysphoria constitute discrimination based on transgender status. To be sure, a law may not be drafted with "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Hecox*, 2023 WL 5283127 at *10 (cleaned up). But the Ninth Circuit has expressly reserved the question whether the regulation of "gender dysphoria" is so "closely correlated with being transgender" that a regulation related to gender dysphoria "constitutes discrimination against transgender persons." *Karnoski,* 926 F.3d at 1201 n.18; *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (treating as an open question whether "disallowing gender reassignment surgery should be treated as discriminating against transgender persons").

Second, even if transgender identity were equivalent to having gender dysphoria, that still does not suggest heightened scrutiny applies to the regulation of *specific treatments* for gender dysphoria. It does not trigger heightened scrutiny to "restrict[] a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive." *Eknes-Tucker*, 2023 WL 5344981 at *17.  As the Ninth Circuit explained in *Hecox*, if "a classification based on pregnancy is not per se a classification based on sex, even though it is true that only women can become pregnant." *Hecox*, 2023 WL 5283127 at *11 (cleaned up). For the same reasons, then, a

classification based on a gender dysphoria is not per se a classification based on transgender status *even if* only transgender persons can be diagnosed with gender dysphoria. Therefore, just as the regulation of a procedure that only one *sex* can undergo "does not trigger heightened constitutional scrutiny" absent proof of invidious discrimination against members of one sex, *Dobbs*, 142 S. Ct. at 2245–46, so too "the regulation of a course of treatment that only gender nonconforming individuals undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals." *Eknes-Tucker*, 2023 WL 5344981 at *17. And as explained in more detail below, there is no plausible basis to conclude that the Act is a mere pretext for invidious discrimination. In sum, the Act does not discriminate by sex or transgender status, and heightened scrutiny does not apply.

### B.    Parents have no right to experimental and harmful treatments.

Hidden away in the Due Process Clause, the Parent Plaintiffs purport to have discovered a constitutional right to obtain puberty blockers, cross-sex hormones, and gender-transition surgeries for their children. But their analysis falls well short of the Supreme Court's requirements for a substantive Due Process right. That test requires that the right is "fundamental" or "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). "But the use of these medications in general—let alone for children—almost certainly is not 'deeply rooted' in our nation's history." *Eknes-Tucker* 2023 WL 5344981 at *10. The "earliest-recorded uses of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century." *Id.*

In light of this history, the Parent Plaintiffs seek to raise the level of generality for the right they are asserting. They primarily rely on principles discussed in the Supreme Court's decision in *Parham v. J.R.*, 442 U.S. 584, 602 (1979), regarding the right of parents to make medical decisions for their children. *See* Dkt. 32-1 at 23.  But because courts seek to "exercise the utmost care whenever" they "are asked to break new ground in th[e] field" of substantive Due Process, they require "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721. And "*Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law." *Eknes-Tucker*, 2023 WL 5344981 at *12.

Indeed, there is not even a "historical recognition of a fundamental right of *adults* to obtain the medications at issue for themselves." *Id.* at *13 n.18. Therefore, "it would make little sense for adults to have a *parental* right to obtain these medications for their children but not a *personal* right to obtain the same medications for themselves." *Id.* It would make little sense to find a parental right to a pharmacological treatment that the FDA has not even approved to treat gender dysphoria. *L.W.*, 73 F.4th at 418. This perhaps explains why the United States does not endorse this argument. *See* Dkt. 45 at 1 n.2. And the cases Plaintiffs cite "applying the fundamental parental right in the context of medical decision-making do not establish that parents have a derivative fundamental right to obtain a particular medical treatment for their children as long as a critical mass of medical professionals approve." *Eknes-Tucker*, 2023 WL 5344981 at *13; *see also L.W.*, 73 F.4th at 417-18 (citing *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 703 (D.C. Cir. 2007)

(en banc)). Thus, Plaintiffs "have not shown that a right to new medical treatments" such as these "is deeply rooted in our history and traditions and thus beyond the democratic process to regulate." *L.W.* 73 F.4th at 417.

