Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on the following page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**,<br><br>    *Plaintiffs*,<br><br>v.<br><br>**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities,<br><br>    *Defendants*. | Case No. 1:23-cv-00269-CWD |

**EXPERT REBUTTAL DECLARATION OF CHRISTINE BRADY, PhD**

Eric Alan Stone*  
Ariella C. Barel*  
Kyle Bersani*  
GROOMBRIDGE, WU, BAUGHMAN AND STONE LLP  
565 5th Avenue, Suite 2900  
New York, NY 10017  
Tel: (332) 269-0030  
eric.stone@groombridgewu.com  
ariella.barel@groombridgewu.com  
kyle.bersani@groombridgewu.com  

Philip S. May*  
GROOMBRIDGE, WU, BAUGHMAN AND STONE LLP  
801 17th St. NW, Suite 1050  
Washington, DC 20006  
Tel: (202) 505-5830  
philip.may@groombridgewu.com  

*Admitted *pro hac vice*

Jordan Orosz*  
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP  
2001 K Street, NW  
Washington, DC 20006-1047  
Tel: (202) 223-7300  
jorosz@paulweiss.com  

Dina Flores-Brewer (ISB no. 6141)  
ACLU OF IDAHO FOUNDATION  
P.O. Box 1897  
Boise, ID 83701  
(208) 344-9750  
dfloresbrewer@acluidaho.org  

*Attorneys for Plaintiffs*

I, Christine Brady, PhD, hereby declare and state as follows:

1. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2. I have actual knowledge of the matters stated herein.

3. My background and credentials are outlined in my initial declaration.

4. I reviewed the declarations of Drs. Cantor and Weiss. There are many assertions made in those declarations that I do not believe are supported by evidence. I do not attempt to address all of them here but, instead, respond to some of the central arguments made in those declarations. I reserve the right to supplement my opinions, if necessary, as the case proceeds.

**DR. WEISS'S ASSERTION THAT GENDER DYSPHORIA IS A SYMPTOM OF OTHER MENTAL HEALTH DISORDERS IS UNSUPPORTED BY EVIDENCE**

5. Dr. Weiss misunderstands gender dysphoria to be a symptom of other mental health issues such as trauma, abuse and depression (as opposed to a separate diagnosis), and claims that if those other issues are addressed, that will resolve the gender dysphoria. Declaration of Daniel Weiss (Dkt. 56-3) ("Weiss Decl.") ¶ 21; Ex. B to the Declaration of Ritchie Eppink, Daniel Weiss Deposition Transcript ("Weiss Dep.") 213:1-215:8. By using quotation marks when referring to gender dysphoria (but not any other diagnoses), Dr. Weiss apparently disagrees with the DSM's recognition of gender dysphoria as a psychiatric diagnosis. His views are completely at odds with how gender dysphoria is understood by those working within the mental health field, including Dr. Cantor, who agrees that gender dysphoria is a mental health condition that should be treated. Declaration of James Cantor (Dkt. 56-4) ("Cantor Decl.") ¶109. Indeed, gender dysphoria (and precursor diagnoses such as "gender identity disorder") has been included in the DSM as a diagnosis since the publication of the DSM-III in 1980. Gender dysphoria, like all mental health conditions, can co-occur with other diagnosed conditions but

that does not mean that in those cases, gender dysphoria is a symptom of other conditions. Moreover, not all people with gender dysphoria have the other mental health conditions mentioned by Dr. Weiss. I have treated a number of adolescents with gender dysphoria who do not meet criteria for any other DSM diagnosis and have no history of trauma or abuse.

**DEFENDANTS' EXPERTS' STATED CONCERNS ABOUT GENDER-AFFIRMING CARE ARE BASED ON A MISUNDERSTANDING OF HOW SUCH CARE IS PROVIDED IN ACCORDANCE WITH THE WPATH SOC**

6. The State's experts assert a number of concerns about the treatment of adolescents with gender dysphoria that are premised on a profound misunderstanding of how care is provided in accordance with the recommendations of the World Professional Association for Transgender Health's Standards of Care for Transgender and Gender Diverse People ("WPATH SOC"). Specifically, they assert concerns regarding automatic acceptance of reported transgender identity, the misdiagnosis of gender dysphoria, and social influences causing adolescents to present at gender clinics. All of these stated concerns ignore or misunderstand the comprehensive psychosocial evaluation, which is a core recommendation of the WPATH SOC prior to considering any medical interventions for adolescents.

