RAÚL R. LABRADOR
ATTORNEY GENERAL

James E.M. Craig ISB #6365
Acting Division Chief, Civil Litigation
and Constitutional Defense
Rafael J. Droz, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID  83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8073
james.craig@ag.idaho.gov
rafael.droz@ag.idaho.gov

David H. Thompson (PHV filed)
Special Deputy Attorney General
Brian W. Barnes (PHV filed)
Special Deputy Attorney General
John D. Ramer (PHV filed)
Special Deputy Attorney General
Cooper & Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Attorneys for Defendants Raúl Labrador and Individual Members of the Idaho Code Commission*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| PAM POE, by and through her parents and next friends, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00269-BLW<br><br>**SURREPLY REGARDING THE DECLARATION OF DR. JACK TURBAN** |

## ARGUMENT

Dr. Turban's belated entry to this case adds little substance. Much like Plaintiffs' other experts, Dr. Turban has no answer to the most important fact: Systematic reviews of the entire body of evidence have demonstrated there is no evidence that justifies medically or surgically transitioning minors as a treatment for gender dysphoria. As previously explained, a systematic review represents the highest form of medical evidence because it deploys a "standardized procedure to assess comprehensively all available evidence on an issue." Dkt. 65 at 8. And systematic reviews conducted by the health authorities in both the United Kingdom and Sweden have concluded that there is insufficient evidence to justify the practice of medically and surgically transitioning minors as a treatment for gender dysphoria. *Id*. Not a single systematic review has reached a contrary conclusion.

Dr. Turban attempts to downplay this inconvenient truth based on his fundamental misunderstanding of both the nature and purpose of systematic reviews. He says that "all a 'systematic review' means is that the authors of the reports pre-defined the search terms they used when conducting literature reviews in various databases." Dkt. 70-4 at 15. He then asserts that the "primary advantage to a systematic review would be its potential (though no guarantee) to identify research publications that had not previously been identified in this discussion." *Id*. at 16.

That assertion is demonstrably false. Rather than merely reveal the process for *locating* studies, a systematic review also qualitatively *assesses* "the risk of bias associated with primary studies." Turban Dep. ("Ex. A") 41:24-42:8. Indeed, even the document Dr. Turban cites to support his mistaken contention explains that a

systematic review involves the "synthesis of all available evidence" and "analyzing relevant studies." *See* Ex. A 57:9-16. This type of assessment is often done using the "GRADE" method (Grading of Recommendations Assessment, Development and Evaluations) to evaluate the degree of bias in a study. *See* Dkt. 56-4 at 20-21. Thus, the process for a systematic review—as even Dr. Turban's own source reveals—is far more than merely reporting "search terms" and seeking to "identify" studies.

More significantly, the step that Dr. Turban omits—assessing individual studies for risk of bias—is a critical one in this case. Dr. Turban touts that there are "over a dozen studies evaluating efficacy and effectiveness of puberty blockers and gender-affirming hormones for the treatment of adolescents with gender dysphoria." Dkt. 70-4 at 3 & n.2. But "[e]ven if the results of different studies are consistent, determining their risk of bias is still important" because "[c]onsistent results are less compelling if they come from studies with a high risk of bias." Ex. A at 48:4-11. Dr. Turban, however, has no method for assessing that bias; instead, he simply "read[s] the full paper" and decides. *See* Ex. A 49:17-50:8. Indeed, he has never even attempted to apply the GRADE criteria to the studies he cites in his declaration. Ex. A 40:7-15.

During his deposition, Dr. Turban revealed a remarkable lack of curiosity regarding any research that disagreed with his conclusions. For example, the systematic review commissioned by Swedish health authorities concluded that the "[e]vidence to assess the effects of hormone treatment" on "children with gender dysphoria is insufficient." Ex. A 231:15-20. Dr. Turban was aware of this article and the conclusions it reached, but he never bothered to analyze it because he "didn't have time." Ex. A 232:14-23. Similarly, Dr. Turban was aware that the Florida Agency for

SURREPLY REGARDING THE REPORT OF DR. JACK TURBAN – 3

Healthcare Administration had imposed policies that restricted the provision of medical and surgical transitions, but he never even attempted to investigate the evidentiary basis for that decision. *See* Ex. A 255:24-256:9.

If Dr. Turban had taken the time to analyze the Swedish systematic review, he would have seen that it examined the very studies he relies upon. The same is true of the UK's systematic reviews. And critically, the researchers (using the GRADE methodology that Dr. Turban has never attempted) deemed many of those studies—including one of Dr. Turban's own studies—so unreliable due to bias that the researchers did not even consider them worthy of including in the body of evidence. *See* Ex. A 234:22-235:15; 215:17-216:9; 225:16-226:1. And even when his cited studies did make the cut, the researchers still downgraded the reliability of those studies due to their high risk of bias. *See* Ex. A 218:2-219:12.

