# Exhibit A

```
 1                 UNITED STATES DISTRICT COURT
 2                      DISTRICT OF IDAHO
 3
 4      PAM POE, by and through her   )  Case No.
        parents and next friends,     )  1:23-cv-00269-CWD
 5      Penny and Peter Poe; PENNY    )
        POE; PETER POE; JANE DOE, by  )
 6      and through her parents and   )
        next friends, Joan and John   )
 7      Doe; JOAN DOE; JOHN DOE,      )
                                      )
 8                       Plaintiffs,  )
                                      )
 9      v.                            )
                                      )
10      RAÚL LABRADOR, in his         )
        official capacity as the      )
11      Attorney General of the State)
        of Idaho; JAN M. BENNETTS, in)
12      her official capacity as      )
        County Prosecuting Attorney   )
13      for Ada, Idaho; and the       )
        INDIVIDUAL MEMBERS OF THE     )
14      IDAHO CODE COMMISSION, in     )
        their official capacities,    )
15                                    )
                        Defendants. )
16      _____)
17
18
19        REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS
20                    MONDAY, OCTOBER 16, 2023
21
22
23
24
25      Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC
```

                                                       Page 1

1    several other factors that would be important to

2    consider when -- whether or not to recommend a

3    treatment.

4         But it has two steps in that way.  It has

5    kind of the grading of the evidence and then

6    determining strength of recommendations.

7         Q.   And have you ever attempted to apply the

8    criteria specified by GRADE to assess a study?

9         A.   It's generally recommended that one do

10   that as part of, like, a full research group.   And

11   I've not been on one of those groups.

12        Q.   And so then you -- you've also never

13   attempted to do that for any of the studies that

14   you cite in your declaration, correct?

15        A.   No, not apply specific GRADE criteria.

16   Generally GRADE criteria is used when one is

17   writing guidelines.

18        Q.   I'm sorry.  Say that again?

19        A.   GRADE is typically used when one is

20   writing clinical practice guidelines.

21        Q.   Is GRADE ever used in a systematic

22   review?

23        A.   Some people might.  I have not.

24        Q.   How many systematic reviews have you

25   done?

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

1          A.    Just one.

2          Q.    Can you explain how those who would use

3    GRADE in a systematic review would use it in the

4    process of creating the systematic review?

5               MS. NOWLIN-SOHL:  Object to the form;

6    foundation.

7               THE WITNESS:  Yeah, I don't think they

8    would GRADE the systematic review.  I think they

9    would have different research questions, and there

10   would be a body of literature they would identify

11   through their search that they would then look at

12   in their specific tables that give you, like, a

13   rough general sense of how to apply the GRADE

14   criteria to different conclusions.

15         Q.    (BY MR. RAMER)  And then sticking with

16   this document, I'd like to go to page 273, which

17   is 302 in the PDF, I believe.

18               Are you there?

19         A.    Yes.

20         Q.    Okay.  And then the -- well, the only

21   full paragraph on the page, it's a little long,

22   but I'm going to read it and ask if I read it

23   correctly.

24               It says "In contrast to systematic

25   reviews, traditional narrative reviews typically

                                        Page 41

1    address multiple aspects of the disease (e.g.,

2    etiology, diagnosis, prognosis, or management),

3    have no explicit criteria for selecting the

4    included studies, do not include systematic

5    assessments of the risk of bias associated with

6    primary studies and do not provide quantitative

7    best estimates or rate the confidence in these

8    estimates.

9            "The traditional narrative review

10   articles are useful for obtaining a broad overview

11   of a clinical condition, but may not provide a

12   reliable and unbiased answer to a focused,

13   clinical question."

14           Did I read that correctly?

15       A.   Yes.

16       Q.   And then what is your understanding of

17   how systematic reviews differ from narrative

18   reviews with respect to systematic assessment of

19   the risk of bias associated with primary studies?

20       A.   A systematic review may or may not

21   include an assessment of the risk of bias.

22           Also, as the paragraph that you skipped

23   over notes, it may or may not include, like, an

24   unbiased summary of the literature, like a

25   meta-analysis.

Page 42

1    final two sentences of that paragraph.

2         A.   Okay.  I'm there now.

3         Q.   Okay.  I'll start again.

4              "Even if the results of different studies

5    are consistent, determining their risk of bias is

6    still important.  Consistent results are less

7    compelling if they come from studies with a high

8    risk of bias than if they come from studies with a

9    low risk of bias."

10             Did I read that correctly?

11        A.   Yes.

12        Q.   So this is saying even if you have

13   numerous studies showing the same results, you

14   still should assess those individual studies for

15   risk of bias, correct?

