```
 1                    UNITED STATES DISTRICT COURT
 2                        DISTRICT OF IDAHO
 3
 4       PAM POE, by and through her  )  Case No.
         parents and next friends,    )  1:23-cv-00269-CWD
 5       Penny and Peter Poe; PENNY    )
         POE; PETER POE; JANE DOE, by )
 6       and through her parents and   )
         next friends, Joan and John   )
 7       Doe; JOAN DOE; JOHN DOE,      )
                                       )
 8                         Plaintiffs, )
                                       )
 9       v.                            )
                                       )
10       RAÚL LABRADOR, in his         )
         official capacity as the      )
11       Attorney General of the State)
         of Idaho; JAN M. BENNETTS, in)
12       her official capacity as      )
         County Prosecuting Attorney   )
13       for Ada, Idaho; and the       )
         INDIVIDUAL MEMBERS OF THE     )
14       IDAHO CODE COMMISSION, in     )
         their official capacities,    )
15                                     )
                         Defendants.   )
16       _____)
17
18
19         REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS
20                     MONDAY, OCTOBER 16, 2023
21
22
23
24
25       Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC

                                                   Page 1
```

1  REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS
2
3      BE IT REMEMBERED that the remote videotaped
4  deposition of JACK TURBAN, M.D., MHS was taken via Zoom
5  videoconference by the attorney for the Defendants before
6  Associated Reporting & Video, a Veritext company, Amy E.
7  Simmons, Idaho CSR No. 685, California CSR No. 14553,
8  Washington CSR No. 22012915, Oregon CSR No. 22-009, and
9  Notary Public in and for the County of Ada, State of
10 Idaho, on Monday, the 16th day of October, 2023,
11 commencing at the hour of 9:06 a.m. Pacific time in the
12 above-entitled matter.
13
14
15 APPEARANCES (remotely):
16 For the Plaintiffs:   AMERICAN CIVIL LIBERTIES UNION
             By:  Li Nowlin-Sohl, Esq.
17             Leslie Cooper, Esq.
             125 Broad Street
18           New York, NY 10004
             Telephone:  212.549.2584
19           lnowlin-sohl@aclu.org
             lcooper@aclu.org
20
21 GROOMBRIDGE WU BAUGHMAN & STONE
             By:  Philip S. May, Esq.
22           801 17th Street, Suite 1050
             Washington, D.C. 20006
23           Telephone:  202.539.6620
             philip.may@groombridgewu.com
24
25
                                                    Page 2

1  APPEARANCES (remotely, continued):
2
3  For the Plaintiffs:  ACLU OF IDAHO FOUNDATION
             By:  Dina Flores-Brewer, Esq.
4            Post Office Box 1897
             Boise, ID 83701
5            Telephone:  208.344.9750
             dfloresbrewer@acluidaho.org
6
7  For the Defendants, Labrador and the Individual Members
   of the Idaho Code Commission:
8
             COOPER & KIRK PLLC
9            By:  John Ramer, Esq.
             1523 New Hampshire Ave NW
10           Washington, D.C. 20036
             Telephone:  202.220.9621
11           jramer@cooperkirk.com
12 OFFICE OF THE ATTORNEY GENERAL
             By:  Rafael J. Droz, Esq.
13           Post Office Box 83720
             Boise, ID  83720
14           Telephone:  208.334.2400
             Facsimile:  208.854.8073
15           rafael.droz@ag.idaho.gov
16
   Also Present:    Chris Ennis, Videographer
17                  Jocelyn Larsson,
                    Court Reporting Intern
18
19
20
21
22
23
24
25
                                                    Page 3

1                 I N D E X
2         E X A M I N A T I O N
3
4  JACK TURBAN, M.D.                          PAGE
5
   By:  Mr. Ramer..................................10, 315
6
   Ms. Nowlin-Sohl.............................313
7
8
9
10
11         E X H I B I T S
12 NO.                            PAGE
13 Exhibit 1.   Expert Rebuttal Declaration of Jack   11
             Turban, MD, MHS (49 pages)
14 Exhibit 2.   Deposition Transcript of Jack         11
             Turban, M.D., MHS, Taken 5/19/23
15           (354 pages)
16 Exhibit 3.   Errata Sheet for Deposition Taken     11
             5/19/23 (5 pages)
17
   Exhibit 4.   Users' Guides to the Medical          21
18           Literature (545 pages)
19 Exhibit 5.   The Cass Review Document              29
             (112 pages)
20
   Exhibit 6.   Harvard Countway Library Systematic   56
21           Reviews and Meta Analysis (3 pages)
22 Exhibit 7.   International Journal of              83
             Transgender Health Chapter 6,
23           Adolescents (24 pages)
24 Exhibit 8.   GenderGP Podcast Transcript          102
             (14 pages)
25
                                                    Page 4

1         E X H I B I T S (continued)
2  NO.                            PAGE
3  Exhibit 9.   HHS Public Access Author Manuscript  125
             (15 pages)
4
   Exhibit 10.  2015 Report of the U.S. Transgender   131
5            Survey (302 pages)
6  Exhibit 11.  Plos One "Access to                   136
             Gender-Affirming Hormones During
7            Adolescence and Mental Health
             Outcomes Among Transgender Adults"
8            (15 pages)
9  Exhibit 12.  JAMA Psychology "Association          139
             Between Recalled Exposure to Gender
10           Identity Conversion Efforts and
             Psychological Distress and Suicide
11           Attempts Among Transgender Adults"
             (9 pages)
12
   Exhibit 13.  "Transgender Conversion Therapy       148
13           Associated with Severe
             Psychological Distress" (3 pages)
14
   Exhibit 14.  Journal of Adolescent Health "Age     151
15           of Realization and Disclosure of
             Gender Identity Among Transgender
16           Adults" (8 pages)
17 Exhibit 15.  Annalou de Vries and Sabine Hannema   177
             "Growing Evidence and Remaining
18           Questions in Adolescent Transgender
             Care" (3 pages)
19
   Exhibit 16.  Transgender Health "Consensus         194
20           Parameter" Research Methodologies
             to Evaluate Neurodevelopmental
21           Effects of Pubertal Suppression in
             Transgender Youth" (12 pages)
22
   Exhibit 17.  "Evidence Review: Gonadotrophin       213
23           Releasing Hormone Analogues for
             Children and Adolescents with
24           Gender Dysphoria" (131 pages)
25
                                                    Page 5

                                          2 (Pages 2 - 5)

1        E X H I B I T S (continued)
2   NO.                              PAGE
3   Exhibit 18.  "Evidence Review: Gender-Affirming    224
        Hormones for Children and
4       Adolescents with Gender Dysphoria"
        (156 pages)
5
    Exhibit 19.   ACTA Peadiatrica "A Systematic       230
6       Review of Hormone Treatment For
        Children with Gender Dysphoria and
7       Recommendations for Research"
        (14 pages)
8
    Exhibit 20.  Bilaga Till Rapport Article           234
9       (2 pages)
10  Exhibit 21.  Brignardello-Peterson, et al.         255
        "Effects of Gender-Affirming
11      Therapies in People with Gender
        Dysphoria: Evaluation of the Best
12      Available Evidence" (70 pages)
13  Exhibit 22.  Socialstyrelsen "Care of Children     236
        and Adolescents with Gender
14      Dysphoria" (6 pages)
15  Exhibit 23.  Turban "The Evidence for Trans        258
        Youth Gender-Affirming Medical
16      Care" (10 pages)
17  Exhibit 24.  Plos One "Correction: Access to       267
        Gender-Affirming Hormones During
18      Adolescence and Mental Health
        Outcomes Among Transgender Adults"
19      (7 pages)
20  Exhibit 25.  Tweet by Jack Turban, MD (1 page)     274
21  Exhibit 26.  Tweet by Jack Turban, MD (1 page)     277
22  Exhibit 27.  Tweet by Jack Turban, MD (1 page)     280
23  Exhibit 28.  Tweet by Jack Turban, MD (1 page)     284
24  Exhibit 29.  "One Size Does Not Fit All: In        296
        Support of Psychotherapy for Gender
25      Dysphoria" (10 pages)
                                                Page 6

1        E X H I B I T S (continued)
2   NO.                              PAGE
3   Exhibit 30.  LGBT Health "Factors Leading to       299
        'Detransition' Among Transgender
4       and Gender Diverse People in the
        United States: A Mixed-Methods
5       Analysis" (8 pages)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                Page 7

1              P R O C E E D I N G S

2

3          THE VIDEOGRAPHER:  All right.  So we are

4   recording, and we are on the record.  Today's date

5   is October 16, 2023.  The time is 9:06 a.m.

6   Pacific.

7          For the record, this is the remote

8   videotaped deposition of Dr. Jack Turban.  It's

9   taken by the Defendants in the matter of Poe, et

10  al. vs. Labrador, et al.  It's Case

11  No. 1:23-cv-00269-CWD.  It is in the United States

12  District Court for the District of Idaho.

13         The videotaped deposition is being held

14  remotely via Zoom videoconference.  The videotaped

15  deposition is being recorded by Chris Ennis and

16  reported by Amy Simmons of Associated Reporting &

17  Video, a Veritext Company.

18         And if counsel will please state their

19  appearances and any stipulations for the record.

20         MR. RAMER:  John Ramer of the law firm

21  Cooper & Kirk representing the State defendants.

22         MS. NOWLIN-SOHL:  Li Nowlin-Sohl with the

23  ACLU representing Plaintiffs.

24         MS. COOPER:  Leslie Cooper with the ACLU,

25  Plaintiffs.

1          MR. MAY:  And Philip May from

2   Groombridge, Wu, Baughman & Stone on behalf of

3   Plaintiffs.

4          THE VIDEOGRAPHER:  And if the court

5   reporter will please swear the witness.

6          THE REPORTER:  I think we have a couple

7   more people that need to identify themselves

8   first.  I've got Rafael Droz and Dina Flores.

9          MS. FLORES-BREWER:  Yes.  This is Dina

10  Flores-Brewer.  I'm one of the attorneys for ACLU

11  of Idaho.  I am just listening in today.

12         THE REPORTER:  Thank you.  And Mr. Droz

13  is for the State; is that correct?  I'm thinking

14  he's just not on.

15         MR. RAMER:  That's right.  He's with the

16  Idaho Attorney General's Office representing the

17  State defendants.

18

19         JACK TURBAN, M.D., MHS,

20  a witness having been first duly sworn to tell the truth,

21  the whole truth, and nothing but the truth, testified as

22  follows:

23  ///

24  ///

25  ///

EXAMINATION

BY MR. RAMER:

1    Q. (BY MR. RAMER) Good morning, Dr. Turban.

2    A. Good morning.

3    Q. My name is John Ramer. I'm from the law
firm Cooper & Kirk representing the State
defendants in this case.

4         I know you've been deposed before, but
just as a quick refresher for both of us -- more
for me -- but for the benefit of the court
reporter, we'll try not to talk over one another.

5         And I'd just ask that you respond
verbally when answering questions.

6         If you don't understand anything about my
question, please just let me know; otherwise, I'll
assume you're answering the question asked.

7         And I typically aim for a break every
hour or so, but if you need a break at any point,
just let me know. And my only request would be
that you answer any question that's pending before
we go on a break.

8         Does that all sound good?

9    A. Yes.

10        MR. RAMER: And first, I'm just going to
introduce and mark some documents that we'll

Page 10

likely be referring to throughout the day. The
first one Li should have. It's Turban Exhibit 1.
I think the file name says "Tab A." When you have
it, just let me know.

    (Deposition Exhibit No. 1 was marked.)

    THE WITNESS: I have it.

    Q. (BY MR. RAMER) And, Dr. Turban, is this
a copy of the declaration you submitted in this
case?

    A. Yes.

    Q. Okay. And attached to the declaration,
is your CV attached?

    A. Yes.

    Q. And I assume there are not any major
changes over the weekend from when this was filed
on Friday?

    A. Correct.

    (Deposition Exhibit No. 2 was marked.)

    Q. (BY MR. RAMER) Okay. The next document,
Turban Exhibit 2, does this appear to be the
transcript of your deposition in the Indiana case,
K.C. vs. The Individual Members of the Medical
Licensing Board?

    A. It appears to be, yes.

    (Deposition Exhibit No. 3 was marked.)

Page 11

    Q. (BY MR. RAMER) And then Turban
Exhibit 3, does this document appear to be your
signed errata sheet for your deposition in the
Indiana case?

    A. Yes.

    Q. And, Dr. Turban, is anyone in the room
with you besides Li Nowlin-Sohl?

    A. Sorry, no.

    Q. And do you have any documents open in
front of you?

    A. Just the exhibits that you sent.

    Q. Great. Dr. Turban, are you familiar with
the term "evidence-based medicine"?

    A. Yes.

    Q. And what is your understanding of that
term?

    A. The broad term, that refers to using the
existing published research literature when making
decisions about medical care.

    Q. And do you practice evidence-based
medicine?

    A. Yes.

    Q. And how does one practice evidence-based
medicine?

    A. That's a big question that involves many

Page 12

years of medical school and residency and
fellowship training, but as a general matter it
involves having a patient in front of you and
referencing the existing research literature to
try to make the best decision for that patient
based on the research that's been published.

    Q. Are you familiar with the term
"systematic review"?

    A. Yes.

    Q. And what is your understanding of that
term?

    A. Systematic review is when one predefines
search terms that they are going to use when
searching various research databases. Then they
provide a review of the literature that they
identify through that search method.

    Q. When you say "they provide a review of
the literature," what do you mean by that?

    A. They would define search terms. They
would put those search terms into the research
databases. Many papers will come out of there,
but then there's variation in how they may choose
to include or exclude different studies, how they
interpret them, and how they summarize their
reading of those papers.

Page 13

4 (Pages 10 - 13)

Page 14

1    Q.  And what does the practice of
2  evidence-based medicine say about the role of
3  systematic reviews in clinical decision-making?
4        MS. NOWLIN-SOHL: Object to the form.
5        THE WITNESS:  Again, because systematic
6  reviews can be so broad, there would be systematic
7  reviews that would be very useful and there would
8  be some other systematic reviews that would be
9  less useful.
10        Usually in evidence-based medicine people
11  are talking about systematic reviews of clinical
12  trials or of non -- like, observational studies or
13  comparative studies, but there's not really a
14  straightforward answer.  Systematic review is just
15  one way of collecting literature that you may then
16  use when working through evidence-based medicine.
17    Q.  (BY MR. RAMER)  And do you know how a
18  systematic review is conducted?
19    A.  There are many different ways to conduct
20  a systematic review, but again, in general, one
21  would predefine their search terms to find the
22  databases they're going to use, put those search
23  terms into those databases, screen abstracts,
24  identify the abstracts that they feel are relevant
25  to their questions, and then summarize that

Page 15

1  literature.
2    Q.  What is the value of a systematic review
3  over an alternative method of reviewing a body of
4  scientific literature?
5    A.  Do you mean comparing a systematic review
6  to, say, a narrative review?
7    Q.  Sure.  Or any other -- I guess what other
8  types of reviews of the body of scientific
9  literature are there besides systematic review and
10  a narrative review?
11    A.  Those are the two main ones that people
12  would discuss.  So a narrative view is usually
13  written by an expert who knows the literature
14  broadly but they may not include in their
15  manuscript what specific search terms they used,
16  what specific databases they used, but they'll
17  summarize what's known about the research, and
18  they'll go through peer review where other experts
19  check that material also.
20        They would add additional literature if
21  that individual author has missed something.  It
22  goes back and forth through the peer-review
23  process until the reviewer, the editor, and the
24  author feel that it's comprehensive.
25        A systematic review is different in that

Page 16

1  the manuscript will actually say "These are the
2  search terms that we used when searching our
3  literature databases, and these are the databases
4  that we used."  So it makes it a little bit easier
5  for another researcher to repeat their search.
6    Q.  Have you ever conducted a systematic
7  review?
8    A.  Not as a first author, but I've been part
9  of a team that's conducted a systematic review.
10    Q.  And what systematic review was that?
11    A.  The systematic review of a broad category
12  of functional neurologic disorders among sexual-
13  and gender-minority people.
14    Q.  Do you happen to know the name of that
15  paper?
16    A.  I think the first author is Lerario,
17  L-e-r-a-r-i-o, I believe.
18    Q.  And what was your role in that systematic
19  review?
20    A.  I assisted the team with choosing our
21  search terms, choosing the databases, and also in
22  writing the manuscript, editing the manuscript.
23    Q.  As you sit here today, are you able to
24  name any specific systematic reviews relating to
25  literature in your field that you have read?

Page 17

1        MS. NOWLIN-SOHL:  Object to form.
2        THE WITNESS:  I don't know that I would
3  have, like, a specific title that I could rattle
4  off, but there have been many systematic
5  reviews -- is there a specific part of my field
6  that you're referencing?
7    Q.  (BY MR. RAMER)  I guess what field are
8  you opining upon as an expert in this case?
9    A.  The treatment of adolescents with gender
10  dysphoria.
11    Q.  So then, yes, I guess I'll talk about
12  that field.
13        Have you -- as you sit here today, are
14  you able to name any specific systematic reviews
15  relating to literature in that field that you have
16  read?
17    A.  I don't remember the exact titles, but I
18  know there was one, I believe, in the Journal of
19  Transgender Health a few years ago.
20        There have been a number of
21  non-peer-reviewed systematic reviews.
22        I believe there were systematic reviews
23  conducted as part of some of the guidelines that
24  were written.
25    Q.  And I know you said you don't know the

5 (Pages 14 - 17)

Page 18

1    title, but the one that you first referred to in
2    the Journal For Transgender Health, can you
3    describe it so that we can at least try to
4    identify it?
5        A.  It was a few years ago that it came out,
6    but it was I think generally looking at the mental
7    health impacts of different gender-affirming
8    medical interventions for adolescents with gender
9    dysphoria.
10        And, as a systematic review generally
11   does, goes through the strengths and weaknesses of
12   different studies that have been published.
13       Q.  Do you remember any of the authors on it?
14       A.  I don't recall.
15       Q.  Of the systematic reviews you described,
16   did you study them in detail?
17       MS. NOWLIN-SOHL:  Object to form.
18       THE WITNESS:  Generally if you are in a
19   specific field where you know most of the research
20   papers, the thing that's most interesting about
21   systematic review is if it identifies a paper that
22   you didn't already know about.
23       The big thing about systematic review is
24   that it's using specific search terms and doing
25   this really comprehensive search of these large

Page 19

1    databases, so it's values that can identify a
2    peer-reviewed research paper that you didn't know
3    about previously.
4        So probably what I would have done is if
5    there were any papers in there that I didn't know
6    about, I would have added it to my running list of
7    papers that I think are important for me to know
8    and for my fellows to know and others in the
9    field.
10       Q.  (BY MR. RAMER)  And this question may not
11   make sense, but have you taken any particular
12   courses on the evidence-based medicine?  Or is it
13   more it's a set of principles that is infused into
14   all of medical education?
15       MS. NOWLIN-SOHL:  Object to form.
16       THE WITNESS:  Certainly there is some in
17   my undergraduate degree in neuroscience that was
18   from Harvard.  Also my medical school courses --
19   [indiscernible].
20       THE REPORTER:  Dr. Turban, I'm sorry to
21   interrupt.  I'm having a hard time understanding
22   you a little bit.  I don't know if you can get
23   closer to the microphone or maybe slow down a tiny
24   bit?  Some of your words are just cutting out, and
25   I'm struggling with understanding them.

Page 20

1        So can you repeat that answer for me,
2    please?
3        THE WITNESS:  Yeah, sorry.  I'm trying to
4    see if I can turn up the microphone also.
5        THE REPORTER:  Thank you.
6        THE WITNESS:  I think the microphone is
7    up all the way.  Is this better with it close?
8        THE REPORTER:  Let's try it.
9        THE WITNESS:  I think the question was if
10   I've had any coursework in using evidence-based
11   medicine?
12       Q.  (BY MR. RAMER)  That's right.
13       A.  So certainly that would be part of -- my
14   undergraduate degree was in neuroscience from
15   Harvard College.
16       And then I received my medical school
17   degree from Yale School of Medicine where we
18   talked about evidence-based medicine both in our
19   preclinical classroom courses and through our
20   clinical courtships when we're working with
21   patients.
22       And then received a master's of health
23   sciences research from Yale also.
24       I did my adult psychiatry residency at
25   Harvard Medical School at MGH McLean where we had

Page 21

1    more courses on it as well as applying it
2    practically to seeing patients.
3        And then similarly in my fellowship in
4    child and adolescent psychiatry at Stanford.
5        MR. RAMER:  Okay.  And I'd like to
6    introduce what will be Turban Exhibit 4.  And it
7    should be the Users' Guides to the Medical
8    Literature Third Edition.
9        (Deposition Exhibit No. 4 was marked.)
10       Q.  (BY MR. RAMER)  Do you see that?
11       A.  Yes.
12       Q.  And have you seen this document before?
13       A.  I do not believe I have.
14       Q.  Do you recognize the lead author's name,
15   Gordon Guyatt?
16       A.  I do not.  It looks like he is a
17   biostatistician in Ontario.
18       Q.  Where are you getting that information?
19       A.  From the first page.
20       Q.  Oh, I see.  And I'd like to go to page 4,
21   which I think is 33 in the PDF.
22       A.  Okay.
23       Q.  The second full sentence on this page,
24   I'll just read it and ask if I've read it
25   correctly.

6 (Pages 18 - 21)

1    It says "Efficient and optimally
2 effective evidence-based practice dictates
3 bypassing the critical assessment of primary
4 studies and, if they are available, moving
5 straight to the evaluation of rigorous systematic
6 reviews."
7    Did I read that correctly?
8    A.  Yes.
9    Q.  And do you agree with that statement?
10    A.  Yeah, I think this is similar to what I
11 was saying before, that it wouldn't be a good
12 practice to just look at one or two individual
13 studies.  [Indiscernible] -- of a systematic
14 review is that it's going to identify more studies
15 that you may not find -- that a more, as they're
16 saying, quote, rigorous systematic review with a
17 certain search approach would potentially
18 identify.
19    It's basically saying that you don't want
20 to miss individual studies that might be important
21 for your interpretation.
22    Q.  But it looks like it's discussing that
23 you need to bypass, quote, the critical assessment
24 primary studies, end quote, and instead proceed to
25 systematic reviews.

Page 22

1 understand the very last part of what you just
2 said.
3    Could you say that again?
4    A.  The word "bypass" is tricky because I
5 think -- correct me if I'm wrong, but I think you
6 were reading "bypass" as meaning you should not
7 read the individual studies and you should just go
8 to the systematic review.  That's not my
9 interpretation.
10    I think they're saying that you shouldn't
11 just read individual studies because you might
12 miss other important studies.  So you should read
13 the studies that you identified, but you should
14 also go to systematic reviews to make sure you're
15 not missing important information or studies that
16 you yourself didn't identify in your search.
17    Q.  And then I'd like to go to page 14, which
18 I think is page 43 in the PDF.
19    A.  Okay.
20    Q.  And the first full paragraph on this
21 page, I'm just going to read the first two
22 sentences and ask if I read it correctly.
23    It says "Rational clinical decisions
24 require systematic summaries of the best available
25 evidence.  Without such summaries, clinicians,

Page 24

1    And that -- do you agree that seems to be
2 discussing something different than merely
3 identifying studies?
4    MS. NOWLIN-SOHL:  Object to form.
5    THE WITNESS:  I may have to read it in
6 context to see what they mean by "bypass," if you
7 give me a moment.
8    If read in context, this seems to talk
9 about how one could read individual studies.  It
10 then goes on to say that there are times where an
11 individual study doesn't give you the full picture
12 because other studies may provide additional
13 information.
14    Then they're saying, you know, you should
15 bypass the individual studies and go to the
16 systematic reviews, but I think really what they
17 mean is don't only read individual studies because
18 that would put you at risk of missing other
19 studies that are important for understanding the
20 body of research as a whole is how I read that
21 sentence.  I don't think they're saying to ignore
22 individual studies or to not consider reading them
23 in depth when they're identified in the systematic
24 review.
25    Q.  (BY MR. RAMER)  I'm sorry.  I didn't

Page 23

1 expert or otherwise, will be unduly influenced by
2 their own preconceptions and by unrepresentative
3 and often lower quality evidence."
4    Did I read that correctly?
5    A.  Yes.
6    Q.  And do you agree with those statements?
7    A.  Again, I think what this is saying is
8 that if you only knew some of the research
9 literature and you were missing several research
10 studies, then you wouldn't have the complete
11 picture of the evidence.  And I believe that is
12 true.
13    Q.  What do you take them to be referring to
14 when they discuss "lower quality evidence"?
15    MS. NOWLIN-SOHL:  Object to form;
16 foundation.
17    THE WITNESS:  They don't -- I don't know
18 if they provided a specific definition earlier,
19 but it's a subjective term relevant to others.  It
20 would depend on what you were comparing,
21 presumably something lower quality than the other
22 papers you had not identified in some way.  But I
23 don't think they're specifying a specific way in
24 which one paper is lower quality than another,
25 just highlighting that some papers may be higher

Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1  quality than others. | 1      and we are back on the record. |
| 2      Q.  (BY MR. RAMER) How can one paper be | 2          MR. RAMER:  Okay.  I just tried hitting |
| 3  higher quality than another? | 3  send again the compressed version.  So if that |
| 4      A.  Oh, I would need to give you an entire | 4  shows up, Li, just let me know. |
| 5  course on clinical research and statistical | 5      Q.  (BY MR. RAMER)  While we're waiting, |
| 6  approaches. | 6  Dr. Turban, have you ever heard the term the |
| 7      Q.  Okay.  So your point -- just to kind of | 7  "hierarchy of evidence"? |
| 8  summarize here, your point is that the value of | 8      Sorry.  Did you hear me? |
| 9  the systematic review is really just the value of | 9          MR. RAMER:  Amy, can you hear me? |
| 10  identifying relevant studies; is that fair? | 10          THE WITNESS:  Something just happened |
| 11      A.  The major goal of systematic review is to | 11  with our A/V system. |
| 12  collect the best you can.  Systematic reviews are | 12          MS. NOWLIN-SOHL:  Can you hear us, John? |
| 13  never perfect.  There are intricacies in what | 13          MR. RAMER:  I just said while we're |
| 14  search terms you use, which databases you use, how | 14  waiting -- |
| 15  you choose to include and exclude different | 15          MS. NOWLIN-SOHL:  Okay.  We cannot hear |
| 16  studies, so there are many ways that systematic | 16  you. |
| 17  review can be high quality or low quality itself. | 17          MR. RAMER:  Okay.  Let's go off the |
| 18      But in general the goal, if it's done | 18  record again. |
| 19  well, is that you would identify all the relevant | 19          THE WITNESS:  Try again now, please. |
| 20  research, that you could really be making your | 20          MR. RAMER:  Can you hear me?  All right. |
| 21  summaries of the literature based on a complete | 21          THE VIDEOGRAPHER:  Okay.  I'll take you |
| 22  picture, that you're not missing important | 22  guys off here.  One second. |
| 23  studies. | 23      So the time is 9:35 a.m. Pacific, and we |
| 24      Q.  So it's just about locating studies; is | 24  are off the record. |
| 25  that right? | 25          (Brief pause in the proceedings.) |
| Page 26 | Page 28 |
| 1          MS. NOWLIN-SOHL:  Objection; | 1          THE VIDEOGRAPHER:  Okay.  So we are |
| 2  mischaracterizes prior testimony. | 2  regarding.  The time is 9:37 a.m. Pacific, and we |
| 3          THE WITNESS:  It's about in a systematic | 3  are back on the record. |
| 4  way, identifying relevant papers and then one | 4      (Deposition Exhibit No. 5 was marked.) |
| 5  generally summarizes them as well. | 5      Q.  (BY MR. RAMER)  Okay.  Dr. Turban, do you |
| 6      Ideally, a critical reader of a | 6  have Turban Exhibit 5, which says "The Cass |
| 7  systematic review would go back to those studies | 7  Review" at the top in front of you? |
| 8  and read them as well, if it were feasible. | 8      A.  Yes.  February 2022. |
| 9          MR. RAMER:  And I tried to send what I'll | 9      Q.  And have you seen this document before? |
| 10  call Turban Exhibit 5.  Did you receive that, Li? | 10      A.  Yes. |
| 11          MS. NOWLIN-SOHL:  I have not. | 11      Q.  Have you read it? |
| 12          MR. RAMER:  Okay. | 12      A.  Yes. |
| 13      Q.  (BY MR. RAMER)  Let's do it this way. | 13      Q.  And when did you first read it? |
| 14  Dr. Turban, have you ever heard of the pyramid of | 14      A.  I don't recall.  Many months ago. |
| 15  evidence? | 15      Q.  Do you recall what you thought when you |
| 16      A.  Broadly speaking. | 16  read it? |
| 17          MR. RAMER:  Hey, Li, do you mind if we go | 17      A.  My main takeaways were that they -- |
| 18  off the record for just one second to discuss a | 18  there's a lot of news coverage of it also. |
| 19  technical issue? | 19      My understanding is there were very long |
| 20          MS. NOWLIN-SOHL:  Yeah, that's fine. | 20  wait lists for the central gender clinic in the |
| 21          THE VIDEOGRAPHER:  Okay.  So the time is | 21  U.K.  And because of those long waits, there was |
| 22  9:32 a.m. Pacific time, and we are off the record. | 22  concern that the physicians weren't able to |
| 23      (Brief pause in the proceedings.) | 23  provide comprehensive care and be able to see the |
| 24          THE VIDEOGRAPHER:  All right.  So we are | 24  number of patients they had on their very long |
| 25  recording.  The time is 9:33 a.m. Pacific time, | 25  wait list. |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

1     So I think the review went in and
2  ultimately determined it would be better to close
3  that centralized clinic and open several regional
4  clinics where they'd be able to provide more
5  comprehensive individualized care.
6     Q.  Okay.  And I'd like to go to page 62 of
7  this document.
8        And just let me know when you're there.
9     A.  We're there.  Figure 3?
10    Q.  Yes.  And so Figure 3 is entitled
11  "Pyramid of Standards of Evidence"; is that right?
12    A.  Yes.
13    Q.  And have you seen this image before?
14    A.  I've seen images like this one before.
15    Q.  And have you ever heard the term
16  "hierarchy of evidence"?
17    A.  In a general sense, yes.
18    Q.  And what's your understanding of that
19  term?
20    A.  Just a broad reference to the fact that
21  some research studies may have fewer potential
22  interpretive pitfalls than others.
23    Q.  And can you explain why this figure has
24  "Systematic reviews" at the top of the pyramid?
25    A.  I think this is going to the point that
Page 30

1  knowing the body of literature as a whole is more
2  useful than just an individual study.
3        I think it's worth pointing out that it
4  actually says "Systematic reviews and
5  meta-analyses."
6        And meta-analyses are different.  So
7  meta-analyses are when you actually take all the
8  research studies that have been done and conduct
9  statistical analyses to create a composite number
10  that really tells you in a quantitative way how to
11  put all the research together instead of some of
12  these systematic reviews where their description
13  is narrative; they're just kind of saying their
14  interpretation of the data.
15        That's different from a meta-analysis
16  where they actually apply statistical techniques
17  to summarize all of the research as a whole.
18        So systematic review and meta-analysis is
19  a specific kind of paper that's not just a
20  systematic review.
21        But generally what this figure is getting
22  at is that if you have a paper that has all of the
23  research literature, or as much as possible of the
24  research literature together and summarized,
25  that's of higher value than individual studies.
Page 31

1     Q.  And why is that of higher value?
2     A.  Because you're looking at all of the
3  studies instead of looking at just one.
4     Q.  And so again, you think that what this
5  figure is showing is that systematic reviews are
6  at the top of the pyramid because they identify
7  all the studies?
8        MS. NOWLIN-SOHL:  Objection;
9  mischaracterizes prior testimony.
10        THE WITNESS:  Yeah, I would say what's at
11  the top is "Systematic review and meta-analyses,"
12  and that a systematic review with a meta-analysis
13  is summarizing to the best of its ability with
14  many caveats as much of the literature as
15  possible.
16    Q.  (BY MR. RAMER)  Okay.  Can you explain
17  why cohort studies are below randomized controlled
18  trials on this pyramid?
19    A.  So cohort studies are studies where you
20  have a group of patients and you follow them over
21  time.  So the realm of gender-affirming medical
22  care, this would be something like having
23  adolescents with gender dysphoria who are treated
24  with testosterone, and you look before and after
25  and you see their mental health is better after.
Page 32

1  That's a cohort study.
2        If you were looking just at an individual
3  cohort study -- and again, this is why you
4  shouldn't look at just one paper -- you might ask,
5  "Okay.  Did their mental health improve because of
6  the testosterone?  Or was their mental health
7  going to improve anyway?"
8        Does that make sense?
9        So in the research, we have other studies
10  that compared those who had access to treatment to
11  those who didn't.  We have parallel process
12  models.  We have all these ways to answer that
13  question that aren't on this, like, very basic
14  teaching tool that's this pyramid.
15        The reason a randomized controlled trial
16  is above that is because a randomized controlled
17  trial in a single paper could answer two
18  questions.  So it could tell you does mental
19  health improve before and after?  And also do
20  people who get treatment do better than those who
21  don't do treatment, which approaches this question
22  of would their mental health have just gotten
23  better anyway?
24        So a randomized controlled trial can kind
25  of hit more things in one study than a cohort
Page 33

9 (Pages 30 - 33)

Jack Turban , M.D., MHS October 16, 2023

1  study can.
2      Q.  Do you think this pyramid is saying that
3  a randomized controlled trial is of higher quality
4  than a cohort study?
5      A.  I think that's a broad
6  oversimplification, but I think what it's saying
7  is that if you had a single randomized controlled
8  trial that was well conducted, it would likely
9  give you more information than a cohort study.
10     Q.  Because it's of higher quality?
11     A.  Not necessary -- what do you mean by
12  "higher quality"?
13     Q.  Because that study design is of higher
14  quality than a cohort study.
15     A.  I would say because it has the benefit of
16  having a control group, medical cohort study does
17  not, which gives you additional information about
18  whether or not your outcome would have improved
19  whether or not the introduction was given.  It
20  gives you more information.
21     A single randomized controlled trial,
22  when well conducted, can give more information
23  than a cohort study.
24     Q.  What about -- and I know this is -- I'm
25  not -- this question is not about a specific

Page 34

1      THE WITNESS:  Again, with all due
2  respect, I think your question is implying lack of
3  understanding of how the studies are designed.
4  You can't put the exact same inputs into a cohort
5  study and a randomized controlled trial because
6  they're different study designs.
7      So when you're saying "all else being
8  equal," I really don't know what you -- I need you
9  to be more specific.
10     Q.  (BY MR. RAMER)  And when you say they're
11  a different study design, does the design of one
12  lead to a higher quality study than the design of
13  the other?
14     MS. NOWLIN-SOHL:  Object to the form.
15     THE WITNESS:  I believe I answered that
16  question.
17     Q.  (BY MR. RAMER)  Could you remind me what
18  your answer was?
19     MS. NOWLIN-SOHL:  Same objection.
20     THE WITNESS:  So they're different study
21  designs.  A cohort study tells you whether or not
22  an outcome changes before and after the
23  intervention.  It does not have a control group.
24     So you could be left with the question of
25  whether or not your outcome improved because of

Page 36

1  study.  It's more about methodology in theory.
2      And so my question is looking at this, in
3  theory you have a group of four cohort studies.
4  And if you have a group of four randomized
5  controlled trials, all else being equal, based on
6  the design of those studies, are the randomized
7  controlled trials of higher quality than the
8  cohort studies?
9      MS. NOWLIN-SOHL:  Object to form.
10     THE WITNESS:  It's hard to say all else
11  being equal because there are so many variables
12  that go into how you design a cohort study or how
13  you design a randomized controlled trial, so I
14  would really need you to kind of give me specific
15  studies to answer that question.
16     Q.  (BY MR. RAMER)  Well, no.  It's a
17  hypothetical about the theory and the method of
18  it, and so the hypothetical is all else being
19  equal -- they have the exact same inputs, the
20  exact same outputs, one is a randomized controlled
21  trial; one is a group of cohort studies.
22     And my question is is the group of
23  randomized controlled trials of higher quality
24  than the group of cohort studies?
25     MS. NOWLIN-SOHL:  Object to form.

Page 35

1  the intervention or because it was going to
2  improve anyway over time.
3      A randomized controlled trial generally
4  has two groups.  One group gets intervention; one
5  group doesn't.  So you can see maybe the treatment
6  group improves and the other group, which could be
7  many different groups -- let's say it's a placebo
8  in this case -- does not improve, and then that
9  would tell you, okay.  It probably wasn't that
10  they improved just because of time.
11     So in that case, a randomized controlled
12  trial can give you more information than a cohort
13  study wouldn't.  So it has the potential to give
14  you more information certainly.
15     Q.  And on this pyramid, on the left side of
16  it, the arrow that's adjacent that refers to
17  quality, what do you think that's referring to?
18     A.  I think it's just a vague reference to
19  the fact that -- these are all different study
20  designs as you go up the pyramid.
21     And as you go up the pyramid, you get --
22  the study designs have the potential to answer
23  other kinds of questions, right?
24     So the cohort study can't tell you about
25  whether or not mental health would have improved

Page 37

10 (Pages 34 - 37)

1  without the treatment.  The randomized controlled
2  trial tells you that.
3        And then all randomized controlled trials
4  are going to have strengths and benefits, right?
5  They may have different patient populations.  They
6  might have different study outcomes.  They may
7  have different blinding procedures.
8        And so a systematic review and
9  meta-analysis would tell you instead of like, oh,
10 look, I only have this one study I'm looking at,
11 you would look at all of them, and that would give
12 you more and more richer information.
13    Q.  Okay.  I'd like to go back to Turban
14 Exhibit 4, which is the Users' Guide to the
15 Medical Literature.
16        And I would like to go to page 6 in the
17 document.  I think it's 35 in the PDF.
18    A.  Yes.
19    Q.  And I'm just going to read the -- it's
20 the sentence at the very bottom that carries over
21 on to page 7.  And I'll just read it and ask if I
22 read it correctly.
23        It says "In our discussions of systematic
24 reviews and guidelines, we introduce the GRADE
25 (Grading of Recommendations Assessment,

Page 38

1  several other factors that would be important to
2  consider when -- whether or not to recommend a
3  treatment.
4        But it has two steps in that way.  It has
5  kind of the grading of the evidence and then
6  determining strength of recommendations.
7    Q.  And have you ever attempted to apply the
8  criteria specified by GRADE to assess a study?
9    A.  It's generally recommended that one do
10 that as part of, like, a full research group.  And
11 I've not been on one of those groups.
12    Q.  And so then you -- you've also never
13 attempted to do that for any of the studies that
14 you cite in your declaration, correct?
15    A.  No, not apply specific GRADE criteria.
16 Generally GRADE criteria is used when one is
17 writing guidelines.
18    Q.  I'm sorry.  Say that again?
19    A.  GRADE is typically used when one is
20 writing clinical practice guidelines.
21    Q.  Is GRADE ever used in a systematic
22 review?
23    A.  Some people might.  I have not.
24    Q.  How many systematic reviews have you
25 done?

Page 40

1  Development, and Evaluation) approach to
2  summarizing evidence and developing
3  recommendations, an approach that we believe
4  represents a major advance in EBM," parentheses,
5  cross-reference to chapter 15.
6        Did I read that correctly?
7    A.  Yes.
8    Q.  And are you familiar with the GRADE
9  approach that's referenced here?
10    A.  Broadly, yes.
11    Q.  And could you explain your understanding
12 of that approach?
13    A.  Yes.  So GRADE generally involves looking
14 at the research literature.  And then there's some
15 subjectivity to it, but they provide you with
16 general guidelines about how you would -- like,
17 great level of confidence in the research itself.
18        Then there's a -- and then each of those
19 get GRADE scores.  I think it's something like
20 low, very low, high, very high.  I could be wrong
21 about the exact names of the categories.
22        And then there's a separate set of
23 factors that are applied about strength of
24 recommendation.  So it takes into account both
25 what the research literature is, but then makes

Page 39

1    A.  Just one.
2    Q.  Can you explain how those who would use
3  GRADE in a systematic review would use it in the
4  process of creating the systematic review?
5        MS. NOWLIN-SOHL:  Object to the form;
6  foundation.
7        THE WITNESS:  Yeah, I don't think they
8  would GRADE the systematic review.  I think they
9  would have different research questions, and there
10 would be a body of literature they would identify
11 through their search that they would then look at
12 in their specific tables that give you, like, a
13 rough general sense of how to apply the GRADE
14 criteria to different conclusions.
15    Q.  (BY MR. RAMER)  And then sticking with
16 this document, I'd like to go to page 273, which
17 is 302 in the PDF, I believe.
18        Are you there?
19    A.  Yes.
20    Q.  Okay.  And then the -- well, the only
21 full paragraph on the page, it's a little long,
22 but I'm going to read it and ask if I read it
23 correctly.
24        It says "In contrast to systematic
25 reviews, traditional narrative reviews typically

Page 41

11 (Pages 38 - 41)

1  address multiple aspects of the disease (e.g.,
2  etiology, diagnosis, prognosis, or management),
3  have no explicit criteria for selecting the
4  included studies, do not include systematic
5  assessments of the risk of bias associated with
6  primary studies and do not provide quantitative
7  best estimates or rate the confidence in these
8  estimates.
9      "The traditional narrative review
10  articles are useful for obtaining a broad overview
11  of a clinical condition, but may not provide a
12  reliable and unbiased answer to a focused,
13  clinical question."
14      Did I read that correctly?
15  A.  Yes.
16  Q.  And then what is your understanding of
17  how systematic reviews differ from narrative
18  reviews with respect to systematic assessment of
19  the risk of bias associated with primary studies?
20  A.  A systematic review may or may not
21  include an assessment of the risk of bias.
22      Also, as the paragraph that you skipped
23  over notes, it may or may not include, like, an
24  unbiased summary of the literature, like a
25  meta-analysis.

Page 42

1      So systematic reviews can have some of
2  these same problems that you're outlining.
3  Q.  Do narrative reviews include systematic
4  assessments of the risk of bias associated with
5  the primary studies?
6  A.  Neither a systematic review nor a
7  narrative review necessarily include that.
8  Q.  Does a narrative review ever include
9  that?
10  A.  It could.
11  Q.  And for systematic reviews, can they
12  include systematic assessments of the risk of bias
13  associated with primary studies?
14  A.  They could.
15  Q.  Would that be a value --
16  A.  Yes.
17  Q.  I'm sorry?
18  A.  Yes.
19  Q.  Well, let me ask this question:  Would
20  that be a value that comes with conducting a
21  systematic review?
22      MS. NOWLIN-SOHL:  Object to form.
23      THE WITNESS:  Not necessarily.  A
24  systematic review may or may not do that, and a
25  narrative review may or may not do that.

Page 43

1      Q.  (BY MR. RAMER)  Well, let's suppose you
2  have a systematic review that does include a
3  systematic assessment of the risk of bias
4  associated with primary studies.
5      Do you agree that would be a valuable
6  consideration from that systematic review?
7  A.  I believe that would be useful
8  information.
9  Q.  And sticking with this document, I'd like
10  to go to page 275, which is just a couple pages
11  up.
12      And specifically Figure 14-2, which is
13  entitled "The Process of Conducting a Systematic
14  Review and Meta-Analysis."
15      Do you see that?
16  A.  Yes.
17  Q.  Do you see how this figure divides
18  between a systematic review and a meta-analysis on
19  the right-hand side?
20  A.  Yes.
21  Q.  And as part of the systematic review part
22  of this figure, do you agree that it includes the
23  bullet "Assess risk of bias, abstract data"?
24  A.  Yes.  I believe the point of this
25  textbook chapter is to tell you the best way --

Page 44

1  highest quality way to do a systematic review.
2  Q.  Okay.
3  A.  I think it's strongly implying you should
4  do the meta-analysis as well.
5  Q.  So as part of the systematic review
6  process that's outlined here, authors would assess
7  risk of bias, correct?
8  A.  I believe they're saying ideally you
9  would do that, yes.
10  Q.  And how does one assess the risk of bias?
11  A.  There are a lot of different ways.  There
12  are formal ways in which I'm not a statistical
13  expert, but they can create these kind of summary
14  plots and run statistical analyses to try and,
15  like, quantitatively look at the risk of bias.
16      But then also just as you look at
17  individuals studies by study, there are a lot of
18  different types of bias.  There's selection bias;
19  there's recall bias; there's social desirability
20  bias.  So it's a broad area of technologic
21  analysis.
22  Q.  And have you ever assessed risk of bias
23  as part of the systematic review that you
24  conducted?
25  A.  I'd have to go back and look.  What we

Page 45

12 (Pages 42 - 45)

1  were doing was specifically called a scoping
2  review.  So that's more focused on identification
3  what has been looked at and what's not been looked
4  at.
5       And our main conclusion from that was
6  that there hasn't been much research on functional
7  neurologic disorders among sexual- and
8  gender-minority people, so there wasn't a lot of
9  literature to analyze the depth in that way.
10     Q.  And what is this figure referring to when
11  it refers to the process of abstracting data?
12     A.  I usually think of that as something more
13  for the meta-analysis where you're going into the
14  tables and pulling out summary statistics and
15  P-values and confidence intervals so that you can,
16  like, pull out the most relevant numbers and
17  statistics from the paper.
18       For a meta-analysis, you then feed that
19  into a different statistical analysis where you're
20  pulling the data all together.
21       But if they're saying just as part of the
22  systematic review of doing that, I think they're
23  more just broadly saying pulling out the key
24  findings of the research.  Because if it's not a
25  meta-analysis, you wouldn't be feeding that

Page 46

1  final two sentences of that paragraph.
2     A.  Okay.  I'm there now.
3     Q.  Okay.  I'll start again.
4       "Even if the results of different studies
5  are consistent, determining their risk of bias is
6  still important.  Consistent results are less
7  compelling if they come from studies with a high
8  risk of bias than if they come from studies with a
9  low risk of bias."
10       Did I read that correctly?
11     A.  Yes.
12     Q.  So this is saying even if you have
13  numerous studies showing the same results, you
14  still should assess those individual studies for
15  risk of bias, correct?
16     A.  Yes.  I think we can broadly always agree
17  in medicine that anytime you have a research
18  study, you should assess it for risk and bias.
19       I think I'd also highlight that there are
20  many different types of bias.  I don't know what
21  specific type of bias they're referencing here
22  without reading the full chapter and the context.
23     Q.  And is some bias worse than others?
24     A.  I don't know that I would say "worse."
25  They're different.

Page 48

1  abstracted data into a more sophisticated
2  methodology of summarizing the data
3  quantitatively.
4     Q.  And sticking with this document, I'd like
5  to go to page 283, which I think is page 312 in
6  the PDF.  And just let me know when you're there.
7     A.  Sorry.  Which part of page 312?
8     Q.  So it's page 283 in the book.  Page 312
9  in the PDF.
10     A.  Yes.  We're on the page.
11     Q.  Okay.  And I want to look at the -- in
12  the middle of the page you see the blue header?
13  It says "Was the risk of bias of the primary
14  studies assessed?"
15     A.  Yes.
16     Q.  And the first full paragraph below that,
17  I'm just going to read the final two sentences of
18  that paragraph and ask if I read it correctly.
19       It says "Even if the results of different
20  studies are consistent, determining their risk of
21  bias is still important."
22     A.  Sorry, I thought you were -- Sorry.
23  You're starting halfway down?
24     Q.  So it's the first full paragraph after
25  the blue header.  And I'm going to be reading the

Page 47

1     Q.  And for the studies that you cite in your
2  declaration, have you assessed them for risk of
3  bias?
4       MS. NOWLIN-SOHL:  Object to form.
5       THE WITNESS:  Yes.  Any scientific
6  research paper you read is going to, likely in the
7  discussion section, talk about for that individual
8  paper what biases may come up or what limitations
9  there are to how you interpret that study in
10  isolation, which is why, back to your point of why
11  you want the systematic review and identifying all
12  of the research, that you always want to look at
13  all the research as a whole, because every
14  individual study is going to have strengths and
15  weaknesses.  They're pointing out that's true even
16  for randomized controlled trials.
17     Q.  (BY MR. RAMER)  And so I think you
18  discussed that you read the discussion to see
19  where the bias is in the study.
20       And is that generally how you assess
21  studies for risk of bias?
22     A.  That's a good starting point, because
23  often the author of the paper, in the peer-review
24  process, whatever peer reviewer identifies as a
25  limitation of the study, if that -- that's due to

Page 49

13 (Pages 46 - 49)

| | |
|---|---|
| 1 something like recall bias, et cetera, that's<br>2 usually the part of the paper where that's going<br>3 to be written.<br>4     But I think most experts are also going<br>5 to read the full paper to see if they identify any<br>6 other limitations of the study that weren't<br>7 explicitly noted in the discussion section of the<br>8 paper.<br>9     Q.   And this will for now be my last question<br>10 on this, and then maybe we can take a break.<br>11     But I'd like to go to page 182 in this<br>12 document.  Just let me know if you're there.<br>13     A.   We're there.<br>14     Q.   Okay.  And I'd like to look at the last<br>15 paragraph on the page in the first sentence.  And<br>16 I'll just read it and ask if I read it correctly.<br>17     It says "In answering any clinical<br>18 question, our first goal should be to identify<br>19 whether there is an existing systematic review of<br>20 the topic that can provide a summary of the<br>21 highest quality available evidence (see the<br>22 summarizing the evidence section)."<br>23     Did I read that correctly?<br>24     A.   Yes.<br>25     Q.   And do you agree that the first goal in<br><div align="right">Page 50</div> | 1 wanted to be an expert, you would probably pull<br>2 the individual studies that are identified in the<br>3 systematic review, analyze them further, see what<br>4 additional information can be teased out that<br>5 maybe wasn't teased out by the person who did the<br>6 initial systematic review where likely their goal<br>7 was just to give you a sense of the whole of the<br>8 literature.<br>9     MR. RAMER:  All right.  I think maybe<br>10 we're at a breaking point here.  Does that sound<br>11 good?<br>12     MS. NOWLIN-SOHL:  Yeah, that sounds good.<br>13 Five minutes?<br>14     MR. RAMER:  Yeah, works for me.<br>15     THE VIDEOGRAPHER:  Okay.  So the time is<br>16 10:06 a.m. Pacific time, and we are off the<br>17 record.<br>18     (Break taken from 10:06 a.m. to 10:12 a.m.)<br>19     THE VIDEOGRAPHER:  So we are recording.<br>20 The time is 10:12 a.m. Pacific, and we are back on<br>21 the record.<br>22     Q.   (BY MR. RAMER)  Dr. Turban, I'd like to<br>23 go to your declaration, which is Turban Exhibit 1,<br>24 and specifically go to page 15 and paragraph 24.<br>25     And I just want to read the -- it's<br><div align="right">Page 52</div> |
| 1 answering any clinical question is to identify<br>2 whether there is an existing systematic review of<br>3 the topic?<br>4     MS. NOWLIN-SOHL:  Object to the form.<br>5     THE WITNESS:  I think what this is likely<br>6 referencing -- not having read the entire<br>7 textbook, but it looks like it's a textbook about<br>8 teaching clinicians how to conduct evidence-based<br>9 medicine -- I think they're saying when you first<br>10 come to a topic, so if you're not an expert in a<br>11 topic -- let's say I were going to treat someone<br>12 with -- let's just say it's a hypothetical<br>13 condition that I don't treat every day but I have<br>14 a patient who I need to help.<br>15     One of the first things I would look for<br>16 is yes, a systematic review.  If I don't already<br>17 know that literature, that's going to be a really<br>18 fast way for me to find a summary of a lot of the<br>19 literature that I need to know for that given<br>20 situation.  So yes, it would be a good place to<br>21 start.<br>22     I think if your aim is to be an expert in<br>23 the field, you wouldn't stop there.  You would<br>24 read the systematic review.  You would look at the<br>25 evidence that's in there but then if you really<br><div align="right">Page 51</div> | 1 toward the end of the paragraph on this page.<br>2 I'll read the sentence starting with the word<br>3 "but" and then just ask if I read it correctly.<br>4     It says "But all a systematic review<br>5 means is that the authors of the reports<br>6 predefined the search terms they used when<br>7 conducting literature reviews in various<br>8 databases."<br>9     And did I read that correctly?<br>10     A.   Correct.  There's a citation to the<br>11 Harvard Countway Library.<br>12     Q.   And based on what we've discussed so far<br>13 today, do you agree that this sentence is wrong?<br>14     A.   No.<br>15     Q.   You maintain that all a systematic review<br>16 means is that the authors of the reports predefine<br>17 the search terms they used when conducting the<br>18 literature reviews; is that right?<br>19     A.   Correct.<br>20     Q.   Okay.<br>21     A.   There are other things one may do as part<br>22 of a systematic review to add to it, but the label<br>23 at its face means that the review was systematic,<br>24 that you defined your search terms and your<br>25 databases for how you identified your literature.<br><div align="right">Page 53</div> |

<div align="right">14 (Pages 50 - 53)</div>

Page 54

1  Different authors might do different things from
2  there.
3      Q.  And so you do not think that a systematic
4  review includes the assessment of the individual
5  studies that make up the review?
6      A.  What differentiates a systematic review
7  from a narrative review or a different type of
8  review -- all of those are going to talk about the
9  literature, but what distinguishes it is that it
10  defines its search terms and the bases that it
11  uses so that others can repeat that search.
12      Q.  And so you do not think that the
13  assessment of individual studies for bias is a
14  component of a systematic review; is that right?
15      A.  It may or may not be.  Depends on the
16  systematic review.  Ideally it would, but just
17  calling something a systematic review doesn't mean
18  it will do that.
19      Q.  And so you're not speaking categorically
20  in that sentence; is that right?
21      MS. NOWLIN-SOHL:  Object to form.
22      THE WITNESS:  I'm saying the term
23  "systematic review" means that the authors of the
24  reports predefined the search terms they used when
25  conducting the literature reviews in various

Page 55

1  databases.
2      Q.  (BY MR. RAMER)  Are there systematic
3  reviews where the authors also include an
4  assessment of the individual studies that make up
5  the systematic review?
6      A.  Yes.
7      Q.  So then isn't it wrong to say that all a
8  systematic review is is just predefining the
9  search terms?
10      MS. NOWLIN-SOHL:  Object to the form;
11  argumentative, mischaracterizes prior testimony.
12      THE WITNESS:  It says "but all a
13  systematic review means is that the authors of the
14  reports predefined the search terms they used when
15  conducting literature reviews in various
16  databases."
17      So if you're calling a paper a systematic
18  review, that is what the term "systematic review"
19  means.
20      It's not saying there's nothing else in
21  it but the search terms.  There's the search terms
22  that the papers identify that they summarize in
23  the literature, but when you're using the term
24  "systematic review," what you're highlighting is
25  that -- exactly what I put there, that you

Page 56

1  predefined your search terms and the databases you
2  used for searching.
3      MR. RAMER:  Okay.  I'd like to go to --
4  yeah, I'd like to go to what I'll call Turban
5  Exhibit 6 that I just sent.  Let me know when you
6  have it.
7      (Deposition Exhibit No. 6 was marked.)
8      Q.  (BY MR. RAMER)  And is this the web page
9  you're citing in footnote 31?
10      A.  Yes, it appears to be.
11      Q.  Okay.  And you cite this page in support
12  of the proposition that all a systematic review
13  means is that the authors of the reports
14  predefined the search terms they used when
15  conducting literature reviews in various
16  databases, correct?
17      A.  Correct.  This then goes on to say other
18  things went in to add to a systematic review to
19  make it a better systematic review, but again,
20  what the phrase "systematic review" means is that
21  you were systematic in how you collected your
22  literature for the review.
23      Q.  You don't think that it also includes
24  being systematic in how you assess the studies
25  that form the systematic review?

Page 57

1      A.  Not necessarily.  Ideally it would be,
2  but I don't believe all systematic reviews reach
3  that level of rigor.
4      Q.  Okay.  So on this document, Turban
5  Exhibit 6, there is a -- on page 1 there is a bold
6  question that says "What is a systematic review?"
7  And I'm just going to read the first two sentences
8  under that and ask if I read them correctly.
9      It says "A systematic review is guided
10  filtering and synthesis of all available evidence
11  addressing a specific, focused research question,
12  generally about a specific intervention or
13  exposure.  The use of a standardized, systematic
14  methods and preselected eligibility criteria
15  reduce the risk of bias in identifying, selecting,
16  and analyzing relevant studies."
17      Did I read that correctly?
18      A.  Yes.
19      Q.  What is your understanding of what this
20  page is describing when it mentions "analyzing
21  relevant studies"?
22      MS. NOWLIN-SOHL:  Object to form.
23      THE WITNESS:  So they're saying you use
24  standardized systematic methods in preselected
25  eligibility criteria, so those are all things to

15 (Pages 54 - 57)

1 identify the studies you're going to look at.
2       They're saying that doing that reduces
3 the risk of bias in identifying, selecting, and
4 then reporting out the relevant studies.  If
5 you -- if you didn't do a systematic review -- and
6 again, a systematic review doesn't guarantee that
7 your search methods are perfect, but it increases
8 the likelihood that you're not going to miss
9 important studies that need to be analyzed.
10       But I don't read this as saying that you
11 necessarily need to have a standardized systematic
12 method of analyzing the relevant studies, although
13 that would be ideal.
14       Q.  (BY MR. RAMER)  Well, in the first
15 sentence then, what is your understanding of what
16 it's referring to when it is discussing the
17 synthesis of all available evidence?
18       A.  The general process of taking all the
19 studies that you identify and then reporting out
20 the summary.
21       Q.  Would creating a synthesis of all
22 available evidence require analyzing the relevant
23 studies?
24       A.  There are many ways you could go about
25 analyzing the relevant studies.

Page 58

1       Q.  Like what?
2       A.  You could read them and give your general
3 impression.
4       You could, if you were doing a practice
5 guideline, you might be able to create criteria.
6 Those are two examples.
7       You might look at the sample size of all
8 of that.
9       You might look at the inclusion and
10 exclusion criteria.
11       Q.  Do you agree that this paragraph states
12 that a systematic review is something more than
13 predefining search terms used when conducting
14 literature reviews in various databases?
15       MS. NOWLIN-SOHL:  Object to form.
16       THE WITNESS:  I believe it explains that
17 the term "systematic review" means that one
18 defines the way that they're defining their search
19 terms and their databases.  That's what a
20 systematic review as a whole means.
21       It goes on to say -- it says -- well, it
22 says halfway down a well-designed systematic
23 review includes clear objectives, preselected
24 criteria, an explicit methodology, a thorough and
25 reproducible search of the literature, an

Page 59

1 assessment of the validity or risk of bias.  And
2 it does go on to tell you how ideally they would
3 be conducted.
4       But the term "systematic review" means
5 what I noted in my declaration.
6       Q.  (BY MR. RAMER)  But you think the meaning
7 of the term you note in your declaration comes
8 from what we're looking at right now?
9       MS. NOWLIN-SOHL:  Object to form;
10 argumentative.
11       THE WITNESS:  Yes.
12       Q.  (BY MR. RAMER)  What is this paragraph --
13 let me rephrase.
14       What is your understanding of what this
15 paragraph is discussing in the sentence you were
16 reading where it says "an assessment of the
17 validity or risk of bias of each included study"?
18       MS. NOWLIN-SOHL:  Object to form; asked
19 and answered.
20       THE WITNESS:  Sorry.  I'm not sure which
21 sentence you're referring to.
22       Q.  (BY MR. RAMER)  You were reading the
23 second-to-last sentence in this paragraph, and you
24 got to the point where it says "an assessment of
25 the validity or risk of bias of each included

Page 60

1 study."
2       And my question is what is your
3 understanding of what that is referring to?
4       MS. NOWLIN-SOHL:  Same objections.
5       THE WITNESS:  Yeah.  So again, that
6 sentence starts "A well-designed systematic review
7 includes," and it ends with "an analysis and
8 presentation of the findings of the included
9 studies."  And before that, "an assessment of the
10 validity or risk of bias that each study
11 included."
12       Not all systematic reviews will be well
13 designed.
14       Q.  (BY MR. RAMER)  Why would a well-designed
15 systematic review include an assessment of the
16 validity or risk of bias of each included study?
17       A.  Again, it's useful information.
18 Different -- analyses of different types of bias
19 provide different types of useful information.
20       But for instance, recall bias would be
21 important to know if people are asked questions
22 about the remote past.  Right?  Like, you'd want
23 to know if you were asking someone about their
24 childhood how long ago was that?  What kind of
25 question was it?  Is it likely that they would

Page 61

16 (Pages 58 - 61)

| | |
|---|---|
| 1 remember something that long ago given the nature<br>2 of the event? It's just one example of the many<br>3 types of bias we may examine.<br>4    Q. And why would a well-designed systematic<br>5 review look for bias in the individual studies?<br>6    A. Because it gets you more information<br>7 about what the study actually tells you.<br>8    Q. Do you agree that assessing bias in the<br>9 individual studies is an advantage of a systematic<br>10 review over a narrative review?<br>11      MS. NOWLIN-SOHL: Object to form.<br>12      THE WITNESS: No. I think both can do<br>13 that.<br>14    Q. (BY MR. RAMER) Do they both do it<br>15 systematically?<br>16      MS. NOWLIN-SOHL: Object to form.<br>17      THE WITNESS: Not necessarily.<br>18    Q. (BY MR. RAMER) And why not necessarily?<br>19    A. Both of them could do it unsystematically<br>20 based on general impression of the authors.<br>21    Q. And I'd like to go back to your<br>22 declaration and the same paragraph but on the next<br>23 page, so the run-over. And the second to last<br>24 sentence, I'll just read it and ask if I read it<br>25 correctly.<br>                  Page 62 | 1    A. So I don't know that I would use this<br>2 specific citation.<br>3    Q. Okay. And then just going back to your<br>4 declaration page -- sorry, paragraph 24, but back<br>5 to page 15 and the sentence we were previously<br>6 discussing, and so the point of -- I'll just -- to<br>7 refresh, the sentence says "But all a systematic<br>8 review means is that the authors of the reports<br>9 predefined the search terms they used when<br>10 conducting literature reviews in various<br>11 databases."<br>12      And you would agree that the description<br>13 you give there does not define a well-designed<br>14 systematic review, correct?<br>15      MS. NOWLIN-SOHL: Object to form.<br>16      THE WITNESS: I think it's a<br>17 rectangle/square situation. I think my definition<br>18 will cover all systematic reviews.<br>19    Q. (BY MR. RAMER) I think where I'm getting<br>20 hung up with that answer is the beginning of the<br>21 sentence where you say, "but all a systematic<br>22 review means," which means to describe the full<br>23 universe of systematic reviews can be defined<br>24 strictly by the fact that the authors used<br>25 predefined search terms.<br>                  Page 64 |
| 1      It says "The primary advantage to a<br>2 systematic review would be its potential, and no<br>3 guarantee, to identify research publications that<br>4 had not previously been identified in this<br>5 discussion."<br>6      Did I read that correctly?<br>7    A. Yes.<br>8    Q. And you do not cite anything for that<br>9 proposition, correct?<br>10    A. Correct. There's no citation on that<br>11 sentence.<br>12    Q. Do you think the documents we were<br>13 looking at, Turban Exhibit 6 from Harvard that you<br>14 cited in footnote 31, could support that<br>15 proposition?<br>16    A. Let me look.<br>17    Q. And if you don't know, that's fine.<br>18      Just so I can keep track of time, what<br>19 page are you on currently?<br>20    A. I went through -- I'm not seeing that<br>21 there is a section that explicitly is discussing<br>22 what the advantage of the systematic review is<br>23 over something else. It's mostly describing what<br>24 they are.<br>25    Q. Okay.<br>                  Page 63 | 1      Is there --<br>2    A. All systematic reviews will have<br>3 predefined their search terms.<br>4    Q. And will well-designed systematic reviews<br>5 only predefine their search terms?<br>6      MS. NOWLIN-SOHL: Object to form.<br>7      THE WITNESS: This is my rectangle/square<br>8 comment.<br>9      So when you're calling something a<br>10 systematic review, the piece of information you're<br>11 communicating is that they predefined their search<br>12 terms and the databases they used. So that term<br>13 is telling you that.<br>14      There are a million other things that the<br>15 term doesn't tell you, right? It doesn't tell you<br>16 the author list. It doesn't tell you how long it<br>17 is. It doesn't tell you how they went about<br>18 analyzing all the studies.<br>19      That term tells you that they predefined<br>20 their search terms in some way, and they tell you<br>21 what databases they used. It doesn't tell you<br>22 more than that.<br>23    Q. And can we return to Turban Exhibit --<br>24 let's see -- Exhibit 4, which is the Users'<br>25 Guidelines to the Medical Literature?<br>                  Page 65 |

17 (Pages 62 - 65)

Page 66

1    MS. NOWLIN-SOHL:  What page, John?
2    MR. RAMER:  Yeah, sorry.  Database
3 page 275, which I believe is page 304.
4    MS. NOWLIN-SOHL:  Okay.  We're there.
5    Q.  (BY MR. RAMER)  And just looking at
6 Figure 14-2 again.
7       It seems as though you are defining a
8 systematic review to be something less than what
9 Figure 14-2 is defining to be a systematic review;
10 is that fair?
11    MS. NOWLIN-SOHL:  Object to form.
12    THE WITNESS:  Could you repeat the
13 question?
14    Q.  (BY MR. RAMER)  Is it fair to say that
15 you were defining systematic review differently
16 from how this is defining systematic review?
17    MS. NOWLIN-SOHL:  Object to form;
18 mischaracterizes prior testimony.
19    THE WITNESS:  I don't think that these
20 definitions are in conflict with each other.
21    Q.  (BY MR. RAMER)  Do you agree that this
22 figure defines a systematic review to include
23 reviewing the full text of possibly eligible
24 studies and then assessing risk of bias and
25 abstracting data?

Page 67

1    MS. NOWLIN-SOHL:  Object to form.
2    THE WITNESS:  Again, not all systematic
3 reviews would necessarily assess the risk of bias.
4 I think this is describing how you would ideally
5 conduct a systematic review.  They will always
6 involve reviewing the text of the studies that you
7 identify.  That's what a review is.
8    Q.  (BY MR. RAMER)  And so you think that in
9 this figure, the bottom two lines that make up the
10 systematic review are unnecessary for something to
11 be a systematic review; is that right?
12    MS. NOWLIN-SOHL:  Object to the form;
13 mischaracterizes prior testimony.
14    THE WITNESS:  I don't think all
15 systematic reviews are necessarily going to assess
16 the risk of bias.
17       Abstract data -- I'm not sure what
18 they're referencing specifically in this figure
19 since it's a vague term.  I do think all
20 systematic reviews are going to review the studies
21 that they identify through their predefined
22 searches.
23    Q.  (BY MR. RAMER)  And we can kind of shift
24 gears a little bit and move off that document.
25       Dr. Turban, how did you come to be an

Page 68

1 expert in this case?
2    A.  I'm not sure I understand the question.
3    Q.  How did you --
4    A.  Sorry.  Come to be an expert in the
5 field, or how did I get involved in the case?
6    Q.  How did you become an expert witness in
7 this particular case?
8    A.  I was asked by one of the attorneys on
9 the case.
10    Q.  And who specifically asked you?
11    A.  Leslie Cooper.
12    Q.  And without going into anything that you
13 spoke about with counsel, when were you contacted
14 to serve as an expert witness in this case?
15    A.  I don't recall.  Sometime recently,
16 perhaps in the past month or so.
17    Q.  Was it after August?
18    A.  I believe so.
19    Q.  Was it after September 5th?
20    A.  I really have to look at my call logs.
21 I'm not entirely sure when.
22    Q.  Do you know whether the Defendants in the
23 case had already submitted their brief opposing
24 the preliminary injunction when you were asked to
25 serve as an expert?

Page 69

1    A.  I know I received -- I'm not a lawyer.  I
2 received -- what was it? -- a combined brief, I
3 believe, opposing preliminary injunction,
4 something, the second half of the goal of the
5 memorandum that I reviewed at some point.
6       But I don't remember when I received
7 that, so I don't know how the dates lined up.  I
8 know I asked to see it at a certain point because
9 I think it's referenced in something.
10    Q.  And do you know the other expert
11 witnesses supporting the Plaintiffs in this case?
12    A.  If you named them I could tell you.
13    Q.  Dr. Kara Connelly?
14    A.  I know of Dr. Connelly but do not know
15 her personally.
16    Q.  Did you read the declaration she
17 submitted in this case?
18    A.  I did not.
19    Q.  Do you know Dr. Christine Brady?
20    A.  I do.  Dr. Brady is a former supervisor
21 of mine from Stanford.
22    Q.  Have you spoken at all with Dr. Brady in
23 this case?
24    A.  I speak with Dr. Brady because we have
25 some shared patients.  I don't recall if we

18 (Pages 66 - 69)

1 specifically talked about the case, but it
2 wouldn't have been anything more than in passing.
3    Q.   Before you were asked to be an expert in
4 this case, did you know that Dr. Brady was serving
5 as an expert?
6    A.   I think I knew that Dr. Brady -- I knew
7 of another case she'd done in Louisiana, and I
8 think I knew she was considering doing other
9 cases.  But I don't know if I knew she was doing
10 this one specifically.
11    Q.   What is the case in Louisiana you're
12 referring to?
13    A.   I believe it was a case related to the
14 gender clinic that she worked in.  Sorry,
15 what's -- was it Louisville?  University of
16 Louisville, I think.  I'm forgetting the details.
17 I talked to her about it years ago.
18    Q.   And she was serving as an expert in that
19 case?
20    A.   I don't know if she was an expert or
21 because she was in the clinic was deposed, but
22 there was some forensic component to it where I
23 think they were asking her about care for
24 adolescent gender dysphoria.
25    Q.   Did I freeze?

Page 70

1    A.   Yeah.  You're back up, though.
2    Q.   Okay.
3       MR. RAMER:  Amy, could you read back the
4 last answer for me?
5       (The record was read by the reporter.)
6    Q.   (BY MR. RAMER)  And, Dr. Turban, before
7 you were asked to be an expert in this case, did
8 Dr. Brady ever contact you about the process of
9 serving as an expert witness?
10    A.   We may have spoken about it, like the
11 general process of doing expert witness work when
12 I was at Stanford, but I don't remember specific
13 conversations.
14    Q.   And what did you do to prepare for this
15 deposition?
16    A.   I reviewed my own declaration.  I earlier
17 reviewed the declarations of Dr. Cantor and
18 Dr. Weiss, and I read the State's memorandum that
19 I think was -- I keep forgetting.  I think it was
20 a combined memoranda and opposition to preliminary
21 injunction, maybe motion to dismiss.
22    Q.   Did you do any prep for the deposition?
23    A.   I had two meetings with the lawyers from
24 the ACLU to go through my declaration and prepare.
25    Q.   And who was in those meetings, without

Page 71

1 disclosing the contents of the discussion?
2    A.   Li was with me here, Leslie Cooper, and I
3 believe Philip May.
4    Q.   Anyone else?
5    A.   No, not that I recall.
6    Q.   And, Dr. Turban, what does it mean to be
7 transgender?
8    A.   One has a gender identity different from
9 their sex assigned at birth.
10    Q.   And what is gender dysphoria?
11    A.   Gender dysphoria is a diagnosis in the
12 DSM-5 -- now DSM-5 text revision that involves
13 having a gender identity different from one's sex
14 assigned at birth, and then having clinically
15 relevant distress related to that that causes some
16 impairment in social, occupational, or other
17 functioning.
18       There are two sets of criteria.  One set
19 for prepubertal children, and another set for
20 adolescents and adults.
21    Q.   Can an individual be transgender but not
22 experience gender dysphoria?
23    A.   Yes.
24    Q.   Is gender dysphoria different from
25 anxiety?

Page 72

1    A.   "Anxiety" is a very broad, untechnical
2 term.  There are a series of anxiety disorders
3 that are specified in the DSM, like generalized
4 anxiety disorder or social anxiety disorder.
5    Q.   And are those different from gender
6 dysphoria?
7    A.   Those are different diagnoses, yes.
8    Q.   And what is the difference between
9 generalized anxiety disorder and gender dysphoria?
10    A.   In generalized anxiety disorder, one
11 typically has anxiety in several different
12 domains.  So for instance, they might be anxious
13 about their health and anxious about their grades
14 and anxious about being late.
15       One classic thing we say in psychiatry is
16 people with generalized anxiety disorder sometimes
17 become anxious that they will become anxious, so
18 just highlighting that there are many, many
19 different types of things that they become anxious
20 about.
21       And then again, that needs to lead to
22 some sort of clinic-basing assent impairment.  So
23 all of us have day-to-day worries, but that
24 wouldn't necessarily meet the criteria for
25 generalized anxiety disorder.

Page 73

19 (Pages 70 - 73)

1        Gender dysphoria is different in that the
2   distress is specifically related to an
3   incongruence, if you will, which means their
4   gender identity and their sex assigned at birth.
5        Q.   And is gender dysphoria different from
6   some form of clinical depression?
7        MS. NOWLIN-SOHL:  Object to form.
8        THE WITNESS:  Those are different
9   diagnoses.  So there's major depressive disorder,
10  for instance, that requires two weeks of a number
11  of symptoms related to depression.  It would be
12  different combinations of the symptoms, but
13  generally depressed mood, loss of ability to enjoy
14  things, disturbances in sleep, disturbances in
15  appetite, delayed psychomotor movements,
16  impairments of concentration.
17       Then again separately, gender dysphoria
18  is more about the psychological distress related
19  to one's sex assigned at birth being different
20  from their gender identity.
21       Q.   (BY MR. RAMER)  And what is gender
22  identity?
23       A.   Gender identity is one's psychological
24  understanding of their gender broadly in terms of
25  masculinity, femininity.
                                          Page 74

1        Q.   Can gender identity change over time?
2        A.   So there's research showing that there's
3   a strong innate biological basis for gender
4   identity that forms kind of the base, if you will.
5   That's what I think of as the person's gender
6   identity.
7        But in the same way that we, with other
8   parts of ourselves, kind of describe language to
9   that and conceptualize it, put words to it, that
10  can evolve over time.
11       Q.   And so the latter that you just described
12  can change over time, but can the former category,
13  the gender identity itself, change over time?
14       A.   It seems no.  It seems that there's -- we
15  have twin studies, for instance, I think are the
16  strongest piece of data that we have for that,
17  that are usually what we use for determining if
18  something has an innate biological determinate.
19  And those show that gender identity has a strong
20  biological component, particularly trans
21  identities is what the studies looked at.
22       But certainly we see patients where the
23  language they ascribe to their gender identity or
24  their understanding of it could evolve over time.
25       Q.   So is it fair to say that gender identity
                                          Page 75

1   does not change over time, but the language
2   someone uses to describe it can change over time?
3        A.   That's how I conceptualize it given the
4   biological literature that we have.
5        Q.   If an individual identifies as a male at
6   age 16 and later identifies as a female at age 22,
7   has that person's gender identity changed?
8        A.   It would be really difficult to know.  So
9   I think I cited in my declaration a paper we wrote
10  in the Journal of the American Academy of Child
11  and Adolescent Psychiatry about thinking about
12  changes in the way people conceptualize their
13  gender identity or people's evolution of interests
14  in gender-affirming medical care.  And in it, we
15  describe that that could be due to internal
16  factors or external factors.
17       So what we often see -- we call this
18  [indiscernible] -- is that if you are constantly
19  told that your gender identity or you're harassed
20  for being transgender or you're discriminated
21  against, you can certainly internalize a lot of
22  those messages and then -- which -- or state that
23  you are now cisgender.
24       We talked about it can also be an
25  internal factor where without those external
                                          Page 76

1   negative pressures, you may evolve on your own to
2   have a different conceptualization of your gender
3   identity.
4        The thing that's further complicated is
5   minority stress framework explains the ways in
6   which people internalize negative messages that
7   might minoritize people from the commute.  So you
8   can imagine if you are a young trans person who's
9   constantly told that trans people are invalid or
10  being trans is a result of trauma or you're a
11  danger to people on sports teams or you're a
12  danger to people in bathrooms, they might start to
13  internalize those negative views of trans people
14  and then kind of push yourself to present as
15  cisgender.
16       I think it's similar to what we saw with
17  the ex-gay movements in the past.  But again, this
18  is seeking broadly and I think we'd have to kind
19  of look person by person because it's such a
20  complex question.
21       Q.   But those examples that you just gave,
22  those are examples of the way the language they're
23  using to describe their gender identity changes.
24  But their actual gender identity has not changed,
25  correct?
                                          Page 77

Jack Turban , M.D., MHS October 16, 2023

Page 78

1    MS. NOWLIN-SOHL:  Object to form;
2  mischaracterizes prior testimony.
3    THE WITNESS:  Yeah, I think I gave
4  examples, both in which the language they used
5  changes but also the ways in which their
6  understanding of their gender identity has evolved
7  potentially through those internal or external
8  factors.
9    But I would go back to the fact that
10  there are these data showing this strong
11  biological determinate of our gender identities.
12  But obviously the human psyche is complex in how
13  it understands and evolves in its understanding of
14  itself.
15    Q.  (BY MR. RAMER) So are you saying that
16  there are examples where because they have --
17  individuals have.  Let me rephrase.
18    Are you saying there are examples where
19  internal and external factors do in fact change
20  someone's gender identity?
21    A.  The external factors can drive internal
22  factors, which can subsequently change one's
23  understanding of their gender identity.
24    Q.  And is there a distinction between gender
25  identity and one's understanding of their gender

Page 79

1  identity?
2    A.  I believe so.  I think it's important to
3  differentiate with what we know about the brain
4  and these innate biological factors from the
5  influence of how people ascribe language and
6  understanding to themselves over time.
7    Q.  And so when you're discussing examples
8  where an individual's understanding of their
9  gender identity has changed, that does not mean
10  that their gender identity has changed, correct?
11    A.  That's how I would conceptualize it.  I
12  think that's fair.
13    Q.  And so just going back to my question, if
14  an individual identifies as a male at age 16 and
15  later identifies as a female at age 22, that
16  individual's gender identity has not changed,
17  correct?
18    MS. NOWLIN-SOHL:  Object to form; asked
19  and answered.
20    THE WITNESS:  Are you thinking of a
21  person that you have more detail where we can
22  discuss it in depth?
23    Q.  (BY MR. RAMER) I don't understand.  I
24  guess I don't understand how the question -- how
25  the answer, based on your view that gender

Page 80

1  identity does not change over time, could alter
2  the answer to the question.
3    A.  So I think your question was the person
4  had a gender identity at one point and then had a
5  different gender identity at the other points, but
6  I would want to know from you what you mean by
7  their gender identity was different at one point
8  in time or two.
9    Did their understanding change?  Did
10  something happen?  Were they told something?  Or
11  even assessing this based on what they are telling
12  you?
13    Q.  But so your view is, though, that at time
14  point 1 and time point 2, there is never a change
15  in gender identity, correct?
16    MS. NOWLIN-SOHL:  Object to form;
17  argumentative, mischaracterizes prior testimony.
18    THE WITNESS:  What I'm saying is there is
19  strong evidence of an innate biological
20  determinate of gender identity that appears to be
21  stable throughout time, but there is extreme
22  complexity in how people think about themselves,
23  and they ascribe language to that and feel
24  comfortable sharing it or not at various times.
25    Q.  (BY MR. RAMER) So can you -- are you

Page 81

1  able to say that the evidence shows that gender
2  identity does not change over time?
3    MS. NOWLIN-SOHL:  Object to form.
4    THE WITNESS:  If you're defining "gender
5  identity" as those innate biological factors, then
6  yes, because they're innate biological factors,
7  that they would be unlikely to change over time.
8    And if you look at clinical experience,
9  I've not had any patients who identified as
10  transgender and then subsequently identified as
11  cisgender.
12    I have had patients who have kind of had
13  this core transgender identity but have kind of
14  shifted the way they conceptualize it between,
15  say, transmasculine or nonbinary.
16    I've had patients who moved somewhere or
17  studied abroad and felt that they weren't safe
18  being out as trans so they went into the closet.
19  To everyone around them, they presented as being
20  cisgender for that period of time.
21    I hope that helps provide context.
22    Q.  (BY MR. RAMER) Do you ever think it
23  would be appropriate to provide puberty blockers
24  to a patient who was not formally diagnosed with
25  gender dysphoria under the DSM-5?

21 (Pages 78 - 81)

1    A.  Perhaps if they had central precocious
2  puberty.
3    Q.  Would the exception of central precocious
4  puberty -- I'll just rephrase it differently.
5      Do you think it is appropriate to provide
6  puberty blockers as a treatment for gender
7  dysphoria to a patient who was not formally
8  diagnosed with gender dysphoria under the DSM-5?
9      MS. NOWLIN-SOHL:  Object to form.
10      THE WITNESS:  I guess I don't understand
11  how the patient has gender dysphoria if they don't
12  meet the criteria for gender dysphoria.
13    Q.  (BY MR. RAMER)  Well, would you -- do you
14  think it's appropriate to give puberty blockers to
15  a patient who meets the classification of gender
16  incongruence under the ICD-11?
17    A.  But does not meet the criteria for gender
18  dysphoria?
19    Q.  Correct.
20      MS. NOWLIN-SOHL:  Object to form.
21      THE WITNESS:  No.  In the United States,
22  that would not be appropriate practice.
23    Q.  (BY MR. RAMER)  Is the primary purpose of
24  gender-affirming medical interventions to reduce
25  the distress associated with gender dysphoria?

Page 82

1    Q.  And have you read it?
2    A.  Yes.
3    Q.  Okay.  I'd like to go to page S43, which
4  is page 45 in the PDF.
5      MS. NOWLIN-SOHL:  So, John, we have an
6  excerpt that starts at S43, and it's only a
7  24-page PDF.
8      MR. RAMER:  Yes.  I apologize.  So that's
9  my fault, so let's just stick with this.  So page
10  S43, the page we're on.
11      MS. NOWLIN-SOHL:  Okay.
12      MR. RAMER:  Sorry about that.
13    Q.  (BY MR. RAMER)  And this chapter is about
14  adolescents, correct?
15    A.  Correct.
16    Q.  Okay.  And I'd like to go down to S48,
17  which is page 6 in the PDF.
18      And these are WPATH statements of
19  recommendations regarding care for adolescents,
20  correct?
21    A.  Yes.
22    Q.  So about partway down this box, there's
23  an italics that says -- I'll just read it and ask
24  if I read it correctly.
25      It says "The following recommendations

Page 84

1    A.  Yes.
2    Q.  And so a treatment that does not reduce
3  the distress associated with gender dysphoria
4  cannot be deemed an effective treatment for gender
5  dysphoria, correct?
6      MS. NOWLIN-SOHL:  Object to form.
7      THE WITNESS:  The caveat I would add is
8  that generally in actual history of gender
9  dysphoria is that it worsens over time.
10      So if there were a treatment that could
11  prevent the worsening of the distress, that would
12  be an improvement as well, and a notable goal.
13    Q.  (BY MR. RAMER)  Oh, I see.  You're saying
14  like -- you're referring to, like, maintaining the
15  baseline is what you're saying?
16    A.  Yeah.  If you can prevent it from getting
17  worse, that would also be a good goal.
18      MR. RAMER:  And, Dr. Turban, I'd like to
19  introduce what we'll call Turban Exhibit 7.
20      (Deposition Exhibit No. 7 was marked.)
21    Q.  (BY MR. RAMER)  And I'll just represent
22  to you that this is Chapter 6 of the WPATH
23  Standards of Care, Version 8.
24      And have you seen this document before?
25    A.  Yes.

Page 83

1  are made regarding the requirements for
2  gender-affirming medical and surgical treatment
3  (all of them must be met)."
4      Did I read that correctly?
5    A.  Yes.
6    Q.  And then I'd like to go to 6.12.C in this
7  box just a few lines down.  And I'll read that and
8  ask if I read it correctly.
9      It says "The adolescent demonstrates the
10  emotional and cognitive maturity required to
11  provide informed consent/assent for the
12  treatment."
13      Did I read that correctly?
14    A.  Yes.
15    Q.  And am I right in thinking that as a
16  general matter, minors do not actually consent to
17  treatments but rather their parents provide
18  informed consent and then the minor provides
19  informed assent?
20      MS. NOWLIN-SOHL:  Object to the extent
21  that it calls for a legal conclusion.
22      THE WITNESS:  In general, that is
23  correct.  I'll say this is a very conservative
24  area of medicine, and generally when assessing
25  capacity, which is kind of the medical version of

Page 85

22 (Pages 82 - 85)

Page 86

1  ability to consent, we use something called the
2  Applebaum criteria for adults.
3      And I think I and many apply those
4  Applebaum criteria for being able to provide
5  informed consent to minors, but technically
6  because they are minors, even if they have -- they
7  meet those Applebaum criteria that we would use
8  for adults saying that they could give informed
9  consent, we would call it assent because of their
10 minor status. Their parents would need to provide
11 the consent for them to be able to access care.
12     Q.  (BY MR. RAMER)  Would you ever provide --
13 let me rephrase.
14         Would you ever provide the treatment
15 described in Chapter 6 when a minor provides
16 informed assent but you do not have informed
17 consent from the parent?
18     MS. NOWLIN-SOHL:  Object to form.
19     THE WITNESS:  No, I can't imagine I would
20 do that.
21     And the latest guidelines I think have a
22 statement in there that you need informed consent
23 from parents. I think it says something like
24 unless that would be dangerous. I think that
25 means, you know, like a noncustodial parent or a

Page 87

1  parent who is physically abusive or a parent who
2  is not in the child's life that you would need a
3  legal guardian to provide the informed consent.
4      Q.  (BY MR. RAMER)  And I want to look still
5  in this box. I want to look at first read 6.12.b
6  and ask if I read it correctly, and then I'll read
7  d.
8      So 6.12.b says "The experience of gender
9  diversity/incongruence is marked and sustained
10 over time."
11         Did I read that correctly?
12     A.  Yes.
13     Q.  And then 6.12.d says "the adolescent's
14 mental health concerns (if any) that may interfere
15 with diagnostic clarity, capacity to consent, and
16 gender-affirming medical treatments have been
17 addressed."
18         And did I read that correctly?
19     A.  Yes.
20     Q.  So based on these guidelines, could there
21 be times where an adolescent is able to provide
22 informed assent for a treatment but a provider
23 still should not provide the treatment?
24     MS. NOWLIN-SOHL:  Object to form.
25     THE WITNESS:  I think most of these other

Page 88

1  criteria that are kind of separate from the
2  consent criteria would likely make them unable to
3  be able to provide the consent.
4      Q.  (BY MR. RAMER)  Okay. Well, let's take
5  that and with respect to 6.12.b.
6      Do you think that if an individual has
7  not experienced gender diversity or incongruence
8  for a marked and sustained period of time that
9  they would not be able to provide informed assent?
10     A.  Oh, sorry. I thought you were only
11 referencing the text within d and e.
12     Q.  Sorry. Do you want me to back out? Can
13 I ask the question again?
14     A.  Sure.
15     Q.  All I'm asking is so we have this
16 requirement of informed consent/assent in 6.12.c.
17         And my question is simply based on this
18 list and the statement above it that says all of
19 these criteria must be met, doesn't that mean that
20 there can be a situation where adolescent can
21 provide informed assent or consent and thus
22 satisfy 6.12.c and yet nevertheless not be
23 eligible for treatment based on one of these other
24 requirements?
25     A.  Yes.

Page 89

1      Q.  And have you ever heard the terms
2  "assessment model" and "informed consent model"
3  used to describe a treatment protocol?
4      A.  Yes.
5      Q.  What is the difference between an
6  assessment model and an informed consent model?
7      A.  They're not as clearly delineated as I
8  think one would like, but I can kind of describe
9  the two broad concepts.
10         So an informed consent model, this is
11 what we do pretty much in all of medicine where we
12 provide individuals with the risks of a treatment,
13 the potential benefits of a treatment, unknowns of
14 the treatment, just everything that's important to
15 know, like, when making a decision about the
16 treatment.
17         And then they decide -- in pediatric
18 medicine -- again, in the vast majority of the
19 cases it's not actually the adolescent deciding;
20 it's the parents deciding and the adolescent
21 agreeing -- but I think generally most doctors,
22 particularly for their adolescent patients, really
23 want the patients to have about as strong of an
24 understanding of the treatment as their parents
25 do.

23 (Pages 86 - 89)

1    The assessment model is a little bit
2 ill-defined, but it involves still informed
3 consent because you're giving them all the
4 information.
5    But in particular for gender-affirming
6 medical interventions, the guidelines require the
7 biopsychosocial assessment, where in addition to
8 making sure that they have all the information
9 about the treatments to make the decision, you as
10 the provider want to know more so that you're
11 making sure you're supporting them in all the ways
12 that they need to be supported.
13    So you want to know their family history.
14 You want to know genetic predispositions they
15 have.  That's kind of the bio -- you want to know
16 any medications they're on.  You would want to
17 know any medical conditions they have, bio.
18    Psycho is understanding the way their
19 mind works.  Do they have certain personality
20 characteristics?  Do they have certain typical
21 thought patterns?  We try and vary all psychiatry,
22 but it's safe to say there are many different
23 psychological dynamics that you can evaluate.
24    And then social is particularly important
25 for these kids because you want to understand

Page 90

1 their family environment.  You want to understand
2 their peer environment.  You want to understand
3 how their teachers are treating them.  You want to
4 know if there's potential for bullying or violence
5 or harassment, all of these things that can affect
6 mental health.
7    So you want to have the comprehensive
8 biopsychosocial assessment so you can know all the
9 ways you can help the person, right?  So maybe
10 they need us to talk to their school to make sure
11 there's a bathroom where they feel safe.
12    Maybe we need them to talk to their
13 families, help their families understand their
14 experience.  Or if there's communication breaking
15 down, getting everyone together to make sure
16 they're on the same page so everyone can feel
17 loved and respected.
18    And maybe in some of the those cases the
19 medical interventions will be in part to consider
20 also, but that assessment model takes a very broad
21 look at the young person, but ultimately does
22 involve a lot of the informed consent work as
23 well.
24    Q.  And do you think Chapter 6, these
25 guidelines that we've been looking at, do you

Page 91

1 think these have elements of both models?  Or do
2 you think this is better described as an
3 assessment model?  Or how would you characterize
4 these particular guidelines?
5    MS. NOWLIN-SOHL:  Object to form.
6    THE WITNESS:  My understanding is that
7 they require a comprehensive biopsychosocial
8 assessment prior to initiating any
9 gender-affirming medical or surgical care for a
10 minor.
11    Q.  (BY MR. RAMER)  And if there are
12 requirements over and above informed consent or
13 informed assent such as the provider needs to
14 confirm the length of time of the gender
15 incongruence or the provider needs to address
16 particular comorbidities before providing
17 treatment, wouldn't those be aspects of an
18 assessment model?
19    MS. NOWLIN-SOHL:  Object to form.
20    THE WITNESS:  This is what I was saying.
21 The distinction is not always entirely cut and
22 dried in that way, because to be able to -- in my
23 opinion, to be able to give true informed consent,
24 you would -- you as the provider would need to
25 understand a lot of those dynamics about the

Page 92

1 person so that you could properly educate them on
2 how to make the decision and the relevant things
3 that they need to consider.
4    Q.  (BY MR. RAMER)  So I guess -- sorry.  Go
5 ahead.
6    A.  So I think, you know, informed consent is
7 not the model in pediatrics, I'll say, first and
8 foremost.  But I think just the concept of
9 informed consent requires asking the person a lot
10 of questions in a focused assessment kind of way
11 because you need to understand them well to be
12 able to counsel them on informed consent.
13    Q.  So you could not accurate -- let me
14 rephrase.
15    You could not accurately describe the
16 guidelines in Chapter 6 as an informed consent
17 model, correct?
18    MS. NOWLIN-SOHL:  Object to form; asked
19 and answered.
20    THE WITNESS:  I think they involved
21 informed consent, but I think they moved past that
22 into more of an assessment as well.  But again,
23 they're not clean distinctions between those two
24 terms.
25    Q.  (BY MR. RAMER)  And I'd like to go to

Page 93

24 (Pages 90 - 93)

1  page S62, which is page 20 in the PDF.
2       And then in the right column it appears
3  there is a section discussing statement 6.12.d in
4  more depth; is that fair?
5       A.  Yes.
6       Q.  Okay.  And I'd like to go to the next
7  page and the left column and specifically the
8  paragraph that is numbered 2.  And I'll just read
9  this full paragraph and ask if I read it
10  correctly, and then we can go from there.
11       It says "Second, mental health can also
12  complicate the assessment of gender development
13  and gender identity related needs.  For example,
14  it is critical to differentiate gender
15  incongruence from specific mental health
16  presentations such as obsessions and compulsions,
17  special interests in autism, rigid thinking,
18  broader identity problems, parent/child
19  interaction difficulties, severe developmental
20  anxieties, (e.g., fear of growing up and pubertal
21  changes unrelated to gender identity), trauma or
22  psychotic thoughts.  Mental health challenges that
23  interfere with the clarity of identity development
24  and gender-related decision-making should be
25  prioritized and addressed."

Page 94

1       Did I read that correctly?
2       A.  Yes.
3       Q.  And what is diagnostic clarity?
4       A.  Sorry, I'm just going to see where it
5  came up in that paragraph.
6       Q.  Sorry.  I think it's in -- let's see
7  here.  It actually might be in the statement
8  itself.  Yeah, sorry.
9       So going back another page -- going back
10  another page, right column, so this is S62,
11  Statement 6.12.d.
12       It says "The adolescent's mental health
13  concerns parentheses (if any) that may interfere
14  with diagnostic clarity."
15       And my question is just what is
16  diagnostic clarity?
17       A.  I think in their instance, they're
18  referencing clarity around a gender dysphoria
19  diagnosis.
20       Q.  And do you agree that mental health
21  concerns can interfere with diagnostic clarity?
22       A.  Yes.
23       Q.  How so?
24       A.  In many of the ways listed.  One example
25  that you gave was autism.

Page 95

1       So I had a patient once who came to me
2  wanting to better understand his gender identity.
3  He had autism and somewhat rigid thinking.  And
4  really enjoyed -- is it okay if I change some of
5  the details to protected the patient's
6  confidentiality if the theme is the same?
7       Q.  We can just say we're talking about a
8  hypothetical, but sure, go ahead.
9       A.  So let's say he enjoyed ballet, like a
10  stereotypical female activity, and wondered if
11  that meant that he was trans.
12       The more we talked to him, we realized
13  that no, he just likes that particular activity,
14  but still very much identified as male and
15  certainly didn't actually have a disconnect
16  between his gender identity and his sex assigned
17  at birth.  Certainly didn't have any problem with
18  his physical body or primary or secondary sex
19  characteristics.
20       And the more we talked through it, it
21  seemed clear, you know, he didn't have gender
22  dysphoria.  But maybe at first glance he did have
23  suspicion for it because of how he was describing
24  this rigid thinking around gender roles' behavior.
25       Q.  If -- and this is another hypothetical.

Page 96

1       If the adolescent is at the beginning of
2  Tanner Stage II has been diagnosed with gender
3  dysphoria and wants puberty blockers, but the
4  adolescent is expressing suicidal ideation, in
5  your opinion, is that adolescent eligibility to
6  receive puberty blockers as a treatment?
7       MS. NOWLIN-SOHL:  Object to form.
8       THE WITNESS:  It depends.  Suicidal
9  ideation is a broad construct.  That kind of
10  ranges from what some people will call passive
11  suicidal ideation, something like, I'd rather not
12  be alive.  I'm so miserable.  But I don't have any
13  plan or intent to harm myself.
14       Another end of the spectrum might be, you
15  know, active suicidal ideation with intent to
16  plan, where somebody wants to die and they have a
17  plan to act on it and they plan to act on it soon.
18  If you were on that side of the spectrum, then
19  we're not going to start talking about puberty
20  blockers.  We're going to work towards an
21  inpatient hospitalization to make sure that that
22  person is safe and stabilized, and then they could
23  potentially be a candidate in the future.
24       Another end of the spectrum I would
25  really want to understand the nature of the

Page 97

25 (Pages 94 - 97)

1 suicidality, you know, if it was not acute
2 suicidality, the person doesn't have a physical
3 safety risk but they're so unhappy that they're
4 expressing a desire not to live even though they
5 wouldn't act on that, and a lot of that is related
6 to gender dysphoria and the fear of puberty
7 progressing.  And that's a patient where you might
8 do more work towards understanding if they would
9 be a candidate for pubertal suppression.
10      Q.  (BY MR. RAMER)  If the patient is
11 expressing passive suicidal ideation, are you
12 saying they would not be eligible until after
13 you've done the further assessment?  Or are you
14 saying if the patient is expressing passive
15 suicidal ideation, they would be eligible?
16      A.  If they're expressing passive suicidal
17 ideation, that wouldn't make them immediately
18 ineligible but they would need to go through the
19 full biopsychosocial assessment, meet all the
20 other criteria.
21      And if they had -- if their suicidality
22 was being driven by other things that aren't
23 gender dysphoria, we would want to treat those as
24 well.  And we'd likely work on safety planning,
25 the standard approaches that we take for patients

Page 98

1 who are having suicidal thoughts.
2      Q.  So is passive suicidal ideation, for lack
3 of a better term, less serious than active
4 suicidal ideation?
5      A.  Do you have a better term?
6      Q.  I'm asking you.  You're saying you treat
7 people differently based on whether they have
8 passive suicidal ideation or active, and I guess
9 the question is how do you justify treating them
10 differently?
11      MS. NOWLIN-SOHL:  Object to form.
12      THE WITNESS:  So if a person has active
13 suicidal ideation with intent to plan, we need to
14 get them somewhere where they can be watched and
15 supervised and make sure they're not going to act
16 on that plan and die.
17      If the person is confident they're not
18 going to act on it; they don't have a plan, then
19 wouldn't necessarily need to be in that type of
20 restrictive setting.
21      MR. RAMER:  I think we've been going just
22 a little over an hour.  Do you want to -- could
23 you use a break?  I could if you couldn't, but
24 either way, do you want to take a break?
25      MS. NOWLIN-SOHL:  That sounds good.

Page 99

1      MR. RAMER:  Okay.
2      THE VIDEOGRAPHER:  Okay.  So the time is
3 11:17 a.m. Pacific time, and we are off the
4 record.
5      (Break taken from 11:17 a.m. to 11:23 a.m.)
6      THE VIDEOGRAPHER:  All right.  So we are
7 recording.  The time is 11:23 a.m. Pacific, and we
8 are back on the record.
9      Q.  (BY MR. RAMER) Dr. Turban, I'd like to
10 return to Turban Exhibit 7, which is Chapter 6,
11 the "Adolescents" chapter of the SOC8.  And going
12 back to page S48, which is 6 in the PDF.
13      I want to look again at statement 6.12.B,
14 which requires that the experience of gender
15 diversity/incongruence is marked and sustained
16 over time.
17      And my question is based on your review
18 of the evidence, do you agree with that
19 requirement as a precondition for adolescent
20 receiving treatment?
21      MS. NOWLIN-SOHL:  Object to form;
22 foundation.
23      THE WITNESS:  Yes.
24      Q.  (BY MR. RAMER)  And then with 6.12.d,
25 same page, do you -- let me rephrase.

Page 100

1      Also based on your review of the
2 evidence, do you agree with that requirement as a
3 precondition for receiving treatment?
4      MS. NOWLIN-SOHL:  Object to form.
5      THE WITNESS:  Yes, as well as based on
6 clinical experience.
7      Q.  (BY MR. RAMER)  Do you think there's an
8 argument that a less rigorous mental health
9 assessment could be better because patients would
10 not have to go untreated for gender dysphoria as
11 long?
12      MS. NOWLIN-SOHL:  Object to form.
13      THE WITNESS:  I'm aware that argument has
14 increased.
15      Q.  (BY MR. RAMER)  And do you agree with
16 that argument?
17      A.  I see the theoretical basis for it.  That
18 being said, it wouldn't be in line with current
19 guidelines.  It's a balance, right?  Like, the
20 level of assessment, make sure someone's making a
21 very good, informed decision.
22      The longer the assessment is,
23 particularly for pubertal suppression, the longer
24 people are waiting and progressing through
25 puberty, which is worsening their gender

Page 101

26 (Pages 98 - 101)

1 dysphoria. So it's a complex balance between
2 those two factors.
3          MR. RAMER: And I'd like to turn to
4 Turban -- or introduce Turban Exhibit 8.
5          MR. RAMER: Do you have that, Li?
6          MS. NOWLIN-SOHL: Not yet.
7          MR. RAMER: Okay.
8     Q.  (BY MR. RAMER) And I can start while
9 we're waiting and just ask, Dr. Turban, have you
10 appeared on an episode of the GenderGP podcast?
11     A.  Perhaps I'm not sure which podcast that
12 is, but it sounds like a podcast I did appear on.
13          MR. RAMER: And are you still waiting on
14 it, Li?
15          MS. NOWLIN-SOHL: We just got it.
16          (Deposition Exhibit No. 8 was marked.)
17          THE WITNESS: I see. Yes, I do recall
18 this one.
19     Q.  (BY MR. RAMER) Okay. And I'll just
20 represent to you that this is a transcript that is
21 posted on GenderGP's website.
22          And on page 1, is that your photo?
23     A.  That is quite the photo of me, yes.
24     Q.  I'd like to go to page 6. And at the top
25 of this page, there is a response attributed to

Page 102

1 you. And I'll just read the first, the first part
2 of this paragraph, and ask you a question about
3 it.
4          And it says "Yeah, I think that's a huge
5 question that especially in pediatrics people are
6 grappling with -- I think people have had an
7 easier time in adult medicine kind of recognizing
8 that these, like, assessment/gatekeeping were a
9 little bit ridiculous and damaging. And it's
10 interesting that not all of the lessons from that
11 have made it into pediatrics yet because people
12 don't trust kids to make decisions in the same
13 way, obviously, but, like, things people are
14 familiar with, right? Like, if you're -- if you
15 set up this assessment, gatekeeping protocol,
16 people are just going to figure out the answers
17 and then tell you what you want to hear. And
18 you've set up this really kind of like argument
19 representative with your patient or client.
20 (Unclear time stamped 1407). And you're like why?
21 Why even bother? You know?"
22          And do you think there's any reason to
23 bother with an assessment model for
24 gender-affirming medical interventions?
25          MS. NOWLIN-SOHL: Object to form.

Page 103

1          THE WITNESS: So what I was referencing
2 here -- and you'll see at the top I mentioned
3 adult, quote, gatekeeping models, was that there
4 was a history within psychiatry where there was an
5 extensive assessment process prior to adults being
6 able to start gender-affirming medical
7 interventions, and some of the assessment criteria
8 were not very reasonable. You know, if the
9 psychiatrist felt that the trans woman's outfit
10 was not particularly feminine or felt that her
11 makeup was done well or that she didn't have the
12 sexual orientation that the psychiatrist thought
13 she should have, they would refuse to provide the
14 person with care.
15          And then also what happened was the trans
16 community just learned the questions that some of
17 those physicians were asking, and they would go in
18 and address the way the person wanted and answer
19 the questions the way they were [indiscernible]
20 and it really stifled the relationship.
21          You know the person wasn't actually
22 answering the questions honestly to the physician
23 because the things that were being asked weren't
24 really so much about whether or not decision was
25 right for the person, and was more about the

Page 104

1 therapist's views around what women should look
2 like.
3          I do think there's a role for assessment
4 in pediatrics, but I think it shouldn't be that
5 kind of thing. I don't think they should be
6 sitting judging a patient's physical appearance,
7 but rather really trying to understand them in a
8 collaborative way so they feel comfortable
9 speaking with me, so I really understand them, the
10 whole spectrum of their lives, all the ways I can
11 support them and guide them and their family
12 through these decisions about whether they will
13 benefit from puberty blockers or gender-affirming
14 hormones.
15     Q.  Do you think that acquiring a diagnosis
16 of gender dysphoria on the DSM-5 before an
17 adolescent can obtain gender-affirming medical
18 interventions is an assessment model?
19     A.  I think it's somewhat semantics, but
20 determining the diagnosis is an assessment.
21 You're doing a diagnostic assessment to come to
22 that diagnostic conclusion.
23     Q.  Do you think there's a risk that
24 individuals would be able to figure out the
25 answers to obtain a diagnosis of gender dysphoria

Page 105

27 (Pages 102 - 105)

1  on the DSM-5 and then tell the providers what they
2  want to hear?
3        MS. NOWLIN-SOHL:  Object to form; calls
4  for speculation.
5        THE WITNESS:  I think less so in minors
6  because we're usually interviewing their parents
7  and other people in their lives as well, so we
8  want to have fairly consistent answers between the
9  different members of the family.
10       And when answers seem to be discordant
11  with each other, we usually facilitate family
12  therapy sessions to try to come to a shared
13  understanding of what's going on to make sure we
14  have a clear understanding of the picture.
15    Q.  (BY MR. RAMER) So you think parents'
16  observations or conclusions regarding the gender
17  identity of their children is relevant to this
18  assessment?
19    A.  I think the parents' experience and
20  perception is a piece of the puzzle, yes.
21    Q.  And are you aware of any providers in the
22  United States who use only an informed consent
23  model to provide gender-affirming medical
24  interventions?
25        MS. NOWLIN-SOHL:  Object to form.

Page 106

1    A.  Correct.
2    Q.  And you're talking about the diagnosis
3  for gender dysphoria here; is that right?
4    A.  In the context of psychiatric
5  appointments.
6    Q.  So what do you mean when you say, "The
7  only argument for the diagnosis existing is
8  insurance coverage"?
9    A.  I believe this was in the context of
10  arguments about whether or not gender dysphoria
11  should be in the DSM.  And there have been
12  arguments on both sides.  Some people have
13  highlighted concerns that because gender dysphoria
14  is in the DSM, that the general public will
15  misinterpret that to think that trans identities
16  are a mental illness and that that will promote
17  stigma, which I think is something that we've
18  seen.
19       My philosophy on that is that we just
20  shouldn't stigmatize mental health conditions
21  broadly.  I wouldn't stigmatize someone with major
22  depressive disorder in the same way that I
23  wouldn't stigmatize someone with gender dysphoria,
24  but I understand that stigma exists.
25       Another side of the spectrum, people have

Page 108

1        THE WITNESS:  For minors or adults?
2    Q.  (BY MR. RAMER)  Minors.
3    A.  No.  But again, it's this what do you
4  mean by informed consent?
5        So what I would say, which hopefully
6  answers the question, is that everyone I know
7  conducts this comprehensive biopsychosocial
8  evaluation prior to initiating care, and that that
9  biopsychosocial assessment involves ensuring the
10  patient can provide informed consent or assent and
11  that the parents can provide informed consent.
12    Q.  In sticking with this same document, I'd
13  like to move to page 11.  And on this page there
14  are two answers attributed to you.  One is very
15  short.  I'm looking at the second one further
16  down.
17       And in particular in that paragraph, I
18  just want to read the third to last sentence that
19  begins with the words "And right."  And I'll
20  ask -- I'm sorry.  Maybe the fourth to last -- the
21  sentence that begins with the words "And right,"
22  and then I'll ask if I read it correctly.
23       It says "And right.  The only argument
24  for the diagnosis existing is insurance coverage."
25       Did I read that correctly?

Page 107

1  made arguments that it should be in the DSM, and
2  there are plenty of peer-reviewed publications
3  that highlight that for psychiatrists, the main
4  reason it's in the DSM is for insurance billing.
5  So that if I'm talking to someone about
6  gender-affirming medical care, for instance, and
7  doing that biopsychosocial evaluation, I need some
8  diagnostic code to put down, otherwise I wouldn't
9  be able to do that work theoretically.
10    Q.  And here you say the only argument for
11  the diagnosis existing is insurance coverage.
12       Is that what you think?
13        MS. NOWLIN-SOHL:  Object to form.
14        THE WITNESS:  Again, I think that's in
15  the context of psychiatric events.  Like, on a
16  broader level, it's a useful diagnosis for
17  establishing that somebody could be a candidate
18  for gender-affirming medical intervention.
19       But, you know, you could get at a similar
20  concept of gender dysphoria without using that
21  specific term that many find stigmatizing.
22    Q.  (BY MR. RAMER)  So, I mean, what do
23  you -- how would you do it without using that
24  term?  You'd just call it something else?
25        MS. NOWLIN-SOHL:  Object to form.

Page 109

28 (Pages 106 - 109)

1    THE WITNESS: I mean, you could describe
2  that the person has a gender identity that's
3  incongruent with their sex assigned at birth and
4  have for many years, and that's creating
5  clinically relevant distress. Maybe describe the
6  different elements of typical gender dysphoria
7  that they have. But the way insurance billing is
8  set up, you would need to actually generally bill
9  that kind of diagnostic code.
10    Similarly, a lot of insurance companies
11  won't cover, I think, some of the medical
12  appointments as well unless there's a diagnostic
13  code.
14    Q. (BY MR. RAMER) Do you think that an
15  individual who has distress resulting from --
16  well, no, let me rephrase.
17    Do you think there are instances where an
18  individual can desire gender-affirming medical
19  interventions but not meet the criteria for a
20  diagnosis of gender dysphoria under the DSM-5?
21    A. It's theoretically possible.
22    Q. And do you think that those individuals
23  should receive gender-affirming medical
24  interventions?
25    MS. NOWLIN-SOHL: Object to form; calls

1  this end.
2    Did you say you could not picture a case?
3    A. I cannot picture a case where that would
4  be a reasonable practice.
5    Q. And I want to skip the next sentence and
6  then read the one after that and ask if I read it
7  correctly.
8    It says "Never once have I had a" --
9  sorry. I'll start again.
10    "Never once have I had a treatment plan
11  for someone's, like, gender dysphoria. But I've
12  had treatment plans to help them with their
13  anxiety or their depression or trauma-related
14  symptoms."
15    Did I read that correctly?
16    A. Sorry. I'm just finding where you are.
17    Yes.
18    Q. And is it true that you have never once
19  had a treatment plan for someone's gender
20  dysphoria?
21    A. So again, this is talking in the context
22  of a psychiatric treatment plan. So I wouldn't
23  have -- there's no evidence psychotherapy is to
24  try and push someone to identify with their sex
25  assigned at birth.

1  for speculation.
2    THE WITNESS: No. That would be
3  practicing outside of guidelines.
4    Q. (BY MR. RAMER) Don't the guidelines
5  create exceptions? Or are they rigid rules?
6    A. They're a general set of guidelines for
7  care.
8    But that would be an extreme departure,
9  to provide the intervention to somebody in the
10  United States where we use the DSM who doesn't
11  meet the criteria for gender dysphoria. It's hard
12  for me to imagine that situation happening.
13    Q. And just as a -- you know, an expert in
14  this field, do you think the guidelines should
15  prevent those individuals from receiving
16  gender-affirming medical interventions?
17    MS. NOWLIN-SOHL: Object to form. Also
18  objection to the extent that it calls for a legal
19  conclusion.
20    THE WITNESS: Yeah, I mean, I'm hesitant
21  to make broad characterizations of all of medicine
22  not knowing, like, all the specific details of a
23  given case. But I can't picture a case that
24  would be a reasonable practice.
25    Q. (BY MR. RAMER) I couldn't hear you at

1    I might try and work with their school
2  around bullying or work with their family around,
3  like, communication and validation skills or --
4  what I'm getting at here is there's not an
5  evidence-based psychotherapy or psychiatric
6  medication that's evidence based for gender
7  dysphoria.
8    Q. I guess I thought we were just discussing
9  that the only reason for the diagnosis is so that
10  you can enter a code for health insurance
11  purposes.
12    And I guess I don't understand if you
13  don't have treatment plans for gender dysphoria
14  because you're a psychiatrist, what is the need
15  for the diagnosis?
16    MS. NOWLIN-SOHL: Object to form;
17  mischaracterizes prior testimony.
18    THE WITNESS: So for instance, if I were
19  doing the biopsychosocial assessment for somebody
20  to consider starting pubertal suppression for
21  gender dysphoria, I would conceptualize that as
22  the treatment is the pubertal suppression, and I'm
23  conducting the biopsychosocial assessment to
24  broadly support them in many areas of their life
25  and then also, you know, pass them on to the next

1  step to actually get them treatment, which is the
2  pubertal suppression.  So it's a bit of semantics
3  in that way.
4      I think another problem that comes up
5  sometimes -- and, again, with the insurance
6  issue -- is let's say I do an assessment and the
7  person doesn't meet the criteria for a gender
8  dysphoria, then you're also left with, you know,
9  what do we bill insurance in this instance?
10      But it's just kind of a technicality of
11  how insurance billing works.
12     Q.   (BY MR. RAMER)  So is the only thing that
13  you as a psychiatrist do for the treatment for
14  gender dysphoria is the initial biopsycho -- let
15  me rephrase.
16      Is the only thing that you, as a
17  psychiatrist, do for the treatment of gender
18  dysphoria the initial biopsychosocial assessment?
19     MS. NOWLIN-SOHL:  Object to form.
20     THE WITNESS:  Yes.  In terms of the
21  distress the person's having related to their
22  physical body not aligning with their gender
23  identity, our primary role is to do that
24  biopsychosocial assessment.
25      If they had something else going on, if

Page 114

1  they had major depressive disorder or generalized
2  anxiety disorder, I would treat that as well.  And
3  I'll also do general psychosocial intervention so
4  family therapy or working with the school or
5  trying to prevent bullying.
6      But those things don't work to get rid of
7  the fact that the person's distressed about their
8  body not aligning with their gender identity,
9  which is the gender dysphoria.
10     Q.   (BY MR. RAMER)  Are there individuals who
11  have gender dysphoria but do not have anxiety that
12  rises to the level of general anxiety disorder?
13     A.   Generalized anxiety disorder is not
14  defined by the level of anxiety but rather the
15  types of things about which one has anxiety.
16     Q.   So in this sentence when you say "But
17  I've had treatment plans to help them with their
18  anxiety or their depression," are you referring to
19  actual diagnoses of an anxiety disorder or a
20  depression disorder?
21     A.   Yeah.  Those are colloquialisms for
22  anxiety disorders, which there are many, or
23  depression which can have many different diagnoses
24  that cause it.
25     Q.   And so for that treatment you're

Page 115

1  describing there, there actually is a different
2  diagnostic code for purposes of health insurance,
3  right?  You're treating anxiety or you're treating
4  depression?
5      MS. NOWLIN-SOHL:  Object to form.
6      THE WITNESS:  If I were treating someone
7  who had that.  But not everyone who comes to see
8  me as part of gender-related care is going to have
9  those other diagnoses.
10     Q.   (BY MR. RAMER)  So do you see patients
11  who are receiving gender-affirming medical
12  interventions after you have conducted the
13  biopsychosocial assessment with them?
14     A.   Like, do I continue to see them?
15     Q.   Yes.
16     A.   Yes.
17     Q.   And what are you doing during those
18  meetings?
19     A.   It depends on the patient.
20     Q.   Can you provide me some examples?
21     A.   If they also had -- generally if they --
22  for someone who ultimately did start the
23  gender-affirming medical intervention, I would
24  check with them to see how they're feeling about
25  the intervention, making sure that they're

Page 116

1  comfortable continuing with it, seeing if they
2  have any questions or if there are any worries
3  that are coming up around it.
4      If they also had generalized anxiety
5  disorder, I might be offering an evidence-based
6  medication or an evidence-based psychotherapy for
7  generalized anxiety disorder like cognitive
8  behavioral therapy.
9     Q.   Was there more?
10     A.   I don't know how many examples --
11     Q.   That's fine.  That's fine.  Let's -- so
12  same page, toward the bottom, and just there's a
13  statement attributed to Dr. Helen Webberley.
14      In this paragraph she's discussing
15  Johanna Olson-Kennedy, correct?
16     A.   Do you want me to --
17     Q.   Sure, you can.  And just as a reminder,
18  my question is just simply if she is discussing
19  Johanna Olson-Kennedy.
20     A.   Looks like she's referencing
21  Dr. Olson-Kennedy as well as -- I don't know who
22  Darlene Tando is.  I don't know Aiden's last name,
23  but I believe Aiden is a psychotherapist who works
24  with trans youth.
25     Q.   And do you know Dr. Olson-Kennedy?

Page 117

30 (Pages 114 - 117)

1    A.   Yes.
2    Q.   And on page 12, Dr. Webberley -- so top
3 of page 12, second and third full sentences,
4 Dr. Webberley says, "And basically Johanna has
5 just said, 'Look, if your kid -- if your kid tells
6 you that they're trans, they most likely are.
7 Just believe it.'"
8        Did I read that correctly?
9    A.   Yes.
10    Q.   Do you agree that Dr. Olson's -- well,
11 sorry.
12        Do you agree that Dr. Olson-Kennedy's
13 practice is that if your kids tell you that
14 they're trans, you should just believe it?
15        MS. NOWLIN-SOHL:   Object to form;
16 foundation.
17        THE WITNESS:   I think probably that's
18 mostly glib.  I don't think that's her actual
19 practice.
20        My understanding is that she conducts the
21 biopsychosocial evaluation, and that Aiden --
22 again, whose last name I forget -- is a therapist
23 who similarly conducts those evaluations.
24    Q.   (BY MR. RAMER)  And then same page down
25 to your response which follows.  And I'll just

Page 118

1 read the first few sentences and ask if I read it
2 correctly.
3        It says "Yeah, I was really talking
4 around it and not naming names, but that model
5 does exist in the U.S., right?  So Dr. Olson,
6 that's her model.  Brown University's clinic has a
7 similar model.  And I think we're now starting to
8 have the conversations like, great.  Those models
9 have now been around for a little while where they
10 don't have a lot of mental health involvement.
11 They don't have a gatekeeping model.  They have
12 this informed consent model, and so far it seems
13 to be going fine."
14        Did I read that correctly?
15    A.   Yes.
16    Q.   And are you, in this response, accurately
17 describing the model that Dr. Olson-Kennedy uses?
18    A.   Again, I think it's a little tricky
19 between these terms, assessment and gatekeeping
20 and informed consent being somewhat unclear.
21        But my understanding, especially talking
22 to Dr. Olson and -- Dr. Forcier is the one at the
23 Brown University clinic -- is that they do conduct
24 these biopsychosocial assessments as adolescent
25 medicine physicians who are trained in doing

Page 119

1 mental health treatment.
2        The good thing that's unique about their
3 model versus other models is it's not necessarily
4 like an LMFT or a social worker or a psychologist.
5 It's this medical doctor who has special training
6 in conducting biopsychosocial assessments, whereas
7 other places it's more, you know, a psychologist
8 or a psychiatrist.
9        And then what they've told me is that if
10 it is particularly complex and they feel that they
11 need someone like a Ph.D. or psychologist, those
12 individual patients they'll refer over.  So if
13 someone has complex autism or trauma or psychosis.
14    Q.   And you used an acronym, "LMFT."
15        What is that?
16    A.   It's a licensed marriage and family
17 therapist.
18    Q.   And at Brown University, you said -- did
19 you say Dr. Forcier?
20    A.   Yes.  F-o-r-c-i-e-r.
21    Q.   But in this passage, you say that, quote,
22 they don't have a lot of mental health
23 involvement, end quote.
24        What did you mean by that?
25    A.   Yeah, that in their clinics, there are

Page 120

1 these adolescent medicine physicians who have kind
2 of broader training.  So they -- they can
3 prescribe hormones and puberty blockers, but they
4 also are the pediatric medical specialty that
5 focuses the most on mental health.  So they're not
6 pure psychiatrists the way that I am, so there's
7 not necessarily a psychologist or psychiatrist
8 involved in every single case.  Sometimes it's an
9 adolescent medicine physician who has mental
10 health expertise.
11    Q.   And so that model results in less mental
12 health involvement; is that right?
13        MS. NOWLIN-SOHL:   Object to form.
14        THE WITNESS:   Yeah, I guess I'm saying
15 less mental health involvement.  I just mean that
16 it's an adolescent medicine doctor who has mental
17 health training that is different than, say, a
18 psychiatrist or a psychologist who only has mental
19 health training.
20        So for them, it could be the same person
21 doing the biopsychosocial mental health assessment
22 and also providing the hormones, whereas in other
23 models you have a specified, separate person.
24    Q.   (BY MR. RAMER)  So are there patients
25 receiving fewer mental health interventions as a

Page 121

31 (Pages 118 - 121)

1 result?
2        MS. NOWLIN-SOHL:  Object to form; calls
3 for speculation.
4        THE WITNESS:  No, I think it's fewer
5 practitioners that they're seeing but not
6 necessarily fewer mental health interventions.
7    Q.  (BY MR. RAMER)  And what's the benefit of
8 having fewer practitioners that they're seeing?
9    A.  I think their logic is that it would be
10 more streamlined.  So for instance, in our model,
11 a patient has to wait many months to be able to
12 come in to see me.  You know, there's, like, the
13 delay going from provider to provider having more
14 and more appointments.
15      So in our model, we do often have
16 patients who are progressing through puberty while
17 their mental health is worsening while we try and
18 work on logistics of getting that biopsychosocial
19 assessment done.  But in their model, because it's
20 the same doctor, it's more streamlined.
21      And again, I don't work in these clinics.
22 I'm giving you my understanding from talking to
23 them to the best of my ability.  But take it with
24 a grain of salt, having not actually worked in
25 there or seen their exact protocols.

Page 122

1    Q.  And at the beginning of this answer you
2 say you were talking around it and not naming
3 names.
4        Why were you not naming names?
5    A.  I don't remember.  I'd have to go through
6 the rest of the --
7    Q.  That's fine.  If you don't know --
8    A.  Probably because I was just speaking in
9 general terms and not talking about the specific
10 clinics.
11    Q.  And so it doesn't have something to do
12 with the fact that the type of model they're using
13 would somehow be controversial?
14        MS. NOWLIN-SOHL:  Object to form.
15        THE WITNESS:  I don't know what you mean
16 by "controversial."
17    Q.  (BY MR. RAMER)  Well, I guess that it
18 would be inconsistent with the WPATH guidelines.
19        MS. NOWLIN-SOHL:  Object to form.
20        THE WITNESS:  I would have to go back and
21 look at when this interview was and look at how
22 the guidelines evolved, because I think it was
23 during Standards of Care 7.
24        And I can't remember -- it's something
25 that's irrelevant to me because I am a

Page 123

1 psychiatrist, so I am the one doing mental health
2 assessment, but I can't remember if there's
3 specific language in the old guidelines versus the
4 new guidelines that said whether it could be an
5 adolescent medicine physician doing the mental
6 health biopsychosocial evaluation versus another
7 type of medical professional.
8    Q.  (BY MR. RAMER)  And you don't know the
9 answer to that question with respect to the
10 current guidelines either?
11        MS. NOWLIN-SOHL:  Object to form.
12        THE WITNESS:  I believe the current
13 guidelines say "mental health professional," but I
14 would have to go back and look.  It hasn't been
15 relevant since I am a mental health professional.
16    Q.  (BY MR. RAMER)  Yeah.  Yeah.  Okay.  That
17 makes sense.
18        MR. RAMER:  Li, did you receive Turban
19 Exhibit 9?
20        MS. NOWLIN-SOHL:  No.
21        MR. RAMER:  Still no?
22        MS. NOWLIN-SOHL:  Still no.
23        MR. RAMER:  Well, I'll just -- we can get
24 started and then we can confirm the document.
25    Q.  (BY MR. RAMER)  But what I'm going to be

Page 124

1 bringing up, Dr. Turban, is your article entitled
2 "Pubertal" -- "Pubertal Suppression For
3 Transgender Youth and Risk of Suicidal Ideation,"
4 which is published in Pediatrics.
5        MR. RAMER:  You still do not have the
6 document?
7        MS. NOWLIN-SOHL:  Just arrived.
8        THE WITNESS:  Okay.
9      (Deposition Exhibit No. 9 was marked.)
10    Q.  (BY MR. RAMER)  And is this that
11 document, Doctor?
12    A.  Yes.
13    Q.  And where did the data for this article
14 come from?
15    A.  This data is from the 2015 U.S.
16 Transgender Survey.
17    Q.  And looking -- sticking with your
18 article, going to page 3 under "Methods," and just
19 at a high level of generality, I'm trying to
20 understand what the study does.  And basically --
21 tell me if I have this generally correct.
22        Basically the study takes two different
23 groups.  The first group is individuals who wanted
24 puberty blockers and received them; and the second
25 group is individuals who wanted puberty blockers

Page 125

32 (Pages 122 - 125)

1 but did not receive them.
2     Is that fair?
3     A.  Yes.
4     Q.  And then you compared those two groups on
5 a number of different metrics, correct?
6     A.  Yes.
7     Q.  And on this page, moving down to "Study
8 Population," I just -- the second and third
9 sentences I'm going to read and ask if I read them
10 correctly.
11     It says that "Given that pubertal
12 suppression for transgender youth was not
13 available in the United States until 1998, only
14 participants who are 17 or younger in 1998 would
15 have had healthcare access to GnRHa for pubertal
16 suppression.  We thus restricted the analysis to
17 participants who were 36 or younger at the time of
18 the survey resulting in a sample of 20,619
19 participants."
20     Did I read that correctly?
21     A.  Yes.
22     Q.  And the basic idea there is that it's
23 highly unlikely, if not impossible, that anyone
24 over the age of 36 at the time of the survey would
25 have had access to puberty blockers to treat

Page 126

1 gender dysphoria; is that right?
2     A.  I wouldn't say it's impossible.  There
3 have been some historical studies done by Jules
4 Gill-Peterson, who I think is at the University of
5 Pittsburgh now, that found that individual
6 physicians were offering pubertal suppression in
7 the United States earlier than this.
8     But this is a rough guideline based on
9 what we knew from the published literature.  This
10 was then in the published literature.  The first
11 time it seemed to be offered was at the Gender
12 Management Service at Boston Children's Hospital,
13 it made a publication that -- roughly 1988 is when
14 they started.
15     Q.  And then going to the next page,
16 statistical analysis, about three-quarters of the
17 way down the paragraph, it states that your
18 threshold for statistical significance was a
19 P-value of less than .05; is that right?
20     A.  I believe that's just for when we were
21 comparing demographic differences.  In the
22 multivariable logistic progression, we chose
23 anything with a P-value of less than .2 to include
24 in the model.
25     Q.  Okay.  That's fair.  And I'm just reading

Page 127

1 the sentence that says "P less than .05 defines
2 statistical significance."
3     Is that right?
4     MS. NOWLIN-SOHL:  Object to form.
5     THE WITNESS:  That's talking about one
6 specific -- but the way you build these models,
7 there are different statistical thresholds for
8 different parts in how you build the model.
9     Q.  (BY MR. RAMER)  And is a P-value of less
10 than .05, is that a standard P-value for a
11 threshold of statistical significance?
12     A.  It depends on what you're doing.
13     Q.  And so like what?  What does it depend
14 on?
15     A.  For instance, if you were running a study
16 that had, like, hundreds and hundreds of
17 comparisons, you'd want to do a correction for
18 multiple comparisons and do it using a lower
19 P-value.
20     If you were deciding which variables to
21 build into a logistic progression model, you would
22 probably use a higher P-value like the .2 that we
23 used.
24     Q.  When you have a threshold of statistical
25 significance of less than .05, what do you make of

Page 128

1 a finding with a P-value of .07 or .08 just as a
2 theoretical manner?
3     A.  Theoretically it would tell you nothing
4 one way or another.
5     Q.  Have you heard people use the term
6 "substantial finding" or "important finding" for
7 something like that where the P-value doesn't
8 fully reach the threshold of statistical
9 significance?
10     MS. NOWLIN-SOHL:  Object to form.
11     THE WITNESS:  I've heard people use the
12 term "trend" toward whatever the recitation
13 they're looking at is.  I was trying not to do
14 that.
15     Q.  (BY MR. RAMER)  And sticking with page 4,
16 going up to the top, the first full paragraph but
17 then the last two sentences in that paragraph,
18 just read and ask if I read it correctly.
19     It says "Those who reported beginning
20 treatment after age 17 were excluded to only
21 include participants who likely had pubertal
22 suppression during the active endogenous puberty.
23 The vast majority of adolescents would have
24 reached Tanner 5, the final stage of puberty, by
25 age 17."

Page 129

33 (Pages 126 - 129)

1    Did I read that correctly?
2    A.  Yes.
3    Q.  Why would someone report receiving
4  pubertal suppression after age 17?
5    A.  For birth-assigned males, estrogen alone
6  is not strong enough to suppress your endogenous
7  testosterone, so you often need a second
8  medication on board.  You could use a puberty
9  blocker or GnRH agonist to do that.  They're
10 expensive, so generally they're not.  Generally
11 one uses something like spironolactone.
12    But want to really be looking at it in
13 people who are using it to suppress active puberty
14 rather than, you know, suppress testosterone for
15 someone who was already past the pubertal
16 adolescent window.
17   Q.  So you excluded participants who reported
18 beginning pubertal suppression after age 17
19 because you didn't want to look at that particular
20 treatment?
21    MS. NOWLIN-SOHL:  Object to form.
22    THE WITNESS:  Our clinical question here
23 was pubertal suppression during adolescence rather
24 than, you know, blocking endogenous testosterone
25 as an adult.

1    MR. RAMER:  And, Li, do you have Turban
2  Exhibit 10?
3    MS. NOWLIN-SOHL:  Yes.
4
5    (Deposition Exhibit No. 10 was marked.)
6    Q.  (BY MR. RAMER)  And, Dr. Turban, is this
7  the survey that you used for this paper?
8    A.  This looks like the report of the full
9  survey, yes.
10   Q.  Fair.  And I'd like to go to page 271 and
11 specifically question 12.9 on that page.
12    And is this the question that you used to
13 determine the number of participants who received
14 pubertal suppression?
15   A.  Yes.
16   Q.  And then they would have, for -- I guess
17 let's go to 272 now.
18    And then if they had selected puberty
19 blocking hormones in 12.9, they would be sent to
20 question 12.11; is that right?
21   A.  Yes.
22   Q.  And then they would have a drop-down and
23 report their age; is that right?
24   A.  Correct.
25   Q.  Okay.  Sticking with this document, I'd

1  like to go to page 100.
2    And in the right column there's a blue
3  header it says "See puberty blocking hormones,"
4  and there's one paragraph below it.  And the final
5  sentence of that paragraph says "However, less
6  than 1 percent of respondents reported ever having
7  them."  And then there's an endnote 12.
8    Do you see that?
9    A.  Yes.
10   Q.  And then if we go to page 126, the left
11 column is endnote 12.  And I'd just like to read
12 the middle sentences here and ask if I read them
13 correctly.
14    It says "While puberty-blocking
15 medications are usually used to delay physical
16 changes associated with puberty and youth ages 9
17 to 16 prior to beginning hormone replacement
18 therapy, a large majority, 73 percent of
19 respondents who reported having taken puberty
20 blockers in Q.12.9, reported doing so after age 18
21 in Q.12.11.  This indicates that the question may
22 have misinterpreted by some respondents who
23 confused puberty blockers with the hormone therapy
24 given to adults and older adolescents."
25    Did I read that correctly?

1    A.  Yes.
2    Q.  Would you agree that 73 percent is a
3  large percentage of these respondents?
4    A.  Yes.  And again, these are the
5  respondents that we excluded from our study
6  because we didn't want to look at those who
7  potentially misinterpreted the question or had
8  accessed puberty blockers later as adults.
9    Q.  Do you agree with the second statement I
10 read that "Respondents may have misinterpreted
11 this question and confused puberty blockers with
12 the hormone therapy given to adults and older
13 adolescents"?
14    MS. NOWLIN-SOHL:  Object to form;
15 foundation.
16    THE WITNESS:  Potentially for those older
17 respondents who we excluded.  I think it's less
18 likely for younger people who would be more aware
19 of what pubertal suppression is.
20   Q.  (BY MR. RAMER)  If that many people
21 misunderstood the question, how can you assume the
22 other 27 percent correctly understood the
23 question?
24    MS. NOWLIN-SOHL:  Object to form.
25    THE WITNESS:  There is no way to be

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

1 certain, but I think for younger people who are
2 closer to when pubertal suppression was around and
3 available and in conversation, they would know the
4 difference between the two. But there's no way to
5 be sure.
6     Q.   (BY MR. RAMER) And so this error that's
7 described in footnote 12 does not give you pause
8 in relying on this data?
9     A.   Not extreme pause again, because these
10 people were all excluded from the study, all of
11 the adults who would have said they accessed it
12 late.
13     Q.   I'd like to go back to page 271, and in
14 the right column, question 12.8.
15         And this is the question you used to
16 define the group of people who have ever wanted
17 pubertal suppression, correct?
18     A.   Correct.
19     Q.   And did you adjust the results for this
20 question based on the same error that affected the
21 results for question 12.9?
22         MS. NOWLIN-SOHL:  Object to form.
23         THE WITNESS:  We similarly excluded all
24 older individuals who wouldn't have been able to
25 access them, which would have gotten rid of a lot

Page 134

1 of the older people who answered the question.
2     Q.   (BY MR. RAMER) In the relevant time
3 periods -- I'm sorry.
4         First let's go back to your article,
5 which is Turban Exhibit 9. And it's page 4 where
6 it says "Outcomes."
7         And the relevant time periods for the
8 metrics in this paragraph were the past month, the
9 past year, and lifetime, correct?
10     A.   Yes.
11     Q.   And with respect to the time periods for
12 the past month and the past year, those dates are
13 from the date the survey was taken, right?
14     A.   Correct.
15     Q.   And so with you excluding anybody 36
16 years old and older, your data would still include
17 a 35-year-old who said he had suicidal ideation in
18 the last month, right?
19     A.   Correct.
20     Q.   And this paper does not report the change
21 in these metrics based on the purported inability
22 to access pubertal suppression, correct?
23     A.   No. So as I explained in the
24 declaration, there are two types of studies
25 generally for this area, studies that look before

Page 135

1 and after and find all that's improved after the
2 treatment, then there's the study that compares
3 those who did receive treatment to those who
4 didn't at a single time point. And this is one of
5 those latter studies.
6         MR. RAMER:  I'm going to send now, see
7 when it reaches you, what I'll mark as Turban
8 Exhibit 11. And this will be --
9         (Deposition Exhibit No. 11 was marked.)
10     Q.   (BY MR. RAMER) This will be your article
11 in Plos One -- sorry, I guess clarification.
12         Do you say "Plos One"?
13     A.   I do.
14     Q.   Okay. This will be your article in Plos
15 One entitled "Access to Gender-Affirming Hormones
16 During Adolescence and Mental Health Outcomes
17 Among Transgender Adults."
18         And the method in this article is similar
19 to the article we just looked at, right?
20         MS. NOWLIN-SOHL:  John, we don't actually
21 have the exhibit quite yet. Can we actually just
22 hang on a second?
23         MR. RAMER:  I mean, does he not --
24     Q.   (BY MR. RAMER) Doctor, is the method you
25 used in accessing gender-affirming hormones with

Page 136

1 respect to the U.S. Transgender Survey similar to
2 what you did in the article we just looked at?
3     A.   The methodology of the Plos One paper is
4 similar to the Pediatrics paper.
5     Q.   And the major difference is this paper
6 that we're going to be looking at is focused on
7 cross-sex hormones, whereas the prior one was
8 focused on pubertal suppression; is that right?
9     A.   Generally, yes.
10         MR. RAMER:  And are we still waiting on
11 it, Li?
12         MS. NOWLIN-SOHL:  Yes.
13     Q.   (BY MR. RAMER) I guess I'll just ask you
14 a general question, Doctor, about what an odds
15 ratio is. And here's what I think it is, and
16 please tell me if I have this wrong.
17         Basically an odds ratio of one tells us
18 there is no relationship between an exposure and
19 an outcome. And an odds ratio of greater than one
20 tells us that the exposure is associated with
21 higher odds of that particular outcome. And an
22 odds ratio of less than one tells us that the
23 exposure is associated with lower odds of that
24 particular outcome.
25         Is that close to being right?

Page 137

35 (Pages 134 - 137)

| | |
|---|---|
| 1     A.  Yes, with the caveat that you would also | 1   JAMA Psychiatry about association between exposure |
| 2   want to look at the key value and the confidence | 2   to gender identity conversion efforts and mental |
| 3   intervals. | 3   health outcomes. |
| 4     MS. NOWLIN-SOHL:  We have the document | 4     Q.  And on page 69, which I think is page 2 |
| 5   now, John. | 5   of the article, in the second paragraph, second |
| 6     MR. RAMER:  Okay.  Great. | 6   sentence, you say, "Gender identity conversion |
| 7     Q.  (BY MR. RAMER)  And just to confirm, | 7   therapy refers to psychological interventions with |
| 8   Doctor, is this your Plos One article titled | 8   a predetermined goal to change a person's gender |
| 9   "Access to Gender-Affirming Hormones During | 9   identity to align with their sex assigned at |
| 10   Adolescence and Mental Health Outcomes Among | 10   birth." |
| 11   Transgender Adults"? | 11   Did I read that correctly? |
| 12     A.  It is.  I would just be careful because | 12     A.  Yes.  Citation 8, so it looks like that |
| 13   we published a correction on this paper later. | 13   definition is from Byne, et al., but it's also the |
| 14   The overall conclusions didn't change, but some of | 14   general definition from the American Academy of |
| 15   the numbers changed. | 15   Child and Adolescent Psychiatry. |
| 16     Q.  And did the numbers change -- well, let's | 16     Q.  And would a psychological intervention |
| 17   go to page 9, Table 2.  And if the numbers I'm | 17   with a predetermined goal of affirming a person's |
| 18   going to ask about did change, maybe we'll take | 18   gender identity constitute gender identity |
| 19   our longer break a little earlier. | 19   conversion therapy? |
| 20   But did the numbers change with respect | 20     A.  What do you mean by the predetermined |
| 21   to the age 16 or 17 group? | 21   goal of affirming their gender identity? |
| 22     A.  I don't think so, but I would want to | 22     Q.  I guess what do you mean by the |
| 23   look to be sure. | 23   predetermined goal to change a person's gender |
| 24     MR. RAMER:  Okay.  Well, we're almost | 24   identity in this passage? |
| 25   coming up on an hour, and then maybe I'll track | 25     A.  I guess make it different than it is, or |
| Page 138 | Page 140 |
| 1   down the corrected version of that. | 1   force it to change. |
| 2   And so do we want to break until -- | 2   Affirming would be accepting the identity |
| 3   what's good for you, Doctor and Li? | 3   they currently have. |
| 4     MS. NOWLIN-SOHL:  Yeah, I think we need | 4     Q.  What about a psychological intervention |
| 5   to go get lunch, so 45 minutes would probably be | 5   with a predetermined goal of consolidating a |
| 6   best.  We can come back right around 1:00 Pacific | 6   person's gender identity?  Would that constitute a |
| 7   time. | 7   gender identity conversion therapy? |
| 8     MR. RAMER:  Top of the hour? | 8     MS. NOWLIN-SOHL:  Object to form. |
| 9     MS. NOWLIN-SOHL:  Yeah. | 9     THE WITNESS:  I don't know what you mean |
| 10     MR. RAMER:  That sounds good to me. | 10   by "consolidate." |
| 11     THE VIDEOGRAPHER:  Okay.  So the time is | 11     Q.  (BY MR. RAMER)  Is any psychological |
| 12   12:17 p.m. Pacific time, and we are off the | 12   intervention with a predetermined goal ethical? |
| 13   record. | 13     MS. NOWLIN-SOHL:  Object to form. |
| 14   (Break taken from 12:17 p.m. to 1:05 p.m.) | 14     THE WITNESS:  Yes.  For instance, if the |
| 15     THE VIDEOGRAPHER:  All right.  So we are | 15   goal was to make someone's major depressive |
| 16   recording.  The time is 1:05 p.m. Pacific time, | 16   disorder go into remission, that would be |
| 17   and we are back on the record. | 17   appropriate. |
| 18   (Deposition Exhibit No. 12 was marked.) | 18     Q.  (BY MR. RAMER)  And are you familiar with |
| 19     Q.  (BY MR. RAMER)  Dr. Turban, I'd like to | 19   the term "exploratory therapy"? |
| 20   introduce Turban Exhibit 12.  If you'd let me know | 20     A.  Yes. |
| 21   when you have that in front of you. | 21     Q.  And what is your understanding of that |
| 22     A.  Is it the JAMA Psychiatry paper? | 22   term? |
| 23     Q.  That's correct.  And can you tell me what | 23     A.  My understanding of exploratory |
| 24   this document is? | 24   psychotherapy is working with a person in a |
| 25     A.  This is a research paper we published in | 25   nondirective way to explore their gender identity |
| Page 139 | Page 141 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

1  and help them understand it without having a
2  predetermined goal in mind.
3        So you wouldn't be doing therapy to try
4  and make them be cisgender; you wouldn't be doing
5  the therapy to try and make them transgender, but
6  rather helping them explore to understand
7  themselves.
8     Q.  And if you had a psychological
9  intervention with a predetermined goal of making
10  someone transgender, would that constitute
11  transgender identity conversion therapy?
12     A.  Essentially, yes.
13     Q.  And do you engage in exploratory therapy
14  with your patients?
15     A.  Yes.
16     Q.  And why do you engage in exploratory
17  therapy with your patients?
18     A.  I think of it as part of the
19  biopsychosocial evaluation to make sure the person
20  has a clear understanding of their identity and
21  the many ways in which they can exist in this
22  world and understanding themselves.
23     Q.  Can exploratory therapy reduce stress
24  related to an individual's gender incongruence?
25        MS. NOWLIN-SOHL:  Object to form.

Page 142

1  trans?
2        MS. NOWLIN-SOHL:  Object to form; calls
3  for speculation.
4        THE WITNESS:  No.  I think that would be
5  a stretch.
6     Q.  (BY MR. RAMER)  Why?
7     A.  I routinely talk to my patients about the
8  risks and benefits of treatments.  They never
9  think that I'm trying to force them to stop being
10  trans.
11        They understand that I am informing them
12  about important risks and benefits to consider
13  about medical treatments they're considering.
14     Q.  If a provider tells a patient that the
15  patient may not access gender-affirming medical
16  interventions until the patient completes a
17  biopsychosocial assessment, do you think it's
18  possible the patient will view that limitation as
19  the provider trying to stop the patient from being
20  trans?
21        MS. NOWLIN-SOHL:  Object to form; calls
22  for speculation.
23        THE WITNESS:  I do not.
24     Q.  (BY MR. RAMER)  And why not?
25        MS. NOWLIN-SOHL:  Same objections.

Page 144

1        THE WITNESS:  I'm not familiar with any
2  evidence that that is the case.
3     Q.  (BY MR. RAMER)  You're not familiar with
4  any evidence that exploratory therapy can reduce
5  stress related to an individual's gender
6  incongruence?
7     A.  Correct.
8     Q.  Are you aware of any evidence that
9  exploratory therapy -- I'll move on.
10        The data for this article also came from
11  the 2015 U.S. Transgender Survey, correct?
12     A.  Yes.
13     Q.  And then if we could go back to
14  Exhibit 10, which is the report of the survey, and
15  I'd like to go to page 273.  And specifically
16  question 13.2 in the left column.
17        And is this the question you used to
18  represent conversion therapy?
19     A.  We use the term "gender identity
20  conversion efforts," but yes.
21     Q.  And if a provider informs a patient about
22  the risks associated with gender-affirming medical
23  interventions, do you think it's possible the
24  patient would construe that information as the
25  provider trying to stop the patient from being

Page 143

1        THE WITNESS:  That's my routine practice,
2  and I've never had a patient think that I was
3  trying to force them to be cisgender when
4  describing to them the treatment guidelines that I
5  would follow.
6     Q.  (BY MR. RAMER)  Do you think your
7  patient -- if one of your patients thought that
8  you were trying to stop them from being trans, do
9  you think that they would tell you?
10        MS. NOWLIN-SOHL:  Object to form; calls
11  for speculation.
12        THE WITNESS:  My patients don't usually
13  hold back if they're unhappy with me about
14  something.  I think they would usually tell me.
15     Q.  (BY MR. RAMER)  Do you think that belief
16  holds true for the majority of adolescents
17  expressing gender dysphoria?
18        MS. NOWLIN-SOHL:  Object to form;
19  foundation, speculation.
20        THE WITNESS:  Could you repeat the
21  question?
22     Q.  (BY MR. RAMER)  I thought you said you
23  don't believe that if your patients thought you
24  were trying to stop them from being trans that
25  they would tell you.

Page 145

37 (Pages 142 - 145)

1    I'm sorry.  You said that -- in effect,
2  you said they would tell you; is that fair?
3    A.  I believe they would tell me or their
4  parents would tell me.  If they were really angry
5  and thought I was trying to force them to be
6  cisgender, they would probably not want to keep
7  seeing me, in which case the parents would
8  probably tell me if they didn't want to keep
9  seeing me, and I would ask why.
10    I think generally that would come to my
11  attention in some way.
12    MR. RAMER:  And, Li, do you have Turban
13  Exhibit 13?
14    MS. NOWLIN-SOHL:  Not yet.
15    MR. RAMER:  Okay.  Well, we'll stick with
16  this document and go to -- I think it's page 75.
17    MS. NOWLIN-SOHL:  And this is still the
18  U.S. Trans Survey?
19    MR. RAMER:  No, I'm sorry.  Return to
20  Turban Exhibit 12, the -- Dr. Turban's paper.  I
21  apologize.  You can go to page 75 in that
22  document.
23    MS. NOWLIN-SOHL:  Okay.  We are there.
24    Q.  (BY MR. RAMER)  Okay.  And in the left
25  column below "Strengths and Limitations," the
                                            Page 146

1  or internalized transphobia, which would have been
2  basically due to experiencing transphobia that
3  they start to internalize in terms of self-hatred,
4  that people who are exposed to these ideas that
5  they should be forced to be cisgender because
6  maybe trans is bad might be more likely to seek
7  out these conversion efforts than other types of
8  therapy that don't try and force them to be
9  cisgender.
10    But that would imply that a societal
11  rejection is leading to that internalized
12  transphobia and other bad mental health outcomes.
13    MR. RAMER:  And, Li, do you have Turban
14  Exhibit 13?
15    MS. NOWLIN-SOHL:  We do.
16    MR. RAMER:  Okay.  Let's bring that up.
17    (Deposition Exhibit No. 13 was marked.)
18    Q.  (BY MR. RAMER)  And, Dr. Turban, I'll
19  represent that this is an NBC news article
20  entitled "Transgender Conversion Therapy
21  Associated with Severe Psychological Distress."
22    And have you seen this article before?
23    A.  Yes.
24    Q.  And toward the top, do you see the date
25  and time -- or actually just the date.
                                            Page 148

1  third sentence says "It is possible that those
2  with worse mental health or internalized
3  transphobia may have been more likely to seek out
4  conversion therapy rather than non-GICE therapy,
5  suggesting that conversion efforts themselves are
6  not causative of these poor mental health
7  outcomes.
8    Did I read that correctly?
9    A.  It's part of a -- I think the next
10  sentence would be important to read.
11    Q.  Okay.  But that sentence I read, I read
12  that correctly, for the record?
13    A.  You read the words correctly without the
14  context, yes.
15    Q.  Okay.  And do you say -- do you say
16  "GICE"?  Do you pronounce that or do you say
17  "GICE"?
18    A.  I usually just say gender identity
19  conversion efforts.
20    Q.  Okay.  And here's an opportunity to add
21  context.
22    Can you just explain what you're saying
23  in that sentence?
24    A.  Yes.  The first sentence you read said
25  it's possible that those with worse mental health
                                            Page 147

1    Do you see the date that this article was
2  published?
3    A.  Yes.
4    Q.  And do you recall what day you published
5  the article we were just looking at in Turban
6  Exhibit 12?
7    A.  I do not.
8    Q.  If we go back to Turban Exhibit 12 and go
9  to the first page, which is page 68, and then
10  towards the bottom, do you see where it says
11  "Published online September 11, 2019"?
12    A.  Yes.
13    Q.  And so the news article in Turban
14  Exhibit 13 was published the same day that you
15  published this article in Turban Exhibit 12
16  online; is that correct?
17    A.  That seems to be the case.  That's
18  generally how news outlets cover new research
19  articles is they get them ahead of time while
20  they're under embargoes so they have time to read
21  them and conduct interviews so that they can
22  publish them around the same time that the paper
23  comes out.
24    Q.  How do the news organizations become
25  aware of the article when it's embargoed?
                                            Page 149

1    A. I'm not sure if they sign up for it or --
2 but essentially most of the major high-impact
3 medical journals send out press releases about
4 articles that are coming out in their future
5 editions that aren't yet to journalists so
6 that the journalists have a chance to request an
7 embargoed version of the article with the
8 agreement that they don't talk about it publicly
9 until the article is officially posted online.
10    Q. And then in this NBC article, which is
11 Turban Exhibit 13, I'd like to go to page 2 of the
12 PDF. And about halfway down before this blank
13 space, there's a quote attributed to you.
14       And it says "We hope our findings
15 contribute to ongoing legislative efforts to ban
16 gender identity conversion efforts."
17       Do you see that?
18    A. Yes.
19    Q. And do you think that's an accurate
20 quote?
21    A. Yes.
22    Q. And before you conducted this study, did
23 you want to ban gender identity conversion
24 efforts?
25    A. They were labeled dangerous and unethical

Page 150

1 by all major medical organizations, including the
2 American Psychiatric Association and the American
3 Academy of Child and Adolescent Psychiatry. And
4 there was broad consensus prior to this research
5 that they were dangerous and ineffective.
6       And anytime there's broad consensus that
7 the practice is harmful towards children in
8 particular, I would be in favor of children not
9 being exposed to that practice.
10    Q. And so yes, you did want to ban gender
11 identity conversion efforts before you conducted
12 this study, correct?
13    A. I am personally not in a position to ban
14 practices, but I was in agreement with the
15 position statements of the American Psychiatric
16 Association and the American Academy of Child and
17 Adolescent Psychiatry.
18    MR. RAMER: Let's turn to -- I'd like to
19 introduce Turban Exhibit 14. Do you have that?
20    MS. NOWLIN-SOHL: We do.
21    MR. RAMER: Okay.
22    (Deposition Exhibit No. 14 was marked.)
23    Q. (BY MR. RAMER) And, Dr. Turban, do you
24 recognize this document? And if so, what is it?
25    A. Yes. This is a research article we

Page 151

1 published in the Journal of Adolescent Health in
2 2023.
3    Q. And just as a general matter for me to
4 understand the method in this article, basically
5 you're identifying two relevant time periods.
6       And the first is when -- the first time
7 period is when participants realize their
8 transgender identity, correct?
9    A. Correct.
10    Q. Sorry?
11    A. Correct.
12    Q. And the second time point is when
13 participants share that identity with others,
14 correct?
15    A. Correct.
16    Q. And so you measure the period between
17 those two points. And as a general matter, if the
18 time period between those two points is longer,
19 that tends to undermine the ROGD hypothesis,
20 right?
21    MS. NOWLIN-SOHL: Object to form.
22    THE WITNESS: I wouldn't say the ROGD
23 hypothesis was a major part of this study. It's
24 been -- I don't think there are many people who
25 take that hypothesis seriously, and the American

Page 152

1 Psychological Association has emphasized that it's
2 not a valid diagnosis and shouldn't be used in
3 assessment or clinical context.
4       So I think that's an interesting, like,
5 extra thing to think about with this paper, but I
6 think what was most interesting about this paper
7 was that a substantial proportion of trans adults
8 don't come to realize their gender identity until
9 later, after age 10, and that for those who
10 realize in childhood before age 10 that there is a
11 very long period of time before they tell someone
12 else, 14 years.
13       The reason that's interesting for that
14 survey from 2018 about rapid onset gender
15 dysphoria is the way they determined in that study
16 that the person's gender identity or gender
17 dysphoria was rapid in onset was based on when
18 parents came to know that the child had gender
19 dysphoria or a trans identity.
20       And this is just highlighting that there
21 are many years. The median was 14 years between
22 somebody knowing their gender identity and telling
23 it to another person when they realized as
24 children, highlighting that using parent report
25 alone the way that survey did is not reliable.

Page 153

1    Q.   Yeah.  And so the reason that the
2  findings here tend to undermine the ROGD
3  hypothesis is because of how long that -- in part
4  because of how long that time period was between
5  the point that the individual identified as
6  transgender and the point that the individual
7  disclosed that information, correct?
8    A.   Yes.  It undermines the notion, one of
9  many notions in the hypothesis that when a parent
10 comes to understand that their child is trans that
11 that coincides with when the child themselves came
12 to understand that.
13   Q.   Right.  Okay.  And so yeah, the longer
14 the time period, the more it tends to undermine
15 the hypothesis.
16        And that's why the 14 years is relevant,
17 right?
18        MS. NOWLIN-SOHL:  Object to form.
19        THE WITNESS:  I don't know that I really
20 agree with that characterization that, you know,
21 if it were 16 versus 14, that would be a matter,
22 or if it would be 14 versus 30.  Just the fact
23 that there is a substantial period of time I think
24 is what undermines it.
25   Q.   (BY MR. RAMER)  And for this study, the
Page 154

1  gender identity after the onset of puberty that
2  they are less likely to continue to have that
3  identity in adulthood.
4        So it's interesting to see that among
5  trans adults.  It's actually not an uncommon
6  experience.
7    Q.   (BY MR. RAMER)  Right.  And the reason
8  it's interesting is it undercuts the idea that,
9  you know, late realization is some sort of new
10 experience, correct?
11        MS. NOWLIN-SOHL:  Object to form.
12        THE WITNESS:  I suppose, or that the
13 later realization, you know, is synonymous --
14 [indiscernible].
15        THE REPORTER:  Dr. Turban, I'm sorry to
16 interrupt.  I couldn't understand you.
17        THE WITNESS:  Oh, sorry.  How far back do
18 you want me to go?
19        THE REPORTER:  Just repeat your answer,
20 if you wouldn't mind.
21        THE WITNESS:  So just saying the thing
22 that's interesting to me is that there was this
23 notion, less so in the field, but sometimes out
24 among the general public, that if one comes to
25 understand their trans identity after puberty,
Page 156

1  data you used again comes from the U.S.
2  Transgender Survey; is that right?
3    A.   Yes.
4    Q.   And so on page 1 here under "Results,"
5  the first sentence says "Of 27,497 participants,
6  40.8 percent reported 'later realization' of TGD
7  identities."
8        Did I read that correctly?
9    A.   Yes.
10   Q.   And so you're saying there that -- I
11 mean, the upshot of this is that later realization
12 was common among the adult survey participants --
13        MS. NOWLIN-SOHL:  Objection.
14        MR. RAMER:  I'm sorry.
15        MS. NOWLIN-SOHL:  I'm sorry, go ahead.
16 Continue.
17   Q.   (BY MR. RAMER)  Okay.  Well, I guess why
18 is that relevant with respect to the ROGD
19 hypothesis?
20        MS. NOWLIN-SOHL:  Object to form.
21        THE WITNESS:  It's not necessarily.  I
22 think it's more relevant that there's the
23 misconcept, I think, less within the field, but
24 more kind of in, like, media and public policy
25 debates that if one comes to understand their
Page 155

1  that it will not persist into adulthood.
2        But here we saw that among adults, it was
3  actually a fairly common experience for them to
4  first come to understand their gender identity
5  after age 10, which is a rough cutoff for puberty.
6    Q.   (BY MR. RAMER)  Well, I guess if the 40.8
7  percent is relevant in the context of persistence
8  or desistance, wouldn't you need to know the
9  individuals who had later realization but then
10 did, in fact, come to identify as cisgender?
11   A.   Yeah, I think you're pointing out there
12 are different studies that could be done.  You
13 could follow people longitudinally and then you
14 could find a desistance rate, if that's the term
15 you wanted to use.
16        This study wasn't that since we didn't
17 follow people longitudinally.  We didn't have that
18 data available.
19        So this was just showing that among trans
20 adults, this isn't an uncommon experience.  But it
21 doesn't tell you how many people would continue to
22 identify that way longitudinally.
23   Q.   And then still on the same page in the
24 same results paragraph, the second and third
25 sentences, you say, "Within the 'childhood
Page 157

1  realization' group, the median age of sharing
2  one's gender identity with another person was 20.
3  In this group, the median time between realization
4  of one's gender identity and sharing this with
5  another person was 14 years."
6  And did I read that correctly?
7  A.  Yes.
8  Q.  Did you also record the median age of
9  participants sharing their gender identity for the
10  later realization group?
11  A.  We did.  We didn't have room in this
12  paper because it wasn't the focus.  But we
13  recently published a response to the letter to the
14  editor where we provided that additional data.  I
15  would have to pull it up to get the numbers.
16  Q.  What letter to the editor are you
17  referring to?
18  A.  I forget the author of the letter, but
19  someone wrote in to the journal asking for more
20  information and analyses, and so we provided them.
21  Q.  And so the -- and this is just a
22  clarification, not a trick question.
23  So in the last sentence here, you're
24  talking about the median time.  That is only
25  referring to the childhood realization group; is

Page 158

1  that right?
2  A.  Correct.  The letter author asks for what
3  you're asking, and so we had it published in the
4  letter response, but I don't have it in front of
5  me.
6  Q.  Okay.  And do you think it's fair to say
7  that -- granting that you disagree with any sort
8  of ROGD hypothesis, do you think it's fair to say
9  that people who think the ROGD hypothesis may be
10  worth investigating, that the hypothesis is
11  focused on adolescents and not children?
12  A.  I think you're missing the point of it in
13  that the reason this childhood question is
14  relevant is that the rapid onset gender dysphoria
15  study survey used the time that parents heard
16  about their child's gender identity as when the
17  children came to recognize their gender identity.
18  What this paper is showing is that those
19  people where the parents first found out in
20  adolescence may have known 12 years earlier,
21  right?  Because there's a mean 12 years between
22  realizing and telling another person.
23  So for what was, from the parents'
24  perspective, the onset of time was actually much,
25  much later potentially than when the young person

Page 159

1  came to know.
2  So I think one author called it rapid
3  onset parental notification, like the parents
4  found out all of a sudden in adolescence, but that
5  it's actually pretty typical for children to
6  withhold this information from their parents for
7  many years, in my clinical experience, due to fear
8  that their parents won't accept them.
9  Q.  And I'd like to go back to Turban
10  Exhibit 10, which is the U.S. -- the report of the
11  U.S. Transgender Survey.  And go to page 259.  And
12  left column, Section 3 --
13  A.  Yes, we have it.
14  Q.  So question 3.1 says "At about what age
15  did you begin to feel that your gender was
16  'different' from your assigned birth sex?"
17  Did I read that correctly?
18  A.  Yes.
19  Q.  And this is the question you used to
20  collect data for determining when the participants
21  first realized their transgender identity,
22  correct?
23  MS. NOWLIN-SOHL:  Object to form.
24  THE WITNESS:  Let me double-check.
25  Sorry.  I'm looking at the underlying question

Page 160

1  because I just want to make sure I'm telling you
2  correct.
3  Q.  (BY MR. RAMER)  I guess it's page -- in
4  your article, page 54, left column under "Age of
5  sharing" -- oh, no, that's the other one.  Sorry.
6  Yeah, so page 853, right column, very
7  bottom.  "Age of TGD identity realization."
8  And you say, "As outlined above,
9  participants were asked the age at which they felt
10  that their gender was different from societal
11  expectations based on their sex assigned at birth
12  and were provided with a drop-down list of integer
13  ages from 1 to 99 years."
14  A.  Yes, question 3.1.
15  Q.  And so returning to -- sorry, if you
16  can -- and so returning to Exhibit 10 in the same
17  page we were on, 259, and same left column,
18  Section 3, I'm going to read question 3.2 and ask
19  if I read it correctly.
20  It says, "At about what age did you start
21  to think you were trans (even if you did not know
22  the word for it)?"
23  Did I read that correctly?
24  A.  Yes.
25  Q.  So why did you use question 3.1 instead

Page 161

41 (Pages 158 - 161)

1  of 3.2?
2      A.  We thought that 3.1 was a bit broader,
3  even though they're quite similar.
4      Q.  Why would you use the broader question,
5  then?
6      A.  Because it captures -- they're really
7  similar questions.  We did not design the survey.
8  We were doing secondary data analyses of the
9  surveys, so we were in a position to try and pick
10 which question we thought was best.
11     The second one says "When did you think
12 you were trans (even if you didn't have the word
13 for it)," and then 3.1 basically asks without the
14 word, the feeling of it.
15     So we felt that 3.1 was just a cleaner
16 question even though they asked quite similar
17 things.  We felt like 3.2 was a little bit more
18 about, like, ascribing language to it, like the
19 word "trans" or maybe someone had a word like
20 "trans" whereas we thought 3.1 captured more like
21 the gender identity experience rather than the
22 language they were ascribing to it.  But they're
23 very similar.
24     Q.  Do you know how the data would have
25 changed if you had used question 3.2 instead of
Page 162

1  3.1?
2      A.  No.  We tried not to run a ton of
3  analyses in that way that we think are going to be
4  similar.  Because when you do that, you're more
5  likely to find a statistical finding due to chance
6  called P-hacking that's commonly criticized in
7  statistical research.  Usually the cleaner, fewer
8  comparisons you make, the better.
9      So we did not repeat the analysis with
10 3.2.  One could do that.
11     Q.  Would you agree that a component of the
12 ROGD hypothesis, as those individuals who suggest
13 it might be legitimate would view it, concerns the
14 effect of social media on adolescents?
15     MS. NOWLIN-SOHL:  Object to form.
16     THE WITNESS:  I don't have any colleagues
17 who are experts in the field who do believe in
18 that hypothesis.
19     Again, the American Psychological
20 Association has argued against using it
21 clinically, the correction on the paper
22 highlighted that it's not a formal valid mental
23 health diagnosis.
24     All I can go off of is that one paper
25 where that single author was describing her
Page 163

1  thoughts about it.  And my reading of that paper
2  is that I think that she did think that it had
3  something to do with social media influence.  But
4  I think you would have to ask her.
5      Q.  (BY MR. RAMER)  Would you agree that as a
6  general matter you would probably have to be born
7  in the 1990s to have grown up with social media as
8  an adolescent?
9      A.  I don't know enough about the history of
10 social media to give you an answer.
11     Q.  Do you think there's a chance that social
12 media existed in its current form before 1990?
13     MS. NOWLIN-SOHL:  Object to form.
14     THE WITNESS:  You're making me think back
15 to when I first got social media.  To be honest, I
16 don't know.  Was MySpace first?  I honestly don't
17 know when social media began.  I don't know that
18 this is within my area of expertise.
19     Q.  (BY MR. RAMER)  And what year was the
20 data collected for the U.S. Transgender Survey?
21     A.  2015.
22     Q.  And an individual had to be 18 years old
23 to take the survey, correct?
24     A.  Correct.
25     Q.  All right.  Sticking with your article,
Page 164

1  I'd like to go to page 855, Table 1.
2      MS. NOWLIN-SOHL:  Sorry, we might have
3  gotten a little bit lost.
4      Which exhibit are we in right now?
5      MR. RAMER:  Turban Exhibit 14, the "Age
6  of Realization" -- sorry, it's hard in the virtual
7  setting to keep track of what's pulled up.  So
8  Turban Exhibit 14, the "Age of Realization" paper.
9      MS. NOWLIN-SOHL:  Okay.
10     MR. RAMER:  And page 855, which has
11 Table 1.
12     MS. NOWLIN-SOHL:  Okay.  We are there.
13     Q.  (BY MR. RAMER)  Okay.  And for this
14 article, you included all age groups in the data,
15 correct?
16     A.  Sorry.  What do you mean by "all age
17 groups"?
18     Q.  Did you exclude anybody from the data
19 based on their age?
20     A.  Based on their age at the time of the
21 survey?
22     Q.  Yes.
23     A.  No.
24     Q.  And so it looks like there's about
25 roughly 800 people in the dataset who are 65 and
Page 165

42 (Pages 162 - 165)

1 older, correct?
2   A.  Yeah.  Looks like that would account for
3 about 5 or 6 percent of the total study.
4   Q.  And then for 45 to 64, about --
5   A.  Maybe 27 percent of the study.
6   Q.  And I appreciate I'm having you do math
7 on the fly, so I'm not looking for it precise.
8      But and then from 25 to 44 it looks like
9 it's -- I'll put myself up -- well, I guess I
10 don't know.  What percentage of the study?
11   A.  Were in the 25 to 44 group?
12   Q.  Yeah.
13   A.  About 77 percent.
14   Q.  Well, maybe this is why we shouldn't do
15 math on the fly.  Because you're just adding those
16 parentheses, but I don't think that would --
17   A.  Oh, wait.  Sorry, yeah.
18   Q.  Well, let's just step back.  This is not
19 the point of the question.
20   A.  To get to your whole point, the most were
21 very young, so mostly the 18 to 24 group.
22   Q.  Okay.  Yeah.  Would you agree that it's
23 highly unlikely if not impossible that individuals
24 in the 45 to 64 age group used social media as
25 adolescents?
Page 166

1   A.  Probably, but they're a small portion of
2 the study.
3   Q.  Would you agree it's highly unlikely, if
4 not impossible, that the majority of the 25 to 44
5 age group used social media as adolescents?
6   A.  We'd have to know the distribution of how
7 many were closer to 25, how many were closer to
8 44.
9   Q.  But it didn't occur to you to make an
10 adjustment for that based on -- sorry.
11   A.  I mean, this paper was not --
12      MS. NOWLIN-SOHL:  Object to form;
13 argumentative.
14      MR. RAMER:  I'll re-ask it.  Let me
15 re-ask it, and then we'll try again.
16   Q.  (BY MR. RAMER)  It didn't occur to you to
17 make an adjustment for that given the fact that
18 the first sentence of the purpose in your paper is
19 discussing rapid onset gender dysphoria?
20      MS. NOWLIN-SOHL:  Object to form;
21 argumentative.
22      THE WITNESS:  Though it's the first
23 sentence, I wouldn't say this paper was really
24 primarily focused on the rapid onset gender
25 dysphoria hypothesis.  That, again, is not a valid
Page 167

1 mental health diagnosis.  It doesn't have support,
2 and the American Psychological Association
3 recommended against using it.  So we weren't
4 designing the study around that hypothesis in a
5 single paper.
6   Q.  (BY MR. RAMER)  Sorry.  I didn't mean to
7 cut you off.
8      And so for this -- sticking with this
9 article and page 855, Table 1, you have two
10 columns here with one for childhood realization
11 and one for late realization, correct?
12   A.  Correct.
13   Q.  And starting with the 65-plus group, is
14 it fair to say the vast majority fall into the
15 childhood realization category?
16      MS. NOWLIN-SOHL:  Object to form.
17      THE WITNESS:  I'd have to -- I'd have to
18 add the numbers and then divide it -- I don't want
19 to do the math.
20   Q.  (BY MR. RAMER)  Fair.  I'll ask it this
21 way.
22      You would agree that 573 is larger than
23 215?
24   A.  That, I can do in my head, yes.
25   Q.  And for the 45 to 64 group, you would
Page 168

1 agree that 3,224 is significantly larger than 825,
2 correct?
3      MS. NOWLIN-SOHL:  Object to form.
4      THE WITNESS:  Yes.
5   Q.  (BY MR. RAMER)  And for the 25 to 44
6 group, you would agree that 7,043 is much larger
7 than 3,856, correct?
8      MS. NOWLIN-SOHL:  Object to form.
9      THE WITNESS:  Yes.
10   Q.  (BY MR. RAMER)  But then when you get to
11 the 18 to 24 group, do you see that it looks like
12 the numbers flip for the first time?
13      MS. NOWLIN-SOHL:  Object to form.
14      THE WITNESS:  Yeah, I would caution
15 against making any of the comparisons you're
16 making because the statistics weren't applied in
17 that way, and so we don't know the degree to which
18 those would be meaningfully different.
19   Q.  (BY MR. RAMER)  I guess why didn't you
20 apply the statistics in that way?
21      MS. NOWLIN-SOHL:  Object to form.
22      THE WITNESS:  Our statistician elected to
23 do these large kind of square analyses so that we,
24 as I referenced earlier, wouldn't be running a ton
25 of analyses that leads you to the potential of
Page 169

43 (Pages 166 - 169)

1  that P-hacking concern.  Otherwise you would be
2  doing a statistical test on every single row in
3  this table, which you can see would progressively
4  become a large number of comparisons.
5      Q.  (BY MR. RAMER)  Did that data that we
6  were just discussing, the fact that is -- in the
7  18 to 24 group for the first time, based on these
8  raw numbers, that a majority of the group fell
9  into the later realization group, did that
10 interest you?
11      MS. NOWLIN-SOHL:  Object to form.
12      THE WITNESS:  It wasn't the focus of the
13 paper, and I wouldn't recommend drawing
14 conclusions based on raw numbers.
15      Q.  (BY MR. RAMER)  Yeah, I'm not drawing
16 conclusions or trying to say what the focus of the
17 paper was.  I'm just -- I mean, as a non-expert
18 looking at that table, like, that struck me.  I
19 found that striking.
20      And I'm curious if you found that
21 interesting and whether you're going to research
22 it more or, you know, you've seen enough.
23      MS. NOWLIN-SOHL:  Object to form.
24      THE WITNESS:  You could go back and run
25 the individual T tests on those lines.

Page 170

1      Q.  (BY MR. RAMER)  Well, I could not because
2  I do not have the expertise you have.
3      A.  I also would need to harass my
4  statistician to do it and give her time, but it's
5  a publicly available data set also, so anyone
6  would be able to request the numbers and run those
7  analyses.
8      Q.  And stepping back from the table now, do
9  you think it's possible for a parent to observe
10 that their child is transgender before the child
11 expressly states it?
12      A.  There can maybe be suggestions, but it's
13 hard to know somebody's internal experience
14 without them telling you.
15      For instance, I'd caution against making
16 assumptions that, you know -- I think we referred
17 to assigned male wanted to play with dolls or wear
18 dresses, that doesn't mean that the young person
19 is transgender.  They could be cisgender and like
20 dolls and dresses.
21      So it's drawing the conclusions based on
22 observations without the person telling you their
23 experience is limited.
24      Q.  Well, that example you just gave, how
25 would that person have answered 3.1?

Page 171

1      MS. NOWLIN-SOHL:  Object to form; calls
2  for speculation.
3      THE WITNESS:  I don't think they would
4  actually be in -- let me look.
5      Because the USTS isn't a sample of trans
6  people, if there were a cisgender person who was
7  just generally nonconforming, they wouldn't be in
8  this study.
9      Q.  (BY MR. RAMER)  Isn't gender expression a
10 major part of living out your gender identity?
11      A.  It could be a major part, but there are
12 people who have gender expressions that you might
13 think of as feminine who would have cisgender
14 identities.
15      If you've ever seen a cisgender man wear
16 nail polish, you might think of that as a feminine
17 gender expression, but it doesn't mean that person
18 is transgender.
19      Q.  I guess what I'm trying to understand is
20 for the second time point in this study, you
21 focused on when the individual's transgender
22 identity was, like, expressly disclosed to
23 somebody else, whereas it seems like much more
24 common that an individual is going to be living
25 out their transgender identity with their gender

Page 172

1  expression and people are going to understand, or
2  like, for lack of a better term, have a hunch of
3  their gender identity --
4      A.  Absolutely.
5      MS. NOWLIN-SOHL:  Hold on.  Let him
6  finish.
7      Q.  (BY MR. RAMER)  Well, no, go ahead.  I
8  was meandering.  Please.
9      MS. NOWLIN-SOHL:  Object to form.  Was
10 there a question?
11      MR. RAMER:  Well, he was going to give an
12 answer.  So please.
13      THE WITNESS:  I lost track -- I lost
14 track of the question, honestly.  What was the
15 question?
16      Q.  (BY MR. RAMER)  I guess it's just isn't
17 the premise of your paper that parents would not
18 know that their child has a transgender identity
19 until the child expressly discloses it to them?
20      MS. NOWLIN-SOHL:  Object to form.
21      THE WITNESS:  I think that's very common,
22 that young trans people live in a world where they
23 know that trans identities are stigmatized, and
24 trans people are commonly bullied and harassed.
25      Often these kids when they're young have

Page 173

44 (Pages 170 - 173)

Jack Turban , M.D., MHS October 16, 2023

1 expressed some small amount of gender diverse
2 expression. So, say, the young kid who played
3 with dolls or played with dresses, and they're
4 usually yelled at or socially sanctioned -- I
5 think the message very early on is that's not
6 acceptable. So it's actually very common that
7 they go to great lengths to hide that for a long
8 time.
9     So no, it's usually not apparent to other
10 people because the kids are trying to hide it
11 because they're afraid of the consequences if
12 people were to know.
13    Q.  (BY MR. RAMER) Right. And that was my
14 question.
15     Isn't the premise of your paper that
16 parents wouldn't know the child has a transgender
17 identity until the child expressly disclosed it to
18 them?
19    MS. NOWLIN-SOHL:  Object to form.
20    THE WITNESS:  I wouldn't say it's the
21 premise of the paper. I would say it's a finding
22 of the paper that the young people didn't feel
23 comfortable sharing it with another person for 12
24 years. Why would they not feel comfortable?
25    Q.  (BY MR. RAMER) But the reason the paper

Page 174

1 is relevant to the ROGD hypothesis is the parents
2 didn't know until a later time, correct?
3    MS. NOWLIN-SOHL:  Object to form.
4    THE WITNESS:  Again, I think you're
5 over-indexing on how important that one survey
6 paper is about ROGD. And again, this paper isn't
7 a direct response to that 2018 single survey, but
8 if you want to tie it to that question of rapid
9 onset, then yes, the point of this paper is that
10 often young people don't tell another person for
11 many years. And so at the time point when parents
12 are being told, that does not necessarily coincide
13 with when the young person first realized.
14    Q.  (BY MR. RAMER) Sorry to keep going back
15 to this, but the point is that the parents would
16 not know until they are told, correct?
17    MS. NOWLIN-SOHL:  Object to form; asked
18 and answered.
19    THE WITNESS:  I think I answered the
20 question.
21    Q.  (BY MR. RAMER) And what was the answer?
22    MS. NOWLIN-SOHL:  Same objection. Asked
23 and answered.
24    THE WITNESS:  That the study found that
25 there were median 12 years before the young people

Page 175

1 told another person. So the parents would have
2 found out 12 years after the young person knew.
3     And as I said earlier, you can't presume
4 someone's gender identity by observing their
5 gender expression, as many cisgender people may
6 like things that you may not consider gender
7 typical. Like a cisgender man who likes musicals,
8 I wouldn't recommend assuming that person is
9 transgender.
10    Q.  (BY MR. RAMER) Switching gears a little
11 bit, how do you stay up-to-date on the literature
12 in your field?
13    A.  A lot of ways. We have conferences. I
14 use Google Scholar notifications so when new
15 peer-reviewed papers are published they come to my
16 inbox. Conversation with colleagues.
17    Q.  Are there any particular authors you
18 trust in the field?
19    MS. NOWLIN-SOHL:  Object to form.
20    THE WITNESS:  I'm not really sure what
21 you mean by, like, "trust" or "distrust."
22    Q.  (BY MR. RAMER) Sure. Do you think that
23 Annelou de Vries is a leading expert in the field?
24    A.  Yes.
25    Q.  Do you think Diane Chen is a leading

Page 176

1 expert in the field?
2    A.  Yes.
3    MR. RAMER:  And, Li, if you have it, I'd
4 like to introduce Turban Exhibit 15.
5    MS. NOWLIN-SOHL:  We are still waiting on
6 that.
7    MR. RAMER:  Please just let me know when
8 it arrives.
9    MS. NOWLIN-SOHL:  Still waiting. Is
10 it -- no, just got it.
11    (Deposition Exhibit No. 15 was marked.)
12    Q.  (BY MR. RAMER) Okay. Dr. Turban, have
13 you seen this editorial before?
14    A.  Yes.
15    Q.  And when was the last time you read it?
16    A.  Probably when it first came out.
17    Q.  And this editorial is coauthored by
18 Annelou de Vries, correct?
19    A.  Yes.
20    Q.  And if you turn to page 277, which I
21 think is the third page in the PDF, and you look
22 at footnote 1 --
23    A.  Sorry. What page again?
24    Q.  277 in the pagination, but I think the
25 last page of the PDF. Or it's an endnote. Sorry,

Page 177

45 (Pages 174 - 177)

1  endnote 1.
2      A.  The first citation?
3      Q.  Yes.
4      A.  Yes.
5      Q.  And that is the Chen article that you
6  cite in your declaration, correct?
7      A.  Yes.  I think the exhibit you sent is an
8  editorial on that paper that came out at the time
9  the paper was published.
10     Q.  And so I'd like to go back to -- back one
11  page to page 276, and left column and second full
12  paragraph.  And I'll just read the first two
13  sentences and ask if I read them correctly.
14         It says "Yet the study leaves some
15  concerns unanswered.  Although overall
16  psychological functioning in the study
17  participants improved, there was substantial
18  variation among participants.  A considerable
19  number still had depression, anxiety, or both at
20  24 months, and two died by suicide."
21         Did I read that correctly?
22     A.  Yes.
23     Q.  And were you aware of these facts before
24  you cited the Chen article?
25     A.  Yes.

Page 178

1      Q.  And so same paragraph, two sentences
2  later, it says "However, other possible
3  determinates of outcomes were not reported,
4  particularly the extent of mental health care
5  provided throughout GAH treatment."
6         Did I read that correctly?
7      A.  You skipped a sentence in between, but
8  yes.
9      Q.  Yeah.  And what is your understanding of
10  what de Vries is saying in that sentence I just
11  read?
12     A.  So the sentence that you skipped, which I
13  explained in my declaration, is that they looked
14  at the correlation between appearance congruence
15  in mental health outcomes and found that degree of
16  physical congruence predicted the improvement in
17  mental health, which is suggesting that it was
18  actually the physical effects of the intervention
19  resulting in the mental health outcomes rather
20  than something like psychotherapy.
21         Then going to the sentence that you read,
22  they're highlighting that, so that that provides
23  evidence that it was from the intervention.  It
24  would have been nice if they also collected data
25  about the degree of mental health involvement that

Page 179

1  would have provided more data along that same
2  line.  I think they could have adjusted for that
3  variable the way some of the other studies have
4  that I cite in my declaration.
5      Q.  Why would you need to adjust for that
6  variable?
7      A.  So I think there's been this question
8  raised, like the experts' declarations of whether
9  or not the improvement that you see when
10  adolescents with gender dysphoria get medical
11  interventions is that improvement from the
12  medication like the puberty blocker or the
13  hormones?  Or is it from therapy they're getting
14  at the same time?
15         So I cited, I believe, three studies in
16  my declaration that looked at that question.  This
17  was one of them.  The way they looked at it was by
18  this parallel process analysis that showed that
19  the improvement tracked with their physical gender
20  incongruence improving as opposed to it not being
21  related to the actual physical impact of the
22  hormones.
23     Q.  So is the idea that de Vries is
24  discussing here the possibility that mental health
25  care could be a confounding variable in this

Page 180

1  study?
2         MS. NOWLIN-SOHL:  Object to form.
3         THE WITNESS:  She's highlighting they did
4  a specific analysis to look at that, and it
5  suggested that the improvements were from not
6  mental health, especially how there's another
7  additional way they could have looked at it.
8      Q.  (BY MR. RAMER)  And so yes, it could be a
9  confounding variable?
10         MS. NOWLIN-SOHL:  Object to form;
11  mischaracterizes his prior testimony.
12         THE WITNESS:  Yeah, I think that's a
13  mischaracterization of what I just said.
14     Q.  (BY MR. RAMER)  No, I wasn't trying to
15  repeat what you were saying.
16         I was asking the question of is the
17  concerns that are unanswered that de Vries is
18  talking about in this paragraph where she
19  references that the extent of mental health care
20  provided throughout GAH treatment was not reported
21  have to do with the fact that mental health care
22  is potentially a confounding variable?
23         MS. NOWLIN-SOHL:  Object to form.
24         THE WITNESS:  That line is pretty far
25  removed from when she uses that phrase

Page 181

46 (Pages 178 - 181)

Page 182

1    "unanswered."
2         And again, they did the parallel process
3    modeling that found that the mental health
4    improvement tracked along with adherence
5    congruence, suggesting that it was the physical
6    effects of the gender-affirming hormones leading
7    the person phenotype to align more with their
8    gender identity that was driving the improvements
9    in mental health as opposed to it being from
10   therapy.
11        Q.  (BY MR. RAMER)  Why do you need to
12   control for mental health care, though, if it's
13   not a potentially confounding variable?
14        MS. NOWLIN-SOHL:  Object to form.
15        THE WITNESS:  You -- they looked at it in
16   a different way using this parallel process
17   monitoring to separate out the impact of the
18   physical effects of the hormones from other
19   potential things like therapy.
20        Q.  (BY MR. RAMER)  And I understand that
21   you're describing what they did.
22        I guess my question is why do you need to
23   control for mental health care --
24        MS. NOWLIN-SOHL:  Object to form.
25        THE WITNESS:  The reason why --

Page 183

1    Q.  (BY MR. RAMER)  Okay.  Why do you need to
2    control for mental health care if it is not a
3    potentially confounding variable?
4         MS. NOWLIN-SOHL:  Object to form.
5         THE WITNESS:  The reason they did that is
6    to address the potential of it being a confounding
7    variable, that they wanted to see was the
8    improvement in mental health from the physical
9    effects of the gender-affirming hormones as
10   opposed to potential things like mental health,
11   like you're implying, or psychotherapy.
12        And they found that it was from the
13   physical effects of the hormones, answering this
14   question of whether or not it could have just been
15   from any psychotherapy they were receiving.
16        Q.  (BY MR. RAMER)  And in your view, given
17   the body of evidence, can we rule out mental
18   health care as a potentially confounding variable?
19        MS. NOWLIN-SOHL:  Object to form.
20        THE WITNESS:  So this study provides
21   evidence that it's not just from -- that the
22   improvements we see from gender-affirming hormones
23   aren't just from therapy provided in time.
24        The Tordoff study that I cited similarly
25   looked at that question and found that the effects

Page 184

1    are there separate from any impact of
2    psychotherapy.
3         And the Costa study that I cited gets at
4    that question as well.
5         Q.  (BY MR. RAMER)  So the answer is that --
6    well, I guess I'm not totally clear.
7         Is the answer that mental health care
8    does not -- let me rephrase.
9         You can say that the evidence does not
10   support the proposition that mental health care
11   can improve the distress associated with gender
12   dysphoria?
13        A.  Now I'm unclear with your question.  So
14   the thing that is being brought up in this
15   editorial was brought up in some of the State's
16   expert reports in which they asked this question:
17   In these studies where people are receiving
18   gender-affirming medical interventions, they're
19   also often receiving therapy.  So is their mental
20   health improving because of the therapy or it's
21   improving because of the gender-affirming
22   hormones?
23        This study, the Tordoff study, and the
24   Costa study provide evidence that their mental
25   health isn't just improving from the therapy.

Page 185

1    Their mental health is improving from the
2    gender-affirming hormones.
3         Q.  And my question is about the word "just"
4    that you're using there in your answer.
5         Because you say, "It shows that it's not
6    improving just because of the mental health
7    therapy."
8         And my question is can you say that the
9    evidence shows that mental health care is not
10   effective in reducing the distress associated with
11   gender dysphoria?
12        MS. NOWLIN-SOHL:  Object to form.
13        THE WITNESS:  So that's not -- these
14   studies are looking -- are not asking that
15   question.
16        These studies are asking do
17   gender-affirming hormones improve mental health?
18        You're asking does what psychotherapy
19   improve gender dysphoria?
20        Q.  (BY MR. RAMER)  Say again.
21        A.  What psychotherapy are you asking me if
22   it -- there's evidence that it improves gender
23   dysphoria?
24        Q.  The psychotherapy that's a potentially
25   confounding variable that they're controlling for

47 (Pages 182 - 185)

**Page 186**

1  in these studies.
2      A.  Again, the de Vries study didn't take
3  that statistical approach of controlling for a
4  potential confounder of psychotherapy.  They did
5  it through parallel process models.
6      Q.  Do you mean the Chen study?
7      A.  Yes.
8      Q.  Why is it significant if you have a study
9  where the patients are receiving both
10  gender-affirming medical interventions and
11  psychotherapy to control for the psychotherapy?
12      MS. NOWLIN-SOHL:  Object to form.
13      THE WITNESS:  Because you want to know if
14  the improvement was from the hormones or from the
15  psychotherapy.
16      Q.  (BY MR. RAMER)  And my question for you
17  is does the evidence show that psychotherapy is
18  ineffective at reducing the distress associated
19  with gender dysphoria?
20      MS. NOWLIN-SOHL:  Object to form.
21      THE WITNESS:  So to say that something is
22  ineffective, you would need to do something like a
23  noninferiority study, which has not been done.
24      But I'm not aware of any research that
25  shows that psychotherapy is effective in

**Page 187**

1  alleviating gender dysphoria.
2      Q.  (BY MR. RAMER)  What about studies where
3  they are giving the patients both gender-affirming
4  medical interventions and psychotherapy and they
5  are not controlling for psychotherapy?
6      Do you think that those studies suggest
7  that the gender-affirming medical interventions
8  can reduce distress associated with gender
9  dysphoria?
10      MS. NOWLIN-SOHL:  Object to form.
11      THE WITNESS:  Sorry.  Can you repeat the
12  question?
13      Q.  (BY MR. RAMER)  So maybe it's more of a
14  hypothetical about a theory, which is you have a
15  study.  In the study, the patients are receiving
16  both gender-affirming medical interventions and
17  psychotherapy.  The outcome of the study is
18  improvement on all scores.
19      What?
20      A.  Scores on what?
21      Q.  On all metrics that you're -- depression,
22  anxiety, distress associated with gender
23  dysphoria.
24      A.  It would be hard to have a scale to
25  measure distress associated with gender dysphoria

**Page 188**

1  because there is not a clean measure for that.
2      Q.  You can't use the UGDS?
3      A.  Not really.  You'd have to flip the
4  scores the way the Dutch have done it
5  intermittently, but it's not really a good measure
6  of those things, more measure the degree to which
7  you don't identify with your sex assigned at
8  birth.  They're not really designed to track
9  improvements in the distress related to that over
10  time.
11      Q.  Okay.  Well, let's go back to the
12  hypothetical -- and if you'll just allow me to
13  finish, and then I'll give you the opportunity to
14  answer -- which is you have a study.  The patients
15  are receiving both gender-affirming medical
16  interventions and psychotherapy.  The outcome is
17  improvement in quality of life.
18      Do you think that that study provides
19  evidence that gender-affirming medical
20  interventions are effective in improving quality
21  of life?
22      MS. NOWLIN-SOHL:  Object to form.
23      THE WITNESS:  So you're describing the
24  Costa study from 2015 essentially which does
25  exist, which did show that pubertal suppression

**Page 189**

1  improved mental health, whereas for the group that
2  got six months of therapy and then got a year of
3  therapy plus puberty blockers, they did not
4  improve when they just got therapy, but when they
5  got therapy with the blockers, they improved,
6  suggesting that the blockers improved their
7  health --
8      Q.  (BY MR. RAMER)  Sorry, go ahead.
9      A.  For that immediately eligible group they
10  got six months of therapy, but therapy did not
11  improve their mental health in a statistically
12  significant way with the caveat to not interpret
13  one statistical finding as valid.  But then once
14  they got pubertal suppression with the therapy,
15  their mental health did improve.
16      Q.  And so I'm not describing the Costa study
17  because in my hypothetical the study is not
18  distinguishing between patients who received only
19  psychotherapy and patients who received
20  psychotherapy and then proceeded on to
21  gender-affirming medical intervention.
22      My hypothetical is a study where the
23  patients received both for the entire time, and
24  they show improvement.
25      And my question is does that type of

48 (Pages 186 - 189)

1  study in my hypothetical constitute evidence that
2  gender-affirming medical interventions are
3  effective in improving that quality of life
4  metric?
5          MS. NOWLIN-SOHL:  Object to form.
6          THE WITNESS:  In that study, you would --
7  in that theoretical study, you would want to
8  disentangle what was from therapy and what was
9  from the pubertal suppression.  If that were the
10  only study that existed and that was the study
11  that you were looking at and you had this question
12  of whether or not therapy alone was effective,
13  then you would want to separate it.
14      Q.  (BY MR. RAMER)  What if the question is
15  whether or not gender-affirming medical
16  interventions are effective?  Is that study also
17  worthless in that context?
18          MS. NOWLIN-SOHL:  Object to form.
19          THE WITNESS:  I wouldn't call it
20  worthless.  I think it would be interesting.  But
21  I think it would be more informative if you
22  adjusted for -- separated out the impacts of
23  therapy from puberty blockers.
24      Q.  (BY MR. RAMER)  And so if you don't
25  separate it out, can you cite that hypothetical

Page 190

1  study as evidence that gender-affirming medical
2  interventions are effective?
3          MS. NOWLIN-SOHL:  Object to form; calls
4  for speculation.
5          THE WITNESS:  It would be a piece of
6  evidence.  I wouldn't recommend using it in
7  isolation but look at the full body of literature
8  where they've done some other things to try to
9  tease apart those two interventions.
10          MR. RAMER:  Okay.  I think we've been
11  going for just about an hour if you all want to
12  take a break.
13          MS. NOWLIN-SOHL:  Yeah, that sounds good.
14          MR. RAMER:  Let's go off the record.
15          THE VIDEOGRAPHER:  Okay.  So the time is
16  2:13 p.m. Pacific time, and we are off the record.
17      (Break taken from 2:13 p.m. to 2:19 p.m.)
18          THE VIDEOGRAPHER:  All right.  So we are
19  recording.  The time is 2:19 Pacific time, and we
20  are back on record.
21      Q.  (BY MR. RAMER)  And, Dr. Turban, I'd like
22  to stick with the article we were just discussing.
23  And I'd like to look on page 276 and the right
24  column and the second full paragraph, first
25  sentence.  And I'll read it and ask if I read it

Page 191

1  correctly.
2          It says "Finally, benefits of early
3  medical intervention, including puberty
4  suppressions, need to be weighed against possible
5  adverse effects -- for example, with regard to
6  bone and brain development and fertility."
7          Did I read that correctly?
8      A.  Yes.
9      Q.  And you see where de Vries mentions
10  possible adverse effects on brain development?
11      A.  Just in that sentence?
12      Q.  In that sentence.
13      A.  Yes.
14      Q.  What do you know about the risk of
15  adverse effects on brain development from pubertal
16  suppression?
17      A.  So there's only one study that looked at
18  potential impacts on effective functioning that
19  seemed to suggest no adverse impact.
20          I think Dr. de Vries mentions something
21  here, educational achievements are expected given
22  their pretreatment status is reassuring.
23          I'm not aware of any convincing clinical
24  data that says there's an adverse impact on brain
25  development.

Page 192

1          Certainly the delay in bone density
2  accrual is well known with pubertal suppression,
3  but to be honest, I'm not sure what she's
4  referencing with brain development.
5      Q.  Is adolescence associated with
6  significant neurodevelopment?
7      A.  Yes.
8      Q.  And do you agree that adolescence is
9  associated with an increase in capabilities for
10  abstraction and logical thinking?
11      A.  Yes.
12      Q.  And is puberty linked to developmental
13  changes in social and emotional processing?
14      A.  I'm not an expert on the intricacies of
15  that research, but I can say as a clinical matter
16  in terms of cognitive development for my
17  patients -- I mean, I have a handful of patients
18  who are now at Ivy League universities who are
19  doing quite well, so there doesn't seem to be an
20  apparent, clear negative path on cognition.
21      Q.  So you are not an expert on cognitive
22  development; is that right?
23      A.  I am broadly, but I wouldn't be able to
24  dive into the depths of the study of -- like,
25  neuroimaging studies that look at different

Page 193

49 (Pages 190 - 193)

1  neuroimaging paths throughout adolescence.
2      Q.  In this case are you opining as an expert
3  on cognitive development?
4          MS. NOWLIN-SOHL:  Object to form.
5          THE WITNESS:  At the level of being a
6  child in adolescent psychiatry, yes, but not at
7  the level of being somebody who spends my whole
8  career doing things like neuroimaging studies,
9  looking at neural pathway development.
10         MR. RAMER:  And, Li, do you have Turban
11  Exhibit 16 yet?
12         MS. NOWLIN-SOHL:  I do.
13         MR. RAMER:  Oh, great.
14         (Deposition Exhibit No. 16 was marked.)
15     Q.  (BY MR. RAMER)  And, Dr. Turban, have you
16  seen this article before?
17     A.  No.
18     Q.  Do you recognize the lead author?
19     A.  Yes.
20     Q.  And I'd like to go to page 254 in this
21  article, and specifically the left column under
22  "Discussion," and the second sentence in that
23  paragraph following the discussion header.  And
24  I'll read it and ask if I read it correctly.
25         It says "However, puberty is a major

Page 194

1  developmental process.  And the full consequences,
2  both beneficial and adverse of suppressing
3  endogenous puberty, are not yet understood."
4          Did I read that correctly?
5      A.  Yes.
6      Q.  Do you agree that the full consequences
7  of suppressing endogenous puberty are not yet
8  understood?
9      A.  This is a somewhat vague sentence.  I
10  think the thing that's difficult when talking
11  about the impact of any medication on cognition is
12  that there are really infinite cognitive domains
13  one could look at.  So in many ways, it's an
14  unanswerable question.
15         People have looked at different
16  questions, for instance, impact on executive
17  functioning.  It does not seem that there's an
18  adverse impact.
19         There is also a meta-analysis that looked
20  mostly at young adults, not adolescents, so
21  different, that did find an adverse impact on
22  several cognitive things they looked at.
23         They found an improvement in visual
24  spatial reasoning among people that took
25  testosterone.

Page 195

1          But I think the sentence you read is too
2  vague to say a lot from.
3      Q.  And what are the two studies you're
4  referencing?
5      A.  I have to remember the -- I think the one
6  that was the meta-analysis looking among young
7  adults I believe was in the Journal of Psycho
8  Neurologic Chronology I think in 2021.
9          The executive functioning one I believe
10  was by the Dutch, but I don't know the name of the
11  first author.
12     Q.  Is the executive functioning one the one
13  with the Tower of London test?
14     A.  Yes.
15     Q.  I'd like to go to page -- stick with this
16  article, go to page 249, and right column and
17  first full paragraph.  And I'd like to just read
18  it and ask if I read it correctly.
19         It says "We employed a two-round Delphi
20  procedure to obtain expert consensus regarding the
21  most efficacious research design elements
22  addressing the following research question:  What,
23  if any, real world impact does pubertal
24  suppression have on transgender children's
25  cognitive and neural development?"

Page 196

1          Did I read that correctly?
2      A.  Yes.
3      Q.  Do you know the answer to that question?
4          MS. NOWLIN-SOHL:  Object to form.
5          THE WITNESS:  I think it's too broad of a
6  question to have a straightforward answer.  I
7  don't know that I could answer any question for
8  any medical intervention.
9      Q.  (BY MR. RAMER)  Do you think that
10  question is unanswerable?
11         MS. NOWLIN-SOHL:  Object to form.
12         THE WITNESS:  I think it's too broad to
13  really be able to answer.  It kind of would
14  involve nearly infinite subquestions.  So it would
15  be interesting to see the results of this Delphi
16  procedure to see what they thought were the
17  important subquestions to be answered.
18     Q.  (BY MR. RAMER)  Do you agree that
19  learning the answer to that question could have
20  important clinical implications?
21         MS. NOWLIN-SOHL:  Object to form.
22         THE WITNESS:  Again, it's such a broad
23  question.  I certainly could imagine that there
24  would be subquestions that come out of it that
25  would be interesting, but nothing this paper

Page 197

50 (Pages 194 - 197)

1 ultimately does. But I have not seen this
2 particular paper.
3     Q. (BY MR. RAMER) So are you -- just to
4 understand, are you criticizing the question
5 that's in italics there?
6     MS. NOWLIN-SOHL: Object to form;
7 mischaracterizes prior testimony.
8     THE WITNESS: I think it's a broad
9 question that is likely designed from more
10 specific questions.
11     Q. (BY MR. RAMER) Do you know -- can you
12 describe any impact -- let me put it this way:
13 What can you tell me about the effect of pubertal
14 suppression on transgender children's cognitive
15 and neural development?
16     MS. NOWLIN-SOHL: Object to form.
17     THE WITNESS: It appears to result in
18 improved anxiety, depression, and from the data we
19 have, not impact executive functioning in that
20 clinically these young people don't seem to have
21 major issues in academic functioning.
22     Q. (BY MR. RAMER) Would you agree that
23 anxiety, depression, executive functioning, and
24 academic functioning are not necessarily the same
25 thing as neural and cognitive development?

Page 198

1     MS. NOWLIN-SOHL: Object to form.
2     THE WITNESS: I think they're aspects of
3 cognitive development. Again, this is kind of my
4 overall point here, that cognitive neural
5 development is such a broad term that it could
6 encompass nearly infinite things.
7     Q. (BY MR. RAMER) So you think -- sorry.
8 So just to confirm that I understand, you think
9 that the question that was developed by these
10 researchers is so broad that it encompasses an
11 infinite number of things?
12     MS. NOWLIN-SOHL: Object to form;
13 mischaracterizes prior testimony.
14     THE WITNESS: I don't think this is the
15 question that came out of the Delphi procedure.
16 It looks like this is the question they used to
17 prompt their Delphi procedure to then see what
18 their more specific questions would be.
19     I haven't read this paper, but from the
20 section you showed me, that's what it looks like.
21     Q. (BY MR. RAMER) Let's go to page 253 in
22 this document. Right column, about halfway down
23 there's a sentence that begins with "In addition."
24 And I'll just read it and ask if I read it
25 correctly.

Page 199

1     "In addition, cognitive/behavioral
2 flexibility, a component of executive functioning,
3 should be measured, given that studies in rodents
4 show ovarian hormones, acting during puberty,
5 program cognitive flexibility by exerting
6 long-lasting effects on excitatory and inhibitory
7 balance in the prefrontal cortex."
8     Did I read that correctly?
9     A. Yes.
10     Q. Do you agree that rodent studies have
11 shown that ovarian hormones can have long-lasting
12 effects in brain development?
13     MS. NOWLIN-SOHL: Object to form;
14 foundation.
15     THE WITNESS: Whether or not a research
16 finding from rodents is going to translate to
17 humans is always very up in the air. I'd have to
18 look at the specific citation to know the details
19 of this rodent study.
20     Q. (BY MR. RAMER) Well, I guess following
21 up on that, if a scientist is faced with animal
22 studies reporting that pubertal hormones have
23 long-lasting effects on brain development,
24 shouldn't that scientist conclude there was some
25 possibility that pubertal hormones may also have

Page 200

1 long-lasting effects on brain development in
2 humans?
3     MS. NOWLIN-SOHL: Object to form.
4     THE WITNESS: Not necessarily a high
5 probability because rodent studies often don't
6 translate into clinically meaningful measures in
7 humans, but potentially.
8     Q. (BY MR. RAMER) I'd like to go to --
9 well, I guess before seeing this article, which
10 you said you've seen for the first time today,
11 were you aware of references in literature
12 regarding the effect of pubertal suppression on
13 brain development in animals?
14     MS. NOWLIN-SOHL: Object to form.
15     THE WITNESS: I believe there is one
16 study in sheep that's been referenced.
17     I mean, the way I think about this
18 clinically is that these medications have been
19 around for decades. And generally, anytime
20 there's a medication that's FDA approved and on
21 the market, there's market surveillance.
22     And we will often identify if there is a
23 really serious consequence, and there haven't been
24 any apparent serious -- when I say "apparent,"
25 adverse consequences from pubertal suppression

Page 201

51 (Pages 198 - 201)

1  that I'm aware of.
2       But certainly it's reasonable to do
3  research to study this more in depth to see if
4  maybe there are finer, less clinically significant
5  or obvious impacts.
6       Q.  (BY MR. RAMER)  When you say the
7  medications have been around for a while -- I'm
8  paraphrasing -- but the use of puberty blockers in
9  particular, the FDA approval is for central
10 precocious puberty, correct?
11      A.  Correct.
12      Q.  And when treating central precocious
13 puberty, you will eventually cease giving the
14 patient puberty blockers and then the patient will
15 then proceed through endogenous puberty, correct?
16      A.  Correct.
17      Q.  And so if the question is suppressing
18 endogenous puberty permanently, and what effect
19 that has on cognition, the fact that puberty
20 blockers have been FDA approved for central
21 precocious puberty is irrelevant, correct?
22      MS. NOWLIN-SOHL:  Object to form.
23      THE WITNESS:  I wouldn't call it
24 irrelevant.  I think in both circumstances people
25 are exposed to the medications for a period of
Page 202

1  time that puberty is suppressed.  And then they go
2  through either estrogen or testosterone puberty.
3       Q.  (BY MR. RAMER)  Well, you're saying
4  estrogen or testosterone puberty.  That is not the
5  same thing, necessarily, as endogenous puberty,
6  correct?
7       A.  For any given person, yeah, their
8  endogenous -- or endogenous puberty, it would be
9  estrogen or testosterone puberty, depending on
10 their sex assigned at birth.
11      Q.  I'd like to go to page 252 in this
12 document.  And the left column just about over
13 halfway down the paragraph there's a sentence that
14 starts with the words "The effects."  And I'll
15 read it and ask if I read it correctly.
16      "The effects of pubertal suppression may
17 not appear for several years.  Any GnRHa-related
18 difference in brain structure is likely to be
19 observed over the long term rather than
20 immediately."
21      Did I read that correctly?
22      A.  Yes.
23      Q.  Do you agree with those statements?
24      A.  I mean it says "may," so hard to argue
25 with the sentence.
Page 203

1       Q.  Well, what about the second sentence that
2  says "any GnRHa-related difference in brain
3  structure is likely to be observed over the long
4  term rather than immediately"?
5       A.  It's somewhat imprecise.  I don't know
6  what they mean "over the long term" versus
7  "immediately," but I don't have any specific
8  objection to the sentence.
9       Q.  And going to 255 in this document, left
10 column, second full paragraph about halfway down
11 that paragraph, there's a sentence that starts
12 with "Yet."  And I'll just read these two
13 sentences in this paragraph and ask if I read them
14 correctly first.
15      "Yet, evidence suggests an
16 over-occurrence of neurodiversity characteristics,
17 (especially related to autism) among
18 gender-referred youth.  The neurodevelopmental
19 impact of pubertal suppression on neurodiverse
20 gender-diverse youth might well be different than
21 in neurotypical gender-diverse youth given
22 variations in neurodevelopmental trajectories
23 observed across neurodevelopment conditions."
24      Did I read that correctly?
25      A.  Yes.
Page 204

1       Q.  Are you aware of any studies researching
2  the effect of pubertal suppression on
3  neurodevelopment in adolescents with neurodiverse
4  characteristics?
5       A.  Yes.  So the research on the relationship
6  between autism and gender dysphoria has been
7  controversial about whether or not there is a true
8  relationship between the two.
9       So we published a paper in the Journal of
10 the American Academy of Child and Adolescent
11 Psychiatry a few years ago where we looked at the
12 different studies that looked at whether or not
13 there was a co-occurrence between gender dysphoria
14 and autism and vice versus, and pointed out that
15 there were a lot of issues with that research.
16      So for the research, looking at those
17 with gender dysphoria, they would often use
18 screening instruments like the social
19 responsiveness scale or the autism quotient.  And
20 they found that trans youth with gender dysphoria
21 were more likely to score in the clinical range on
22 those instruments than youth without gender
23 dysphoria.
24      The problem, as you know, is those
25 instruments are very nonspecific, so as many as
Page 205

52 (Pages 202 - 205)

1 80 percent of the kids who just have social
2 anxiety will score in the clinical range.
3     So for that reason we didn't know are
4 these young people scoring in the clinical range
5 because they truly have autism?  Or is it because
6 they have other conditions that they're screening
7 for in this range too.
8     So that prompted some people to wonder if
9 these, quote, autism results were truly a result
10 of autism or if they were a result of minority
11 stress or gender dysphoria.  So it raised the
12 question of whether or not these supposed autism
13 symptoms would improve following gender-affirming
14 medical care.
15     And I know there was at least one study
16 that only looked at pubertal suppression for, I
17 forget how long, a year or two, and looked at how
18 the social responsiveness scale changed over time
19 after gender-affirming medical treatment.
20     Q.   What is the social responsiveness scale?
21     A.   Screening instrument for autism that
22 again is somewhat nonspecific, because people with
23 other conditions like social anxiety disorder will
24 often screen in the clinical range.
25     Q.   So in your previous answer, what question

Page 206

1 were you answering?
2     A.   You asked if I was aware of any studies
3 looking at the impact of gender-affirming medical
4 care among those with neurodivergent
5 characteristics like autism.
6     Q.   Well, it was actually specifically are
7 you aware of any study researching the effect of
8 pubertal suppression on neurodevelopment in
9 adolescents with neurodiverse characteristics?
10     A.   Autism is a -- neurodiversity is a
11 category that includes autism.  People often use
12 "neurodiversity" to reference people who have
13 autism characteristics.  And so that was a study
14 of looking at people who were neurodiverse and
15 that they had presumably autism.  And they
16 followed them after pubertal suppression.
17     Q.   And so I appreciate that "neurodiverse"
18 includes people who have autism.
19     My question is the study about the effect
20 of pubertal suppression on neurodevelopment
21 specifically in adolescents who are neurodiverse.
22     Aware of any study researching that?
23     A.   What do you mean by "neurodevelopment"?
24     Q.   What do you understand that term to mean?
25     A.   It's a broad term that could look at

Page 207

1 different cognitive outcomes.  It could be the
2 social responsiveness scale that they looked it.
3 It can look at neuroimaging techniques.
4     Q.   Okay.  Exclude the social responsiveness
5 scale.
6     Are you aware of any study researching
7 the effect of pubertal suppression on
8 neurodevelopment in adolescents with neurodiverse
9 characteristics?
10     A.   I have to look back at what other
11 outcomes that study looked at, but I can't recall.
12     Q.   Okay.  Let's go back to -- it was a while
13 ago -- Turban Exhibit 5, which I believe is the
14 Cass interim report.
15     And specifically I'd like to go to
16 page 38.  And in the right column there is a
17 paragraph numbered 3.32.  I'm just going to read
18 the first sentence and ask if I read it correctly.
19     MS. NOWLIN-SOHL:  Can you give us one
20 second, John?
21     MR. RAMER:  Oh, sorry.  Yep.
22     MS. NOWLIN-SOHL:  You said 3.32?
23     MR. RAMER:  Yeah, so page 38, right
24 column, paragraph numbered 3.32.
25     MS. NOWLIN-SOHL:  Okay.  We are there.

Page 208

1     Q.   (BY MR. RAMER)  Okay.  I'll read the
2 first sentence of that paragraph and ask if I read
3 it correctly.
4     It says "A closely linked concern is the
5 unknown impacts on development, maturation, and
6 cognition if a child or young person is not
7 exposed to the physical, psychological,
8 physiological, neurochemical, and sexual changes
9 that accompany adolescent hormone surges."
10     Did I read that correctly?
11     A.   Yes.
12     Q.   And do you agree that the impact of
13 puberty blockers on the child's developmental
14 cognition is currently unknown?
15     MS. NOWLIN-SOHL:  Object to form.
16     THE WITNESS:  There are elements of
17 neurocognition that have been studied, but we
18 don't know for every domain of neurocognition.
19 And I think the same is probably true for the vast
20 majority of medications.
21     Q.   (BY MR. RAMER)  What's your basis for
22 that conclusion?
23     A.   That we don't routinely study every
24 medication for every way in which it could impact
25 every domain of neurocognitive development.

Page 209

53 (Pages 206 - 209)

1 You know, there's impact to their
2 functioning; there's visual/spatial reasoning;
3 there's verbal fluency; there's different measures
4 of mathematical ability.  There's just so many
5 different ways you can measure neurocognitive
6 development, and we don't routinely -- we just
7 don't have research for the vast majority of
8 medications and how they impact all those
9 different domains because there are so many.
10 Q.  In your testimony --
11 A.  If there were -- again, like a
12 post-medication surveillance signal that came up
13 from the FDA showing, wow, we have a lot of
14 patients who took this specific medication, and it
15 seems like they're having clinically significant
16 impairment in their neurocognitive domain, that
17 would probably prompt that research.
18 But that's not routinely done for every
19 medication.  It would be nice if it were, but it's
20 a lot of research and really intensive research to
21 do.
22 Q.  And so you're saying that for the vast
23 majority of medications, we do not know the
24 neurocognitive outcomes from taking those
25 medications; is that right?
Page 210

1 hormones?
2 MS. NOWLIN-SOHL:  Object to form.
3 THE WITNESS:  I can say clinically most
4 patients who get pubertal suppression -- well,
5 essentially all of them, will later either stop
6 pubertal suppression and go through endogenous
7 puberty, or they'll start gender-affirming
8 hormones.
9 Generally clinical experience has been
10 that those patients do quite well, and we don't
11 see that they have major cognitive impairments
12 that are clinically significant, but I'm not aware
13 of a specific peer-reviewed study looking at that
14 question, and again would point out that this term
15 "brain maturation" is very vague and not a very
16 technical term.  And so I'm not sure exactly what
17 metric of brain maturation you're referencing.
18 Q.  (BY MR. RAMER) You read this when --
19 well, when did you read this?
20 A.  I don't remember.  Many months ago.
21 Q.  And if you thought that the phrase "brain
22 maturation" was vague, did it lead you to want to
23 investigate further what they were talking about?
24 MS. NOWLIN-SOHL:  Object to form.
25 THE WITNESS:  From this specific
Page 212

1 MS. NOWLIN-SOHL:  Object to form.
2 THE WITNESS:  We might know some
3 neurocognitive outcomes, but we don't know the
4 full range of neurocognitive outcomes.
5 Q.  (BY MR. RAMER) And for pubertal
6 suppression, do we know some neurocognitive
7 outcomes?
8 A.  I would say we have some mental health
9 outcomes, and we have executive functioning.  And
10 those are the ones that I'm aware of.
11 Q.  So same paragraph, final sentence at the
12 bottom starting with "If."  I'll read it and ask
13 if I read it correctly first.
14 "If pubertal sex hormones are essentially
15 to these brain maturation processes, this raises a
16 secondary question of whether there is a critical
17 time window for the processes to take place or
18 whether catch-up is possible when estrogen or
19 testosterone is introduced later."
20 Did I read that correctly?
21 A.  Yes.
22 Q.  Are you aware of any study that addresses
23 whether a negative impact on brain maturation due
24 to pubertal blockade can be corrected later if the
25 child is exposed to either endogenous or cross-sex
Page 211

1 international report, no.
2 Q.  (BY MR. RAMER) Did anything in this
3 report lead you to do additional investigation?
4 A.  What do you mean by "investigation"?
5 Q.  I mean, did you read something in this
6 report and say, "Oh, that's a valid concern.  I
7 should look into that"?  Or no?
8 MS. NOWLIN-SOHL:  Object to form.
9 THE WITNESS:  I don't recall this report
10 bringing up anything relevant to my practice that
11 was new or interesting or present any new or
12 interesting data to my practice.
13 I remember the most interesting thing
14 being the description of how care is delivered in
15 the U.K. and how they're changing that.  But it
16 didn't -- I don't recall it presenting any new
17 research or concepts that I wasn't previously
18 familiar with.
19 MR. RAMER:  Okay.  I'd like to go to
20 Turban Exhibit 17.  Let me know when you have that
21 in front of you.
22 MS. NOWLIN-SOHL:  Okay.
23 (Deposition Exhibit No. 17 was marked.)
24 Q.  (BY MR. RAMER) Dr. Turban, do you
25 recognize this document?
Page 213

54 (Pages 210 - 213)

1     A.   Yes.
2     Q.   What is it?
3     A.   I believe this was a report by a U.K.
4  government agency looking at the research related
5  to pubertal suppression for adolescent gender
6  dysphoria.
7     Q.   And do you understand this to be a
8  systematic review?
9     A.   Yes.
10    Q.   And is this something that you've read
11 before?
12    A.   Yes.
13    Q.   And did you read it in some detail or did
14 you skim it?
15    A.   When I initially read it, I read it in
16 detail.
17    Q.   And what did you think when you read it?
18    A.   It's been a while, but I remember that --
19 to our point earlier that all a systematic review
20 really means is that they define their search
21 terms.  But then subsequent decisions about which
22 research you include or don't include can be very
23 subjective.  I recall them excluding studies that
24 I thought were important to include.
25    Q.   And did this review reach conclusions

Page 214

1  that you disagree with?
2     A.   It's been a while since I read it, so I'd
3  have to ask you if there's a specific line you're
4  referencing.
5     Q.   Well, when you -- the comment you just
6  made about them excluding studies that you thought
7  were important, so do you have reason to doubt
8  that the analysis in this document is reliable?
9        MS. NOWLIN-SOHL:  Object to form.
10       THE WITNESS:  I recall them not including
11 all the studies that they should have included.
12    Q.   (BY MR. RAMER)  And do you know whether
13 this systematic review assessed any of the studies
14 that you rely on in your declaration?
15    A.   I presume it reviews some of them, but
16 it's been a while since I've read it.
17    Q.   Okay.  Let's go to page 74.  And kind of
18 middle of the page, you see appendix D entitled
19 "Excluded Studies Table"?
20    A.   Yes.
21    Q.   And do you recall whether you cite the
22 first study -- let me rephrase.
23       Do you recall whether in your declaration
24 you submitted in this case that you cite the first
25 study listed here?

Page 215

1     A.   Yes.
2     Q.   And the fourth one down on this table,
3  the de Vries study, do you recall, is that also a
4  study you cite in your declaration?
5     A.   Yes.
6     Q.   And the next page, third from the bottom,
7  the Turban article.  And do you recall is this a
8  study you cite in your declaration?
9     A.   Yes.
10    Q.   And did you know the review excluded
11 these studies?
12    A.   Yes.
13    Q.   And do you disagree with the review's
14 conclusion to exclude these studies?
15    A.   I call it a decision, not a conclusion,
16 but yes.
17    Q.   And why?
18    A.   Because I think the studies give you
19 valuable information.  The Achille study, though
20 it doesn't separate GnRH analogues out from the
21 other interventions because it's underpowered when
22 it does that, I do think it's valuable information
23 to know when they look at the group that received
24 gender-affirming medical interventions including
25 blockers and hormones that their mental health

Page 216

1  improved.  I think that that's useful information.
2        The de Vries study they excluded, I think
3  may be okay since this report was just interested
4  in pubertal suppression, but I do think that's an
5  important paper to know about because it looks at
6  pubertal suppression followed by gender-affirming
7  hormones followed by gender-affirming surgery.  So
8  it gives you a lot of fresh informational, albeit
9  not just about puberty blockers.
10       And then our study where it says they
11 excluded because it doesn't report separately from
12 other interventions, I'd have to pull up our paper
13 again but I'm pretty sure that's not true.  I
14 believe we adjusted for access to gender-affirming
15 hormones.
16    Q.   You don't know as you sit here whether
17 you adjusted for --
18    A.   I just don't want to say on the record
19 without double-checking, but do you want to pull
20 up the --
21    Q.   No, I think my question is actually,
22 like, as you sit here, you don't know the answer
23 to that?
24    A.   I'm pretty sure, but want to
25 double-check.

Page 217

1    Q.  Okay.  That's sufficient.
2        Okay.  I'd like to go to -- let's stick
3  with this document and go to page 99.  And at the
4  top it says "Appendix G Grade Profiles."
5        Do you see that?
6    A.  Yes.
7    Q.  And the first study in Table 2 here is
8  de Vries 2011 study.
9        And you cite that in your declaration,
10  correct?
11    A.  Yes.
12    Q.  And in that table, there's a little
13  footnote 2.  And then you go down to footnote 2
14  and it says "Downgraded one level -- the cohort
15  study by de Vries, et al. (2011) was assessed as
16  at high risk of bias (poor quality overall, lack
17  of binding, and no control group)."
18        Do you see that?
19    A.  Yes.
20    Q.  And do you disagree with that assessment?
21    A.  No.
22    Q.  And then I'd like to go to page 101.
23  Actually, I'm sorry, 102.  The following page.
24        And do you see they refer to the Costa
25  2015 study in this table?

Page 218

1  subjective and there are different ways you can
2  decide to up score or down score each thing.
3        I'd really have to sit down with them and
4  go through it in detail to see how they decided
5  for each of the columns.  But it doesn't surprise
6  me that on the GRADE supporting system that
7  prioritizes randomized controlled trials that it
8  would have ended up in a low, very low category
9  according to that term of art of GRADE scoring.
10    Q.  (BY MR. RAMER) If you don't use GRADE,
11  what tool are you using to assess the degree of
12  bias in this study?
13        MS. NOWLIN-SOHL:  Object to form.
14        THE WITNESS:  GRADE is not really just
15  about bias.  I think one part of the GRADE
16  criteria is they look at risk of bias.  But I
17  generally look at study by study to go into more
18  detail on different types of bias and how they
19  impact the results.
20    Q.  (BY MR. RAMER) Do you use a particular
21  methodology to assess the degree of bias in a
22  study?
23    A.  Depends on the type of bias that you're
24  looking at.  It could be recall bias, selection
25  bias.  They're all managed differently.

Page 220

1    A.  Yes.
2    Q.  And you also cite the Costa 2015 study,
3  right?
4    A.  Yes.
5    Q.  And if you go to page 106, down at the
6  very bottom there's another little footnote 1.
7  And it says "Downgraded one level -- the cohort
8  study by Costa, et al. (2015) was assessed as at
9  high risk of bias (poor quality overall, lack of
10  binding, and no control group."
11        Do you see that?
12    A.  Yes.
13    Q.  And do you agree with that assessment?
14    A.  I agree with the lack of binding.  I
15  don't think it's fully accurate to say there
16  wasn't a control group.
17    Q.  Do you agree it's at high risk of bias?
18    A.  It depends on how they're defining that
19  term.
20    Q.  What if they're defining it in accordance
21  with the GRADE methodology?
22        MS. NOWLIN-SOHL:  Object to form.
23        THE WITNESS:  The thing about GRADE
24  methodology is there are several categories to go
25  through each one, and then it's somewhat

Page 219

1        The other thing about the GRADE criteria
2  is that they -- they grade each individual study,
3  but I find it's useful to look at the body of
4  research as a whole because certain studies are
5  going to have weaknesses that other studies
6  complement with their strengths, so it's important
7  to look at the full body of research as a whole
8  where these individual GRADE scores for different
9  individual studies are true because studies are
10  going to have strengths and limitations.  But it's
11  useful within the body of literature as a whole.
12    Q.  (BY MR. RAMER) And you mention there
13  were different tools to assess different types of
14  bias.
15        What tools do you use?
16    A.  Is there a specific type of bias you're
17  interested in?
18    Q.  Any of the examples you provided.
19    A.  So recall bias, for instance, you would
20  look at the amount of time between when you're
21  asking the person the survey question and when
22  that happened.
23        You would look at the salience of the
24  event.  People are more likely to have more
25  intense recall bias if it was a relatively mundane

Page 221

56 (Pages 218 - 221)

1 event from the distant past than they are if it
2 were a very notable event from the somewhat recent
3 past.
4     Q.  I guess do you use a method to assess
5 bias?  Or do you just read the study and reach a
6 conclusion based on your expertise?
7         MS. NOWLIN-SOHL:  Object to form.
8         THE WITNESS:  It depends on the type of
9 bias.  So if it's recall bias, you're looking, for
10 instance, at the number of years between the
11 recall and the event, which is quantitative.
12         And then secondarily you're assessing how
13 salient that event is.
14     Q.  (BY MR. RAMER)  What about a bias for a
15 confounding variable?  How do you assess that when
16 you're reading an individual study?
17     A.  Let's say it's a logistic regression
18 model.  You would look at whether or not they
19 collected that -- the data point for that
20 potential confounder and built it into their
21 statistical model.  If they didn't, then there's a
22 risk of confounding.
23     Q.  And so do you agree that the evidence
24 quality for the use of puberty blockers to treat
25 gender dysphoria is very low on the GRADE scale?

Page 222

1         MS. NOWLIN-SOHL:  Object to form.
2         THE WITNESS:  Again, GRADE scaling is a
3 little difficult because you go through -- and
4 really you're supposed to have a committee where
5 you go through each individual one and it's
6 somewhat subjective because there are many
7 determinations for deciding how to score each
8 category, but I will say the way the GRADE scoring
9 system is set up, it does really prioritize things
10 like randomized controlled trials.
11         So I would expect any group that went
12 through the GRADE scoring would find that it would
13 be in the low, very low categories.
14     Q.  (BY MR. RAMER)  And you say GRADE scoring
15 was somewhat subjective.
16         Do you think it's more or less subjective
17 than you just reading individual studies?
18         MS. NOWLIN-SOHL:  Object to form.
19         THE WITNESS:  I don't understand the
20 question.
21     Q.  (BY MR. RAMER)  What don't you understand
22 about it?
23         MS. NOWLIN-SOHL:  Object to form.
24         THE WITNESS:  Subjective in what way?
25     Q.  (BY MR. RAMER)  Well, you used the term

Page 223

1 "subjective" talking about the GRADE methodology.
2         What were you referring to?
3     A.  That when you go through the categories,
4 like, for instance, bias, indirectness, and
5 inconsistence, there's subjectivity in how you
6 apply those criteria on each of those and
7 discretionary decisions that are made based on the
8 general guidance that the GRADE system creates.
9         MR. RAMER:  I'd like to turn to Turban
10 Exhibit 18, if you have that, Li.
11         MS. NOWLIN-SOHL:  Yes.
12         (Deposition Exhibit No. 18 was marked.)
13     Q.  (BY MR. RAMER)  Okay.  And, Dr. Turban,
14 do you recognize this document?
15     A.  Yes.
16     Q.  And what is it?
17     A.  This is a report from a U.K. agency
18 looking at the research of gender-affirming
19 hormone treatments for adolescent gender
20 dysphoria.
21     Q.  And do you understand this to be a
22 systematic review?
23     A.  Yes.
24     Q.  And is this by the same organization as
25 the one we were just previously looking at?

Page 224

1 Correct?
2     A.  Yes.
3     Q.  And is this something you've read before?
4     A.  Yes.
5     Q.  And did you study it closely?
6     A.  At the time.
7     Q.  And what did you think when you read it?
8     A.  What I recall, it reviewed studies that I
9 generally was already aware of, and I believe
10 similarly had excluded a handful of studies.
11         I think when I was reading it, it was --
12 it had been published for a while, so I also
13 noticed that there understandably was not
14 inclusion of important studies that were published
15 after it came out.
16     Q.  Okay.  I'd like to go to page 70.  And
17 toward the bottom there's a bold blue header that
18 says "Appendix D Excluded Studies Table."
19         Do you see that?  Sorry.  I missed you.
20 Did you see that?
21     A.  Yes.
22     Q.  And then I'd like to go to page 72.  And
23 the second study listed there, the de Vries 2014
24 study.  That's a study that you cite in your
25 declaration, correct?

Page 225

57 (Pages 222 - 225)

1    A.  Correct.
2    Q.  And then I'd like to go to -- well, and
3  you were aware that the publishers of this
4  systematic review excluded that study from
5  consideration before you cited it in your
6  declaration, correct?
7    A.  It's years ago that I read this, but yes,
8  I would have at some point been aware of that.
9    Q.  And let's go to page 77.  And that's
10  entitled "Appendix E, Evidence Tables."
11    Do you see that?
12    A.  Yes.
13    Q.  And there they are discussing the Achille
14  article that you cite, correct?
15    A.  I believe that's how you pronounce it.
16    Q.  But that's the article that you cite,
17  correct?
18    A.  Yes.
19    Q.  And then go to page 79.  And toward the
20  bottom, that's the Allen study that you cite,
21  correct?
22    A.  Correct.
23    Q.  And then 81.  And that's the Kaltiala
24  study that you cite, correct?
25    A.  Yes.

Page 226

1    Q.  And then two more.  Page 97.  I'm sorry,
2  page 92, I apologize.
3    And that is the Cooper study that you
4  cite, correct?
5    A.  Yes.
6    Q.  And then page 97 and toward the bottom,
7  that is the de Lara study that you cite, correct?
8    A.  Yes.
9    Q.  I'd like to go back to page 13 of this
10  document.  And just above the middle of the page
11  there is a bold blue header that says
12  "Discussion."  And then the third paragraph after
13  that starts with the words "The included studies."
14  And I'd just like to read that, and I'll ask if I
15  read it correctly.
16    "The included studies have relatively
17  short follow-up with an average duration of
18  treatment with gender-affirming hormones between
19  around one year and 5.8 years.  Further studies
20  with a longer follow-up are needed to determine
21  the long-term effect of gender-affirming hormones
22  for children and adolescents with gender
23  dysphoria."
24    Did I read that correctly?
25    A.  Yes.

Page 227

1    Q.  Do you agree that it will take longer
2  than 5.8 years for some of the effects associated
3  with these hormonal interventions to become
4  apparent?
5    MS. NOWLIN-SOHL:  Object to form.
6    THE WITNESS:  Hard to know.  I guess I
7  would point out that this isn't uncommon in
8  medicine.  Any medication that was approved by the
9  FDA in the past few years we're not going to have,
10  you know, years and years of follow-up data for.
11  That's not really unusual in medicine.
12    And it would be unusual to ban the
13  treatment because we didn't have more than six
14  years of treatment.  It would make it so you had
15  to ban every treatment every time it was approved
16  essentially.
17    But I can't tell you with 100 percent
18  certainty about years past, the data we have.
19    Q.  (BY MR. RAMER)  And going to the next
20  paragraph below that, the first sentence, just
21  read it, ask if I read it correctly.
22    It says "Most studies included in this
23  review did not report comorbidities (physical or
24  mental health) and no study reported concomitant
25  treatments in detail."

Page 228

1    Did I read that correctly?
2    A.  Yeah.  I think that's true because this
3  was published prior to some of those other studies
4  that looked at psychotherapy as a potential
5  confounder.
6    Q.  But for the record, I read that
7  correctly?
8    A.  Yes.
9    Q.  Okay.  And what do you -- well, let me
10  read the next sentence, and then I'll -- my first
11  question will be did I read it correctly.
12    "Because of this, it is not clear whether
13  any changes seen were due to gender-affirming
14  hormones or other treatments the participants may
15  have received."
16    And did I read that correctly?
17    A.  Yes.
18    Q.  And is this paragraph describing a
19  confounding variable like we discussed earlier?
20    MS. NOWLIN-SOHL:  Object to form.
21    THE WITNESS:  Yes.
22    Q.  (BY MR. RAMER)  And the, quote, other
23  treatments in that last sentence could include
24  psychotherapy, correct?
25    A.  Theoretically, yes.  I can't be sure what

Page 229

58 (Pages 226 - 229)

1  they meant, but...
2      Q.  Well, when you read this, what did you
3  understand it to mean?
4      A.  That was my best guess, but they didn't
5  say.
6      Q.  Could it also include psychiatric
7  medication?
8      A.  Potentially.
9          MR. RAMER:  I'd like to now go to Turban
10  Exhibit 19.  And do you have that, Li?
11         MS. NOWLIN-SOHL:  We do.
12         MR. RAMER:  Great.
13         (Deposition Exhibit No. 19 was marked.)
14     Q.  (BY MR. RAMER)  And, Dr. Turban, have you
15  seen this document before?
16     A.  I think yes.  It's a review article that
17  was published in, I think, a Swedish medical
18  journal.
19     Q.  And have you read this?
20     A.  I did read it.  It has, if I remember
21  correctly, a lot of hyperlinks to very long
22  appendices that I have not fully read in detail.
23     Q.  I'd like to go to page 2280, which is the
24  second page of the article.  And right column
25  under Section 2.1, I'll read the first sentence.

Page 230

1  insufficient?
2          MS. NOWLIN-SOHL:  Object to form.
3          THE WITNESS:  I would need a precise
4  definition of what they mean by "insufficient."
5      Q.  (BY MR. RAMER)  When you read this, did
6  you try to figure out what they meant by
7  "insufficient"?
8      A.  Probably at the time.  I don't recall
9  what their definition was.
10     Q.  And so you said the article included a
11  lot of hyperlinks to very long appendices; is that
12  right?
13     A.  Yes.
14     Q.  And did you ever try to analyze those?
15     A.  I started to, but didn't have time.  But
16  as I mentioned earlier, a lot of what happens with
17  the systematic review is there are subjective
18  choices made in how you define your search
19  terminology, how you decide to exclude and
20  include.
21         So my intention was to go through and
22  better understand their full methodology, but
23  ultimately I did not have time.
24     Q.  Okay.  I'd like to go to -- maybe we're
25  still on 2280.  And in the right column there is a

Page 232

1      It says "This systematic review
2  originated from a two-year commissioned work from
3  the governmental body of the Swedish agency for
4  health, technology, assessment, and assessment of
5  social services (SBU)."
6          Did I read that correctly?
7      A.  Yes.
8      Q.  And do you understand this article to be
9  a systematic review commissioned by the Swedish
10  government?
11     A.  I believe so, yes.
12     Q.  So same page in the very top in the fully
13  gray box, there is a conclusion.  And I'll read it
14  and ask if I read it correctly.
15         It says "Evidence to assess the effects
16  of hormone treatment on the above fields in
17  children with gender dysphoria is insufficient.
18  To improve future research, we present the GENDHOR
19  checklist, a checklist for studies in gender
20  dysphoria."
21         Did I read that correctly?
22     A.  Yes.
23     Q.  Do you disagree with the conclusion that
24  evidence to assess the effects of hormone
25  treatment on children with gender dysphoria is

Page 231

1  box with key notes and then some bullets below it.
2          And the last bullet says "GnRHa treatment
3  in children with gender dysphoria should be
4  considered experimental treatment of individual
5  cases rather than standard procedure."
6          Did I read that correctly?
7      A.  Yes.
8      Q.  And do you disagree with that conclusion?
9          MS. NOWLIN-SOHL:  Object to form.
10         THE WITNESS:  Again, the terminology they
11  use doesn't have clear definitions, from my
12  perspective, by calling it an experimental
13  treatment.
14         I think that we always in medicine are
15  considering treatments on a case-by-case basis,
16  and for the individual patient we're weighing
17  risks, benefits, and unknowns, including for
18  puberty blockers.
19         So it's in line with my clinical practice
20  and I think most people's clinical practices that
21  treatment is individualized, and we take things
22  into account for the individual patient.
23         I'm not sure what they would mean by
24  "standard procedure."
25     Q.  (BY MR. RAMER)  I'd like to go to 2281 to

Page 233

59 (Pages 230 - 233)

1 the next page, right column, 3.1. And the final
2 sentence of that paragraph in 3.1 says "A list of
3 excluded studies is provided at the SBU web page,"
4 and then includes a hyperlink.
5        Do you see that?
6    A.  Yes.
7    Q.  All right.
8        MR. RAMER:  I'd like to now introduce
9 Turban Exhibit 20 if you have that, Li.
10       MS. NOWLIN-SOHL:  Yes.
11       (Deposition Exhibit No. 20 was marked.)
12   Q.  (BY MR. RAMER)  And, Dr. Turban, I will
13 represent to you that this document is located at
14 the hyperlink that we just read.
15       And is this one of the long appendices
16 you were referring to?
17   A.  It looks a lot nicer than the one I
18 remember.  I wonder if they fixed some of the
19 formatting in translation.
20   Q.  It could be.
21   A.  But no, that's fine.  It's not very long.
22   Q.  And the -- let's see here.
23       Okay.  Can you see in the light blue -- I
24 won't ask you to read Swedish -- but after the
25 backslash, it says "Appendix 2 studies excluded
                                    Page 234

1        Do we want to take a break here?
2    MS. NOWLIN-SOHL:  Yeah.
3        THE VIDEOGRAPHER:  Okay.  So the time is
4 3:20 p.m. Pacific time, and we are off the record.
5        (Break taken from 3:20 p.m. to 3:27 p.m.)
6        THE VIDEOGRAPHER:  All right.  So we are
7 recording.  The time is 3:27 p.m. Pacific time,
8 and we are back on the record.
9        MR. RAMER:  Okay.  Dr. Turban, I'd like
10 to introduce Turban Exhibit 21 if that has
11 arrived.
12       MS. NOWLIN-SOHL:  It has not.
13       MR. RAMER:  Then we'll hold that as
14 Turban Exhibit 21 just to keep the numbering
15 clear, and I'll introduce Turban Exhibit 22.
16       MS. NOWLIN-SOHL:  Okay.  We have that up.
17       MR. RAMER:  Okay.  Great.
18       (Deposition Exhibit No. 22 was marked.)
19   Q.  (BY MR. RAMER)  And, Dr. Turban, have you
20 seen this document before?
21   A.  Yes.
22   Q.  I'm sorry?
23   A.  Yes.
24   Q.  And did you read it?
25   A.  Yes.
                                    Page 236

1 due to high risk of bias."
2    A.  Yes.
3    Q.  And do you cite -- let me rephrase.
4        The first study listed is the Achille
5 study you cite, correct?
6    A.  Yes.
7    Q.  And the second study listed is the Allen
8 study you cite, correct?
9    A.  Yes.
10   Q.  And the third study listed is one of the
11 de Vries studies that you cite, correct?
12   A.  Yes.
13   Q.  And at the bottom of this page is the de
14 Lara study that you cite, correct?
15   A.  Yes.
16   Q.  Dr. Turban, are you aware of any
17 systematic reviews that have been able to draw
18 conclusions about the effects of gender-affirming
19 hormone therapy on suicide?
20   A.  Like death from suicide?
21   Q.  Yes.
22   A.  No.
23       MR. RAMER:  I think this is a good
24 breaking point.  I also think I've been going for
25 about an hour.
                                    Page 235

1    Q.  And when was the last time you read it?
2    A.  I read this one recently, a few days ago
3 when I was writing my statement.
4    Q.  And I'd like to go to page 3.  And
5 under -- there's a blue header that says "Caution
6 in the use of hormonal and surgical treatment."
7 And I'll just read the first sentence and ask if I
8 read it correctly.
9        It says "At group level (i.e., for the
10 group of adolescents with gender dysphoria as a
11 whole) the National Board of Health and Welfare
12 currently assesses that the risk of puberty
13 blockers and gender-affirming treatment are likely
14 to outweigh the expected benefits of these
15 treatments."
16       Did I read that correctly?
17   A.  Yes.
18   Q.  And a little further down on this page,
19 the second full paragraph -- I guess, sorry.  Let
20 me ask first, do you agree that the risks of
21 puberty blockers and gender-affirming treatment
22 are likely to outweigh the expected benefits of
23 those treatments?
24       MS. NOWLIN-SOHL:  Object to form.
25       THE WITNESS:  They have a strange clause
                                    Page 237

60 (Pages 234 - 237)

1  of "at a group level (i.e., for the group
2  adolescents with gender dysphoria)" as a whole.
3  They say risks likely outweigh the benefits.
4      This document later goes on to note that
5  you should consider these interventions on a
6  case-by-case basis for the individual patient,
7  which, in my view, is very similar to WPATH
8  guidelines and how we practice.  So we conduct
9  these biopsychosocial evaluations to determine if,
10  for an individual person, the potential benefits
11  outweigh the potential risks.
12      So I would say that sentence, I agree.
13      Q.  (BY MR. RAMER)  You think that the policy
14  set forth by this document is consistent with the
15  WPATH guidelines?
16      MS. NOWLIN-SOHL:  Object to the form;
17  mischaracterizes prior testimony.
18      THE WITNESS:  I think in that it
19  recommends being very thoughtful about who
20  receives gender-affirming medical interventions
21  but still considering them.  I think that's a
22  theme of both.
23      Q.  (BY MR. RAMER)  If Sweden's policy were
24  implemented in the United States, would treatment
25  change at all?

Page 238

1      MS. NOWLIN-SOHL:  Object to form.
2      THE WITNESS:  You'll have to give me a
3  minute to read it in detail again for any
4  potential --
5      Q.  (BY MR. RAMER)  Sorry.  To read what in
6  detail?  That sentence?
7      A.  This document of the guidelines.  You
8  wanted me to tell you if the guidelines are
9  essentially identical to what's practiced in the
10  U.S.
11      Q.  Well, the question I originally asked was
12  about the first sentence.  Do you agree that the
13  risks of puberty blockers and gender-affirming
14  treatment are likely to outweigh the expected
15  benefits of these treatments?
16      And I thought your answer was, well,
17  they're talking about the group level.  They have
18  this strange clause about the group level.  And we
19  don't practice medicine any different here in the
20  United States because we go on an individualized
21  basis.
22      And so I guess you were extrapolating
23  from the first sentence to the practice of care
24  here, and that's why I asked the question.  So I
25  frankly do not want to take -- you know, I have

Page 239

1  some other questions we can ask, but you think
2  that that first sentence is consistent with the
3  practice in the United States currently?
4      MS. NOWLIN-SOHL:  Object to form.  Object
5  to prior mischaracterization of testimony.
6      Q.  (BY MR. RAMER)  And if that sentence is
7  just not relevant, that's fine, but just following
8  up on your answer.
9      A.  I think I answered the question that it's
10  similar between what's written here and what's
11  practiced in the U.S., that we don't, without a
12  thoughtful biopsychosocial evaluation, routinely
13  provide gender-affirming medical interventions
14  without carefully weighing the potential risks
15  against potential benefits for individuals.
16      Q.  On the same page a little further down,
17  second paragraph, there's a sentence that begins
18  with "In revising its recommendations."  I just
19  want to read it and first ask if I read it
20  correctly.
21      "In revising its recommendations, the
22  National Board of Health and Welfare has taken
23  account of the fact that the efficacy and safety,
24  benefits, and risks of treatments are not proven,
25  and that three factors have shifted the balance

Page 240

1  between benefit and risk in a negative direction."
2      Did I read that correctly?
3      A.  Yes.
4      Q.  And the first bullet they list is --
5  refers to "the uncertainty resulting from the lack
6  of clarity about the causes that the number of
7  people diagnosed with gender dysphoria has
8  continued to rise since the publication of the
9  guidelines in 2015, particularly in the 13 to 17
10  age group, and especially among people whose
11  registered sex at birth is female."
12      Do you see that?
13      A.  Yes.
14      Q.  And do you agree there's uncertainty
15  resulting from the lack of clarity about the cause
16  for the increase of gender dysphoria among
17  adolescents whose registered sex at birth is
18  female?
19      MS. NOWLIN-SOHL:  Object to form.
20      THE WITNESS:  I believe I wrote this in
21  my declaration, but most experts think that the
22  reason for the increase in referrals to gender
23  clinics is due to increased public knowledge that
24  these interventions exist.
25      I believe I cited a paper from the Dutch

Page 241

61 (Pages 238 - 241)

1  group that noted that the number of referrals that
2  they received increased, but the percentage of
3  individuals who presented to the clinic and
4  actually received gender-affirming medical
5  interventions was low, highlighting that despite
6  the increase of referrals, there's still a
7  stringent process and evaluation on an individual
8  basis, as I noted, for who actually receives
9  gender-affirming medical interventions.
10        The question of the sex ratio, I believe
11  I discussed also.  When we look at large data sets
12  in the United States of community samples, it's
13  actually quite close to one to one among trans
14  youth, how many are sex assigned at birth, male
15  versus female.
16        So there's a lot of research on this
17  question.
18        Q.  (BY MR. RAMER)  And so you disagree that
19  there's a lack of clarity about that?
20        MS. NOWLIN-SOHL:  Object to form.
21        THE WITNESS:  I think there's more known
22  than is explained here.
23        Q.  (BY MR. RAMER)  In the second -- flipping
24  to the next page, the second bullet states "The
25  documented prevalence among young adults of

Page 242

1  medical detransition, which is the process by
2  which a person discontinues gender-affirming
3  medical treatment for any reason or seeks to
4  reverse the medical effects of completed
5  gender-affirming treatment, according to the SBU,
6  it is not possible to assess how common it is for
7  young people to later change their perception of
8  their gender identity or to discontinue a
9  gender-affirming treatment."
10        Did I read that correctly?
11        A.  You read it correctly.
12        Q.  Do you agree that it is not possible to
13  assess how common it is for young people to later
14  change their perception of their gender identity?
15        A.  I think this bullet point is somewhat
16  contradictory because it first says that there is
17  a documented prevalence of detransition, and then it
18  suggesting that we do know the number, and then it
19  goes on to say that it's not possible to know the
20  number.
21        There are some studies that have looked
22  at that question.  The de Vries study followed 55
23  adolescents through pubertal suppression,
24  gender-affirming hormones into young adulthood.
25  None of their gender identities changed.

Page 243

1        The Brick, et al. study, I'm not sure if
2  I referenced that one or not, that one found of
3  those who started pubertal suppression, a few of
4  them did not go on to gender-affirming hormones
5  for various reasons.  Some of them still
6  identified as transgender; some did not.
7        There's also the Wiepjes study where
8  1.9 percent of adolescents who started pubertal
9  suppression did not go on to gender-affirming
10  hormones.
11        So again there is more data known than is
12  provided in this bullet point, and I think the
13  bullet point is confusing and that it contradicts
14  itself.  I don't know if it's a translation issue.
15        Q.  Well, with respect to the contradiction,
16  you agree there is a distinction between knowing
17  the number of individuals who would detransition
18  and knowing how common it would be for people to
19  later detransition, correct?
20        A.  Would you repeat the question?
21        Q.  Is there a distinction between a number
22  and a probability is basically the question?
23        A.  The probability is a number.  Sorry.  I'm
24  not understanding.
25        Q.  I guess you're saying the first sentence

Page 244

1  of the bullet point is contradictory because the
2  first sentence says "The documented prevalence
3  among young adults," so it's admitting it knows
4  that these people exist.
5        And then the second sentence says "It is
6  not possible to assess how common it is."
7        And I thought your answer was that's
8  contradictory.
9        And I guess my question is is it really
10  contradictory if you know that a certain number of
11  people experience something but you also don't
12  know how common it will be for others to have that
13  same experience?
14        A.  The word "prevalence" means how common
15  something is, not just that it exists.
16        Q.  And so you think "prevalence" does mean
17  how common something is?
18        A.  In medicine, that's what "prevalence"
19  means.
20        Q.  And with respect to -- with respect to
21  determining how common it is for young people to
22  later change their perception of their gender
23  identity, is it your testimony that we do have
24  good evidence of how common it would be?
25        MS. NOWLIN-SOHL:  Object to form.

Page 245

62 (Pages 242 - 245)

1      THE WITNESS:  We have the studies I just
2  described.
3      Q.  (BY MR. RAMER)  And you think those
4  constitute good evidence for determining how
5  common it is for young people to later change
6  their perception of their gender identity?
7      MS. NOWLIN-SOHL:  Object to form.
8      THE WITNESS:  As a scientist, I don't
9  like words like this that don't have precise
10  meaning, but it is evidence to that question.
11      Q.  (BY MR. RAMER)  Do you agree that some
12  individuals regret receiving gender-affirming
13  medical interventions?
14      A.  Yes.
15      Q.  Is it possible to predict beforehand
16  which individuals will come to regret those
17  interventions?
18      MS. NOWLIN-SOHL:  Object to form.
19      THE WITNESS:  The goal of the
20  biopsychosocial evaluation is to understand the
21  person's biological factors, psychological
22  factors, social environment as much as is
23  possible.  And it's all designed to minimize that
24  risk, but it's not certain, as with most things in
25  medicine, to determine with 100 percent certainty.
Page 246

1      Q.  (BY MR. RAMER)  And then staying on this
2  page, I'd like to go down.  There is a section
3  entitled "Decisions on Treatment in an Individual
4  Case."
5      Do you see that?
6      A.  Yes.
7      Q.  And I'm going to read the first sentence
8  and ask if I read it correctly.
9      It says "To guide the decision on
10  puberty-suppressing treatment for an adolescent in
11  Tanner Stage 3 and for gender-affirming hormone
12  therapy, the National Board of Health and Welfare
13  recommends the criteria whose use has been
14  documented and monitored within the framework of
15  the Dutch protocol."
16      Did I read that correctly?
17      A.  Yes.
18      Q.  And can you describe the criteria that
19  has been used for the Dutch protocol?
20      A.  The WPATH guidelines are modeled off of
21  the Dutch protocol.  They were the first to
22  publish in the academic literature their approach
23  to these gender-affirming medical interventions
24  for adolescents with gender dysphoria.
25      I'd say the biggest themes are, one,
Page 247

1  conducting a biopsychosocial evaluation prior to
2  proceeding with treatment.
3      And the second is that treatment is
4  offered in a step-wise fashion from most
5  reversible to least reversible.  So you would
6  start with pubertal suppression prior to
7  considering gender-affirming hormones, which are
8  less reversible.  And then the last resort would
9  be surgery.
10      Q.  Does the criteria of the Dutch protocol
11  require incongruence since childhood?
12      A.  I think they've evolved in their practice
13  over time.  Certainly initially they focused
14  specifically on prepubertal diagnoses of gender
15  dysphoria, or at least documented history of that,
16  but I've not checked in with them recently to know
17  if that's still a search criterion or not.
18      Q.  I'll read the second sentence here and
19  ask if I read it correctly.
20      It says "The criteria include the
21  existence of the incongruence since childhood, the
22  stability of gender identity over time, clear
23  distress caused by the onset of puberty, and the
24  absence of factors that complicate the diagnostic
25  assessment."
Page 248

1      Did I read that correctly?
2      A.  Yes.
3      Q.  And so the Swedish government seems to
4  think the criteria for the Dutch protocol does
5  include the incongruence since childhood, correct?
6      MS. NOWLIN-SOHL:  Object to form.
7      THE WITNESS:  That's what that sentence
8  is implying.  Again, I've not checked with the
9  Dutch to know if they still have that element in
10  place.
11      Q.  (BY MR. RAMER)  If -- is that
12  requirement -- are the current WPATH guidelines
13  consistent with that requirement?
14      A.  They are certainly influenced by that
15  requirement, but they say if there's not a clear
16  history of gender incongruence during childhood,
17  then you should extend the biopsychosocial
18  assessment process.
19      Q.  But a patient would be eligible for
20  treatment under the WPATH guidelines even if that
21  patient did not have gender incongruence during
22  childhood, correct?
23      MS. NOWLIN-SOHL:  Object to form.
24      THE WITNESS:  They would need to go
25  through a longer diagnostic assessment process,
Page 249

63 (Pages 246 - 249)

1 but it wouldn't be considered an absolute
2 contraindication, if you will, but something that
3 would kind of raise a flag for the medical team to
4 proceed with more caution.
5 Q. (BY MR. RAMER) Did the Dutch protocol
6 assess individuals who had a nonbinary gender
7 identity?
8 MS. NOWLIN-SOHL: Object to form.
9 THE WITNESS: Historically most of their
10 patients, I believe, had expressed a binary
11 understanding of their gender identity. I would
12 be surprised if they haven't also treated patients
13 with nonbinary identities, but I can't say for
14 sure.
15 Q. (BY MR. RAMER) Well, I guess the studies
16 that you cite out of the Dutch clinic -- well, no,
17 let's do it this way.
18 Same page, paragraph below the one we
19 were just looking at, first sentence says "The
20 documented experience with the Dutch protocol
21 includes only adolescents with binary gender
22 identity. And among participating experts, there
23 is a lack of clinical experience with
24 puberty-suppressing and gender-affirming hormone
25 therapy with adolescents with nonbinary gender
Page 250

1 MS. NOWLIN-SOHL: Object to form;
2 foundation.
3 THE WITNESS: I don't know what you mean
4 by "less available."
5 Q. (BY MR. RAMER) Do you treat patients
6 whose gender identity -- excuse me.
7 Do you treat patients whose gender
8 incongruence arose during adolescence as opposed
9 to during childhood?
10 A. All of my patients I can think of had
11 some degree of gender incongruence during
12 childhood, but it's not considered an absolute
13 contraindication.
14 Again, as the WPATH guidelines note, if
15 you had a patient, they would have to meet
16 criteria for gender dysphoria, so they would need
17 to have a gender identity different than their sex
18 assigned at birth for at least six months. And
19 then you would need to extend the diagnostic
20 process to better understand the situation.
21 Q. So your clinical population -- let me
22 rephrase.
23 Your practice would not change if there
24 was a requirement imposed that patients needed to
25 have a history of gender incongruence in
Page 252

1 identity."
2 Did I read that correctly?
3 A. Yes.
4 Q. And so are they wrong where they state
5 the Dutch protocol includes only adolescents with
6 binary gender identity?
7 MS. NOWLIN-SOHL: Object to form and
8 foundation.
9 THE WITNESS: Again, in the past I think
10 the vast majority of their patients had binary
11 gender identities. I'm not sure if they still
12 have that requirement in the Dutch clinic.
13 Q. (BY MR. RAMER) Did the individuals in
14 the de Vries 2011 or de Vries 2014 studies have a
15 nonbinary gender identity?
16 A. I believe in the 2014 study they all had
17 binary gender identities.
18 To the 2011 study, I'd have to go back
19 and look at the details of the methodology.
20 Q. If there was a requirement in the United
21 States that an adolescent could not obtain
22 gender-affirming medical interventions unless the
23 adolescent had a history of gender incongruence
24 since childhood, would gender-affirming medical
25 interventions be less available?
Page 251

1 childhood; is that right?
2 MS. NOWLIN-SOHL: Object to form;
3 mischaracterizes prior testimony.
4 THE WITNESS: Some of my current patients
5 that I can think of, they all had some amount of
6 gender incongruence during childhood. But I can't
7 speak as to what patients I would have in the
8 future and if all of them would.
9 I think the WPATH guidelines, in
10 acknowledging that there are some patients who
11 come to understand their gender identity later, in
12 that they explain that you need to extend the
13 diagnostic process, highlights that patients like
14 that do exist.
15 The Journal of Adolescent Health paper we
16 talked about recently also shows there's a sizable
17 portion of patients like that.
18 So I think it would be limiting care for
19 those such patients who might need treatment.
20 Q. (BY MR. RAMER) Are puberty blockers
21 available as a treatment for gender dysphoria in
22 the U.K.?
23 A. My understanding is yes. My reading of
24 the Cass Interim Report is that the plan was to
25 close their centralized clinic and open regional
Page 253

64 (Pages 250 - 253)

1  clinics around the country.  I don't know what
2  their progress has been in doing that.
3      Q.  So you think that minors with gender
4  dysphoria can receive puberty blockers at those
5  regional clinics in the U.K.?
6      A.  My understanding is that that their plan,
7  to set up regional clinics so that patients could
8  access care, and that care could include pubertal
9  suppression.
10     Q.  So you do not think that access to
11  pubertal suppression in the U.K. is limited to
12  research trials?
13         MS. NOWLIN-SOHL:  Object to form;
14  mischaracterizes prior testimony.
15         THE WITNESS:  I believe what they said is
16  that the regional centers should have ongoing data
17  collection.  So if you would call that the
18  clinical trial, then sure.
19     Q.  (BY MR. RAMER) Ongoing data collection
20  on the administration of puberty blockers to treat
21  gender dysphoria?
22     A.  I believe it said that the regional
23  clinic should have ongoing data collection, yes.
24     Q.  And so the regional clinics, your
25  understanding is that they are permitted to
Page 254

1  provide puberty blockers to adolescents with
2  gender dysphoria; is that correct?
3         MS. NOWLIN-SOHL:  Object to form.  Object
4  to the extent that it calls for a legal
5  conclusion.
6         THE WITNESS:  I'm not certain if it's
7  physically in that center, but the report makes it
8  clear that pubertal suppression is still an option
9  for individual patients, and that the general
10  gender dysphoria care is being moved from that
11  centralized clinic to regional clinics.
12         MR. RAMER:  I'd like to look at -- did
13  the Turban Exhibit 21 come through, Li?
14         MS. NOWLIN-SOHL:  Yes.
15         MR. RAMER:  Okay.  I'd like to pull up
16  Turban Exhibit 21, which has the title "Effects of
17  Gender-Affirming Therapies and People With Gender
18  Dysphoria:  Evaluation of the Best Available
19  Evidence."
20         (Deposition Exhibit No. 21 was marked.)
21     Q.  (BY MR. RAMER)  And Dr. Turban, have you
22  seen this document before?
23     A.  I have not.
24     Q.  And were you aware that the Florida
25  Agency For Healthcare Administration imposed
Page 255

1  policies that restricted access to
2  gender-affirming medical interventions?
3      A.  I read it in the news.
4      Q.  And did you ever try to research the
5  evidentiary basis for that decision?
6         MS. NOWLIN-SOHL:  Object to form.
7         THE WITNESS:  I know they commissioned a
8  report that was criticized by others, but I
9  personally did not go through it.
10     Q.  (BY MR. RAMER)  Okay.  That's all I have
11  on that one.
12         And, Dr. Turban, do you consider yourself
13  to be an expert?
14         MS. NOWLIN-SOHL:  Object to form.
15         THE WITNESS:  Are you still there?
16     Q.  (BY MR. RAMER)  I didn't hear you.  I'm
17  sorry.
18         My question was do you consider yourself
19  to be an expert?
20         MS. NOWLIN-SOHL:  Same objection.
21         THE WITNESS:  Do you mean in something
22  specific?
23     Q.  (BY MR. RAMER)  In anything.
24     A.  I would say I'm an expert in the research
25  regarding the mental health treatment of
Page 256

1  adolescents and children with gender dysphoria.
2      Q.  And are you an endocrinologist?
3      A.  No.
4      Q.  Are you a surgeon?
5      A.  No.
6      Q.  Are you a social worker?
7      A.  No.
8      Q.  Are you a urologist?
9      A.  No.
10     Q.  Are you a gynecologist?
11     A.  I'm not.
12     Q.  Are you a bioethicist?
13     A.  I've given bioethics grand rounds at Yale
14  and spoken on ethics issues, but it's not my
15  primary area of focus.
16     Q.  Are you a neurologist?
17     A.  No.
18     Q.  And could you just briefly describe what
19  your current position is?
20     A.  I'm an assistant professor of child and
21  adolescent psychiatry at the University of
22  California San Francisco and affiliate faculty as
23  the chief for health policy studies there.
24         I direct our gender psychiatry program in
25  the area of child and adolescent psychiatry.
Page 257

65 (Pages 254 - 257)

1      And I serve as an attending in the eating
2  disorder clinic and the adult LGBT psychiatry
3  program as well, in addition to my research work.
4      Q.   And if that were not enough, are you also
5  going to be attending law school soon?
6      A.   I'm enrolled in a master's of legal
7  studies program.
8      Q.   And where is that?
9      A.   UC Law San Francisco.  There's an
10  affiliation with UCSF.
11          MR. RAMER:  And, Li, did Turban
12  Exhibit 23 come through?
13          MS. NOWLIN-SOHL:  It did.
14          (Deposition Exhibit No. 23 was marked.)
15      Q.   (BY MR. RAMER)  And Dr. Turban, do you
16  recognize this document?
17      A.   Yes.
18      Q.   And what is it?
19      A.   This is, like, a popular press article I
20  wrote for a Psychology Today blog.
21      Q.   And this was initially published in
22  January of 2022, correct?
23      A.   I do not recall the date.
24      Q.   On the first page below the title and the
25  subheader, do you see it says "Posted January 24,

1  2022"?
2      A.   Yes.
3      Q.   And then there's a list of key points.
4  And then a little further down there's a note that
5  says "This post was updated on October 11, 2022.
6  In discussions of studies 5, 7, 8, and 10, the
7  final sentence was appended to include further
8  information about the study."
9          Do you see that?
10      A.   Yes.
11      Q.   And I'd like to go down and just look at
12  those.
13          So study No. 5, which I think is the
14  fourth page in the PDF, and that is the Kaltiala
15  study, correct?
16      A.   Yes.
17      Q.   And the last sentence says "However, the
18  authors note that gender reassignment is not
19  enough to improve functioning and relieve
20  psychiatric comorbidities among adolescents with
21  gender dysphoria," correct?
22      A.   Yes.
23      Q.   And then going to study 7, which is on
24  the next page --
25      A.   To clarify --

1      Q.   Sure.
2      A.   I think that's reference to my
3  declaration also, that often with gender-affirming
4  interventions, we see improvements of mental
5  health but not a complete elimination of mental
6  health challenges because although these
7  treatments improve mental health, these people are
8  still experiencing minority stress and societal
9  stigmas that can drive anxiety, depression, et
10  cetera.
11          So if you want to have a study where
12  you're looking at whether or not the intervention
13  improves, you need to either look at whether or
14  not the person improved before and after or
15  whether those who received treatment do better
16  than those who don't.
17          We've come to expect that you can't use
18  the general population as the control group
19  because though the treatments may improve physical
20  gender dysphoria, we don't expect them to improve
21  bullying, discrimination, et cetera.
22      Q.   So going to the next page for study 7,
23  the final sentence there says "However, because
24  subjects received psychotherapy, the authors note
25  that the study did not provide direct evidence

1  that pubertal suppression improves mental health
2  in transgender youth."
3          Did I read that correctly?
4      A.   Yes.  And again, this is why I wouldn't
5  take any one study in isolation since they all
6  have strengths and weaknesses.  This was not one
7  of the studies that adjusted for psychotherapy.  I
8  think we mentioned earlier some of the ones that
9  did.
10      Q.   And so next page, study 10, I believe
11  this is your own study.  And the final sentence
12  says "Of note, this study did not identify
13  psychotherapy as a potentially confounding
14  variable."
15          Did I read that correctly?
16      A.   Yes.
17      Q.   Was this the one you were struggling to
18  remember earlier?
19      A.   No.  The question was whether or not it
20  adjusted for access to gender-affirming hormones.
21      Q.   Which -- the question in the study or the
22  question I had earlier?
23      A.   The question I could not recall for sure
24  is whether or not it adjusted for gender-affirming
25  hormones, not psychotherapy.

66 (Pages 258 - 261)

1    Q.  Okay.  And then just going back to
2  study 8 on the previous page, the last sentence
3  there is "Over the course of the study, there was
4  a statistically significant decrease in depression
5  scores in one group, male to female transitioners
6  who underwent pubertal suppression only."
7        Did I read that correctly?
8    A.  Yes.  I generally wouldn't use the word
9  "transitioners."  I think these editors -- some of
10  these edits were from -- not me but from
11  Psychology Today.
12        And the thing about this study is they
13  found that overall there was mental health
14  improvement, the full group.  And then I think
15  when they went and made their subgroups that
16  sample size got smaller and smaller and smaller so
17  they became underpowered to detect most
18  statistically significant differences.
19    Q.  When you say the editors were changing
20  things in the document, was there anything else
21  that you can think of that the editors changed
22  without your approval?
23    A.  I think several things.  The story here
24  was that there was someone at the Manhattan
25  Institute who's been very focused on this blog

Page 262

1  post and I think sent a long series of emails to
2  Psychology Today wanting them to add information.
3        And as it's a blog post, they didn't feel
4  it was essential to devote a lot of time going
5  back and forth to them, so I left Psychology Today
6  to do whatever edits they needed to do.  And when
7  I read them, they were generally reasonable.
8    Q.  Okay.  So for study 8 -- well, just to
9  clarify, the individual at the Manhattan
10  Institute, are you referring to Leor Sapir?
11    A.  Yes.
12    Q.  And for study 8, just to unpack what's
13  going on there, so there was -- am I correct in
14  reading this to conclude that there was no
15  statistically significant -- start again -- no
16  statistically significant decrease in depression
17  scores for any female to male transitioners in
18  that study; is that right?
19        MS. NOWLIN-SOHL:  Object to form.
20        THE WITNESS:  So again, it's this issue
21  that you shouldn't -- you can't interpret a lack
22  of statistically significant findings to mean that
23  there's not an effect, because when you start
24  looking at smaller and smaller subgroups and parse
25  out your data, you lose statistical power.

Page 263

1        So they couldn't say one way or another
2  for those specific subgroups.
3        So it doesn't mean that the treatment
4  worked.  It doesn't mean that the treatment
5  doesn't work.  It just means that their sample
6  size got very small and they weren't able to tell
7  you one way or another.
8    Q.  (BY MR. RAMER)  And going back to the
9  first page of this, the second paragraph, the
10  first sentence, you say -- well, maybe you, maybe
11  the editors.  I guess I'll ask you that.
12        The sentence says "Since several U.S.
13  states are introducing legislation to outlaw
14  gender-affirming medical care this year (despite
15  opposition from just about every major medical
16  organization, including the American Medical
17  Association, the American Academy of Pediatrics,
18  and the American Psychiatric Association), I
19  thought this was a good time to review the
20  relevant research for you all."
21        Did I read that correctly?
22    A.  Yes.
23    Q.  Did you write that sentence?
24    A.  I believe so.
25    Q.  And why did the introduction of

Page 264

1  legislation lead you to think it was a good time
2  to review the relevant research for the readers of
3  this blog?
4    A.  Because legislators in several states
5  were making false statements that there was not
6  evidence regarding the benefits of this care, and
7  that I thought it was important for constituents
8  to know when statements by lawmakers are untrue.
9    Q.  Is it fair to say that the -- I'm going
10  to put it this way:  In the cases where you have
11  testified as an expert, is it fair to say that the
12  laws at issue in those cases were enacted by
13  Republican lawmakers?
14        MS. NOWLIN-SOHL:  Object to form;
15  foundation.
16        THE WITNESS:  I believe that's true.
17        MR. RAMER:  And to go back to -- I think
18  I finally have the correction, so I will send
19  that.
20    Q.  (BY MR. RAMER)  Okay.  So I will
21  represent to you that what I am sending is the
22  correction to the Plos One article entitled
23  "Access to Gender-Affirming Hormones During
24  Adolescence and Mental Health Outcomes Among
25  Transgender Adults."

Page 265

67 (Pages 262 - 265)

Page 266

1 And once you receive it, I'll just ask
2 that we kind of pick up where we left off with the
3 prior version, which is Table 2.
4 MS. NOWLIN-SOHL: So, John, are you
5 saying we should open up the prior exhibit as well
6 as the correction?
7 MR. RAMER: Oh, no. I was just trying to
8 explain that we'll use the correction, Turban
9 Exhibit 24. And just go to Table 2, which was the
10 table I was previously asking questions about, and
11 then --
12 MS. NOWLIN-SOHL: Got it. Okay. We're
13 still waiting on it, but I'll let you know when we
14 have it.
15 MR. RAMER: Okay.
16 Okay. Are we still waiting?
17 MS. NOWLIN-SOHL: We are.
18 MR. RAMER: We actually probably have
19 about an hour left on the clock would be my guess.
20 Do you want to take a final break here?
21 Or if it's arrived, we can just continue.
22 MS. NOWLIN-SOHL: Yeah, let's do a
23 five-minute break.
24 MR. RAMER: Okay.
25 THE VIDEOGRAPHER: Okay. So the time is

Page 267

1 4:07 p.m. Pacific time, and we are off the record.
2 (Break taken from 4:07 p.m. to 4:13 p.m.)
3 THE VIDEOGRAPHER: All right. So we are
4 recording. The time is 4:13 p.m. Pacific, and we
5 are back on the record.
6 (Deposition Exhibit No. 24 was marked.)
7 Q. (BY MR. RAMER) Okay. And, Dr. Turban,
8 do you have -- well, I'll introduce Turban
9 Exhibit 24.
10 And does this appear to be the correction
11 you were referring to earlier today?
12 A. Yes.
13 Q. And I'd like to go down to page 4 and
14 Table 2, and I just want to understand.
15 The first row of this chart is basically
16 showing that exposure to GAH, or gender-affirming
17 hormones, is associated with lower odds of past
18 year suicidal ideation; is that right?
19 A. Yes.
20 Q. And the way to understand that is because
21 the adjusted odds ratio for those categories are
22 less than one, and you've hit your statistical
23 significance threshold of less than .0001; is that
24 right?
25 A. I believe this paper has a bottom

Page 268

1 correction -- we might need to open the original
2 paper to see what the cutoff was.
3 Q. Hold on. What did you say? It has a
4 what correction?
5 A. So this is what I was saying earlier that
6 we try not to run a lot of comparisons because
7 when you run a lot of comparisons, it increases
8 the probability of you detecting something that
9 looks significant when it's not.
10 This is one of those papers where we did
11 run a lot of analyses. So when you do that, you
12 do something called a Bonferroni correction where
13 it takes into account how many things you looked
14 at.
15 And the more statistical comparisons you
16 make, the stricter it makes your statistical
17 cutoff. So I need to look at what that number was
18 from the original paper.
19 Q. When you say "what that number was," are
20 you referring to the threshold you're using?
21 A. Correct.
22 Q. So the P-value for the data in this row
23 where it says "less than .0001," I mean, that's
24 going to be --
25 A. So those would all clearly meet the

Page 269

1 threshold, but if you wanted to go through more, I
2 would need to look up what the threshold was.
3 Q. Maybe we should do that. So that was --
4 the original, pre-corrections, was Turban
5 Exhibit 11, I believe.
6 And you would typically report your
7 threshold of statistical significance down in the
8 statistical analyses, I would assume?
9 A. Yes.
10 Q. So that's down on page 4.
11 A. So it was .001.
12 Q. And where are you seeing that?
13 A. Page 5 at the top.
14 Q. Oh, okay. Gotcha. Okay. So the --
15 okay. So the threshold you were using was .001.
16 Now going back to what is Turban
17 Exhibit 24, the correction, we can see that the
18 P-values on those returns is less than .0001, so
19 clearly below the threshold for statistical
20 significance, correct?
21 A. Yes.
22 Q. Okay. And just staying on this row, in
23 looking at the first group, so those who accessed
24 gender-affirming hormones at age 13 through 15,
25 you have an adjusted odds ratio of .4.

68 (Pages 266 - 269)

1     Do you see that?
2     A.  Yes.
3     Q.  And in plain English, to the extent these
4  things can be explained in plain English, does
5  that basically mean that exposure to
6  gender-affirming hormones at ages 13 to 15 is
7  associated with a 60 percent decrease in reporting
8  past year suicidal ideation?
9     A.  60 percent lower odds.
10    Q.  Okay.  So you're 60 percent less likely
11 to report that.  Is that --
12    A.  Odds ratios are a little less intuitive
13 than that, but I would say the odds ratio was
14 60 percent less.
15    Q.  Okay.  If we go down to -- if we go down
16 a row to "Past Year Suicidal Ideation With Plan,"
17 the odds ratios on this one all kind of hover
18 around one, and the P-values do not really come
19 close to statistical significance.
20      So basically we can't really draw any
21 conclusions from that row; is that right?
22    A.  Correct, one way or another.
23    Q.  And then going down to the fourth row,
24 past year's suicide attempt requiring inpatient
25 hospitalization, and with respect to the middle
Page 270

1  group, which accessed gender-affirming hormones at
2  ages 16 or 17, there you have an adjusted odds
3  ratio of 2.2, correct?
4     A.  The P-value is .01, so the -- you can't
5  interpret it.  It doesn't mean anything.  It's not
6  statistically significant, so it doesn't tell you
7  anything one way or another.
8     Q.  And you would decline to use any sort of
9  terminology like "trending towards statistical
10 significance," correct?
11    A.  No.  That's technically incorrect.
12    Q.  Wait.  What?  No, I'm asking if you would
13 use that term.  And I thought --
14    A.  I would not.  That's not appropriate
15 statistical terminology.
16    Q.  And for this paper generally, did you
17 ever break out data by sex assigned at birth?
18    A.  So in the original paper, we did not.
19 Again, because the more comparisons you make, the
20 more you need to do that Bonferroni correction
21 that makes your levels for statistical
22 significance more and more stringent.  And if you
23 go too far with that, then essentially nothing
24 works.
25      I believe as part of the correction,
Page 271

1  somebody had asked us to do that, and I think we
2  did it.  But I don't remember the results, to be
3  honest.
4     Q.  And so you don't recall whether there
5  were any differences in outcomes based on whether
6  the individual received testosterone or estrogen;
7  is that right?
8     A.  I remember it cutting a lot of the sample
9  sizes in half, so we lost a lot of the statistical
10 power.  So it's a little bit harder to interpret
11 the results, but I don't remember the specifics.
12 Because as you can see, for every single statement
13 here, we ran a ton of analyses.
14    Q.  And do you think there could be a
15 difference in outcomes based on whether the
16 individual received testosterone or estrogen?
17    A.  Potentially.
18       MS. NOWLIN-SOHL:  Object to form.
19       THE WITNESS:  Sorry.  Potentially.
20    Q.  (BY MR. RAMER)  And why?
21    A.  I mean, just theoretically, when you
22 break groups up by different characteristics, it
23 could be that certain groups respond to things
24 differently than others, but hard to know.
25       I would expect so, based on clinical
Page 272

1  experience and the general phenomenology of gender
2  dysphoria.
3     Q.  What are --
4     A.  It's a few different things.  So clinical
5  experience we generally see, both for assigned
6  males and for assigned females, tend to improve.
7       And then in terms of just the
8  phenomenology of gender dysphoria, we know a lot
9  of the distress is from one's physical body not
10 aligning with the secondary sex characteristics of
11 one's gender identity.  So our hypothesis would be
12 that both would help with that.
13      That being said, testosterone is a
14 stronger hormone than estrogen, so its physical
15 effects become apparent more quickly than
16 estrogen, and it has more physical effects than
17 estrogen does.
18      So it's possible that those assigned
19 female at birth who were taking testosterone might
20 have more robust or earlier improvement, but the
21 hypothesis would be that both would improve but
22 not necessarily at the same rate or to the same
23 degree.
24      MR. RAMER:  And, Li, do you have Turban
25 Exhibit 25?
Page 273

1        MS. NOWLIN-SOHL:  I believe so.  Yes.
2        (Deposition Exhibit No. 25 was marked.)
3        Q.  (BY MR. RAMER)  And, Dr. Turban, do you
4    have a -- an account on the website formerly known
5    as Twitter, now known as X?
6        A.  Yes.
7        Q.  And is your handle @jack_turban?
8        A.  Yes.
9        Q.  And do you have Exhibit 25 in front of
10   you?
11       A.  Yes.
12       Q.  And is this a Tweet that you sent?
13       A.  Yes.
14       Q.  And I'll just read it first and then ask
15   if I read it correctly.  It says "I'm really sick
16   of the #GOP's creative ways of signaling bigotry.
17   They don't care about the flag.  They just want to
18   signal that they:  (1) hate #LGBTQ people, (2)
19   want them to shut up and hide, and (3) want to
20   (and feel entitled to) have power over them.  It's
21   gross."
22       Did I read that correctly?
23       A.  Yes.
24       Q.  Do you think that Republicans hate LGBTQ
25   people?

Page 274

1    take care of know that it's not a universal view
2    that people think that they should be forced to
3    hide or that any symbols that represent that they
4    should be proud of themselves should be removed
5    from public life.
6        Q.  Do you think the legislators who enacted
7    the law at issue in this case hate LGBTQ people?
8        MS. NOWLIN-SOHL:  Object to form;
9    foundation.
10       THE WITNESS:  Admittedly, I didn't follow
11   the legislative debates about this specific law in
12   Idaho, so I don't even know who introduced it.
13       Q.  (BY MR. RAMER)  So you think that
14   somebody could support legislation like the law at
15   issue in this case without hating LGBTQ people?
16       MS. NOWLIN-SOHL:  Object to form;
17   foundation, mischaracterizes prior testimony.
18       THE WITNESS:  I don't think I can say
19   anything about the motivations of the people who
20   introduced this specific bill.  I think it's
21   possible that they were provided with
22   misinformation about the care that maybe led them
23   to want to introduce it, but I've not spoken with
24   them about their motivations.
25       Q.  (BY MR. RAMER)  And so you think that the

Page 276

1        A.  So this Tweet --
2        MS. NOWLIN-SOHL:  Object to form.
3        THE WITNESS:  This Tweet was specifically
4    in reference to several GOP members not wanting
5    the LGBT Pride flag to be hung at certain events.
6    And they were arguing that they felt that having
7    the flag -- the LGBTQ flag raised in certain
8    places was disrespectful to the American flag,
9    which in my mind, that specific view of wanting to
10   erase a symbol of LGBTQ people from public spaces
11   was a creative way of wanting to force LGBTQ
12   people to hide or not be visible in society or
13   telling them that they need to hide the symbols
14   that represented them.
15       So it's not a broad statement about all
16   members of that political party, but in a specific
17   instance where people were very actively trying to
18   eliminate any symbol of LGBT people from public
19   spaces, I did feel that that was a creative way of
20   trying to exercise power over that population,
21   which includes a lot of young patients I take care
22   of who are very vulnerable and are impacted by
23   those messages.
24       And I think it was important for that to
25   be voiced, particularly so these young patients I

Page 275

1    legislators that you were referring to in this
2    Tweet about the flag -- and sorry.  Where was
3    that, the flag episode that you were describing?
4        A.  This was back in June.  I don't recall
5    the specifics.
6        Q.  It was back just a few months ago.  You
7    don't recall, like, what state?  Was it Congress?
8        A.  There have been many instances like this
9    over the past several months.  I wish this one
10   stood out more than others, but no, I don't
11   remember this specific instance in June.
12       MR. RAMER:  And I'd like to go to Turban
13   Exhibit 26.
14       (Deposition Exhibit No. 26 was marked.)
15       Q.  (BY MR. RAMER)  And do you have that up?
16       A.  Yes.
17       Q.  And I'll just read this one again and ask
18   if I read it correctly.
19       "Republicans don't believe in freedom of
20   speech.  They silenced an elected representative
21   because she disagreed with them on the House
22   floor.  It's not a coincidence that she's
23   transgender.  They are steadfast in silencing and
24   attacking trans Americans.  American democracy is
25   dead."

Page 277

70 (Pages 274 - 277)

1    Did I read that correctly?
2    A.   Yes, with a -- there's a statement below
3  it from the representative who was forced to stop
4  speaking on the House floor.
5    Q.   Do you think that Republicans are
6  steadfast in attacking trans Americans?
7    MS. NOWLIN-SOHL:  Object to form.
8    THE WITNESS:  I think there's been a
9  clear rise in legislation that is not evidence
10 based and goes against the broad consensus in
11 medicine about how we can help these young people
12 I'm responsible for taking care of.  And I have
13 been watching more and more legislation being
14 introduced that is harmful to them and that is
15 concerning to me.
16   Q.   (BY MR. RAMER) Do you think supporters
17 of that legislation are attacking trans Americans?
18   MS. NOWLIN-SOHL:  Object to form.
19   THE WITNESS:  Again, I can't speak to
20 every individual who's introducing legislation,
21 but I can tell you it's legislation where the
22 evidence suggests that it's going to be harmful to
23 this population.
24   And it's very sad to me to watch that
25 non-evidence-based legislation be pushed forward

Page 278

1  democracy is dead?
2    MS. NOWLIN-SOHL:  Object to form.
3    THE WITNESS:  I think it's very scary
4  that politicians would weaponize the government to
5  silence elected representatives from being able to
6  speak on legislation.
7    And as someone who's aware that often
8  physicians don't do a good job sharing evidence
9  broadly and that often the information that we
10 have and this research and peer-reviewed journals
11 doesn't always make its way into legislative
12 debates, it's scary to imagine that the few ways
13 in which that research and data is supposed to get
14 into the law-making process is in some instances
15 being prevented.
16   MR. RAMER:  And I'd like to go to Turban
17 Exhibit 27.
18   (Deposition Exhibit No. 27 was marked.)
19   Q.   (BY MR. RAMER)  And do you have that up?
20   A.   Yes.
21   Q.   And I'll just read it first and then ask
22 if I read it correctly.
23   "Our country is dying and the GOP is
24 killing it.  They are abusing power to attack
25 minorities, then demand that they stand silent

Page 280

1  when all the evidence we have suggests that it's
2  going to be harmful to the young patients that I
3  take care of.
4    Q.   (BY MR. RAMER)  You said the previous
5  Tweet was not a categorical statement.
6    Is this Tweet where you say "Republicans
7  are steadfast in attracting" -- excuse me.
8    "Republicans are steadfast in attacking
9  trans Americans," is that a categorical statement?
10   MS. NOWLIN-SOHL:  Object to form;
11 mischaracterizes prior testimony.
12   THE WITNESS:  This, again, was in
13 response to a specific instance that is described
14 in the screenshot below the Tweet in which a bill
15 was being discussed that would impact trans youth.
16   And there was a representative who was
17 trying to share information about the research and
18 evidence about why that legislation would be
19 harmful to young people.
20   And these Republican lawmakers in
21 question voted to ban her from the House floor to
22 prevent her from making any more comments about
23 the evidence behind why this legislation was
24 potentially dangerous.
25   Q.   (BY MR. RAMER)  And do you think American

Page 279

1  while attacked.  We've seen this before in
2  history, and it's never ended well."
3    Did I read that part of the Tweet
4  correctly?
5    A.   I'll have to read the screenshot below it
6  to know what the context was, but you read the
7  part above the screenshot correct.
8    Q.   And do you think that the GOP is killing
9  our country?
10   MS. NOWLIN-SOHL:  Object to form.
11   THE WITNESS:  I'll need a second to read
12 the part you didn't read.
13   Q.   (BY MR. RAMER)  Okay.
14   A.   Okay.  This seems like the same -- a
15 reference to the same situation as the last Tweet,
16 which, again, I think was very concerning that
17 there was a member of this legislative body trying
18 to share research and data about -- I think in
19 this case it was a ban on gender-affirming medical
20 care for adolescents being dangerous.
21   And they used different techniques to
22 eventually silence that representative from being
23 able to share that information.
24   And I think the representatives who did
25 that and actively worked to try and remove

Page 281

71 (Pages 278 - 281)

1  evidence from debates about health policy that
2  impact young people are dangerous.
3      I think when public policy doesn't
4  consider research and evidence and isn't based on
5  science and data, that that's dangerous.
6      And as somebody who spends all of my time
7  working with young people who are impacted by this
8  legislation and it's my responsibility to protect
9  their mental health and make sure that they do
10 well, I think it's important to call out when laws
11 are being passed that aren't based on research and
12 evidence and are not in the best interest of young
13 people based on what we know about the science.
14     Q.   And in the first sentence of the Tweet
15 you say, "Our country is dying, and the GOP is
16 killing it."
17     And my question is do you think that is
18 true?
19     MS. NOWLIN-SOHL:  Object to form; asked
20 and answered.
21     THE WITNESS:  I think I already answered
22 that question.
23     Q.   (BY MR. RAMER)  I don't think you did.
24 I'll just ask it again.
25     And you say, "Our country is dying, and
Page 282

1  the GOP is killing it."
2      And my question is do you think that is
3  true?
4      MS. NOWLIN-SOHL:  Object to form; asked
5  and answered.
6      THE WITNESS:  Again, this was a reference
7  to a situation in which certain GOP lawmakers
8  eliminated evidence that was important to be
9  discussed and made sure that scientific evidence
10 didn't enter discussion about laws that would
11 impact the mental health of young people who I'm
12 responsible for taking care of.
13     And I think that is a sad sign for our
14 country that we're pushing forward legislation
15 that's not based in science and evidence,
16 particularly when the stakes are as high as the
17 mental health of young people.
18     Q.   (BY MR. RAMER)  And do you think those
19 certain GOP lawmakers are killing our country?
20     MS. NOWLIN-SOHL:  Object to form; asked
21 and answered.
22     THE WITNESS:  I think I answered that
23 question.
24     Q.   (BY MR. RAMER)  Yes or no.
25     MS. NOWLIN-SOHL:  Object to form; asked
Page 283

1  and answered.
2      THE WITNESS:  I think I answered the
3  question.
4      Q.   (BY MR. RAMER)  Are you refusing to
5  answer the question yes or no of whether you think
6  that those certain GOP lawmakers who you just
7  referenced are killing our country?
8      MS. NOWLIN-SOHL:  Object to form;
9  argumentative, asked and answered.
10     THE WITNESS:  I don't think it's a
11 yes-or-no question, and I think I answered the
12 question.
13     MR. RAMER:  All right.  Let's go to
14 Turban Exhibit 28.
15     (Deposition Exhibit No. 28 was marked.)
16     Q.   (BY MR. RAMER)  Do you have that up?
17     A.   Yes.
18     Q.   I'll just read this and then ask if I
19 read it correctly.
20     "I should clarify.  I don't hate all
21 conservatives," exclamation point.  "Mostly just
22 the aggressive anti-trans Heritage folks," heart
23 emoji.  "I should use more precise terminology for
24 my haters."
25     Did I read that correctly?
Page 284

1      A.   Yes.
2      Q.   And what are anti-trans Heritage folks?
3      A.   I don't recall the specific context of
4  this Tweet, but presumably it was someone similar
5  to this line of questioning accusing me of hating
6  all conservatives.
7      I have many conservative friends.  I have
8  all throughout my education.  I'm very close with
9  conservatives and people across the political
10 spectrum.
11     At the end of the day I work as a child
12 psychiatrist who takes care of a specific
13 population that I care deeply, which are the young
14 transgender youth.
15     There are individuals at the Heritage
16 Foundation who intermittently have passed
17 misinformation or said things about this
18 population or the research regarding them that's
19 not true, and it is very upsetting for me to see
20 people spread misinformation that's going to hurt
21 the young patients that I take care of.
22     So again, this is meant to clarify -- I
23 think the line of questioning that you're going
24 after is whether or not I have an issue with a
25 certain political party.  And this Tweet is
Page 285

72 (Pages 282 - 285)

1 highlighting that I don't at all, but I do very
2 much have a problem with attacks on young patients
3 and the research that's designed to improve their
4 mental health and keep them safe.
5    Q.  Who are the individuals at the Heritage
6 Foundation you were referencing?
7    A.  Honestly, I haven't seen reports from
8 them for a while.  This is from back in 2020.  I
9 think at the time they were issuing individual
10 reports that were non-peer-reviewed scientific
11 research to spread misinformation about various
12 forms of gender care for young people.
13    Q.  And so you do hate those people?
14    MS. NOWLIN-SOHL:  Object to form;
15 mischaracterizes prior testimony.
16    THE WITNESS:  I have a strong negative
17 feeling towards people spreading misinformation
18 that would result in public policies that would
19 harm young people.
20    Q.  (BY MR. RAMER)  Is there anyone else you
21 can think of you would group into the Heritage
22 Foundation bucket?
23    MS. NOWLIN-SOHL:  Object to form.
24    THE WITNESS:  I think it's a large group,
25 but specifically I believe this was years ago, and
Page 286

1 it was in reference to somebody who had written a
2 supposed research paper that they didn't submit to
3 peer review, which is the standard process for
4 making sure that scientific research is valid and
5 the sort of thing that should influence public
6 policy because it's been checked by experts to be
7 valid.
8    And this person attempted to circumvent
9 that process to spread the misinformation that
10 could have had the potential to promote public
11 policy that could have been harmful.
12    Q.  (BY MR. RAMER)  When you say "it's a
13 large group," what do you mean by that?
14    A.  I mean there are many people that work at
15 the Heritage Foundation, and I do not know all of
16 them.
17    Q.  So is your hate only directed at the
18 Heritage Foundation?
19    MS. NOWLIN-SOHL:  Object to form;
20 mischaracterizes prior testimony.
21    THE WITNESS:  As I just said, my hate or
22 anger was towards the specific action that I
23 thought had the potential to harm young people and
24 lead to public policies that were harmful.
25    And I wouldn't be able to give you an
Page 287

1 opinion on everyone at the Heritage Foundation as
2 I know very few of them.
3    Q.  (BY MR. RAMER)  Would you put Leor Sapir
4 into this bucket?
5    MS. NOWLIN-SOHL:  Object to the form.
6    THE WITNESS:  I wasn't aware that he
7 worked at the Heritage Foundation.
8    Q.  (BY MR. RAMER)  I'm not saying he does.
9 I'm saying would you classify Leor Sapir as
10 somebody who is spreading misinformation?
11    A.  I haven't really seen something from him
12 recently.
13    Is there some specific report that he
14 issued that you want me to comment on?
15    Q.  No, I'm just asking in general.
16    A.  I can't think of something specific.  I
17 know I've seen him spread things in the past that
18 I didn't think were accurate or true, but I can't
19 think of anything recently.
20    Q.  And a few times today you've discussed
21 the "minority stress."  I don't know if you called
22 it a theory or minority stress -- a principle of
23 minority stress.
24    Just as a general matter, can you explain
25 that to me?
Page 288

1    A.  So minority stress is a framework that
2 was described by Ilan Meyer at UCLA initially used
3 to described why we see mental health disparities
4 among sexual minorities to include bisexual
5 cisgender men.
6    And it describes distal factors and
7 proximal factors.  Distal factors are factors from
8 the outside world that impact one's mental health,
9 so things like harassment based on your sexual
10 orientation, discrimination, violence.
11    Both described that over time, those
12 external factors can drive internal factors,
13 things like internalized homophobia, feeling that
14 you need to conceal your identity like we
15 discussed earlier, and anticipatory anxiety where
16 people develop a constant fear that they're going
17 to be victims of that past discrimination again in
18 the future even if they're in a safe environment.
19 And they may have trouble calibrating when they're
20 safe and when they're not, which can drive
21 anxiety.
22    That model was later adopted for trans
23 people in the gender minority stress model
24 by Hendricks and Testa that has essentially
25 analogous proximal and distal factors described.
Page 289

1    Q.   Did external factors ever drive internal
2 factors --
3         MS. NOWLIN-SOHL:  Object to form.
4         MR. RAMER:  Sorry.  I'm just talking
5 slowly.
6    Q.   (BY MR. RAMER)  Can external factors ever
7 drive internal factors to lead someone to identify
8 as transgender?
9         MS. NOWLIN-SOHL:  Object to form.
10        THE WITNESS:  Are you asking if -- what
11 kind of external factor?  Like a sexual minority
12 stress external factor?
13   Q.   (BY MR. RAMER)  Well, I guess do you
14 think that external factors for -- let me back up.
15        Somebody who identifies as transgender
16 and then at some point ceases identifying as
17 transgender, the reason they can do that could be
18 for a number of external factors such as
19 discrimination, correct?
20        MS. NOWLIN-SOHL:  Object to form.
21        THE WITNESS:  I'm trying to understand
22 the question.
23   Q.   (BY MR. RAMER)  Well, were there
24 individuals who responded to the U.S. Transgender
25 Survey who said that they detransitioned at some

Page 290

1         So in this case, it was, I believe, go
2 back to living as your sex assigned at birth at
3 least for some time, so it didn't necessarily
4 imply that their gender identity changed, but
5 their gender expression changed or, quote, they
6 went into the closet, to use that colloquialism.
7    Q.   Well, gender identity never changes,
8 correct?
9         MS. NOWLIN-SOHL:  Object to form.
10        THE WITNESS:  So as we talked about
11 earlier, that core, biologically determined gender
12 identity is not the way in which one ascribes body
13 language to it or sexualizes or understands it.
14   Q.   (BY MR. RAMER)  And so the -- is living
15 as your sex assigned at birth different from
16 identifying as cisgender?
17   A.   Yes.
18   Q.   How so?
19   A.   One may still identify as transgender but
20 be somewhere where it wouldn't be safe to tell
21 people that or be open about it, so they may
22 present to the world as cisgender due to fear that
23 they would be subject to violence or harassment or
24 other maltreatment if they were to be openly
25 transgender.

Page 292

1 point in their life?
2    A.   Yes.
3    Q.   And what would you say are the
4 explanations for why they would detransition at
5 some point in their life?
6    A.   So we published a paper on this that you
7 might be referencing in LGBT Health, I believe, in
8 2021.  I don't have the numbers in front of me,
9 but we found that a substantial proportion of
10 trans adults, so people who currently are living
11 their lives in their gender identity, had
12 transitioned, at some point in the past
13 detransition.  So it was presumably temporary
14 because they're now living as trans adults.
15        I want to say it was maybe somewhere
16 between 10 and 15 percent said that they had that
17 experience in the past.  And of those,
18 82.5 percent of them said it was due to at least
19 one external factor, so things like harassment and
20 discrimination.
21   Q.   And so external factors could lead
22 someone to identify as cisgender; is that right?
23   A.   That's not specifically what the study
24 said.  You have to be careful about the term
25 "detransition" and how it's defined.

Page 291

1    Q.   And so what you were measuring -- or I
2 guess is this the point that you're making that
3 the word "detransition" is complex?
4    A.   It can represent a broad heterogenous
5 range of experiences.
6         And when looking at the academic
7 research, it's important to look at how it's
8 defined.
9         Sometimes people will conflate
10 detransition with regret, or conflate detransition
11 with the changing gender identity understanding.
12 So it's important to look at how the individual
13 study really defines it.
14   Q.   And what was the last one you said,
15 change in gender identity understanding?  Is that
16 right?
17   A.   Yeah, the way in which they conceptualize
18 their gender identity.
19   Q.   And could somebody -- could a transgender
20 individual cease identifying as transgender for
21 reasons other than regret?
22        MS. NOWLIN-SOHL:  Object to form.
23        THE WITNESS:  Can you explain how you
24 would see regret as a reason for one's identity
25 change?

Page 293

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

1    Q.  (BY MR. RAMER)  Well, I'm asking can't
2  somebody do it without having regret?
3    A.  Can somebody stop a gender-affirming
4  medical intervention and not have regret?  Is that
5  the question?
6    Q.  Let's start there, yes.  Can somebody
7  cease a gender-affirming medical intervention and
8  not have regret?
9    A.  Yes.
10    Q.  And why?
11    A.  It can be for all sorts of reasons.  I've
12  had patients who took testosterone, for instance,
13  and had sufficient physical effects from it that
14  they felt that they didn't need any more physical
15  changes, so they stopped the medication but didn't
16  regret it.
17        We wrote about one patient who took
18  estrogen for a period of time and had some body
19  fat redistribution and then stopped it because
20  they identified as nonbinary, but they noted that
21  they didn't regret the body fat redistribution and
22  felt that that experience was necessary for them
23  to understand themselves.
24        Someone might lose insurance coverage and
25  not be able to access their gender-affirming

Page 294

medical interventions anymore.  So in that case
they would stop them, but it doesn't mean they
regretted taking them.  In fact, they might want
to keep taking them.
    Q.  When you say the patient felt they didn't
need it anymore, are you using colloquial terms to
say that the distress associated with gender
dysphoria had resolved?
    A.  That they had -- in that example,
testosterone -- achieved a level of physical
masculinization of their secondary sex
characteristics that their gender dysphoria
resolved, yes.
    Q.  And so we were discussing why somebody --
or we were discussing how and why somebody could
cease gender-affirming medical interventions and
not have regret.
        And my next question is could someone
receive a gender-affirming medical intervention
and later in life decide -- take the word "decide"
out of it.  I'm going to restart.
        Could someone receive a gender-affirming
medical intervention and later in life identify
with their sex assigned at birth and not have
regret for having received the prior

Page 295

gender-affirming medical intervention?
    A.  I've not had such a patient, but
potentially.
    Q.  So if individuals receive
gender-affirming medical interventions and then
subsequently identify with their sex assigned at
birth, they likely would regret the
gender-affirming medical interventions?
        MS. NOWLIN-SOHL:  Object to form;
mischaracterizes prior testimony.
        THE WITNESS:  I think that's a different
question.  I've not had such a patient.  They
could potentially.  That's something that we
counsel patients as a possibility.
        MR. RAMER:  And I'd like to introduce
Turban Exhibit 29.
        Do you have that?
        THE WITNESS:  Yes.
        (Deposition Exhibit No. 29 was marked.)
    Q.  (BY MR. RAMER)  And you've seen this
before, correct?
    A.  Yes.  I've not read it in a while, but
I've seen it.
    Q.  I'd just like to ask you one kind of
narrow question on -- so I'd like to go to

Page 296

page 11, right column under "Discussion," and the
second full paragraph.
        And in that paragraph, the second to last
sentence -- and I'll just read it and ask if I
read it correctly, and then that will be my first
question.
        "To the best of our knowledge, all of the
letters written to the editor JAMA Psychiatry,
many by respected academics and clinicians who
outlined the serious problems in the study, have
been rejected (some of them were later submitted
as non-indexed comments in the online
publication)."
        Did I read that correctly?
    A.  Yes.
    Q.  And were you aware of letters being
written to the editor of JAMA Psychiatry outlining
problems with your study?
    A.  No.
    Q.  Were you serving as a manuscript reviewer
for JAMA Psychiatry at the time?
    A.  I do ad hoc manuscript reviews for most
of the top journals, so I probably intermittently
reviewed papers for them.
    Q.  Do you know if you were reviewing one at

Page 297

75 (Pages 294 - 297)

1 the time that these letters to the editor were
2 being rejected?
3     A.   Not that I recall, but I'm kind of
4 reviewing a steady stream of articles for
5 different journals.
6     Q.   And how often is there turnover at the
7 position of editor of JAMA Psychiatry?
8        MS. NOWLIN-SOHL:  Object to form;
9 foundation.
10        THE WITNESS:  I do not know.
11     Q.   (BY MR. RAMER)  How do the letters to the
12 editor -- I know they're called letters to the
13 editor, but, like, is the editor actually reading
14 them?
15        Or, just based on your experience working
16 at these journals, what is the process once a
17 letter to the editor is submitted?
18        MS. NOWLIN-SOHL:  Object to form.
19        THE WITNESS:  I think it probably varies
20 journal by journal, but generally they would be
21 read by members of the editorial board who would
22 read them to decide if they have scientific merit.
23        And if they were deemed to have
24 scientific merit, they would be sent to the author
25 of the paper, and they would ask the author of the
Page 298

1 paper to respond to them, in which case the letter
2 to the editor gets published and then a response.
3        The vast majority of the time, they're
4 not sent for external peer review, but sometimes
5 they are.  Again, I think that's a
6 journal-by-journal decision.
7        MR. RAMER:  And maybe it would be good if
8 we just took a short break and I can clarify if
9 there's anything else I need to ask, but otherwise
10 I'm pretty close to being done.
11        MS. NOWLIN-SOHL:  Yes, that's fine.
12        MR. RAMER:  We'll go off the record.
13        THE VIDEOGRAPHER:  Okay.  So the time is
14 4:56 p.m. Pacific time, and we are off the record.
15     (Break taken from 4:56 p.m. to 5:04 p.m.)
16        THE VIDEOGRAPHER:  All right.  So we are
17 recording.  The time is 5:04 p.m. Pacific time,
18 and we are back on the record.
19     Q.   (BY MR. RAMER)  And, Dr. Turban, I just
20 wanted to kind of put more detail on the
21 conversation we were trying to have earlier.
22        MR. RAMER:  And so I'll introduce Turban
23 Exhibit 30.  And just let me know when you have
24 that up.
25     (Deposition Exhibit No. 30 was marked.)
Page 299

1        THE WITNESS:  Yes.
2     Q.   (BY MR. RAMER)  And do you recognize this
3 document?
4     A.   Yes.
5     Q.   And what is it?
6     A.   This is a paper we published in the
7 Journal of LGBT Health in 2021.
8     Q.   And this is the article that either you
9 or I, probably me, was kind of alluding to earlier
10 that we were kind of talking around, right?
11     A.   One of them, yes.
12     Q.   Okay.  And this study used data from the
13 U.S. Transgender Survey, correct?
14     A.   Yes.
15     Q.   And on 274, which I think is page 2, down
16 in the left column above "Methods," the last
17 sentence you acknowledge that because the USTS
18 exclusively surveyed people who currently
19 identified as TGD, that your study is restricted
20 to the examination of detransition among people
21 who subsequently identified as TGD, right?
22     A.   Yes.
23     Q.   And then in the right column below
24 "Quantitative Responses and Analysis," I'm just
25 going to read the first sentence.
Page 300

1        Actually, no.  It's a very long sentence.
2 I'm just going to read the first part, which says
3 "Respondents who reported a history of
4 detransition were asked 'Why did you detransition?
5 In other words, why did you go back to living as
6 your sex assigned at birth?'  Mark all that
7 apply."
8        Do you see that?
9     A.   Yes.
10     Q.   And so the question you used to define
11 detransition in this study was whether the
12 participants went back to living as their sex
13 assigned at birth, right?
14     A.   So this is from data we did a secondary
15 analysis on on the U.S. Transgender Survey, so I
16 didn't design this survey question, but that's the
17 question that was used.
18     Q.   Right, but -- so fair enough.  You didn't
19 write the survey questions, but to use the survey
20 data for this paper, you used that question to
21 shape the definition of "detransition" that you
22 use in this paper, right?
23     A.   Yeah.  I admittedly don't love the
24 wording of the question, but it's the question
25 that was in the data set that we had available, so
Page 301

1 that's the one that was used.
2    Q.  What would you change about it?
3    A.  I just find the term "detransition" in
4 general to be somewhat vague and heterogenous. So
5 I prefer a more specific question like "Did you
6 regret the certain intervention?  Did you stop
7 gender-affirming medical care?  Did you go back to
8 presenting as your sex assigned at birth?"
9        This was kind of a broad question that
10 encapsulated a lot of experiences, but
11 conveniently -- or not conveniently because it was
12 a lot of work -- but there was a free response, so
13 we were able to go through and code the 800 free
14 responses, which helped us get a rich perspective
15 on what exactly people were describing as their,
16 quote, detransition experiences.
17    Q.  And in this paragraph toward the bottom
18 the second to last sentence, it says in
19 quotations, "'I realized that gender transition
20 was not for me'" was collapsed into a
21 'fluctuations in identity/desire' category."
22        Did I read that correctly?
23    A.  Sorry.  I'm just reading what it was --
24 this paragraph.
25        Yeah, I think there weren't many people,
<p style="text-align:right">Page 302</p>

1 if I remember correctly, who chose that one, which
2 I think is why we collapsed them together.  But
3 that's another one where I think the wording was
4 pretty unclear, unfortunately.
5    Q.  That was going to be my next question.
6        So using the definition of -- well, let
7 me step back.
8        I think it's implied in what we've
9 already discussed, but just to clarify, this study
10 did not set out to tell us and does not tell us
11 anything about individuals who transitioned and
12 then permanently went back to living as their sex
13 assigned at birth, correct?
14    A.  Correct.
15    Q.  And using the definition of
16 "detransition" that you use in this study, of all
17 individuals who have detransitioned, do you think
18 the majority of them subsequently identify as
19 transgender?
20    A.  It's hard to answer quantitatively, but
21 the research that has worked to identify people
22 who detransitioned -- probably the science would
23 say they stopped gender-affirming medical
24 interventions -- the numbers have been relatively
25 low.  The lowest one that I've seen was that one
<p style="text-align:right">Page 303</p>

1 study that identified 100 people.
2        This one, we're looking at trans people
3 who have at least temporarily detransitioned, and
4 it was over 2,000 people, and that was just of
5 this survey.
6        So, I mean, it's an imperfect way to look
7 at it, but it appears that there are a lot of
8 people who detransition due to these external
9 factors.
10    Q.  Were you just -- sorry.
11        Were you just comparing the 100 people in
12 that study to the 2,000 people here to draw a
13 conclusion about the prevalence?
14        MS. NOWLIN-SOHL:  Object to form.
15        THE WITNESS:  I think you were asking,
16 like, of people who detransition -- are you asking
17 if they think most people are, like, detransitioning
18 in this way versus are detransitioning in the
19 Littman description?  I'm not sure I understand
20 the question.
21    Q.  (BY MR. RAMER) Sorry.  Let me just
22 clarify.  Is the Littman study -- I didn't
23 actually hear you all that well.
24        Is the Littman study the one that you're
25 referring to that identified the 100 people?  Did
<p style="text-align:right">Page 304</p>

1 you say Littman?
2    A.  Yes.
3    Q.  Okay.  I guess what I'm asking is of
4 people -- let me try and ask it this way:  Of
5 people who detransition using the definition you
6 use in this study, do you think most of them go on
7 to retransition and identify as transgender?
8        MS. NOWLIN-SOHL:  Object to the form.
9        THE WITNESS:  I just want to be clear
10 that this study doesn't look at that question at
11 all.
12    Q.  (BY MR. RAMER) No.  I understand that.
13 And that's why I'm asking.
14        I'm asking does this study capture the
15 typical detransitioner or not?
16        MS. NOWLIN-SOHL:  Object to the form;
17 calls for speculation.
18        THE WITNESS:  I don't know that we have
19 research because it seems there aren't enough
20 detransitioners to have a rigorous study on what
21 the common detransition experience is.
22        The largest study I know is that Littman
23 study of 100 individuals that I think I put in my
24 declaration, but it would be helpful if we pulled
25 the paper up.
<p style="text-align:right">Page 305</p>

<p style="text-align:right">77 (Pages 302 - 305)</p>

Jack Turban , M.D., MHS October 16, 2023

1       But even within there, they had
2   heterogenous experiences where some had regret;
3   some did not.  Some felt that they benefitted from
4   the transition despite the fact that they later
5   stopped gender-affirming medical interventions;
6   others did not.
7       That study is also complicated because it
8   recruited from various and specific social media
9   websites, so it's really hard to know how
10  representative that is.
11      I don't know how to answer that question
12  with the data.
13      Q.  (BY MR. RAMER)  When you say we don't
14  have enough detransitioners to properly study the
15  question, are you basing that off of the fact that
16  Littman only identified 100 people?  Or is there
17  something else that is leading you to that
18  conclusion?
19      A.  Just all the research we have is
20  suggesting that it's not a very common experience.
21      There's that paper.
22      There's the Wiepjes paper that generally
23  looks like -- they were more looking at regret,
24  where regret rates were low, at least for surgery.
25      When we look at the papers, how many

Page 306

1   people take blockers and then don't go on to
2   gender-affirming hormones, it's in the low, few
3   percent.
4       But, again, all of this is kind of
5   muddied by what your definition of "detransition"
6   is.
7       Q.  Do you expect that the -- let me put it
8   this way:  In terms of raw numbers, do you expect
9   that the number of detransitioners, using the
10  definition you use in this study, will increase in
11  the next 15 years?
12      MS. NOWLIN-SOHL:  Object to form; calls
13  for speculation.
14      THE WITNESS:  The definition of going
15  back to presenting as their sex assigned at birth?
16      Q.  (BY MR. RAMER)  Go back to living as your
17  sex assigned at birth, yes.
18      A.  I think it's really hard to predict.  It
19  would depend on a lot of different factors.  This
20  study specifically was on -- most of the people in
21  the study were doing that because of some sort of
22  anti-trans stigma they were encountering in their
23  communities.
24      So if that were to continue to rise, this
25  would be a more common experience.  If that became

Page 307

1   less common, I think this would become a less
2   common experience.  So I don't know that I can
3   predict.
4       Q.  Would external factors only ever drive
5   somebody to detransition?  Or could they ever
6   drive somebody to transition in the first
7   instance?
8       MS. NOWLIN-SOHL:  Object to form.
9       THE WITNESS:  It would be pretty -- maybe
10  we're not having a shared definition of "external
11  factors."
12      It sounds like generally external factors
13  are anti-trans discrimination.
14      I'm having trouble understanding why
15  someone would choose to transition because of
16  stigma and harassment towards trans people if they
17  weren't trans.
18      Q.  (BY MR. RAMER)  Well, I guess --
19      A.  That would seem counter to their personal
20  interests.
21      Q.  I guess my question is are external
22  factors always negative, like discrimination?
23      MS. NOWLIN-SOHL:  Object to form.
24      THE WITNESS:  That's why I'm asking if we
25  have a shared definition.

Page 308

1       The way they're used in the minority
2   stress framework is they're referring to stigma
3   external factors.
4       Q.  (BY MR. RAMER)  And so in the minority
5   stress framework, external factors are always
6   negative stigmatic factors; is that fair?
7       A.  Definition in the way it's used in that
8   framework.
9       They do have other -- I mean, there's
10  other elements of the framework, a buffering
11  effect against internal and external factors of
12  community connectedness at pride, but I think we
13  call those resilience factors.
14      Q.  And what do you mean by "pride"?
15      A.  Like having pride in one -- as opposed to
16  shame, like being proud of the trans community,
17  recognizing that trans people make important
18  contributions to society, being able to have trans
19  role models in the type of things that you want to
20  do.
21      So say you're a young trans person who
22  wants to be a physician and you don't have any
23  role models.  You might think, oh, trans people
24  can't be doctors.  So meeting a trans doctor or
25  seeing an example of someone in the media.

Page 309

78 (Pages 306 - 309)

1      Q.   Could an external factor like that ever
2  shape an internal factor?
3         MS. NOWLIN-SOHL:  Object to form.
4         THE WITNESS:  Those aren't called
5  external factors in the model.  Those are
6  resilience factors.
7         But are you trying to ask if, like,
8  somebody being in a community where there are
9  positive views of trans people would lead them to
10  transition to be trans?
11      Q.   (BY MR. RAMER)  Well, sure.  What is the
12  answer to that?
13      A.   Is that the question?
14      Q.   Yes.
15      A.   Sorry.  The question is kind of are
16  there -- you just asked --
17      Q.   What did you just say?  Sorry.  What did
18  you just say?  And that's the question.
19      A.   Are there environments where there could
20  be a positive view of trans people that would lead
21  someone to come out as trans when they're not
22  trans?
23      Q.   Yes, that question.
24         MS. NOWLIN-SOHL:  Object to form.
25         THE WITNESS:  I have not experienced any

Page 310

1  such environment.  Even in California where I work
2  in the Bay, my patients routinely have harassment
3  and stigma.  Other people don't realize that.
4         But at one local school that people think
5  of liberal, somebody burned a Pride flag outside
6  to express anti-trans stigma.
7         We published a paper in Pediatrics where
8  we looked at the rates of bullying victimization
9  against trans youth versus cisgender sexual
10  minority youth, and the rates were substantially
11  higher, so I don't think that's the social
12  environment that we live in.
13         When we do a biopsychosocial evaluation,
14  we always ask, if you were to start a
15  gender-affirming medical intervention, how would
16  your parents react?  How would your peers react?
17  How would other people in your community react?
18         I'll say almost universally young people
19  are afraid that there are going to be negative
20  reactions.
21         If there were a circumstance where they
22  said, "Oh, everyone is going to give me a ton of
23  praise and presents and positive things," then
24  that would be a major flag for us to try and
25  figure out what was going on.  That's something we

Page 311

1  have never seen, but something that would come up
2  in the evaluation process as a possibility.
3      Q.   And in your answer why did you say "even
4  in California"?
5      A.   There's often a perception that in the
6  Bay Area where I work that there's a lot of
7  acceptance of trans young people.  It's something
8  that people will often mention to me when they go
9  to conferences or when I'm presenting such as at
10  different academic institutions.
11         But sadly I find that's often not the
12  case in this area that people think of being very
13  accepting towards young trans people.
14      Q.   And why did you reference a liberal
15  school?
16      A.   Because those schools people tend to
17  think of as having more acceptance towards young
18  trans people.
19      Q.   And do you disagree with that perception?
20      A.   Yes, I don't think it's universal.  I
21  think I've seen schools where people think of them
22  as being very liberal, whatever that means, but
23  that the kids still experience a lot of bullying
24  and harassment and stigmas when they come out as
25  trans.

Page 312

1         MR. RAMER:  And I don't have any further
2  questions for now.  I'll turn things over to your
3  counsel, but thank you very much, Doctor.
4         THE WITNESS:  Thank you.
5         MS. NOWLIN-SOHL:  I think I just have a
6  couple.
7
8            EXAMINATION
9  BY MS. NOWLIN-SOHL:
10      Q.   So, Dr. Turban, do you remember earlier
11  when we were talking about Exhibit -- I believe it
12  was 14, which is the article in the Journal of
13  Adolescent Health titled the "Age of Realization
14  and Disclosure of Gender Identity Among
15  Transgender Adults"?
16      A.   Yes.
17         MS. NOWLIN-SOHL:  John, do you want a
18  minute to pull that up?
19      Q.   (BY MS. NOWLIN-SOHL)  And I believe you
20  and Mr. Ramer at one point were talking about
21  table one, the demographics.
22         Do you recall that conversation?
23      A.   Yes.
24      Q.   And on that table, there's two kind of
25  columns for different age categories, one for the

Page 313

1 age less than 10, and one for age 11-plus; is that
2 correct?
3     A.  Yes.
4     Q.  And I think you and Mr. Ramer were
5 talking about the percentages in those columns
6 as -- at one point it was mentioned that they
7 didn't quite add up to 100 percent.
8         Can you help clarify what the numbers in
9 parentheses after each block number reflects?
10     A.  Yes.  So I think the question was trying
11 to get at how many participants in the overall
12 study were in each of those age brackets at the
13 top left, 18 to 24, 25 to 44, 45 to 64, and 65
14 plus.
15         And the question was how many of them are
16 in each of those categories of percentage of the
17 full population, and I was doing incorrect math.
18 My apologies.
19         So in order to calculate that, you would
20 add the two numbers in each of the rows from both
21 columns, and then divide that by the total number
22 in the study.  So the percentages I was giving
23 earlier were incorrect.
24     MS. NOWLIN-SOHL:  No further questions.
25     MR. RAMER:  Can I just ask one follow-up

Page 314

1 on that?
2
3         FURTHER EXAMINATION
4 BY MR. RAMER:
5     Q.  Which, looking at that same table,
6 looking at the 18 to 24 group, do you agree --
7 well, sorry.  I may have gotten more confused.
8         But so the 33.4 next to 18 to -- in the
9 18 to 24 row, the 33.4 in parentheses, that means
10 that the 18 to 24 group makes up 33.4 percent of
11 the early realization group; is that right?
12     A.  Yes.  I believe that's true.
13     Q.  And then when you shift over a column,
14 the 18 to 24 group makes up 56.4 percent of the
15 later realization group, correct?
16     A.  Yeah, that looks correct.  Whatever 6,322
17 divided by 11,218 is, which sounds roughly like
18 56.4.
19         11,218 is the total number of people in
20 the late realization group.
21     Q.  Got it.  Okay.  I'm clear now.
22     MR. RAMER:  Thank you very much, Doctor.
23 I appreciate it.  I think we're all set.
24     THE VIDEOGRAPHER:  All right.  That's it?
25     MR. RAMER:  Yeah.

Page 315

1     THE VIDEOGRAPHER:  Okay.  Then this
2 concludes our video deposition with Dr. Jack
3 Turban.  It is October 16, 2023.  The time is
4 5:26 p.m. Pacific time, and we are off the record.
5
6     (Whereupon the deposition was concluded at 5:26 p.m.)
7             ****
8         (Signature requested.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 316

1         REPORTER'S CERTIFICATE
2 STATE OF IDAHO      )
3                     )
3 COUNTY OF ADA       )
4
5     I, Amy E. Simmons, Certified Shorthand Reporter and
6 Notary Public in and for the State of Idaho, do hereby
7 certify:
8     That prior to being examined, the witness named in
9 the foregoing deposition was by me duly sworn to testify
10 to the truth, the whole truth, and nothing but the truth;
11     That said deposition was taken down by me in
12 shorthand at the time and place therein named and
13 thereafter reduced to typewriting under my direction, and
14 that the foregoing transcript contains a full, true, and
15 verbatim record of said deposition.
16     I further certify that I have no interest in the
17 event of the action.
18     WITNES                          day of October,
19 2023.
20
21
22     AMY E. SIMMONS
        ID CSR No. 685
23      CA CSR No. 14453
        WA CSR No. 22012915
24      OR CSR No. 22-009
        RDR, CRR, CRC,
25      and Notary Public
My commission expires:  6/13/28.

Page 317

80 (Pages 314 - 317)

1  Philip S. May
2  philip.may@groombridgewu.com
3          October 20, 2023
4  RE:   Poe, Et Al. v. Labrador, Et Al.
5    10/16/2023, Jack Turban , M.D., MHS (#6058443)
6    The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  Calendar-Idaho@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
                                          Page 318

1  Poe, Et Al. v. Labrador, Et Al.
2  Jack Turban , M.D., MHS (#6058443)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Jack Turban , M.D., MHS, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Jack Turban , M.D., MHS            Date
13  *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25
                                          Page 320

1  Poe, Et Al. v. Labrador, Et Al.
2  Jack Turban , M.D., MHS (#6058443)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Jack Turban , M.D., MHS            Date
25
                                          Page 319

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

Jack Turban , M.D., MHS October 16, 2023

**[& - 1:05]**

| & |
|---|
| **&** 2:6,21 3:8 8:16,21 9:2 10:6 |

| 0 |
|---|
| **0001** 267:23 268:23 269:18 |
| **001** 269:11,15 |
| **00269** 1:4 8:11 |
| **01** 271:4 |
| **05** 127:19 128:1,10,25 |
| **07** 129:1 |
| **08** 129:1 |

| 1 |
|---|
| **1** 4:12 6:20,21 6:22,23 11:2,5 52:23 57:5 80:14 102:22 132:6 155:4 161:13 165:1 165:11 168:9 177:22 178:1 219:6 274:18 |
| **1.9** 244:8 |
| **10** 4:5 5:4 6:16 6:25 131:2,5 143:14 153:9 153:10 157:5 160:10 161:16 259:6 261:10 291:16 314:1 |
| **10/16/2023** 318:5 |

**100** 132:1 228:17 246:25 304:1,11,25 305:23 306:16 314:7
**10004** 2:18
**101** 218:22
**102** 4:24 218:23
**1050** 2:22
**106** 219:5
**10:06** 52:16,18
**10:12** 52:18,20
**11** 4:12,14,16 5:6 82:16 107:13 136:8,9 149:11 259:5 269:5 297:1 314:1
**11,218** 315:17 315:19
**112** 4:19
**11:17** 100:3,5
**11:23** 100:5,7
**12** 5:9,21 118:2 118:3 132:7,11 134:7 139:18 139:20 146:20 149:6,8,15 159:20,21 174:23 175:25 176:2
**12.11** 131:20
**12.8.** 134:14

**12.9** 131:11,19 134:21
**125** 2:17 5:3
**126** 132:10
**12:17** 139:12 139:14
**13** 5:12 146:13 148:14,17 149:14 150:11 227:9 241:9 269:24 270:6
**13.2** 143:16
**131** 5:4,24
**136** 5:6
**139** 5:9
**14** 4:24 5:14 6:7 24:17 151:19,22 153:12,21 154:16,21,22 158:5 165:5,8 313:12
**14-2** 44:12 66:6 66:9
**1407** 103:20
**14453** 317:23
**14553** 2:7
**148** 5:12
**15** 5:3,8,17 39:5 52:24 64:5 177:4,11 269:24 270:6 291:16 307:11
**151** 5:14

**1523** 3:9
**156** 6:4
**16** 1:20 5:19 8:5 76:6 79:14 132:17 138:21 154:21 194:11 194:14 271:2 316:3
**16th** 2:10
**17** 5:22 126:14 129:20,25 130:4,18 138:21 213:20 213:23 241:9 271:2
**177** 5:17
**17th** 2:22
**18** 6:3 132:20 164:22 166:21 169:11 170:7 224:10,12 314:13 315:6,8 315:9,10,14
**182** 50:11
**1897** 3:3
**19** 6:5 230:10 230:13 317:18
**194** 5:19
**1988** 127:13
**1990** 164:12
**1990s** 164:7
**1998** 126:13,14
**1:00** 139:6
**1:05** 139:14,16

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[1:23 - 3.1]**

**1:23**   1:4 8:11

**2**

**2**   4:14 6:9
11:18,20 80:14
94:8 127:23
128:22 138:17
140:4 150:11
218:7,13,13
234:25 266:3,9
267:14 274:18
300:15
**2,000**   304:4,12
**2.1**   230:25
**2.2**   271:3
**20**   6:8 94:1
158:2 234:9,11
318:3 320:15
**20,619**   126:18
**20006**   2:22
**20036**   3:10
**2011**   218:8,15
251:14,18
**2014**   225:23
251:14,16
**2015**   5:4
125:15 143:11
164:21 188:24
218:25 219:2,8
241:9
**2018**   153:14
175:7
**2019**   149:11
**202.220.9621**
3:10

**202.539.6620**
2:23
**2020**   286:8
**2021**   196:8
291:8 300:7
**2022**   29:8
258:22 259:1,5
**2023**   1:20 2:10
8:5 152:2
316:3 317:19
318:3
**208.334.2400**
3:14
**208.344.9750**
3:4
**208.854.8073**
3:14
**21**   4:17 6:10
236:10,14
255:13,16,20
**212.549.2584**
2:18
**213**   5:22
**215**   168:23
**22**   6:13 76:6
79:15 236:15
236:18
**22-009**   2:8
317:24
**22012915**   2:8
317:23
**224**   6:3
**2280**   230:23
232:25

**2281**   233:25
**23**   6:15 258:12
258:14
**230**   6:5
**234**   6:8
**236**   6:13
**24**   4:23 6:17
52:24 64:4
84:7 166:21
169:11 170:7
178:20 258:25
266:9 267:6,9
269:17 314:13
315:6,9,10,14
**249**   196:16
**25**   6:20 166:8
166:11 167:4,7
169:5 273:25
274:2,9 314:13
**252**   203:11
**253**   199:21
**254**   194:20
**255**   6:10 204:9
**258**   6:15
**259**   160:11
161:17
**26**   6:21 277:13
277:14
**267**   6:17
**27**   6:22 133:22
166:5 280:17
280:18
**27,497**   155:5
**271**   131:10
134:13

**272**   131:17
**273**   41:16
143:15
**274**   6:20
300:15
**275**   44:10 66:3
**276**   178:11
191:23
**277**   6:21
177:20,24
**28**   6:23 284:14
284:15
**280**   6:22
**283**   47:5,8
**284**   6:23
**29**   4:19 6:24
296:16,19
**29423**   317:21
**296**   6:24
**299**   7:3
**2:13**   191:16,17
**2:19**   191:17,19

**3**

**3**   4:16,21 5:13
5:18 11:25
12:2 30:9,10
125:18 160:12
161:18 237:4
247:11 274:19
**3,224**   169:1
**3,856**   169:7
**3.1**   160:14
161:25 162:2
162:13,15,20
163:1 171:25

**[3.1 - 855]**

234:2

**3.1.**   161:14

234:1

**3.2**   161:18

162:1,17,25

**3.2.**   163:10

**3.32**   208:22

**3.32.**   208:17,24

**30**   7:3 154:22

299:23,25

318:17

**302**   5:5 41:17

**304**   66:3

**31**   56:9 63:14

**312**   47:5,7,8

**313**   4:6

**315**   4:5

**33**   21:21

**33.4**   315:8,9,10

**35**   38:17

135:17

**354**   4:15

**36**   126:17,24

135:15

**38**   208:16,23

**3:20**   236:4,5

**3:27**   236:5,7

**4**

**4**   4:17 21:6,9

21:20 38:14

65:24 129:15

135:5 267:13

269:10,25

**40.8**   155:6

157:6

**43**   24:18

**44**   166:8,11

167:4,8 169:5

314:13

**45**   84:4 139:5

166:4,24

168:25 314:13

**49**   4:13

**4:07**   267:1,2

**4:13**   267:2,4

**4:56**   299:14,15

**5**

**5**   4:16,19 27:10

29:4,6 72:12

72:12 81:25

82:8 105:16

106:1 110:20

129:24 166:3

208:13 259:6

259:13 269:13

**5.8**   227:19

228:2

**5/19/23**   4:14,16

**54**   161:4

**545**   4:18

**55**   243:22

**56**   4:20

**56.4**   315:14

**56.4.**   315:18

**573**   168:22

**5:04**   299:15,17

**5:26**   316:4,6

**5th**   68:19

**6**

**6**   4:20,22 6:14

38:16 56:5,7

57:5 63:13

83:22 84:17

86:15 91:24

93:16 100:10

100:12 102:24

166:3

**6,322**   315:16

**6.12.b**   87:5,8

100:13

**6.12.b.**   88:5

**6.12.c**   85:6

88:22

**6.12.c.**   88:16

**6.12.d**   87:13

94:3 100:24

**6.12.d.**   95:11

**6/13/28**   317:25

**60**   270:7,9,10

270:14

**6058443**   318:5

319:2 320:2

**62**   30:6

**64**   166:4,24

168:25 314:13

**65**   165:25

168:13 314:13

**68**   149:9

**685**   2:7 317:22

**69**   140:4

**7**

**7**   4:22 6:19

38:21 83:19,20

100:10 123:23

259:6,23

260:22

**7,043**   169:6

**70**   6:12 225:16

**72**   225:22

**73**   132:18

133:2

**74**   215:17

**75**   146:16,21

**77**   166:13

226:9

**79**   226:19

**8**

**8**   4:24 5:16 7:5

83:23 102:4,16

140:12 259:6

262:2 263:8,12

**80**   206:1

**800**   165:25

302:13

**801**   2:22

**81**   226:23

**82.5**   291:18

**825**   169:1

**83**   4:22

**83701**   3:4

**83720**   3:13,13

**853**   161:6

**855**   165:1,10

168:9

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[9 - action]**

| 9 |
|---|
| **9**   5:3,11 124:19 |
| 125:9 132:16 |
| 135:5 138:17 |
| **92**   227:2 |
| **97**   227:1,6 |
| **99**   161:13 |
| 218:3 |
| **9:06**   2:11 8:5 |
| **9:32**   27:22 |
| **9:33**   27:25 |
| **9:35**   28:23 |
| **9:37**   29:2 |

| a |
|---|
| **a.m.**   2:11 8:5 |
| 27:22,25 28:23 |
| 29:2 52:16,18 |
| 52:18,20 100:3 |
| 100:5,5,7 |
| **ability**   32:13 |
| 74:13 86:1 |
| 122:23 210:4 |
| **able**   16:23 |
| 17:14 29:22,23 |
| 30:4 59:5 81:1 |
| 86:4,11 87:21 |
| 88:3,9 92:22 |
| 92:23 93:12 |
| 104:6 105:24 |
| 109:9 122:11 |
| 134:24 171:6 |
| 193:23 197:13 |
| 235:17 264:6 |
| 280:5 281:23 |
| 287:25 294:25 |

302:13 309:18
**above**   2:12
33:16 88:18
92:12 161:8
227:10 231:16
281:7 300:16
318:6 320:7
**abroad**   81:17
**absence**   248:24
**absolute**   250:1
252:12
**absolutely**
173:4
**abstract**   44:23
67:17
**abstracted**   47:1
**abstracting**
46:11 66:25
**abstraction**
193:10
**abstracts**   14:23
14:24
**abusing**   280:24
**abusive**   87:1
**academic**
198:21,24
247:22 293:6
312:10
**academics**
297:9
**academy**   76:10
140:14 151:3
151:16 205:10
264:17

**accept**   160:8
**acceptable**
174:6
**acceptance**
312:7,17
**accepting**
141:2 312:13
**access**   5:3,6
6:17 33:10
86:11 126:15
126:25 134:25
135:22 136:15
138:9 144:15
217:14 254:8
254:10 256:1
261:20 265:23
294:25
**accessed**   133:8
134:11 269:23
271:1
**accessing**
136:25
**accompany**
209:9
**accordance**
219:20
**account**   39:24
166:2 233:22
240:23 268:13
274:4
**accrual**   193:2
**accuracy**   318:9
**accurate**   93:13
150:19 219:15
288:18

**accurately**
93:15 119:16
**accusing**   285:5
**achieved**
295:10
**achievements**
192:21
**achille**   216:19
226:13 235:4
**acknowledge**
300:17
**acknowledge...**
320:3
**acknowledging**
253:10
**acknowledg...**
318:12
**aclu**   3:2 8:23
8:24 9:10
71:24
**aclu.org**   2:19
2:19
**acluidaho.org**
3:5
**acquiring**
105:15
**acronym**
120:14
**act**   97:17,17
98:5 99:15,18
**acta**   6:5
**acting**   200:4
**action**   287:22
317:17

**[active - adults]**

active   97:15
  99:3,8,12
  129:22 130:13
actively   275:17
  281:25
activity   96:10
  96:13
actual   77:24
  83:8 115:19
  118:18 180:21
actually   16:1
  31:4,7,16 62:7
  85:16 89:19
  95:7 96:15
  104:21 110:8
  114:1 116:1
  122:24 136:20
  136:21 148:25
  156:5 157:3
  159:24 160:5
  172:4 174:6
  179:18 207:6
  217:21 218:23
  242:4,8,13
  266:18 298:13
  301:1 304:23
acute   98:1
ad   297:22
ada   1:13 2:9
  317:3
add   15:20
  53:22 56:18
  83:7 147:20
  168:18 263:2
  314:7,20

added   19:6
adding   166:15
addition   90:7
  199:23 200:1
  258:3
additional
  15:20 23:12
  34:17 52:4
  158:14 181:7
  213:3
additions   320:6
address   42:1
  92:15 104:18
  183:6
addressed
  87:17 94:25
addresses
  211:22
addressing
  57:11 196:22
adherence
  182:4
adjacent   37:16
adjust   134:19
  180:5
adjusted   180:2
  190:22 217:14
  217:17 261:7
  261:20,24
  267:21 269:25
  271:2
adjustment
  167:10,17
administration
  254:20 255:25

admittedly
  276:10 301:23
admitting
  245:3
adolescence   5:7
  6:18 130:23
  136:16 138:10
  159:20 160:4
  193:5,8 194:1
  252:8 265:24
adolescent   5:14
  5:18 21:4
  70:24 76:11
  85:9 87:21
  88:20 89:19,20
  89:22 97:1,4,5
  100:19 105:17
  119:24 121:1,9
  121:16 124:5
  130:16 140:15
  151:3,17 152:1
  164:8 194:6
  205:10 209:9
  214:5 224:19
  247:10 251:21
  251:23 253:15
  257:21,25
  313:13
adolescent's
  87:13 95:12
adolescents
  4:23 5:23 6:4
  6:13 17:9 18:8
  32:23 72:20
  84:14,19

100:11 129:23
  132:24 133:13
  145:16 159:11
  163:14 166:25
  167:5 180:10
  195:20 205:3
  207:9,21 208:8
  227:22 237:10
  238:2 241:17
  243:23 244:8
  247:24 250:21
  250:25 251:5
  255:1 257:1
  259:20 281:20
adopted   289:22
adult   20:24
  103:7 104:3
  130:25 155:12
  258:2
adulthood
  156:3 157:1
  243:24
adults   5:7,11
  5:16 6:18
  72:20 86:2,8
  104:5 107:1
  132:24 133:8
  133:12 134:11
  136:17 138:11
  153:7 156:5
  157:2,20
  195:20 196:7
  242:25 245:3
  265:25 291:10
  291:14 313:15

**[advance - align]**

| | | | |
|---|---|---|---|
| **advance**  39:4 | 190:2,15 191:1 | 130:18 131:23 | 118:12 133:2,9 |
| **advantage**  62:9 | 206:13,19 | 132:20 138:21 | 154:20 163:11 |
| 63:1,22 | 207:3 212:7 | 153:9,10 157:5 | 164:5 166:22 |
| **adverse**  192:5 | 216:24 217:6,7 | 158:1,8 160:14 | 167:3 168:22 |
| 192:10,15,19 | 217:14 224:18 | 161:4,7,9,20 | 169:1,6 193:8 |
| 192:24 195:2 | 227:18,21 | 165:5,8,14,16 | 195:6 197:18 |
| 195:18,21 | 229:13 235:18 | 165:19,20 | 198:22 200:10 |
| 201:25 | 237:13,21 | 166:24 167:5 | 203:23 209:12 |
| **affect**  91:5 | 238:20 239:13 | 241:10 269:24 | 219:13,14,17 |
| **affected**  134:20 | 240:13 242:4,9 | 313:13,25 | 222:23 228:1 |
| **affiliate**  257:22 | 243:2,5,9,24 | 314:1,1,12 | 237:20 238:12 |
| **affiliation** | 244:4,9 246:12 | **agency**  214:4 | 239:12 241:14 |
| 258:10 | 247:11,23 | 224:17 231:3 | 243:12 244:16 |
| **affirming**  5:6 | 248:7 250:24 | 255:25 | 246:11 315:6 |
| 6:3,10,15,17 | 251:22,24 | **ages**  132:16 | **agreeing**  89:21 |
| 18:7 32:21 | 255:17 256:2 | 161:13 270:6 | **agreement** |
| 76:14 82:24 | 260:3 261:20 | 271:2 | 150:8 151:14 |
| 85:2 87:16 | 261:24 264:14 | **aggressive** | **ahead**  93:5 |
| 90:5 92:9 | 265:23 267:16 | 284:22 | 96:8 149:19 |
| 103:24 104:6 | 269:24 270:6 | **ago**  17:19 18:5 | 155:15 173:7 |
| 105:13,17 | 271:1 281:19 | 29:14 61:24 | 189:8 |
| 106:23 109:6 | 294:3,7,25 | 62:1 70:17 | **aiden**  117:23 |
| 109:18 110:18 | 295:16,19,22 | 205:11 208:13 | 118:21 |
| 110:23 111:16 | 296:1,5,8 | 212:20 226:7 | **aiden's**  117:22 |
| 116:11,23 | 302:7 303:23 | 237:2 277:6 | **aim**  10:17 |
| 136:15,25 | 306:5 307:2 | 286:25 | 51:22 |
| 138:9 140:17 | 311:15 | **agonist**  130:9 | **air**  200:17 |
| 140:21 141:2 | **afraid**  174:11 | **agree**  22:9 23:1 | **al**  6:10 8:10,10 |
| 143:22 144:15 | 311:19 | 25:6 44:5,22 | 140:13 218:15 |
| 182:6 183:9,22 | **ag.idaho.gov** | 48:16 50:25 | 219:8 244:1 |
| 184:18,21 | 3:15 | 53:13 59:11 | 318:4,4 319:1 |
| 185:2,17 | **age**  5:14 76:6,6 | 62:8 64:12 | 319:1 320:1,1 |
| 186:10 187:3,7 | 79:14,15 | 66:21 95:20 | **albeit**  217:8 |
| 187:16 188:15 | 126:24 129:20 | 100:18 101:2 | **align**  140:9 |
| 188:19 189:21 | 129:25 130:4 | 101:15 118:10 | 182:7 |

**[aligning - apparent]**

| | | | |
|---|---|---|---|
| **aligning** 114:22 | 45:14 61:18 | 42:12 64:20 | **anticipatory** |
| 115:8 273:10 | 158:20 162:8 | 71:4 79:25 | 289:15 |
| **alive** 97:12 | 163:3 169:23 | 80:2 104:18 | **anxieties** 94:20 |
| **allen** 226:20 | 169:25 171:7 | 123:1 124:9 | **anxiety** 72:25 |
| 235:7 | 268:11 269:8 | 156:19 164:10 | 73:1,2,4,4,9,10 |
| **alleviating** | 272:13 | 173:12 175:21 | 73:11,16,25 |
| 187:1 | **analysis** 4:21 | 184:5,7 185:4 | 112:13 115:2 |
| **allotted** 318:20 | 7:5 31:15,18 | 188:14 197:3,6 | 115:11,12,13 |
| **allow** 188:12 | 32:12 38:9 | 197:7,13,19 | 115:14,15,18 |
| **alluding** 300:9 | 42:25 44:14,18 | 206:25 217:22 | 115:19,22 |
| **alter** 80:1 | 45:4,21 46:13 | 239:16 240:8 | 116:3 117:4,7 |
| **alternative** | 46:18,19,25 | 245:7 284:5 | 178:19 187:22 |
| 15:3 | 61:7 126:16 | 303:20 306:11 | 198:18,23 |
| **american** 2:16 | 127:16 163:9 | 310:12 312:3 | 206:2,23 260:9 |
| 76:10 140:14 | 180:18 181:4 | **answered** | 289:15,21 |
| 151:2,2,15,16 | 195:19 196:6 | 36:15 60:19 | **anxious** 73:12 |
| 152:25 163:19 | 215:8 300:24 | 79:19 93:19 | 73:13,14,17,17 |
| 168:2 205:10 | 301:15 | 135:1 171:25 | 73:19 |
| 264:16,17,18 | **analyze** 46:9 | 175:18,19,23 | **anybody** |
| 275:8 277:24 | 52:3 232:14 | 197:17 240:9 | 135:15 165:18 |
| 279:25 | **analyzed** 58:9 | 282:20,21 | **anymore** 295:1 |
| **americans** | **analyzing** | 283:5,21,22 | 295:6 |
| 277:24 278:6 | 57:16,20 58:12 | 284:1,2,9,11 | **anytime** 48:17 |
| 278:17 279:9 | 58:22,25 65:18 | **answering** | 151:6 201:19 |
| **amount** 174:1 | **anger** 287:22 | 10:13,16 50:17 | **anyway** 33:7 |
| 221:20 253:5 | **angry** 146:4 | 51:1 104:22 | 33:23 37:2 |
| **amy** 1:25 2:6 | **animal** 200:21 | 183:13 207:1 | **apart** 191:9 |
| 8:16 28:9 71:3 | **animals** 201:13 | **answers** 103:16 | **apologies** |
| 317:5,22 | **annalou** 5:17 | 105:25 106:8 | 314:18 |
| **analogous** | **annelou** 176:23 | 106:10 107:6 | **apologize** 84:8 |
| 289:25 | 177:18 | 107:14 | 146:21 227:2 |
| **analogues** 5:23 | **answer** 10:20 | **anti** 284:22 | **apparent** 174:9 |
| 216:20 | 14:14 20:1 | 285:2 307:22 | 193:20 201:24 |
| **analyses** 31:5,6 | 33:12,17 35:15 | 308:13 311:6 | 201:24 228:4 |
| 31:7,9 32:11 | 36:18 37:22 | | 273:15 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[appear - asking]**

appear  11:20
12:2 102:12
203:17 267:10
appearance
105:6 179:14
appearances
2:15 3:1 8:19
appeared
102:10
appears  11:24
56:10 80:20
94:2 198:17
304:7
appended
259:7 320:7
appendices
230:22 232:11
234:15
appendix
215:18 218:4
225:18 226:10
234:25
appetite  74:15
applebaum
86:2,4,7
applicable
318:8
applied  39:23
169:16
apply  31:16
40:7,15 41:13
86:3 169:20
224:6 301:7
applying  21:1

appointments
108:5 110:12
122:14
appreciate
166:6 207:17
315:23
approach
22:17 39:1,3,9
39:12 186:3
247:22
approaches
26:6 33:21
98:25
appropriate
81:23 82:5,14
82:22 141:17
271:14
approval  202:9
262:22
approved
201:20 202:20
228:8,15
area  45:20
85:24 135:25
164:18 257:15
257:25 312:6
312:12
areas  113:24
argue  203:24
argued  163:20
arguing  275:6
argument
101:8,13,16
103:18 107:23
108:7 109:10

argumentative
55:11 60:10
80:17 167:13
167:21 284:9
arguments
108:10,12
109:1
arose  252:8
arrived  125:7
236:11 266:21
arrives  177:8
arrow  37:16
art  220:9
article  6:8
125:1,13,18
135:4 136:10
136:14,18,19
137:2 138:8
140:5 143:10
148:19,22
149:1,5,13,15
149:25 150:7,9
150:10 151:25
152:4 161:4
164:25 165:14
168:9 178:5,24
191:22 194:16
194:21 196:16
201:9 216:7
226:14,16
230:16,24
231:8 232:10
258:19 265:22
300:8 313:12

articles  42:10
149:19 150:4
298:4
ascribe  75:23
79:5 80:23
ascribes  292:12
ascribing
162:18,22
asked  10:16
60:18 61:21
68:8,10,24
69:8 70:3 71:7
79:18 93:18
104:23 161:9
162:16 175:17
175:22 184:16
207:2 239:11
239:24 272:1
282:19 283:4
283:20,25
284:9 301:4
310:16
asking  61:23
70:23 88:15
93:9 99:6
104:17 158:19
159:3 181:16
185:14,16,18
185:21 221:21
266:10 271:12
288:15 290:10
294:1 304:15
304:16 305:3
305:13,14
308:24

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[asks - authors]**

| | | | |
|---|---|---|---|
| **asks** 159:2 | 93:10,22 94:12 | **assisted** 16:20 | **attempted** 40:7 |
| 162:13 | 98:13,19 101:9 | **associated** 2:6 | 40:13 287:8 |
| **aspects** 42:1 | 101:20,22 | 5:13 8:16 42:5 | **attempts** 5:11 |
| 92:17 199:2 | 103:8,15,23 | 42:19 43:4,13 | **attending** |
| **assent** 73:22 | 104:5,7 105:3 | 44:4 82:25 | 258:1,5 |
| 85:11,19 86:9 | 105:18,20,21 | 83:3 132:16 | **attention** |
| 86:16 87:22 | 106:18 107:9 | 137:20,23 | 146:11 |
| 88:9,16,21 | 113:19,23 | 143:22 148:21 | **attorney** 1:11 |
| 92:13 107:10 | 114:6,18,24 | 184:11 185:10 | 1:12 2:5 3:12 |
| **assess** 40:8 | 116:13 119:19 | 186:18 187:8 | 9:16 318:13 |
| 44:23 45:6,10 | 121:21 122:19 | 187:22,25 | **attorneys** 9:10 |
| 48:14,18 49:20 | 124:2 144:17 | 193:5,9 228:2 | 68:8 |
| 56:24 67:3,15 | 153:3 218:20 | 267:17 270:7 | **attracting** |
| 220:11,21 | 219:13 231:4,4 | 295:7 | 279:7 |
| 221:13 222:4 | 248:25 249:18 | **association** 5:9 | **attributed** |
| 222:15 231:15 | 249:25 | 140:1 151:2,16 | 102:25 107:14 |
| 231:24 243:6 | **assessments** | 153:1 163:20 | 117:13 150:13 |
| 243:13 245:6 | 42:5 43:4,12 | 168:2 264:17 | **august** 68:17 |
| 250:6 | 119:24 120:6 | 264:18 | **author** 5:3 |
| **assessed** 45:22 | **assigned** 72:9 | **assume** 10:16 | 15:21,24 16:8 |
| 47:14 49:2 | 72:14 74:4,19 | 11:14 133:21 | 16:16 49:23 |
| 215:13 218:15 | 96:16 110:3 | 269:8 | 65:16 158:18 |
| 219:8 | 112:25 130:5 | **assuming** 176:8 | 159:2 160:2 |
| **assesses** 237:12 | 140:9 160:16 | **assumptions** | 163:25 194:18 |
| **assessing** 62:8 | 161:11 171:17 | 171:16 | 196:11 298:24 |
| 66:24 80:11 | 188:7 203:10 | **attached** 11:11 | 298:25 |
| 85:24 222:12 | 242:14 252:18 | 11:12 318:11 | **author's** 21:14 |
| **assessment** | 271:17 273:5,6 | **attack** 280:24 | **authors** 18:13 |
| 22:3,23 38:25 | 273:18 292:2 | **attacked** 281:1 | 45:6 53:5,16 |
| 42:18,21 44:3 | 292:15 295:24 | **attacking** | 54:1,23 55:3 |
| 54:4,13 55:4 | 296:6 301:6,13 | 277:24 278:6 | 55:13 56:13 |
| 60:1,16,24 | 302:8 303:13 | 278:17 279:8 | 62:20 64:8,24 |
| 61:9,15 89:2,6 | 307:15,17 | **attacks** 286:2 | 176:17 259:18 |
| 90:1,7 91:8,20 | **assistant** | **attempt** 270:24 | 260:24 |
| 92:3,8,18 | 257:20 | | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[autism - begins]**

**autism** 94:17
95:25 96:3
120:13 204:17
205:6,14,19
206:5,9,10,12
206:21 207:5
207:10,11,13
207:15,18
**available** 6:12
22:4 24:24
50:21 57:10
58:17,22
126:13 134:3
157:18 171:5
251:25 252:4
253:21 255:18
301:25 318:6
**ave** 3:9
**average** 227:17
**aware** 101:13
106:21 133:18
143:8 149:25
178:23 186:24
192:23 201:11
202:1 205:1
207:2,7,22
208:6 211:10
211:22 212:12
225:9 226:3,8
235:16 255:24
280:7 288:6
297:16

**b**

**b** 4:10 5:1 6:1
7:1
**back** 15:22
27:7 28:1 29:3
38:13 45:25
49:10 52:20
62:21 64:3,4
71:1,3 78:9
79:13 88:12
95:9,9 100:8
100:12 123:20
124:14 134:13
135:4 139:6,17
143:13 145:13
149:8 156:17
160:9 164:14
166:18 170:24
171:8 175:14
178:10,10
188:11 191:20
208:10,12
227:9 236:8
251:18 262:1
263:5 264:8
265:17 267:5
269:16 277:4,6
286:8 290:14
292:2 299:18
301:5,12 302:7
303:7,12
307:15,16
**backslash**
234:25

**bad** 148:6,12
**balance** 101:19
102:1 200:7
240:25
**ballet** 96:9
**ban** 150:15,23
151:10,13
228:12,15
279:21 281:19
**base** 75:4
**based** 12:13,20
12:23 13:6
14:2,10,16
19:12 20:10,18
22:2 26:21
35:5 51:8
53:12 62:20
79:25 80:11
87:20 88:17,23
99:7 100:17
101:1,5 113:5
113:6 117:5,6
127:8 134:20
135:21 153:17
161:11 165:19
165:20 167:10
170:7,14
171:21 222:6
224:7 272:5,15
272:25 278:10
278:25 282:4
282:11,13
283:15 289:9
298:15

**baseline** 83:15
**bases** 54:10
**basic** 33:13
126:22
**basically** 22:19
118:4 125:20
125:22 137:17
148:2 152:4
162:13 244:22
267:15 270:5
270:20
**basing** 73:22
306:15
**basis** 75:3
101:17 209:21
233:15 238:6
239:21 242:8
256:5
**bathroom**
91:11
**bathrooms**
77:12
**baughman**
2:21 9:2
**bay** 311:2
312:6
**began** 164:17
**beginning**
64:20 97:1
123:1 129:19
130:18 132:17
**begins** 107:19
107:21 199:23
240:17

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[behalf - birth]**

**behalf** 9:2
**behavior** 96:24
**behavioral**
  117:8 200:1
**belief** 145:15
**believe** 16:17
  17:18,22 21:13
  25:11 36:15
  39:3 41:17
  44:7,24 45:8
  57:2 59:16
  66:3 68:18
  69:3 70:13
  72:3 79:2
  108:9 117:23
  118:7,14
  124:12 127:20
  145:23 146:3
  163:17 180:15
  196:7,9 201:15
  208:13 214:3
  217:14 225:9
  226:15 231:11
  241:20,25
  242:10 250:10
  251:16 254:15
  254:22 261:10
  264:24 265:16
  267:25 269:5
  271:25 274:1
  277:19 286:25
  291:7 292:1
  313:11,19
  315:12

**beneficial**
  195:2
**benefit** 10:10
  34:15 105:13
  122:7 241:1
**benefits** 38:4
  89:13 144:8,12
  192:2 233:17
  237:14,22
  238:3,10
  239:15 240:15
  240:24 265:6
**benefitted**
  306:3
**bennetts** 1:11
**best** 6:11 13:5
  24:24 26:12
  32:13 42:7
  44:25 122:23
  139:6 162:10
  230:4 255:18
  282:12 297:7
**better** 20:7
  30:2 32:25
  33:20,23 56:19
  92:2 96:2 99:3
  99:5 101:9
  163:8 173:2
  232:22 252:20
  260:15
**bias** 42:5,19,21
  43:4,12 44:3
  44:23 45:7,10
  45:15,18,18,19
  45:20,22 47:13

47:21 48:5,8,9
48:15,18,20,21
48:23 49:3,19
49:21 50:1
54:13 57:15
58:3 60:1,17
60:25 61:10,16
61:18,20 62:3
62:5,8 66:24
67:3,16 218:16
219:9,17
220:12,15,16
220:18,21,23
220:24,25
221:14,16,19
221:25 222:5,9
222:9,14 224:4
235:1
**biases** 49:8
**big** 12:25 18:23
**biggest** 247:25
**bigotry** 274:16
**bilaga** 6:8
**bill** 110:8 114:9
  276:20 279:14
**billing** 109:4
  110:7 114:11
**binary** 250:10
  250:21 251:6
  251:10,17
**binding** 218:17
  219:10,14
**bio** 90:15,17
**bioethicist**
  257:12

**bioethics**
  257:13
**biological** 75:3
  75:18,20 76:4
  78:11 79:4
  80:19 81:5,6
  246:21
**biologically**
  292:11
**biopsycho**
  114:14
**biopsychosoc...**
  90:7 91:8 92:7
  98:19 107:7,9
  109:7 113:19
  113:23 114:18
  114:24 116:13
  118:21 119:24
  120:6 121:21
  122:18 124:6
  142:19 144:17
  238:9 240:12
  246:20 248:1
  249:17 311:13
**biostatistician**
  21:17
**birth** 72:9,14
  74:4,19 96:17
  110:3 112:25
  130:5 140:10
  160:16 161:11
  188:8 203:10
  241:11,17
  242:14 252:18
  271:17 273:19

Page 11

**[birth - broadly]**

292:2,15
295:24 296:7
301:6,13 302:8
303:13 307:15
307:17
**bisexual** 289:4
**bit** 16:4 19:22
19:24 67:24
90:1 103:9
114:2 162:2,17
165:3 176:11
272:10
**blank** 150:12
**blinding** 38:7
**block** 314:9
**blockade**
211:24
**blocker** 130:9
180:12
**blockers** 81:23
82:6,14 97:3,6
97:20 105:13
121:3 125:24
125:25 126:25
132:20,23
133:8,11 189:3
189:5,6 190:23
202:8,14,20
209:13 216:25
217:9 222:24
233:18 237:13
237:21 239:13
253:20 254:4
254:20 255:1
307:1

**blocking**
130:24 131:19
132:3,14
**blog** 258:20
262:25 263:3
265:3
**blue** 47:12,25
132:2 225:17
227:11 234:23
237:5
**board** 11:23
130:8 237:11
240:22 247:12
298:21
**body** 15:3,8
23:20 31:1
41:10 96:18
114:22 115:8
183:17 191:7
221:3,7,11
231:3 273:9
281:17 292:12
294:18,21
**boise** 3:4,13
**bold** 57:5
225:17 227:11
**bone** 192:6
193:1
**bonferroni**
268:12 271:20
**book** 47:8
**born** 164:6
**boston** 127:12
**bother** 103:21
103:23

**bottom** 38:20
67:9 117:12
149:10 161:7
211:12 216:6
219:6 225:17
226:20 227:6
235:13 267:25
302:17
**box** 3:3,13
84:22 85:7
87:5 231:13
233:1
**brackets**
314:12
**brady** 69:19,20
69:22,24 70:4
70:6 71:8
**brain** 79:3
192:6,10,15,24
193:4 200:12
200:23 201:1
201:13 203:18
204:2 211:15
211:23 212:15
212:17,21
**break** 10:17,18
10:21 50:10
52:18 99:23,24
100:5 138:19
139:2,14
191:12,17
236:1,5 266:20
266:23 267:2
271:17 272:22
299:8,15

**breaking** 52:10
91:14 235:24
**brewer** 3:3 9:9
9:10
**brick** 244:1
**brief** 27:23
28:25 68:23
69:2
**briefly** 257:18
**brignardello**
6:10
**bring** 148:16
**bringing** 125:1
213:10
**broad** 2:17
12:17 14:6
16:11 30:20
34:5 42:10
45:20 73:1
89:9 91:20
97:9 111:21
151:4,6 197:5
197:12,22
198:8 199:5,10
207:25 275:15
278:10 293:4
302:9
**broader** 94:18
109:16 121:2
162:2,4
**broadly** 15:14
27:16 39:10
46:23 48:16
74:24 77:18
108:21 113:24

**[broadly - categories]**

193:23 280:9
**brought** 184:14
184:15
**brown** 119:6
119:23 120:18
**bucket** 286:22
288:4
**buffering**
309:10
**build** 128:6,8
128:21
**built** 222:20
**bullet** 44:23
233:2 241:4
242:24 243:15
244:12,13
245:1
**bullets** 233:1
**bullied** 173:24
**bullying** 91:4
113:2 115:5
260:21 311:8
312:23
**burned** 311:5
**byne** 140:13
**bypass** 22:23
23:6,15 24:4,6
**bypassing** 22:3

**c**

**c** 8:1 120:20
**ca** 317:23
**calculate**
314:19
**calendar**
318:15

**calibrating**
289:19
**california** 2:7
257:22 311:1
312:4
**call** 27:10 56:4
68:20 76:17
83:19 86:9
97:10 109:24
190:19 202:23
216:15 254:17
282:10 309:13
**called** 46:1 86:1
160:2 163:6
268:12 288:21
298:12 310:4
**calling** 54:17
55:17 65:9
233:12
**calls** 85:21
106:3 110:25
111:18 122:2
144:2,21
145:10 172:1
191:3 255:4
305:17 307:12
**candidate**
97:23 98:9
109:17
**cantor** 71:17
**capabilities**
193:9
**capacities** 1:14
**capacity** 1:10
1:12 85:25

87:15
**capture** 305:14
**captured**
162:20
**captures** 162:6
**care** 5:18 6:13
6:16 12:19
29:23 30:5
32:22 70:23
76:14 83:23
84:19 86:11
92:9 104:14
107:8 109:6
111:7 116:8
123:23 179:4
180:25 181:19
181:21 182:12
182:23 183:2
183:18 184:7
184:10 185:9
206:14 207:4
213:14 239:23
253:18 254:8,8
255:10 264:14
265:6 274:17
275:21 276:1
276:22 278:12
279:3 281:20
283:12 285:12
285:13,21
286:12 302:7
**career** 194:8
**careful** 138:12
291:24

**carefully**
240:14
**carries** 38:20
**case** 1:4 8:10
10:7 11:9,21
12:4 17:8 37:8
37:11 68:1,5,7
68:9,14,23
69:11,17,23
70:1,4,7,11,13
70:19 71:7
111:23,23
112:2,3 121:8
143:2 146:7
149:17 194:2
215:24 233:15
233:15 238:6,6
247:4 276:7,15
281:19 292:1
295:1 299:1
312:12
**cases** 70:9
89:19 91:18
233:5 265:10
265:12
**cass** 4:19 29:6
208:14 253:24
**catch** 211:18
**categorical**
279:5,9
**categorically**
54:19
**categories**
39:21 219:24
223:13 224:3

**[categories - childhood]**

267:21 313:25
314:16
**category** 16:11
75:12 168:15
207:11 220:8
223:8 302:21
**causative** 147:6
**cause** 115:24
241:15
**caused** 248:23
**causes** 72:15
241:6
**caution** 169:14
171:15 237:5
250:4
**caveat** 83:7
138:1 189:12
**caveats** 32:14
**cease** 202:13
293:20 294:7
295:16
**ceases** 290:16
**center** 255:7
**centers** 254:16
**central** 29:20
82:1,3 202:9
202:12,20
**centralized**
30:3 253:25
255:11
**certain** 22:17
69:8 90:19,20
134:1 221:4
245:10 246:24
255:6 272:23

275:5,7 283:7
283:19 284:6
285:25 302:6
**certainly** 19:16
20:13 37:14
75:22 76:21
96:15,17 193:1
197:23 202:2
248:13 249:14
**certainty**
228:18 246:25
**certificate**
317:1
**certified** 317:5
**certify** 317:7,16
**cetera** 50:1
260:10,21
**challenges**
94:22 260:6
**chance** 150:6
163:5 164:11
**change** 75:1,12
75:13 76:1,2
78:19,22 80:1
80:9,14 81:2,7
96:4 135:20
138:14,16,18
138:20 140:8
140:23 141:1
238:25 243:7
243:14 245:22
246:5 252:23
293:15,25
302:2 319:4,7
319:10,13,16

319:19
**changed** 76:7
77:24 79:9,10
79:16 138:15
162:25 206:18
243:25 262:21
292:4,5
**changes** 11:15
36:22 76:12
77:23 78:5
94:21 132:16
193:13 209:8
229:13 292:7
294:15 318:10
320:6
**changing**
213:15 262:19
293:11
**chapter** 4:22
39:5 44:25
48:22 83:22
84:13 86:15
91:24 93:16
100:10,11
**characteristics**
90:20 96:19
204:16 205:4
207:5,9,13
208:9 272:22
273:10 295:12
**characterizati...**
154:20
**characterizati...**
111:21

**characterize**
92:3
**chart** 267:15
**check** 15:19
116:24 160:24
217:25
**checked** 248:16
249:8 287:6
**checking**
217:19
**checklist**
231:19,19
**chen** 176:25
178:5,24 186:6
**chief** 257:23
**child** 21:4
76:10 94:18
140:15 151:3
151:16 153:18
154:10,11
171:10,10
173:18,19
174:16,17
194:6 205:10
209:6 211:25
257:20,25
285:11
**child's** 87:2
159:16 209:13
**childhood**
61:24 153:10
157:25 158:25
159:13 168:10
168:15 248:11
248:21 249:5

**[childhood - closely]**

| | | | |
|---|---|---|---|
| 249:16,22 | 148:5,9 157:10 | **clarity** 87:15 | **clinical** 14:3,11 |
| 251:24 252:9 | 171:19 172:6 | 94:23 95:3,14 | 20:20 24:23 |
| 252:12 253:1,6 | 172:13,15 | 95:16,18,21 | 26:5 40:20 |
| **children** 5:23 | 176:5,7 289:5 | 241:6,15 | 42:11,13 50:17 |
| 6:3,6,13 72:19 | 291:22 292:16 | 242:19 | 51:1 74:6 81:8 |
| 106:17 151:7,8 | 292:22 311:9 | **classic** 73:15 | 101:6 130:22 |
| 153:24 159:11 | **citation** 53:10 | **classification** | 153:3 160:7 |
| 159:17 160:5 | 63:10 64:2 | 82:15 | 192:23 193:15 |
| 227:22 231:17 | 140:12 178:2 | **classify** 288:9 | 197:20 205:21 |
| 231:25 233:3 | 200:18 | **classroom** | 206:2,4,24 |
| 257:1 | **cite** 40:14 49:1 | 20:19 | 212:9 233:19 |
| **children's** | 56:11 63:8 | **clause** 237:25 | 233:20 250:23 |
| 127:12 196:24 | 178:6 180:4 | 239:18 | 252:21 254:18 |
| 198:14 | 190:25 215:21 | **clean** 93:23 | 272:25 273:4 |
| **choices** 232:18 | 215:24 216:4,8 | 188:1 | **clinically** 72:14 |
| **choose** 13:22 | 218:9 219:2 | **cleaner** 162:15 | 110:5 163:21 |
| 26:15 308:15 | 225:24 226:14 | 163:7 | 198:20 201:6 |
| **choosing** 16:20 | 226:16,20,24 | **clear** 59:23 | 201:18 202:4 |
| 16:21 | 227:4,7 235:3 | 96:21 106:14 | 210:15 212:3 |
| **chose** 127:22 | 235:5,8,11,14 | 142:20 184:6 | 212:12 |
| 303:1 | 250:16 | 193:20 229:12 | **clinicians** 24:25 |
| **chris** 3:16 8:15 | **cited** 63:14 | 233:11 236:15 | 51:8 297:9 |
| **christine** 69:19 | 76:9 178:24 | 248:22 249:15 | **clinics** 30:4 |
| **chronology** | 180:15 183:24 | 255:8 278:9 | 120:25 122:21 |
| 196:8 | 184:3 226:5 | 305:9 315:21 | 123:10 241:23 |
| **circumstance** | 241:25 | **clearly** 89:7 | 254:1,5,7,24 |
| 311:21 | **citing** 56:9 | 268:25 269:19 | 255:11 |
| **circumstances** | **civil** 2:16 | **client** 103:19 | **clock** 266:19 |
| 202:24 | **clarification** | **clinic** 29:20 | **close** 20:7 30:2 |
| **circumvent** | 136:11 158:22 | 30:3 70:14,21 | 137:25 242:13 |
| 287:8 | **clarify** 259:25 | 73:22 119:6,23 | 253:25 270:19 |
| **cisgender** | 263:9 284:20 | 242:3 250:16 | 285:8 299:10 |
| 76:23 77:15 | 285:22 299:8 | 251:12 253:25 | **closely** 209:4 |
| 81:11,20 142:4 | 303:9 304:22 | 254:23 255:11 | 225:5 |
| 145:3 146:6 | 314:8 | 258:2 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

[closer - commute]

**closer** 19:23
134:2 167:7,7
**closet** 81:18
292:6
**coauthored**
177:17
**code** 1:14 3:7
109:8 110:9,13
113:10 116:2
302:13
**cognition**
193:20 195:11
202:19 209:6
209:14
**cognitive** 85:10
117:7 193:16
193:21 194:3
195:12,22
196:25 198:14
198:25 199:3,4
200:1,5 208:1
212:11
**cohort** 32:17,19
33:1,3,25 34:4
34:9,14,16,23
35:3,8,12,21,24
36:4,21 37:12
37:24 218:14
219:7
**coincide** 175:12
**coincidence**
277:22
**coincides**
154:11

**collaborative**
105:8
**collapsed**
302:20 303:2
**colleagues**
163:16 176:16
**collect** 26:12
160:20
**collected** 56:21
164:20 179:24
222:19
**collecting**
14:15
**collection**
254:17,19,23
**college** 20:15
**colloquial**
295:6
**colloquialism**
292:6
**colloquialisms**
115:21
**column** 94:2,7
95:10 132:2,11
134:14 143:16
146:25 160:12
161:4,6,17
178:11 191:24
194:21 196:16
199:22 203:12
204:10 208:16
208:24 230:24
232:25 234:1
297:1 300:16
300:23 315:13

**columns**
168:10 220:5
313:25 314:5
314:21
**combinations**
74:12
**combined** 69:2
71:20
**come** 13:21
48:7,8 49:8
51:10 67:25
68:4 105:21
106:12 122:12
125:14 139:6
146:10 153:8
157:4,10
176:15 197:24
246:16 253:11
255:13 258:12
260:17 270:18
310:21 312:1
312:24
**comes** 43:20
60:7 114:4
116:7 149:23
154:10 155:1
155:25 156:24
**comfortable**
80:24 105:8
117:1 174:23
174:24
**coming** 117:3
138:25 150:4
**commencing**
2:11

**comment** 65:8
215:5 288:14
**comments**
279:22 297:12
**commission**
1:14 3:7
317:25
**commissioned**
231:2,9 256:7
**committee**
223:4
**common**
155:12 157:3
172:24 173:21
174:6 243:6,13
244:18 245:6
245:12,14,17
245:21,24
246:5 305:21
306:20 307:25
308:1,2
**commonly**
163:6 173:24
**communicating**
65:11
**communication**
91:14 113:3
**communities**
307:23
**community**
104:16 242:12
309:12,16
310:8 311:17
**commute** 77:7

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[comorbidities - conflate]**

comorbidities
92:16 228:23
259:20
companies
110:10
company 2:6
8:17
comparative
14:13
compared
33:10 126:4
compares
136:2
comparing
15:5 25:20
127:21 304:11
comparisons
128:17,18
163:8 169:15
170:4 268:6,7
268:15 271:19
compelling
48:7
complement
221:6
complete 25:10
26:21 260:5
320:8
completed
243:4 318:17
completes
144:16
complex 77:20
78:12 102:1
120:10,13

293:3
complexity
80:22
complicate
94:12 248:24
complicated
77:4 306:7
component
54:14 70:22
75:20 163:11
200:2
composite 31:9
comprehensive
15:24 18:25
29:23 30:5
91:7 92:7
107:7
compressed
28:3
compulsions
94:16
conceal 289:14
concentration
74:16
concept 93:8
109:20
concepts 89:9
213:17
conceptualiz...
77:2
conceptualize
75:9 76:3,12
79:11 81:14
113:21 293:17

concern 29:22
170:1 209:4
213:6
concerning
278:15 281:16
concerns 87:14
95:13,21
108:13 163:13
178:15 181:17
conclude
200:24 263:14
concluded
316:6
concludes
316:2
conclusion 46:5
85:21 105:22
111:19 209:22
216:14,15
222:6 231:13
231:23 233:8
255:5 304:13
306:18
conclusions
41:14 106:16
138:14 170:14
170:16 171:21
214:25 235:18
270:21
concomitant
228:24
condition 42:11
51:13
conditions
90:17 108:20

204:23 206:6
206:23
conduct 14:19
31:8 51:8 67:5
119:23 149:21
238:8
conducted
14:18 16:6,9
17:23 34:8,22
45:24 60:3
116:12 150:22
151:11
conducting
43:20 44:13
53:7,17 54:25
55:15 56:15
59:13 64:10
113:23 120:6
248:1
conducts 107:7
118:20,23
conferences
176:13 312:9
confidence
39:17 42:7
46:15 138:2
confident 99:17
confidentiality
96:6
confirm 92:14
124:24 138:7
199:8
conflate 293:9
293:10

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[conflict - controversial]**

**conflict** 66:20
**confounder**
  186:4 222:20
  229:5
**confounding**
  180:25 181:9
  181:22 182:13
  183:3,6,18
  185:25 222:15
  222:22 229:19
  261:13
**confused**
  132:23 133:11
  315:7
**confusing**
  244:13
**congress** 277:7
**congruence**
  179:14,16
  182:5
**connectedness**
  309:12
**connelly** 69:13
  69:14
**consensus** 5:19
  151:4,6 196:20
  278:10
**consent** 85:11
  85:16,18 86:1
  86:5,9,11,17,22
  87:3,15 88:2,3
  88:16,21 89:2
  89:6,10 90:3
  91:22 92:12,23
  93:6,9,12,16,21

106:22 107:4
107:10,11
119:12,20
**consequence**
  201:23
**consequences**
  174:11 195:1,6
  201:25
**conservative**
  85:23 285:7
**conservatives**
  284:21 285:6,9
**consider** 23:22
  40:2 91:19
  93:3 113:20
  144:12 176:6
  238:5 256:12
  256:18 282:4
**considerable**
  178:18
**consideration**
  44:6 226:5
**considered**
  233:4 250:1
  252:12
**considering**
  70:8 144:13
  233:15 238:21
  248:7
**consistent**
  47:20 48:5,6
  106:8 238:14
  240:2 249:13
**consolidate**
  141:10

**consolidating**
  141:5
**constant**
  289:16
**constantly**
  76:18 77:9
**constituents**
  265:7
**constitute**
  140:18 141:6
  142:10 190:1
  246:4
**construct** 97:9
**construe**
  143:24
**contact** 71:8
**contacted**
  68:13
**contains**
  317:14
**contents** 72:1
**context** 23:6,8
  48:22 81:21
  108:4,9 109:15
  112:21 147:14
  147:21 153:3
  157:7 190:17
  281:6 285:3
**continue**
  116:14 155:16
  156:2 157:21
  266:21 307:24
**continued** 3:1
  5:1 6:1 7:1
  241:8

**continuing**
  117:1
**contradiction**
  244:15
**contradictory**
  243:16 245:1,8
  245:10
**contradicts**
  244:13
**contraindicat...**
  250:2 252:13
**contrast** 41:24
**contribute**
  150:15
**contributions**
  309:18
**control** 34:16
  36:23 182:12
  182:23 183:2
  186:11 218:17
  219:10,16
  260:18
**controlled**
  32:17 33:15,16
  33:24 34:3,7
  34:21 35:5,7
  35:13,20,23
  36:5 37:3,11
  38:1,3 49:16
  220:7 223:10
**controlling**
  185:25 186:3
  187:5
**controversial**
  123:13,16

**[controversial - costa]**

| | | | |
|---|---|---|---|
| 205:7 | 80:15 82:19 | 290:19 292:8 | 155:8 158:6 |
| **conveniently** | 83:5 84:14,15 | 296:21 300:13 | 160:17 161:19 |
| 302:11,11 | 84:20 85:23 | 303:13,14 | 161:23 178:13 |
| **conversation** | 93:17 108:1 | 314:2 315:15 | 178:21 179:6 |
| 134:3 176:16 | 117:15 125:21 | 315:16 320:8 | 192:1,7 194:24 |
| 299:21 313:22 | 126:5 131:24 | **corrected** 139:1 | 195:4 196:18 |
| **conversations** | 134:17,18 | 211:24 | 197:1 199:25 |
| 71:13 119:8 | 135:9,14,19,22 | **correction** 6:17 | 200:8 203:15 |
| **conversion** | 139:23 143:7 | 128:17 138:13 | 203:21 204:14 |
| 5:10,12 140:2 | 143:11 149:16 | 163:21 265:18 | 204:24 208:18 |
| 140:6,19 141:7 | 151:12 152:8,9 | 265:22 266:6,8 | 209:3,10 |
| 142:11 143:18 | 152:11,14,15 | 267:10 268:1,4 | 211:13,20 |
| 143:20 147:4,5 | 154:7 156:10 | 268:12 269:17 | 227:15,24 |
| 147:19 148:7 | 159:2 160:22 | 271:20,25 | 228:21 229:1,7 |
| 148:20 150:16 | 161:2 164:23 | **corrections** | 229:11,16 |
| 150:23 151:11 | 164:24 165:15 | 269:4 320:6 | 230:21 231:6 |
| **convincing** | 166:1 168:11 | **correctly** 21:25 | 231:14,21 |
| 192:23 | 168:12 169:2,7 | 22:7 24:22 | 233:6 237:8,16 |
| **cooper** 2:17 3:8 | 175:2,16 | 25:4 38:22 | 240:20 241:2 |
| 8:21,24,24 | 177:18 178:6 | 39:6 41:23 | 243:10,11 |
| 10:6 68:11 | 202:10,11,15 | 42:14 47:18 | 247:8,16 |
| 72:2 227:3 | 202:16,21 | 48:10 50:16,23 | 248:19 249:1 |
| **cooperkirk.c...** | 203:6 218:10 | 53:3,9 57:8,17 | 251:2 261:3,15 |
| 3:11 | 225:1,25 226:1 | 62:25 63:6 | 262:7 264:21 |
| **copies** 318:14 | 226:6,14,17,21 | 84:24 85:4,8 | 274:15,22 |
| **copy** 11:8 | 226:22,24 | 85:13 87:6,11 | 277:18 278:1 |
| **core** 81:13 | 227:4,7 229:24 | 87:18 94:10 | 280:22 281:4 |
| 292:11 | 235:5,8,11,14 | 95:1 107:22,25 | 284:19,25 |
| **correct** 9:13 | 244:19 249:5 | 112:7,15 118:8 | 297:5,14 |
| 11:17 24:5 | 249:22 255:2 | 119:2,14 | 302:22 303:1 |
| 40:14 45:7 | 258:22 259:15 | 126:10,20 | **correlation** |
| 48:15 53:10,19 | 259:21 263:13 | 129:18 130:1 | 179:14 |
| 56:16,17 63:9 | 268:21 269:20 | 132:13,25 | **cortex** 200:7 |
| 63:10 64:14 | 270:22 271:3 | 133:22 140:11 | **costa** 184:3,24 |
| 77:25 79:10,17 | 271:10 281:7 | 147:8,12,13 | 188:24 189:16 |

**[costa - databases]**

218:24 219:2,8
**counsel** 8:18
68:13 93:12
296:14 313:3
318:14
**counter** 308:19
**country** 254:1
280:23 281:9
282:15,25
283:14,19
284:7
**countway** 4:20
53:11
**county** 1:12 2:9
317:3
**couple** 9:6
44:10 313:6
**course** 26:5
262:3
**courses** 19:12
19:18 20:19
21:1
**coursework**
20:10
**court** 1:1 3:17
8:12 9:4 10:10
**courtships**
20:20
**cover** 64:18
110:11 149:18
**coverage** 29:18
107:24 108:8
109:11 294:24
**crc** 1:25 317:24

**create** 31:9
45:13 59:5
111:5
**creates** 224:8
**creating** 41:4
58:21 110:4
**creative** 274:16
275:11,19
**criteria** 40:8,15
40:16 41:14
42:3 57:14,25
59:5,10,24
72:18 73:24
82:12,17 86:2
86:4,7 88:1,2
88:19 98:20
104:7 110:19
111:11 114:7
220:16 221:1
224:6 247:13
247:18 248:10
248:20 249:4
252:16
**criterion**
248:17
**critical** 22:3,23
27:6 94:14
211:16
**criticized** 163:6
256:8
**criticizing**
198:4
**cross** 39:5
137:7 211:25

**crr** 1:25 317:24
**csr** 1:25 2:7,7,8
2:8 317:22,23
317:23,24
**curious** 170:20
**current** 101:18
124:10,12
164:12 249:12
253:4 257:19
**currently** 63:19
141:3 209:14
237:12 240:3
291:10 300:18
**cut** 92:21 168:7
**cutoff** 157:5
268:2,17
**cutting** 19:24
272:8
**cv** 1:4 8:11
11:12
**cwd** 1:4 8:11

**d**

**d** 4:1 8:1 87:7
88:11 215:18
225:18
**d.c.** 2:22 3:10
**damaging**
103:9
**danger** 77:11
77:12
**dangerous**
86:24 150:25
151:5 279:24
281:20 282:2,5

**darlene** 117:22
**data** 31:14
44:23 46:11,20
47:1,2 66:25
67:17 75:16
78:10 125:13
125:15 134:8
135:16 143:10
155:1 157:18
158:14 160:20
162:8,24
164:20 165:14
165:18 170:5
171:5 179:24
180:1 192:24
198:18 213:12
222:19 228:10
228:18 242:11
244:11 254:16
254:19,23
263:25 268:22
271:17 280:13
281:18 282:5
300:12 301:14
301:20,25
306:12
**database** 66:2
**databases**
13:14,21 14:22
14:23 15:16
16:3,3,21 19:1
26:14 53:8,25
55:1,16 56:1
56:16 59:14,19
64:11 65:12,21

Page 20

**[dataset - deponent]**

**dataset** 165:25
**date** 8:4 135:13
  148:24,25
  149:1 176:11
  258:23 319:24
  320:12
**dates** 69:7
  135:12
**day** 2:10 11:1
  51:13 73:23,23
  149:4,14
  285:11 317:18
  320:15
**days** 237:2
  318:17
**de** 5:17 176:23
  177:18 179:10
  180:23 181:17
  186:2 192:9,20
  216:3 217:2
  218:8,15
  225:23 227:7
  235:11,13
  243:22 251:14
  251:14
**dead** 277:25
  280:1
**death** 235:20
**debates** 155:25
  276:11 280:12
  282:1
**decades** 201:19
**decide** 89:17
  220:2 232:19
  295:20,20

298:22
**decided** 220:4
**deciding** 89:19
  89:20 128:20
  223:7
**decision** 13:5
  14:3 89:15
  90:9 93:2
  94:24 101:21
  104:24 216:15
  247:9 256:5
  299:6
**decisions** 12:19
  24:23 103:12
  105:12 214:21
  224:7 247:3
**declaration**
  4:12 11:8,11
  40:14 49:2
  52:23 60:5,7
  62:22 64:4
  69:16 71:16,24
  76:9 135:24
  178:6 179:13
  180:4,16
  215:14,23
  216:4,8 218:9
  225:25 226:6
  241:21 260:3
  305:24
**declarations**
  71:17 180:8
**declare** 320:4
**decline** 271:8

**decrease** 262:4
  263:16 270:7
**deemed** 83:4
  298:23 320:6
**deeply** 285:13
**defendants**
  1:15 2:5 3:7
  8:9,21 9:17
  10:7 68:22
**define** 13:19
  64:13 134:16
  214:20 232:18
  301:10
**defined** 53:24
  64:23 90:2
  115:14 291:25
  293:8
**defines** 54:10
  59:18 66:22
  128:1 293:13
**defining** 59:18
  66:7,9,15,16
  81:4 219:18,20
**definition**
  25:18 64:17
  140:13,14
  232:4,9 301:21
  303:6,15 305:5
  307:5,10,14
  308:10,25
  309:7
**definitions**
  66:20 233:11
**degree** 19:17
  20:14,17

169:17 179:15
  179:25 188:6
  220:11,21
  252:11 273:23
**delay** 122:13
  132:15 193:1
**delayed** 74:15
**delineated** 89:7
**delivered**
  213:14
**delphi** 196:19
  197:15 199:15
  199:17
**demand** 280:25
**democracy**
  277:24 280:1
**demographic**
  127:21
**demographics**
  313:21
**demonstrates**
  85:9
**density** 193:1
**departure**
  111:8
**depend** 25:20
  128:13 307:19
**depending**
  203:9
**depends** 54:15
  97:8 116:19
  128:12 219:18
  220:23 222:8
**deponent**
  318:13 320:3

Page 21

**[deposed - detransitioners]**

**deposed**   10:8
70:21
**deposing**
318:13
**deposition**   1:19
2:1,4 4:14,16
8:8,13,15 11:5
11:18,21,25
12:3 21:9 29:4
56:7 71:15,22
83:20 102:16
125:9 131:5
136:9 139:18
148:17 151:22
177:11 194:14
213:23 224:12
230:13 234:11
236:18 255:20
258:14 267:6
274:2 277:14
280:18 284:15
296:19 299:25
316:2,6 317:9
317:11,15
**depressed**
74:13
**depression**
74:6,11 112:13
115:18,20,23
116:4 178:19
187:21 198:18
198:23 260:9
262:4 263:16
**depressive**   74:9
108:22 115:1

141:15
**depth**   23:23
46:9 79:22
94:4 202:3
**depths**   193:24
**describe**   18:3
64:22 75:8
76:2,15 77:23
89:3,8 93:15
110:1,5 198:12
247:18 257:18
**described**
18:15 75:11
86:15 92:2
134:7 246:2
279:13 289:2,3
289:11,25
**describes**   289:6
**describing**
57:20 63:23
67:4 96:23
116:1 119:17
145:4 163:25
182:21 188:23
189:16 229:18
277:3 302:15
**description**
31:12 64:12
213:14 304:19
**design**   34:13
35:6,12,13
36:11,11,12
162:7 196:21
301:16

**designed**   36:3
59:22 61:6,13
61:14 62:4
64:13 65:4
188:8 198:9
246:23 286:3
**designing**
168:4
**designs**   36:6,21
37:20,22
**desirability**
45:19
**desire**   98:4
110:18 302:21
**desistance**
157:8,14
**despite**   242:5
264:14 306:4
**detail**   18:16
79:21 214:13
214:16 220:4
220:18 228:25
230:22 239:3,6
299:20
**details**   70:16
96:5 111:22
200:18 251:19
**detect**   262:17
**detecting**   268:8
**determinate**
75:18 78:11
80:20
**determinates**
179:3

**determinations**
223:7
**determine**
131:13 227:20
238:9 246:25
**determined**
30:2 153:15
292:11
**determining**
40:6 47:20
48:5 75:17
105:20 160:20
245:21 246:4
**detransition**
7:3 243:1,17
244:17,19
291:4,25 293:3
293:10,10
300:20 301:4,4
301:11,21
302:3,16
303:16 304:8
304:16 305:5
305:21 307:5
308:5
**detransitioned**
290:25 291:13
303:17,22
304:3
**detransitioner**
305:15
**detransitioners**
305:20 306:14
307:9

Page 22

**[detransitioning - discrimination]**

detransitioning
304:17,18
develop 289:16
developed
199:9
developing
39:2
development
39:1 94:12,23
192:6,10,15,25
193:4,16,22
194:3,9 196:25
198:15,25
199:3,5 200:12
200:23 201:1
201:13 209:5
209:25 210:6
developmental
94:19 193:12
195:1 209:13
devote 263:4
dfloresbrewer
3:5
diagnosed
81:24 82:8
97:2 241:7
diagnoses 73:7
74:9 115:19,23
116:9 248:14
diagnosis 42:2
72:11 95:19
105:15,20,25
107:24 108:2,7
109:11,16
110:20 113:9

113:15 153:2
163:23 168:1
diagnostic
87:15 95:3,14
95:16,21
105:21,22
109:8 110:9,12
116:2 248:24
249:25 252:19
253:13
diane 176:25
dictates 22:2
die 97:16 99:16
died 178:20
differ 42:17
difference 73:8
89:5 134:4
137:5 203:18
204:2 272:15
differences
127:21 262:18
272:5
different 13:23
14:19 15:25
18:7,12 23:2
26:15 31:6,15
36:6,11,20
37:7,19 38:5,6
38:7 41:9,14
45:11,18 46:19
47:19 48:4,20
48:25 54:1,1,7
61:18,18,19
72:8,13,24
73:5,7,11,19

74:1,5,8,12,19
77:2 80:5,7
90:22 106:9
110:6 115:23
116:1 121:17
125:22 126:5
128:7,8 140:25
157:12 160:16
161:10 169:18
182:16 193:25
195:15,21
204:20 205:12
208:1 210:3,5
210:9 220:1,18
221:8,13,13
239:19 252:17
272:22 273:4
281:21 292:15
296:11 298:5
307:19 312:10
313:25
differentiate
79:3 94:14
differentiates
54:6
differently
66:15 82:4
99:7,10 220:25
272:24
difficult 76:8
195:10 223:3
difficulties
94:19
dina 3:3 9:8,9

direct 175:7
257:24 260:25
directed 287:17
direction 241:1
317:13
disagree 159:7
215:1 216:13
218:20 231:23
233:8 242:18
312:19
disagreed
277:21
disclosed 154:7
172:22 174:17
discloses
173:19
disclosing 72:1
disclosure 5:15
313:14
disconnect
96:15
discontinue
243:8
discontinues
243:2
discordant
106:10
discretionary
224:7
discriminated
76:20
discrimination
260:21 289:10
289:17 290:19
291:20 308:13

Page 23

**[discrimination - domain]**

308:22
**discuss** 15:12
25:14 27:18
79:22
**discussed** 49:18
53:12 229:19
242:11 279:15
283:9 288:20
289:15 303:9
**discussing**
22:22 23:2
58:16 60:15
63:21 64:6
79:7 94:3
113:8 117:14
117:18 167:19
170:6 180:24
191:22 226:13
295:14,15
**discussion** 49:7
49:18 50:7
63:5 72:1
194:22,23
227:12 283:10
297:1
**discussions**
38:23 259:6
**disease** 42:1
**disentangle**
190:8
**dismiss** 71:21
**disorder** 73:4,4
73:9,10,16,25
74:9 108:22
115:1,2,12,13

115:19,20
117:5,7 141:16
206:23 258:2
**disorders** 16:12
46:7 73:2
115:22
**disparities**
289:3
**disrespectful**
275:8
**distal** 289:6,7
289:25
**distant** 222:1
**distinction**
78:24 92:21
244:16,21
**distinctions**
93:23
**distinguishes**
54:9
**distinguishing**
189:18
**distress** 5:10,13
72:15 74:2,18
82:25 83:3,11
110:5,15
114:21 148:21
184:11 185:10
186:18 187:8
187:22,25
188:9 248:23
273:9 295:7
**distressed**
115:7

**distribution**
167:6
**district** 1:1,2
8:12,12
**distrust** 176:21
**disturbances**
74:14,14
**dive** 193:24
**diverse** 7:4
174:1 204:20
204:21
**diversity** 87:9
88:7 100:15
**divide** 168:18
314:21
**divided** 315:17
**divides** 44:17
**doctor** 120:5
121:16 122:20
125:11 136:24
137:14 138:8
139:3 309:24
313:3 315:22
**doctors** 89:21
309:24
**document** 4:19
11:19 12:2
21:12 29:9
30:7 38:17
41:16 44:9
47:4 50:12
57:4 67:24
83:24 107:12
124:24 125:6
125:11 131:25

138:4 139:24
146:16,22
151:24 199:22
203:12 204:9
213:25 215:8
218:3 224:14
227:10 230:15
234:13 236:20
238:4,14 239:7
255:22 258:16
262:20 300:3
**documented**
242:25 243:17
245:2 247:14
248:15 250:20
**documents**
10:25 12:9
63:12
**doe** 1:5,7,7,7
**doing** 18:24
46:1,22 58:2
59:4 70:8,9
71:11 105:21
109:7 113:19
116:17 119:25
121:21 124:1,5
128:12 132:20
142:3,4 162:8
170:2 193:19
194:8 254:2
307:21 314:17
**dolls** 171:17,20
174:3
**domain** 209:18
209:25 210:16

Page 24

**[domains - earlier]**

**domains** 73:12 195:12 210:9
**double** 160:24 217:19,25
**doubt** 215:7
**downgraded** 218:14 219:7
**dr** 8:8 10:3 11:7 12:6,12 19:20 27:14 28:6 29:5 52:22 67:25 69:13,14,19,20 69:22,24 70:4 70:6 71:6,8,17 71:18 72:6 83:18 100:9 102:9 117:13 117:21,25 118:2,4,10,12 119:5,17,22,22 120:19 125:1 131:6 139:19 146:20 148:18 151:23 156:15 177:12 191:21 192:20 194:15 213:24 224:13 230:14 234:12 235:16 236:9 236:19 255:21 256:12 258:15 267:7 274:3 299:19 313:10 316:2

**draw** 235:17 270:20 304:12
**drawing** 170:13,15 171:21
**dresses** 171:18 171:20 174:3
**dried** 92:22
**drive** 78:21 260:9 289:12 289:20 290:1,7 308:4,6
**driven** 98:22
**driving** 182:8
**drop** 131:22 161:12
**droz** 3:12 9:8 9:12
**dsm** 72:12,12 73:3 81:25 82:8 105:16 106:1 108:11 108:14 109:1,4 110:20 111:10
**due** 36:1 49:25 76:15 148:2 160:7 163:5 211:23 229:13 235:1 241:23 291:18 292:22 304:8
**duly** 9:20 317:9
**duration** 227:17

**dutch** 188:4 196:10 241:25 247:15,19,21 248:10 249:4,9 250:5,16,20 251:5,12
**dying** 280:23 282:15,25
**dynamics** 90:23 92:25
**dysphoria** 5:24 6:4,6,11,14,25 17:10 18:9 32:23 70:24 72:10,11,22,24 73:6,9 74:1,5 74:17 81:25 82:7,8,11,12,18 82:25 83:3,5,9 95:18 96:22 97:3 98:6,23 101:10 102:1 105:16,25 108:3,10,13,23 109:20 110:6 110:20 111:11 112:11,20 113:7,13,21 114:8,14,18 115:9,11 127:1 145:17 153:15 153:17,19 159:14 167:19 167:25 180:10 184:12 185:11

185:19,23 186:19 187:1,9 187:23,25 205:6,13,17,20 205:23 206:11 214:6 222:25 224:20 227:23 231:17,20,25 233:3 237:10 238:2 241:7,16 247:24 248:15 252:16 253:21 254:4,21 255:2 255:10,18 257:1 259:21 260:20 273:2,8 295:8,12

**e**

**e** 1:25 2:6 4:1,2 4:10 5:1 6:1 7:1 8:1,1 16:17 88:11 120:20 226:10 317:5 317:22 319:3,3 319:3
**e.g.** 42:1 94:20
**earlier** 25:18 71:16 127:7 138:19 159:20 169:24 176:3 214:19 229:19 232:16 261:8 261:18,22 267:11 268:5 273:20 289:15

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

**[earlier - entitled]**

292:11 299:21
300:9 313:10
314:23
**early** 174:5
192:2 315:11
**easier** 16:4
103:7
**eating** 258:1
**ebm** 39:4
**editing** 16:22
**edition** 21:8
**editions** 150:5
**editor** 15:23
158:14,16
297:8,17 298:1
298:7,12,13,13
298:17 299:2
**editorial**
177:13,17
178:8 184:15
298:21
**editors** 262:9
262:19,21
264:11
**edits** 262:10
263:6
**educate** 93:1
**education**
19:14 285:8
**educational**
192:21
**effect** 146:1
163:14 198:13
201:12 202:18
205:2 207:7,19

208:7 227:21
263:23 309:11
**effective** 22:2
83:4 185:10
186:25 188:20
190:3,12,16
191:2 192:18
**effects** 5:21
6:10 179:18
182:6,18 183:9
183:13,25
192:5,10,15
200:6,12,23
201:1 203:14
203:16 228:2
231:15,24
235:18 243:4
255:16 273:15
273:16 294:13
**efficacious**
196:21
**efficacy** 240:23
**efficient** 22:1
**efforts** 5:10
140:2 143:20
147:5,19 148:7
150:15,16,24
151:11
**either** 99:24
124:10 203:2
211:25 212:5
260:13 300:8
**elected** 169:22
277:20 280:5

**element** 249:9
**elements** 92:1
110:6 196:21
209:16 309:10
**eligibility** 57:14
57:25 97:5
**eligible** 66:23
88:23 98:12,15
189:9 249:19
**eliminate**
275:18
**eliminated**
283:8
**elimination**
260:5
**emails** 263:1
**embargoed**
149:25 150:7
**embargoes**
149:20
**emoji** 284:23
**emotional**
85:10 193:13
**emphasized**
153:1
**employed**
196:19
**enacted** 265:12
276:6
**encapsulated**
302:10
**encompass**
199:6
**encompasses**
199:10

**encountering**
307:22
**ended** 220:8
281:2
**endnote** 132:7
132:11 177:25
178:1
**endocrinolog...**
257:2
**endogenous**
129:22 130:6
130:24 195:3,7
202:15,18
203:5,8,8
211:25 212:6
**ends** 61:7
**engage** 142:13
142:16
**english** 270:3,4
**enjoy** 74:13
**enjoyed** 96:4,9
**ennis** 3:16 8:15
**enrolled** 258:6
**ensuring** 107:9
**enter** 113:10
283:10
**entire** 26:4 51:6
189:23
**entirely** 68:21
92:21
**entitled** 2:12
30:10 44:13
125:1 136:15
148:20 215:18
226:10 247:3

**[entitled - exclude]**

265:22 274:20

**environment**
91:1,2 246:22
289:18 311:1
311:12

**environments**
310:19

**episode** 102:10
277:3

**equal** 35:5,11
35:19 36:8

**erase** 275:10

**errata** 4:16
12:3 318:11,13
318:17

**error** 134:6,20

**especially**
103:5 119:21
181:6 204:17
241:10

**esq** 2:16,17,21
3:3,9,12

**essential** 263:4

**essentially**
142:12 150:2
188:24 211:14
212:5 228:16
239:9 271:23
289:24

**establishing**
109:17

**estimates** 42:7
42:8

**estrogen** 130:5
203:2,4,9

211:18 272:6
272:16 273:14
273:16,17
294:18

**et** 6:10 8:9,10
50:1 140:13
218:15 219:8
244:1 260:9,21
318:4,4 319:1
319:1 320:1,1

**ethical** 141:12

**ethics** 257:14

**etiology** 42:2

**evaluate** 5:20
90:23

**evaluation** 6:11
22:5 39:1
107:8 109:7
118:21 124:6
142:19 240:12
242:7 246:20
248:1 255:18
311:13 312:2

**evaluations**
118:23 238:9

**event** 62:2
221:24 222:1,2
222:11,13
317:17

**events** 109:15
275:5

**eventually**
202:13 281:22

**evidence** 5:17
5:22 6:3,12,15

12:13,20,23
14:2,10,16
19:12 20:10,18
22:2 24:25
25:3,11,14
27:15 28:7
30:11,16 39:2
40:5 50:21,22
51:8,25 57:10
58:17,22 80:19
81:1 100:18
101:2 112:23
113:5,6 117:5
117:6 143:2,4
143:8 179:23
183:17,21
184:9,24 185:9
185:22 186:17
188:19 190:1
191:1,6 204:15
222:23 226:10
231:15,24
245:24 246:4
246:10 255:19
260:25 265:6
278:9,22,25
279:1,18,23
280:8 282:1,4
282:12 283:8,9
283:15

**evidentiary**
256:5

**evolution** 76:13

**evolve** 75:10,24
77:1

**evolved** 78:6
123:22 248:12

**evolves** 78:13

**ex** 77:17

**exact** 17:17
35:19,20 36:4
39:21 122:25

**exactly** 55:25
212:16 302:15

**examination**
10:1 300:20
313:8 315:3

**examine** 62:3

**examined**
317:8

**example** 62:2
94:13 95:24
171:24 192:5
295:9 309:25

**examples** 59:6
77:21,22 78:4
78:16,18 79:7
116:20 117:10
221:18

**exception** 82:3

**exceptions**
111:5

**excerpt** 84:6

**excitatory**
200:6

**exclamation**
284:21

**exclude** 13:23
26:15 165:18
208:4 216:14

[exclude - experts]

232:19
excluded
129:20 130:17
133:5,17
134:10,23
215:19 216:10
217:2,11
225:10,18
226:4 234:3,25
excluding
135:15 214:23
215:6
exclusion   59:10
exclusively
300:18
excuse   252:6
279:7
executive
195:16 196:9
196:12 198:19
198:23 200:2
211:9
exercise   275:20
exerting   200:5
exhibit   4:12,14
4:16,17,19,20
4:22,24 5:3,4,6
5:9,12,14,17,19
5:22 6:3,5,8,10
6:13,15,17,20
6:21,22,23,24
7:3 11:2,5,18
11:20,25 12:2
21:6,9 27:10
29:4,6 38:14

52:23 56:5,7
57:5 63:13
65:23,24 83:19
83:20 100:10
102:4,16
124:19 125:9
131:2,5 135:5
136:8,9,21
139:18,20
143:14 146:13
146:20 148:14
148:17 149:6,8
149:14,15
150:11 151:19
151:22 160:10
161:16 165:4,5
165:8 177:4,11
178:7 194:11
194:14 208:13
213:20,23
224:10,12
230:10,13
234:9,11
236:10,14,15
236:18 255:13
255:16,20
258:12,14
266:5,9 267:6
267:9 269:5,17
273:25 274:2,9
277:13,14
280:17,18
284:14,15
296:16,19
299:23,25

313:11
exhibits   12:11
exist   119:5
142:21 188:25
241:24 245:4
253:14
existed   164:12
190:10
existence
248:21
existing   12:18
13:4 50:19
51:2 107:24
108:7 109:11
exists   108:24
245:15
expect   223:11
260:17,20
272:25 307:7,8
expectations
161:11
expected
192:21 237:14
237:22 239:14
expensive
130:10
experience
72:22 81:8
87:8 91:14
100:14 101:6
106:19 156:6
156:10 157:3
157:20 160:7
162:21 171:13
171:23 212:9

245:11,13
250:20,23
273:1,5 291:17
294:22 298:15
305:21 306:20
307:25 308:2
312:23
experienced
88:7 310:25
experiences
293:5 302:10
302:16 306:2
experiencing
148:2 260:8
experimental
233:4,12
expert   4:12
15:13 17:8
25:1 45:13
51:10,22 52:1
68:1,4,6,14,25
69:10 70:3,5
70:18,20 71:7
71:9,11 111:13
170:17 176:23
177:1 184:16
193:14,21
194:2 196:20
256:13,19,24
265:11
expertise
121:10 164:18
171:2 222:6
experts   15:18
50:4 163:17

**[experts - fault]**

180:8 241:21
250:22 287:6
**expires** 317:25
**explain** 30:23
32:16 39:11
41:2 147:22
253:12 266:8
288:24 293:23
**explained**
135:23 179:13
242:22 270:4
**explains** 59:16
77:5
**explanations**
291:4
**explicit** 42:3
59:24
**explicitly** 50:7
63:21
**exploratory**
141:19,23
142:13,16,23
143:4,9
**explore** 141:25
142:6
**exposed** 148:4
151:9 202:25
209:7 211:25
**exposure** 5:9
57:13 137:18
137:20,23
140:1 267:16
270:5
**express** 311:6

**expressed**
174:1 250:10
**expressing** 97:4
98:4,11,14,16
145:17
**expression**
172:9,17 173:1
174:2 176:5
292:5
**expressions**
172:12
**expressly**
171:11 172:22
173:19 174:17
**extend** 249:17
252:19 253:12
**extensive** 104:5
**extent** 85:20
111:18 179:4
181:19 255:4
270:3
**external** 76:16
76:25 78:7,19
78:21 289:12
290:1,6,11,12
290:14,18
291:19,21
299:4 304:8
308:4,10,12,21
309:3,5,11
310:1,5
**extra** 153:5
**extrapolating**
239:22

**extreme** 80:21
111:8 134:9

**f**

**f** 120:20
**face** 53:23
**faced** 200:21
**facilitate**
106:11
**facsimile** 3:14
**fact** 30:20
37:19 64:24
78:9,19 115:7
123:12 154:22
157:10 167:17
170:6 181:21
202:19 240:23
295:3 306:4,15
**factor** 76:25
290:11,12
291:19 310:1,2
**factors** 7:3
39:23 40:1
76:16,16 78:8
78:19,21,22
79:4 81:5,6
102:2 240:25
246:21,22
248:24 289:6,7
289:7,7,12,12
289:25 290:1,2
290:6,7,14,18
291:21 304:9
307:19 308:4
308:11,12,22
309:3,5,6,11,13

310:5,6
**facts** 178:23
**faculty** 257:22
**fails** 318:19
**fair** 26:10
66:10,14 75:25
79:12 94:4
126:2 127:25
131:10 146:2
159:6,8 168:14
168:20 265:9
265:11 301:18
309:6
**fairly** 106:8
157:3
**fall** 168:14
**false** 265:5
**familiar** 12:12
13:7 39:8
103:14 141:18
143:1,3 213:18
**families** 91:13
91:13
**family** 90:13
91:1 105:11
106:9,11 113:2
115:4 120:16
**far** 53:12
119:12 156:17
181:24 271:23
**fashion** 248:4
**fast** 51:18
**fat** 294:19,21
**fault** 84:9

Page 29

**[favor - fixed]**

| | | | |
|---|---|---|---|
| **favor** 151:8 | **females** 273:6 | **finally** 192:2 | 125:23 127:10 |
| **fda** 201:20 | **feminine** | 265:18 | 129:16 135:4 |
| 202:9,20 | 104:10 172:13 | **find** 14:21 | 147:24 149:9 |
| 210:13 228:9 | 172:16 | 22:15 51:18 | 152:6,6 155:5 |
| **fear** 94:20 98:6 | **femininity** | 109:21 136:1 | 157:4 159:19 |
| 160:7 289:16 | 74:25 | 157:14 163:5 | 160:21 164:15 |
| 292:22 | **fertility** 192:6 | 195:21 221:3 | 164:16 167:18 |
| **feasible** 27:8 | **fewer** 30:21 | 223:12 302:3 | 167:22 169:12 |
| **february** 29:8 | 121:25 122:4,6 | 312:11 | 170:7 175:13 |
| **feed** 46:18 | 122:8 163:7 | **finding** 112:16 | 177:16 178:2 |
| **feeding** 46:25 | **field** 16:25 17:5 | 129:1,6,6 | 178:12 191:24 |
| **feel** 14:24 15:24 | 17:7,12,15 | 163:5 174:21 | 196:11,17 |
| 80:23 91:11,16 | 18:19 19:9 | 189:13 200:16 | 201:10 204:14 |
| 105:8 120:10 | 51:23 68:5 | **findings** 46:24 | 208:18 209:2 |
| 160:15 174:22 | 111:14 155:23 | 61:8 150:14 | 211:13 215:22 |
| 174:24 263:3 | 156:23 163:17 | 154:2 263:22 | 215:24 218:7 |
| 274:20 275:19 | 176:12,18,23 | **fine** 27:20 | 228:20 229:10 |
| **feeling** 116:24 | 177:1 | 63:17 117:11 | 230:25 235:4 |
| 162:14 286:17 | **fields** 231:16 | 117:11 119:13 | 237:7,20 |
| 289:13 | **figure** 30:9,10 | 123:7 234:21 | 239:12,23 |
| **fell** 170:8 | 30:23 31:21 | 240:7 299:11 | 240:2,19 241:4 |
| **fellows** 19:8 | 32:5 44:12,17 | **finer** 202:4 | 243:16 244:25 |
| **fellowship** 13:2 | 44:22 46:10 | **finish** 173:6 | 245:2 247:7,21 |
| 21:3 | 66:6,9,22 67:9 | 188:13 | 250:19 258:24 |
| **felt** 81:17 104:9 | 67:18 103:16 | **firm** 8:20 10:6 | 264:9,10 |
| 104:10 161:9 | 105:24 232:6 | **first** 9:8,20 | 267:15 269:23 |
| 162:15,17 | 311:25 | 10:24 11:2 | 274:14 280:21 |
| 275:6 294:14 | **file** 11:3 | 16:8,16 18:1 | 282:14 297:5 |
| 294:22 295:5 | **filed** 11:15 | 21:19 24:20,21 | 300:25 301:2 |
| 306:3 | **filtering** 57:10 | 29:13 47:16,24 | 308:6 |
| **female** 76:6 | **final** 47:17 48:1 | 50:15,18,25 | **fit** 6:24 |
| 79:15 96:10 | 129:24 132:4 | 51:9,15 57:7 | **five** 52:13 |
| 241:11,18 | 211:11 234:1 | 58:14 87:5 | 266:23 |
| 242:15 262:5 | 259:7 260:23 | 93:7 96:22 | **fixed** 234:18 |
| 263:17 273:19 | 261:11 266:20 | 103:1,1 119:1 | |

**[flag - form]**

| | | | |
|---|---|---|---|
| **flag** 250:3 | **followed** | 54:21 55:10 | 170:11,23 |
| 274:17 275:5,7 | 207:16 217:6,7 | 56:25 57:22 | 172:1 173:9,20 |
| 275:7,8 277:2 | 243:22 | 59:15 60:9,18 | 174:19 175:3 |
| 277:3 311:5,24 | **following** 84:25 | 62:11,16 64:15 | 175:17 176:19 |
| **flexibility** | 194:23 196:22 | 65:6 66:11,17 | 181:2,10,23 |
| 200:2,5 | 200:20 206:13 | 67:1,12 74:6,7 | 182:14,24 |
| **flip** 169:12 | 218:23 240:7 | 78:1 79:18 | 183:4,19 |
| 188:3 | **follows** 9:22 | 80:16 81:3 | 185:12 186:12 |
| **flipping** 242:23 | 118:25 | 82:9,20 83:6 | 186:20 187:10 |
| **floor** 277:22 | **footnote** 56:9 | 86:18 87:24 | 188:22 190:5 |
| 278:4 279:21 | 63:14 134:7 | 92:5,19 93:18 | 190:18 191:3 |
| **flores** 3:3 9:8,9 | 177:22 218:13 | 97:7 99:11 | 194:4 197:4,11 |
| 9:10 | 218:13 219:6 | 100:21 101:4 | 197:21 198:6 |
| **florida** 255:24 | **force** 141:1 | 101:12 103:25 | 198:16 199:1 |
| **fluctuations** | 144:9 145:3 | 106:3,25 | 199:12 200:13 |
| 302:21 | 146:5 148:8 | 109:13,25 | 201:3,14 |
| **fluency** 210:3 | 275:11 | 110:25 111:17 | 202:22 209:15 |
| **fly** 166:7,15 | **forced** 148:5 | 113:16 114:19 | 211:1 212:2,24 |
| **focus** 158:12 | 276:2 278:3 | 116:5 118:15 | 213:8 215:9 |
| 170:12,16 | **forcier** 119:22 | 121:13 122:2 | 219:22 220:13 |
| 257:15 | 120:19 | 123:14,19 | 222:7 223:1,18 |
| **focused** 42:12 | **foregoing** | 124:11 128:4 | 223:23 228:5 |
| 46:2 57:11 | 317:9,14 320:5 | 129:10 130:21 | 229:20 232:2 |
| 93:10 137:6,8 | **foremost** 93:8 | 133:14,24 | 233:9 237:24 |
| 159:11 167:24 | **forensic** 70:22 | 134:22 141:8 | 238:16 239:1 |
| 172:21 248:13 | **forget** 118:22 | 141:13 142:25 | 240:4 241:19 |
| 262:25 | 158:18 206:17 | 144:2,21 | 242:20 245:25 |
| **focuses** 121:5 | **forgetting** | 145:10,18 | 246:7,18 249:6 |
| **folks** 284:22 | 70:16 71:19 | 152:21 154:18 | 249:23 250:8 |
| 285:2 | **form** 14:4 17:1 | 155:20 156:11 | 251:7 252:1 |
| **follow** 32:20 | 18:17 19:15 | 160:23 163:15 | 253:2 254:13 |
| 145:5 157:13 | 23:4 25:15 | 164:12,13 | 255:3 256:6,14 |
| 157:17 227:17 | 35:9,25 36:14 | 167:12,20 | 263:19 265:14 |
| 227:20 228:10 | 41:5 43:22 | 168:16 169:3,8 | 272:18 275:2 |
| 276:10 314:25 | 49:4 51:4 | 169:13,21 | 276:8,16 278:7 |

**[form - gender]**

278:18 279:10 280:2 281:10 282:19 283:4 283:20,25 284:8 286:14 286:23 287:19 288:5 290:3,9 290:20 292:9 293:22 296:9 298:8,18 304:14 305:8 305:16 307:12 308:8,23 310:3 310:24
**formal** 45:12 163:22
**formally** 81:24 82:7
**formatting** 234:19
**former** 69:20 75:12
**formerly** 274:4
**forms** 75:4 286:12
**forth** 15:22 238:14 263:5
**forward** 278:25 283:14
**found** 127:5 159:19 160:4 170:19,20 175:24 176:2 179:15 182:3 183:12,25

195:23 205:20 244:2 262:13 291:9
**foundation** 3:2 25:16 41:6 100:22 118:16 133:15 145:19 200:14 251:8 252:2 265:15 276:9,17 285:16 286:6 286:22 287:15 287:18 288:1,7 298:9
**four** 35:3,4
**fourth** 107:20 216:2 259:14 270:23
**framework** 77:5 247:14 289:1 309:2,5 309:8,10
**francisco** 257:22 258:9
**frankly** 239:25
**free** 302:12,13
**freedom** 277:19
**freeze** 70:25
**fresh** 217:8
**friday** 11:16
**friends** 1:4,6 285:7
**front** 12:10 13:3 29:7 139:21 159:4

213:21 274:9 291:8
**full** 21:23 23:11 24:20 40:10 41:21 47:16,24 48:22 50:5 64:22 66:23 94:9 98:19 118:3 129:16 131:8 178:11 191:7,24 195:1 195:6 196:17 204:10 211:4 221:7 232:22 237:19 262:14 297:2 314:17 317:14
**fully** 129:8 219:15 230:22 231:12
**functional** 16:12 46:6
**functioning** 72:17 178:16 192:18 195:17 196:9,12 198:19,21,23 198:24 200:2 210:2 211:9 259:19
**further** 52:3 77:4 98:13 107:15 212:23 227:19 237:18 240:16 259:4,7

313:1 314:24 315:3 317:16
**future** 97:23 150:4 231:18 253:8 289:18

**g**

**g** 8:1 218:4
**gah** 179:5 181:20 267:16
**gatekeeping** 103:8,15 104:3 119:11,19
**gay** 77:17
**gears** 67:24 176:10
**gender** 5:6,9,15 5:24 6:3,4,6,10 6:11,13,15,17 6:24 7:4 16:13 17:9 18:7,8 29:20 32:21,23 46:8 70:14,24 72:8,10,11,13 72:22,24 73:5 73:9 74:1,4,5 74:17,20,21,23 74:24 75:1,3,5 75:13,19,23,25 76:7,13,14,19 77:2,23,24 78:6,11,20,23 78:24,25 79:9 79:10,16,25 80:4,5,7,15,20 81:1,4,25 82:6

Page 32

**[gender - generally]**

| | | | |
|---|---|---|---|
| 82:8,11,12,15 | 153:18,22 | 238:2,20 | 296:8 302:7,19 |
| 82:17,24,25 | 156:1 157:4 | 239:13 240:13 | 303:23 306:5 |
| 83:3,4,8 85:2 | 158:2,4,9 | 241:7,16,22 | 307:2 311:15 |
| 87:8,16 88:7 | 159:14,16,17 | 242:4,9 243:2 | 313:14 |
| 90:5 92:9,14 | 160:15 161:10 | 243:5,8,9,14,24 | **gendergp**   4:24 |
| 94:12,13,14,21 | 162:21 167:19 | 243:25 244:4,9 | 102:10 |
| 94:24 95:18 | 167:24 172:9 | 245:22 246:6 | **gendergp's** |
| 96:2,16,21,24 | 172:10,12,17 | 246:12 247:11 | 102:21 |
| 97:2 98:6,23 | 172:25 173:3 | 247:23,24 | **gendhor** |
| 100:14 101:10 | 174:1 176:4,5 | 248:7,14,22 | 231:18 |
| 101:25 103:24 | 176:6 180:10 | 249:16,21 | **general**   1:11 |
| 104:6 105:13 | 180:19 182:6,8 | 250:6,11,21,24 | 3:12 13:2 |
| 105:16,17,25 | 183:9,22 | 250:25 251:6 | 14:20 26:18 |
| 106:16,23 | 184:11,18,21 | 251:11,15,17 | 30:17 39:16 |
| 108:3,10,13,23 | 185:2,11,17,19 | 251:22,23,24 | 41:13 58:18 |
| 109:6,18,20 | 185:22 186:10 | 252:6,7,11,16 | 59:2 62:20 |
| 110:2,6,18,20 | 186:19 187:1,3 | 252:17,25 | 71:11 85:16,22 |
| 110:23 111:11 | 187:7,8,16,22 | 253:6,11,21 | 108:14 111:6 |
| 111:16 112:11 | 187:25 188:15 | 254:3,21 255:2 | 115:3,12 123:9 |
| 112:19 113:6 | 188:19 189:21 | 255:10,17,17 | 137:14 140:14 |
| 113:13,21 | 190:2,15 191:1 | 256:2 257:1,24 | 152:3,17 |
| 114:7,14,17,22 | 204:18,20,21 | 259:18,21 | 156:24 164:6 |
| 115:8,9,11 | 205:6,13,17,20 | 260:3,20 | 224:8 255:9 |
| 116:8,11,23 | 205:22 206:11 | 261:20,24 | 260:18 273:1 |
| 127:1,11 | 206:13,19 | 264:14 265:23 | 288:15,24 |
| 136:15,25 | 207:3 212:7 | 267:16 269:24 | 302:4 |
| 138:9 140:2,6 | 214:5 216:24 | 270:6 271:1 | **general's**   9:16 |
| 140:8,18,18,21 | 217:6,7,14 | 273:1,8,11 | **generality** |
| 140:23 141:6,7 | 222:25 224:18 | 281:19 286:12 | 125:19 |
| 141:25 142:24 | 224:19 227:18 | 289:23 291:11 | **generalized** |
| 143:5,19,22 | 227:21,22 | 292:4,5,7,11 | 73:3,9,10,16,25 |
| 144:15 145:17 | 229:13 231:17 | 293:11,15,18 | 115:1,13 117:4 |
| 147:18 150:16 | 231:19,25 | 294:3,7,25 | 117:7 |
| 150:23 151:10 | 233:3 235:18 | 295:7,12,16,19 | **generally**   18:6 |
| 153:8,14,16,16 | 237:10,13,21 | 295:22 296:1,5 | 18:10,18 27:5 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[generally - going]**

| | | | |
|---|---|---|---|
| 31:21 37:3 | 216:18 239:2 | 71:24 78:9 | 232:21,24 |
| 39:13 40:9,16 | 287:25 311:22 | 84:3,16 85:6 | 233:25 237:4 |
| 49:20 57:12 | **given**   34:19 | 93:4,25 94:6 | 239:20 244:4,9 |
| 74:13 83:8 | 51:19 62:1 | 94:10 96:8 | 247:2 249:24 |
| 85:24 89:21 | 76:3 111:23 | 98:18 101:10 | 251:18 256:9 |
| 110:8 116:21 | 126:11 132:24 | 102:24 104:17 | 259:11 265:17 |
| 125:21 130:10 | 133:12 167:17 | 123:5,20 | 266:9 267:13 |
| 130:10 135:25 | 183:16 192:21 | 124:14 131:10 | 269:1 270:15 |
| 137:9 146:10 | 200:3 203:7 | 131:17 132:1 | 270:15 271:23 |
| 149:18 172:7 | 204:21 257:13 | 132:10 134:13 | 277:12 280:16 |
| 201:19 212:9 | 320:9 | 135:4 138:17 | 284:13 292:1 |
| 220:17 225:9 | **gives**   34:17,20 | 139:5 141:16 | 296:25 299:12 |
| 262:8 263:7 | 217:8 | 143:13,15 | 301:5 302:7,13 |
| 271:16 273:5 | **giving**   90:3 | 146:16,21 | 305:6 307:1,16 |
| 298:20 306:22 | 122:22 187:3 | 149:8,8 150:11 | 312:8 |
| 308:12 | 202:13 314:22 | 155:15 156:18 | **goal**   26:11,18 |
| **genetic**   90:14 | **glance**   96:22 | 160:9,11 | 50:18,25 52:6 |
| **getting**   21:18 | **glib**   118:18 | 163:24 165:1 | 69:4 83:12,17 |
| 31:21 64:19 | **gnrh**   130:9 | 170:24 173:7 | 140:8,17,21,23 |
| 83:16 91:15 | 216:20 | 174:7 178:10 | 141:5,12,15 |
| 113:4 122:18 | **gnrha**   126:15 | 188:11 189:8 | 142:2,9 246:19 |
| 180:13 | 203:17 204:2 | 191:14 194:20 | **goes**   15:22 |
| **gice**   147:4,16 | 233:2 | 196:15,16 | 18:11 23:10 |
| 147:17 | **go**   10:21 15:18 | 199:21 201:8 | 56:17 59:21 |
| **gill**   127:4 | 21:20 23:15 | 203:1,11 | 238:4 243:19 |
| **give**   23:7,11 | 24:7,14,17 | 208:12,15 | 278:10 |
| 26:4 34:9,22 | 27:7,17 28:17 | 212:6 213:19 | **going**   10:24 |
| 35:14 37:12,13 | 30:6 35:12 | 215:17 218:2,3 | 13:13 14:22 |
| 38:11 41:12 | 37:20,21 38:13 | 218:13,22 | 22:14 24:21 |
| 52:7 59:2 | 38:16 41:16 | 219:5,24 220:4 | 30:25 33:7 |
| 64:13 82:14 | 44:10 45:25 | 220:17 223:3,5 | 37:1 38:4,19 |
| 86:8 92:23 | 47:5 50:11 | 224:3 225:16 | 41:22 46:13 |
| 134:7 164:10 | 52:23,24 56:3 | 225:22 226:2,9 | 47:17,25 49:6 |
| 171:4 173:11 | 56:4 58:24 | 226:19 227:9 | 49:14 50:2,4 |
| 188:13 208:19 | 60:2 62:21 | 230:9,23 | 51:11,17 54:8 |

**[going - guess]**

| | | | |
|---|---|---|---|
| 57:7 58:1,8 | **good** 10:3,4,22 | 223:2,8,12,14 | 216:23 218:17 |
| 64:3 67:15,20 | 22:11 49:22 | 224:1,8 | 219:10,16 |
| 68:12 79:13 | 51:20 52:11,12 | **grades** 73:13 | 223:11 237:9 |
| 95:4,9,9 97:19 | 83:17 99:25 | **grading** 38:25 | 237:10 238:1,1 |
| 97:20 99:15,18 | 101:21 120:2 | 40:5 | 239:17,18 |
| 99:21 100:11 | 139:3,10 188:5 | **grain** 122:24 | 241:10 242:1 |
| 103:16 106:13 | 191:13 235:23 | **grand** 257:13 | 260:18 262:5 |
| 114:25 116:8 | 245:24 246:4 | **granting** 159:7 | 262:14 269:23 |
| 119:13 122:13 | 264:19 265:1 | **grappling** | 271:1 286:21 |
| 124:25 125:18 | 280:8 299:7 | 103:6 | 286:24 287:13 |
| 126:9 127:15 | **google** 176:14 | **gray** 231:13 | 315:6,10,11,14 |
| 129:16 136:6 | **gop** 275:4 | **great** 12:12 | 315:15,20 |
| 137:6 138:18 | 280:23 281:8 | 39:17 119:8 | **groups** 37:4,7 |
| 161:18 163:3 | 282:15 283:1,7 | 138:6 174:7 | 40:11 125:23 |
| 170:21 172:24 | 283:19 284:6 | 194:13 230:12 | 126:4 165:14 |
| 173:1,11 | **gop's** 274:16 | 236:17 | 165:17 272:22 |
| 175:14 179:21 | **gordon** 21:15 | **greater** 137:19 | 272:23 |
| 191:11 200:16 | **gotcha** 269:14 | **groombridge** | **growing** 5:17 |
| 204:9 208:17 | **gotten** 33:22 | 2:21 9:2 | 94:20 |
| 221:5,10 228:9 | 134:25 165:3 | **groombridge...** | **grown** 164:7 |
| 228:19 235:24 | 315:7 | 2:23 318:2 | **guarantee** 58:6 |
| 247:7 258:5 | **government** | **gross** 274:21 | 63:3 |
| 259:23 260:22 | 214:4 231:10 | **group** 32:20 | **guardian** 87:3 |
| 262:1 263:4,13 | 249:3 280:4 | 34:16 35:3,4 | **guess** 15:7 17:7 |
| 264:8 265:9 | **governmental** | 35:21,22,24 | 17:11 79:24 |
| 268:24 269:16 | 231:3 | 36:23 37:4,5,6 | 82:10 93:4 |
| 270:23 278:22 | **grade** 38:24 | 37:6 40:10 | 99:8 113:8,12 |
| 279:2 285:20 | 39:8,13,19 | 125:23,25 | 121:14 123:17 |
| 285:23 289:16 | 40:8,15,16,19 | 134:16 138:21 | 131:16 136:11 |
| 295:21 300:25 | 40:21 41:3,8 | 158:1,3,10,25 | 137:13 140:22 |
| 301:2 303:5 | 41:13 218:4 | 166:11,21,24 | 140:25 155:17 |
| 307:14 311:19 | 219:21,23 | 167:5 168:13 | 157:6 161:3 |
| 311:22,25 | 220:6,9,10,14 | 168:25 169:6 | 166:9 169:19 |
| **gonadotrophin** | 220:15 221:1,2 | 169:11 170:7,8 | 172:19 173:16 |
| 5:22 | 221:8 222:25 | 170:9 189:1,9 | 182:22 184:6 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[guess - health]**

200:20 201:9
222:4 228:6
230:4 237:19
239:22 244:25
245:9 250:15
264:11 266:19
290:13 293:2
305:3 308:18
308:21
**guidance** 224:8
**guide** 38:14
105:11 247:9
**guided** 57:9
**guideline** 59:5
127:8
**guidelines**
17:23 38:24
39:16 40:17,20
65:25 86:21
87:20 90:6
91:25 92:4
93:16 101:19
111:3,4,6,14
123:18,22
124:3,4,10,13
145:4 238:8,15
239:7,8 241:9
247:20 249:12
249:20 252:14
253:9
**guides** 4:17
21:7
**guyatt** 21:15
**guys** 28:22

**gynecologist**
257:10

**h**

**h** 4:10 5:1 6:1
7:1 319:3
**hacking** 163:6
170:1
**half** 69:4 272:9
**halfway** 47:23
59:22 150:12
199:22 203:13
204:10
**hampshire** 3:9
**hand** 44:19
317:18
**handful** 193:17
225:10
**handle** 274:7
**hang** 136:22
**hannema** 5:17
**happen** 16:14
80:10
**happened**
28:10 104:15
221:22
**happening**
111:12
**happens**
232:16
**harass** 171:3
**harassed** 76:19
173:24
**harassment**
91:5 289:9
291:19 292:23

308:16 311:2
312:24
**hard** 19:21
35:10 111:11
165:6 171:13
187:24 203:24
228:6 272:24
303:20 306:9
307:18
**harder** 272:10
**harm** 97:13
286:19 287:23
**harmful** 151:7
278:14,22
279:2,19
287:11,24
**harvard** 4:20
19:18 20:15,25
53:11 63:13
**hate** 274:18,24
276:7 284:20
286:13 287:17
287:21
**haters** 284:24
**hating** 276:15
285:5
**hatred** 148:3
**head** 168:24
**header** 47:12
47:25 132:3
194:23 225:17
227:11 237:5
**health** 4:22 5:7
5:14,19 6:18
7:3 17:19 18:2

18:7 20:22
32:25 33:5,6
33:19,22 37:25
73:13 87:14
91:6 94:11,15
94:22 95:12,20
101:8 108:20
113:10 116:2
119:10 120:1
120:22 121:5
121:10,12,15
121:17,19,21
121:25 122:6
122:17 124:1,6
124:13,15
136:16 138:10
140:3 147:2,6
147:25 148:12
152:1 163:23
168:1 179:4,15
179:17,19,25
180:24 181:6
181:19,21
182:3,9,12,23
183:2,8,10,18
184:7,10,20,25
185:1,6,9,17
189:1,7,11,15
211:8 216:25
228:24 231:4
237:11 240:22
247:12 253:15
256:25 257:23
260:5,6,7
261:1 262:13

Page 36

**[health - hour]**

265:24 282:1,9
283:11,17
286:4 289:3,8
291:7 300:7
313:13
**healthcare**
126:15 255:25
**hear** 28:8,9,12
28:15,20
103:17 106:2
111:25 256:16
304:23
**heard** 27:14
28:6 30:15
89:1 129:5,11
159:15
**heart** 284:22
**held** 8:13
**helen** 117:13
**help** 51:14 91:9
91:13 112:12
115:17 142:1
273:12 278:11
314:8
**helped** 302:14
**helpful** 305:24
**helping** 142:6
**helps** 81:21
**hendricks**
289:24
**hereto** 320:7
**heritage** 284:22
285:2,15 286:5
286:21 287:15
287:18 288:1,7

**hesitant** 111:20
**heterogenous**
293:4 302:4
306:2
**hey** 27:17
**hhs** 5:3
**hide** 174:7,10
274:19 275:12
275:13 276:3
**hierarchy** 28:7
30:16
**high** 26:17
39:20,20 48:7
125:19 150:2
201:4 218:16
219:9,17 235:1
283:16
**higher** 25:25
26:3 31:25
32:1 34:3,10
34:12,13 35:7
35:23 36:12
128:22 137:21
311:11
**highest** 45:1
50:21
**highlight** 48:19
109:3
**highlighted**
108:13 163:22
**highlighting**
25:25 55:24
73:18 153:20
153:24 179:22
181:3 242:5

286:1
**highlights**
253:13
**highly** 126:23
166:23 167:3
**historical** 127:3
**historically**
250:9
**history** 83:8
90:13 104:4
164:9 248:15
249:16 251:23
252:25 281:2
301:3
**hit** 33:25
267:22
**hitting** 28:2
**hoc** 297:22
**hold** 145:13
173:5 236:13
268:3
**holds** 145:16
**homophobia**
289:13
**honest** 164:15
193:3 272:3
**honestly**
104:22 164:16
173:14 286:7
**hope** 81:21
150:14
**hopefully** 107:5
**hormonal**
228:3 237:6

**hormone** 5:23
6:6 132:17,23
133:12 209:9
224:19 231:16
231:24 235:19
247:11 250:24
273:14
**hormones** 5:6
6:3,17 105:14
121:3,22
131:19 132:3
136:15,25
137:7 138:9
180:13,22
182:6,18 183:9
183:13,22
184:22 185:2
185:17 186:14
200:4,11,22,25
211:14 212:1,8
216:25 217:7
217:15 227:18
227:21 229:14
243:24 244:4
244:10 248:7
261:20,25
265:23 267:17
269:24 270:6
271:1 307:2
**hospital** 127:12
**hospitalization**
97:21 270:25
**hour** 2:11
10:18 99:22
138:25 139:8

Page 37

[hour - identity]

| | i | identifies 18:21 | 75:1,4,6,13,19 |
|---|---|---|---|
| 191:11 235:25 266:19 | | 49:24 76:5,6 | 75:23,25 76:7 |
| house 277:21 | i.e. 237:9 238:1 | 79:14,15 | 76:13,19 77:3 |
| 278:4 279:21 | icd 82:16 | 290:15 | 77:23,24 78:6 |
| hover 270:17 | idaho 1:2,11,13 | identify 9:7 | 78:20,23,25 |
| huge 103:4 | 1:14 2:7,10 3:2 | 13:16 14:24 | 79:1,9,10,16 |
| human 78:12 | 3:7 8:12 9:11 | 18:4 19:1 | 80:1,4,5,7,15 |
| humans 200:17 | 9:16 276:12 | 22:14,18 24:16 | 80:20 81:2,5 |
| 201:2,7 | 317:2,6 318:15 | 26:19 32:6 | 81:13 94:13,18 |
| hunch 173:2 | idea 126:22 | 41:10 50:5,18 | 94:21,23 96:2 |
| hundreds | 156:8 180:23 | 51:1 55:22 | 96:16 106:17 |
| 128:16,16 | ideal 58:13 | 58:1,19 63:3 | 110:2 114:23 |
| hung 64:20 | ideally 27:6 | 67:7,21 112:24 | 115:8 140:2,6 |
| 275:5 | 45:8 54:16 | 157:10,22 | 140:9,18,18,21 |
| hurt 285:20 | 57:1 60:2 67:4 | 188:7 201:22 | 140:24 141:2,6 |
| hyperlink | ideas 148:4 | 261:12 290:7 | 141:7,25 |
| 234:4,14 | ideation 97:4,9 | 291:22 292:19 | 142:11,20 |
| hyperlinks | 97:11,15 98:11 | 295:23 296:6 | 143:19 147:18 |
| 230:21 232:11 | 98:15,17 99:2 | 303:18,21 | 150:16,23 |
| hypothesis | 99:4,8,13 | 305:7 | 151:11 152:8 |
| 152:19,23,25 | 125:3 135:17 | identifying | 152:13 153:8 |
| 154:3,9,15 | 267:18 270:8 | 23:3 26:10 | 153:16,19,22 |
| 155:19 159:8,9 | 270:16 | 27:4 49:11 | 156:1,3,25 |
| 159:10 163:12 | identical 239:9 | 57:15 58:3 | 157:4 158:2,4 |
| 163:18 167:25 | identification | 152:5 290:16 | 158:9 159:16 |
| 168:4 175:1 | 46:2 | 292:16 293:20 | 159:17 160:21 |
| 273:11,21 | identified | identities 75:21 | 161:7 162:21 |
| hypothetical | 23:23 24:13 | 78:11 108:15 | 172:10,22,25 |
| 35:17,18 51:12 | 25:22 52:2 | 155:7 172:14 | 173:3,18 |
| 96:8,25 187:14 | 53:25 63:4 | 173:23 243:25 | 174:17 176:4 |
| 188:12 189:17 | 81:9,10 96:14 | 250:13 251:11 | 182:8 243:8,14 |
| 189:22 190:1 | 154:5 244:6 | 251:17 | 245:23 246:6 |
| 190:25 | 294:20 300:19 | identity 5:10 | 248:22 250:7 |
| | 300:21 304:1 | 5:15 72:8,13 | 250:11,22 |
| | 304:25 306:16 | 74:4,20,22,23 | 251:1,6,15 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[identity - includes]**

252:6,17
253:11 273:11
289:14 291:11
292:4,7,12
293:11,15,18
293:24 302:21
313:14
**ignore** 23:21
**ii** 97:2
**ilan** 289:2
**illness** 108:16
**image** 30:13
**images** 30:14
**imagine** 77:8
86:19 111:12
197:23 280:12
**immediately**
98:17 189:9
203:20 204:4,7
**impact** 150:2
180:21 182:17
184:1 192:19
192:24 195:11
195:16,18,21
196:23 198:12
198:19 204:19
207:3 209:12
209:24 210:1,8
211:23 220:19
279:15 282:2
283:11 289:8
**impacted**
275:22 282:7
**impacts** 18:7
190:22 192:18

202:5 209:5
**impairment**
72:16 73:22
210:16
**impairments**
74:16 212:11
**imperfect**
304:6
**implemented**
238:24
**implications**
197:20
**implied** 303:8
**imply** 148:10
292:4
**implying** 36:2
45:3 183:11
249:8
**important** 19:7
22:20 23:19
24:12,15 26:22
40:1 47:21
48:6 58:9
61:21 79:2
89:14 90:24
129:6 144:12
147:10 175:5
197:17,20
214:24 215:7
217:5 221:6
225:14 265:7
275:24 282:10
283:8 293:7,12
309:17

**imposed**
252:24 255:25
**impossible**
126:23 127:2
166:23 167:4
**imprecise**
204:5
**impression**
59:3 62:20
**improve** 33:5,7
33:19 37:2,8
184:11 185:17
185:19 189:4
189:11,15
206:13 231:18
259:19 260:7
260:19,20
273:6,21 286:3
**improved**
34:18 36:25
37:10,25 136:1
178:17 189:1,5
189:6 198:18
217:1 260:14
**improvement**
83:12 179:16
180:9,11,19
182:4 183:8
186:14 187:18
188:17 189:24
195:23 262:14
273:20
**improvements**
181:5 182:8
183:22 188:9

260:4
**improves** 37:6
185:22 260:13
261:1
**improving**
180:20 184:20
184:21,25
185:1,6 188:20
190:3
**inability**
135:21
**inbox** 176:16
**include** 13:23
15:14 26:15
42:4,21,23
43:3,7,8,12
44:2 55:3
61:15 66:22
127:23 129:21
135:16 214:22
214:22,24
229:23 230:6
232:20 248:20
249:5 254:8
259:7 289:4
**included** 42:4
60:17,25 61:8
61:11,16
165:14 215:11
227:13,16
228:22 232:10
**includes** 44:22
54:4 56:23
59:23 61:7
207:11,18

**[includes - infused]**

234:4 250:21
251:5 275:21
**including** 151:1
192:3 215:10
216:24 233:17
264:16
**inclusion** 59:9
225:14
**incongruence**
74:3 82:16
87:9 88:7
92:15 94:15
100:15 142:24
143:6 180:20
248:11,21
249:5,16,21
251:23 252:8
252:11,25
253:6
**incongruent**
110:3
**inconsistence**
224:5
**inconsistent**
123:18
**incorrect**
271:11 314:17
314:23
**increase** 193:9
241:16,22
242:6 307:10
**increased**
101:14 241:23
242:2

**increases** 58:7
268:7
**indexed** 297:12
**indexing** 175:5
**indiana** 11:21
12:4
**indicates**
132:21
**indirectness**
224:4
**indiscernible**
19:19 22:13
76:18 104:19
156:14
**individual** 1:13
3:7 11:22
15:21 22:12,20
23:9,11,15,17
23:22 24:7,11
31:2,25 33:2
48:14 49:7,14
52:2 54:4,13
55:4 62:5,9
72:21 76:5
79:14 88:6
110:15,18
120:12 127:5
154:5,6 164:22
170:25 172:24
221:2,8,9
222:16 223:5
223:17 233:4
233:16,22
238:6,10 242:7
247:3 255:9

263:9 272:6,16
278:20 286:9
293:12,20
**individual's**
79:8,16 142:24
143:5 172:21
**individualized**
30:5 233:21
239:20
**individuals**
45:17 78:17
89:12 105:24
110:22 111:15
115:10 125:23
125:25 134:24
157:9 163:12
166:23 240:15
242:3 244:17
246:12,16
250:6 251:13
285:15 286:5
290:24 296:4
303:11,17
305:23
**ineffective**
151:5 186:18
186:22
**ineligible** 98:18
**infinite** 195:12
197:14 199:6
199:11
**influence** 79:5
164:3 287:5
**influenced** 25:1
249:14

**information**
21:18 23:13
24:15 34:9,17
34:20,22 37:12
37:14 38:12
44:8 52:4
61:17,19 62:6
65:10 90:4,8
143:24 154:7
158:20 160:6
216:19,22
217:1 259:8
263:2 279:17
280:9 281:23
**informational**
217:8
**informative**
190:21
**informed** 85:11
85:18,19 86:5
86:8,16,16,22
87:3,22 88:9
88:16,21 89:2
89:6,10 90:2
91:22 92:12,13
92:23 93:6,9
93:12,16,21
101:21 106:22
107:4,10,11
119:12,20
**informing**
144:11
**informs** 143:21
**infused** 19:13

Page 40

**[inhibitory - interventions]**

inhibitory
  200:6
initial   52:6
  114:14,18
initially   214:15
  248:13 258:21
  289:2
initiating   92:8
  107:8
injunction
  68:24 69:3
  71:21
innate   75:3,18
  79:4 80:19
  81:5,6
inpatient   97:21
  270:24
inputs   35:19
  36:4
instance   61:20
  73:12 74:10
  75:15 95:17
  109:6 113:18
  114:9 122:10
  128:15 141:14
  171:15 195:16
  221:19 222:10
  224:4 275:17
  277:11 279:13
  294:12 308:7
instances
  110:17 277:8
  280:14
institute   262:25
  263:10

institutions
  312:10
instrument
  206:21
instruments
  205:18,22,25
insufficient
  231:17 232:1,4
  232:7
insurance
  107:24 108:8
  109:4,11 110:7
  110:10 113:10
  114:5,9,11
  116:2 294:24
integer   161:12
intense   221:25
intensive
  210:20
intent   97:13,15
  99:13
intention
  232:21
interaction
  94:19
interest   170:10
  282:12 317:16
interested
  217:3 221:17
interesting
  18:20 103:10
  153:4,6,13
  156:4,8,22
  170:21 190:20
  197:15,25

  213:11,12,13
interests   76:13
  94:17 308:20
interfere   87:14
  94:23 95:13,21
interim   208:14
  253:24
intermittently
  188:5 285:16
  297:23
intern   3:17
internal   76:15
  76:25 78:7,19
  78:21 171:13
  289:12 290:1,7
  309:11 310:2
internalize
  76:21 77:6,13
  148:3
internalized
  147:2 148:1,11
  289:13
international
  4:22 213:1
interpret   13:24
  49:9 189:12
  263:21 271:5
  272:10
interpretation
  22:21 24:9
  31:14
interpretive
  30:22
interrupt   19:21
  156:16

intervals   46:15
  138:3
intervention
  36:23 37:1,4
  57:12 109:18
  111:9 115:3
  116:23,25
  140:16 141:4
  141:12 142:9
  179:18,23
  189:21 192:3
  197:8 260:12
  294:4,7 295:19
  295:23 296:1
  302:6 311:15
interventions
  18:8 82:24
  90:6 91:19
  103:24 104:7
  105:18 106:24
  110:19,24
  111:16 116:12
  121:25 122:6
  140:7 143:23
  144:16 180:11
  184:18 186:10
  187:4,7,16
  188:16,20
  190:2,16 191:2
  191:9 216:21
  216:24 217:12
  228:3 238:5,20
  240:13 241:24
  242:5,9 246:13
  246:17 247:23

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

**[interventions - kids]**

251:22,25
256:2 260:4
295:1,16 296:5
296:8 303:24
306:5
**interview**
123:21
**interviewing**
106:6
**interviews**
149:21
**intricacies**
26:13 193:14
**introduce**
10:25 21:6
38:24 83:19
102:4 139:20
151:19 177:4
234:8 236:10
236:15 267:8
276:23 296:15
299:22
**introduced**
211:19 276:12
276:20 278:14
**introducing**
264:13 278:20
**introduction**
34:19 264:25
**intuitive**
270:12
**invalid**  77:9
**investigate**
212:23

**investigating**
159:10
**investigation**
213:3,4
**involve**  67:6
91:22 197:14
**involved**  68:5
93:20 121:8
**involvement**
119:10 120:23
121:12,15
179:25
**involves**  12:25
13:3 39:13
72:12 90:2
107:9
**irrelevant**
123:25 202:21
202:24
**isolation**  49:10
191:7 261:5
**issue**  27:19
114:6 244:14
263:20 265:12
276:7,15
285:24
**issued**  288:14
**issues**  198:21
205:15 257:14
**issuing**  286:9
**italics**  84:23
198:5
**ivy**  193:18

**j**

**j**  3:12
**jack**  1:19 2:1,4
4:4,12,14 6:20
6:21,22,23 8:8
9:19 274:7
316:2 318:5
319:2,24 320:2
320:4,12
**jama**  5:9
139:22 140:1
297:8,17,21
298:7
**jan**  1:11
**jane**  1:5
**january**  258:22
258:25
**joan**  1:6,7
**job**  280:8
**jocelyn**  3:17
**johanna**  117:15
117:19 118:4
**john**  1:6,7 3:9
8:20 10:5
28:12 66:1
84:5 136:20
138:5 208:20
266:4 313:17
**journal**  4:22
5:14 17:18
18:2 76:10
152:1 158:19
196:7 205:9
230:18 253:15
298:20,20

299:6,6 300:7
313:12
**journalists**
150:5,6
**journals**  150:3
280:10 297:23
298:5,16
**jramer**  3:11
**judging**  105:6
**jules**  127:3
**june**  277:4,11
**justify**  99:9

**k**

**k.c.**  11:22
**kaltiala**  226:23
259:14
**kara**  69:13
**keep**  63:18
71:19 146:6,8
165:7 175:14
236:14 286:4
295:4
**kennedy**
117:15,19,21
117:25 119:17
**kennedy's**
118:12
**key**  46:23 138:2
233:1 259:3
**kid**  118:5,5
174:2
**kids**  90:25
103:12 118:13
173:25 174:10
206:1 312:23

Page 42

**[killing - larger]**

**killing** 280:24
281:8 282:16
283:1,19 284:7
**kind** 26:7 31:13
31:19 33:24
35:14 40:5
45:13 61:24
67:23 75:4,8
77:14,18 81:12
81:13 85:25
88:1 89:8
90:15 93:10
97:9 103:7,18
105:5 110:9
114:10 121:1
155:24 169:23
197:13 199:3
215:17 250:3
266:2 270:17
290:11 296:24
298:3 299:20
300:9,10 302:9
307:4 310:15
313:24
**kinds** 37:23
**kirk** 3:8 8:21
10:6
**knew** 25:8 70:6
70:6,8,9 127:9
176:2
**know** 10:8,15
10:19 11:4
14:17 16:14
17:2,18,25,25
18:19,22 19:2

19:5,7,8,22
23:14 25:17
28:4 30:8
34:24 36:8
47:6 48:20,24
50:12 51:17,19
56:5 61:21,23
63:17 64:1
68:22 69:1,7,8
69:10,14,14,19
70:4,9,20 76:8
79:3 80:6
86:25 89:15
90:10,13,14,15
90:17 91:4,8
93:6 96:21
97:15 98:1
103:21 104:8
104:21 107:6
109:19 111:13
113:25 114:8
117:10,21,22
117:25 120:7
122:12 123:7
123:15 124:8
130:14,24
134:3 139:20
141:9 153:18
154:19,20
156:9,13 157:8
160:1 161:21
162:24 164:9
164:16,17,17
166:10 167:6
169:17 170:22

171:13,16
173:18,23
174:12,16
175:2,16 177:7
186:13 192:14
196:10 197:3,7
198:11 200:18
204:5 205:24
206:3,15
209:18 210:1
210:23 211:2,3
211:6 213:20
215:12 216:10
216:23 217:5
217:16,22
228:6,10
239:25 243:18
243:19 244:14
245:10,12
248:16 249:9
252:3 254:1
256:7 265:8
266:13 272:24
273:8 276:1,12
281:6 282:13
287:15 288:2
288:17,21
297:25 298:10
298:12 299:23
305:18,22
306:9,11 308:2
**knowing** 31:1
111:22 153:22
244:16,18

**knowledge**
241:23 297:7
**known** 15:17
159:20 193:2
242:21 244:11
274:4,5
**knows** 15:13
245:3

**l**

**l** 16:17
**label** 53:22
**labeled** 150:25
**labrador** 1:10
3:7 8:10 318:4
319:1 320:1
**lack** 36:2 99:2
173:2 218:16
219:9,14 241:5
241:15 242:19
250:23 263:21
**language** 75:8
75:23 76:1
77:22 78:4
79:5 80:23
124:3 162:18
162:22 292:13
**lara** 227:7
235:14
**large** 18:25
132:18 133:3
169:23 170:4
242:11 286:24
287:13
**larger** 168:22
169:1,6

Page 43

**[largest - likes]**

largest  305:22
larsson  3:17
lasting  200:6
  200:11,23
  201:1
late  73:14
  134:12 156:9
  168:11 315:20
latest  86:21
law  8:20 10:5
  258:5,9 276:7
  276:11,14
  280:14
lawmakers
  265:8,13
  279:20 283:7
  283:19 284:6
laws  265:12
  282:10 283:10
lawyer  69:1
lawyers  71:23
lcooper  2:19
lead  21:14
  36:12 73:21
  194:18 212:22
  213:3 265:1
  287:24 290:7
  291:21 310:9
  310:20
leading  7:3
  148:11 176:23
  176:25 182:6
  306:17
leads  169:25

league  193:18
learned  104:16
learning
  197:19
leaves  178:14
led  276:22
left  36:24 37:15
  94:7 114:8
  132:10 143:16
  146:24 160:12
  161:4,17
  178:11 194:21
  203:12 204:9
  263:5 266:2,19
  300:16 314:13
legal  85:21
  87:3 111:18
  255:4 258:6
  318:23
legislation
  264:13 265:1
  276:14 278:9
  278:13,17,20
  278:21,25
  279:18,23
  280:6 282:8
  283:14
legislative
  150:15 276:11
  280:11 281:17
legislators
  265:4 276:6
  277:1
legitimate
  163:13

length  92:14
lengths  174:7
leor  263:10
  288:3,9
lerario  16:16
leslie  2:17 8:24
  68:11 72:2
lessons  103:10
letter  158:13,16
  158:18 159:2,4
  298:17 299:1
letters  297:8,16
  298:1,11,12
level  39:17 57:3
  101:20 109:16
  115:12,14
  125:19 194:5,7
  218:14 219:7
  237:9 238:1
  239:17,18
  295:10
levels  271:21
lgbt  7:3 258:2
  275:5,18 291:7
  300:7
lgbtq  274:18,24
  275:7,10,11
  276:7,15
li  2:16 8:22
  11:2 12:7
  27:10,17 28:4
  72:2 102:5,14
  124:18 131:1
  137:11 139:3
  146:12 148:13

177:3 194:10
  224:10 230:10
  234:9 255:13
  258:11 273:24
liberal  311:5
  312:14,22
liberties  2:16
library  4:20
  53:11
licensed  120:16
licensing  11:23
life  87:2 113:24
  188:17,21
  190:3 276:5
  291:1,5 295:20
  295:23
lifetime  135:9
light  234:23
likelihood  58:8
likely  11:1 34:8
  49:6 51:5 52:6
  61:25 88:2
  98:24 118:6
  129:21 133:18
  147:3 148:6
  156:2 163:5
  198:9 203:18
  204:3 205:21
  221:24 237:13
  237:22 238:3
  239:14 270:10
  296:7
likes  96:13
  176:7

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[limitation - looked]**

| | | | |
|---|---|---|---|
| **limitation** 49:25 144:18 | 31:24 32:14 38:15 39:14,25 | 301:12 303:12 307:16 | 38:10,11 41:11 45:15,16,25 |
| **limitations** 49:8 50:6 146:25 221:10 | 41:10 42:24 46:9 51:17,19 52:8 53:7,18 | **lmft** 120:4,14 **lnowlin** 2:19 **local** 311:4 | 47:11 49:12 50:14 51:15,24 58:1 59:7,9 |
| **limited** 171:23 254:11 | 53:25 54:9,25 55:15,23 56:15 | **located** 234:13 **locating** 26:24 | 62:5 63:16 68:20 77:19 |
| **limiting** 253:18 | 56:22 59:14,25 | **logic** 122:9 | 81:8 87:4,5 |
| **line** 101:18 180:2 181:24 215:3 233:19 285:5,23 319:4 319:7,10,13,16 319:19 | 64:10 65:25 76:4 127:9,10 176:11 191:7 201:11 221:11 247:22 | **logical** 193:10 **logistic** 127:22 128:21 222:17 **logistics** 122:18 **logs** 68:20 | 91:21 100:13 105:1 118:5 123:21,21 124:14 130:19 133:6 135:25 |
| **lined** 69:7 | **little** 16:4 19:22 41:21 67:24 | **london** 196:13 **long** 29:19,21 | 138:2,23 172:4 177:21 181:4 |
| **lines** 67:9 85:7 170:25 | 90:1 99:22 103:9 119:9,18 | 29:24 41:21 61:24 62:1 | 191:7,23 193:25 195:13 |
| **linked** 193:12 209:4 | 138:19 162:17 165:3 176:10 | 65:16 101:11 153:11 154:3,4 | 200:18 207:25 208:3,10 213:7 |
| **list** 19:6 29:25 65:16 88:18 161:12 234:2 241:4 259:3 | 218:12 219:6 223:3 237:18 240:16 259:4 270:12 272:10 | 174:7 200:6,11 200:23 201:1 203:19 204:3,6 206:17 227:21 | 216:23 220:16 220:17 221:3,7 221:20,23 222:18 242:11 |
| **listed** 95:24 215:25 225:23 235:4,7,10 | **littman** 304:19 304:22,24 305:1,22 306:16 | 230:21 232:11 234:15,21 263:1 301:1 | 251:19 255:12 259:11 260:13 268:17 269:2 |
| **listening** 9:11 **lists** 29:20 | **live** 98:4 173:22 311:12 | **longer** 101:22 101:23 138:19 152:18 154:13 | 293:7,12 304:6 305:10 306:25 |
| **literature** 4:18 12:18 13:4,15 13:18 14:15 15:1,4,9,13,20 16:3,25 17:15 21:8 25:9 26:21 31:1,23 | **lives** 105:10 106:7 291:11 **living** 172:10 172:24 291:10 291:14 292:2 292:14 301:5 | 227:20 228:1 249:25 **longitudinally** 157:13,17,22 **look** 22:12 32:24 33:4 | **looked** 46:3,3 75:21 136:19 137:2 179:13 180:16,17 181:7 182:15 183:25 192:17 195:15,19,22 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[looked - making]**

205:11,12
206:16,17
208:2,11 229:4
243:21 268:13
311:8
**looking** 18:6
32:2,3 33:2
35:2 38:10
39:13 60:8
63:13 66:5
91:25 107:15
125:17 129:13
130:12 137:6
149:5 160:25
166:7 170:18
185:14 190:11
194:9 196:6
205:16 207:3
207:14 212:13
214:4 220:24
222:9 224:18
224:25 250:19
260:12 263:24
269:23 293:6
304:2 306:23
315:5,6
**looks** 21:16
22:22 51:7
117:20 131:8
140:12 165:24
166:2,8 169:11
199:16,20
217:5 234:17
268:9 306:23
315:16

**lose** 263:25
294:24
**loss** 74:13
**lost** 165:3
173:13,13
272:9
**lot** 29:18 45:11
45:17 46:8
51:18 76:21
91:22 92:25
93:9 98:5
110:10 119:10
120:22 134:25
176:13 196:2
205:15 210:13
210:20 217:8
230:21 232:11
232:16 234:17
242:16 263:4
268:6,7,11
272:8,9 273:8
275:21 302:10
302:12 304:7
307:19 312:6
312:23
**louisiana** 70:7
70:11
**louisville** 70:15
70:16
**love** 301:23
**loved** 91:17
**low** 26:17
39:20,20 48:9
220:8,8 222:25
223:13,13

242:5 303:25
306:24 307:2
**lower** 25:3,14
25:21,24
128:18 137:23
267:17 270:9
**lowest** 303:25
**lunch** 139:5

| m |
|---|

**m** 1:11 4:2
**m.d.** 1:19 2:1,4
4:4,14 9:19
318:5 319:2,24
320:2,4,12
**made** 85:1
103:11 109:1
127:13 215:6
224:7 232:18
262:15 283:9
320:5
**main** 15:11
29:17 46:5
109:3
**maintain** 53:15
**maintaining**
83:14
**major** 11:14
26:11 39:4
74:9 108:21
115:1 137:5
141:15 150:2
151:1 152:23
172:10,11
194:25 198:21
212:11 264:15

311:24
**majority** 89:18
129:23 132:18
145:16 167:4
168:14 170:8
209:20 210:7
210:23 251:10
299:3 303:18
**make** 13:5
19:11 24:14
33:8 54:5 55:4
56:19 67:9
88:2 90:9
91:10,15 93:2
97:21 98:17
99:15 101:20
103:12 106:13
111:21 128:25
140:25 141:15
142:4,5,19
161:1 163:8
167:9,17
228:14 268:16
271:19 280:11
282:9 309:17
**makes** 16:4
39:25 124:17
255:7 268:16
271:21 315:10
315:14
**makeup** 104:11
**making** 12:18
14:3 26:20
89:15 90:8,11
94:24 101:20

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

Jack Turban , M.D., MHS October 16, 2023

**[making - media]**

116:25 142:9
164:14 169:15
169:16 171:15
265:5 279:22
280:14 287:4
293:2
**male** 76:5
79:14 96:14
171:17 242:14
262:5 263:17
**males** 130:5
273:6
**maltreatment**
292:24
**man** 172:15
176:7
**managed**
220:25
**management**
42:2 127:12
**manhattan**
262:24 263:9
**manner** 129:2
**manuscript** 5:3
15:15 16:1,22
16:22 297:20
297:22
**mark** 10:25
136:7 301:6
**marked** 11:5
11:18,25 21:9
29:4 56:7
83:20 87:9
88:8 100:15
102:16 125:9

131:5 136:9
139:18 148:17
151:22 177:11
194:14 213:23
224:12 230:13
234:11 236:18
255:20 258:14
267:6 274:2
277:14 280:18
284:15 296:19
299:25
**market** 201:21
201:21
**marriage**
120:16
**masculinity**
74:25
**masculinizati...**
295:11
**master's** 20:22
258:6
**material** 15:19
**math** 166:6,15
168:19 314:17
**mathematical**
210:4
**matter** 2:12 8:9
13:2 85:16
152:3,17
154:21 164:6
193:15 288:24
**maturation**
209:5 211:15
211:23 212:15
212:17,22

**maturity** 85:10
**mclean** 20:25
**md** 4:13 6:20
6:21,22,23
**mean** 13:18
15:5 23:6,17
34:11 54:17
72:6 79:9 80:6
88:19 107:4
108:6 109:22
110:1 111:20
120:24 121:15
123:15 136:23
140:20,22
141:9 155:11
159:21 165:16
167:11 168:6
170:17 171:18
172:17 176:21
186:6 193:17
201:17 203:24
204:6 207:23
207:24 213:4,5
230:3 232:4
233:23 245:16
252:3 256:21
263:22 264:3,4
268:23 270:5
271:5 272:21
287:13,14
295:2 304:6
309:9,14
**meandering**
173:8

**meaning** 24:6
60:6 246:10
**meaningful**
201:6
**meaningfully**
169:18
**means** 53:5,16
53:23 54:23
55:13,19 56:13
56:20 59:17,20
60:4 64:8,22
64:22 74:3
86:25 214:20
245:14,19
264:5 312:22
315:9
**meant** 96:11
230:1 232:6
285:22
**measure**
152:16 187:25
188:1,5,6
210:5
**measured**
200:3
**measures** 201:6
210:3
**measuring**
293:1
**media** 155:24
163:14 164:3,7
164:10,12,15
164:17 166:24
167:5 306:8
309:25

Page 47

**[median - meta]**

| | | | |
|---|---|---|---|
| **median** 153:21 | 246:13 247:23 | **meet** 73:24 | 163:22 168:1 |
| 158:1,3,8,24 | 250:3 251:22 | 82:12,17 86:7 | 179:4,15,17,19 |
| 175:25 | 251:24 256:2 | 98:19 110:19 | 179:25 180:24 |
| **medical** 4:17 | 264:14,15,16 | 111:11 114:7 | 181:6,19,21 |
| 6:15 11:22 | 281:19 294:4,7 | 252:15 268:25 | 182:3,9,12,23 |
| 12:19 13:1 | 295:1,16,19,23 | **meeting** 309:24 | 183:2,8,10,17 |
| 18:8 19:14,18 | 296:1,5,8 | **meetings** 71:23 | 184:7,10,19,24 |
| 20:16,25 21:7 | 302:7 303:23 | 71:25 116:18 | 185:1,6,9,17 |
| 32:21 34:16 | 306:5 311:15 | **meets** 82:15 | 189:1,11,15 |
| 38:15 65:25 | **medication** | **member** 281:17 | 211:8 216:25 |
| 76:14 82:24 | 113:6 117:6 | **members** 1:13 | 228:24 256:25 |
| 85:2,25 87:16 | 130:8 180:12 | 3:7 11:22 | 260:4,5,7 |
| 90:6,17 91:19 | 195:11 201:20 | 106:9 275:4,16 | 261:1 262:13 |
| 92:9 103:24 | 209:24 210:12 | 298:21 | 265:24 282:9 |
| 104:6 105:17 | 210:14,19 | **memoranda** | 283:11,17 |
| 106:23 109:6 | 228:8 230:7 | 71:20 | 286:4 289:3,8 |
| 109:18 110:11 | 294:15 | **memorandum** | **mention** 221:12 |
| 110:18,23 | **medications** | 69:5 71:18 | 312:8 |
| 111:16 116:11 | 90:16 132:15 | **men** 289:5 | **mentioned** |
| 116:23 120:5 | 201:18 202:7 | **mental** 5:7 6:18 | 104:2 232:16 |
| 121:4 124:7 | 202:25 209:20 | 18:6 32:25 | 261:8 314:6 |
| 143:22 144:13 | 210:8,23,25 | 33:5,6,18,22 | **mentions** 57:20 |
| 144:15 150:3 | **medicine** 12:13 | 37:25 87:14 | 192:9,20 |
| 151:1 180:10 | 12:21,24 14:2 | 91:6 94:11,15 | **merely** 23:2 |
| 184:18 186:10 | 14:10,16 19:12 | 94:22 95:12,20 | **merit** 298:22 |
| 187:4,7,16 | 20:11,17,18 | 101:8 108:16 | 298:24 |
| 188:15,19 | 48:17 51:9 | 108:20 119:10 | **message** 174:5 |
| 189:21 190:2 | 85:24 89:11,18 | 120:1,22 121:5 | **messages** 76:22 |
| 190:15 191:1 | 103:7 111:21 | 121:9,11,15,16 | 77:6 275:23 |
| 192:3 197:8 | 119:25 121:1,9 | 121:18,21,25 | **met** 85:3 88:19 |
| 206:14,19 | 121:16 124:5 | 122:6,17 124:1 | **meta** 4:21 31:5 |
| 207:3 216:24 | 228:8,11 | 124:5,13,15 | 31:6,7,15,18 |
| 230:17 238:20 | 233:14 239:19 | 136:16 138:10 | 32:11,12 38:9 |
| 240:13 242:4,9 | 245:18 246:25 | 140:2 147:2,6 | 42:25 44:14,18 |
| 243:1,3,4 | 278:11 | 147:25 148:12 | 45:4 46:13,18 |

**[meta - move]**

46:25 195:19
196:6
**method** 13:16
15:3 35:17
58:12 136:18
136:24 152:4
222:4
**methodologies**
5:20
**methodology**
35:1 47:2
59:24 137:3
219:21,24
220:21 224:1
232:22 251:19
**methods** 7:4
57:14,24 58:7
125:18 300:16
**metric** 190:4
212:17
**metrics** 126:5
135:8,21
187:21
**meyer** 289:2
**mgh** 20:25
**mhs** 1:19 2:1,4
4:13,14 9:19
318:5 319:2,24
320:2,4,12
**microphone**
19:23 20:4,6
**middle** 47:12
132:12 215:18
227:10 270:25

**million** 65:14
**mind** 27:17
90:19 142:2
156:20 275:9
**mine** 69:21
**minimize**
246:23
**minor** 85:18
86:10,15 92:10
**minorities**
280:25 289:4
**minoritize** 77:7
**minority** 16:13
46:8 77:5
206:10 260:8
288:21,22,23
289:1,23
290:11 309:1,4
311:10
**minors** 85:16
86:5,6 106:5
107:1,2 254:3
**minute** 239:3
266:23 313:18
**minutes** 52:13
139:5
**mischaracteri...**
181:13 240:5
**mischaracteri...**
27:2 32:9
55:11 66:18
67:13 78:2
80:17 113:17
181:11 198:7
199:13 238:17

253:3 254:14
276:17 279:11
286:15 287:20
296:10
**misconcept**
155:23
**miserable**
97:12
**misinformation**
276:22 285:17
285:20 286:11
286:17 287:9
288:10
**misinterpret**
108:15
**misinterpreted**
132:22 133:7
133:10
**missed** 15:21
225:19
**missing** 23:18
24:15 25:9
26:22 159:12
**misunderstood**
133:21
**mixed** 7:4
**model** 89:2,2,6
89:6,10 90:1
91:20 92:3,18
93:7,17 103:23
105:18 106:23
119:4,6,7,11,12
119:17 120:3
121:11 122:10
122:15,19

123:12 127:24
128:8,21
222:18,21
289:22,23
310:5
**modeled**
247:20
**modeling** 182:3
**models** 33:12
92:1 104:3
119:8 120:3
121:23 128:6
186:5 309:19
309:23
**moment** 23:7
**monday** 1:20
2:10
**monitored**
247:14
**monitoring**
182:17
**month** 68:16
135:8,12,18
**months** 29:14
122:11 178:20
189:2,10
212:20 252:18
277:6,9
**mood** 74:13
**morning** 10:3,4
**motion** 71:21
**motivations**
276:19,24
**move** 67:24
107:13 143:9

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[moved - new]**

**moved**  81:16
93:21 255:10
**movements**
74:15 77:17
**moving**  22:4
126:7
**muddied**  307:5
**multiple**  42:1
128:18
**multivariable**
127:22
**mundane**
221:25
**musicals**  176:7
**myspace**
164:16

**n**

**n**  4:1,2,2 8:1
**nail**  172:16
**name**  10:5 11:3
16:14,24 17:14
21:14 117:22
118:22 196:10
**named**  69:12
317:8,12
**names**  39:21
119:4 123:3,4
**naming**  119:4
123:2,4
**narrative**  15:6
15:10,12 31:13
41:25 42:9,17
43:3,7,8,25
54:7 62:10

**narrow**  296:25
**national**  237:11
240:22 247:12
**nature**  62:1
97:25
**nbc**  148:19
150:10
**nearly**  197:14
199:6
**necessarily**
43:7,23 57:1
58:11 62:17,18
67:3,15 73:24
99:19 120:3
121:7 122:6
155:21 175:12
198:24 201:4
203:5 273:22
292:3
**necessary**
34:11 294:22
320:6
**need**  9:7 10:18
22:23 26:4
35:14 36:8
51:14,19 58:9
58:11 86:10,22
87:2 90:12
91:10,12 92:24
93:3,11 98:18
99:13,19 109:7
110:8 113:14
120:11 130:7
139:4 157:8
171:3 180:5

182:11,22
183:1 186:22
192:4 232:3
249:24 252:16
252:19 253:12
253:19 260:13
268:1,17 269:2
271:20 275:13
281:11 289:14
294:14 295:6
299:9
**needed**  227:20
252:24 263:6
**needs**  73:21
92:13,15 94:13
**negative**  77:1,6
77:13 193:20
211:23 241:1
286:16 308:22
309:6 311:19
**neither**  43:6
**neural**  194:9
196:25 198:15
198:25 199:4
**neurochemical**
209:8
**neurocognition**
209:17,18
**neurocognitive**
209:25 210:5
210:16,24
211:3,4,6
**neurodevelop...**
193:6 204:23
205:3 207:8,20

207:23 208:8
**neurodevelop...**
5:20 204:18,22
**neurodivergent**
207:4
**neurodiverse**
204:19 205:3
207:9,14,17,21
208:8
**neurodiversity**
204:16 207:10
207:12
**neuroimaging**
193:25 194:1,8
208:3
**neurologic**
16:12 46:7
196:8
**neurologist**
257:16
**neuroscience**
19:17 20:14
**neurotypical**
204:21
**never**  26:13
40:12 80:14
112:8,10,18
144:8 145:2
281:2 292:7
312:1
**nevertheless**
88:22
**new**  2:18 3:9
124:4 149:18
156:9 176:14

**[new - nowlin]**

| | | | |
|---|---|---|---|
| 213:11,11,16 | **noted** 50:7 60:5 | 87:24 92:5,19 | 172:1 173:5,9 |
| **news** 29:18 | 242:1,8 294:20 | 93:18 97:7 | 173:20 174:19 |
| 148:19 149:13 | 320:7 | 99:11,25 | 175:3,17,22 |
| 149:18,24 | **notes** 42:23 | 100:21 101:4 | 176:19 177:5,9 |
| 256:3 | 233:1 | 101:12 102:6 | 181:2,10,23 |
| **nice** 179:24 | **noticed** 225:13 | 102:15 103:25 | 182:14,24 |
| 210:19 | **notification** | 106:3,25 | 183:4,19 |
| **nicer** 234:17 | 160:3 | 109:13,25 | 185:12 186:12 |
| **non** 14:12 | **notifications** | 110:25 111:17 | 186:20 187:10 |
| 17:21 147:4 | 176:14 | 113:16 114:19 | 188:22 190:5 |
| 170:17 278:25 | **notion** 154:8 | 116:5 118:15 | 190:18 191:3 |
| 286:10 297:12 | 156:23 | 121:13 122:2 | 191:13 194:4 |
| **nonbinary** | **notions** 154:9 | 123:14,19 | 194:12 197:4 |
| 81:15 250:6,13 | **nowlin** 2:16 4:6 | 124:11,20,22 | 197:11,21 |
| 250:25 251:15 | 8:22,22 12:7 | 125:7 128:4 | 198:6,16 199:1 |
| 294:20 | 14:4 17:1 | 129:10 130:21 | 199:12 200:13 |
| **nonconforming** | 18:17 19:15 | 131:3 133:14 | 201:3,14 |
| 172:7 | 23:4 25:15 | 133:24 134:22 | 202:22 208:19 |
| **noncustodial** | 27:1,11,20 | 136:20 137:12 | 208:22,25 |
| 86:25 | 28:12,15 32:8 | 138:4 139:4,9 | 209:15 211:1 |
| **nondirective** | 35:9,25 36:14 | 141:8,13 | 212:2,24 213:8 |
| 141:25 | 36:19 41:5 | 142:25 144:2 | 213:22 215:9 |
| **noninferiority** | 43:22 49:4 | 144:21,25 | 219:22 220:13 |
| 186:23 | 51:4 52:12 | 145:10,18 | 222:7 223:1,18 |
| **nonspecific** | 54:21 55:10 | 146:14,17,23 | 223:23 224:11 |
| 205:25 206:22 | 57:22 59:15 | 148:15 151:20 | 228:5 229:20 |
| **notable** 83:12 | 60:9,18 61:4 | 152:21 154:18 | 230:11 232:2 |
| 222:2 | 62:11,16 64:15 | 155:13,15,20 | 233:9 234:10 |
| **notary** 2:9 | 65:6 66:1,4,11 | 156:11 160:23 | 236:2,12,16 |
| 317:6,25 | 66:17 67:1,12 | 163:15 164:13 | 237:24 238:16 |
| 320:13,19 | 74:7 78:1 | 165:2,9,12 | 239:1 240:4 |
| **note** 60:7 238:4 | 79:18 80:16 | 167:12,20 | 241:19 242:20 |
| 252:14 259:4 | 81:3 82:9,20 | 168:16 169:3,8 | 245:25 246:7 |
| 259:18 260:24 | 83:6 84:5,11 | 169:13,21 | 246:18 249:6 |
| 261:12 318:10 | 85:20 86:18 | 170:11,23 | 249:23 250:8 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[nowlin - object]**

| | | | |
|---|---|---|---|
| 251:7 252:1 | 245:10 268:17 | 80:16 81:3 | 185:12 186:12 |
| 253:2 254:13 | 268:19 290:18 | 82:9,20 83:6 | 186:20 187:10 |
| 255:3,14 256:6 | 307:9 314:9,21 | 85:20 86:18 | 188:22 190:5 |
| 256:14,20 | 315:19 | 87:24 92:5,19 | 190:18 191:3 |
| 258:13 263:19 | **numbered**   94:8 | 93:18 97:7 | 194:4 197:4,11 |
| 265:14 266:4 | 208:17,24 | 99:11 100:21 | 197:21 198:6 |
| 266:12,17,22 | **numbering** | 101:4,12 | 198:16 199:1 |
| 272:18 274:1 | 236:14 | 103:25 106:3 | 199:12 200:13 |
| 275:2 276:8,16 | **numbers**   46:16 | 106:25 109:13 | 201:3,14 |
| 278:7,18 | 138:15,16,17 | 109:25 110:25 | 202:22 209:15 |
| 279:10 280:2 | 138:20 158:15 | 111:17 113:16 | 211:1 212:2,24 |
| 281:10 282:19 | 168:18 169:12 | 114:19 116:5 | 213:8 215:9 |
| 283:4,20,25 | 170:8,14 171:6 | 118:15 121:13 | 219:22 220:13 |
| 284:8 286:14 | 291:8 303:24 | 122:2 123:14 | 222:7 223:1,18 |
| 286:23 287:19 | 307:8 314:8,20 | 123:19 124:11 | 223:23 228:5 |
| 288:5 290:3,9 | **numerous** | 128:4 129:10 | 229:20 232:2 |
| 290:20 292:9 | 48:13 | 130:21 133:14 | 233:9 237:24 |
| 293:22 296:9 | **nw**   3:9 | 133:24 134:22 | 238:16 239:1 |
| 298:8,18 | **ny**   2:18 | 141:8,13 | 240:4,4 241:19 |
| 299:11 304:14 | **o** | 142:25 144:2 | 242:20 245:25 |
| 305:8,16 | **o**   4:2 8:1 16:17 | 144:21 145:10 | 246:7,18 249:6 |
| 307:12 308:8 | 120:20 | 145:18 152:21 | 249:23 250:8 |
| 308:23 310:3 | **object**   14:4 | 154:18 155:20 | 251:7 252:1 |
| 310:24 313:5,9 | 17:1 18:17 | 156:11 160:23 | 253:2 254:13 |
| 313:17,19 | 19:15 23:4 | 163:15 164:13 | 255:3,3 256:6 |
| 314:24 | 25:15 35:9,25 | 167:12,20 | 256:14 263:19 |
| **number**   17:20 | 36:14 41:5 | 168:16 169:3,8 | 265:14 272:18 |
| 29:24 31:9 | 43:22 49:4 | 169:13,21 | 275:2 276:8,16 |
| 74:10 126:5 | 51:4 54:21 | 170:11,23 | 278:7,18 |
| 131:13 170:4 | 55:10 57:22 | 172:1 173:9,20 | 279:10 280:2 |
| 178:19 199:11 | 59:15 60:9,18 | 174:19 175:3 | 281:10 282:19 |
| 222:10 241:6 | 62:11,16 64:15 | 175:17 176:19 | 283:4,20,25 |
| 242:1 243:18 | 65:6 66:11,17 | 181:2,10,23 | 284:8 286:14 |
| 243:20 244:17 | 67:1,12 74:7 | 182:14,24 | 286:23 287:19 |
| 244:21,23 | 78:1 79:18 | 183:4,19 | 288:5 290:3,9 |

**[object - one's]**

290:20 292:9
293:22 296:9
298:8,18
304:14 305:8
305:16 307:12
308:8,23 310:3
310:24
**objection** 27:1
32:8 36:19
111:18 155:13
175:22 204:8
256:20
**objections** 61:4
144:25
**objectives**
59:23
**observational**
14:12
**observations**
106:16 171:22
**observe** 171:9
**observed**
203:19 204:3
204:23
**observing**
176:4
**obsessions**
94:16
**obtain** 105:17
105:25 196:20
251:21
**obtaining**
42:10
**obvious** 202:5

**obviously**
78:12 103:13
**occupational**
72:16
**occur** 167:9,16
**occurrence**
204:16 205:13
**october** 1:20
2:10 8:5 259:5
316:3 317:18
318:3
**odds** 137:14,17
137:19,21,22
137:23 267:17
267:21 269:25
270:9,12,13,17
271:2
**offered** 127:11
248:4
**offering** 117:5
127:6
**office** 3:3,12,13
9:16
**official** 1:10,12
1:14
**officially** 150:9
**oh** 21:20 26:4
38:9 83:13
88:10 156:17
161:5 166:17
194:13 208:21
213:6 266:7
269:14 309:23
311:22

**okay** 11:11,19
21:5,22 24:19
26:7 27:12,21
28:2,15,17,21
29:1,5 30:6
32:16 33:5
37:9 38:13
41:20 45:2
47:11 48:2,3
50:14 52:15
53:20 56:3,11
57:4 63:25
64:3 66:4 71:2
84:3,11,16
88:4 94:6 96:4
100:1,2 102:7
102:19 124:16
125:8 127:25
131:25 136:14
138:6,24
139:11 146:15
146:23,24
147:11,15,20
148:16 151:21
154:13 155:17
159:6 165:9,12
165:13 166:22
177:12 183:1
188:11 191:10
191:15 208:4
208:12,25
209:1 213:19
213:22 215:17
217:3 218:1,2
224:13 225:16

229:9 232:24
234:23 236:3,9
236:16,17
255:15 256:10
262:1 263:8
265:20 266:12
266:15,16,24
266:25 267:7
269:14,14,15
269:22 270:10
270:15 281:13
281:14 299:13
300:12 305:3
315:21 316:1
**old** 124:3
135:16,17
164:22
**older** 132:24
133:12,16
134:24 135:1
135:16 166:1
**olson** 117:15,19
117:21,25
118:12 119:5
119:17,22
**olson's** 118:10
**once** 96:1 112:8
112:10,18
189:13 266:1
298:16
**one's** 72:13
74:19,23 78:22
78:25 158:2,4
273:9,11 289:8
293:24

Page 53

**[ones - page]**

ones   15:11
  211:10 261:8
ongoing   150:15
  254:16,19,23
online   149:11
  149:16 150:9
  297:12
onset   153:14,17
  156:1 159:14
  159:24 160:3
  167:19,24
  175:9 248:23
ontario   21:17
open   12:9 30:3
  253:25 266:5
  268:1 292:21
openly   292:24
opining   17:8
  194:2
opinion   92:23
  97:5 288:1
opportunity
  147:20 188:13
opposed   180:20
  182:9 183:10
  252:8 309:15
opposing   68:23
  69:3
opposition
  71:20 264:15
optimally   22:1
option   255:8
order   314:19
oregon   2:8

organization
  224:24 264:16
organizations
  149:24 151:1
orientation
  104:12 289:10
original   268:1
  268:18 269:4
  271:18
originally
  239:11
originated
  231:2
outcome   34:18
  36:22,25
  137:19,21,24
  187:17 188:16
outcomes   5:7
  6:18 38:6
  135:6 136:16
  138:10 140:3
  147:7 148:12
  179:3,15,19
  208:1,11
  210:24 211:3,4
  211:7,9 265:24
  272:5,15
outfit   104:9
outlaw   264:13
outlets   149:18
outlined   45:6
  161:8 297:10
outlining   43:2
  297:17

outputs   35:20
outside   111:3
  289:8 311:5
outweigh
  237:14,22
  238:3,11
  239:14
ovarian   200:4
  200:11
overall   138:14
  178:15 199:4
  218:16 219:9
  262:13 314:11
oversimplific...
  34:6
overview   42:10
own   25:2 71:16
  77:1 261:11

**p**

p   8:1 46:15
  127:19,23
  128:1,9,10,19
  128:22 129:1,7
  163:6 170:1
  268:22 269:18
  270:18 271:4
p.m.   139:12,14
  139:14,16
  191:16,17,17
  236:4,5,5,7
  267:1,2,2,4
  299:14,15,15
  299:17 316:4,6
pacific   2:11 8:6
  27:22,25 28:23

29:2 52:16,20
  100:3,7 139:6
  139:12,16
  191:16,19
  236:4,7 267:1
  267:4 299:14
  299:17 316:4
page   4:4,11 5:2
  6:2,20,21,22,23
  7:2 21:19,20
  21:23 24:17,18
  24:21 30:6
  38:16,21 41:16
  41:21 44:10
  47:5,5,7,8,8,10
  47:12 50:11,15
  52:24 53:1
  56:8,11 57:5
  57:20 62:23
  63:19 64:4,5
  66:1,3,3 84:3,4
  84:7,9,10,17
  91:16 94:1,1,7
  95:9,10 100:12
  100:25 102:22
  102:24,25
  107:13,13
  117:12 118:2,3
  118:24 125:18
  126:7 127:15
  129:15 131:10
  131:11 132:1
  132:10 134:13
  135:5 138:17
  140:4,4 143:15

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[page - part]**

146:16,21
149:9,9 150:11
155:4 157:23
160:11 161:3,4
161:6,17 165:1
165:10 168:9
177:20,21,23
177:25 178:11
178:11 191:23
194:20 196:15
196:16 199:21
203:11 208:16
208:23 215:17
215:18 216:6
218:3,22,23
219:5 225:16
225:22 226:9
226:19 227:1,2
227:6,9,10
230:23,24
231:12 234:1,3
235:13 237:4
237:18 240:16
242:24 247:2
250:18 258:24
259:14,24
260:22 261:10
262:2 264:9
267:13 269:10
269:13 297:1
300:15 319:4,7
319:10,13,16
319:19
**pages**   4:13,15
4:16,18,19,21

4:23,24 5:3,5,8
5:11,13,16,18
5:21,24 6:4,7,9
6:12,14,16,19
6:25 7:5 44:10
**pagination**
177:24
**pam**   1:4
**paper**   16:15
18:21 19:2
25:24 26:2
31:19,22 33:4
33:17 46:17
49:6,8,23 50:2
50:5,8 55:17
76:9 131:7
135:20 137:3,4
137:5 138:13
139:22,25
146:20 149:22
153:5,6 158:12
159:18 163:21
163:24 164:1
165:8 167:11
167:18,23
168:5 170:13
170:17 173:17
174:15,21,22
174:25 175:6,6
175:9 178:8,9
197:25 198:2
199:19 205:9
217:5,12
241:25 253:15
267:25 268:2

268:18 271:16
271:18 287:2
291:6 298:25
299:1 300:6
301:20,22
305:25 306:21
306:22 311:7
**papers**   13:21
13:25 18:20
19:5,7 25:22
25:25 27:4
55:22 176:15
268:10 297:24
306:25
**paragraph**
24:20 41:21
42:22 47:16,18
47:24 48:1
50:15 52:24
53:1 59:11
60:12,15,23
62:22 64:4
94:8,9 95:5
103:2 107:17
117:14 127:17
129:16,17
132:4,5 135:8
140:5 157:24
178:12 179:1
181:18 191:24
194:23 196:17
203:13 204:10
204:11,13
208:17,24
209:2 211:11

227:12 228:20
229:18 234:2
237:19 240:17
250:18 264:9
297:2,3 302:17
302:24
**parallel**   33:11
180:18 182:2
182:16 186:5
**parameter**   5:20
**paraphrasing**
202:8
**parent**   86:17
86:25 87:1,1
94:18 153:24
154:9 171:9
**parental**   160:3
**parentheses**
39:4 95:13
166:16 314:9
315:9
**parents**   1:4,6
85:17 86:10,23
89:20,24 106:6
106:15,19
107:11 146:4,7
153:18 159:15
159:19,23
160:3,6,8
173:17 174:16
175:1,11,15
176:1 311:16
**parse**   263:24
**part**   16:8 17:5
17:23 20:13

Page 55

**[part - people]**

| | | | |
|---|---|---|---|
| 24:1 40:10 | 104:10 120:10 | 98:7,10,14 | 254:7 255:9 |
| 44:21,21 45:5 | 179:4 241:9 | 103:19 107:10 | 275:21,25 |
| 45:23 46:21 | 275:25 283:16 | 116:19 122:11 | 279:2 285:21 |
| 47:7 50:2 | **parts** 75:8 | 143:21,24,25 | 286:2 294:12 |
| 53:21 91:19 | 128:8 | 144:14,15,16 | 296:14 311:2 |
| 103:1 116:8 | **partway** 84:22 | 144:18,19 | **patterns** 90:21 |
| 142:18 147:9 | **party** 275:16 | 145:2,7 202:14 | **pause** 27:23 |
| 152:23 154:3 | 285:25 | 202:14 233:16 | 28:25 134:7,9 |
| 172:10,11 | **pass** 113:25 | 233:22 238:6 | **pdf** 21:21 24:18 |
| 220:15 271:25 | **passage** 120:21 | 249:19,21 | 38:17 41:17 |
| 281:3,7,12 | 140:24 | 252:15 294:17 | 47:6,9 84:4,7 |
| 301:2 | **passed** 282:11 | 295:5 296:2,12 | 84:17 94:1 |
| **participants** | 285:16 | **patient's** 96:5 | 100:12 150:12 |
| 126:14,17,19 | **passing** 70:2 | 105:6 | 177:21,25 |
| 129:21 130:17 | **passive** 97:10 | **patients** 20:21 | 259:14 |
| 131:13 152:7 | 98:11,14,16 | 21:2 29:24 | **peadiatrica** 6:5 |
| 152:13 155:5 | 99:2,8 | 32:20 69:25 | **pediatric** 89:17 |
| 155:12 158:9 | **past** 61:22 | 75:22 81:9,12 | 121:4 |
| 160:20 161:9 | 68:16 77:17 | 81:16 89:22,23 | **pediatrics** 93:7 |
| 178:17,18 | 93:21 130:15 | 98:25 101:9 | 103:5,11 105:4 |
| 229:14 301:12 | 135:8,9,12,12 | 116:10 120:12 | 125:4 137:4 |
| 314:11 | 222:1,3 228:9 | 121:24 122:16 | 264:17 311:7 |
| **participating** | 228:18 251:9 | 142:14,17 | **peer** 15:18,22 |
| 250:22 | 267:17 270:8 | 144:7 145:7,12 | 17:21 19:2 |
| **particular** | 270:16,24 | 145:23 186:9 | 49:23,24 91:2 |
| 19:11 68:7 | 277:9 288:17 | 187:3,15 | 109:2 176:15 |
| 90:5 92:4,16 | 289:17 291:12 | 188:14 189:18 | 212:13 280:10 |
| 96:13 107:17 | 291:17 | 189:19,23 | 286:10 287:3 |
| 130:19 137:21 | **path** 193:20 | 193:17,17 | 299:4 |
| 137:24 151:8 | **paths** 194:1 | 210:14 212:4 | **peers** 311:16 |
| 176:17 198:2 | **pathway** 194:9 | 212:10 250:10 | **pending** 10:20 |
| 202:9 220:20 | **patient** 13:3,5 | 250:12 251:10 | **penny** 1:5,5 |
| **particularly** | 38:5 51:14 | 252:5,7,10,24 | **people** 6:11 7:4 |
| 75:20 89:22 | 81:24 82:7,11 | 253:4,7,10,13 | 9:7 14:10 |
| 90:24 101:23 | 82:15 96:1 | 253:17,19 | 15:11 16:13 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[people - ph.d.]**

33:20 40:23
46:8 61:21
73:16 76:12
77:6,7,9,11,12
77:13 79:5
80:22 97:10
99:7 101:24
103:5,6,11,13
103:16 106:7
108:12,25
129:5,11
130:13 133:18
133:20 134:1
134:10,16
135:1 148:4
152:24 157:13
157:17,21
159:9,19
165:25 172:6
172:12 173:1
173:22,24
174:10,12,22
175:10,25
176:5 184:17
195:15,24
198:20 202:24
206:4,8,22
207:11,12,14
207:18 221:24
241:7,10 243:7
243:13 244:18
245:4,11,21
246:5 255:17
260:7 274:18
274:25 275:10

275:12,17,18
276:2,7,15,19
278:11 279:19
282:2,7,13
283:11,17
285:9,20
286:12,13,17
286:19 287:14
287:23 289:16
289:23 291:10
292:21 293:9
300:18,20
302:15,25
303:21 304:1,2
304:4,8,11,12
304:16,17,25
305:4,5 306:16
307:1,20
308:16 309:17
309:23 310:9
310:20 311:3,4
311:17,18
312:7,8,12,13
312:16,18,21
315:19
**people's**   76:13
233:20
**percent**   132:6
132:18 133:2
133:22 155:6
157:7 166:3,5
166:13 206:1
228:17 244:8
246:25 270:7,9
270:10,14

291:16,18
307:3 314:7
315:10,14
**percentage**
133:3 166:10
242:2 314:16
**percentages**
314:5,22
**perception**
106:20 243:7
243:14 245:22
246:6 312:5,19
**perfect**   26:13
58:7
**period**   81:20
88:8 152:7,16
152:18 153:11
154:4,14,23
202:25 294:18
**periods**   135:3,7
135:11 152:5
**permanently**
202:18 303:12
**permitted**
254:25
**persist**   157:1
**persistence**
157:7
**person**   52:5
77:8,19,19
79:21 80:3
91:9,21 93:1,9
97:22 98:2
99:12,17
104:14,18,21

104:25 110:2
114:7 121:20
121:23 141:24
142:19 153:23
158:2,5 159:22
159:25 171:18
171:22,25
172:6,17
174:23 175:10
175:13 176:1,2
176:8 182:7
203:7 209:6
221:21 238:10
243:2 260:14
287:8 309:21
**person's**   75:5
76:7 114:21
115:7 140:8,17
140:23 141:6
153:16 246:21
**personal**
308:19
**personality**
90:19
**personally**
69:15 151:13
256:9
**perspective**
159:24 233:12
302:14
**peter**   1:5,5
**peterson**   6:10
127:4
**ph.d.**   120:11

Jack Turban , M.D., MHS October 16, 2023

**[phenomenology - position]**

phenomenolo... 273:1,8
phenotype 182:7
philip 2:21 9:1 72:3 318:1
philip.may 2:23 318:2
philosophy 108:19
photo 102:22 102:23
phrase 56:20 181:25 212:21
physical 96:18 98:2 105:6 114:22 132:15 179:16,18 180:19,21 182:5,18 183:8 183:13 209:7 228:23 260:19 273:9,14,16 294:13,14 295:10
physically 87:1 255:7
physician 104:22 121:9 124:5 309:22
physicians 29:22 104:17 119:25 121:1 127:6 280:8

physiological 209:8
pick 162:9 266:2
picture 23:11 25:11 26:22 106:14 111:23 112:2,3
piece 65:10 75:16 106:20 191:5
pitfalls 30:22
pittsburgh 127:5
place 51:20 211:17 249:10 317:12
placebo 37:7
places 120:7 275:8
plain 270:3,4
plaintiffs 1:8 2:16 3:2 8:23 8:25 9:3 69:11
plan 97:13,16 97:17,17 99:13 99:16,18 112:10,19,22 253:24 254:6 270:16
planning 98:24
plans 112:12 113:13 115:17
play 171:17

played 174:2,3
please 8:18 9:5 10:15 20:2 28:19 137:16 173:8,12 177:7
plenty 109:2
pllc 3:8
plos 5:6 6:17 136:11,12,14 137:3 138:8 265:22
plots 45:14
plus 168:13 189:3 314:1,14
podcast 4:24 102:10,11,12
poe 1:4,5,5,5 8:9 318:4 319:1 320:1
point 10:18 26:7,8 30:25 44:24 49:10,22 52:10 60:24 64:6 69:5,8 80:4,7,14,14 136:4 152:12 154:5,6 159:12 166:19,20 172:20 175:9 175:11,15 199:4 212:14 214:19 222:19 226:8 228:7 235:24 243:15 244:12,13

245:1 284:21 290:16 291:1,5 291:12 293:2 313:20 314:6
pointed 205:14
pointing 31:3 49:15 157:11
points 80:5 152:17,18 259:3
policies 256:1 286:18 287:24
policy 155:24 238:13,23 257:23 282:1,3 287:6,11
polish 172:16
political 275:16 285:9,25
politicians 280:4
poor 147:6 218:16 219:9
popular 258:19
population 126:8 252:21 260:18 275:20 278:23 285:13 285:18 314:17
populations 38:5
portion 167:1 253:17
position 151:13 151:15 162:9

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[position - presumably]**

257:19 298:7
**positive** 310:9
310:20 311:23
**possibility**
180:24 200:25
296:14 312:2
**possible** 31:23
32:15 110:21
143:23 144:18
147:1,25 171:9
179:2 192:4,10
211:18 243:6
243:12,19
245:6 246:15
246:23 273:18
276:21
**possibly** 66:23
**post** 3:3,13
210:12 259:5
263:1,3
**posted** 102:21
150:9 258:25
**potential** 30:21
37:13,22 63:2
89:13 91:4
169:25 182:19
183:6,10 186:4
192:18 222:20
229:4 238:10
238:11 239:4
240:14,15
287:10,23
**potentially**
22:17 78:7
97:23 133:7,16

159:25 181:22
182:13 183:3
183:18 185:24
201:7 230:8
261:13 272:17
272:19 279:24
296:3,13
**power** 263:25
272:10 274:20
275:20 280:24
**practically**
21:2
**practice** 12:20
12:23 14:1
22:2,12 40:20
59:4 82:22
111:24 112:4
118:13,19
145:1 151:7,9
213:10,12
233:19 238:8
239:19,23
240:3 248:12
252:23
**practiced** 239:9
240:11
**practices**
151:14 233:20
**practicing**
111:3
**practitioners**
122:5,8
**praise** 311:23
**pre** 269:4

**precise** 166:7
232:3 246:9
284:23
**preclinical**
20:19
**precocious**
82:1,3 202:10
202:12,21
**preconceptions**
25:2
**precondition**
100:19 101:3
**predefine**
14:21 53:16
65:5
**predefined**
53:6 54:24
55:14 56:1,14
64:9,25 65:3
65:11,19 67:21
**predefines**
13:12
**predefining**
55:8 59:13
**predetermined**
140:8,17,20,23
141:5,12 142:2
142:9
**predict** 246:15
307:18 308:3
**predicted**
179:16
**predispositions**
90:14

**prefer** 302:5
**prefrontal**
200:7
**preliminary**
68:24 69:3
71:20
**premise** 173:17
174:15,21
**prep** 71:22
**prepare** 71:14
71:24
**prepubertal**
72:19 248:14
**prescribe** 121:3
**preselected**
57:14,24 59:23
**present** 3:16
77:14 213:11
231:18 292:22
**presentation**
61:8
**presentations**
94:16
**presented**
81:19 242:3
**presenting**
213:16 302:8
307:15 312:9
**presents**
311:23
**press** 150:3
258:19
**pressures** 77:1
**presumably**
25:21 207:15

**[presumably - proportion]**

285:4 291:13
**presume** 176:3
215:15
**pretreatment**
192:22
**pretty** 89:11
160:5 181:24
217:13,24
299:10 303:4
308:9
**prevalence**
242:25 243:17
245:2,14,16,18
304:13
**prevent** 83:11
83:16 111:15
115:5 279:22
**prevented**
280:15
**previous**
206:25 262:2
279:4
**previously** 19:3
63:4 64:5
213:17 224:25
266:10
**pride** 275:5
309:12,14,15
311:5
**primarily**
167:24
**primary** 22:3
22:24 42:6,19
43:5,13 44:4
47:13 63:1

82:23 96:18
114:23 257:15
**principle**
288:22
**principles**
19:13
**prior** 27:2 32:9
55:11 66:18
67:13 78:2
80:17 92:8
104:5 107:8
113:17 132:17
137:7 151:4
181:11 198:7
199:13 229:3
238:17 240:5
248:1,6 253:3
254:14 266:3,5
276:17 279:11
286:15 287:20
295:25 296:10
317:8
**prioritize** 223:9
**prioritized**
94:25
**prioritizes**
220:7
**probability**
201:5 244:22
244:23 268:8
**probably** 19:4
37:9 52:1
118:17 123:8
128:22 139:5
146:6,8 164:6

167:1 177:16
209:19 210:17
232:8 266:18
297:23 298:19
300:9 303:22
**problem** 96:17
114:4 205:24
286:2
**problems** 43:2
94:18 297:10
297:18
**procedure**
196:20 197:16
199:15,17
233:5,24
**procedures**
38:7
**proceed** 22:24
202:15 250:4
**proceeded**
189:20
**proceeding**
248:2
**proceedings**
27:23 28:25
**process** 15:23
33:11 41:4
44:13 45:6
46:11 49:24
58:18 71:8,11
104:5 180:18
182:2,16 186:5
195:1 242:7
243:1 249:18
249:25 252:20

253:13 280:14
287:3,9 298:16
312:2
**processes**
211:15,17
**processing**
193:13
**professional**
124:7,13,15
**professor**
257:20
**profiles** 218:4
**prognosis** 42:2
**program** 200:5
257:24 258:3,7
**progress** 254:2
**progressing**
98:7 101:24
122:16
**progression**
127:22 128:21
**progressively**
170:3
**promote**
108:16 287:10
**prompt** 199:17
210:17
**prompted**
206:8
**pronounce**
147:16 226:15
**properly** 93:1
306:14
**proportion**
153:7 291:9

Page 60

**[proposition - pubertal]**

| proposition | 161:12 179:5 | psychiatry | psychotherap... |
|---|---|---|---|
| 56:12 63:9,15 | 180:1 181:20 | 20:24 21:4 | 117:23 |
| 184:10 | 183:23 221:18 | 73:15 76:11 | **psychotherapy** |
| **prosecuting** | 234:3 244:12 | 90:21 104:4 | 6:24 112:23 |
| 1:12 | 276:21 | 139:22 140:1 | 113:5 117:6 |
| **protect** 282:8 | **provider** 87:22 | 140:15 151:3 | 141:24 179:20 |
| **protected** 96:5 | 90:10 92:13,15 | 151:17 194:6 | 183:11,15 |
| **protocol** 89:3 | 92:24 122:13 | 205:11 257:21 | 184:2 185:18 |
| 103:15 247:15 | 122:13 143:21 | 257:24,25 | 185:21,24 |
| 247:19,21 | 143:25 144:14 | 258:2 297:8,17 | 186:4,11,11,15 |
| 248:10 249:4 | 144:19 | 297:21 298:7 | 186:17,25 |
| 250:5,20 251:5 | **providers** | **psycho** 90:18 | 187:4,5,17 |
| **protocols** | 106:1,21 | 196:7 | 188:16 189:19 |
| 122:25 | **provides** 85:18 | **psychological** | 189:20 229:4 |
| **proud** 276:4 | 86:15 179:22 | 5:10,13 74:18 | 229:24 260:24 |
| 309:16 | 183:20 188:18 | 74:23 90:23 | 261:7,13,25 |
| **proven** 240:24 | **providing** | 140:7,16 141:4 | **psychotic** 94:22 |
| **provide** 13:15 | 92:16 121:22 | 141:11 142:8 | **pubertal** 5:21 |
| 13:17 23:12 | **proximal** 289:7 | 148:21 153:1 | 94:20 98:9 |
| 29:23 30:4 | 289:25 | 163:19 168:2 | 101:23 113:20 |
| 39:15 42:6,11 | **psyche** 78:12 | 178:16 209:7 | 113:22 114:2 |
| 50:20 61:19 | **psychiatric** | 246:21 | 125:2,2 126:11 |
| 81:21,23 82:5 | 108:4 109:15 | **psychologist** | 126:15 127:6 |
| 85:11,17 86:4 | 112:22 113:5 | 120:4,7,11 | 129:21 130:4 |
| 86:10,12,14 | 151:2,15 230:6 | 121:7,18 | 130:15,18,23 |
| 87:3,21,23 | 259:20 264:18 | **psychology** 5:9 | 131:14 133:19 |
| 88:3,9,21 | **psychiatrist** | 258:20 262:11 | 134:2,17 |
| 89:12 104:13 | 104:9,12 | 263:2,5 | 135:22 137:8 |
| 106:23 107:10 | 113:14 114:13 | **psychomotor** | 188:25 189:14 |
| 107:11 111:9 | 114:17 120:8 | 74:15 | 190:9 192:15 |
| 116:20 184:24 | 121:7,18 124:1 | **psychosis** | 193:2 196:23 |
| 240:13 255:1 | 285:12 | 120:13 | 198:13 200:22 |
| 260:25 | **psychiatrists** | **psychosocial** | 200:25 201:12 |
| **provided** 25:18 | 109:3 121:6 | 115:3 | 201:25 203:16 |
| 158:14,20 | | | 204:19 205:2 |

**[pubertal - question]**

206:16 207:8
207:16,20
208:7 211:5,14
211:24 212:4,6
214:5 217:4,6
243:23 244:3,8
248:6 254:8,11
255:8 261:1
262:6
**puberty**   81:23
82:2,4,6,14
97:3,6,19 98:6
101:25 105:13
121:3 122:16
125:24,25
126:25 129:22
129:24 130:8
130:13 131:18
132:3,14,16,19
132:23 133:8
133:11 156:1
156:25 157:5
180:12 189:3
190:23 192:3
193:12 194:25
195:3,7 200:4
202:8,10,13,14
202:15,18,19
202:21 203:1,2
203:4,5,8,9
209:13 212:7
217:9 222:24
233:18 237:12
237:21 239:13
247:10 248:23

250:24 253:20
254:4,20 255:1
**public**   2:9 5:3
108:14 155:24
156:24 241:23
275:10,18
276:5 282:3
286:18 287:5
287:10,24
317:6,25
320:19
**publication**
127:13 241:8
297:13
**publications**
63:3 109:2
**publicly**   150:8
171:5
**publish**   149:22
247:22
**published**
12:18 13:6
18:12 125:4
127:9,10
138:13 139:25
149:2,4,11,14
149:15 152:1
158:13 159:3
176:15 178:9
205:9 225:12
225:14 229:3
230:17 258:21
291:6 299:2
300:6 311:7

**publishers**
226:3
**pull**   46:16 52:1
158:15 217:12
217:19 255:15
313:18
**pulled**   165:7
305:24
**pulling**   46:14
46:20,23
**pure**   121:6
**purported**
135:21
**purpose**   82:23
167:18
**purposes**
113:11 116:2
**push**   77:14
112:24
**pushed**   278:25
**pushing**   283:14
**put**   13:20 14:22
23:18 31:11
36:4 55:25
75:9 109:8
166:9 198:12
265:10 288:3
299:20 305:23
307:7
**puzzle**   106:20
**pyramid**   27:14
30:11,24 32:6
32:18 33:14
34:2 37:15,20
37:21

**q**
**q.12.11.**   132:21
**q.12.9**   132:20
**quality**   25:3,14
25:21,24 26:1
26:3,17,17
34:3,10,12,14
35:7,23 36:12
37:17 45:1
50:21 188:17
188:20 190:3
218:16 219:9
222:24
**quantitative**
31:10 42:6
222:11 300:24
**quantitatively**
45:15 47:3
303:20
**quarters**
127:16
**question**   10:15
10:16,20 12:25
19:10 20:9
33:13,21 34:25
35:2,15,22
36:2,16,24
42:13 43:19
50:9,18 51:1
57:6,11 61:2
61:25 66:13
68:2 77:20
79:13,24 80:2
80:3 88:13,17
95:15 99:9

Page 62

**[question - ramer]**

| | | | |
|---|---|---|---|
| 100:17 103:2,5 | 239:11,24 | **quick** 10:9 | 26:2 27:9,12 |
| 107:6 117:18 | 240:9 242:10 | **quickly** 273:15 | 27:13,17 28:2 |
| 124:9 130:22 | 242:17 243:22 | **quite** 102:23 | 28:5,9,13,17,20 |
| 131:11,12,20 | 244:20,22 | 136:21 162:3 | 29:5 32:16 |
| 132:21 133:7 | 245:9 246:10 | 162:16 193:19 | 35:16 36:10,17 |
| 133:11,21,23 | 256:18 261:19 | 212:10 242:13 | 41:15 44:1 |
| 134:14,15,20 | 261:21,22,23 | 314:7 | 49:17 52:9,14 |
| 134:21 135:1 | 279:21 282:17 | **quotations** | 52:22 55:2 |
| 137:14 143:16 | 282:22 283:2 | 302:19 | 56:3,8 58:14 |
| 143:17 145:21 | 283:23 284:3,5 | **quote** 22:16,23 | 60:6,12,22 |
| 158:22 159:13 | 284:11,12 | 22:24 104:3 | 61:14 62:14,18 |
| 160:14,19,25 | 290:22 294:5 | 120:21,23 | 64:19 66:2,5 |
| 161:14,18,25 | 295:18 296:12 | 150:13,20 | 66:14,21 67:8 |
| 162:4,10,16,25 | 296:25 297:6 | 206:9 229:22 | 67:23 71:3,6 |
| 166:19 173:10 | 301:10,16,17 | 292:5 302:16 | 74:21 78:15 |
| 173:14,15 | 301:20,24,24 | **quotient** | 79:23 80:25 |
| 174:14 175:8 | 302:5,9 303:5 | 205:19 | 81:22 82:13,23 |
| 175:20 180:7 | 304:20 305:10 | **r** | 83:13,18,21 |
| 180:16 181:16 | 306:11,15 | **r** 8:1 16:17,17 | 84:8,12,13 |
| 182:22 183:14 | 308:21 310:13 | 120:20,20 | 86:12 87:4 |
| 183:25 184:4 | 310:15,18,23 | 319:3,3 | 88:4 92:11 |
| 184:13,16 | 314:10,15 | **rafael** 3:12 9:8 | 93:4,25 98:10 |
| 185:3,8,15 | **questioning** | **rafael.droz** | 99:21 100:1,9 |
| 186:16 187:12 | 285:5,23 | 3:15 | 100:24 101:7 |
| 189:25 190:11 | **questions** 5:18 | **raise** 250:3 | 101:15 102:3,5 |
| 190:14 195:14 | 10:13 14:25 | **raised** 180:8 | 102:7,8,13,19 |
| 196:22 197:3,6 | 33:18 37:23 | 206:11 275:7 | 106:15 107:2 |
| 197:7,10,19,23 | 41:9 61:21 | **raises** 211:15 | 109:22 110:14 |
| 198:4,9 199:9 | 93:10 104:16 | **ramer** 3:9 4:5 | 111:4,25 |
| 199:15,16 | 104:19,22 | 8:20,20 9:15 | 114:12 115:10 |
| 202:17 206:12 | 117:2 162:7 | 10:2,3,5,24 | 116:10 118:24 |
| 206:25 207:19 | 195:16 198:10 | 11:7,19 12:1 | 121:24 122:7 |
| 211:16 212:14 | 199:18 240:1 | 14:17 17:7 | 123:17 124:8 |
| 217:21 221:21 | 266:10 301:19 | 19:10 20:12 | 124:16,18,21 |
| 223:20 229:11 | 313:2 314:24 | 21:5,10 23:25 | 124:23,25 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[ramer - reach]**

| | | | |
|---|---|---|---|
| 125:5,10 128:9 | 190:14,24 | 265:20 266:7 | **range** 205:21 |
| 129:15 131:1,6 | 191:10,14,21 | 266:15,18,24 | 206:2,4,7,24 |
| 133:20 134:6 | 194:10,13,15 | 267:7 272:20 | 211:4 293:5 |
| 135:2 136:6,10 | 197:9,18 198:3 | 273:24 274:3 | **ranges** 97:10 |
| 136:23,24 | 198:11,22 | 276:13,25 | **rapid** 153:14 |
| 137:10,13 | 199:7,21 | 277:12,15 | 153:17 159:14 |
| 138:6,7,24 | 200:20 201:8 | 278:16 279:4 | 160:2 167:19 |
| 139:8,10,19 | 202:6 203:3 | 279:25 280:16 | 167:24 175:8 |
| 141:11,18 | 208:21,23 | 280:19 281:13 | **rapport** 6:8 |
| 143:3 144:6,24 | 209:1,21 211:5 | 282:23 283:18 | **rate** 42:7 |
| 145:6,15,22 | 212:18 213:2 | 283:24 284:4 | 157:14 273:22 |
| 146:12,15,19 | 213:19,24 | 284:13,16 | **rates** 306:24 |
| 146:24 148:13 | 215:12 220:10 | 286:20 287:12 | 311:8,10 |
| 148:16,18 | 220:20 221:12 | 288:3,8 290:4 | **rather** 85:17 |
| 151:18,21,23 | 222:14 223:14 | 290:6,13,23 | 97:11 105:7 |
| 154:25 155:14 | 223:21,25 | 292:14 294:1 | 115:14 130:14 |
| 155:17 156:7 | 224:9,13 | 296:15,20 | 130:23 142:6 |
| 157:6 161:3 | 228:19 229:22 | 298:11 299:7 | 147:4 162:21 |
| 164:5,19 165:5 | 230:9,12,14 | 299:12,19,22 | 179:19 203:19 |
| 165:10,13 | 232:5 233:25 | 300:2 304:21 | 204:4 233:5 |
| 167:14,16 | 234:8,12 | 305:12 306:13 | **ratio** 137:15,17 |
| 168:6,20 169:5 | 235:23 236:9 | 307:16 308:18 | 137:19,22 |
| 169:10,19 | 236:13,17,19 | 309:4 310:11 | 242:10 267:21 |
| 170:5,15 171:1 | 238:13,23 | 313:1,20 314:4 | 269:25 270:13 |
| 172:9 173:7,11 | 239:5 240:6 | 314:25 315:4 | 271:3 |
| 173:16 174:13 | 242:18,23 | 315:22,25 | **rational** 24:23 |
| 174:25 175:14 | 246:3,11 247:1 | **ran** 272:13 | **ratios** 270:12 |
| 175:21 176:10 | 249:11 250:5 | **randomized** | 270:17 |
| 176:22 177:3,7 | 250:15 251:13 | 32:17 33:15,16 | **rattle** 17:3 |
| 177:12 181:8 | 252:5 253:20 | 33:24 34:3,7 | **raw** 170:8,14 |
| 181:14 182:11 | 254:19 255:12 | 34:21 35:4,6 | 307:8 |
| 182:20 183:1 | 255:15,21 | 35:13,20,23 | **raúl** 1:10 |
| 183:16 184:5 | 256:10,16,23 | 36:5 37:3,11 | **rdr** 1:25 317:24 |
| 185:20 186:16 | 258:11,15 | 38:1,3 49:16 | **reach** 57:2 |
| 187:2,13 189:8 | 264:8 265:17 | 220:7 223:10 | 129:8 214:25 |

**[reach - really]**

222:5
**reached** 129:24
**reaches** 136:7
**react** 311:16,16
311:17
**reactions**
311:20
**read** 16:25
17:16 21:24,24
22:7 23:5,8,9
23:17,20 24:7
24:11,12,21,22
25:4 27:8
29:11,13,16
38:19,21,22
39:6 41:22,22
42:14 47:17,18
48:10 49:6,18
50:5,16,16,23
51:6,24 52:25
53:2,3,9 57:7,8
57:17 58:10
59:2 62:24,24
63:6 69:16
71:3,5,18 84:1
84:23,24 85:4
85:7,8,13 87:5
87:6,6,11,18
94:8,9 95:1
103:1 107:18
107:22,25
112:6,6,15
118:8 119:1,1
119:14 126:9,9
126:20 129:18

129:18 130:1
132:11,12,25
133:10 140:11
147:8,10,11,11
147:13,24
149:20 155:8
158:6 160:17
161:18,19,23
177:15 178:12
178:13,21
179:6,11,21
191:25,25
192:7 194:24
194:24 195:4
196:1,17,18
197:1 199:19
199:24,24
200:8 203:15
203:15,21
204:12,13,24
208:17,18
209:1,2,10
211:12,13,20
212:18,19
213:5 214:10
214:13,15,15
214:17 215:2
215:16 222:5
225:3,7 226:7
227:14,15,24
228:21,21
229:1,6,10,11
229:16 230:2
230:19,20,22
230:25 231:6

231:13,14,21
232:5 233:6
234:14,24
236:24 237:1,2
237:7,8,16
239:3,5 240:19
240:19 241:2
243:10,11
247:7,8,16
248:18,19
249:1 251:2
256:3 261:3,15
262:7 263:7
264:21 274:14
274:15,22
277:17,18
278:1 280:21
280:22 281:3,5
281:6,11,12
284:18,19,25
296:22 297:4,5
297:14 298:21
298:22 300:25
301:2 302:22
318:9 320:5
**reader** 27:6
**readers** 265:2
**reading** 13:25
23:22 24:6
47:25 48:22
60:16,22
127:25 164:1
222:16 223:17
225:11 253:23
263:14 298:13

302:23
**real** 196:23
**realization**
5:15 155:6,11
156:9,13 157:9
158:1,3,10,25
161:7 165:6,8
168:10,11,15
170:9 313:13
315:11,15,20
**realize** 152:7
153:8,10 311:3
**realized** 96:12
153:23 160:21
175:13 302:19
**realizing**
159:22
**really** 14:13
18:25 23:16
26:9,20 31:10
35:14 36:8
51:17,25 68:20
76:8 89:22
96:4 97:25
103:18 104:20
104:24 105:7,9
119:3 130:12
146:4 154:19
162:6 167:23
176:20 188:3,5
188:8 195:12
197:13 201:23
210:20 214:20
220:3,14 223:4
223:9 228:11

Page 65

**[really - reference]**

245:9 270:18
270:20 274:15
288:11 293:13
306:9 307:18
**realm** 32:21
**reason** 33:15
103:22 109:4
113:9 153:13
154:1 156:7
159:13 174:25
182:25 183:5
206:3 215:7
241:22 243:3
290:17 293:24
318:11 319:6,9
319:12,15,18
319:21
**reasonable**
104:8 111:24
112:4 202:2
263:7
**reasoning**
195:24 210:2
**reasons** 244:5
293:21 294:11
**reassignment**
259:18
**reassuring**
192:22
**rebuttal** 4:12
**recall** 18:14
29:14,15 45:19
50:1 61:20
68:15 69:25
72:5 102:17

149:4 208:11
213:9,16
214:23 215:10
215:21,23
216:3,7 220:24
221:19,25
222:9,11 225:8
232:8 258:23
261:23 272:4
277:4,7 285:3
298:3 313:22
**recalled** 5:9
**receipt** 318:18
**receive** 27:10
97:6 110:23
124:18 126:1
136:3 254:4
266:1 295:19
295:22 296:4
**received** 20:16
20:22 69:1,2,6
125:24 131:13
189:18,19,23
216:23 229:15
242:2,4 260:15
260:24 272:6
272:16 295:25
**receives** 238:20
242:8
**receiving**
100:20 101:3
111:15 116:11
121:25 130:3
183:15 184:17
184:19 186:9

187:15 188:15
246:12
**recent** 222:2
**recently** 68:15
158:13 237:2
248:16 253:16
288:12,19
**recitation**
129:12
**recognize**
21:14 151:24
159:17 194:18
213:25 224:14
258:16 300:2
**recognizing**
103:7 309:17
**recommend**
40:2 170:13
176:8 191:6
**recommendat...**
39:24
**recommendat...**
6:7 38:25 39:3
40:6 84:19,25
240:18,21
**recommended**
40:9 168:3
**recommends**
238:19 247:13
**record** 8:4,7,19
27:18,22 28:1
28:18,24 29:3
52:17,21 71:5
100:4,8 139:13
139:17 147:12

158:8 191:14
191:16,20
217:18 229:6
236:4,8 267:1
267:5 299:12
299:14,18
316:4 317:15
**recorded** 8:15
**recording** 8:4
27:25 52:19
100:7 139:16
191:19 236:7
267:4 299:17
**recruited** 306:8
**rectangle** 64:17
65:7
**redistribution**
294:19,21
**reduce** 57:15
82:24 83:2
142:23 143:4
187:8
**reduced** 317:13
**reduces** 58:2
**reducing**
185:10 186:18
**refer** 120:12
218:24
**reference** 30:20
37:18 39:5
207:12 260:2
275:4 281:15
283:6 287:1
312:14

Page 66

**[referenced - rephrase]**

referenced 39:9
  69:9 169:24
  201:16 244:2
  284:7 318:6
references
  181:19 201:11
referencing
  13:4 17:6
  48:21 51:6
  67:18 88:11
  95:18 104:1
  117:20 193:4
  196:4 212:17
  215:4 286:6
  291:7
referrals
  241:22 242:1,6
referred 18:1
  171:16 204:18
referring 11:1
  25:13 37:17
  46:10 58:16
  60:21 61:3
  70:12 83:14
  115:18 158:17
  158:25 224:2
  234:16 263:10
  267:11 268:20
  277:1 304:25
  309:2
refers 12:17
  37:16 46:11
  140:7 241:5
reflects 314:9

refresh 64:7
refresher 10:9
refuse 104:13
refusing 284:4
regard 192:5
regarding 29:2
  84:19 85:1
  106:16 196:20
  201:12 256:25
  265:6 285:18
regional 30:3
  253:25 254:5,7
  254:16,22,24
  255:11
registered
  241:11,17
regression
  222:17
regret 246:12
  246:16 293:10
  293:21,24
  294:2,4,8,16,21
  295:17,25
  296:7 302:6
  306:2,23,24
regretted 295:3
rejected 297:11
  298:2
rejection
  148:11
related 70:13
  72:15 74:2,11
  74:18 94:13,24
  98:5 112:13
  114:21 116:8

142:24 143:5
  180:21 188:9
  203:17 204:2
  204:17 214:4
relating 16:24
  17:15
relationship
  104:20 137:18
  205:5,8
relatively
  221:25 227:16
  303:24
releases 150:3
releasing 5:23
relevant 14:24
  25:19 26:10,19
  27:4 46:16
  57:16,21 58:4
  58:12,22,25
  72:15 93:2
  106:17 110:5
  124:15 135:2,7
  152:5 154:16
  155:18,22
  157:7 159:14
  175:1 213:10
  240:7 264:20
  265:2
reliable 42:12
  153:25 215:8
relieve 259:19
rely 215:14
relying 134:8
remaining 5:17

remember
  17:17 18:13
  62:1 69:6
  71:12 123:5,24
  124:2 196:5
  212:20 213:13
  214:18 230:20
  234:18 261:18
  272:2,8,11
  277:11 303:1
  313:10
remembered
  2:3
remind 36:17
reminder
  117:17
remission
  141:16
remote 1:19 2:1
  2:3 8:7 61:22
remotely 2:15
  3:1 8:14
remove 281:25
removed
  181:25 276:4
repeat 16:5
  20:1 54:11
  66:12 145:20
  156:19 163:9
  181:15 187:11
  244:20
rephrase 60:13
  78:17 82:4
  86:13 93:14
  100:25 110:16

**[rephrase - respect]**

114:15 184:8
215:22 235:3
252:22
**replacement**
132:17
**report**  5:4
130:3 131:8,23
135:20 143:14
153:24 160:10
208:14 213:1,3
213:6,9 214:3
217:3,11
224:17 228:23
253:24 255:7
256:8 269:6
270:11 288:13
**reported**  1:25
8:16 129:19
130:17 132:6
132:19,20
155:6 179:3
181:20 228:24
301:3
**reporter**  9:5,6
9:12 10:11
19:20 20:5,8
71:5 156:15,19
317:5
**reporter's**
317:1
**reporting**  2:6
3:17 8:16 58:4
58:19 200:22
270:7

**reports**  53:5,16
54:24 55:14
56:13 64:8
184:16 286:7
286:10
**represent**
83:21 102:20
143:18 148:19
234:13 265:21
276:3 293:4
**representative**
103:19 277:20
278:3 279:16
281:22 306:10
**representatives**
280:5 281:24
**represented**
275:14
**representing**
8:21,23 9:16
10:6
**represents**  39:4
**reproducible**
59:25
**republican**
265:13 279:20
**republicans**
274:24 277:19
278:5 279:6,8
**request**  10:19
150:6 171:6
**requested**
316:8
**require**  24:24
58:22 90:6

92:7 248:11
**required**  85:10
320:13
**requirement**
88:16 100:19
101:2 249:12
249:13,15
251:12,20
252:24
**requirements**
85:1 88:24
92:12
**requires**  74:10
93:9 100:14
**requiring**
270:24
**research**  5:20
6:7 12:18 13:4
13:6,14,20
15:17 18:19
19:2 20:23
23:20 25:8,9
26:5,20 30:21
31:8,11,17,23
31:24 33:9
39:14,17,25
40:10 41:9
46:6,24 48:17
49:6,12,13
57:11 63:3
75:2 139:25
149:18 151:4
151:25 163:7
170:21 186:24
193:15 196:21

196:22 200:15
202:3 205:5,15
205:16 210:7
210:17,20,20
213:17 214:4
214:22 221:4,7
224:18 231:18
242:16 254:12
256:4,24 258:3
264:20 265:2
279:17 280:10
280:13 281:18
282:4,11
285:18 286:3
286:11 287:2,4
293:7 303:21
305:19 306:19
**researcher**  16:5
**researchers**
199:10
**researching**
205:1 207:7,22
208:6
**residency**  13:1
20:24
**resilience**
309:13 310:6
**resolved**  295:8
295:13
**resort**  248:8
**respect**  36:2
42:18 88:5
124:9 135:11
137:1 138:20
155:18 244:15

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[respect - revising]**

245:20,20
270:25
**respected**
91:17 297:9
**respond** 10:12
272:23 299:1
**responded**
290:24
**respondents**
132:6,19,22
133:3,5,10,17
301:3
**response**
102:25 118:25
119:16 158:13
159:4 175:7
279:13 299:2
302:12
**responses**
300:24 302:14
**responsibility**
282:8
**responsible**
278:12 283:12
**responsiveness**
205:19 206:18
206:20 208:2,4
**rest** 123:6
**restart** 295:21
**restricted**
126:16 256:1
300:19
**restrictive**
99:20

**result** 77:10
122:1 198:17
206:9,10
286:18
**resulting**
110:15 126:18
179:19 241:5
241:15
**results** 47:19
48:4,6,13
121:11 134:19
134:21 155:4
157:24 197:15
206:9 220:19
272:2,11
**retransition**
305:7
**return** 65:23
100:10 146:19
318:13,17
**returning**
161:15,16
**returns** 269:18
**reverse** 243:4
**reversible**
248:5,5,8
**review** 4:19
5:22 6:3,6 13:8
13:12,15,17
14:14,18,20
15:2,5,6,9,10
15:18,22,25
16:7,9,10,11,19
18:10,21,23
22:14,16 23:24

24:8 26:9,11
26:17 27:7
29:7 30:1
31:18,20 32:11
32:12 38:8
40:22 41:3,4,8
42:9,20 43:6,7
43:8,21,24,25
44:2,6,14,18,21
45:1,5,23 46:2
46:22 49:11,23
50:19 51:2,16
51:24 52:3,6
53:4,15,22,23
54:4,5,6,7,8,14
54:16,17,23
55:5,8,13,18,18
55:24 56:12,18
56:19,20,22,25
57:6,9 58:5,6
59:12,17,20,23
60:4 61:6,15
62:5,10,10
63:2,22 64:8
64:14,22 65:10
66:8,9,15,16,22
67:5,7,10,11,20
100:17 101:1
214:8,19,25
215:13 216:10
224:22 226:4
228:23 230:16
231:1,9 232:17
264:19 265:2
287:3 299:4

318:7
**review's** 216:13
**reviewed** 17:21
19:2 69:5
71:16,17 109:2
176:15 212:13
225:8 280:10
286:10 297:24
**reviewer** 15:23
49:24 297:20
**reviewing** 15:3
66:23 67:6
297:25 298:4
**reviews** 4:21
14:3,6,7,8,11
15:8 16:24
17:5,14,21,22
18:15 22:6,25
23:16 24:14
26:12 30:24
31:4,12 32:5
38:24 40:24
41:25,25 42:17
42:18 43:1,3
43:11 53:7,18
54:25 55:3,15
56:15 57:2
59:14 61:12
64:10,18,23
65:2,4 67:3,15
67:20 215:15
235:17 297:22
**revising** 240:18
240:21

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[revision - safe]**

| | | | |
|---|---|---|---|
| **revision** 72:12 | 191:23 193:22 | 98:3 105:23 | **routine** 145:1 |
| **rich** 302:14 | 196:16 199:22 | 125:3 192:14 | **routinely** 144:7 |
| **richer** 38:12 | 208:16,23 | 218:16 219:9 | 209:23 210:6 |
| **rid** 115:6 | 210:25 219:3 | 219:17 220:16 | 210:18 240:12 |
| 134:25 | 230:24 232:12 | 222:22 235:1 | 311:2 |
| **ridiculous** | 232:25 234:1,7 | 237:12 241:1 | **row** 170:2 |
| 103:9 | 236:6 253:1 | 246:24 | 267:15 268:22 |
| **right** 8:3 9:15 | 263:18 267:3 | **risks** 89:12 | 269:22 270:16 |
| 20:12 26:25 | 267:18,24 | 143:22 144:8 | 270:21,23 |
| 27:24 28:20 | 270:21 272:7 | 144:12 233:17 | 315:9 |
| 30:11 37:23 | 284:13 291:22 | 237:20 238:3 | **rows** 314:20 |
| 38:4 44:19 | 293:16 297:1 | 238:11 239:13 | **rule** 183:17 |
| 52:9 53:18 | 299:16 300:10 | 240:14,24 | **rules** 111:5 |
| 54:14,20 60:8 | 300:21,23 | **robust** 273:20 | **run** 45:14 |
| 61:22 65:15 | 301:13,18,22 | **rodent** 200:10 | 62:23 163:2 |
| 67:11 85:15 | 315:11,24 | 200:19 201:5 | 170:24 171:6 |
| 91:9 94:2 | **rigid** 94:17 | **rodents** 200:3 | 268:6,7,11 |
| 95:10 100:6 | 96:3,24 111:5 | 200:16 | **running** 19:6 |
| 101:19 103:14 | **rigor** 57:3 | **rogd** 152:19,22 | 128:15 169:24 |
| 104:25 107:19 | **rigorous** 22:5 | 154:2 155:18 | **s** |
| 107:21,23 | 22:16 101:8 | 159:8,9 163:12 | **s** 2:21 4:10 5:1 |
| 108:3 116:3 | 305:20 | 175:1,6 | 6:1 7:1 8:1 |
| 119:5 121:12 | **rise** 241:8 | **role** 14:2 16:18 | 318:1 319:3 |
| 127:1,19 128:3 | 278:9 307:24 | 105:3 114:23 | **s43** 84:3,6,10 |
| 131:20,23 | **rises** 115:12 | 309:19,23 | **s48** 84:16 |
| 132:2 134:14 | **risk** 23:18 42:5 | **roles** 96:24 | 100:12 |
| 135:13,18 | 42:19,21 43:4 | **room** 12:6 | **s62** 94:1 95:10 |
| 136:19 137:8 | 43:12 44:3,23 | 158:11 | **sabine** 5:17 |
| 137:25 139:6 | 45:7,10,15,22 | **rough** 41:13 | **sad** 278:24 |
| 139:15 152:20 | 47:13,20 48:5 | 127:8 157:5 | 283:13 |
| 154:13,17 | 48:8,9,15,18 | **roughly** 127:13 | **sadly** 312:11 |
| 155:2 156:7 | 49:2,21 57:15 | 165:25 315:17 | **safe** 81:17 |
| 159:1,21 161:6 | 58:3 60:1,17 | **round** 196:19 | 90:22 91:11 |
| 164:25 165:4 | 60:25 61:10,16 | **rounds** 257:13 | 97:22 286:4 |
| 174:13 191:18 | 66:24 67:3,16 | | 289:18,20 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[safe - search]**

| | | | |
|---|---|---|---|
| 292:20 | 181:15 203:3 | 237:9 243:16 | **scoping** 46:1 |
| **safety** 98:3,24 | 210:22 244:25 | 245:2,5 247:9 | **score** 205:21 |
| 240:23 | 266:5 268:5 | 248:20 250:19 | 206:2 220:2,2 |
| **salience** 221:23 | 288:8,9 | 258:25 259:5 | 223:7 |
| **salient** 222:13 | **says** 11:3 22:1 | 259:17 260:23 | **scores** 39:19 |
| **salt** 122:24 | 24:23 29:6 | 261:12 264:12 | 187:18,20 |
| **sample** 59:7 | 31:4 38:23 | 268:23 274:15 | 188:4 221:8 |
| 126:18 172:5 | 41:24 47:13,19 | 301:2 302:18 | 262:5 263:17 |
| 262:16 264:5 | 50:17 53:4 | **sbu** 231:5 | **scoring** 206:4 |
| 272:8 | 55:12 57:6,9 | 234:3 243:5 | 220:9 223:8,12 |
| **samples** 242:12 | 59:21,22 60:16 | **scale** 187:24 | 223:14 |
| **san** 257:22 | 60:24 63:1 | 205:19 206:18 | **screen** 14:23 |
| 258:9 | 64:7 84:23,25 | 206:20 208:2,5 | 206:24 |
| **sanctioned** | 85:9 86:23 | 222:25 | **screening** |
| 174:4 | 87:8,13 88:18 | **scaling** 223:2 | 205:18 206:6 |
| **sapir** 263:10 | 94:11 95:12 | **scary** 280:3,12 | 206:21 |
| 288:3,9 | 103:4 107:23 | **scholar** 176:14 | **screenshot** |
| **satisfy** 88:22 | 112:8 118:4 | **school** 13:1 | 279:14 281:5,7 |
| **saw** 77:16 | 119:3 126:11 | 19:18 20:16,17 | **seal** 317:18 |
| 157:2 | 128:1 129:19 | 20:25 91:10 | **search** 13:13,16 |
| **saying** 22:11,16 | 132:3,5,14 | 113:1 115:4 | 13:19,20 14:21 |
| 22:19 23:14,21 | 135:6 147:1 | 258:5 311:4 | 14:22 15:15 |
| 24:10 25:7 | 149:10 150:14 | 312:15 | 16:2,5,21 |
| 31:13 34:2,6 | 155:5 160:14 | **schools** 312:16 | 18:24,25 22:17 |
| 36:7 45:8 | 161:20 162:11 | 312:21 | 24:16 26:14 |
| 46:21,23 48:12 | 178:14 179:2 | **science** 282:5 | 41:11 53:6,17 |
| 51:9 54:22 | 192:2,24 | 282:13 283:15 | 53:24 54:10,11 |
| 55:20 57:23 | 194:25 196:19 | 303:22 | 54:24 55:9,14 |
| 58:2,10 78:15 | 203:24 204:2 | **sciences** 20:23 | 55:21,21 56:1 |
| 78:18 80:18 | 209:4 217:10 | **scientific** 15:4,8 | 56:14 58:7 |
| 83:13,15 86:8 | 218:4,14 219:7 | 49:5 283:9 | 59:13,18,25 |
| 92:20 98:12,14 | 225:18 227:11 | 286:10 287:4 | 64:9,25 65:3,5 |
| 99:6 121:14 | 228:22 231:1 | 298:22,24 | 65:11,20 |
| 147:22 155:10 | 231:15 233:2 | **scientist** 200:21 | 214:20 232:18 |
| 156:21 179:10 | 234:2,25 237:5 | 200:24 246:8 | 248:17 |

**[searches - sentence]**

| | | | |
|---|---|---|---|
| **searches** 67:22 | **see** 20:4 21:10 | **seeing** 21:2 | **selecting** 42:3 |
| **searching** | 21:20 23:6 | 63:20 117:1 | 57:15 58:3 |
| 13:14 16:2 | 29:23 32:25 | 122:5,8 146:7 | **selection** 45:18 |
| 56:2 | 37:5 44:15,17 | 146:9 201:9 | 220:24 |
| **second** 21:23 | 47:12 49:18 | 269:12 309:25 | **self** 148:3 |
| 27:18 28:22 | 50:5,21 52:3 | **seek** 147:3 | **semantics** |
| 60:23 62:23 | 65:24 69:8 | 148:6 | 105:19 114:2 |
| 69:4 94:11 | 75:22 76:17 | **seeking** 77:18 | **send** 27:9 28:3 |
| 107:15 118:3 | 83:13 95:4,6 | **seeks** 243:3 | 136:6 150:3 |
| 125:24 126:8 | 101:17 102:17 | **seem** 106:10 | 265:18 |
| 130:7 133:9 | 104:2 116:7,10 | 193:19 195:17 | **sending** 265:21 |
| 136:22 140:5,5 | 116:14,24 | 198:20 308:19 | **sense** 19:11 |
| 152:12 157:24 | 122:12 132:3,8 | **seemed** 96:21 | 30:17 33:8 |
| 162:11 172:20 | 136:6 148:24 | 127:11 192:19 | 41:13 52:7 |
| 178:11 191:24 | 149:1,10 | **seems** 23:1,8 | 124:17 |
| 194:22 204:1 | 150:17 156:4 | 66:7 75:14,14 | **sent** 12:11 56:5 |
| 204:10 208:20 | 169:11 170:3 | 119:12 149:17 | 131:19 178:7 |
| 225:23 230:24 | 180:9 183:7,22 | 172:23 210:15 | 263:1 274:12 |
| 235:7 237:19 | 192:9 197:15 | 249:3 281:14 | 298:24 299:4 |
| 240:17 242:23 | 197:16 199:17 | 305:19 | 318:14 |
| 242:24 245:5 | 202:3 212:11 | **seen** 21:12 29:9 | **sentence** 21:23 |
| 248:3,18 264:9 | 215:18 218:5 | 30:13,14 83:24 | 23:21 38:20 |
| 281:11 297:2,3 | 218:18,24 | 108:18 122:25 | 50:15 53:2,13 |
| 302:18 | 219:11 220:4 | 148:22 170:22 | 54:20 58:15 |
| **secondarily** | 225:19,20 | 172:15 177:13 | 60:15,21,23 |
| 222:12 | 226:11 234:5 | 194:16 198:1 | 61:6 62:24 |
| **secondary** | 234:22,23 | 201:10 229:13 | 63:11 64:5,7 |
| 96:18 162:8 | 241:12 247:5 | 230:15 236:20 | 64:21 107:18 |
| 211:16 273:10 | 258:25 259:9 | 255:22 281:1 | 107:21 112:5 |
| 295:11 301:14 | 260:4 268:2 | 286:7 288:11 | 115:16 128:1 |
| **section** 49:7 | 269:17 270:1 | 288:17 296:20 | 132:5 140:6 |
| 50:7,22 63:21 | 272:12 273:5 | 296:23 303:25 | 147:1,10,11,23 |
| 94:3 160:12 | 285:19 289:3 | 312:1,21 | 147:24 155:5 |
| 161:18 199:20 | 293:24 301:8 | **selected** 131:18 | 158:23 167:18 |
| 230:25 247:2 | | | 167:23 179:7 |

Page 72

**[sentence - shut]**

179:10,12,21
191:25 192:11
192:12 194:22
195:9 196:1
199:23 203:13
203:25 204:1,8
204:11 208:18
209:2 211:11
228:20 229:10
229:23 230:25
234:2 237:7
238:12 239:6
239:12,23
240:2,6,17
244:25 245:2,5
247:7 248:18
249:7 250:19
259:7,17
260:23 261:11
262:2 264:10
264:12,23
282:14 297:4
300:17,25
301:1 302:18
**sentences** 24:22
47:17 48:1
57:7 118:3
119:1 126:9
129:17 132:12
157:25 178:13
179:1 204:13
**separate** 39:22
88:1 121:23
182:17 184:1
190:13,25

216:20
**separated**
190:22
**separately**
74:17 217:11
**september**
68:19 149:11
**series** 73:2
263:1
**serious** 99:3
201:23,24
297:10
**seriously**
152:25
**serve** 68:14,25
258:1
**service** 127:12
**services** 231:5
**serving** 70:4,18
71:9 297:20
**sessions** 106:12
**set** 19:13 39:22
72:18,19
103:15,18
110:8 111:6
171:5 223:9
238:14 254:7
301:25 303:10
315:23
**sets** 72:18
242:11
**setting** 99:20
165:7
**several** 25:9
30:3 40:1

73:11 195:22
203:17 219:24
262:23 264:12
265:4 275:4
277:9
**severe** 5:13
94:19 148:21
**sex** 72:9,13
74:4,19 96:16
96:18 110:3
112:24 137:7
140:9 160:16
161:11 188:7
203:10 211:14
211:25 241:11
241:17 242:10
242:14 252:17
271:17 273:10
292:2,15
295:11,24
296:6 301:6,12
302:8 303:12
307:15,17
**sexual** 16:12
46:7 104:12
209:8 289:4,9
290:11 311:9
**sexualizes**
292:13
**shame** 309:16
**shape** 301:21
310:2
**share** 152:13
279:17 281:18
281:23

**shared** 69:25
106:12 308:10
308:25
**sharing** 80:24
158:1,4,9
161:5 174:23
280:8
**she'd** 70:7
**sheep** 201:16
**sheet** 4:16 12:3
318:11
**shift** 67:23
315:13
**shifted** 81:14
240:25
**short** 107:15
227:17 299:8
**shorthand**
317:5,12
**show** 75:19
186:17 188:25
189:24 200:4
**showed** 180:18
199:20
**showing** 32:5
48:13 75:2
78:10 157:19
159:18 210:13
267:16
**shown** 200:11
**shows** 28:4
81:1 185:5,9
186:25 253:16
**shut** 274:19

Page 73

Jack Turban , M.D., MHS October 16, 2023

**[sick - sohl]**

| | | | |
|---|---|---|---|
| **sick** 274:15 | **silencing** 277:23 | **sizable** 253:16 | **society** 275:12 309:18 |
| **side** 37:15 44:19 97:18 108:25 | **silent** 280:25 | **size** 6:24 59:7 262:16 264:6 | **sohl** 2:16,19 4:6 8:22,22 12:7 14:4 17:1 18:17 19:15 |
| **sides** 108:12 | **similar** 22:10 77:16 109:19 119:7 136:18 137:1,4 162:3 162:7,16,23 163:4 238:7 240:10 285:4 | **sizes** 272:9 | 23:4 25:15 |
| **sign** 150:1 283:13 318:12 | | **skills** 113:3 | 27:1,11,20 28:12,15 32:8 |
| **signal** 210:12 274:18 | | **skim** 214:14 | 35:9,25 36:14 36:19 41:5 |
| **signaling** 274:16 | **similarly** 21:3 110:10 118:23 134:23 183:24 225:10 | **skip** 112:5 | 43:22 49:4 |
| **signature** 316:8 317:21 | | **skipped** 42:22 179:7,12 | 51:4 52:12 54:21 55:10 |
| **signed** 12:3 318:20 | | **sleep** 74:14 | 57:22 59:15 |
| **significance** 127:18 128:2 128:11,25 129:9 267:23 269:7,20 270:19 271:10 271:22 | **simmons** 1:25 2:7 8:16 317:5 317:22 | **slow** 19:23 | 60:9,18 61:4 62:11,16 64:15 |
| | | **slowly** 290:5 | 65:6 66:1,4,11 |
| | **simply** 88:17 117:18 | **small** 167:1 174:1 264:6 | 66:17 67:1,12 74:7 78:1 |
| | **single** 33:17 34:7,21 121:8 136:4 163:25 168:5 170:2 175:7 272:12 | **smaller** 262:16 262:16,16 263:24,24 | 79:18 80:16 81:3 82:9,20 |
| **significant** 186:8 189:12 193:6 202:4 210:15 212:12 262:4,18 263:15,16,22 268:9 271:6 | | **soc8** 100:11 | 83:6 84:5,11 85:20 86:18 |
| | | **social** 45:19 72:16 73:4 90:24 120:4 163:14 164:3,7 164:10,11,15 164:17 166:24 167:5 193:13 205:18 206:1 206:18,20,23 208:2,4 231:5 246:22 257:6 306:8 311:11 | 87:24 92:5,19 93:18 97:7 99:11,25 |
| | **sit** 16:23 17:13 217:16,22 220:3 | | 100:21 101:4 101:12 102:6 102:15 103:25 |
| | **sitting** 105:6 | | 106:3,25 |
| | **situation** 51:20 64:17 88:20 111:12 252:20 281:15 283:7 | | 109:13,25 |
| **significantly** 169:1 | | **socially** 174:4 | 110:25 111:17 |
| **silence** 280:5 281:22 | | **socialstyrelsen** 6:13 | 113:16 114:19 116:5 118:15 |
| **silenced** 277:20 | **six** 189:2,10 228:13 252:18 | **societal** 148:10 161:10 260:8 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[sohl - sorry]**

| | | | |
|---|---|---|---|
| 121:13 122:2 | 191:13 194:4 | 281:10 282:19 | **somewhat**   96:3 |
| 123:14,19 | 194:12 197:4 | 283:4,20,25 | 105:19 119:20 |
| 124:11,20,22 | 197:11,21 | 284:8 286:14 | 195:9 204:5 |
| 125:7 128:4 | 198:6,16 199:1 | 286:23 287:19 | 206:22 219:25 |
| 129:10 130:21 | 199:12 200:13 | 288:5 290:3,9 | 222:2 223:6,15 |
| 131:3 133:14 | 201:3,14 | 290:20 292:9 | 243:15 302:4 |
| 133:24 134:22 | 202:22 208:19 | 293:22 296:9 | **soon**   97:17 |
| 136:20 137:12 | 208:22,25 | 298:8,18 | 258:5 |
| 138:4 139:4,9 | 209:15 211:1 | 299:11 304:14 | **sophisticated** |
| 141:8,13 | 212:2,24 213:8 | 305:8,16 | 47:1 |
| 142:25 144:2 | 213:22 215:9 | 307:12 308:8 | **sorry**   12:8 |
| 144:21,25 | 219:22 220:13 | 308:23 310:3 | 19:20 20:3 |
| 145:10,18 | 222:7 223:1,18 | 310:24 313:5,9 | 23:25 28:8 |
| 146:14,17,23 | 223:23 224:11 | 313:17,19 | 40:18 43:17 |
| 148:15 151:20 | 228:5 229:20 | 314:24 | 47:7,22,22 |
| 152:21 154:18 | 230:11 232:2 | **solutions** | 60:20 64:4 |
| 155:13,15,20 | 233:9 234:10 | 318:23 | 66:2 68:4 |
| 156:11 160:23 | 236:2,12,16 | **somebody** | 70:14 84:12 |
| 163:15 164:13 | 237:24 238:16 | 97:16 109:17 | 88:10,12 93:4 |
| 165:2,9,12 | 239:1 240:4 | 111:9 113:19 | 95:4,6,8 |
| 167:12,20 | 241:19 242:20 | 153:22 172:23 | 107:20 112:9 |
| 168:16 169:3,8 | 245:25 246:7 | 194:7 272:1 | 112:16 118:11 |
| 169:13,21 | 246:18 249:6 | 276:14 282:6 | 135:3 136:11 |
| 170:11,23 | 249:23 250:8 | 287:1 288:10 | 146:1,19 |
| 172:1 173:5,9 | 251:7 252:1 | 290:15 293:19 | 152:10 155:14 |
| 173:20 174:19 | 253:2 254:13 | 294:2,3,6 | 155:15 156:15 |
| 175:3,17,22 | 255:3,14 256:6 | 295:14,15 | 156:17 160:25 |
| 176:19 177:5,9 | 256:14,20 | 308:5,6 310:8 | 161:5,15 165:2 |
| 181:2,10,23 | 258:13 263:19 | 311:5 | 165:6,16 |
| 182:14,24 | 265:14 266:4 | **somebody's** | 166:17 167:10 |
| 183:4,19 | 266:12,17,22 | 171:13 | 168:6 175:14 |
| 185:12 186:12 | 272:18 274:1 | **someone's** | 177:23,25 |
| 186:20 187:10 | 275:2 276:8,16 | 78:20 101:20 | 187:11 189:8 |
| 188:22 190:5 | 278:7,18 | 112:11,19 | 199:7 208:21 |
| 190:18 191:3 | 279:10 280:2 | 141:15 176:4 | 218:23 225:19 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[sorry - starting]**

227:1 236:22
237:19 239:5
244:23 256:17
272:19 277:2
290:4 302:23
304:10,21
310:15,17
315:7
**sort** 73:22
156:9 159:7
271:8 287:5
307:21
**sorts** 294:11
**sound** 10:22
52:10
**sounds** 52:12
99:25 102:12
139:10 191:13
308:12 315:17
**space** 150:13
**spaces** 275:10
275:19
**spatial** 195:24
210:2
**speak** 69:24
253:7 278:19
280:6
**speaking** 27:16
54:19 105:9
123:8 278:4
**special** 94:17
120:5
**specialty** 121:4
**specific** 15:15
15:16 16:24

17:3,5,14
18:19,24 25:18
25:23 31:19
34:25 35:14
36:9 40:15
41:12 48:21
57:11,12 64:2
71:12 94:15
109:21 111:22
123:9 124:3
128:6 181:4
198:10 199:18
200:18 204:7
210:14 212:13
212:25 215:3
221:16 256:22
264:2 275:9,16
276:11,20
277:11 279:13
285:3,12
287:22 288:13
288:16 302:5
306:8
**specifically**
44:12 46:1
52:24 67:18
68:10 70:1,10
74:2 94:7
131:11 143:15
194:21 207:6
207:21 208:15
248:14 275:3
286:25 291:23
307:20

**specifics**
272:11 277:5
**specified** 40:8
73:3 121:23
**specifying**
25:23
**spectrum** 97:14
97:18,24
105:10 108:25
285:10
**speculation**
106:4 111:1
122:3 144:3,22
145:11,19
172:2 191:4
305:17 307:13
**speech** 277:20
**spends** 194:7
282:6
**spironolactone**
130:11
**spoke** 68:13
**spoken** 69:22
71:10 257:14
276:23
**sports** 77:11
**spread** 285:20
286:11 287:9
288:17
**spreading**
286:17 288:10
**square** 64:17
65:7 169:23
**stability** 248:22

**stabilized**
97:22
**stable** 80:21
**stage** 97:2
129:24 247:11
**stakes** 283:16
**stamped**
103:20
**stand** 280:25
**standard** 98:25
128:10 233:5
233:24 287:3
**standardized**
57:13,24 58:11
**standards**
30:11 83:23
123:23
**stanford** 21:4
69:21 71:12
**start** 48:3
51:21 77:12
97:19 102:8
104:6 112:9
116:22 148:3
161:20 212:7
248:6 263:15
263:23 294:6
311:14
**started** 124:24
127:14 232:15
244:3,8
**starting** 47:23
49:22 53:2
113:20 119:7
168:13 211:12

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

[starts - strong]

starts 61:6 84:6
203:14 204:11
227:13
state 1:11 2:9
8:18,21 9:13
9:17 10:6
76:22 251:4
277:7 317:2,6
state's 71:18
184:15
statement 22:9
86:22 88:18
94:3 95:7,11
100:13 117:13
133:9 237:3
272:12 275:15
278:2 279:5,9
statements
25:6 84:18
151:15 203:23
265:5,8
states 1:1 7:4
8:11 59:11
82:21 106:22
111:10 126:13
127:7,17
171:11 238:24
239:20 240:3
242:12,24
251:21 264:13
265:4
statistical 26:5
31:9,16 45:12
45:14 46:19
127:16,18

128:2,7,11,24
129:8 163:5,7
170:2 186:3
189:13 222:21
263:25 267:22
268:15,16
269:7,8,19
270:19 271:9
271:15,21
272:9
statistically
189:11 262:4
262:18 263:15
263:16,22
271:6
statistician
169:22 171:4
statistics 46:14
46:17 169:16
169:20
status 86:10
192:22
stay 176:11
staying 247:1
269:22
steadfast
277:23 278:6
279:7,8
steady 298:4
step 114:1
166:18 248:4
303:7
stepping 171:8
steps 40:4

stereotypical
96:10
stick 84:9
146:15 191:22
196:15 218:2
sticking 41:15
44:9 47:4
107:12 125:17
129:15 131:25
164:25 168:8
stifled 104:20
stigma 108:17
108:24 307:22
308:16 309:2
311:3,6
stigmas 260:9
312:24
stigmatic 309:6
stigmatize
108:20,21,23
stigmatized
173:23
stigmatizing
109:21
stipulations
8:19
stone 2:21 9:2
stood 277:10
stop 51:23
143:25 144:9
144:19 145:8
145:24 212:5
278:3 294:3
295:2 302:6

stopped 294:15
294:19 303:23
306:5
story 262:23
straight 22:5
straightforward
14:14 197:6
strange 237:25
239:18
stream 298:4
streamlined
122:10,20
street 2:17,22
strength 39:23
40:6
strengths 18:11
38:4 49:14
146:25 221:6
221:10 261:6
stress 77:5
142:23 143:5
206:11 260:8
288:21,22,23
289:1,23
290:12 309:2,5
stretch 144:5
stricter 268:16
strictly 64:24
striking 170:19
stringent 242:7
271:22
strong 75:3,19
78:10 80:19
89:23 130:6
286:16

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[stronger - subjective]**

| | | | |
|---|---|---|---|
| **stronger** | 66:24 67:6,20 | 49:9,14,19,25 | 220:17,17,22 |
| 273:14 | 75:15,21 127:3 | 50:6 60:17 | 221:2 222:5,16 |
| **strongest**  75:16 | 135:24,25 | 61:1,10,16 | 225:5,23,24,24 |
| **strongly**  45:3 | 136:5 157:12 | 62:7 125:20,22 | 226:4,20,24 |
| **struck**  170:18 | 180:3,15 | 126:7 128:15 | 227:3,7 228:24 |
| **structure** | 184:17 185:14 | 133:5 134:10 | 235:4,5,7,8,10 |
| 203:18 204:3 | 185:16 186:1 | 136:2 150:22 | 235:14 243:22 |
| **struggling** | 187:2,6 193:25 | 151:12 152:23 | 244:1,7 251:16 |
| 19:25 261:17 | 194:8 196:3 | 153:15 154:25 | 251:18 259:8 |
| **studied**  81:17 | 200:3,10,22 | 157:16 159:15 | 259:13,15,23 |
| 209:17 | 201:5 205:1,12 | 166:3,5,10 | 260:11,22,25 |
| **studies**  13:23 | 207:2 214:23 | 167:2 168:4 | 261:5,10,11,12 |
| 14:12,13 18:12 | 215:6,11,13,19 | 172:8,20 | 261:21 262:2,3 |
| 22:4,13,14,20 | 216:11,14,18 | 175:24 178:14 | 262:12 263:8 |
| 22:24 23:3,9 | 221:4,5,9,9 | 178:16 181:1 | 263:12,18 |
| 23:12,15,17,19 | 223:17 225:8 | 183:20,24 | 291:23 293:13 |
| 23:22 24:7,11 | 225:10,14,18 | 184:3,23,23,24 | 297:10,18 |
| 24:12,13,15 | 227:13,16,19 | 186:2,6,8,23 | 300:12,19 |
| 25:10 26:10,16 | 228:22 229:3 | 187:15,15,17 | 301:11 303:9 |
| 26:23,24 27:7 | 231:19 234:3 | 188:14,18,24 | 303:16 304:1 |
| 30:21 31:8,25 | 234:25 235:11 | 189:16,17,22 | 304:12,22,24 |
| 32:3,7,17,19,19 | 243:21 246:1 | 190:1,6,7,10,10 | 305:6,10,14,20 |
| 33:9 35:3,6,8 | 250:15 251:14 | 190:16 191:1 | 305:22,23 |
| 35:15,21,24 | 257:23 258:7 | 192:17 193:24 | 306:7,14 |
| 36:3 40:13 | 259:6 261:7 | 200:19 201:16 | 307:10,20,21 |
| 42:4,6,19 43:5 | **study**  18:16 | 202:3 206:15 | 314:12,22 |
| 43:13 44:4 | 23:11 31:2 | 207:7,13,19,22 | **subgroups** |
| 45:17 47:14,20 | 33:1,3,25 34:1 | 208:6,11 | 262:15 263:24 |
| 48:4,7,8,13,14 | 34:4,9,13,14,16 | 209:23 211:22 | 264:2 |
| 49:1,21 52:2 | 34:23 35:1,12 | 212:13 215:22 | **subheader** |
| 54:5,13 55:4 | 36:5,6,11,12,20 | 215:25 216:3,4 | 258:25 |
| 56:24 57:16,21 | 36:21 37:13,19 | 216:8,19 217:2 | **subject**  292:23 |
| 58:1,4,9,12,19 | 37:22,24 38:6 | 217:10 218:7,8 | **subjective** |
| 58:23,25 61:9 | 38:10 40:8 | 218:15,25 | 25:19 214:23 |
| 62:5,9 65:18 | 45:17 48:18 | 219:2,8 220:12 | 220:1 223:6,15 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[subjective - sure]**

223:16,24
224:1 232:17
**subjectivity**
39:15 224:5
**subjects** 260:24
**submit** 287:2
**submitted** 11:8
68:23 69:17
215:24 297:11
298:17
**subquestions**
197:14,17,24
**subscribed**
320:14
**subsequent**
214:21
**subsequently**
78:22 81:10
296:6 300:21
303:18
**substantial**
129:6 153:7
154:23 178:17
291:9
**substantially**
311:10
**sudden** 160:4
**sufficient** 218:1
294:13
**suggest** 163:12
187:6 192:19
**suggested**
181:5
**suggesting**
147:5 179:17

182:5 189:6
243:18 306:20
**suggestions**
171:12
**suggests** 204:15
278:22 279:1
**suicidal** 97:4,8
97:11,15 98:11
98:15,16 99:1
99:2,4,8,13
125:3 135:17
267:18 270:8
270:16
**suicidality** 98:1
98:2,21
**suicide** 5:10
178:20 235:19
235:20 270:24
**suite** 2:22
**summaries**
24:24,25 26:21
**summarize**
13:24 14:25
15:17 26:8
31:17 55:22
**summarized**
31:24
**summarizes**
27:5
**summarizing**
32:13 39:2
47:2 50:22
**summary** 42:24
45:13 46:14
50:20 51:18

58:20
**supervised**
99:15
**supervisor**
69:20
**support** 6:24
56:11 63:14
105:11 113:24
168:1 184:10
276:14
**supported**
90:12
**supporters**
278:16
**supporting**
69:11 90:11
220:6
**suppose** 44:1
156:12
**supposed**
206:12 223:4
280:13 287:2
**suppress** 130:6
130:13,14
**suppressed**
203:1
**suppressing**
195:2,7 202:17
247:10 250:24
**suppression**
5:21 98:9
101:23 113:20
113:22 114:2
125:2 126:12
126:16 127:6

129:22 130:4
130:18,23
131:14 133:19
134:2,17
135:22 137:8
188:25 189:14
190:9 192:16
193:2 196:24
198:14 201:12
201:25 203:16
204:19 205:2
206:16 207:8
207:16,20
208:7 211:6
212:4,6 214:5
217:4,6 243:23
244:3,9 248:6
254:9,11 255:8
261:1 262:6
**suppressions**
192:4
**sure** 15:7 24:14
60:20 67:17
68:2,21 88:14
90:8,11 91:10
91:15 96:8
97:21 99:15
101:20 102:11
106:13 116:25
117:17 134:5
138:23 142:19
150:1 161:1
176:20,22
193:3 212:16
217:13,24

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[sure - take]**

229:25 233:23
244:1 250:14
251:11 254:18
260:1 261:23
282:9 283:9
287:4 304:19
310:11
**surgeon** 257:4
**surgery** 217:7
248:9 306:24
**surges** 209:9
**surgical** 85:2
92:9 237:6
**surprise** 220:5
**surprised**
250:12
**surveillance**
201:21 210:12
**survey** 5:5
125:16 126:18
126:24 131:7,9
135:13 137:1
143:11,14
146:18 153:14
153:25 155:2
155:12 159:15
160:11 162:7
164:20,23
165:21 175:5,7
221:21 290:25
300:13 301:15
301:16,19,19
304:5
**surveyed**
300:18

**surveys** 162:9
**suspicion** 96:23
**sustained** 87:9
88:8 100:15
**swear** 9:5
**sweden's**
238:23
**swedish** 230:17
231:3,9 234:24
249:3
**switching**
176:10
**sworn** 9:20
317:9 320:14
**symbol** 275:10
275:18
**symbols** 275:13
276:3
**symptoms**
74:11,12
112:14 206:13
**synonymous**
156:13
**synthesis** 57:10
58:17,21
**system** 28:11
220:6 223:9
224:8
**systematic** 4:20
6:5 13:8,12
14:3,5,6,8,11
14:14,18,20
15:2,5,9,25
16:6,9,10,11,18
16:24 17:4,14

17:21,22 18:10
18:15,21,23
22:5,13,16,25
23:16,23 24:8
24:14,24 26:9
26:11,12,16
27:3,7 30:24
31:4,12,18,20
32:5,11,12
38:8,23 40:21
40:24 41:3,4,8
41:24 42:4,17
42:18,20 43:1
43:3,6,11,12,21
43:24 44:2,3,6
44:13,18,21
45:1,5,23
46:22 49:11
50:19 51:2,16
51:24 52:3,6
53:4,15,22,23
54:3,6,14,16,17
54:23 55:2,5,8
55:13,17,18,24
56:12,18,19,20
56:21,24,25
57:2,6,9,13,24
58:5,6,11
59:12,17,20,22
60:4 61:6,12
61:15 62:4,9
63:2,22 64:7
64:14,18,21,23
65:2,4,10 66:8
66:9,15,16,22

67:2,5,10,11,15
67:20 214:8,19
215:13 224:22
226:4 231:1,9
232:17 235:17
**systematically**
62:15

---

**t**

**t** 4:2,10 5:1 6:1
7:1 170:25
319:3,3
**tab** 11:3
**table** 138:17
165:1,11 168:9
170:3,18 171:8
215:19 216:2
218:7,12,25
225:18 266:3,9
266:10 267:14
313:21,24
315:5
**tables** 41:12
46:14 226:10
**take** 25:13
28:21 31:7
50:10 88:4
98:25 99:24
122:23 138:18
152:25 164:23
186:2 191:12
211:17 228:1
233:21 236:1
239:25 261:5
266:20 275:21
276:1 279:3

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[take - test]**

285:21 295:20
307:1
**takeaways**
29:17
**taken**   2:4 4:14
4:16 8:9 19:11
52:18 100:5
132:19 135:13
139:14 191:17
236:5 240:22
267:2 299:15
317:11
**takes**   39:24
91:20 125:22
268:13 285:12
**talk**   10:11
17:11 23:8
49:7 54:8
91:10,12 144:7
150:8
**talked**   20:18
70:1,17 76:24
96:12,20
253:16 292:10
**talking**   14:11
96:7 97:19
108:2 109:5
112:21 119:3
119:21 122:22
123:2,9 128:5
158:24 181:18
195:10 212:23
224:1 239:17
290:4 300:10
313:11,20

314:5
**tando**   117:22
**tanner**   97:2
129:24 247:11
**teachers**   91:3
**teaching**   33:14
51:8
**team**   16:9,20
250:3
**teams**   77:11
**tease**   191:9
**teased**   52:4,5
**technical**   27:19
212:16
**technicality**
114:10
**technically**
86:5 271:11
**techniques**
31:16 208:3
281:21
**technologic**
45:20
**technology**
231:4
**telephone**   2:18
2:23 3:4,10,14
**tell**   9:20 33:18
37:9,24 38:9
44:25 60:2
65:15,15,16,17
65:20,21 69:12
103:17 106:1
118:13 125:21
129:3 137:16

139:23 145:9
145:14,25
146:2,3,4,8
153:11 157:21
175:10 198:13
228:17 239:8
264:6 271:6
278:21 292:20
303:10,10
**telling**   65:13
80:11 153:22
159:22 161:1
171:14,22
275:13
**tells**   31:10
36:21 38:2
62:7 65:19
118:5 137:17
137:20,22
144:14
**temporarily**
304:3
**temporary**
291:13
**tend**   154:2
273:6 312:16
**tends**   152:19
154:14
**term**   12:13,16
12:17 13:7,11
25:19 28:6
30:15,19 54:22
55:18,23 59:17
60:4,7 65:12
65:15,19 67:19

73:2 99:3,5
109:21,24
129:5,12
141:19,22
143:19 157:14
173:2 199:5
203:19 204:4,6
207:24,25
212:14,16
219:19 220:9
223:25 227:21
271:13 291:24
302:3
**terminology**
232:19 233:10
271:9,15
284:23
**terms**   13:13,19
13:20 14:21,23
15:15 16:2,21
18:24 26:14
53:6,17,24
54:10,24 55:9
55:14,21,21
56:1,14 59:13
59:19 64:9,25
65:3,5,12,20
74:24 89:1
93:24 114:20
119:19 123:9
148:3 193:16
214:21 273:7
295:6 307:8
**test**   170:2
196:13

**[testa - think]**

| | | | |
|---|---|---|---|
| **testa** 289:24 | **theme** 96:6 | 190:12,23 | **think** 9:6 11:3 |
| **testified** 9:21 | 238:22 | 235:19 247:12 | 16:16 18:6 |
| 265:11 | **themes** 247:25 | 250:25 | 19:7 20:6,9 |
| **testify** 317:9 | **theoretical** | **thing** 18:20,23 | 21:21 22:10 |
| **testimony** 27:2 | 101:17 129:2 | 73:15 77:4 | 23:16,21 24:5 |
| 32:9 55:11 | 190:7 | 105:5 114:12 | 24:5,10,18 |
| 66:18 67:13 | **theoretically** | 114:16 120:2 | 25:7,23 30:1 |
| 78:2 80:17 | 109:9 110:21 | 153:5 156:21 | 30:25 31:3 |
| 113:17 181:11 | 129:3 229:25 | 184:14 195:10 | 32:4 34:2,5,6 |
| 198:7 199:13 | 272:21 | 198:25 203:5 | 36:2 37:17,18 |
| 210:10 238:17 | **theory** 35:1,3 | 213:13 219:23 | 38:17 39:19 |
| 240:5 245:23 | 35:17 187:14 | 220:2 221:1 | 41:7,8 45:3 |
| 253:3 254:14 | 288:22 | 262:12 287:5 | 46:12,22 47:5 |
| 276:17 279:11 | **therapies** 6:11 | **things** 33:25 | 48:16,19 49:17 |
| 286:15 287:20 | 255:17 | 51:15 53:21 | 50:4 51:5,9,22 |
| 296:10 318:9 | **therapist** | 54:1 56:18 | 52:9 54:3,12 |
| 318:18 320:8 | 118:22 120:17 | 57:25 65:14 | 56:23 60:6 |
| **testosterone** | **therapist's** | 73:19 74:14 | 62:12 63:12 |
| 32:24 33:6 | 105:1 | 91:5 93:2 | 64:16,17,19 |
| 130:7,14,24 | **therapy** 5:12 | 98:22 103:13 | 66:19 67:4,8 |
| 195:25 203:2,4 | 106:12 115:4 | 104:23 115:6 | 67:14,19 69:9 |
| 203:9 211:19 | 117:8 132:18 | 115:15 162:17 | 70:6,8,16,23 |
| 272:6,16 | 132:23 133:12 | 176:6 182:19 | 71:19,19 75:5 |
| 273:13,19 | 140:7,19 141:7 | 183:10 188:6 | 75:15 76:9 |
| 294:12 295:10 | 141:19 142:3,5 | 191:8 194:8 | 77:16,18 78:3 |
| **tests** 170:25 | 142:11,13,17 | 195:22 199:6 | 79:2,12 80:3 |
| **text** 66:23 67:6 | 142:23 143:4,9 | 199:11 223:9 | 80:22 81:22 |
| 72:12 88:11 | 143:18 147:4,4 | 233:21 246:24 | 82:5,14 86:3 |
| **textbook** 44:25 | 148:8,20 | 262:20,23 | 86:21,23,24 |
| 51:7,7 | 180:13 182:10 | 268:13 270:4 | 87:25 88:6 |
| **tgd** 155:6 161:7 | 182:19 183:23 | 272:23 273:4 | 89:8,21 91:24 |
| 300:19,21 | 184:19,20,25 | 285:17 288:17 | 92:1,2 93:6,8 |
| **thank** 9:12 20:5 | 185:7 189:2,3 | 289:9,13 | 93:20,21 95:6 |
| 313:3,4 315:22 | 189:4,5,10,10 | 291:19 309:19 | 95:17 99:21 |
| | 189:14 190:8 | 311:23 313:2 | 101:7 103:4,6 |

Page 82

**[think - time]**

| | | | |
|---|---|---|---|
| 103:22 105:3,4 | 181:12 187:6 | 279:25 280:3 | 90:21 104:12 |
| 105:5,15,19,23 | 188:18 190:20 | 281:8,16,18,24 | 113:8 145:7,22 |
| 106:5,15,19 | 190:21 191:10 | 282:3,10,17,21 | 145:23 146:5 |
| 108:15,17 | 192:20 195:10 | 282:23 283:2 | 162:2,10,20 |
| 109:12,14 | 196:1,5,8 | 283:13,18,22 | 197:16 212:21 |
| 110:11,14,17 | 197:5,9,12 | 284:2,5,10,11 | 214:24 215:6 |
| 110:22 111:14 | 198:8 199:2,7 | 285:23 286:9 | 239:16 245:7 |
| 114:4 118:17 | 199:8,14 | 286:21,24 | 264:19 265:7 |
| 118:18 119:7 | 201:17 202:24 | 288:16,18,19 | 271:13 287:23 |
| 119:18 122:4,9 | 209:19 214:17 | 290:14 296:11 | **thoughtful** |
| 123:22 127:4 | 216:18,22 | 298:19 299:5 | 238:19 240:12 |
| 133:17 134:1 | 217:1,2,4,21 | 300:15 302:25 | **thoughts**  94:22 |
| 137:15 138:22 | 219:15 220:15 | 303:2,3,8,17 | 99:1 164:1 |
| 139:4 140:4 | 223:16 225:7 | 304:15,17 | **three**  127:16 |
| 142:18 143:23 | 225:11 229:2 | 305:6,23 | 180:15 240:25 |
| 144:4,9,17 | 230:16,17 | 307:18 308:1 | **threshold** |
| 145:2,6,9,14,15 | 233:14,20 | 309:12,23 | 127:18 128:11 |
| 146:10,16 | 235:23,24 | 311:4,11 | 128:24 129:8 |
| 147:9 150:19 | 238:13,18,21 | 312:12,17,20 | 267:23 268:20 |
| 152:24 153:4,5 | 240:1,9 241:21 | 312:21,21 | 269:1,2,7,15,19 |
| 153:6 154:23 | 242:21 243:15 | 313:5 314:4,10 | **thresholds** |
| 155:22,23 | 244:12 245:16 | 315:23 | 128:7 |
| 157:11 159:6,8 | 246:3 248:12 | **thinking**  9:13 | **tie**  175:8 |
| 159:9,12 160:2 | 249:4 251:9 | 76:11 79:20 | **till**  6:8 |
| 161:21 162:11 | 252:10 253:5,9 | 85:15 94:17 | **time**  2:11 8:5 |
| 163:3 164:2,2 | 253:18 254:3 | 96:3,24 193:10 | 19:21 27:21,22 |
| 164:4,11,14 | 254:10 259:13 | **third**  21:8 | 27:25,25 28:23 |
| 166:16 171:9 | 260:2 261:8 | 107:18 118:3 | 29:2 32:21 |
| 171:16 172:3 | 262:9,14,21,23 | 126:8 147:1 | 37:2,10 52:15 |
| 172:13,16 | 263:1 265:1,17 | 157:24 177:21 | 52:16,20 63:18 |
| 173:21 174:5 | 272:1,14 | 216:6 227:12 | 75:1,10,12,13 |
| 175:4,19 | 274:24 275:24 | 235:10 | 75:24 76:1,2 |
| 176:22,25 | 276:2,6,13,18 | **thorough**  59:24 | 79:6 80:1,8,13 |
| 177:21,24 | 276:20,25 | **thought**  29:15 | 80:14,21 81:2 |
| 178:7 180:2,7 | 278:5,8,16 | 47:22 88:10 | 81:7,20 83:9 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[time - trans]**

| | | | |
|---|---|---|---|
| 87:10 88:8 | 294:18 297:21 | 294:17 299:8 | **tracked**   180:19 |
| 92:14 100:2,3 | 298:1 299:3,13 | **tool**   33:14 | 182:4 |
| 100:7,16 103:7 | 299:14,17,17 | 220:11 | **traditional** |
| 103:20 126:17 | 316:3,4 317:12 | **tools**   221:13,15 | 41:25 42:9 |
| 126:24 127:11 | 318:19 | **top**   29:7 30:24 | **trained**   119:25 |
| 135:2,7,11 | **timeframe** | 32:6,11 102:24 | **training**   13:2 |
| 136:4 139:7,11 | 318:8 | 104:2 118:2 | 120:5 121:2,17 |
| 139:12,16,16 | **times**   23:10 | 129:16 139:8 | 121:19 |
| 148:25 149:19 | 80:24 87:21 | 148:24 218:4 | **trajectories** |
| 149:20,22 | 288:20 | 231:12 269:13 | 204:22 |
| 152:5,6,12,18 | **tiny**   19:23 | 297:23 314:13 | **trans**   6:15 |
| 153:11 154:4 | **title**   17:3 18:1 | **topic**   50:20 | 75:20 77:8,9 |
| 154:14,23 | 255:16 258:24 | 51:3,10,11 | 77:10,13 81:18 |
| 158:3,24 | **titled**   138:8 | **tordoff**   183:24 | 96:11 104:9,15 |
| 159:15,24 | 313:13 | 184:23 | 108:15 117:24 |
| 165:20 169:12 | **titles**   17:17 | **total**   166:3 | 118:6,14 144:1 |
| 170:7 171:4 | **today**   9:11 | 314:21 315:19 | 144:10,20 |
| 172:20 174:8 | 16:23 17:13 | **totally**   184:6 | 145:8,24 |
| 175:2,11 | 53:13 201:10 | **toward**   53:1 | 146:18 148:6 |
| 177:15 178:8 | 258:20 262:11 | 117:12 129:12 | 153:7,19 |
| 180:14 183:23 | 263:2,5 267:11 | 148:24 225:17 | 154:10 156:5 |
| 188:10 189:23 | 288:20 | 226:19 227:6 | 156:25 157:19 |
| 191:15,16,19 | **today's**   8:4 | 302:17 | 161:21 162:12 |
| 191:19 201:10 | **together**   31:11 | **towards**   97:20 | 162:19,20 |
| 203:1 206:18 | 31:24 46:20 | 98:8 149:10 | 172:5 173:22 |
| 211:17 221:20 | 91:15 303:2 | 151:7 271:9 | 173:23,24 |
| 225:6 228:15 | **told**   76:19 77:9 | 286:17 287:22 | 205:20 242:13 |
| 232:8,15,23 | 80:10 120:9 | 308:16 312:13 | 277:24 278:6 |
| 236:3,4,7,7 | 175:12,16 | 312:17 | 278:17 279:9 |
| 237:1 248:13 | 176:1 | **tower**   196:13 | 279:15 284:22 |
| 248:22 263:4 | **ton**   163:2 | **track**   63:18 | 285:2 289:22 |
| 264:19 265:1 | 169:24 272:13 | 138:25 165:7 | 291:10,14 |
| 266:25 267:1,4 | 311:22 | 173:13,14 | 304:2 307:22 |
| 282:6 286:9 | **took**   195:24 | 188:8 | 308:13,16,17 |
| 289:11 292:3 | 210:14 294:12 | | 309:16,17,18 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[trans - trust]**

309:21,23,24
310:9,10,20,21
310:22 311:6,9
312:7,13,18,25
**transcript** 4:14
4:24 11:21
102:20 317:14
318:6,20 320:5
320:8
**transgender**
4:22 5:4,7,11
5:12,15,18,19
5:21 6:18 7:3
17:19 18:2
72:7,21 76:20
81:10,13 125:3
125:16 126:12
136:17 137:1
138:11 142:5
142:10,11
143:11 148:20
152:8 154:6
155:2 160:11
160:21 164:20
171:10,19
172:18,21,25
173:18 174:16
176:9 196:24
198:14 244:6
261:2 265:25
277:23 285:14
290:8,15,17,24
292:19,25
293:19,20
300:13 301:15

303:19 305:7
313:15
**transition**
302:19 306:4
308:6,15
310:10
**transitioned**
291:12 303:11
**transitioners**
262:5,9 263:17
**translate**
200:16 201:6
**translation**
234:19 244:14
**transmasculine**
81:15
**transphobia**
147:3 148:1,2
148:12
**trauma** 77:10
94:21 112:13
120:13
**treat** 51:11,13
98:23 99:6
115:2 126:25
222:24 252:5,7
254:20
**treated** 32:23
250:12
**treating** 91:3
99:9 116:3,3,6
202:12
**treatment** 6:6
17:9 33:10,20
33:21 37:5

38:1 40:3 82:6
83:2,4,10 85:2
85:12 86:14
87:22,23 88:23
89:3,12,13,14
89:16,24 92:17
97:6 100:20
101:3 112:10
112:12,19,22
113:13,22
114:1,13,17
115:17,25
120:1 129:20
130:20 136:2,3
145:4 179:5
181:20 206:19
227:18 228:13
228:14,15
231:16,25
233:2,4,13,21
237:6,13,21
238:24 239:14
243:3,5,9
247:3,10 248:2
248:3 249:20
253:19,21
256:25 260:15
264:3,4
**treatments**
85:17 87:16
90:9 144:8,13
224:19 228:25
229:14,23
233:15 237:15
237:23 239:15

240:24 260:7
260:19
**trend** 129:12
**trending** 271:9
**trial** 33:15,17
33:24 34:3,8
34:21 35:13,21
36:5 37:3,12
38:2 254:18
**trials** 14:12
32:18 35:5,7
35:23 38:3
49:16 220:7
223:10 254:12
**trick** 158:22
**tricky** 24:4
119:18
**tried** 27:9 28:2
163:2
**trouble** 289:19
308:14
**true** 25:12
49:15 92:23
112:18 145:16
205:7 209:19
217:13 221:9
229:2 265:16
282:18 283:3
285:19 288:18
315:12 317:14
320:8
**truly** 206:5,9
**trust** 103:12
176:18,21

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[truth - u.s.]**

**truth** 9:20,21
9:21 317:10,10
317:10
**try** 10:11 13:5
18:3 20:8
28:19 45:14
90:21 106:12
112:24 113:1
122:17 142:3,5
148:8 162:9
167:15 191:8
232:6,14 256:4
268:6 281:25
305:4 311:24
**trying** 20:3
105:7 115:5
125:19 129:13
143:25 144:9
144:19 145:3,8
145:24 146:5
170:16 172:19
174:10 181:14
266:7 275:17
275:20 279:17
281:17 290:21
299:21 310:7
314:10
**turban** 1:19 2:1
2:4 4:4,13,14
6:15,20,21,22
6:23 8:8 9:19
10:3 11:2,7,20
12:1,6,12
19:20 21:6
27:10,14 28:6

29:5,6 38:13
52:22,23 56:4
57:4 63:13
65:23 67:25
71:6 72:6
83:18,19 100:9
100:10 102:4,4
102:9 124:18
125:1 131:1,6
135:5 136:7
139:19,20
146:12,20
148:13,18
149:5,8,13,15
150:11 151:19
151:23 156:15
160:9 165:5,8
177:4,12
191:21 194:10
194:15 208:13
213:20,24
216:7 224:9,13
230:9,14 234:9
234:12 235:16
236:9,10,14,15
236:19 255:13
255:16,21
256:12 258:11
258:15 266:8
267:7,8 269:4
269:16 273:24
274:3,7 277:12
280:16 284:14
296:16 299:19
299:22 313:10

316:3 318:5
319:2,24 320:2
320:4,12
**turban's**
146:20
**turn** 20:4 102:3
151:18 177:20
224:9 313:2
**turnover** 298:6
**tweet** 6:20,21
6:22,23 274:12
275:1,3 277:2
279:5,6,14
281:3,15
282:14 285:4
285:25
**twin** 75:15
**twitter** 274:5
**two** 15:11
22:12 24:21
33:17 37:4
40:4 47:17
48:1 57:7 59:6
67:9 71:23
72:18 74:10
80:8 89:9
93:23 102:2
107:14 125:22
126:4 129:17
134:4 135:24
152:5,17,18
168:9 178:12
178:20 179:1
191:9 196:3,19
204:12 205:8

206:17 227:1
231:2 313:24
314:20
**type** 48:21 54:7
99:19 123:12
124:7 189:25
220:23 221:16
222:8 309:19
**types** 15:8
45:18 48:20
61:18,19 62:3
73:19 115:15
135:24 148:7
220:18 221:13
**typewriting**
317:13
**typical** 90:20
110:6 160:5
176:7 305:15
**typically** 10:17
40:19 41:25
73:11 269:6

**u**

**u.k.** 29:21
213:15 214:3
224:17 253:22
254:5,11
**u.s.** 5:4 119:5
125:15 137:1
143:11 146:18
155:1 160:10
160:11 164:20
239:10 240:11
264:12 290:24
300:13 301:15

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[uc - unrepresentative]**

| | | | |
|---|---|---|---|
| **uc** 258:9 | **underlying** | **understandably** | **unhappy** 98:3 |
| **ucla** 289:2 | 160:25 | 225:13 | 145:13 |
| **ucsf** 258:10 | **undermine** | **understanding** | **union** 2:16 |
| **ugds** 188:2 | 152:19 154:2 | 12:15 13:10 | **unique** 120:2 |
| **ultimately** 30:2 | 154:14 | 19:21,25 23:19 | **united** 1:1 7:4 |
| 91:21 116:22 | **undermines** | 29:19 30:18 | 8:11 82:21 |
| 198:1 232:23 | 154:8,24 | 36:3 39:11 | 106:22 111:10 |
| **unable** 88:2 | **underpowered** | 42:16 57:19 | 126:13 127:7 |
| **unanswerable** | 216:21 262:17 | 58:15 60:14 | 238:24 239:20 |
| 195:14 197:10 | **understand** | 61:3 74:24 | 240:3 242:12 |
| **unanswered** | 10:14 24:1 | 75:24 78:6,13 | 251:20 |
| 178:15 181:17 | 68:2 79:23,24 | 78:23,25 79:6 | **universal** 276:1 |
| 182:1 | 82:10 90:25 | 79:8 80:9 | 312:20 |
| **unbiased** 42:12 | 91:1,2,13 | 89:24 90:18 | **universally** |
| 42:24 | 92:25 93:11 | 92:6 98:8 | 311:18 |
| **uncertainty** | 96:2 97:25 | 106:13,14 | **universe** 64:23 |
| 241:5,14 | 105:7,9 108:24 | 118:20 119:21 | **universities** |
| **unclear** 103:20 | 113:12 125:20 | 122:22 141:21 | 193:18 |
| 119:20 184:13 | 142:1,6 144:11 | 141:23 142:20 | **university** |
| 303:4 | 152:4 154:10 | 142:22 179:9 | 70:15 119:23 |
| **uncommon** | 154:12 155:25 | 244:24 250:11 | 120:18 127:4 |
| 156:5 157:20 | 156:16,25 | 253:23 254:6 | 257:21 |
| 228:7 | 157:4 172:19 | 254:25 293:11 | **university's** |
| **under** 57:8 | 173:1 182:20 | 293:15 308:14 | 119:6 |
| 81:25 82:8,16 | 198:4 199:8 | **understands** | **unknown** 209:5 |
| 110:20 125:18 | 207:24 214:7 | 78:13 292:13 | 209:14 |
| 149:20 155:4 | 223:19,21 | **understood** | **unknowns** |
| 161:4 194:21 | 224:21 230:3 | 133:22 195:3,8 | 89:13 233:17 |
| 230:25 237:5 | 231:8 232:22 | **underwent** | **unnecessary** |
| 249:20 297:1 | 246:20 252:20 | 262:6 | 67:10 |
| 317:13 | 253:11 267:14 | **unduly** 25:1 | **unpack** 263:12 |
| **undercuts** | 267:20 290:21 | **unethical** | **unrelated** |
| 156:8 | 294:23 304:19 | 150:25 | 94:21 |
| **undergraduate** | 305:12 | **unfortunately** | **unrepresentat...** |
| 19:17 20:14 | | 303:4 | 25:2 |

**[unsystematically - vast]**

| | | | |
|---|---|---|---|
| unsystematic... 62:19 | 303:16 305:6 307:10 | 55:23 77:23 109:20,23 | valuable 44:5 216:19,22 |
| untechnical 73:1 | used 15:15,16 16:2,4 40:16 | 123:12 128:18 130:13 153:24 | value 15:2 26:8 26:9 31:25 |
| untreated 101:10 | 40:19,21 53:6 53:17 54:24 | 163:20 168:3 182:16 185:4 | 32:1 43:15,20 127:19,23 |
| untrue 265:8 | 55:14 56:2,14 | 191:6 220:11 | 128:9,10,19,22 |
| unusual 228:11 228:12 | 59:13 64:9,24 65:12,21 78:4 | 268:20 269:15 295:6 303:6,15 | 129:1,7 138:2 268:22 271:4 |
| updated 259:5 | 89:3 120:14 | 305:5 307:9 | values 19:1 |
| upsetting 285:19 | 128:23 131:7 131:12 132:15 | usts 172:5 300:17 | 46:15 269:18 270:18 |
| upshot 155:11 | 134:15 136:25 | usually 14:10 | variable 180:3 |
| urologist 257:8 | 143:17 153:2 | 15:12 46:12 | 180:6,25 181:9 |
| use 13:13 14:16 | 155:1 159:15 | 50:2 75:17 | 181:22 182:13 |
| 14:22 26:14,14 | 160:19 162:25 | 106:6,11 | 183:3,7,18 |
| 41:2,3 57:13 | 166:24 167:5 | 132:15 145:12 | 185:25 222:15 |
| 57:23 64:1 | 199:16 223:25 | 145:14 147:18 | 229:19 261:14 |
| 75:17 86:1,7 | 247:19 281:21 | 163:7 174:4,9 | variables 35:11 |
| 99:23 106:22 | 289:2 300:12 | **v** | 128:20 |
| 111:10 128:22 | 301:10,17,20 | v 1:9 28:11 | variation 13:22 |
| 129:5,11 130:8 | 302:1 309:1,7 | 318:4 319:1 | 178:18 |
| 143:19 157:15 | 318:20 | 320:1 | variations |
| 161:25 162:4 | useful 14:7,9 | vague 37:18 | 204:22 |
| 176:14 188:2 | 31:2 42:10 | 67:19 195:9 | varies 298:19 |
| 202:8 205:17 | 44:7 61:17,19 | 196:2 212:15 | various 13:14 |
| 207:11 220:10 | 109:16 217:1 | 212:22 302:4 | 53:7 54:25 |
| 220:20 221:15 | 221:3,11 | valid 153:2 | 55:15 56:15 |
| 222:4,24 | users 4:17 21:7 | 163:22 167:25 | 59:14 64:10 |
| 233:11 237:6 | 38:14 65:24 | 189:13 213:6 | 80:24 244:5 |
| 247:13 260:17 | uses 54:11 76:2 | 287:4,7 | 286:11 306:8 |
| 262:8 266:8 | 119:17 130:11 | validation | vary 90:21 |
| 271:8,13 | 181:25 | 113:3 | vast 89:18 |
| 284:23 292:6 | using 12:17 | validity 60:1,17 | 129:23 168:14 |
| 301:19,22 | 18:24 20:10 | 60:25 61:10,16 | 209:19 210:7 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

**[vast - way]**

210:22 251:10
299:3
**verbal**   210:3
**verbally**   10:13
**verbatim**
317:15
**verify**   318:9
**veritext**   2:6
8:17 318:14,23
**veritext.com.**
318:15
**version**   28:3
83:23 85:25
139:1 150:7
266:3
**versus**   120:3
124:3,6 154:21
154:22 204:6
205:14 242:15
304:18 311:9
**vice**   205:14
**victimization**
311:8
**victims**   289:17
**video**   2:6 8:17
316:2
**videoconfere...**
2:5 8:14
**videographer**
3:16 8:3 9:4
27:21,24 28:21
29:1 52:15,19
100:2,6 139:11
139:15 191:15
191:18 236:3,6

266:25 267:3
299:13,16
315:24 316:1
**videotaped**
1:19 2:1,3 8:8
8:13,14
**view**   15:12
79:25 80:13
144:18 163:13
183:16 238:7
275:9 276:1
310:20
**views**   77:13
105:1 310:9
**violence**   91:4
289:10 292:23
**virtual**   165:6
**visible**   275:12
**visual**   195:23
210:2
**voiced**   275:25
**voted**   279:21
**vries**   5:17
176:23 177:18
179:10 180:23
181:17 186:2
192:9,20 216:3
217:2 218:8,15
225:23 235:11
243:22 251:14
251:14
**vs**   8:10 11:22
**vulnerable**
275:22

**w**

**wa**   317:23
**wait**   29:20,25
122:11 166:17
271:12
**waiting**   28:5,14
101:24 102:9
102:13 137:10
177:5,9 266:13
266:16
**waits**   29:21
**want**   22:19
47:11 49:11,12
52:25 61:22
80:6 87:4,5
88:12 89:23
90:10,13,14,15
90:16,25 91:1
91:2,3,7 97:25
98:23 99:22,24
100:13 103:17
106:2,8 107:18
112:5 117:16
128:17 130:12
130:19 133:6
138:2,22 139:2
146:6,8 150:23
151:10 156:18
161:1 168:18
175:8 186:13
190:7,13
191:11 212:22
217:18,19,24
236:1 239:25
240:19 260:11

266:20 267:14
274:17,19,19
276:23 288:14
291:15 295:3
305:9 309:19
313:17
**wanted**   52:1
104:18 125:23
125:25 134:16
157:15 171:17
183:7 239:8
269:1 299:20
**wanting**   96:2
263:2 275:4,9
275:11
**wants**   97:3,16
309:22
**washington**   2:8
2:22 3:10
**watch**   278:24
**watched**   99:14
**watching**
278:13
**way**   14:15 20:7
25:22,23 27:4
27:13 31:10
40:4 44:25
45:1 46:9
51:18 59:18
65:20 75:7
76:12 77:22
81:14 90:18
92:22 93:10
99:24 103:13
104:18,19

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

Jack Turban , M.D., MHS October 16, 2023

**[way - witness]**

105:8 108:22
110:7 114:3
121:6 127:17
128:6 129:4
133:25 134:4
141:25 146:11
153:15,25
157:22 163:3
168:21 169:17
169:20 180:3
180:17 181:7
182:16 188:4
189:12 198:12
201:17 209:24
223:8,24
250:17 264:1,7
265:10 267:20
270:22 271:7
275:11,19
280:11 292:12
293:17 304:6
304:18 305:4
307:8 309:1,7
**ways** 14:19
26:16 33:12
45:11,12 58:24
77:5 78:5
90:11 91:9
95:24 105:10
142:21 176:13
195:13 210:5
220:1 274:16
280:12
**we've** 53:12
91:25 99:21

108:17 191:10
260:17 281:1
303:8
**weaknesses**
18:11 49:15
221:5 261:6
**weaponize**
280:4
**wear** 171:17
172:15
**web** 56:8 234:3
**webberley**
117:13 118:2,4
**website** 102:21
274:4
**websites** 306:9
**weekend** 11:15
**weeks** 74:10
**weighed** 192:4
**weighing**
233:16 240:14
**weiss** 71:18
**welfare** 237:11
240:22 247:12
**went** 30:1
56:18 63:20
65:17 81:18
223:11 262:15
292:6 301:12
303:12
**wiepjes** 244:7
306:22
**window** 130:16
211:17

**wise** 248:4
**wish** 277:9
**withhold** 160:6
**witness** 9:5,20
11:6 14:5 17:2
18:18 19:16
20:3,6,9 23:5
25:17 27:3
28:10,19 32:10
35:10 36:1,15
36:20 41:7
43:23 49:5
51:5 54:22
55:12 57:23
59:16 60:11,20
61:5 62:12,17
64:16 65:7
66:12,19 67:2
67:14 68:6,14
71:9,11 74:8
78:3 79:20
80:18 81:4
82:10,21 83:7
85:22 86:19
87:25 92:6,20
93:20 97:8
99:12 100:23
101:5,13
102:17 104:1
106:5 107:1
109:14 110:1
111:2,20
113:18 114:20
116:6 118:17
121:14 122:4

123:15,20
124:12 125:8
128:5 129:11
130:22 133:16
133:25 134:23
141:9,14 143:1
144:4,23 145:1
145:12,20
152:22 154:19
155:21 156:12
156:17,21
160:24 163:16
164:14 167:22
168:17 169:4,9
169:14,22
170:12,24
172:3 173:13
173:21 174:20
175:4,19,24
176:20 181:3
181:12,24
182:15,25
183:5,20
185:13 186:13
186:21 187:11
188:23 190:6
190:19 191:5
194:5 197:5,12
197:22 198:8
198:17 199:2
199:14 200:15
201:4,15
202:23 209:16
211:2 212:3,25
213:9 215:10

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[witness - yeah]**

219:23 220:14
222:8 223:2,19
223:24 228:6
229:21 232:3
233:10 237:25
238:18 239:2
241:20 242:21
246:1,8,19
249:7,24 250:9
251:9 252:3
253:4 254:15
255:6 256:7,15
256:21 263:20
265:16 272:19
275:3 276:10
276:18 278:8
278:19 279:12
280:3 281:11
282:21 283:6
283:22 284:2
284:10 286:16
286:24 287:21
288:6 290:10
290:21 292:10
293:23 296:11
296:18 298:10
298:19 300:1
304:15 305:9
305:18 307:14
308:9,24 310:4
310:25 313:4
317:8,18 318:8
318:10,12,19
**witnesses**   69:11

**woman's**   104:9
**women**   105:1
**wonder**   206:8
   234:18
**wondered**
   96:10
**word**   24:4 53:2
   161:22 162:12
   162:14,19,19
   185:3 245:14
   262:8 293:3
   295:20
**wording**
   301:24 303:3
**words**   19:24
   75:9 107:19,21
   147:13 203:14
   227:13 246:9
   301:5
**work**   71:11
   91:22 97:20
   98:8,24 109:9
   113:1,2 115:6
   122:18,21
   231:2 258:3
   264:5 285:11
   287:14 302:12
   311:1 312:6
**worked**   70:14
   122:24 264:4
   281:25 288:7
   303:21
**worker**   120:4
   257:6

**working**   14:16
   20:20 115:4
   141:24 282:7
   298:15
**works**   52:14
   90:19 114:11
   117:23 271:24
**world**   142:22
   173:22 196:23
   289:8 292:22
**worries**   73:23
   117:2
**worse**   48:23,24
   83:17 147:2,25
**worsening**
   83:11 101:25
   122:17
**worsens**   83:9
**worth**   31:3
   159:10
**worthless**
   190:17,20
**wow**   210:13
**wpath**   83:22
   84:18 123:18
   238:7,15
   247:20 249:12
   249:20 252:14
   253:9
**write**   264:23
   301:19
**writing**   16:22
   40:17,20 237:3
**written**   15:13
   17:24 50:3

240:10 287:1
   297:8,17
**wrong**   24:5
   39:20 53:13
   55:7 137:16
   251:4
**wrote**   76:9
   158:19 241:20
   258:20 294:17
**wu**   2:21 9:2

| x |
|---|

**x**   4:1,2,10 5:1
   6:1 7:1 274:5

| y |
|---|

**yale**   20:17,23
   257:13
**yeah**   20:3
   22:10 27:20
   32:10 41:7
   52:12,14 56:4
   61:5 66:2 71:1
   78:3 83:16
   95:8 103:4
   111:20 115:21
   119:3 120:25
   121:14 124:16
   124:16 139:4,9
   154:1,13
   157:11 161:6
   166:2,12,17,22
   169:14 170:15
   179:9 181:12
   191:13 203:7
   208:23 229:2

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

**[yeah - zoom]**

| | |
|---|---|
| 236:2 266:22 | 175:10,13,25 |
| 293:17 301:23 | 176:2 195:20 |
| 302:25 315:16 | 196:6 198:20 |
| 315:25 | 206:4 209:6 |
| **year**  135:9,12 | 242:25 243:7 |
| 135:17 164:19 | 243:13,24 |
| 189:2 206:17 | 245:3,21 246:5 |
| 227:19 231:2 | 275:21,25 |
| 264:14 267:18 | 278:11 279:2 |
| 270:8,16 | 279:19 282:2,7 |
| **year's**  270:24 | 282:12 283:11 |
| **years**  13:1 | 283:17 285:13 |
| 17:19 18:5 | 285:21 286:2 |
| 70:17 110:4 | 286:12,19 |
| 135:16 153:12 | 287:23 309:21 |
| 153:21,21 | 311:18 312:7 |
| 154:16 158:5 | 312:13,17 |
| 159:20,21 | **younger**  126:14 |
| 160:7 161:13 | 126:17 133:18 |
| 164:22 174:24 | 134:1 |
| 175:11,25 | **youth**  5:21 6:15 |
| 176:2 203:17 | 117:24 125:3 |
| 205:11 222:10 | 126:12 132:16 |
| 226:7 227:19 | 204:18,20,21 |
| 228:2,9,10,10 | 205:20,22 |
| 228:14,18 | 242:14 261:2 |
| 286:25 307:11 | 279:15 285:14 |
| **yelled**  174:4 | 311:9,10 |
| **yep**  208:21 | **z** |
| **york**  2:18 | **zoom**  2:4 8:14 |
| **young**  77:8 | |
| 91:21 159:25 | |
| 166:21 171:18 | |
| 173:22,25 | |
| 174:2,22 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

Idaho Rules of Civil
Procedure

Rule
30

(e) Review by the Witness; Changes.

(1) Unless waived by the deponent and the
parties, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which (A)
to review the transcript or recording; and
(B) if there are changes in form or
substance, to sign a statement listing the
changes and the reasons for making them. (2)
Changes indicated in the Officer's
Certificate. The officer must note in
the certificate prescribed by Rule 30
(f)(1) whether a review was requested
and, if so, must attach any changes the
deponent makes during the 30-day period.
(3) Witness Failure to Sign. (A) In
General, If the deposition is not signed
by the witness within the 30-day period,
the officer must sign it and state on
the record the fact of the waiver of
signature, or of the illness or absence

of the witness or the fact of the
refusal to sign the deposition together
with any reason given for not signing.
(B)  Use of Unsigned Deposition.  The
deposition may be used as if it were
signed, unless pursuant to Rule 32
(d)(4) the court determines that the
reasons given for the refusal to sign
require rejection of the deposition in
whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.