### C.     The Act satisfies any level of scrutiny.

The Act, "like other health and welfare laws, is entitled to a strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284. And "[j]udicial deference is especially appropriate where 'medical and scientific uncertainty' exists." *L.W.*, 73 F.4th at 417 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). Because the Act does not trigger heightened scrutiny for reasons already explained, it is subject only to rational-basis review, which "is a paradigm of judicial restraint." *Raidoo v. Moylan*, 75 F.4th 1115, 1121 (9th Cir. 2023) (quotations omitted). And the Act clearly satisfies that standard, which "is highly deferential to the government" and asks only whether "some conceivable legitimate purpose could have supported it." *Id.*

Nevertheless, the Act satisfies any level of scrutiny that might be applied. Even if strict scrutiny applies, the Act survives, since States "have a compelling interest in protecting children from drugs, particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects." *Eknes-Tucker*, 2023 WL 5344981 at *13. And the unknown long-term effects of these treatments, when combined with the impossibility of identifying who will persist in their identity as transgender, underscores that the Act's ban is necessary to *adequately* serve the compelling interest of protecting children and adolescents.

Here, the seriousness of the unknowns is staggering. For example, Plaintiffs' expert Dr. Connelly forthrightly admitted that she does not "think there's enough

data to draw conclusions about adverse effects on brain development in patients treated with medical interventions." Ex. A 208:5-8. In addition, Dr. Connelly also admitted she is not aware of a single study suggesting that natal females who transition during adolescence will be able to achieve pregnancy.  Ex. A 253:16-20.  And even from a clinical perspective, Dr. Connelly has no idea what the long-term outcomes are for her patients because over 90% of them move to different providers by the time they are 22 years old. Ex. A 66:8-13. And her clinic does not even attempt to contact them. Ex. A 67:23-25. To her knowledge, not a single one of her patients who has received medical interventions has ever conceived a child.  Ex. A 258:25-259:2.

Moreover, the unexplained existence of detransitioners and those who regret their transition also justifies the need for a ban. Critically, as Plaintiffs' expert Dr. Connelly admitted, it is not possible to identify those who will detransition ahead of time. Ex. A 84:21-23; *see also id.* 271:15-22 (agreeing that it would "be unrealistic to predict or eliminate" gender-related regret "that results from a change in gender identity"). Plaintiffs' experts generally treat the existence of detransitioners as an inconvenient fact to be minimized—stating that there has been a "'weaponization of information on regret,'" Ex. A 269:3-15, or that regret "'has been woefully politicized.'" Ex. B. 190:17-25. But no amount of downplaying the tragic stories of detransitioners can undermine the fact that they are living proof of the lack of evidence to justify using these interventions on minors.

Because the Act satisfies strict scrutiny, it necessarily satisfies intermediate scrutiny. That standard asks whether the Act "serves important governmental objectives" and the alleged "'discriminatory means employed are substantially related to

the achievement of those objectives.'" *Hecox*, 2023 WL 5283127 at *13 (quoting *Virginia*, 518 U.S. at 516). Here, the State of Idaho clearly "has an 'exceedingly persuasive justification' for regulating these drugs" and surgeries given the "potentially uncertain risks," the "uncertainty about how to tell which patients need these interventions for this purpose and which don't." *Eknes-Tucker*, 2023 WL 5344981 at *21 (Brasher, J., concurring). Thus, "even if [Idaho's] statute triggered intermediate scrutiny, it would likely survive that heightened scrutiny." *Id.*

Plaintiffs assert that the Act would fail even rational-basis review. Specifically, both Plaintiffs and the United States assert that the Legislature enacted the Act out of animus. But "[o]n the few occasions where" the Supreme Court has held that a law fails rational basis, the "common thread has been that the laws at issue lack *any* purpose other than a bare . . . desire to harm a politically unpopular group." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (cleaned up) (emphasis added). Given the state of scientific evidence regarding these treatments, it is impossible to suggest that the Act lacks *any* purpose other than a bare desire to harm transgender persons. As Swedish health authorities have concluded, the "risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Cantor ¶ 28 (citing Swedish Socialstyrelsen Support 2022 at 10-12). The law clearly has a rational basis.