7. Dr. Cantor suggests that gender affirming healthcare providers support "transition-on-demand". Cantor Decl. ¶ 125. He seems to be asserting that when patients present to gender clinics, if they say they are transgender, doctors fail to engage in exploration of the patient's gender identity and other comorbidities. *See* Cantor Decl. p. 111 (heading) (suggesting doctors "assum[e] literal accuracy of self-report"). This is simply untrue. Under the WPATH SOC, a comprehensive psychosocial assessment is a critical component of care prior to considering medical interventions. WPATH SOC, p. S59-S61. And that includes not only assessing whether the patient meets the criteria for gender dysphoria, but also assessing other mental health issues affecting the patient. *Id.*, p. S62-S63. Additionally, information is obtained

not *just* from the youth but also from their parents. *Id.*, p. S60. This is not only to increase the reliability of the clinical data obtained, but to more fully understand the history of the child's experience related to their gender and any other mental health issues.

8.  The State's experts also suggest that adolescents may be misdiagnosed with gender dysphoria when they have other mental health conditions that need to be addressed.[1] Again, this overlooks the comprehensive psychosocial evaluation that is provided prior to considering medical interventions. Differential diagnosis is a part of the process and alternative or additional mental health conditions may be identified. In my own clinical experience, I've had a number of patients who have presented expressing issues related to their gender identity where, after evaluation and exploration, it became clear that the patient did not have gender dysphoria and there were other issues that required attention and treatment. In other cases, patients have gender dysphoria in addition to other mental health issues that need to be addressed. It is not unique to gender dysphoria that individuals can carry multiple mental health

---

[1] Dr. Cantor suggests a specific concern about gender dysphoria diagnoses being misdiagnosed as borderline personality disorder (BPD). Cantor Decl. ¶ 160. He highlighted two of nine criteria of BPD that he believes could be diagnostically confused with gender dysphoria, starting with "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior" and "identity disturbance: markedly and persistently unstable self-image or sense of self." While suicidal thoughts and self-harm behaviors are diagnostic criteria for many mental health disorders including various forms of depression, bipolar disorder, schizophrenia, anxiety and PTSD, they are not part of the diagnostic criteria for gender dysphoria and the presence of those symptoms would not impact or influence the diagnosis of gender dysphoria. As for the "identity disturbance" criterion, as stated in the diagnostic criteria for BPD, the identity must be "persistently unstable." In the case of gender dysphoria, symptoms must be stably present for a duration of at least six months and in most cases presenting to our Gender Clinic, have been stable for several years. Goldhammer and colleagues (2019) examined the relationship between BPD and gender dysphoria and concluded that "gender minority identity is rarely a sign of identity diffusion." Hilary Goldhammer et al., *Distinguishing and Addressing Gender Minority Stress and Borderline Personality Symptoms*, 27 HARV REV PSYCHIATRY 317-325, 323 (2019). Finally, in order to be diagnosed with BPD, an individual must display 5 or more of the nine criteria. Having these two symptoms alone would not meet criteria for BPD and completely different symptoms must be had in order to be diagnosed with gender dysphoria.

diagnoses. And the suggestion by the State's experts that a gender dysphoria diagnosis and treatment with gender-affirming medication means that any other mental health conditions a patient has will not be addressed, *see* Cantor Decl. ¶¶ 158, 237, is without basis. I provide psychotherapy for comorbidities to many patients who are receiving puberty blockers or hormone therapy, and this is common in gender clinics across the country.

9.  The State's experts assert that many adolescents present for care at gender clinics because they are influenced by social media and their peers. Cantor Decl. ¶ 136; Weiss Decl. ¶ 30. It is hard to imagine this happening given that in my clinical experience, most patients have experienced gender incongruity and dysphoria for several years prior to presenting to clinic. In any case, should social influence lead someone to present to a medical provider asserting a transgender identity and seek gender-affirming medical care, like all patients they would receive a comprehensive psychosocial evaluation prior to considering any medical interventions, which would examine the history of their gender identity and possible external drivers of identity. I am confident that such evaluations would identify peer and social media influence if that were a factor and no medical interventions would be provided if the patient did not meet the criteria for gender dysphoria.

**THE STATE'S EXPERTS INAPPROPRIATELY RELY ON THE DESISTANCE STUDIES OF PREPUBERTAL CHILDREN TO SUPPORT BANNING GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS WITH GENDER DYSPHORIA**

10. The State presents data on pre-pubertal gender nonconforming children to suggest that most youth affected by the Idaho law will "cease to want to be the other gender." Cantor Decl. ¶ 116. There are several reasons why such a conclusion cannot be made from this data. First, the studies included in Dr. Cantor's meta-analysis date from 1972 – 2021 (with all but 1 of the 11 studies done during prior to the DSM-5). Cantor Decl. Table 2, pp. 50-51. As outlined in my opening declaration, prior to DSM-5, the diagnostic criteria did not require that a child

identify with a different sex – in other words, a child could be diagnosed with the precursor diagnosis of gender identity disorder solely on the basis of gender atypical behavior. As Dr. Cantor acknowledges in his report, many of the studies were not limited to transgender children, but rather included gay, uncertain, and crossdressing children; several of the studies—as indicated by their titles—assessed "effeminate behavior in boys". *Id*. Therefore, the studies do not provide data on desistance of children who have gender dysphoria.