Dr. Turban's attempt to rule out psychotherapy as a treatment for gender dysphoria reveals further flaws in his analysis. As experts, researchers, and even the very studies cited by Dr. Turban have explained, when patients in a study received both psychotherapy and medical interventions, any reported improvement could be due either to the medical intervention or the psychotherapy. *See* Ex. A 229:9-25, 261:10-16; Dkt. 56-4 at 26, 67, 82-83. In research terminology, psychotherapy is a "confounding variable" because it is possible the psychotherapy, *not* the medical intervention, led to any change. Dkt. 56-4 at 26. And given the drastic difference in the "risk-benefit analysis" for psychotherapy as compared to medical and surgical transition, Dr. Turban must justify the vastly greater risks associated with medical and surgical interventions with "correspondingly greater benefit." Dkt. 65 at 7. He

has not come close to doing so. Although he says "there are no evidence-based psychotherapy protocols that effectively treat gender dysphoria itself," Dkt. 70-4 at 30, the entire reason psychotherapy is deemed a confounding variable in these studies is because the studies may indeed be evidence that the *psychotherapy alone* was leading to improvement. And Dr. Turban offers nothing to rule out that possibility.

It is fair to ask whether Dr. Turban's seemingly one-sided analysis is driven by science or politics. For example, the same day that Dr. Turban published a study (cited at footnote 63 of his declaration), he was quoted in an NBC News article expressing his "hope" that his "findings contribute to ongoing legislative efforts." *See* Ex. A 149:13-150:21. In other words, Dr. Turban presumably *set out* to publish a study to support those "ongoing legislative efforts." More explicitly, while serving as an expert witness in cases involving laws enacted by Republican lawmakers, Ex. A 265:10-16, Dr. Turban has posted on social media that Republicans "hate #LGBTQ people," Ex. A 274:12-21, "are steadfast in silencing and attacking trans Americans," Ex. A 277:17-278:2, and "are abusing power to attack minorities," Ex. A 280:21-281:7. As he once put it more succinctly: "Our country is dying and the GOP is killing it." Ex. A 280:23-24. And although Dr. Turban assures that he "ha[s] many conservative friends" and does not "hate all conservatives," he still maintains ire for what he calls "anti-trans Heritage folks," by which he means members of the Heritage Foundation. *See* Ex. A 284:18-285:16. Defendants acknowledge there are strong political views on both sides of this case, and Dr. Turban is entitled to his views like anyone else. But partisan passion is no substitute for sober scientific analysis. And there is reason to question whether Dr. Turban's conclusions are based on ideology or evidence.

Indeed, his description of this area of medicine appears to change based on his audience. In his declaration, Dr. Turban emphasizes the safeguarding effect of "the comprehensive biopsychosocial mental health assessment that is done prior to starting gender-affirming medical interventions under current guidelines." Dkt. 70-4 at 20. But in an interview with the "GenderGP Podcast," Dr. Turban said, "if you set up this assessment, gatekeeping protocol, people are just going to figure out the answers and then tell you what you want to hear. . . . And you're like why? Why even bother?" Ex. A 103:14-21. In his declaration, Dr. Turban stresses the "stringent" "criteria for diagnosis" of gender dysphoria. *See* Dkt. 70-4 at 24. But in the podcast interview, Dr. Turban said "[t]he only argument for the diagnosis existing is insurance coverage." Ex. A 107:23-108:1. Underscoring an apparent belief that gender dysphoria may not really be a mental-health condition at all, he added: "Never once have I had a treatment plan for someone's, like, gender dysphoria." Ex. A 112:10-11. Instead, he has merely "had treatment plans to help them with their anxiety or their depression, or trauma-related symptoms." Ex. A 112:11-14.

Finally, Dr. Turban says no European country has "banned care." Dkt. 70-4 at 31. But in the UK, for example, puberty blockers may not be used to treat gender dysphoria outside of a formal research protocol. Dkt. 56-4 at 9. That is a ban. Either way, however, the State is free to make its own policy choices. And with respect to the scientific evidence, the relevance of the European countries is not necessarily the *policy* they chose but the *reason* for their policies: The risks of medical and surgical interventions outweigh the benefits. Dkt. 56-4 at 13. Nothing in Dr. Turban's declaration shows otherwise. No evidence justifies these interventions.

DATED: October 27, 2023.

        STATE OF IDAHO
        OFFICE OF THE ATTORNEY GENERAL

    By:  /s/ *David Thompson*
        DAVID THOMPSON
        Special Deputy Attorney General

## CERTIFICATE OF SERVICE

I Hereby Certify that on October 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Alexia D. Korberg
akorber@paulweiss.com
mao_fednational@paulweiss.com

Ariella C. Barel
ariella.barel@groombridgewu.com

Brad S. Karp
bkarp@paulweiss.com

Casey Parsons
casey@wrest.coop

Colleen Rosannah Smith
csmith@stris.com
6969944420@filings.docketbird.com

Cortlin H. Lannin
clannin@cov.com
docketing@cov.com

D Jean Veta
jveta@cov.com

Dana Kennedy
dkennedy@paulweiss.com

Leslie Jill Cooper
lcooper@aclu.org
ccaicedo@aclu.org
sgarcia@aclu.org

Heather M. McCarthy
hmccarthy@adacounty.id.gov
telemons@adacounty.id.gov

Jackson Cory Yates
jyates@paulweiss.com

Jordan E. Orosz
jorosz@paulweiss.com

Kyle N. Bersani
kyle.bersani@groombridgewu.com

Richard Alan Eppink
ritchie@wrest.coop

Li Nowlin-Sohl
lnowlin-sohl@aclu.org

Meredith Taylor Brown
tbrown@aclu.org

Philip S. May
philip.may@groombridgewu.com

Dayton Patrick Reed
dreed@adacounty.id.gov
civilpafiles@adacounty.id.gov
citedemann@adacounty.id.gov

By: /s/ *James E. M. Craig*
James E.M. Craig