16        A.   Yes.  I think we can broadly always agree

17   in medicine that anytime you have a research

18   study, you should assess it for risk and bias.

19             I think I'd also highlight that there are

20   many different types of bias.  I don't know what

21   specific type of bias they're referencing here

22   without reading the full chapter and the context.

23        Q.   And is some bias worse than others?

24        A.   I don't know that I would say "worse."

25   They're different.

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

1      Q.    And for the studies that you cite in your

2    declaration, have you assessed them for risk of

3    bias?

4           MS. NOWLIN-SOHL:  Object to form.

5           THE WITNESS:  Yes.  Any scientific

6    research paper you read is going to, likely in the

7    discussion section, talk about for that individual

8    paper what biases may come up or what limitations

9    there are to how you interpret that study in

10   isolation, which is why, back to your point of why

11   you want the systematic review and identifying all

12   of the research, that you always want to look at

13   all the research as a whole, because every

14   individual study is going to have strengths and

15   weaknesses.  They're pointing out that's true even

16   for randomized controlled trials.

17        Q.   (BY MR. RAMER)  And so I think you

18   discussed that you read the discussion to see

19   where the bias is in the study.

20           And is that generally how you assess

21   studies for risk of bias?

22        A.    That's a good starting point, because

23   often the author of the paper, in the peer-review

24   process, whatever peer reviewer identifies as a

25   limitation of the study, if that -- that's due to

Page 49

1   something like recall bias, et cetera, that that's

2   usually the part of the paper where that's going

3   to be written.

4            But I think most experts are also going

5   to read the full paper to see if they identify any

6   other limitations of the study that weren't

7   explicitly noted in the discussion section of the

8   paper.

9       Q.   And this will for now be my last question

10  on this, and then maybe we can take a break.

11           But I'd like to go to page 182 in this

12  document.  Just let me know if you're there.

13      A.   We're there.

14      Q.   Okay.  And I'd like to look at the last

15  paragraph on the page in the first sentence.  And

16  I'll just read it and ask if I read it correctly.

17           It says "In answering any clinical

18  question, our first goal should be to identify

19  whether there is an existing systematic review of

20  the topic that can provide a summary of the

21  highest quality available evidence (see the

22  summarizing the evidence section)."

23           Did I read that correctly?

24      A.   Yes.

25      Q.   And do you agree that the first goal in

Page 50

```
 1           A.   Not necessarily.  Ideally it would be,
 2      but I don't believe all systematic reviews reach
 3      that level of rigor.
 4           Q.   Okay.  So on this document, Turban
 5      Exhibit 6, there is a -- on page 1 there is a bold
 6      question that says "What is a systematic review?"
 7      And I'm just going to read the first two sentences
 8      under that and ask if I read them correctly.
 9               It says "A systematic review is guided
10      filtering and synthesis of all available evidence
11      addressing a specific, focused research question,
12      generally about a specific intervention or
13      exposure.  The use of a standardized, systematic
14      methods and preselected eligibility criteria
15      reduce the risk of bias in identifying, selecting,
16      and analyzing relevant studies."
17               Did I read that correctly?
18           A.   Yes.
19           Q.   What is your understanding of what this
20      page is describing when it mentions "analyzing
21      relevant studies"?
22               MS. NOWLIN-SOHL:  Object to form.
23               THE WITNESS:  So they're saying you use
24      standardized systematic methods in preselected
25      eligibility criteria, so those are all things to
```

Page 57

1    you.  And I'll just read the first, the first part

2    of this paragraph, and ask you a question about

3    it.

4              And it says "Yeah, I think that's a huge

5    question that especially in pediatrics people are

6    grappling with -- I think people have had an

7    easier time in adult medicine kind of recognizing

8    that these, like, assessment/gatekeeping were a

9    little bit ridiculous and damaging.  And it's

10   interesting that not all of the lessons from that

11   have made it into pediatrics yet because people

12   don't trust kids to make decisions in the same

13   way, obviously, but, like, things people are

14   familiar with, right?  Like, if you're -- if you

15   set up this assessment, gatekeeping protocol,

16   people are just going to figure out the answers

17   and then tell you what you want to hear.  And

18   you've set up this really kind of like argument

19   representative with your patient or client.

20   (Unclear time stamped 1407).  And you're like why?

21   Why even bother?  You know?"

22             And do you think there's any reason to

23   bother with an assessment model for

24   gender-affirming medical interventions?

25             MS. NOWLIN-SOHL:  Object to form.

Page 103

1            THE WITNESS:  For minors or adults?

2       Q.   (BY MR. RAMER)  Minors.

3       A.   No.  But again, it's this what do you

4   mean by informed consent?