In support of their animus argument, Plaintiffs and the United States cite two statements from Senator Tammy Nichols. But of course, "[s]tray remarks of individual legislators are among the weakest evidence of legislative intent." *Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022). Indeed, the evidence of legislative intent

demonstrates beyond doubt that Idaho legislators were motivated by their concern regarding the lack of benefit and the harm associated with these treatments: The United States itself acknowledges that Idaho legislators deem these treatments "dangerous," "experimental, irreversible, and medically unnecessary." Dkt. 45 at 16, 17 n.38 (quotations omitted). Moreover, "[e]ven when an argument about legislative motive is backed by statements made by legislators who voted for a law," courts should be reluctant "to attribute those motives to the legislative body as a whole." *Dobbs*, 142 S. Ct. at 2256. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.*

In any event, the statements that Plaintiffs and the United States highlight are far from probative. For one, they came *after* the law was enacted. Moreover, Plaintiffs' assertion that Senator Nichols's support for this law was motivated by animus is belied by the public record. Before the bill was passed, Senator Nichols noted that the Act addressed a "very sensitive topic." Senate Chamber Session Day 78 (Mar. 27, 2023)(https://tinyurl.com/3ebfbknt) 3:08:23-3:08:24. Specifically, she highlighted that many children diagnosed with gender dysphoria may have other underlying mental health conditions that should be treated with therapy rather than medical intervention. *See id.* 3:08:45-3:12:10. Senator Nichols also discussed the experience of a transgender individual who came to Idaho to describe the adverse effects the individual suffered as a result of these treatments. *See id.* 3:12:15- 3:12:32. The Senator's thoughtful consideration of this "sensitive topic" is not a desire to harm transgender individuals.

In a footnote, the United States cites certain statements from Senator Ben Adams and Representative Bruce Skaug relating to a child's mental state and gender dysphoria.  Dkt. 45 at 19, n.45. The United States says these statements demonstrate animus because they "did not refer to or cite any medical or scientific support." *Id*. But this argument ignores the testimony offered at the hearings on these bills— namely, that providing medical interventions to affirm a child or adolescent's gender identity, rather than mental health therapy to treat the gender dysphoria, is harmful, not helpful. *See, e.g.*, Testimony of Dr. Roger Hiatt, February 7, 2023, House Judiciary, Rules & Administration Hearing, 24:07-24:21 (https://tinyurl.com/59jt7376)("Efforts to medicalize a psychiatric disorder robs otherwise healthy children of the opportunity to rediscover their innate biology and instead doom them to a lifetime as medical patients in pursuit of an impossible dream."). As noted by one individual who had transitioned as an adult and, after many complications, is transitioning back, children with gender dysphoria "need help, they need mental care help, not gender-affirming help." February 7, 2023, House Judiciary, Rules & Administration Hearing, 18:15-18:20. In sum, given the compelling interest served by the Act and the fact that the long-term outcomes and harms are completely unknown, the Act satisfies any level of scrutiny.

### D.    Plaintiffs' experts' opinions are unreliable.

As set forth above, the totality of the scientific literature shows that the risks of the procedures banned by the Act far outweigh their benefits. And Plaintiffs' experts opinions to the contrary are unreliable. Although the Rules of Evidence do not technically apply at the preliminary injunction stage, the serious defects in Plaintiffs'

experts' methodologies would preclude them from satisfying the reliability requirements of Rule 702. This absence of reliable scientific proof too is a reason Plaintiffs cannot show they are likely to succeed on the merits.