11. Second, the studies looked only at prepubertal children and say nothing about the likelihood of desistance among adolescents—youth who have started puberty, who Dr. Cantor recognizes are less likely to desist. Cantor Decl. ¶ 245 (desistance less likely to occur after age 12). It is important to note that medical interventions are not offered to pre-pubertal youth. Thus, the rates of desistance among prepubertal children would not support an argument to prohibit medical care for adolescents.

**DR. CANTOR'S OPINION THAT GENDER-AFFIRMING MEDICAL CARE SHOULD BE POSTPONED UNTIL ADULTHOOD WOULD RESULT IN SERIOUS SUFFERING**

12. Dr. Cantor states "Accepting that gender identity can change, even if only *involuntarily*, calls for the very policy Dr. Brady rejects: Hold off medicalization until adulthood." Cantor Decl. ¶ 267. As an initial matter, Dr. Cantor overstates the likelihood of gender identity changing among adolescents—the group affected by the Idaho law—by relying inappropriately on the desistance studies of prepubertal children. In my clinical experience, while I have had patients who, over time, use different gender diverse identity labels for themselves, e.g., shifting from identifying as transgender female to non-binary, shifts from gender diverse to cisgender have been extremely rare (6 out of over 900 patients). The fact that there may be some adolescents who have a shift in their gender identity to cisgender is not a basis to withhold treatment from those who need and would benefit from it. The fact that a

patient's gender identity changed to cisgender does not equate with regretting treatment or negative consequences of treatment. That was my clinical experience with my two patients who shifted to a cisgender identity after having received pubertal suppression. And research shows that people whose gender identity evolved to cisgender have nonetheless found that the treatment helpful for them at the time.[2] Moreover, almost all if not all medical treatments have some patients who ultimately regret receiving them, but that is not a reason to deny treatment to those who need and benefit from it.

13. The State's experts suggest that gender dysphoria can be treated with psychotherapy alone. *See, e.g.*, Weiss Dep. 186:10-187:2. While psychotherapy can be important to treat comorbidities—which is something I do regularly with patients—it does not address the distress of gender dysphoria. For my patients who have had to delay accessing medical treatment (e.g., because their parents did not consent to treatment), their gender dysphoria was not alleviated despite regular therapy and often their mental health severely decompensated until they were able to begin medical treatment.

14. Dr. Cantor suggests that a study by Costa (2015) demonstrates the effectiveness of psychotherapy alone, and that I misinterpreted the findings of that study. Cantor Decl. ¶ 290; *see* R. Costa et al, Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria, 12 J. SEXUAL MEDICINE 2206-2214 (2015). That is not so. Costa found that psychosocial support alone for 6 months significantly improved psychosocial functioning in a group of adolescents with GD who were deemed "delayed eligible" for puberty blockers, but then no further significant improvements were observed (plateau) over the next 12

---

[2] *See, e.g.*, Lisa Littman, *Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners*. 50 ARCHIVES SEXUAL BEHAV.3353-3369, 3363 (2021).

months of psychological support and their psychosocial functioning scores continue to be lower than those of healthy peers. *Id.* at 2211. In contrast, for adolescents with GD who were deemed "immediately eligible" for blockers, 6 months of psychosocial support alone did not significantly improve their psychosocial functioning but after 12 months of pubertal suppression, their psychosocial functioning significantly improved and their scores matched those of healthy peers. *Id.* The "delayed eligible" group included those individuals who needed more time to make a decision or where "clinicians needed more time to make the decision of starting GnRHa because of possible comorbid psychiatric problems and/or psychological difficulties." *Id.* at 2208-09. This study unsurprisingly reaffirms that psychological support can be helpful to improve psychosocial functioning, particularly in individuals with other psychiatric issues. *Id.* at 2212. It also shows that pubertal suppression provided benefits that did not come with psychotherapy alone. *Id.* at 2212-13. Also, of note, the delayed eligible group all elected to receive pubertal blockers on average 6 months after the study concluded. *Id*. at 2209.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 10/13/2023

Christine Brady, PhD