5            So what I would say, which hopefully

6   answers the question, is that everyone I know

7   conducts this comprehensive biopsychosocial

8   evaluation prior to initiating care, and that that

9   biopsychosocial assessment involves ensuring the

10  patient can provide informed consent or assent and

11  that the parents can provide informed consent.

12      Q.   In sticking with this same document, I'd

13  like to move to page 11.  And on this page there

14  are two answers attributed to you.  One is very

15  short.  I'm looking at the second one further

16  down.

17           And in particular in that paragraph, I

18  just want to read the third to last sentence that

19  begins with the words "And right."  And I'll

20  ask -- I'm sorry.  Maybe the fourth to last -- the

21  sentence that begins with the words "And right,"

22  and then I'll ask if I read it correctly.

23           It says "And right.  The only argument

24  for the diagnosis existing is insurance coverage."

25           Did I read that correctly?

                                        Page 107

1        A.    Correct.

2        Q.    And you're talking about the diagnosis

3    for gender dysphoria here; is that right?

4        A.    In the context of psychiatric

5    appointments.

6        Q.    So what do you mean when you say, "The

7    only argument for the diagnosis existing is

8    insurance coverage"?

9        A.    I believe this was in the context of

10   arguments about whether or not gender dysphoria

11   should be in the DSM.  And there have been

12   arguments on both sides.  Some people have

13   highlighted concerns that because gender dysphoria

14   is in the DSM, that the general public will

15   misinterpret that to think that trans identities

16   are a mental illness and that that will promote

17   stigma, which I think is something that we've

18   seen.

19        My philosophy on that is that we just

20   shouldn't stigmatize mental health conditions

21   broadly.  I wouldn't stigmatize someone with major

22   depressive disorder in the same way that I

23   wouldn't stigmatize someone with gender dysphoria,

24   but I understand that stigma exists.

25        Another side of the spectrum, people have

Page 108

1    this end.

2           Did you say you could not picture a case?

3       A.   I cannot picture a case where that would

4    be a reasonable practice.

5       Q.   And I want to skip the next sentence and

6    then read the one after that and ask if I read it

7    correctly.

8           It says "Never once have I had a" --

9    sorry.  I'll start again.

10          "Never once have I had a treatment plan

11   for someone's, like, gender dysphoria.  But I've

12   had treatment plans to help them with their

13   anxiety or their depression or trauma-related

14   symptoms."

15          Did I read that correctly?

16      A.   Sorry.  I'm just finding where you are.

17          Yes.

18      Q.   And is it true that you have never once

19   had a treatment plan for someone's gender

20   dysphoria?

21      A.   So again, this is talking in the context

22   of a psychiatric treatment plan.  So I wouldn't

23   have -- there's no evidence psychotherapy is to

24   try and push someone to identify with their sex

25   assigned at birth.

Page 112

Jack Turban , M.D., MHS October 16, 2023

1          Do you see the date that this article was

2     published?

3          A.   Yes.

4          Q.   And do you recall what day you published

5     the article we were just looking at in Turban

6     Exhibit 12?

7          A.   I do not.

8          Q.   If we go back to Turban Exhibit 12 and go

9     to the first page, which is page 68, and then

10    towards the bottom, do you see where it says

11    "Published online September 11, 2019"?

12         A.   Yes.

13         Q.   And so the news article in Turban

14    Exhibit 13 was published the same day that you

15    published this article in Turban Exhibit 12

16    online; is that correct?

17         A.   That seems to be the case.  That's

18    generally how news outlets cover new research

19    articles is they get them ahead of time while

20    they're under embargoes so they have time to read

21    them and conduct interviews so that they can

22    publish them around the same time that the paper

23    comes out.

24         Q.   How do the news organizations become

25    aware of the article when it's embargoed?

                                        Page 149

1          A.   I'm not sure if they sign up for it or --
2     but essentially most of the major high-impact
3     medical journals send out press releases about
4     articles that are coming out in their future
5     editions that aren't out yet to journalists so
6     that the journalists have a chance to request an
7     embargoed version of the article with the
8     agreement that they don't talk about it publicly
9     until the article is officially posted online.
10         Q.   And then in this NBC article, which is
11    Turban Exhibit 13, I'd like to go to page 2 of the
12    PDF.  And about halfway down before this blank
13    space, there's a quote attributed to you.
14              And it says "We hope our findings
15    contribute to ongoing legislative efforts to ban
16    gender identity conversion efforts."
17              Do you see that?
18         A.   Yes.
19         Q.   And do you think that's an accurate
20    quote?
21         A.   Yes.
22         Q.   And before you conducted this study, did
23    you want to ban gender identity conversion
24    efforts?
25         A.   They were labeled dangerous and unethical

                                        Page 150

1     that you disagree with?