First, Plaintiffs' experts show a shocking lack of familiarity with the medical evidence surrounding these interventions. "[S]ound scientific methodology requires that a scientist consider all of the scientific evidence when making causation determinations," *In re Zoloft*, 26 F. Supp. 3d 449, 463 (E.D. Penn. 2014), and "expert testimony that 'cherry-picks' relevant data" should be excluded. *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases); *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005). But not only did Dr. Brady not consider contrary evidence, she has never even read a *single* publication from any European health authority regarding the treatment for gender dysphoria. Ex. B. 203:4-7. Indeed, at her deposition, she could not recall *ever* reading a research publication that disagreed with her conclusions. Ex. B. 133:13–18. Nor had she ever read a systematic review relating to the treatment of gender dysphoria. Ex. B. 137:5–10. Dr. Connelly, for her part, said she had read one systematic review but could not "remember the title of it." Ex. A 118:11–15. Neither of them cited these reviews in their declarations. It is frankly "alarming" that Plaintiffs' experts engaged in this "biased reliance on favorable sources" while ignoring systematic reviews by European medical authorities that "could not be more relevant" to their opinions. *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at *12 (S.D.N.Y. Sept. 3, 2021), *aff'd*, 2023 WL 4837521 (2d Cir. July 28, 2023).

Second, Dr. Connelly and Dr. Brady either misunderstand or overstate the conclusions that can be drawn from the studies they cite.  At her deposition, Dr. Brady could not recall whether *any* study of medical and surgical interventions, including those she cites, controlled for whether the participants were receiving mental-health therapy. Ex. B. 49:6-12. Where, as here, a critical question is whether the more intrusive interventions of medical and surgical interventions are necessary given the less intrusive option of mental-health therapy, the failure to control for mental-health therapy is a confounding variable that forecloses any reliable conclusion. Cantor ¶¶ 179-81; *see* Ex. B. (161:4-11) (agreeing that, all else being equal, providers should "prefer the less invasive procedure"). Relatedly, in her declaration, Dr. Brady asserts there are "no scientific studies demonstrating that non-medical treatments alone" are effective in the treatment of gender dysphoria. Brady Decl. ¶ 41. But not "only do such studies exist, Dr. Brady cited one herself in her declaration." Cantor ¶ 290 (highlighting Dr. Brady's reliance on the Costa study, which found that "psychotherapy" was "effective in improving mental health"). With respect to Dr. Connelly's opinion, when Swedish researchers conducted a systematic review, they "excluded due to high risk of bias" many of the studies that Dr. Connelly cites as her leading authorities. *Compare* Cantor Table 1 at 33-34 (noting exclusion by Swedish researchers of Achille, Allen, de Vries, and López de Lara studies), *with* Connelly Decl. ¶ 32 n.7 (relying on those same studies).

Third, it is no answer for Dr. Connelly and Dr. Brady to say they are relying on their clinical experience. Ex. A 288:6-16; Ex. B. 141:11-19. In "evidence-based medicine, opinion based on clinical experience" is "the *least* reliable source of medical

knowledge." Cantor ¶ 54. Compared to other forms of evidence, "non-systematic rec-ollections of unstructured clinical experiences with" individuals "in an uncontrolled setting" is "the most subject to bias." *Id.* Indeed, it was reliance on this anecdotal evidence that led to development of evidence-based medicine. *See id.* Thus, an expert who grounds an opinion in clinical experience must "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Plaintiffs' experts make "no attempt to do this," *In re Lipitor*, 185 F. Supp. 3d 786, 806 (D.S.C. 2016), and their opinions are little more than "un-scientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