2          A.   It's been a while since I read it, so I'd

3     have to ask you if there's a specific line you're

4     referencing.

5          Q.   Well, when you -- the comment you just

6     made about them excluding studies that you thought

7     were important, so do you have reason to doubt

8     that the analysis in this document is reliable?

9               MS. NOWLIN-SOHL:  Object to form.

10              THE WITNESS:  I recall them not including

11    all the studies that they should have included.

12         Q.   (BY MR. RAMER)  And do you know whether

13    this systematic review assessed any of the studies

14    that you rely on in your declaration?

15         A.   I presume it reviews some of them, but

16    it's been a while since I've read it.

17         Q.   Okay.  Let's go to page 74.  And kind of

18    middle of the page, you see appendix D entitled

19    "Excluded Studies Table"?

20         A.   Yes.

21         Q.   And do you recall whether you cite the

22    first study -- let me rephrase.

23              Do you recall whether in your declaration

24    you submitted in this case that you cite the first

25    study listed here?

                                        Page  215

1          A.    Yes.

2          Q.    And the fourth one down on this table,

3     the de Vries study, do you recall, is that also a

4     study you cite in your declaration?

5          A.    Yes.

6          Q.    And the next page, third from the bottom,

7     the Turban article.   And do you recall is this a

8     study you cite in your declaration?

9          A.    Yes.

10         Q.    And did you know the review excluded

11    these studies?

12         A.    Yes.

13         Q.    And do you disagree with the review's

14    conclusion to exclude these studies?

15         A.    I call it a decision, not a conclusion,

16    but yes.

17         Q.    And why?

18         A.    Because I think the studies give you

19    valuable information.  The Achille study, though

20    it doesn't separate GnRH analogues out from the

21    other interventions because it's underpowered when

22    it does that, I do think it's valuable information

23    to know when they look at the group that received

24    gender-affirming medical interventions including

25    blockers and hormones that their mental health

Page 216

1        Q.   Okay.  That's sufficient.

2              Okay.  I'd like to go to -- let's stick

3     with this document and go to page 99.  And at the

4     top it says "Appendix G Grade Profiles."

5              Do you see that?

6        A.   Yes.

7        Q.   And the first study in Table 2 here is

8     de Vries 2011 study.

9              And you cite that in your declaration,

10    correct?

11       A.   Yes.

12       Q.   And in that table, there's a little

13    footnote 2.  And then you go down to footnote 2

14    and it says "Downgraded one level -- the cohort

15    study by de Vries, et al. (2011) was assessed as

16    at high risk of bias (poor quality overall, lack

17    of binding, and no control group)."

18              Do you see that?

19       A.   Yes.

20       Q.   And do you disagree with that assessment?

21       A.   No.

22       Q.   And then I'd like to go to page 101.

23    Actually, I'm sorry, 102.  The following page.

24              And do you see they refer to the Costa

25    2015 study in this table?

Page 218

1          A.    Yes.

2          Q.    And you also cite the Costa 2015 study,

3     right?

4          A.    Yes.

5          Q.    And if you go to page 106, down at the

6     very bottom there's another little footnote 1.

7     And it says "Downgraded one level -- the cohort

8     study by Costa, et al. (2015) was assessed as at

9     high risk of bias (poor quality overall, lack of

10    binding, and no control group."

11               Do you see that?

12         A.    Yes.

13         Q.    And do you agree with that assessment?

14         A.    I agree with the lack of binding.  I

15    don't think it's fully accurate to say there

16    wasn't a control group.

17         Q.    Do you agree it's at high risk of bias?

18         A.    It depends on how they're defining that

19    term.

20         Q.    What if they're defining it in accordance

21    with the GRADE methodology?

22               MS. NOWLIN-SOHL:  Object to form.

23               THE WITNESS:  The thing about GRADE

24    methodology is there are several categories to go

25    through each one, and then it's somewhat

                                        Page 219

Jack Turban , M.D., MHS October 16, 2023

```
 1        Correct?

 2             A.   Yes.

 3             Q.   And is this something you've read before?

 4             A.   Yes.

 5             Q.   And did you study it closely?

 6             A.   At the time.

 7             Q.   And what did you think when you read it?

 8             A.   What I recall, it reviewed studies that I

 9        generally was already aware of, and I believe

10        similarly had excluded a handful of studies.

11                  I think when I was reading it, it was --

12        it had been published for a while, so I also

13        noticed that there understandably was not

14        inclusion of important studies that were published

15        after it came out.

16             Q.   Okay.  I'd like to go to page 70.  And

17        toward the bottom there's a bold blue header that

18        says "Appendix D Excluded Studies Table."

19                  Do you see that?  Sorry.  I missed you.

20        Did you see that?

21             A.   Yes.

22             Q.   And then I'd like to go to page 72.  And

23        the second study listed there, the de Vries 2014

24        study.  That's a study that you cite in your

25        declaration, correct?
```

Page 225

1          A.    Correct.

2          Q.    And then I'd like to go to -- well, and

3     you were aware that the publishers of this

4     systematic review excluded that study from

5     consideration before you cited it in your

6     declaration, correct?