The distinction between clinical expertise and reported data is perhaps most stark with respect to Dr. Connelly's testimony. In her declaration, she states that her clinic sees "dramatic improvements" when patients "begin gender-affirming medical care" as measured by the anxiety-screening tool GAD-7 and the depression-screening tool PHQ-9. Connelly Decl. ¶ 31. But in an article published with data from her clinic that measured anxiety and depression using the GAD-7 and PHQ-9, the data showed that, between first and second visits at the clinic, the average scores indicating both anxiety and depression *increased* for patients on cross-sex hormones and *decreased* for patients who were *not* on cross-sex hormones. Ex. A 189:23-190:13; 191:8-23. In other words, the published data shows precisely *the opposite* of what Dr. Connelly reports seeing in her declaration. And even if these recorded changes were not statis-tically significant, that fact in and of itself refutes Dr. Connelly's claim of seeing

"dramatic improvement" at her clinic when patients "begin gender-affirming medical care." Connelly Decl. ¶ 31. Plaintiffs' experts' reliance on their unsupported clinical judgment is all the more troubling because their "opinion runs contrary to the published literature" in systematic reviews, which they fail to even cite. *In re Lipitor*, 185 F. Supp. 3d at 806.

## III.   Plaintiffs have not met the remaining preliminary-injunction factors.

Although likelihood of success on the merits "is the most important factor" when analyzing a request for injunctive relief, *California v. Azar*, 911 F.3d at 575 (quotations omitted), Plaintiffs invoke the Ninth Circuit precedent that "serious questions going to the merits" are sufficient to obtain an injunction when "the balance of hardships tips sharply towards the plaintiff." *See* Dkt. 32-1 11 (citing *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020)). But even accounting for this standard, Plaintiffs have still failed to show they are entitled to a preliminary injunction.

Idaho "will suffer irreparable harm from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children." *L.W.*, 73 F.4th at 421; *see also Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (noting authority for the proposition "that 'a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined'" (quoting *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997))). Moreover, as catalogued above, Plaintiffs have failed to provide evidence showing that the benefits of these treatments outweigh the harms associated with them.  Indeed, the *entire point* of the Act is to *prevent* irreparable harm to children and adolescents from these specific interventions. Idaho acknowledges that

Plaintiffs disagree about how best to treat gender dysphoria in minors, but Idaho's "elected representatives made these precise cost-benefit decisions" in adopting the Act. *L.W.*, 73 F.4th at 421. Finally, timing does not favor Plaintiffs because the Act does not go into effect until January 1, 2024. That provides Plaintiffs time to draw down their medication, which "'lessens the harm' to minors 'who wish to continue receiving treatment.'" *Doe 1 v. Thornbury*, 75 F.4th 655, 657 (6th Cir. 2023) (per curiam) (quoting *L.W.*, 73 F.4th at 421).

"When the government is a party," the balance of equities and public-interest "factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, Idaho's "interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture." *L.W.*, 73 F.4th at 421–22. If the Act is enjoined, untold numbers of children in Idaho will face lasting harm and irreversible damage to their bodies. Plaintiffs have not shown they are entitled to an injunction imposing that harm to the public.

## IV. The scope of Plaintiffs' requested relief is inappropriate.

Even if this Court concludes that Plaintiffs are entitled to injunctive relief, Plaintiffs have failed to demonstrate that the scope of relief they request is appropriate. As an initial matter, Plaintiffs' remedial argument seemingly conflates two distinct questions—whether Plaintiffs are entitled to a *statewide* injunction and whether Plaintiffs are entitled to an injunction against enforcement of the statute in *all*

applications. This conflation is ultimately irrelevant, however, because Plaintiffs have failed to demonstrate an entitlement to either form of relief.

With respect to the question of statewide relief, an "injunction must be narrowly tailored to remedy the specific harm shown." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quotations omitted). Plaintiffs would be entitled to an injunction throughout the State of Idaho only if "such breadth was necessary to remedy" Plaintiffs' "harm." *Id*. To obtain an injunction of that scope, Plaintiffs' request must be "supported by the record as it stands." *Id*. at 1028. The relief they seek is access to particular medical interventions, which could be provided by an injunction prohibiting enforcement of the Act against Plaintiffs and their providers. And the two premises of their request for that relief are flawed.