7          A.    It's years ago that I read this, but yes,

8     I would have at some point been aware of that.

9          Q.    And let's go to page 77.  And that's

10    entitled "Appendix E, Evidence Tables."

11               Do you see that?

12         A.    Yes.

13         Q.    And there they are discussing the Achille

14    article that you cite, correct?

15         A.    I believe that's how you pronounce it.

16         Q.    But that's the article that you cite,

17    correct?

18         A.    Yes.

19         Q.    And then go to page 79.  And toward the

20    bottom, that's the Allen study that you cite,

21    correct?

22         A.    Correct.

23         Q.    And then 81.  And that's the Kaltiala

24    study that you cite, correct?

25         A.    Yes.

```
 1                Did I read that correctly?
 2        A.    Yeah.   I think that's true because this
 3    was published prior to some of those other studies
 4    that looked at psychotherapy as a potential
 5    confounder.
 6        Q.   But for the record, I read that
 7    correctly?
 8        A.   Yes.
 9        Q.   Okay.  And what do you -- well, let me
10    read the next sentence, and then I'll -- my first
11    question will be did I read it correctly.
12             "Because of this, it is not clear whether
13    any changes seen were due to gender-affirming
14    hormones or other treatments the participants may
15    have received."
16             And did I read that correctly?
17        A.   Yes.
18        Q.   And is this paragraph describing a
19    confounding variable like we discussed earlier?
20             MS. NOWLIN-SOHL:  Object to form.
21             THE WITNESS:  Yes.
22        Q.   (BY MR. RAMER)  And the, quote, other
23    treatments in that last sentence could include
24    psychotherapy, correct?
25        A.   Theoretically, yes.  I can't be sure what
```

Page 229

1           It says "This systematic review

2      originated from a two-year commissioned work from

3      the governmental body of the Swedish agency for

4      health, technology, assessment, and assessment of

5      social services (SBU)."

6           Did I read that correctly?

7      A.    Yes.

8      Q.    And do you understand this article to be

9      a systematic review commissioned by the Swedish

10     government?

11          A.    I believe so, yes.

12          Q.    So same page in the very top in the fully

13     gray box, there is a conclusion.  And I'll read it

14     and ask if I read it correctly.

15          It says "Evidence to assess the effects

16     of hormone treatment on the above fields in

17     children with gender dysphoria is insufficient.

18     To improve future research, we present the GENDHOR

19     checklist, a checklist for studies in gender

20     dysphoria."

21          Did I read that correctly?

22     A.    Yes.

23     Q.    Do you disagree with the conclusion that

24     evidence to assess the effects of hormone

25     treatment on children with gender dysphoria is

                                        Page 231

1      insufficient?

2              MS. NOWLIN-SOHL:  Object to form.

3              THE WITNESS:  I would need a precise

4      definition of what they mean by "insufficient."

5          Q.   (BY MR. RAMER)  When you read this, did

6      you try to figure out what they meant by

7      "insufficient"?

8          A.   Probably at the time.  I don't recall

9      what their definition was.

10         Q.   And so you said the article included a

11     lot of hyperlinks to very long appendices; is that

12     right?

13         A.   Yes.

14         Q.   And did you ever try to analyze those?

15         A.   I started to, but didn't have time.  But

16     as I mentioned earlier, a lot of what happens with

17     the systematic review is there are subjective

18     choices made in how you define your search

19     terminology, how you decide to exclude and

20     include.

21              So my intention was to go through and

22     better understand their full methodology, but

23     ultimately I did not have time.

24         Q.   Okay.  I'd like to go to -- maybe we're

25     still on 2280.  And in the right column there is a

Page 232

1    the next page, right column, 3.1.  And the final

2    sentence of that paragraph in 3.1 says "A list of

3    excluded studies is provided at the SBU web page,"

4    and then includes a hyperlink.

5              Do you see that?

6        A.   Yes.

7        Q.   All right.

8              MR. RAMER:  I'd like to now introduce

9    Turban Exhibit 20 if you have that, Li.

10             MS. NOWLIN-SOHL:  Yes.

11             (Deposition Exhibit No. 20 was marked.)