First, Plaintiffs speculate that providers would not know who the Plaintiffs are. Dkt. 32-1 at 28. But Plaintiffs provide no support for this speculation, and the Court's grant of leave for *them* to proceed anonymously cannot be used to leverage relief for non-parties. Moreover, the injunction runs against *Defendants*, and the Court could enter a protective order disclosing the identity of Plaintiffs and their Providers to ensure Defendants comply, so a statewide injunction is not "necessary." Second, Plaintiffs worry that "the institutions where" providers "work may implement policies prohibiting" the relevant care. Dkt. 32-1 at 28. But institutions may *already* prohibit the relevant care, which has nothing to do with any injunctive relief from this Court. Plaintiffs' speculative assertions are not "supported by the record" and come woefully short of showing a statewide injunction is "necessary to remedy" Plaintiffs' harm. *East Bay Sanctuary Covenant*, 934 F.3d at 1028–29.

With respect to whether Plaintiffs are entitled to facial, as opposed to as-applied relief, "litigants mounting a facial challenge to a statute normally must establish that *no set of circumstances* exists under which the statute would be valid." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (cleaned up). Plaintiffs do not argue the Act is unconstitutional in *every* circumstance. Nor could they, since the substance of their constitutional claims turn entirely on WPATH and Endocrine Society guidelines. Even the guidelines that Plaintiffs champion impose limitations on gender-affirming medical and surgical interventions. *See* Dkt. 32-1 at 3–5.

Thus, even under Plaintiffs' theory, the Legislature may clearly regulate the provision of interventions not in accordance with those guidelines. This regulation would include prohibiting the provision of any medical or surgical interventions to any child before puberty, Dkt. 32-1 at 3; providing any interventions to individuals who are not formally diagnosed with gender dysphoria under the DSM-V, *id.*; or providing interventions when an individual's co-occuring mental-health issues may interfere with diagnostic clarity or the ability to provide informed consent, *id.* at 4–5. And the concern that providers may not strictly follow the guidelines is not merely hypothetical: Plaintiffs' own expert stated that, in her opinion, "there may be extenuating circumstances" where "different care may be provided that may not be included in the guidelines." Ex. A 103:25–104:14. Plaintiffs are entitled to neither statewide relief nor an injunction against the Act in all applications.

## CONCLUSION

The Court should deny an injunction and dismiss the Complaint.

DATED: September 5, 2023.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By:  /s/ Lincoln D. Wilson
     LINCOLN DAVIS WILSON
     Chief, Civil Litigation and
     Constitutional Defense

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 5, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Alexia D. Korberg
akorber@paulweiss.com
mao_fednational@paulweiss.com

Heather M. McGarthy
hmccarthy@adacounty.id.gov
telemons@adacounty.id.gov

Ariella C. Barel
ariella.barel@groombridgewu.com

Jackson Cory Yates
jyates@paulweiss.com

Brad S. Karp
bkarp@paulweiss.com

Jordan E. Orosz
jorosz@paulweiss.com

Casey Parsons
casey@wrest.coop

Kyle N. Bersani
kyle.bersani@groombridgewu.com

Colleen Rosannah Smith
csmith@stris.com
6969944420@filings.docketbird.com

Richard Alan Eppink
ritchie@wrest.coop

Cortlin H. Lannin
clannin@cov.com
docketing@cov.com

Li Nowlin-Sohl
lnowlin-sohl@aclu.org

D Jean Veta
jveta@cov.com

Meredith Taylor Brown
tbrown@aclu.org

Dana Kennedy
dkennedy@paulweiss.com

Philip S. May
philip.may@groombridgewu.com

Leslie Jill Cooper
lcooper@aclu.org
ccaicedo@aclu.org
sgarcia@aclu.org

Dayton Patrick Reed
dreed@adacounty.id.gov
civilpafiles@adacounty.id.gov
citedemann@adacounty.id.gov

By:/s/ *Lincoln D. Wilson*
LINCOLN DAVIS WILSON