12        Q.   (BY MR. RAMER)  And, Dr. Turban, I will

13   represent to you that this document is located at

14   the hyperlink that we just read.

15             And is this one of the long appendices

16   you were referring to?

17        A.   It looks a lot nicer than the one I

18   remember.  I wonder if they fixed some of the

19   formatting in translation.

20        Q.   It could be.

21        A.   But no, that's fine.  It's not very long.

22        Q.   And the -- let's see here.

23             Okay.  Can you see in the light blue -- I

24   won't ask you to read Swedish -- but after the

25   backslash, it says "Appendix 2 studies excluded

                                          Page  234

1    due to high risk of bias."

2         A.    Yes.

3         Q.    And do you cite -- let me rephrase.

4               The first study listed is the Achille

5    study you cite, correct?

6         A.    Yes.

7         Q.    And the second study listed is the Allen

8    study you cite, correct?

9         A.    Yes.

10        Q.    And the third study listed is one of the

11   de Vries studies that you cite, correct?

12        A.    Yes.

13        Q.    And at the bottom of this page is the de

14   Lara study that you cite, correct?

15        A.    Yes.

16        Q.    Dr. Turban, are you aware of any

17   systematic reviews that have been able to draw

18   conclusions about the effects of gender-affirming

19   hormone therapy on suicide?

20        A.    Like death from suicide?

21        Q.    Yes.

22        A.    No.

23              MR. RAMER:   I think this is a good

24   breaking point.   I also think I've been going for

25   about an hour.

                              Page 235

```
 1    provide puberty blockers to adolescents with
 2    gender dysphoria; is that correct?
 3              MS. NOWLIN-SOHL:  Object to form.  Object
 4    to the extent that it calls for a legal
 5    conclusion.
 6              THE WITNESS:  I'm not certain if it's
 7    physically in that center, but the report makes it
 8    clear that pubertal suppression is still an option
 9    for individual patients, and that the general
10    gender dysphoria care is being moved from that
11    centralized clinic to regional clinics.
12              MR. RAMER:  I'd like to look at -- did
13    the Turban Exhibit 21 come through, Li?
14              MS. NOWLIN-SOHL:  Yes.
15              MR. RAMER:  Okay.  I'd like to pull up
16    Turban Exhibit 21, which has the title "Effects of
17    Gender-Affirming Therapies and People With Gender
18    Dysphoria:  Evaluation of the Best Available
19    Evidence."
20              (Deposition Exhibit No. 21 was marked.)
21         Q.   (BY MR. RAMER)  And Dr. Turban, have you
22    seen this document before?
23         A.   I have not.
24         Q.   And were you aware that the Florida
25    Agency For Healthcare Administration imposed
```

Page 255

```
 1    policies that restricted access to
 2    gender-affirming medical interventions?
 3         A.   I read it in the news.
 4         Q.   And did you ever try to research the
 5    evidentiary basis for that decision?
 6              MS. NOWLIN-SOHL:  Object to form.
 7              THE WITNESS:  I know they commissioned a
 8    report that was criticized by others, but I
 9    personally did not go through it.
10         Q.   (BY MR. RAMER)  Okay.  That's all I have
11    on that one.
12              And, Dr. Turban, do you consider yourself
13    to be an expert?
14              MS. NOWLIN-SOHL:  Object to form.
15              THE WITNESS:  Are you still there?
16         Q.   (BY MR. RAMER)  I didn't hear you.  I'm
17    sorry.
18              My question was do you consider yourself
19    to be an expert?
20              MS. NOWLIN-SOHL:  Same objection.
21              THE WITNESS:  Do you mean in something
22    specific?
23         Q.   (BY MR. RAMER)  In anything.
24         A.   I would say I'm an expert in the research
25    regarding the mental health treatment of
```

Page 256

1    that pubertal suppression improves mental health

2    in transgender youth."

3            Did I read that correctly?

4         A.   Yes.  And again, this is why I wouldn't

5    take any one study in isolation since they all

6    have strengths and weaknesses.  This was not one

7    of the studies that adjusted for psychotherapy.  I

8    think we mentioned earlier some of the ones that

9    did.

10        Q.   And so next page, study 10, I believe

11   this is your own study.  And the final sentence

12   says "Of note, this study did not identify

13   psychotherapy as a potentially confounding

14   variable."

15           Did I read that correctly?

16        A.   Yes.

17        Q.   Was this the one you were struggling to

18   remember earlier?

19        A.   No.  The question was whether or not it

20   adjusted for access to gender-affirming hormones.

21        Q.   Which -- the question in the study or the

22   question I had earlier?

23        A.   The question I could not recall for sure

24   is whether or not it adjusted for gender-affirming

25   hormones, not psychotherapy.

Page 261

1    legislation lead you to think it was a good time

2    to review the relevant research for the readers of

3    this blog?

4        A.   Because legislators in several states

5    were making false statements that there was not

6    evidence regarding the benefits of this care, and

7    that I thought it was important for constituents

8    to know when statements by lawmakers are untrue.

9        Q.   Is it fair to say that the -- I'm going

10   to put it this way:  In the cases where you have

11   testified as an expert, is it fair to say that the

12   laws at issue in those cases were enacted by

13   Republican lawmakers?

14            MS. NOWLIN-SOHL:  Object to form;

15   foundation.

16            THE WITNESS:  I believe that's true.

17            MR. RAMER:  And to go back to -- I think

18   I finally have the correction, so I will send

19   that.

20       Q.   (BY MR. RAMER)  Okay.  So I will

21   represent to you that what I am sending is the

22   correction to the Plos One article entitled

23   "Access to Gender-Affirming Hormones During

24   Adolescence and Mental Health Outcomes Among

25   Transgender Adults."

Page 265

```
 1                    MS. NOWLIN-SOHL:  I believe so.  Yes.
 2                    (Deposition Exhibit No. 25 was marked.)
 3            Q.   (BY MR. RAMER)  And, Dr. Turban, do you
 4      have a -- an account on the website formerly known
 5      as Twitter, now known as X?
 6            A.   Yes.
 7            Q.   And is your handle @jack_turban?
 8            A.   Yes.
 9            Q.   And do you have Exhibit 25 in front of
10      you?
11            A.   Yes.
12            Q.   And is this a Tweet that you sent?
13            A.   Yes.
14            Q.   And I'll just read it first and then ask
15      if I read it correctly.  It says "I'm really sick
16      of the #GOP's creative ways of signaling bigotry.
17      They don't care about the flag.  They just want to
18      signal that they:  (1) hate #LGBTQ people, (2)
19      want them to shut up and hide, and (3) want to
20      (and feel entitled to) have power over them.  It's
21      gross."
22                    Did I read that correctly?
23            A.   Yes.
24            Q.   Do you think that Republicans hate LGBTQ
25      people?
```

Page 274

1    legislators that you were referring to in this

2    Tweet about the flag -- and sorry.  Where was

3    that, the flag episode that you were describing?

4         A.   This was back in June.  I don't recall

5    the specifics.

6         Q.   It was back just a few months ago.  You

7    don't recall, like, what state?  Was it Congress?

8         A.   There have been many instances like this

9    over the past several months.  I wish this one

10   stood out more than others, but no, I don't

11   remember this specific instance in June.

12             MR. RAMER:  And I'd like to go to Turban

13   Exhibit 26.

14             (Deposition Exhibit No. 26 was marked.)

15        Q.   (BY MR. RAMER)  And do you have that up?

16        A.   Yes.

17        Q.   And I'll just read this one again and ask

18   if I read it correctly.

19             "Republicans don't believe in freedom of

20   speech.  They silenced an elected representative

21   because she disagreed with them on the House

22   floor.  It's not a coincidence that she's

23   transgender.  They are steadfast in silencing and

24   attacking trans Americans.  American democracy is

25   dead."

Page  277

1          Did I read that correctly?

2          A.    Yes, with a -- there's a statement below

3     it from the representative who was forced to stop

4     speaking on the House floor.

5          Q.    Do you think that Republicans are

6     steadfast in attacking trans Americans?

7                MS. NOWLIN-SOHL:  Object to form.

8                THE WITNESS:  I think there's been a

9     clear rise in legislation that is not evidence

10    based and goes against the broad consensus in

11    medicine about how we can help these young people

12    I'm responsible for taking care of.  And I have

13    been watching more and more legislation being

14    introduced that is harmful to them and that is

15    concerning to me.

16         Q.    (BY MR. RAMER)  Do you think supporters

17    of that legislation are attacking trans Americans?

18                MS. NOWLIN-SOHL:  Object to form.

19                THE WITNESS:  Again, I can't speak to

20    every individual who's introducing legislation,

21    but I can tell you it's legislation where the

22    evidence suggests that it's going to be harmful to

23    this population.

24                And it's very sad to me to watch that

25    non-evidence-based legislation be pushed forward

                                          Page 278

```
 1    democracy is dead?
 2              MS. NOWLIN-SOHL:  Object to form.
 3              THE WITNESS:  I think it's very scary
 4    that politicians would weaponize the government to
 5    silence elected representatives from being able to
 6    speak on legislation.
 7              And as someone who's aware that often
 8    physicians don't do a good job sharing evidence
 9    broadly and that often the information that we
10    have and this research and peer-reviewed journals
11    doesn't always make its way into legislative
12    debates, it's scary to imagine that the few ways
13    in which that research and data is supposed to get
14    into the law-making process is in some instances
15    being prevented.
16              MR. RAMER:  And I'd like to go to Turban
17    Exhibit 27.
18              (Deposition Exhibit No. 27 was marked.)
19         Q.   (BY MR. RAMER)  And do you have that up?
20         A.   Yes.
21         Q.   And I'll just read it first and then ask
22    if I read it correctly.
23              "Our country is dying and the GOP is
24    killing it.  They are abusing power to attack
25    minorities, then demand that they stand silent
```

                                        Page 280

1    while attacked.  We've seen this before in

2    history, and it's never ended well."

3              Did I read that part of the Tweet

4    correctly?

5         A.   I'll have to read the screenshot below it

6    to know what the context was, but you read the

7    part above the screenshot correct.

8         Q.   And do you think that the GOP is killing

9    our country?

10             MS. NOWLIN-SOHL:  Object to form.

11             THE WITNESS:  I'll need a second to read

12   the part you didn't read.

13        Q.   (BY MR. RAMER)  Okay.

14        A.   Okay.  This seems like the same -- a

15   reference to the same situation as the last Tweet,

16   which, again, I think was very concerning that

17   there was a member of this legislative body trying

18   to share research and data about -- I think in

19   this case it was a ban on gender-affirming medical

20   care for adolescents being dangerous.

21             And they used different techniques to

22   eventually silence that representative from being

23   able to share that information.

24             And I think the representatives who did

25   that and actively worked to try and remove

                                        Page 281

```
 1      and answered.
 2              THE WITNESS:  I think I answered the
 3      question.
 4          Q.   (BY MR. RAMER)  Are you refusing to
 5      answer the question yes or no of whether you think
 6      that those certain GOP lawmakers who you just
 7      referenced are killing our country?
 8              MS. NOWLIN-SOHL:  Object to form;
 9      argumentative, asked and answered.
10              THE WITNESS:  I don't think it's a
11      yes-or-no question, and I think I answered the
12      question.
13              MR. RAMER:  All right.  Let's go to
14      Turban Exhibit 28.
15              (Deposition Exhibit No. 28 was marked.)
16          Q.   (BY MR. RAMER)  Do you have that up?
17          A.   Yes.
18          Q.   I'll just read this and then ask if I
19      read it correctly.
20              "I should clarify.  I don't hate all
21      conservatives," exclamation point.  "Mostly just
22      the aggressive anti-trans Heritage folks," heart
23      emoji.  "I should use more precise terminology for
24      my haters."
25              Did I read that correctly?
```

Page  284

1        A.    Yes.

2        Q.    And what are anti-trans Heritage folks?

3        A.    I don't recall the specific context of

4    this Tweet, but presumably it was someone similar

5    to this line of questioning accusing me of hating

6    all conservatives.

7              I have many conservative friends.  I have

8    all throughout my education.  I'm very close with

9    conservatives and people across the political

10   spectrum.

11             At the end of the day I work as a child

12   psychiatrist who takes care of a specific

13   population that I care deeply, which are the young

14   transgender youth.

15             There are individuals at the Heritage

16   Foundation who intermittently have passed

17   misinformation or said things about this

18   population or the research regarding them that's

19   not true, and it is very upsetting for me to see

20   people spread misinformation that's going to hurt

21   the young patients that I take care of.

22             So again, this is meant to clarify -- I

23   think the line of questioning that you're going

24   after is whether or not I have an issue with a

25   certain political party.  And this Tweet is

Page 285

```
1                         REPORTER'S CERTIFICATE
2      STATE OF IDAHO         )
                              )
3      COUNTY OF ADA          )
4
5          I, Amy E. Simmons, Certified Shorthand Reporter and
6      Notary Public in and for the State of Idaho, do hereby
7      certify:
8          That prior to being examined, the witness named in
9      the foregoing deposition was by me duly sworn to testify
10     to the truth, the whole truth, and nothing but the truth;
11         That said deposition was taken down by me in
12     shorthand at the time and place therein named and
13     thereafter reduced to typewriting under my direction, and
14     that the foregoing transcript contains a full, true, and
15     verbatim record of said deposition.
16         I further certify that I have no interest in the
17     event of the action.
18         WITNESS my hand and seal this 19 day of October,
19     2023.
20
21
22                         AMY E. SIMMONS
                           ID CSR No. 685
23                         CA CSR No. 14453
                           WA CSR No. 22012915
24                         OR CSR No. 22-009
                           RDR, CRR, CRC,
25                         and Notary Public
       My commission expires:  6/13/28.

                                              Page 317
```